# In The Matter Of:

*Crystal Trawick v.*
*Carmike Cinemas, Inc.*

---

*Crystal Wing Trawick*
*August 17, 2017*

---

*Thompson Reporting Services, Inc.*
*Georgia Certified Court Reporters*
*P.O. Box 792*
*Powder Springs, Georgia  30127-0792*
*(678) 483-0600*



Original File 081717CT.txt
Min-U-Script® with Word Index

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF GEORGIA
2                  COLUMBUS DIVISION

3    _____

4    CRYSTAL TRAWICK,

5                    Plaintiff,          CIVIL ACTION

6             vs.                        FILE NO.

7    CARMIKE CINEMAS, INC.,              4:16-CV-00380-CDL

8                  Defendant.
     _____

9

10

11                VIDEOTAPE DEPOSITION OF

12               CRYSTAL WING TRAWICK

13             Thursday, August 17, 2017

14                    9:09 a.m.

15

16              1250 Lenox Towers North
                3400 Peachtree Road
17                 Atlanta, Georgia

18           Linda C. Ruggeri, CCR-A-261

19

20

21           Thompson Reporting Services, Inc.
             Georgia Certified Court Reporters
22                    P.O. Box 792
              Powder Springs, Georgia  30127
23           www.thompsonreportingservices.com
                    (678) 483-0600
24

25

1                    APPEARANCES OF COUNSEL

2

3    On behalf of the Plaintiff:

4          MARY A. PREBULA, Esq.
           Prebula & Associates
5          1250 Lenox Towers North
           3400 Peachtree Road, N.E.
6          Atlanta, Georgia 30326
           770-495-9090

7

8    On behalf of the Defendant:

9          RICHARD W. GERAKITIS, Esq.
           REBECCA H. SILK, Esq.
10         Troutman Sanders
           5200 Bank of America Plaza
11         600 Peachtree Street, N.E.
           Atlanta, Georgia 30308-2216
12         404-885-3000

13

     Also Present:
14
           Ms. Caroline L. Harwell
15

16   Videographer:

17         Mr. Justin Stewart

18

19                              - - -

20

21

22

23

24

25

1                    TABLE OF CONTENTS

2

3              EXAMINATION                      PAGE

4

5   Cross-Examination by Mr. Gerakitis             10

6   Direct Examination by Ms. Prebula             351

7

8                      - - -

9

10  DEFENDANT'S
      EXHIBIT            DESCRIPTION            PAGE
11

12    Exhibit 1    Letter - June 7, 2015          17
                   McMillon to To Whom It May Concern
13
      Exhibit 2    Letter - June 7, 2015          23
14                 Trawick to Member

15    Exhibit 3    Letter - June 7, 2015          26
                   Trawick to Member
16
      Exhibit 4    W-9 for Quadrille Club         38
17                 June 12, 2015

18    Exhibit 5    The Quadrille 2010 Constitution  47
                   and Bylaws
19
      Exhibit 6    e-mail - July 7, 2015          64
20                 Trawick to Trawick
                   Subject:  Reports
21
      Exhibit 7    e-mail - September 28, 2015    65
22                 Trawick to Trawick
                   Subject:  Work
23
      Exhibit 8    Letter - September 12, 2014    66
24                 To Prospective Member

25

| DEFENDANT'S EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 9 | Photograph | 70 |
| Exhibit 10 | e-mail Chain dated October 6, 2015 | 72 |
| Exhibit 11 | Printout of Sponsorship Requests | 73 |
| Exhibit 12 | Letter - August 15, 2014<br>Trawick to Member | 75 |
| Exhibit 13 | Letter - August 15, 2014<br>Trawick to Ladies | 77 |
| Exhibit 14 | Ladies Night Invitation | 79 |
| Exhibit 15 | e-mail Chain dated<br>September 30, 2014 | 80 |
| Exhibit 16 | Letter - December 30, 2014<br>Trawick to To Whom It May Concern | 82 |
| Exhibit 17 | e-mail - June 11, 2015<br>Trawick to crystalawing@gmail.com | 87 |
| Exhibit 18 | Letter - June 11, 2015<br>To Board | 89 |
| Exhibit 19 | Letter - June 11, 2015<br>To Board | 92 |
| Exhibit 20 | e-mail - June 12, 2015<br>Trawick to crystalawing@gmail.com | 95 |
| Exhibit 21 | e-mail Chain dated June 10, 2015 | 97 |
| Exhibit 22 | Save the Date Card<br>Quadrille White Party | 98 |
| Exhibit 23 | Quadrille White Party Invitation | 99 |
| Exhibit 24 | e-mail Chain dated<br>October 26, 2015 | 100 |
| Exhibit 25 | e-mail - October 26, 2015<br>Trawick to Mahogany and Therrien | 106 |

| DEFENDANT'S EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 26 | e-mail - September 8, 2015<br>Trawick to crystalawing@gmail.com<br>Subject: QD 2016 List | 113 |
| Exhibit 27 | Spreadsheet | 114 |
| Exhibit 28 | Spreadsheet entitled "Quadrille<br>Membership Directory 2015-2016" | 117 |
| Exhibit 29 | Quadrille Spreadsheet | 123 |
| Exhibit 30 | 2014-15 Quadrille Spreadsheet | 129 |
| Exhibit 31 | Spreadsheet of Donation Records | 137 |
| Exhibit 32 | AVLF Flyer for PurSHOEing Justice | 148 |
| Exhibit 33 | e-mail Chain Regarding<br>Sinfonia Donation | 151 |
| Exhibit 34 | Memo - November 6, 2015<br>Powell to Hare and Friedel | 152 |
| Exhibit 35 | Marketing Communications Associate<br>Job Description | 168 |
| Exhibit 36 | Program Updates<br>November 9, 2015 | 175 |
| Exhibit 37 | Program Updates<br>November 16, 2015 | 176 |
| Exhibit 38 | Troy University Transcript | 191 |
| Exhibit 39 | Resume - Crystal W. Trawick | 198 |
| Exhibit 40 | Resume - Crystal W. Trawick | 201 |
| Exhibit 41 | Resume - Crystal W. Trawick | 204 |
| Exhibit 42 | Resume - Crystal W. Trawick | 206 |
| Exhibit 43 | Complaint<br>Trawick v. Carmike Cinemas | 208 |

| DEFENDANT'S EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 44 | Calendar<br>October 2012 through January 2015 | 295 |
| Exhibit 45 | Document entitled "Grievances Against Carmike" | 305 |
| Exhibit 46 | 2015 Bonus Structure for Crystal Trawick | 310 |
| Exhibit 47 | e-mail - January 6, 2015<br>Van Noy to Lucas, Greer, Lehman,<br>Pflegl, Trawick, and Lundin | 310 |
| Exhibit 48 | Document entitled<br>"2014 Department Overview" | 311 |
| Exhibit 49 | e-mail Chain dated<br>February 16, 2015<br>Subject:  New Marketing Personnel | 312 |
| Exhibit 50 | Letter - July 31, 2017<br>Prebula to Gerakitis | 315 |
| Exhibit 51 | e-mail - March 9, 2015<br>Passman to Williams | 316 |
| Exhibit 52 | e-mail - April 6, 2015<br>Van Noy to Trawick | 317 |
| Exhibit 53 | Letter - November 24, 2015<br>Prebula to Ellis | 319 |
| Exhibit 54 | Columbus-Ledger-Enquirer Article<br>December 18, 2017 | 320 |
| Exhibit 55 | Letter - December 24, 2015<br>Prebula to Ellis | 321 |
| Exhibit 56 | EEOC Charge of Discrimination | 324 |
| Exhibit 57 | EEOC Dismissal and Notice of Rights | 335 |
| Exhibit 58 | EEOC Intake Questionnaire | 335 |

7

| DEFENDANT'S EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 59 | Letter - August 2, 2016 Prebula to Vanairsdale | 337 |
| Exhibit 60 | Document Listing Marketing Projects Manager Responsibilities and Accountabilities | 340 |
| Exhibit 61 | Document entitled "Current Occurrences" | 340 |
| Exhibit 62 | Document entitled "2014 Department Overview" | 340 |
| Exhibit 63 | Plaintiff's Rule 26(a)(1) Initial Disclosures | 340 |
| Exhibit 64 | Plaintiff's First Supplemental Response to Defendant Carmike Cinemas, Inc.'s First Request for Production of Documents | 348 |

(Original Exhibits 1 through 64 except 38 have been attached to the original transcript.  Exhibit 38 has been retained by Mr. Gerakitis.)

1              (Reporter disclosure made pursuant to

2        Article 10.B of the Rules and Regulations of the

3        Board of Court Reporting of the Judicial Council

4        of Georgia.)

5              THE VIDEOGRAPHER:  We are now on the video

6        record; and this will be the deposition of

7        Crystal Trawick, being taken in the case of

8        Trawick versus Carmike Cinemas, Inc.  This is

9        being held in the United States District Court

10       for the Middle District of Georgia, Columbus

11       Division.  Today's date is Thursday, August 17,

12       2017; and the time is 9:09 a.m.  We are taking

13       this deposition at Prebula & Associates on

14       Peachtree Road in Atlanta, Georgia, 3400

15       Peachtree Road.

16              And would the attorneys present please

17       introduce themselves after which our witness will

18       be sworn.

19              MS. PREBULA:  Mary Prebula for the

20       plaintiff, and I have Caroline Harwell here for

21       the plaintiff as well.

22              MR. GERAKITIS:  And Richard Gerakitis and

23       Rebecca Silk for Defendant Carmike Cinemas.

24              (The witness was duly sworn.)

25              MR. GERAKITIS:  This will be the

1    deposition of Crystal Wing Trawick, taken by

2    defendant, for all purposes authorized by the

3    Federal Rules of Civil Procedure.  This

4    deposition is being taken in accordance with

5    agreement of counsel for Ms. Trawick and by

6    notice of deposition.  It's proposed that all

7    formalities as to notice of the time, place, and

8    filing of the transcript of this deposition be

9    waived; and it's further provided that all

10   objections, except as to the form of the

11   question, are reserved.

12         In the event the deponent wishes to read

13   and sign her deposition transcript, she can do so

14   before any notary public, not necessarily the

15   notary who takes down or transcribes it.

16         Are those stipulations agreeable?

17         MS. PREBULA:  She will read and sign.

18   Generally we'll agree to reserve, except as to

19   form of the question, unless I think it's

20   absolutely necessary to object; and I obviously

21   will make attorney-client privilege or work

22   product objections.

23         MR. GERAKITIS:  We'll cover it under the

24   rules.

25   / / /

```
 1              CRYSTAL WING TRAWICK,
 2   having been first duly sworn, was examined and
 3   testified as follows:
 4                   CROSS-EXAMINATION
 5   BY MR. GERAKITIS:
 6       Q.     Ms. Trawick, I want to make sure you give
 7   a response to my questions that can be heard and
 8   understood by the court reporter.  It's difficult to
 9   accurately take down a nod or shake of the head even
10   though you're on video.
11       A.     Sure.
12       Q.     So if I ask you if that's a yes or is that
13   a no, I'm asking you that you use an understood verbal
14   response that can be accurately recorded by our court
15   reporter.  Then if you at any point don't understand a
16   question that I've asked, just tell me you don't
17   understand it; and I will repeat it or rephrase it.
18   And unless you tell me you don't understand the
19   question, I'm going to assume that you understand the
20   question and the answer you give to the question I've
21   asked is the answer you intend to give.  All
22   understood?
23       A.     Yes.
24       Q.     Good.  Let me ask the entire question
25   before you answer because I talk sort of slowly; and
```

```
 1   I'll do my best not to talk while you're answering the
 2   questions and just ask you to afford me the same by
 3   not answering until I finish the question.  Good?
 4        A.    Yes.
 5        Q.    If you become tired, need to take a break,
 6   let's do it.  The only thing I ask is, if there's a
 7   question pending, answer the question and then we'll
 8   take the break.  Understood?
 9        A.    Yes.
10        Q.    Tell us your full name.
11        A.    Crystal Wing Trawick.
12        Q.    And what is your husband's name?
13        A.    Walter Johnson Trawick, II --  Jr., I'm
14   sorry.
15        Q.    Do y'all have any children?
16        A.    Yes.
17        Q.    How many?
18        A.    One.
19        Q.    How old?
20        A.    Three.
21        Q.    And what's your residence address?
22        A.    REDACTED Cherokee Avenue.
23        Q.    In Columbus, Georgia?
24        A.    Columbus, Georgia.
25        Q.    So    REDACTED Cherokee Avenue has got to be
```

1    about a sand wedge away from Columbus High School?

2        A.      Two doors down.

3        Q.      Okay.  Any previous marriages?

4        A.      Yes.

5        Q.      When were you previously married?

6        A.      More than 12 years ago.  I don't remember.

7        Q.      More than 12 years ago.  This is 2017.  So

8    it's pre-2005?

9        A.      Yeah.

10       Q.      Yes?

11       A.      Yes.  I'm sorry.

12       Q.      And if it's a no, tell me it's no.

13       A.      Yeah.

14       Q.      I just want to make sure.

15       A.      No.  I just remember I've been with my

16   current husband, dating and then married, since 2004.

17   So it would have been maybe before that.  I'm not sure

18   of the year, I'm sorry, start and finish.

19       Q.      And what was your previous spouse's name?

20       A.      Seth Snow.

21       Q.      And where does Seth Snow live?

22       A.      The last I know, Montgomery, Alabama.

23       Q.      Did you divorce Mr. Snow?

24       A.      I did.

25       Q.      And what county was your divorce?

1      A.      Muscogee.

2      Q.      So you were living in Columbus at the time

3  when you were married to Mr. Snow?

4      A.      Yes.

5      Q.      Were you married in Columbus?

6      A.      Yes.

7      Q.      And do you recall how long you were

8  married to Mr. Snow?

9      A.      Roughly three and a half years, maybe.

10     Q.      Do you remember how old you were when you

11  married?

12     A.      I believe 22.

13     Q.      And your date of birth is May 21, 1979?

14             MS. PREBULA:  I'm going to ask that that

15        not be on the record for privacy reasons, so if

16        you'll please strike that.

17     Q.      (By Mr. Gerakitis)  Let me ask it this

18  way:  Are you 38 years old?

19     A.      Yes.

20     Q.      Do you have any family members living in

21  the Columbus, Georgia, area on the Wing side of the

22  family?

23     A.      Not in Columbus, no.

24     Q.      How about your sister, Lisa, where is she

25  living?

```
 1        A.      I'm not sure of her whereabouts.

 2        Q.      Any other sisters besides Lisa?

 3        A.      No.

 4        Q.      So Lisa is your only sibling?

 5        A.      She's my only full-blooded sibling.

 6        Q.      When is the last time you were in contact

 7   with Lisa?

 8        A.      She left a note on my doorstep during my

 9   son's birthday this year with no contact information

10   wishing us well.

11        Q.      And that would have been in May of this

12   year?

13        A.      Uh-huh.

14        Q.      Did she leave it after seeing you or

15   before seeing you?

16        A.      I never saw her.

17        Q.      And so the Trawick/Hatcher side of the

18   family, obviously, there are many living in Columbus.

19   Whether you go back to the Bickerstaffs or whomever,

20   there's quite a few, correct?

21        A.      Yes.

22        Q.      I'm going to ask you some questions

23   related to your computer usage.  And I'll probably

24   have some follow-up as we go through it, but I just

25   want to make sure of some things.  You have used an
```

1    Apple MacBook since 2013, correct?

2         A.    Yes.  Roughly, yes.

3         Q.    Do you know when you acquired the MacBook?

4         A.    No, sir; no.

5         Q.    Do you know how you acquired the MacBook?

6         A.    I was given it by the company for use.

7         Q.    Did you ever use the MacBook for work at

8    Children's Network?

9         A.    Yes.

10        Q.    Did you ever use the MacBook for work at

11   Fun Academy?

12        A.    Yes.

13        Q.    You've produced to us an invoice for an SD

14   card, which is short for storage device.  Is it your

15   understanding that a storage device is a computer hard

16   drive?

17        A.    I don't have any understanding of a

18   computer.

19        Q.    Do you have any other invoice other than

20   the invoice for the SD card from Graphicom?

21        A.    No.

22        Q.    Do you remember how much you paid

23   Graphicom for any repair work done in November of 2016

24   on the MacBook?

25        A.    No.

16

1     Q.     Was your husband involved in getting the

2   MacBook repaired?

3     A.     Yes.

4     Q.     Has Junior League Follies materials been

5   on the MacBook at any point in time?

6     A.     Yes.

7     Q.     Has Quadrille's data been on the MacBook

8   at any point in time?

9     A.     Yes.

10     Q.     And since you were given the MacBook by

11   Carmike, you, I would assume, had Carmike business

12   records on the MacBook at points in time both when you

13   were employed and when you left in November of 2015?

14     A.     Yes.

15     Q.     You were the president of The Quadrille on

16   June 7 of 2015, correct?

17     A.     Yes -- wait.  '17?  Did you say '17?

18     Q.     No.  2015.

19     A.     2015?

20     Q.     Yes.

21     A.     The year was split.  So it would have been

22   half of '14 and half of '15, so not for the entire

23   year of '15 would I have been president.

24     Q.     Okay.  Let me make sure I'm clear on this.

25     A.     Okay.

1      Q.     My question was:  You were the president

2   of The Quadrille on January -- excuse me.  Let me go

3   back.

4             You were the president of the Quadrille

5   Club first on June 7 of 2015, correct?

6      A.     I'm sorry.  Can you -- I don't --

7      Q.     Sure.

8      A.     I'm trying to get the timeline in my head,

9   but I don't understand the question.  I'm sorry.

10      Q.     Sure.  I was trying to work backwards, but

11   I'll start here.

12      A.     Sure.

13      Q.     You were the president of the Quadrille

14   Club on June 7, 2015, correct?

15      A.     Yes.  I'm sorry.

16             (Defendant's Exhibit 1 was marked for

17          identification.)

18      Q.     (By Mr. Gerakitis)  Let me hand you what's

19   been marked as Defendant's Exhibit 1.  It appears to

20   be a letter dated June 7, 2015, on a Quadrille

21   letterhead, correct?

22      A.     Yes.  I mean, it's --

23      Q.     So you got Defendant's Exhibit 1 from

24   Jenny McMillen, correct?

25      A.     No.

```
 1        Q.     Who did you get Defendant's Exhibit 1
 2   from?
 3        A.     I created this document for use by Jenny
 4   to solicit.
 5        Q.     So did you prepare it and send it to
 6   Jenny?
 7        A.     Uh-huh.
 8        Q.     Yes?
 9        A.     Yes.  I'm sorry.
10        Q.     Do you know whether Jenny reviewed it?
11        A.     No.
12        Q.     Jenny's name is misspelled.  Do you see
13   that?
14        A.     I did.
15        Q.     You did?
16        A.     Oh, here?
17        Q.     Yes, on Defendant's Exhibit 1.  It's
18   misspelled M-c-M-i-l-l-o-n.  It's M-c-M-i-l-l-e-n,
19   correct?
20        A.     I guess so.  I'm sorry.  I don't --
21        Q.     When did The Quadrille board approve
22   asking for sponsorships?
23        A.     I don't remember.
24        Q.     When did The Quadrille board get asked to
25   approve requesting sponsorships?
```

1        A.      I was on the board.

2        Q.      My question was --

3        A.      I'm sorry.

4        Q.      -- when did The Quadrille board get asked

5    to approve requesting sponsorships?

6        A.      I don't remember.

7        Q.      How did The Quadrille board get asked to

8    approve requesting sponsorships?

9        A.      I proposed to the past president -- and I

10   don't remember who else was in attendance -- that we

11   solicit sponsorships for Quadrille, not just that year

12   but to move forward, that it was in the best interest

13   of the organization.

14       Q.      The past president was Jenny McMillen at

15   the time that you said that you proposed soliciting

16   sponsorships?

17       A.      Uh-huh.

18       Q.      Yes?

19       A.      Yes.  Sorry.

20       Q.      Who else was in attendance besides Jenny

21   McMillen, the past president, when you made the

22   suggestion?

23       A.      I don't remember.

24       Q.      Where was this meeting that you made the

25   suggestion?

1          A.      At my house.

2          Q.      When was the suggestion made at your

3    house?

4          A.      I don't remember.

5          Q.      Was it announced before the meeting that

6    you were going to be discussing sponsorships?

7          A.      No.

8          Q.      How many board members were present when

9    you had this meeting at your house to discuss

10   sponsorships?

11              MS. PREBULA:  Objection, asked and

12         answered twice.

13              MR. GERAKITIS:  The objection is noted.

14         Q.      (By Mr. Gerakitis)  You can answer.

15         A.      I don't remember.

16         Q.      Heather Garrett was a board member there

17   then, wasn't she?

18         A.      Yes.

19         Q.      Jessica Tillery was The Quadrille

20   secretary on June 7, 2015.  Do you remember if either

21   of them were present?

22         A.      I remember they were not.

23         Q.      Amy Bryan was The Quadrille's treasurer on

24   June 7, 2015, correct?

25         A.      Correct.

1     Q.     I take it she wasn't present for the

2   meeting when you were suggesting sponsorships?

3     A.     No, she was not.

4     Q.     This Defendant's Exhibit 1 says:  "Warmest

5   Regards, 2014-2015 Quadrille Board and Membership."

6   Did you announce to the membership that you would be

7   requesting sponsorships?

8     A.     No.

9     Q.     Did you receive anything from membership

10  approving asking for sponsorships?

11    A.     No.

12    Q.     So was Defendant's Exhibit 1 Jenny

13  McMillen's idea or your idea?

14    A.     It was my idea.

15    Q.     Did you note a vote of the persons present

16  to ask for sponsorships?

17    A.     No.

18    Q.     In Defendant's Exhibit 1 it says that the

19  Quadrille Club continues to grow.  Do you see that in

20  the first line?

21    A.     I'm sorry.  What?

22    Q.     In the letter Defendant's Exhibit 1 --

23    A.     Uh-huh.

24    Q.     -- it says the Quadrille Club continues to

25  grow in the first line.  Do you see that?

1      A.      Yes.

2      Q.      Do you know how many members were in the

3  Quadrille Club in 2010 about the time you joined?

4      A.      A hundred, roughly.

5      Q.      Do you know how many Quadrille Club

6  members there were in June of 2015?

7      A.      I would be guessing.  I would be guessing

8  if I respond to that.

9      Q.      You were the president --

10      A.      Sure.

11      Q.      -- in 2015?

12      A.      Sure.

13      Q.      You kept the records of members, correct?

14      A.      I mean, I saw them, yes.

15      Q.      Well, you kept them physically on your

16  MacBook, didn't you?

17      A.      Yes.

18      Q.      So you would have had and produced at

19  least spreadsheets of members showing who had paid

20  dues and who hadn't, correct?

21      A.      Uh-huh; yes.

22      Q.      Was the Quadrille Club smaller in 2015

23  than it was in 2010 or smaller?

24      A.      It was smaller than 2010.  I do remember

25  that.

1      Q.     Did Jenny McMillen make any edits to

2   Defendant's Exhibit 1 after you proposed it to her?

3      A.     I don't know.

4      Q.     Did you send it to her by e-mail?

5      A.     I believe so.

6             (Defendant's Exhibit 2 was marked for

7      identification.)

8      Q.     (By Mr. Gerakitis)  Let me hand you what's

9   been marked as Defendant's Exhibit 2.  This appears to

10  be a letter dated June 7, 2015, on Quadrille

11  letterhead.  Is that what Defendant's Exhibit 2 is?

12     A.     What's the question?  I'm sorry.

13     Q.     This appears to be a letter dated June 7,

14  2015, on Quadrille letterhead.  Is that what

15  Defendant's Exhibit 2 is?

16     A.     Yes.

17     Q.     Did you prepare Defendant's Exhibit 2?

18     A.     Yes.

19     Q.     Jenny McMillen did not prepare it, nor did

20  anyone else besides you?

21     A.     I'm sorry?  Was that a yes or a no

22  question?

23     Q.     Yes.  The question is:  Did anyone besides

24  you prepare Defendant's Exhibit 2?

25     A.     No.

1        Q.      So you prepared this the same day you

2    prepared Defendant's Exhibit 1?  Defendant's Exhibit 2

3    was prepared that very same day, correct?

4        A.      It appears to be.

5        Q.      Defendant's Exhibit 2, you said:  "I hope

6    you will accept our sincerest apologies regarding this

7    year's event calendar that was not fulfilled as we

8    expected."  Do you see that?

9        A.      I do.

10       Q.      Does that mean that you had fewer parties

11   that year?

12       A.      That means we didn't honor the original

13   schedule.  We had set out a calendar ahead saying we

14   would have these events throughout the year, and those

15   dates were moved.

16       Q.      You sent out a notice that you were going

17   to have four parties that year, correct?

18       A.      Uh-huh.

19       Q.      Yes?

20       A.      Yes.

21       Q.      And if it's no --

22       A.      I'm sorry.

23       Q.      If it's no, tell me it's no.  But I'm just

24   trying to make sure we have a clear record.

25       A.      I understand.  Sorry.

1      Q.      So the plan was to have four parties for

2   The Quadrille year 2014-2015 while you were president,

3   correct?

4      A.      Correct.

5      Q.      You did not have four parties --

6      A.      No.

7      Q.      -- that year?

8      A.      And to be clear, the years preceding this

9   there were only three parties.  We were aggressive in

10  that schedule that year.  I just --

11     Q.      I'm just trying to --

12     A.      I know.  I understand.  I got it.

13     Q.      -- ask the questions and understand how

14  this was operating.

15     A.      Sure.

16     Q.      Defendant's Exhibit 2 says nothing about

17  soliciting sponsors, correct?

18     A.      Correct.

19     Q.      Defendant's Exhibit 2 says zero about

20  developing skills for young women, correct?

21     A.      Correct.

22     Q.      It says nothing -- Defendant's Exhibit 2

23  says nothing about creating a healthy quality of life?

24     A.      Correct.

25     Q.      Or healthier quality of life, correct?

```
 1        A.      Sure.  Yes.  Sorry.

 2        Q.      It does not say that, does it?

 3        A.      It does not.

 4        Q.      Defendant's Exhibit 2 doesn't say anything

 5   about creating a stronger presence in the workplace,

 6   correct?

 7        A.      Correct.

 8        Q.      Defendant's Exhibit 2 says that you felt

 9   personally responsible for this year's calendar and

10   fully intend to provide the members with the

11   entertainment and social engagement representing

12   Quadrille's legacy through your final event that year,

13   correct?

14        A.      Correct.

15        Q.      That final event that year was the White

16   Party at Columbus Country Club?

17        A.      Yes.

18               (Defendant's Exhibit 3 was marked for

19          identification.)

20        Q.      (By Mr. Gerakitis)  Let me hand you what's

21   been marked as Defendant's Exhibit 3.  This appears to

22   be a letter dated June 7, 2015, on Quadrille

23   letterhead.  Is that what Defendant's Exhibit 3 is?

24        A.      Can you repeat the question?

25        Q.      Defendant's Exhibit 3 appears to be a
```

1    letter dated June 7, 2015, on Quadrille letterhead,

2    correct?

3         A.    Correct.

4         Q.    Did you prepare Defendant's Exhibit 3?

5         A.    Yes.

6         Q.    Did anyone review it before it was

7    prepared other than you?

8         A.    Not that I can recall.

9         Q.    This letter in Defendant's Exhibit 3 and

10   your letter of Defendant's Exhibit 2 were both signed

11   by you, correct?

12        A.    Electronically, yes.

13        Q.    Well, it has your name as if it's a

14   signature, correct?

15        A.    Sure, yes.

16        Q.    You didn't sign Defendant's Exhibit 1,

17   correct?

18        A.    I mean, no.

19        Q.    Your name doesn't appear on Defendant's

20   Exhibit 1, does it?

21        A.    No.

22        Q.    You could have signed Defendant's

23   Exhibit 1; you chose not to, correct?

24        A.    Correct.

25        Q.    Let's look at your board that's listed on

1    Defendant's Exhibit 3.  Ansley Forsberg, did you tell

2    Ansley Forsberg before you prepared and sent to

3    Carmike Cinemas Defendant's Exhibit 1?

4         A.    No.

5         Q.    Did you tell Heather Garrett before you

6    prepared and sent to Carmike Cinemas Defendant's

7    Exhibit 1?

8         A.    No.

9         Q.    Did you tell Leslie Anne Jones before you

10   prepared and sent to Carmike Cinemas Defendant's

11   Exhibit 1?

12        A.    No.

13        Q.    So those three you didn't tell that you

14   were going to send Defendant's Exhibit 1 and you never

15   told them you were going to ask for sponsors, correct?

16        A.    Not that I'm aware of, no.

17        Q.    Let's go to the next three.  Whitney

18   O'Hara, Meg Perkins, and Angela Springer, you didn't

19   tell any of those three ladies that you were going to

20   be submitting a sponsor's request for Carmike, did

21   you?

22        A.    No, I did not.

23        Q.    Palmer Trawick is your sister-in-law?

24        A.    Yes.

25        Q.    That's Johnson's younger sister?

1    A.    Yes.

2    Q.    You didn't tell Palmer Trawick that you

3  were going to be submitting a sponsor's request to

4  Carmike Cinemas, did you?

5    A.    I'm not sure about that because I'm not

6  sure whether or not she was there when we had that

7  discussion with Jenny.  That's -- honestly, I'm not

8  sure.

9    Q.    Mary Allen Tondee?

10   A.    And I'm not sure about her either.

11   Q.    You don't remember whether you mentioned

12  to Mary Allen Tondee that you were going to be

13  soliciting a sponsorship from Carmike?

14   A.    No, because I don't remember whether or

15  not those two were in attendance with me and Jenny.

16  And I don't remember.  I'm sorry, I don't.

17   Q.    In Defendant's Exhibit 3, it reads:  If

18  you've communicated intentions of not returning to

19  Quadrille, we'll permanently remove your membership

20  from the directory.  Is that right?

21   A.    Yes.

22   Q.    Is that according to the bylaws or is that

23  your decision?

24   A.    I don't remember if that was something I

25  copied from a previous letter.  I don't know.

1      Q.     What were the annual receipts for The
2  Quadrille while you were on the board?
3      A.     I don't remember.
4      Q.     What were the annual receipts for The
5  Quadrille while you were president?
6      A.     I don't remember.
7      Q.     In exchange for $4,000 listed in
8  Defendant's Exhibit 1, what did the sponsor receive?
9      A.     The amount is 2,000.
10     Q.     There's a $4,000 platinum sponsor.
11     A.     Oh, I'm sorry.
12     Q.     Do you see that?
13     A.     I do.  I'm sorry.
14     Q.     My question is:  In exchange for the
15  $4,000 platinum sponsorship, what did the sponsor
16  receive?
17     A.     We didn't have a $4,000 level sponsor sign
18  on.
19     Q.     So you had no plan on what someone would
20  get for a $4,000 platinum sponsorship when you --
21     A.     No, I understood -- I'm sorry.
22     Q.     Let me ask the whole question.  When you
23  prepared Defendant's Exhibit 1 and presented it to
24  Carmike Cinemas as a sponsorship, you had not
25  discussed what someone would receive for a $4,000

1   platinum sponsorship, correct?

2          MS. PREBULA:  Objection, assumes facts not

3   in evidence.

4          MR. GERAKITIS:  Objection is noted.

5          THE WITNESS:  I don't remember what the

6   sponsorship levels were.

7   Q.   (By Mr. Gerakitis)  Was it Jenny's idea to

8   have four different sponsorship levels or your idea?

9   A.   It was mine.

10   Q.   What was your idea of what a sponsorship

11   level at platinum would result in for that sponsor?

12   A.   When I created those levels, it would have

13   been based on previous experience in the charity world

14   as to what the marketing value should look like.

15   However, I do not remember what those allocations were

16   for those levels during that time.

17   Q.   What do you recall discussing with Jenny

18   McMillen as to what marketing values should look like

19   for those sponsorship levels?

20   A.   I don't remember and I'm not sure that we

21   discussed the details of each of the levels because

22   that's not an area that she had experience.

23   Q.   Who on your board had experience with

24   sponsorship levels?

25   A.   I probably had the highest.

1      Q.     Amy Bryan didn't?

2      A.     Yes, she would have.  Sorry.

3      Q.     But you didn't discuss it with Amy?

4      A.     No, because she wasn't in attendance.

5      Q.     And you didn't discuss it even outside of

6  a board meeting with Amy Bryan, correct?

7      A.     I don't remember.  I don't know.

8      Q.     Is it I don't remember or you don't know?

9      A.     I don't remember.

10     Q.     It's not in the letter in Defendant's

11  Exhibit 1 what you'd receive for $4,000 as a platinum

12  sponsor, is it?

13     A.     No.

14     Q.     Can you think of any sponsor letters

15  you've received where the details about what you'd

16  receive for a high-level sponsorship would be is

17  omitted?

18     A.     Can you ask the question again?  I'm

19  sorry.

20     Q.     Sure.  Can you think of a single sponsor

21  level or a single letter for sponsorship that would

22  neglect to list what a sponsor would receive for that

23  level of sponsorship?

24           MS. PREBULA:  I'm going to object, assumes

25       facts not in evidence.  You can answer it.

```
 1              THE WITNESS:  Oh, okay.  I received
 2         solicitations on behalf of sponsorships in every
 3         different version, and some of them have not
 4         included levels.  It's our job as a company to
 5         ask those questions before we say yes.
 6         Q.      (By Mr. Gerakitis)  What did you tell
 7    anyone at Carmike they would get for a platinum
 8    sponsor level sponsorship?
 9         A.      I didn't propose the platinum sponsorship
10    level to discuss it with anybody at Carmike.
11         Q.      What did you propose was the level of
12    sponsorship at Carmike that Defendant's Exhibit 1 sets
13    out?
14         A.      The silver sponsor?  I discussed that
15    level with Lisa De La Cruz.
16         Q.      And what did you tell Lisa De La Cruz
17    would be the marketing value out of a $2,000 silver
18    sponsor level?
19         A.      I told her the value was getting involved
20    with this organization because of the women that were
21    members.  That was the value to us.  They're
22    influencers in the community.
23         Q.      What else?
24         A.      That was the -- as far as I recall, the
25    summary.
```

1      Q.      No other detail other than the value was

2   because of the women that were members, their

3   influence in the community?

4              MS. PREBULA:  Objection, ambiguous.

5      Q.      (By Mr. Gerakitis)  You can answer.

6      A.      Okay.  Yes.  I mean, it was important for

7   her to understand what this membership body was made

8   up of and what that would do for us; and Carmike,

9   being involved with this organization, we would be one

10  of the first companies to do it and I thought it was a

11  great connection for us.

12     Q.      Nothing prevented you from signing

13  Defendant's Exhibit 1, did it?

14     A.      No.

15     Q.      You could have signed it?

16     A.      I didn't want to because I didn't want to

17  be responsible for the full-on solicitation program.

18  I needed somebody else to help me on the board.

19     Q.      So who else helped you on the board with

20  these sponsorship letters in Defendant's Exhibit --

21     A.      Just Jenny.

22     Q.      Let me ask the whole question.

23     A.      I'm sorry.

24     Q.      Who else helped you with soliciting

25  sponsors as you did in Defendant's Exhibit 1?

```
 1        A.      Just Jenny.

 2        Q.      Who all did Jenny solicit --

 3        A.      I don't --

 4        Q.      -- besides Carmike?

 5        A.      I don't know.

 6        Q.      Who else besides Carmike did you solicit?

 7        A.      No one.

 8        Q.      Jenny had no involvement in setting the

 9   sponsorship levels, correct?

10        A.      Correct.

11        Q.      And you never sent a sponsor request to

12   anyone other than Carmike?

13        A.      Correct.

14        Q.      You could have sent one to J. Smith

15   Lanier, correct?

16        A.      Correct.

17        Q.      J. Smith Lanier could have gotten a

18   value --

19        A.      Sure.

20        Q.      -- out of participating in The Quadrille,

21   is that your understanding?

22        A.      Sure, yes.

23        Q.      You held back, then, from people in your

24   own family from participating, is that right?

25        A.      Yes.  I didn't have the time.
```

1    Q.    Can you tell me what was exchanged for any

2  level of sponsorship other than the marketing value to

3  your Quadrille or The Quadrille members?

4    A.    I'm sorry.  Say that one more time.

5    Q.    Can you tell me what at all was exchanged

6  for any level of sponsorship you outline in

7  Defendant's Exhibit 1 other than the marketing value

8  to your Quadrille members?

9    A.    There was no other value other than

10  marketing exchanged.

11    Q.    You didn't list who your board members or

12  officers were on Defendant's Exhibit 1, did you?

13    A.    No.

14    Q.    There was certainly room to do that,

15  wasn't there?

16    A.    Yes.

17    Q.    That would have given more information

18  about the influential people who would have been

19  soliciting the sponsorship, correct?

20    A.    Yes.

21    Q.    Let me hand you what's been marked as --

22  well, first let me ask you this:  You learned at some

23  point after submitting Defendant's Exhibit 1 that you

24  needed a W-9 taxpayer identification certification,

25  correct?

1      A.      I'm sorry.  What was the question again?
2  I'm sorry.
3      Q.      Sure.  You learned at some point after
4  submitting Defendant's Exhibit 1 that you needed a W-9
5  taxpayer identification certification, correct?
6      A.      The company requested it, yes.
7      Q.      Well, did you learn that a W-9 was
8  required for Defendant's Exhibit 1 in order to pay the
9  $2,000?
10      A.      I'm not sure I have a yes or no response
11  to that question.  Am I allowed to explain?  Okay.
12  Because I know that anytime the company had a new
13  vendor that we needed to get a W-9.  And so this was a
14  new vendor to receive a paycheck from -- I mean, a
15  check from the company; so they would obviously need a
16  W-9.
17      Q.      Did someone ask you for a W-9 for The
18  Quadrille?
19      A.      Within the company?
20      Q.      Within the company.
21      A.      Yes.
22      Q.      Who?
23      A.      Jennifer Therrien.  And she submitted the
24  check request.
25      Q.      We can cover that in a minute.  What did

1    Jennifer Therrien say when she asked for a W-9 for the
2    Defendant's Exhibit 1 sponsorship?
3         A.     That they needed a W-9.  It was a new
4    vendor.
5         Q.     Who is the "they" that needed it?
6         A.     Accounts payable.
7                (Defendant's Exhibit 4 was marked for
8         identification.)
9         Q.     (By Mr. Gerakitis)  Let me hand you what's
10   been marked as Defendant's Exhibit 4.  This appears to
11   be a W-9 form.  Is that what Defendant's Exhibit 4 is?
12        A.     Yes.
13        Q.     Defendant's Exhibit 4 does not have the
14   correct name of The Quadrille, does it?
15        A.     Where would that be?
16        Q.     Well, up at No. 1 up at the top.
17        A.     What's wrong with Quadrille?
18        Q.     It's not the Quadrille Club.  It's The
19   Quadrille.  That's what it's known as according to the
20   bylaws and constitution, correct?
21        A.     Okay.  I didn't know that.  Sorry.
22        Q.     Did you prepare Defendant's Exhibit --
23        A.     No.
24        Q.     -- 4?  Let me ask the whole question
25   before --

1       A.      I'm sorry.

2       Q.      Did you prepare and fill out Defendant's

3    Exhibit 4?

4       A.      No.

5       Q.      When Jennifer Therrien asked you to get a

6    W-9 for The Quadrille, what did you do next?

7       A.      I reached out to Jenny McMillen.

8       Q.      And did you tell Jenny McMillen how to

9    complete Defendant's Exhibit 4?

10       A.      Not to my recollection.

11       Q.      Did Jenny McMillen have any questions

12    about Defendant's Exhibit 4?

13       A.      Not to my recollection.

14       Q.      So the name Quadrille Club is not in your

15    constitution and bylaws.  Do you know that?

16       A.      I don't recall that.  Sorry.

17       Q.      It lists individual/sole proprietor or

18    single-member LLC.  At the time this W-9 in

19    Defendant's Exhibit 4 was prepared, do you know

20    whether The Quadrille was an individual/sole

21    proprietor?

22       A.      I don't know.

23       Q.      Do you know at the time Defendant's

24    Exhibit 4 was signed if The Quadrille was a

25    single-member LLC?

1      A.     I don't know the difference.

2      Q.     Defendant's Exhibit 4 lists an address of

3  2715 Averett Drive.  Do you see that?

4      A.     Uh-huh.

5      Q.     Yes?

6      A.     Yes.  Sorry.

7      Q.     That address is not shown on Defendant's

8  Exhibit 1, is it?

9      A.     No.

10     Q.     So 2715 Averett Drive is not Jenny

11  McMillen's address, correct?

12     A.     I don't know where she was living during

13  this time.  Sorry.  I don't know.

14     Q.     Do you know who lives at 2715 Averett

15  Drive?

16     A.     No.

17     Q.     Do you know a person by the name of Katie

18  Athey?

19     A.     Yes.

20     Q.     Is it Athey?

21     A.     Athey.

22     Q.     Is her husband Delta Data?

23     A.     Uh-huh.

24     Q.     Yes?

25     A.     Yes.  Sorry.

1      Q.     So this Defendant's Exhibit 4 lists an
2  address different than the address on Defendant's
3  Exhibit 1.
4      A.     Oh.
5             MS. PREBULA:  Objection, asked and
6        answered.
7      Q.     (By Mr. Gerakitis)  Correct?
8             MS. PREBULA:  Same objection.
9      Q.     (By Mr. Gerakitis)  You can answer.
10             MS. PREBULA:  You can answer unless --
11             THE WITNESS:  Okay.
12             MS. PREBULA:  -- I instruct you not to
13        answer.
14             THE WITNESS:  Yeah.  Katie lives on
15        Averett Drive.  I'm sorry.  I didn't --
16      Q.     (By Mr. Gerakitis)  Is 2715 Averett Drive
17  Katie --
18      A.     I don't know that -- I know she lives on
19  Averett Drive.  I'm sorry.
20      Q.     I'll ask the whole question.  I won't talk
21  on your answer.  I'll do my best.
22             Is 2715 Averett Drive Katie Athey's
23  address?
24      A.     I don't know if 2715 is her address.  I
25  know she lives on Averett Drive.  Sorry.

1      Q.      Social Security number is marked out on
2  Defendant's Exhibit 4.  Do you see that?
3      A.      Yes.
4      Q.      Do you know whose Social Security number
5  was on Defendant's Exhibit 4 when it was submitted?
6      A.      No.
7      Q.      Is that Jenny McMillen's signature?
8      A.      It appears to be.
9      Q.      So we know that Sunday was June 7th.  That
10  would make June 12th a Friday.
11            MS. PREBULA:  Do you have a calendar?
12            MR. GERAKITIS:  Well, I've just counted
13      the days up.  I mean, June 7th, if you look at
14      her Defendant's Exhibit 2 and 3, it shows Sunday,
15      6/7.  If you count forward five days, it should
16      get you to Friday, June 12th.
17      Q.      (By Mr. Gerakitis)  So on Friday,
18  June 12th, did you see Defendant's Exhibit 4?
19      A.      I don't know what date I received that.
20      Q.      Do you recall ever having possession of
21  Defendant's Exhibit 4 after Defendant's Exhibit 1 was
22  submitted?
23      A.      I'm sorry.  So did I receive --
24      Q.      Did you ever have possession of
25  Defendant's Exhibit 4 after you submitted Defendant's

1    Exhibit 1?

2        A.    Yes.

3        Q.    How did you get possession of Defendant's

4    Exhibit 4?

5        A.    Jenny gave it to me.

6        Q.    Where did she give you Defendant's

7    Exhibit 4?

8        A.    I don't remember.  I don't know how she

9    gave it to me.

10       Q.    How did Jenny McMillen get Defendant's

11   Exhibit 4 before it was completed?

12       A.    I don't know.

13       Q.    You didn't send it to her?

14       A.    I don't remember sending her a W-9.

15       Q.    How did Jenny McMillen know to get it back

16   to you?  How did Jenny McMillen know to get

17   Defendant's Exhibit 4 back to you?

18            MS. PREBULA:  Objection, beyond the scope

19       of this witness' knowledge.  You're asking her --

20       well, I'll just leave the objection on the

21       record.

22       Q.    (By Mr. Gerakitis)  Okay.  Let's state it

23   this way:  Did you tell Jenny McMillen to give you

24   back Defendant's Exhibit 4 after it was completed?

25       A.    I told Jenny I needed a W-9.  I don't

```
 1   remember the before and afters of that.
 2       Q.    Did you tell Jenny McMillen how to
 3   complete Defendant's Exhibit 4?
 4       A.    Not that I recall.
 5       Q.    Did anyone call you about Defendant's
 6   Exhibit 4 on how to complete it?
 7       A.    I don't know.
 8       Q.    So Jenny McMillen gave you back
 9   Defendant's Exhibit 4, but you don't recall when?
10       A.    I don't remember her giving -- me giving
11   her a W-9, her sending it back to me.  I don't recall
12   any of the handlings of this other than the fact the
13   company needed a W-9.  I mean, I just don't remember.
14       Q.    You produced Defendant's Exhibit 4 to us.
15   Do you see at the bottom the small Bates Nos. PL-4?
16       A.    Uh-huh.
17       Q.    And 5?
18       A.    Uh-huh.
19       Q.    And 6?
20       A.    Sure.
21       Q.    And 7?  Yes?
22             MS. PREBULA:  Let him finish his whole
23       question and then answer.
24             THE WITNESS:  Okay.
25       Q.    (By Mr. Gerakitis)  So you produced this
```

1    W-9, this Defendant's Exhibit 4, to us, correct?

2         A.    Yes.

3         Q.    Yes?

4         A.    Yes.  I mean --

5         Q.    So you had possession of it at some point

6    in time before this lawsuit started, correct?

7         A.    Yes.

8         Q.    You had possession of Defendant's

9    Exhibit 4 before you left employment of Carmike,

10   correct?

11        A.    Yes.

12        Q.    Was it part of The Quadrille's files?

13        A.    I don't know.

14        Q.    Did you maintain any Quadrille files --

15        A.    Yes.

16        Q.    -- before November 17, 2015?

17        A.    I'm sorry.  Can you say it again?

18        Q.    Sure.

19        A.    I started answering your question early.

20        Q.    Did you maintain any Quadrille files

21   before November 17, 2015?

22        A.    Yes.

23        Q.    Did you ever see The Quadrille apply for

24   becoming a limited liability corporation?

25        A.    There were talks in a board meeting, but I

1    wasn't part of the process.

2        Q.    Who talked about The Quadrille becoming a

3    limited liability company or corporation?

4        A.    Well, that wasn't the term.  Sorry.  That

5    was just formalizing some of -- I don't know.  I

6    really don't understand the different --

7        Q.    My question was not whether you understood

8    it.  My question was:  Who discussed The Quadrille

9    becoming an LLC?

10       A.    In a board meeting with the board handoff

11   into the upcoming year of all the new board to include

12   the new president, Leslie Anne Heard, there was some

13   discussion around formalizing some of their processes;

14   and I don't remember what exactly that was or if that

15   included an LLC discussion.  I don't know.

16       Q.    And Leslie Anne Heard is Leslie Anne Heard

17   Jones now?

18       A.    Yes.

19       Q.    Yes.  And she became president of The

20   Quadrille when?

21       A.    Right after the -- well, the fall of '15.

22   We transferred the board over after that summer.

23       Q.    Jenny McMillen signed Defendant's

24   Exhibit 4, but she was not an officer recognized by

25   The Quadrille bylaws, was she?

1      A.      As past president you're on the board.

2  I'm not sure what the difference is between the

3  officer and the board.

4              (Defendant's Exhibit 5 was marked for

5        identification.)

6      Q.      (By Mr. Gerakitis)  Let me hand you what's

7  been marked as Defendant's Exhibit 5.  This appears to

8  be a Quadrille constitution and bylaws.  Is that what

9  Defendant's Exhibit 5 is?

10     A.      Yes.

11     Q.      While we're on the bylaws, they were never

12 changed while you were an officer, were they?

13     A.      Not that I'm aware of.  They weren't --

14 they weren't followed for many years.

15     Q.      Turn to Page -- this is not paginated; but

16 if you open it to the back of the fourth page where it

17 says constitution and bylaws --

18     A.      We're backwards.

19     Q.      Start from the front.  Turn a page.  Turn

20 another page.  Stop.

21     A.      Okay.

22     Q.      Do you see where it says "Constitution and

23 Bylaws" on the top of that page --

24     A.      Yes.

25     Q.      -- in Defendant's Exhibit 5?  Yes?

```
 1        A.    Yes.

 2        Q.    If you look at the bottom, it says

 3   officers of The Quadrille, correct?

 4        A.    Uh-huh; yes.

 5        Q.    Yes.  It says the officers shall be a

 6   president, correct?

 7        A.    Yes.

 8        Q.    A vice president, correct?

 9        A.    Yes.

10        Q.    A secretary and a treasurer, correct?

11        A.    Yes.

12        Q.    There is no past president officer, is

13   there?

14        A.    No.

15        Q.    Now, while you were president, board

16   members asked you for copies of the bylaws, didn't

17   they?

18        A.    I don't recall.

19        Q.    Let's look at the bylaws for a moment

20   under "Constitution and Bylaws."  It says the name is

21   The Quadrille, correct?

22        A.    Yes.

23        Q.    Not Quadrille Club?

24        A.    Yes.

25        Q.    And its purpose is the "entertainment at
```

1    one or more parties each year of its members and their

2    guests," correct?

3        A.    Where is the purpose?

4        Q.    Do you see No. 2 under Roman Numeral I?

5        A.    Yes.

6        Q.    Is it correct that the purpose of The

7    Quadrille is "the entertainment at one or more parties

8    each year of its members and their guests"?

9        A.    Yes.

10       Q.    The members of The Quadrille, how many men

11   are members of The Quadrille?

12       A.    None.

13       Q.    Can you think of any men who have been

14   invited to participate in The Quadrille?

15       A.    I can think of several.

16       Q.    Who?

17       A.    Well, the spouses of the members or dates

18   of the members.

19       Q.    How many men have been invited to join The

20   Quadrille as a member?

21       A.    Oh, none.

22       Q.    What prevents a man from being invited to

23   join The Quadrille?

24            MS. PREBULA:  Objection, assumes facts not

25       in evidence.

1      Q.      (By Mr. Gerakitis)  Well, is it the
2  constitution and bylaws?  Is it your decision?  What
3  is it?
4      A.      It wasn't my --
5              MS. PREBULA:  Same objection.
6              MR. GERAKITIS:  Objection is noted.
7              THE WITNESS:  It wasn't my decision, and I
8      wasn't very familiar with this.  I'm sorry.
9      Q.      (By Mr. Gerakitis)  What's "this"?
10     A.      The bylaws.
11     Q.      The purpose of the Quadrille Club that we
12  just read, it is not described in Defendant's
13  Exhibit 1, is it?
14     A.      No.
15     Q.      You chose not to put the purpose of the
16  Quadrille Club in Defendant's Exhibit 1, correct?
17             MS. PREBULA:  Objection, argumentative and
18     assumes facts not in evidence.
19             MR. GERAKITIS:  Objection is noted.
20             THE WITNESS:  This was not the same
21     organization in 2014 and '15 that's represented
22     in this document, and most of what's in this
23     document hadn't been adhered to in years.  So,
24     no, we had changed -- I mean, a lot of what we
25     were doing had changed just in practice.

1          Q.      (By Mr. Gerakitis)  Did you ever change
2     the bylaws while you were on the board?
3          A.      I didn't formally change anything.
4          Q.      Is the answer no, we never changed the
5     bylaws while I was on the board?
6          A.      No, we never changed the bylaws while I
7     was on the board.
8          Q.      Are you a member of The Quadrille now?
9          A.      No, I'm not.
10         Q.      Why aren't you a member of The Quadrille
11    now or for what reason are you not a member?
12         A.      Because I'm 38 and most of the membership
13    are in their 20s or early 30s.
14         Q.      Well, Jenny McMillen is in her 40s?
15         A.      She's not a member.
16         Q.      No longer?
17         A.      No.
18         Q.      When did Jenny McMillen drop out?
19         A.      Probably a year before I did.
20         Q.      So this is the age group of an Ellie
21    Flowers or a Hannah Mize kind of group, right?
22         A.      Yeah.  Leslie Anne is probably aging out.
23    She's in her early 30s.
24         Q.      Did you ever ask Ashley Turner to become a
25    member?

1      A.      I don't really know her that well.

2      Q.      Do you remember her ever being asked?

3      A.      No, I don't recall.

4      Q.      Ever ask Ceil Branch to become a member?

5      A.      No.  I think that in 2010 that was a much

6   older group that was recruited by like Margo Slides

7   and so forth, and I think they were asking a lot of

8   those older women, so --

9      Q.      How about Cam Swift, was she ever invited

10  to be a member?

11     A.      I think she was.

12     Q.      Do you know who invited her?

13     A.      I don't.

14     Q.      Can you think of any writing that

15  described the purpose of the Quadrille Club that

16  you've ever seen other than described in Defendant's

17  Exhibit 5 under the constitution and bylaws?

18          MS. PREBULA:  Objection, ambiguous.

19          THE WITNESS:  Can you say it again?

20     Q.      (By Mr. Gerakitis)  Sure.

21     A.      I'm sorry.

22     Q.      Can you think of any writing that

23  describes the purpose for the Quadrille Club that

24  you've ever seen other than what's described in

25  Exhibit 5 under the constitution and bylaws?

```
 1              MS. PREBULA:  Same objection.
 2              THE WITNESS:  Am I allowed to answer?
 3              MS. PREBULA:  Yes.  You answer it unless I
 4         instruct you not to.
 5              THE WITNESS:  Okay.  Not that I'm aware
 6         of.  There wasn't a lot of formality for five
 7         years.
 8         Q.    (By Mr. Gerakitis)  In the constitution
 9    and bylaws, it says that one regular meeting will be
10    held each year, is that correct?
11         A.    Where?  I'm sorry.
12         Q.    Under III, Roman Numeral III, meetings.
13         A.    Yes, it says that.
14         Q.    Did you hold a regular meeting while you
15    were president?
16         A.    Our Girls Only first event of the year was
17    all I was aware of that we did with the membership I
18    guess would have honored that.  I don't know.
19         Q.    Was that counted as a party, as you
20    describe it, the Girls Only first event?
21         A.    Uh-huh.  It was an event that we discussed
22    kind of the upcoming year and the new membership came
23    in.  It just wasn't very formal.  But that was what we
24    did at the beginning of each of the membership years,
25    so -- and then we had regular board meetings outside
```

1    of that.  But I don't know what in context this is

2    requiring me to do.  I mean, we just always had a

3    Girls Only event at the beginning of the year.

4         Q.    Was the Girls Only event at the beginning

5    of the year considered a party?

6         A.    It was a meeting/event, party.  I don't --

7         Q.    Did all the members come from that Girls

8    Only event?

9         A.    Most of the members came for that first

10   one, yes.

11        Q.    Did any spouses come --

12        A.    No.

13        Q.    -- or significant others?

14        A.    No.

15        Q.    Was alcohol served at the Girls Only

16   event?

17        A.    Yes.

18        Q.    Did you call any special meetings while

19   you were president?

20        A.    I called several board meetings to discuss

21   different processes to include that meeting where we

22   were supposed to discuss the sponsorship

23   solicitations.

24        Q.    But you can't recall if anyone other than

25   perhaps Mary Allen Tondee and Palmer Trawick who you

1    might have discussed getting sponsors from, correct?

2        A.    Correct.

3        Q.    Now, the sponsor's letter doesn't list in

4    Defendant's Exhibit 1 any of your authorized officers,

5    correct?

6        A.    Correct.

7        Q.    It doesn't list Amy Bryan, correct?

8        A.    Correct.

9        Q.    It doesn't list Jessica Tillery, correct?

10       A.    Correct.

11       Q.    She dropped out of Quadrille, too,

12   recently, correct?

13       A.    I don't know how recent, but I know she's

14   not a member anymore.

15       Q.    Well, let's go back to your constitution

16   and bylaws, then.  Under officers, on the next page,

17   it says under Part 3.A.(3):  "The duties of the

18   officers shall be conducted as follows:  President (3)

19   shall execute in the name of the club all contracts

20   and other obligations," correct?

21       A.    Correct.

22       Q.    When did Jenny McMillen sign any contract

23   or other obligation other than the W-9, which is

24   Defendant's Exhibit 4?

25            MS. PREBULA:  Objection, beyond the scope

1        of the witness' knowledge.

2        Q.    (By Mr. Gerakitis)  If you don't know,

3    you're going to tell me you don't know, right?

4        A.    I am.

5        Q.    Okay.  Well, I'll ask you the question

6    again, then.

7        A.    What was the question again?

8        Q.    When to your knowledge did Jenny McMillen

9    ever sign any contract or other obligation other than

10   Defendant's Exhibit 4?

11       A.    I don't know.

12       Q.    You did not sign the W-9, correct?

13       A.    Correct.

14       Q.    You were authorized by your constitution

15   and bylaws to sign Defendant's Exhibit 4, correct?

16       A.    I was not aware of that at the time.

17       Q.    The answer is yes, I was authorized to

18   sign it, but I was not aware of it at the time, is

19   that right?

20            MS. PREBULA:  I'm going to object.  She --

21            MR. GERAKITIS:  Objection is noted.

22            MS. PREBULA:  You're misstating her

23       answer.

24            MR. GERAKITIS:  The objection is noted.

25       Q.    (By Mr. Gerakitis)  My question is:  At

```
 1   the time Defendant's Exhibit 4 was signed by Jenny
 2   McMillen, you were authorized to sign it according to
 3   The Quadrille bylaws, correct?
 4        A.     Correct.
 5        Q.     In Defendant's Exhibit 4, there's no
 6   officer's address as the certified address for the
 7   club on Defendant's Exhibit 4, is there?
 8        A.     No.
 9               MS. PREBULA:  Give her just a second.
10               THE WITNESS:  It fell off.
11        Q.     (By Mr. Gerakitis)  Do you know if Jenny
12   McMillen talked with Ms. Athey about Defendant's
13   Exhibit 4?
14        A.     I don't recall.
15        Q.     Did you talk with Jenny McMillen this
16   week?
17        A.     Yes.
18        Q.     What did you and Jenny McMillen talk about
19   this week?
20        A.     Her boyfriend problems and I got a text
21   message saying that she had received a subpoena later
22   on and -- what else?
23        Q.     Anything else?
24        A.     I mean, probably a lot more than that, but
25   I don't --
```

1        Q.      Did you talk with Ms. McMillen after you

2   got the text message about receiving a subpoena?

3        A.      I've not spoken to her since the text

4   message that I recall.

5        Q.      Have you spoken with any other former or

6   current Quadrille members this week?

7        A.      My sister-in-law.

8        Q.      Palmer Trawick?

9        A.      Yes.

10        Q.      Anyone else?

11        A.      I don't remember.  I mean, I don't -- I

12   talk to a lot of people.  As to whether or not they

13   were a connection to Quadrille, I just don't connect

14   the dots.  I'm sorry.  I don't know.

15        Q.      Did you talk to Amy Bryan this week?

16        A.      No.

17        Q.      Katie Athey?

18        A.      I spoke to her or texted back and forth --

19   I did talk to her.  She just got back from the lake,

20   and our children are going to play together.  But I

21   don't remember when that was.  That could have been a

22   week ago, maybe Tuesday.

23        Q.      But you didn't talk to her since Jenny

24   McMillen got the subpoena?

25        A.      No.

1      Q.      Let's review the other authorized duties

2  of these officers.  If you look at the board of

3  directors under 5, it's at the bottom of the next

4  page.

5      A.      Okay.

6      Q.      It says:  "The responsibility for the

7  operation of The Quadrille shall be vested in the

8  board of directors."  Do you see that?

9      A.      Yes.

10     Q.      Is the board-at-large referred to in your

11 Defendant's Exhibit 3 letter, the board of directors?

12     A.      Yes, board-at-large and executive board.

13     Q.      That's what I'm trying to figure out.

14     A.      Okay.

15     Q.      Is the board of directors the eight women

16 listed under board-at-large on Defendant's Exhibit 3?

17     A.      Yes.

18     Q.      Do you understand according to the bylaws

19 that the responsibility for the operation of The

20 Quadrille shall be vested in the board of directors?

21 Correct?

22     A.      I mean, do I understand that today reading

23 this document right now, yes.

24     Q.      You have never seen bylaws different than

25 Defendant's Exhibit 5 for The Quadrille, have you?

1      A.      No.

2      Q.      Let's turn to the next page on the back

3   side under Roman Numeral VI, No. 6, "A prospective

4   member who declines an invitation to membership shall

5   not be issued a subsequent invitation at a later

6   date."

7      A.      Where is that?  I'm so sorry.

8      Q.      Under Roman Numeral VI.

9      A.      Uh-huh.

10      Q.      No. 6.

11      A.      Okay.  Yes.

12      Q.      Did you have a parliamentarian within The

13   Quadrille?

14      A.      What does that mean?  I'm sorry.

15      Q.      I'm just asking, did you have a

16   parliamentarian within Quadrille?

17      A.      I don't know what that is.

18      Q.      So Jenny McMillen never served as the

19   parliamentarian for the board of directors, is that

20   right?

21      A.      I don't know what that is.

22      Q.      Let's go to No. X, Roman Numeral X, dues

23   and fees.  It says:  "Dues and fees.  Dues shall be

24   fixed by the board of directors" in Defendant's

25   Exhibit 5, correct?

1        A.      That's what it says, yes.

2        Q.      There's nothing under dues and fees that

3   refers to a sponsorship for funding, correct?

4        A.      Correct.

5        Q.      Do you know who reported the income from

6   the $2000 Carmike sponsorship?

7        A.      No, I do not.

8        Q.      When you saw Defendant's Exhibit 4 after

9   it was completed back in 2015, did you notice whose

10  Social Security number was on Defendant's Exhibit 4?

11       A.      No.

12       Q.      How much money did Quadrille have as of

13  June 7, 2015, in its account at CB&T?

14       A.      I don't remember.

15       Q.      Did you get the bank statements?

16       A.      No.

17       Q.      Who got the bank statements?

18       A.      I believe that would have still been sent

19  to Katie Athey as past treasurer; if not, Amy Bryan.

20  But I don't know.

21       Q.      The exceptional final party was the White

22  Party at Columbus Country Club on June 27th, correct?

23       A.      Correct.

24       Q.      And you had Carmike staff prepare the

25  White Party invitations, correct?

```
 1        A.      Correct.
 2        Q.      And you had Carmike staff prepare the
 3   White Party save the date notification, correct?
 4        A.      Yes.
 5        Q.      There's no mention of Carmike sponsoring
 6   the White Party on the save the date notice to your
 7   members, is there?
 8        A.      No.
 9        Q.      There's no notice of Carmike's sponsoring
10   the White Party on any invitation to your members, is
11   there?
12        A.      No.
13        Q.      Did you give Jennifer Therrien Defendant's
14   Exhibit 1 to process it for payment?
15        A.      She doesn't process payment.  Shannon
16   Sailors does.
17        Q.      So as far as you recall, you did not give
18   Jennifer Therrien the Defendant's Exhibit 1 to process
19   for payment?
20        A.      She was given that document along with a
21   check request to send to Accounts Payable after
22   Shannon approved the level of sponsorship.
23        Q.      I wasn't asking about approval.
24        A.      Okay, sure.
25        Q.      I was asking about the process for
```

1    payment, which you just said she would take

2    Defendant's Exhibit 1 along with a check request and

3    send it to Accounts Payable --

4         A.    Yes.

5         Q.    -- for payment, right?

6         A.    Correct.

7         Q.    You asked Jennifer to join Quadrille,

8    didn't you?

9         A.    Yes.

10        Q.    You told her we don't do anything except

11   four parties a year, right?

12        A.    I don't remember what I told her or what

13   the sales pitch was.

14             MS. PREBULA:  Let's take a short break and

15        let me mute that.

16             THE VIDEOGRAPHER:  Off video.

17             MS. PREBULA:  Off video.  Let's just take

18        a short break.

19             (Recess from 10:18 a.m. to 10:28 a.m.)

20             THE VIDEOGRAPHER:  We are back on the

21        video record.

22        Q.    (By Mr. Gerakitis)  I take it if you

23   didn't know what a parliamentarian is, while you were

24   past president, you never served as the

25   parliamentarian of The Quadrille, correct?

1      A.      I don't know what that is.  So I was on
2  the board and there to help advise for a year, but
3  that's all I did.
4      Q.      Did you ever advise Leslie Ann Heard Jones
5  about the bylaws or constitution of The Quadrille?
6      A.      No.
7              (Defendant's Exhibit 6 was marked for
8      identification.)
9      Q.      (By Mr. Gerakitis)  I want to hand you
10  what's been marked as Defendant's Exhibit 6.  This
11  appears to be a copy of an e-mail that you sent to
12  yourself with a subject line of "Reports," correct?
13      A.      Yes.
14      Q.      And in it it shows that you sent yourself
15  a Quadrille 2014-15 spreadsheet dated 6/7/15.  Do you
16  see that?
17      A.      Yes.
18      Q.      And you sent yourself a copy of a bonus
19  plan for C. Trawick dated 5/26/15, correct?
20      A.      Yes.
21      Q.      And you sent yourself a Junior League 2015
22  sponsorship list, correct?
23      A.      Yes.
24      Q.      And you sent yourself a marketing and
25  advertisement expense comparison, correct?

1      A.      Yes.

2              (Defendant's Exhibit 7 was marked for

3      identification.)

4      Q.      (By Mr. Gerakitis)  Let me hand you what's

5  been marked as Defendant's Exhibit 8.

6              MS. PREBULA:  I think you're on 7.

7              MR. GERAKITIS:  That's what I thought for

8      a second.  Okay.  Good.

9      Q.      (By Mr. Gerakitis)  Let me hand you what's

10  been marked as Defendant's Exhibit 7.  This appears to

11  be an e-mail you sent to yourself about -- with a

12  subject line of "Work" dated 9/28 of 2015.  Is that

13  what Defendant's Exhibit 7 is?

14      A.      I'm sorry.  What was the question?

15      Q.      The question is:  Is Defendant's Exhibit 7

16  an e-mail you sent yourself with the subject line

17  "Work" on September 28, 2015?

18      A.      Yes.

19      Q.      And in it you show a spreadsheet for

20  Quadrille, correct?

21      A.      Yes.

22      Q.      As an attachment, right?

23      A.      Yes.

24      Q.      You also show a Quadrille prospect letter

25  as an attachment, correct?

```
1        A.     Yes.

2        Q.     You show a Follies 2016 -- I assume you

3  meant to say "presentation" there, not

4  "presenatation," correct?

5        A.     Yes.

6        Q.     And then Altoona, Pennsylvania, opening

7  agenda, correct?

8        A.     Yes.

9        Q.     A 2016 Follies letterhead, correct?

10        A.     Yes.

11        Q.     And 2016 Follies ad sales and sizes?

12        A.     Yes.

13        Q.     Follies 2016 information, correct?

14        A.     Yes.

15        Q.     And then Supper Club 2015 Version 1?

16        A.     Yes.

17        Q.     And Follies 2016 timelines, correct?

18        A.     Yes.

19               (Defendant's Exhibit 8 was marked for

20         identification.)

21        Q.     (By Mr. Gerakitis)  Let me hand you what's

22  been marked as Defendant's Exhibit 8.  Is Defendant's

23  Exhibit 8 a Quadrille prospect letter?

24        A.     Yes.

25        Q.     Did you prepare Defendant's Exhibit 8?
```

```
 1        A.      I believe so.
 2        Q.      Well, who else would have been involved if
 3   you weren't in preparing it?
 4              MS. PREBULA:  Objection, argumentative.
 5              THE WITNESS:  I don't know.  I just don't
 6        remember making it, but I -- I don't know.
 7        Q.      (By Mr. Gerakitis)  And Defendant's
 8   Exhibit 8 it had been just over three months -- in
 9   fact, it's actually three months to the day since the
10   W-9, Defendant's Exhibit 4, was provided Carmike.  It
11   says "our organization has provided tremendous
12   entertainment for our members," correct?
13        A.      Yes.
14        Q.      That's not what was put in Defendant's
15   Exhibit 1, that the organization provides tremendous
16   entertainment for The Quadrille members, does it?
17        A.      No.
18        Q.      And this is asking new applicants to
19   complete an application for admission?
20        A.      Yes.
21        Q.      That's what Defendant's Exhibit 8 is
22   asking for, correct?
23        A.      Yes.
24        Q.      And it's asking that checks be made
25   payable to the Quadrille Club and mailed to Cathryn
```

1    Smitherman, correct?

2         A.    Correct.

3         Q.    Now, Cathryn Smitherman worked at Carmike

4    Cinemas, correct?

5         A.    Correct.

6         Q.    She's listed in your initial disclosures

7    as a person with information about your case, correct?

8         A.    Correct.

9         Q.    There's nowhere in Defendant's Exhibit 8

10   where it refers to we raise money through

11   sponsorships, correct?

12        A.    Exhibit 9?

13        Q.    No, Defendant's Exhibit 8.

14        A.    I'm sorry.  Where?

15            MS. PREBULA:  You marked this one wrong.

16            MR. GERAKITIS:  Thank you.  Are you at 7,

17       Mary?

18            MS. PREBULA:  No.  That is 8.

19            THE WITNESS:  7 is missing.

20            MS. PREBULA:  7 is this one.

21            THE WITNESS:  I'm sorry.

22            MS. PREBULA:  He marked them all wrong.

23            MR. GERAKITIS:  Well, let's fix this.

24            MS. PREBULA:  So you identified this as 7

25       on the record.

1           MR. GERAKITIS:  All right.  I'll go back

2       through it real quick.

3           MS. PREBULA:  I think the record is clear.

4       And you even referred to Defendant's 8 as

5       Defendant's 8.  You just marked it wrong.

6           MR. GERAKITIS:  Thank you.

7       Q.    (By Mr. Gerakitis)  Back to Defendant's

8   Exhibit 8, you were still president of The Quadrille

9   as of September 12, 2015?

10      A.    Not technically.

11      Q.    Well, when was there an election before

12  September 12 of 2015?

13      A.    There is no election.  The current

14  president nominates the next president, and that's

15  pretty much how it works.

16      Q.    When was the next president chosen for

17  2015-2016?

18      A.    Leslie Anne accepted her presidency

19  sometime after this process.

20      Q.    Sometime after Defendant's Exhibit 8?

21      A.    Yes, sir.

22      Q.    So back to --

23      A.    Yes.

24      Q.    -- you were still the president as of the

25  time Defendant's Exhibit 8 was submitted to

1    applicants, correct?

2         A.    I understood it as my duties were over.  I

3    was trying to hand the board off to a new board and

4    get that in order.  I had a very difficult time

5    getting a president to say yes to that commitment.  So

6    going through several different options on the current

7    president, Leslie Anne finally accepted.  To keep the

8    organization moving forward, I continued with some of

9    the communications to help with that process to

10   include nominating Cathryn Smitherman as treasurer of

11   Quadrille.

12              (Defendant's Exhibit 9 was marked for

13         identification.)

14         Q.    (By Mr. Gerakitis)  Let me hand you what's

15   been marked as Defendant's Exhibit 9.  Is Defendant's

16   Exhibit 9 a photograph of you and other persons at the

17   Steeplechase?

18         A.    Yes.

19         Q.    And this picture was taken in 2013?

20         A.    '14.

21         Q.    2014?

22         A.    Yes.

23         Q.    And that's Jennifer Therrien immediately

24   to your left?

25         A.    Yes.

1      Q.     And Dan Ellis standing behind Jennifer
2   Therrien?
3      A.     Yes.
4      Q.     And then Cathryn Smitherman next to
5   Jennifer Therrien?
6      A.     Yes.
7      Q.     Do you know who else was in this
8   photograph?
9      A.     Yes.  Lisa De La Cruz is the blonde in the
10   back.  Bob Scarborough, film buyer for Carmike, was
11   next to her.
12      Q.     Between her and Dan Ellis?
13      A.     Yes.  Zach Benito, IT for Carmike.  Below
14   him was Lisa Woods, her sister, who was, I believe,
15   head of payroll to her left; and then I'm not sure of
16   the employee in the middle.
17      Q.     But these are all Carmike employees in
18   Defendant's Exhibit 9?
19      A.     I believe so other than -- I don't -- I'm
20   fairly certain the woman in the very middle -- because
21   it was a Carmike photo, and everybody that was there
22   took a picture together.
23      Q.     Did you have any Carmike photos done in
24   2015 with you in them?
25      A.     No.

1              (Defendant's Exhibit 10 was marked for

2         identification.)

3         Q.    (By Mr. Gerakitis)  Let me hand you what's

4    been marked as Defendant's Exhibit 10.  This appears

5    to be a sponsorship request from Bradley Beck.  Is

6    that what Defendant's Exhibit 10 is?

7         A.    Yes.

8         Q.    And in Defendant's Exhibit 10, it sets out

9    a number of marketing opportunities, logo on date

10   cards and flyers, correct?

11        A.    Yes.

12        Q.    If Brad Beck had not included details

13   about what were going to be the marketing value, that

14   is, the return for the sponsorship, would you have

15   asked him for those details or would you have had

16   somebody else do it?

17        A.    If I was unfamiliar with the event, I

18   would have wanted more details.

19        Q.    In it you said you're circulating the

20   sponsorship package for final approval now, correct?

21        A.    Correct.

22        Q.    And all they were asking for was $400,

23   correct?

24        A.    Correct.

25        Q.    And for $400 there would at least be the

```
 1    logo on a thousand save the date cards, another 150 --
 2    another thousand flyers and 150 people at least at the
 3    event, correct?
 4         A.    Correct.
 5               (Defendant's Exhibit 11 was marked for
 6         identification.)
 7         Q.    (By Mr. Gerakitis)  Let me hand you what's
 8    been marked as Defendant's Exhibit 11.  This is a
 9    printout of a page of sponsorship requests.  Is that
10    what Defendant's Exhibit 11 is?
11         A.    Yes.
12         Q.    And this one runs on Defendant's
13    Exhibit 11 from September 26 of '14 down to
14    December 3rd of '14, correct?
15         A.    I'm sorry.  What were the dates again?
16         Q.    At the top it says September 26th --
17         A.    Yes.
18         Q.    -- of 2014, correct?
19         A.    I don't know what year it is.  Oh, I see
20    it.  Okay.  Sorry.  I'm sorry.  I'm sorry.
21         Q.    That's okay.
22         A.    It's small.
23         Q.    And then at the bottom, December 3rd of
24    2014, correct?
25         A.    Yes.
```

1      Q.      And some of these requests for sponsorship

2   are told no, correct?

3      A.      Correct.

4      Q.      You might have somebody who's fund-raising

5   for youth to attend the ELCA National Youth Gathering;

6   and it says "keep us in mind next year," right?

7      A.      What line?  I don't --

8      Q.      Well, if you go up -- go to the first "no"

9   up from the bottom, about eight lines up.  And the

10  date it was mailed was 10 of October.

11     A.      Okay.

12     Q.      So you would gather these up and then send

13  out mailings to them, it looks like, in groups on

14  October 1st, on October 2nd, and then again on

15  October 10th, correct?

16     A.      That I sent these out?  Our department

17  did.

18     Q.      Or your department did?

19     A.      Our department did, yes.

20     Q.      Now, who was responsible for approving

21  whether they got the request for support approved or

22  not?

23     A.      I was.

24     Q.      Let me hand you what's been marked --

25     A.      And to be clear, these are tickets,

1    sponsorship tickets, that are also tied to box office
2    contracts, which is the reason that this was so
3    differently regulated.
4         Q.     But you managed it?
5         A.     I did.
6         Q.     Right.  And you wanted detail about what
7    the requests were, correct?
8         A.     Yes.  But denial was also based on
9    frequency of those tickets in the marketplace because
10   we couldn't exceed a number in the box office without
11   getting us in trouble with the studio.
12        Q.     But if you were permitted by the studio to
13   do it, you would still decline it if you didn't think
14   it was a worthy purpose, correct?
15        A.     Yes.
16               (Defendant's Exhibit 12 was marked for
17          identification.)
18        Q.     (By Mr. Gerakitis)  Okay.  Let me hand you
19   what's been marked as Defendant's Exhibit 12.  This is
20   a letter dated August 15 on The Quadrille, correct?
21        A.     Yes.
22        Q.     This is 2014, right after you had become
23   president, correct?
24        A.     Yes.
25        Q.     Jenny McMillen was the president

1    immediately before you, correct?

2         A.    Yes.

3         Q.    Did you draft Defendant's Exhibit 12?

4         A.    Yes.

5         Q.    And in it you said you'll find the

6    leadership in place for this year's incredible

7    calendar of events, correct?

8         A.    Yes.

9         Q.    And then you asked folks "please circulate

10   among your sweet friends and fill out the attached

11   information form," correct?

12        A.    Yes.

13        Q.    And in it you refer to folks for marking

14   their calendars for four parties, correct?

15        A.    Yes.

16        Q.    You planned for four parties?  As you

17   said, you were ambitious?

18        A.    Yes.

19        Q.    You had a Ladies Night Out, correct?

20        A.    Yes.

21        Q.    There was a cost for that Ladies Night

22   Out, right?

23        A.    Yes.

24        Q.    You had a New Year's Eve party, correct?

25        A.    Yes.

1    Q.    And there was a cost for that New Year's

2    Eve party, correct?

3    A.    Yes.

4    Q.    You did not have a St. Patty's Day party,

5    correct?

6    A.    Correct.

7    Q.    And you did not have a Derby Day party,

8    correct?

9    A.    Correct.

10    Q.    And on the next page, you listed in

11    Defendant's Exhibit 12 all of the executive board and

12    the board-at-large, correct?

13    A.    Yes.

14            (Defendant's Exhibit 13 was marked for

15            identification.)

16    Q.    (By Mr. Gerakitis)  Let me hand you what's

17    been marked as Defendant's Exhibit 13.  This is a

18    letter also dated August 15 of 2014.  And this says

19    "Subject:  QD Board."  Is "QD" the abbreviation for

20    Quadrille?

21    A.    Yes.

22    Q.    And this sets out a more expansive

23    schedule than what you had in Defendant's Exhibit 12

24    because it lists nominations surveys, mailing

25    invitations.  So, in other words, you're telling the

1   board this is the work ahead of us, right?

2       A.      Correct.

3       Q.      On Page 2 of Defendant's Exhibit 13, it

4   says that by May 30, 2015, announcement of incoming

5   president, correct?

6       A.      Correct.

7       Q.      Who all did you request become incoming

8   president for the 2015-2016 Quadrille?

9       A.      I talked to Ansley Forsberg, I tried to

10  talk to Meg Perkins, Kelly Alexander, and I don't know

11  who else.

12      Q.      You said you tried to talk to Meg Perkins.

13  Did she avoid you?

14      A.      I think -- I tried to reach out to her to

15  discuss the presidency, and it was a challenge getting

16  in touch with her.

17      Q.      What does Meg Perkins do outside the home?

18      A.      I don't know.

19      Q.      Ansley Forsberg, what did she tell you?

20      A.      She couldn't do it.

21      Q.      And Kelly Alexander, what did she tell

22  you?

23      A.      She couldn't even be on the board, more or

24  less step into an accelerated role.  She had too much

25  going on.

1      Q.      So you didn't have a vice president in

2   place under the bylaws when you were the president?

3      A.      No.  I didn't -- no, I did not.

4      Q.      Was there anything preventing you from

5   having a vice president, president-elect when you

6   become president?

7      A.      Oversight.

8      Q.      Is that lack of oversight or --

9      A.      It was oversight -- I meant lack of

10  oversight, sorry.

11     Q.      You mean you overlooked it?

12     A.      Correct, yeah.

13             (Defendant's Exhibit 14 was marked for

14         identification.)

15     Q.      (By Mr. Gerakitis)  Let me hand you what's

16  been marked as Defendant's Exhibit 14.  This appears

17  to be an invitation for the first gathering you had.

18  Is that what Defendant's Exhibit 14 is?

19     A.      Yes.

20     Q.      And this refers to the Ladies Night,

21  Friday, October 10th, correct?

22     A.      Correct.

23     Q.      Did you prepare Defendant's Exhibit 14?

24     A.      I believe I prepared the language.

25     Q.      Who prepared Defendant's Exhibit 14?

```
1        A.      I don't know.  I don't remember.

2        Q.      Was it somebody at Carmike?

3        A.      I don't know.  I know London helped out

4    with a couple of things, but I'm not sure if it was

5    this particular document.

6        Q.      Well, it lists 1916 Cherokee Avenue on it.

7    That's not your address, is it?

8        A.      No.  That's a typo.

9        Q.      Was the Ladies Night held at your house?

10       A.      Yes.

11       Q.      Was it held Friday, October 10th?

12       A.      I don't remember.  The president often

13   held the first meeting, meet and greet with the new

14   membership.  So that was just what I was accustomed

15   to.

16           (Defendant's Exhibit 15 was marked for

17           identification.)

18       Q.      (By Mr. Gerakitis)  Let me hand you what's

19   been marked as Defendant's Exhibit 15.  It starts at

20   the bottom of Defendant's Exhibit 15 from Amy Bryan to

21   Crystal Trawick on September 30, "Subject:  Carmike

22   Sponsorship," correct?

23       A.      Yes.

24       Q.      Now, that subject line of Carmike

25   sponsorship is not in reference to the sponsorship in
```

1    Defendant's Exhibit 1, is it?

2        A.    No.

3        Q.    It's in connection with the Chamber of

4    Commerce, correct?

5        A.    Correct.

6        Q.    At the top of Defendant's Exhibit 15, it

7    refers to you needing to sign on to The Quadrille

8    account.  Was that the bank account?

9        A.    To Amy, yes.

10       Q.    So tell me what you did to get signed on

11   to The Quadrille bank account.

12       A.    The past president and treasurer needed to

13   get Amy and I as signatories on the account because

14   Amy was the new treasurer, and I was trying to get her

15   availability.

16       Q.    So you're e-mailing Amy in Defendant's

17   Exhibit 15 and saying we need to get you signed on to

18   The Quadrille account?

19       A.    Correct.

20       Q.    Referring to Amy?

21       A.    Yes.

22       Q.    Were you signed on to The Quadrille

23   account as of September 30 to sign checks, make

24   deposits?

25       A.    I don't know what date I got signed on.

1      Q.     Do you remember whether you ever got

2  signed on?

3      A.     Yes.

4      Q.     Do you remember if Amy ever got signed on

5  to sign on The Quadrille bank account at CB&T?

6      A.     I don't.  It was a challenge.  I don't

7  remember.

8             (Defendant's Exhibit 16 was marked for

9        identification.)

10      Q.     (By Mr. Gerakitis)  Let me hand you what's

11  been marked as Defendant's Exhibit 16.  Defendant's

12  Exhibit 16 is a letter dated December 30, 2014, To

13  Whom It May Concern.  Did you prepare Defendant's

14  Exhibit 16?

15      A.     Yes.

16      Q.     And from December 30, 2014, back to

17  September 30, 2014, you were not signed on to the

18  account at Columbus Bank & Trust?

19      A.     Not that I recall.

20      Q.     So when you sent them at Columbus Bank &

21  Trust Defendant's Exhibit 16, you were signed on to

22  the account, correct?

23      A.     It appears that this is my attempt to get

24  signed on to the account.

25      Q.     Now, you said:  "As current 2014 Quadrille

1    president, I would like to formally request the

2    following individuals be added to The Quadrille

3    account will full access to funds."  Is that "with

4    full access to funds"?

5         A.    Yes.

6         Q.    So what besides sending Defendant's

7    Exhibit 16 did you do to get formally added to The

8    Quadrille account?

9         A.    I believe I went with Jenny to the bank

10   after this letter was submitted, and I believe I was

11   told I needed to submit this letter in order to make

12   that happen.

13        Q.    Did you provide them a tax identification

14   number for the bank account?

15        A.    No.  Jenny handled all that.

16        Q.    Jenny McMillen?

17        A.    Uh-huh.

18        Q.    Yes?

19        A.    Yes.  And if she didn't, Katie had it.  So

20   I don't -- I just don't know.  I didn't get that

21   involved with that part of it.

22        Q.    But did you ever sign checks out of The

23   Quadrille account?

24        A.    Once I had access, yes.

25        Q.    Who were some of the people you sent

1    checks to?

2         A.      The Columbus Country Club.  It was a

3    venue.  I don't know if I or Amy Bryan signed the

4    checks for the New Year's Eve party as far as like the

5    band and stuff.  I don't know.  And then everything

6    else was out-of-pocket expenses.

7         Q.      Well, as of December 30, 2014, did you

8    have check-signing privileges?

9         A.      If I didn't, I wouldn't have signed a

10   check; so I don't know.

11        Q.      Would you trust the bank records to be

12   accurate?

13        A.      Yes.

14        Q.      So the New Year's Eve party in 2014 was, I

15   hope, on New Year's Eve?

16        A.      Yes.

17        Q.      Did you have any expenses before the

18   party?

19        A.      Yes.

20        Q.      And how did those get paid?

21        A.      The board members that purchased items did

22   it out of pocket.

23        Q.      So they never got repaid?

24        A.      At the end of the year, out-of-pocket

25   expenses were reimbursed.

1      Q.      Did you ever write a check to yourself?

2      A.      No.

3      Q.      Never?

4      A.      No.

5      Q.      Did anyone from Quadrille write a check to

6  you to repay you?

7      A.      Yes.

8      Q.      Who wrote the checks to you?

9      A.      Jenny McMillen.

10     Q.      You said at the end of the year.  That

11  would happen at the end of 2015?

12     A.      At the end of The Quadrille year, which

13  was an overlap in between two years.

14     Q.      Okay.  At the end of The Quadrille year,

15  which you put in one of the earlier exhibits as May 30

16  when you announced the new president, remember that?

17     A.      Yes.

18     Q.      So that's the end of The Quadrille year,

19  May 30?

20     A.      It should have been, yes.

21     Q.      So as of May 30, 2015, was Jenny McMillen

22  still able to sign checks --

23     A.      Yes.

24     Q.      -- for The Quadrille?

25     A.      Yes.

1        Q.      But you had told the bank on December 30,

2    2014, in Defendant's Exhibit 16 to remove Jenny

3    McMillen from the account?

4        A.      Correct.  They didn't do it.

5        Q.      But they added you?

6        A.      Yes.

7        Q.      Do you know how the bank account at

8    Columbus Bank & Trust, the title of it was listed?

9        A.      No.

10       Q.      Did you ever see the bank statements list

11    an account name?

12       A.      Not that I recall.

13       Q.      Did you see the bank statements?

14       A.      Not that I recall.  I don't remember.

15       Q.      Do you know how much money was in the

16    account?  Well, let me put it this way:  Let me start

17    back.  Do you know if the bank account was ever closed

18    after you were president?

19       A.      Yes.

20       Q.      How was it closed?

21       A.      Smitherman said she closed it and was

22    starting a new one.

23       Q.      Do you know how much money was in the

24    account when you handed it off to Leslie Anne Heard

25    Jones?

```
 1        A.      I don't remember.
 2                (Defendant's Exhibit 17 was marked for
 3        identification.)
 4        Q.      (By Mr. Gerakitis)  Let me hand you what's
 5   been marked as Defendant's Exhibit 17.  This appears
 6   to be an e-mail from you to your Gmail account for the
 7   subject "D."  Do you see that?
 8        A.      Uh-huh.
 9        Q.      Is that another way of referring -- I need
10   you to say yes.
11        A.      Yes.  Sorry.
12        Q.      Is that Quadrille, "D"?
13        A.      I don't know why I would have written -- I
14   don't know.
15        Q.      Were there others who were sent
16   Defendant's Exhibit 17 besides you at
17   crystalwing@gmail.com?
18        A.      I don't know.
19        Q.      You don't recall ever sending it to Amy
20   Bryan?
21        A.      I don't recall seeing this document, more
22   or less who it went to.
23        Q.      Okay.  This e-mail says:  "I'm sending
24   these bank statements to reflect the expenses I've
25   recorded to the attached updated spreadsheet.  We can
```

1   work together to reconcile the expense tab.  Once this

2   is complete, I'll generate a balance sheet for the

3   year."

4          A.     Okay.

5          Q.     Did you send Defendant's Exhibit 17 to

6   yourself?

7          A.     I mean, the e-mail says that, the chain

8   does.  I just don't remember this document.  I'm

9   sorry.

10         Q.     Well, look at Party 1.  That would have

11  been the Ladies Night Out?

12         A.     Okay.  How do you know it's for the Ladies

13  Night?

14         Q.     Well, remember we went through and saw an

15  invitation earlier that the first party of the year

16  was the Ladies Night Out --

17         A.     Uh-huh.

18         Q.     -- at your house, 1926 Cherokee Avenue?

19         A.     Correct.

20         Q.     So Party 1 would have been that date,

21  correct, in 2014?

22         A.     Correct.

23         Q.     And then Party 2 sum is $162.85, correct?

24         A.     I'm sorry.  Where?  Oh, I'm sorry.  I'm

25  sorry.  I'm sorry.

1      Q.      On Defendant's Exhibit 17, it refers to

2    Party 2 sum 162.85, correct?

3      A.      Uh-huh; correct.

4      Q.      Was this money that you spent yourself for

5    Quadrille expenses?

6      A.      It appears to be.

7      Q.      Now, you said:  "I'm sending these bank

8    statements to reflect the expenses."  Were those CB&T

9    Bank statements?

10     A.      No.  These appear to be my personal

11   account statements.

12             (Defendant's Exhibit 18 was marked for

13         identification.)

14     Q.      (By Mr. Gerakitis)  Let me hand you what's

15   been marked as Defendant's Exhibit 18.  This appears

16   to be an e-mail from crystalwing@gmail to Crystal

17   Trawick dated Thursday, June 11, 2015, correct?

18     A.      Correct.

19     Q.      And this one refers to "Q," correct?

20     A.      Correct.

21     Q.      So on the same day you sent Defendant's

22   Exhibit 17, you sent an e-mail to your board, correct?

23     A.      Correct.

24     Q.      You wouldn't have asked for a W-9 from

25   Jenny McMillen unless the sponsorship for The

1    Quadrille had been approved, would you?

2         A.    I'm sorry.  What?

3         Q.    You wouldn't have asked for a W-9 from

4    Jenny McMillen unless the sponsorship by Carmike for

5    The Quadrille had been approved, would you?

6         A.    For the purposes of Carmike, no, I would

7    not have requested one unless Carmike approved a

8    sponsorship.

9         Q.    So you wouldn't just go get a W-9 from her

10   if the sponsorship had not been approved already,

11   right?

12        A.    If someone had not requested a W-9, I

13   would not have sought a W-9.

14        Q.    But you didn't have to go get W-9s for

15   sponsorships that had not been approved?  It was only

16   after a sponsorship had been approved and you had a

17   new vendor, right?

18        A.    The new vendor required a W-9 on file.

19        Q.    Carmike required a W-9 on file for the new

20   vendor, right?

21        A.    For the new vendor, yes.  That's outside

22   of sponsorship.  That's just period.

23        Q.    Well, they're paying $2,000 --

24        A.    Right.

25        Q.    -- to something called the Quadrille Club,

1    right?

2         A.     Right.

3         Q.     And they had never done that before?

4         A.     Correct.

5         Q.     So on June 11 of 2015, you knew the

6    Carmike sponsorship had been approved, correct?

7         A.     I don't know what date we approved the

8    sponsorship.

9         Q.     Well, it's dated June 7.  That was a

10   Sunday.

11        A.     Okay.  I don't know what date I circulated

12   that to Lisa De La Cruz and Shannon Sailors.

13        Q.     Well, if Friday was the 12th --

14        A.     Okay.

15        Q.     -- and Jenny signed it on Friday, did she

16   get it the same day?  Did she get that W-9 the same

17   day and sign it?

18        A.     I don't know.

19        Q.     You didn't mention anything in Defendant's

20   Exhibit 18 about a sponsorship sought from Carmike,

21   did you?

22        A.     Let me read the document.  There is no

23   mention of Carmike in the letter on June 11th.

24        Q.     About a sponsorship being paid to The

25   Quadrille, is there?

1      A.      No.

2              (Defendant's Exhibit 19 was marked for

3      identification.)

4      Q.      (By Mr. Gerakitis)  Let me hand you what's

5  been marked as Defendant's Exhibit 19.  This is

6  another letter to your board similar to Defendant's

7  Exhibit 18, except there's a few changes.  Is that

8  what Defendant's Exhibit 19 is?  It's a Quadrille

9  letter to your board?

10     A.      Okay.

11     Q.      Defendant's Exhibit 19 says that save the

12 dates went out, invitations are being printed, and I'm

13 handling the distribution this week, correct?

14     A.      Correct.

15     Q.      The save the date is for the White Party,

16 correct?

17     A.      Correct.

18     Q.      And that was something that Carmike staff,

19 your staff, had prepared, correct?

20     A.      Yes.

21     Q.      They did a mailing, correct, besides the

22 save the date card?

23     A.      I don't know.  I don't remember.  I mean,

24 I don't -- specifically what was mailed for me to

25 answer the question, I just don't understand.

```
1        Q.     Was there a mailing that went out about
2   the White Party in June of 2015 that anyone at Carmike
3   made a mistake in mailing out?
4        A.     There was a letter sent to Quadrille that
5   there was a mistake made that should not have been
6   sent out from Carmike, but it wasn't to my knowledge
7   any correlation to this.
8        Q.     What was it in correlation -- what was the
9   mistaken letter sent to Quadrille members that was a
10  mistake that should have not been sent out from
11  Carmike?
12       A.     There was some communication to the
13  membership that I received at my house which is how I
14  knew that it had gone out through Carmike, and it was
15  not supposed to be sent through Carmike's mailroom.
16       Q.     And who was instructed not to send it
17  through Carmike's mailroom?
18       A.     Jennifer Therrien.
19       Q.     And when was she instructed not to send it
20  through Carmike's mailroom?
21       A.     I was at an opening, and I called her
22  back.  I was going through a list of things going on
23  at the office, and I specifically asked her about
24  those mail-outs.  And I said, I need them to go out,
25  but do not use Carmike's letterhead, do not use their
```

1    envelopes, and do not use their mailroom.

2        Q.    Was it before Defendant's Exhibit 19 that

3    you had that conversation with Jennifer Therrien?

4        A.    I really don't remember.

5        Q.    Did you make any notes of it?

6        A.    No.  It was over the phone, and it was in

7    conjunction with several other things going on in the

8    office in my absence.

9        Q.    Did you send her a text about it?

10       A.    I don't remember.

11       Q.    Did you send her an e-mail telling her not

12   to send it out over Carmike letterhead?

13       A.    Not that I recall.

14       Q.    Nothing prevented you from sending her a

15   text or an e-mail with those instructions, right?

16       A.    I gave her instructions not just about

17   Quadrille but other things in that same conversation.

18   So, no, I didn't follow up with any of those other

19   items that I can recall.

20       Q.    So the answer is no, I didn't send her a

21   text or an e-mail telling her don't send it out with

22   Carmike letterhead or envelopes?

23       A.    Correct, that I recall.

24       Q.    So this Defendant's Exhibit 19, this is

25   past the date for you announcing the incoming

1    president, right?

2         A.      Which -- yes.

3         Q.      And there's nothing about an approved

4    sponsorship by Carmike?

5         A.      No.

6                 (Defendant's Exhibit 20 was marked for

7         identification.)

8         Q.      (By Mr. Gerakitis)  Let me hand you what's

9    been marked as Defendant's Exhibit 20.  This appears

10   to be an e-mail from crystalwing@gmail to Crystal

11   Trawick, quick update regarding the year-end Quadrille

12   party and our memberships.  Do you see that?

13        A.      Yes.

14        Q.      And this is Party No. 3.  Is that the

15   White Party referenced in Defendant's Exhibit 20?

16        A.      Yes.

17        Q.      So as of June 12, 2015, I assume that you

18   were e-mailing Jessica Tillery, Heather Garrett, Jenny

19   McMillen, Mary Allen Tondee, Heather Garrett, Palmer

20   Trawick since they're all listed as having jobs to do

21   for Party No. 3, correct?

22        A.      Correct.

23        Q.      Nowhere in Defendant's Exhibit 20 do you

24   mention a Carmike sponsorship for $2,000, do you?

25        A.      No.

1     Q.     And do you recall anybody else who you

2   sent Defendant's Exhibit 20 to other than Tillery,

3   Garrett, McMillen, Tondee, and Palmer Trawick?

4     A.     I don't recall who the recipients were of

5   this e-mail.

6     Q.     Now, The Quadrille membership according to

7   this was, as you say, in good standing 51.

8     A.     Is that on here?  Okay.  Yes.

9     Q.     Was that accurate?

10    A.     At that time I would have -- yes, to my

11  knowledge at that time, yes.

12    Q.     And you recall you said that in 2010 the

13  membership was around 100 or more, right?

14    A.     It was at 99.

15    Q.     99.  That's pretty close.  Even for an

16  Auburn person, it's pretty close, 99.  So it was at

17  least 99 in 2010?

18    A.     Uh-huh.

19    Q.     Yes?

20    A.     Yes.

21    Q.     And then by 2015, while you were

22  president, the members in good standing were 51?

23    A.     Yes.

24    Q.     How much money was in The Quadrille CB&T

25  Bank account at the time you sent Defendant's

1    Exhibit 20?

2        A.    I don't recall.

3        Q.    Do you know how much money was accounted

4    for as Quadrille dues or income for the year 2015?

5        A.    I don't.  I remember at the end of the

6    year we were still trying to get membership dues

7    honored from the membership that had participated.

8        Q.    As of June 12th you certainly knew that

9    the sponsorship was approved, right?  As of June 12,

10   2015, you certainly knew the Carmike sponsorship for

11   The Quadrille was approved, right?

12       A.    I believe so, yes.

13             (Defendant's Exhibit 21 was marked for

14        identification.)

15       Q.    (By Mr. Gerakitis)  Let me hand you what's

16   been marked as Defendant's Exhibit 21.  This is you

17   e-mailing London Mahogany about a Quadrille save the

18   date, correct?

19       A.    Yes.

20       Q.    You didn't tell him anything about adding

21   a Carmike logo on the save the date, correct?

22       A.    Correct.

23       Q.    Or thanking our sponsor, correct?

24       A.    Correct.

25       Q.    You could have done it, right?

1        A.      Yeah.

2        Q.      Right?

3        A.      Yes.

4                (Defendant's Exhibit 22 was marked for

5        identification.)

6        Q.      (By Mr. Gerakitis)  Let me hand you what's

7    been marked as Defendant's Exhibit 22.  This is the

8    actual save the date invite.  Is that what Defendant's

9    Exhibit 22 is?

10       A.      Yes.

11       Q.      I see a Quadrille symbol, but I don't see

12   anything that lists Carmike as sponsoring one of your

13   experiences.

14       A.      Is that a question?

15       Q.      Yes.

16               MS. PREBULA:  I'm going to object.  It's

17       ambiguous.

18       Q.      (By Mr. Gerakitis)  Okay.  Let me start

19   back.  There's this Quadrille symbol on Defendant's

20   Exhibit 22, correct?

21       A.      Correct.

22       Q.      There is no Carmike logo or symbol on

23   Defendant's Exhibit 22, is there?

24       A.      No.

25       Q.      There's no mention of Carmike at all on

1    Defendant's Exhibit 22, correct?

2         A.    No.

3              (Defendant's Exhibit 23 was marked for

4         identification.)

5         Q.    (By Mr. Gerakitis)  Let me hand you what's

6    been marked as Defendant's Exhibit 23.  This appears

7    to be an invitation to The Quadrille White Party,

8    correct?

9         A.    Correct.

10        Q.    This was prepared at Carmike?  Defendant's

11   Exhibit 23 was prepared at Carmike, correct?

12        A.    I don't recall.

13        Q.    You don't recall London Mahogany

14   preparing --

15        A.    He helped with a lot of things.  I just

16   can't answer specifically to this document.

17        Q.    Did you approve Defendant's Exhibit 23's

18   invitation?

19        A.    Yes.

20        Q.    Did you approve not mentioning Carmike on

21   Defendant's Exhibit 23?

22        A.    I approved this invitation.

23        Q.    Did you approve not mentioning Carmike on

24   Defendant's Exhibit 23?

25        A.    Yes.

1        Q.       2610 Cherokee Avenue, that's Columbus
2   Country Club's address?
3        A.       Correct.
4                 (Defendant's Exhibit 24 was marked for
5        identification.)
6        Q.       (By Mr. Gerakitis)  Let me hand you what's
7   been marked as Defendant's Exhibit 24.  While I'm
8   doing that, how many people went to the White Party
9   from Quadrille?
10        A.       I don't recall.
11        Q.       At the White Party, what displays of
12   Carmike materials, logos, or signage was displayed?
13        A.       I printed bar signage.
14        Q.       Say that again.
15        A.       I printed bar signage, like signs on the
16   actual bar; and I personally spoke about Carmike at
17   the White Party?
18        Q.       And how many people were there?
19        A.       I don't remember.  We had an outdoor party
20   planned that was rained out due to terrible weather;
21   and due to that the attendance, I remember, suffered.
22        Q.       So who was present when you talked about
23   Carmike --
24        A.       I don't know.
25        Q.       -- at the White Party?

```
 1        A.      I really don't remember.

 2        Q.      Was Heather Garrett there?

 3        A.      I don't remember.

 4        Q.      In Defendant's Exhibit -- let me go back,

 5   then.  You said you printed bar signs?

 6        A.      Signage for the bar.

 7        Q.      What did the signs say?

 8        A.      "Sponsored by Carmike" and it had the

 9   Carmike logo.

10        Q.      And what did you say when you mentioned

11   Carmike?

12        A.      That this event was brought to you

13   presented by Carmike.

14        Q.      Who had you told before that party on your

15   board that the party was sponsored by Carmike?

16        A.      Definitely Jenny McMillen.

17        Q.      Anybody else?

18        A.      And I don't know who else was at that

19   meeting when we discussed sponsorships.

20        Q.      What else did you say about the

21   sponsorship other than this party is brought to you by

22   Carmike?

23        A.      Nothing that I recall.

24        Q.      How did you print the bar signs?

25        A.      From Carmike.
```

1     Q.     How?  I mean, did you go on your MacBook?

2   Did you pull it up as a program?  Did you use --

3     A.     I just used a Word document and then

4   folded an 8-by-11 sheet of paper.

5     Q.     Sheet of paper.

6     A.     And had them sitting on the bar.

7     Q.     Is that how you normally display signage

8   for Carmike?  You print an 8-1/2-by-11 Word document?

9     A.     In other events that I've been part of on

10  boards, as long as the traffic of the event was going

11  to be seeing the logo of your sponsorships and there

12  was an announcement made, that was sufficient.

13    Q.     My question is:  Is that how you normally

14  display signage for Carmike?  You print an 8-1/2-by-11

15  Word document with the Carmike logo on it?

16    A.     I have done that before, yes.

17    Q.     Is it your practice to print an

18  8-1/2-by-11-inch Word document with the Carmike logo

19  as a sign for the company to display in a public

20  facility?

21    A.     My practice was to print materials with

22  our logo on it and put it where customers would see

23  it.

24    Q.     But usual --

25    A.     The format or whatever print material I

1    used to do that was conducive to where the traffic
2    would flow.
3         Q.    But usually you would have -- you'd use a
4    card stock at least.  You'd use a heavier paper.
5    You'd use something different, wouldn't you?
6         A.    I would use what's available.
7         Q.    You didn't have anybody help you print the
8    sign for the White Party?
9         A.    There was no design necessary.  It was
10   just content and a logo.
11        Q.    If Heather Garrett were to say that there
12   was no signage or mention of Carmike at the White
13   Party, would you dispute that?
14        A.    I would.
15             MS. PREBULA:  Objection, assumes facts
16        not --
17             MR. GERAKITIS:  Object noted.
18        Q.    (By Mr. Gerakitis)  You would?
19             MS. PREBULA:  Excuse me.  I'm going to put
20        my objection on the record.
21             MR. GERAKITIS:  Your objection is noted.
22        It's reserved.
23             MS. PREBULA:  Assumes facts not in
24        evidence.
25             MR. GERAKITIS:  The objection is noted.

1      Q.      (By Mr. Gerakitis)  You can answer it.  If
2    Heather Garrett said there was no Carmike signage and
3    there was no mention of Carmike at the White Party,
4    would you dispute that?
5      A.      I would.
6              MS. PREBULA:  Same objection.
7              THE WITNESS:  I'm sorry.
8              MR. GERAKITIS:  Objection is noted.
9      Q.      (By Mr. Gerakitis)  Defendant's
10   Exhibit 24, this is an e-mail from you to London
11   Mahogany forwarding on an e-mail from your
12   sister-in-law, Palmer Trawick, asking for him to clean
13   this up and Jennifer will help.  Do you see that?
14     A.      I do.
15     Q.      Now, there's nothing in here about
16   instructions on which envelopes to use, right?
17     A.      Correct.
18     Q.      So had the envelope issue come up before
19   October 26, 2015, with Jennifer Therrien?
20     A.      I don't know.  I don't know what this is,
21   honestly.
22     Q.      When were you terminated?
23     A.      November; mid-November 2015.
24     Q.      Tuesday, November 17, 2015, correct?
25     A.      Correct.

1    Q.    So did the mailing mistake by Jennifer

2  Therrien happen between October 26, 2015, and

3  November 17, 2015?

4    A.    I don't know when her mailing mistake

5  happened.

6    Q.    It refers in Defendant's Exhibit 24 to a

7  long skinny envelope.  Did you buy any long skinny

8  envelopes?

9    A.    I had personal stationery in my desk that

10  was mine.

11    Q.    In Defendant's Exhibit 24 it doesn't ask

12  about stationery or envelopes you had in your desk.

13  It says from Palmer:  "Can you print these?  They have

14  to be done on card stock and for a long skinny

15  envelope," correct?

16    A.    Correct.

17    Q.    Did you buy any long skinny envelopes to

18  send out a Quadrille invitation?

19    A.    I had long skinny envelopes in my

20  possession that were mine and not of the company's in

21  my desk drawer.

22    Q.    Did you have card stock?

23    A.    No.

24    Q.    How did you get the card stock to use to

25  print it on?

1       A.      I don't know.

2       Q.      Did you leave it up to London and Jennifer

3  to do that?

4       A.      I don't know.

5               (Defendant's Exhibit 25 was marked for

6          identification.)

7       Q.      (By Mr. Gerakitis)  Let me hand you what's

8  been marked as Defendant's Exhibit 25.  This appears

9  to be a letter also of October 26 -- well, actually,

10  it appears to be an e-mail communication of

11  October 26, 2015, from you to London Mahogany and

12  Jennifer Therrien, correct?

13      A.      Yes.

14      Q.      And you're telling them, "please clean

15  up."  What does that mean, "please clean up"?

16      A.      The logo was blurry.

17      Q.      Was that unacceptable?

18      A.      I just needed -- I would like -- I wanted

19  a cleaner version, and I was asking for London's help.

20      Q.      And my question is:  Was it unacceptable

21  to have a blurry Quadrille logo?

22      A.      I can't answer that.

23      Q.      Did you consider The Quadrille logo on

24  Defendant's Exhibit 25 you're seeing right now to be

25  blurry, that needed to be cleaned up?

```
 1        A.      At the time, yes, that was a blurry logo.
 2        Q.      So you consider the one that's on
 3   Defendant's Exhibit 25 to be blurry?
 4        A.      Yes.
 5        Q.      So by 10/26 of 2015 there had been no
 6   president voted on by Quadrille, right?
 7        A.      There is no vote for president, and I
 8   don't know that one was elected yet.
 9        Q.      So the answer is no, there's --
10        A.      Not that I --
11        Q.      -- no president voted on?
12        A.      No, I don't remember when Leslie Anne said
13   yes to Quadrille.
14        Q.      You vote on members but not on officers?
15        A.      Correct.  That was my understanding.
16        Q.      So as of October 26, you didn't have a
17   president selected, correct?
18        A.      I don't know.
19        Q.      Pull out Defendant's Exhibit 1, if you
20   would.
21        A.      (Witness complies with request.)
22        Q.      In Defendant's Exhibit 25 it says you're a
23   social organization, correct?
24        A.      I'm sorry?
25        Q.      In Defendant's Exhibit --
```

1     A.     On 25, yes.

2     Q.     Right.  Defendant's Exhibit 25 refers to

3  you as a social organization, right?

4     A.     Correct.

5     Q.     Known as The Quadrille?

6     A.     Correct.

7     Q.     Not the Quadrille Club?

8     A.     Correct.

9     Q.     And it says "the purpose shall be the

10  entertainment at one or more parties each year of its

11  members and their guests," correct?

12     A.     Correct.

13     Q.     There is no other purpose recited in

14  Defendant's Exhibit 25 which came up four months after

15  your sponsor letter to Carmike, correct?

16     A.     I'm sorry.  What?  Can you say that again?

17     Q.     Sure.  There is no other purpose mentioned

18  in Defendant's Exhibit 25 -- well, let's go back.

19  Let's fix it this way:  Defendant's Exhibit 25 was

20  sent four months after Carmike paid the sponsorship,

21  right?

22     A.     Correct.

23     Q.     You had the money from Carmike as of the

24  time the White Party was held, correct?

25     A.     Correct.

1      Q.      The only purpose listed in Defendant's

2   Exhibit 25 is the entertainment at one or more parties

3   each year of members and their guests, correct?

4      A.      Correct.

5      Q.      That's the only purpose mentioned in the

6   constitution and bylaws in 2015, correct?

7      A.      Correct.

8      Q.      You're not identifying any change at all

9   to the purpose of The Quadrille in Defendant's

10  Exhibit 25 over what's in Defendant's Exhibit -- we'll

11  find it just to make sure we're clear on the record --

12  5.  And I'll ask it again.

13          There is no change at all to the purpose

14  of The Quadrille in Defendant's Exhibit 25 over what's

15  in Defendant's Exhibit 5, is there?

16     A.      No.

17     Q.      If you pull out Defendant's Exhibit 1, it

18  mentions nothing about serving as an opportunity for

19  young women to network in Defendant's Exhibit 25, does

20  it?

21     A.      No, it does not.

22     Q.      It mentions nothing about developing

23  skills and social environments, does it?

24     A.      No.

25     Q.      It mentions nothing about translating to a

1    healthier quality of life, does it?

2         A.    No.

3         Q.    It mentions nothing about a stronger

4    presence in the workplace, does it?

5         A.    No.

6         Q.    There are members of The Quadrille who

7    don't work in the workplace, aren't there?

8         A.    Correct.  But they work in nonprofits

9    without receiving -- they're just helpful in the

10   community, so --

11        Q.    Is that what's in Defendant's Exhibit 25,

12   people in The Quadrille work in the nonprofits?

13        A.    No.  But this is an old document that was

14   getting cleaned up to turn over files to the new

15   board.  These are not in my words.  This was -- and

16   this was also activities throughout the year that we

17   did benefit from.

18        Q.    Did you make any edits to Defendant's

19   Exhibit 25 other than saying clean up the logo?

20        A.    There is a date of November 6, 2015, on

21   here; so obviously something has been updated.

22        Q.    You said dues are payable.

23        A.    Uh-huh.

24        Q.    That's the only thing -- that's the only

25   thing you think you changed?  You said that dues are

1    payable by November 6?

2        A.      I don't recall editing any major edits or

3    changes to this.

4        Q.      Then back to the sponsor letter.  It

5    doesn't say anything in Defendant's Exhibit 25 about

6    The Quadrille having a mission to continue this

7    cultivation through increasing leadership roles, does

8    it?

9        A.      No, it does not.

10       Q.      You could have included it, but you chose

11   not to, right?

12       A.      It was no longer my board.

13       Q.      We've established that Ms. Jones was not

14   the president as of October 26, correct?

15       A.      Again, we don't know when she said yes.

16       Q.      You were still maintaining Quadrille

17   records in October and on October 26 of 2015, correct?

18       A.      I was in the process of transitioning

19   those documents over to a new board.

20       Q.      Did you get an e-mail from Ms. Jones that

21   the mission of the Quadrille Club or any communication

22   at all that the mission of the Quadrille Club was to

23   continue this cultivation through increasing

24   leadership roles among our members?

25       A.      No, not that I'm aware of.

1      Q.      Have you ever seen a single mission
2  statement for Quadrille about the mission of Quadrille
3  is to continue this cultivation through increasing
4  leadership roles among our members other than in
5  Defendant's Exhibit 1?
6      A.      Not that I'm aware of.
7      Q.      Did Jenny McMillen write Defendant's
8  Exhibit 1 all in her handwriting -- I mean, all in her
9  own writing?
10      A.      I drafted that document.
11      Q.      You drafted this, Defendant's Exhibit 1?
12      A.      Yes.
13      Q.      And Jenny reviewed it?
14      A.      I gave it to her.  I don't know if she
15  looked at it.  I can't verify.
16      Q.      Well, in it it says "after established."
17  Wouldn't you rather say after being established,
18  having been established?
19      A.      Are you asking me about a typo?
20      Q.      I don't consider it a typo.  I consider it
21  to be syntax and grammar, but --
22      A.      Okay.  Well, I mean, I drafted that
23  document.  If there's any error, it would have been
24  mine.
25      Q.      So you drafted Defendant's Exhibit 1?

```
1       A.      Yes.

2       Q.      All by yourself?

3       A.      Yes.

4       Q.      No input from Jenny?  Yes or no?

5       A.      I don't recall what we spoke about and

6   what ended up in this document from Jenny.

7       Q.      Did anybody at Carmike help you prepare

8   Defendant's Exhibit 1?

9       A.      Not that I'm aware of.

10      Q.      Did anybody within your Quadrille help you

11  prepare Defendant's Exhibit 1 other than perhaps Jenny

12  McMillen, as you say?

13      A.      I do not recall.

14              (Defendant's Exhibit 26 was marked for

15              identification.)

16      Q.      (By Mr. Gerakitis)  Let me hand you what's

17  been marked as Defendant's Exhibit 26.  This is an

18  e-mail with a Quadrille August 25 QD 2016 list.  It's

19  a spreadsheet, correct?

20      A.      Yes.

21      Q.      And this was sent from your Carmike e-mail

22  to your Gmail account, correct?

23      A.      Correct.

24      Q.      Did you commonly send Quadrille

25  spreadsheets to yourself?
```

1     A.     I sent attachments to myself when I was
2  going to be in transit in case I needed reference.
3     Q.     So you never worked on Quadrille stuff
4  while you were at home, only while you were in
5  transit?
6     A.     I didn't say that.
7     Q.     You said you sent things to yourself when
8  you were -- in case you were going to be in transit?
9     A.     Correct.
10    Q.     But you would also send documents to
11 yourself on Quadrille in case you were at home to work
12 on it, right?
13    A.     Would you please ask the question again?
14 I'm sorry.
15    Q.     Sure.  You would send documents to
16 yourself on Quadrille in case you were at home to work
17 on them, right?
18    A.     Amongst other documents, yes.
19           (Defendant's Exhibit 27 was marked for
20           identification.)
21    Q.     (By Mr. Gerakitis)  Let me hand you what's
22 been marked as Defendant's Exhibit 27.  Can you tell
23 me what kind of spreadsheet Defendant's Exhibit 27
24 lists?  It looks to be broken into first quarter,
25 second quarter, third quarter, and fourth quarter.

1   What are the things that are listed on there?

2       A.      Some of this is conference expenses,

3   advertising --

4       Q.      Let's start with conference.

5               MS. PREBULA:  Let's let her finish her

6           answer.

7       Q.      (By Mr. Gerakitis)  Okay.  Go ahead.  Keep

8   going.  Conference, advertising, what else?

9       A.      Computer equipment.

10      Q.      Okay.  Computer equipment.  What else?

11      A.      I don't know what speaker fee is on here.

12  There's sponsorship dollars, magazine ads, donations,

13  congratulatory ad placement in magazines.

14      Q.      Have you ever seen a document like

15  Defendant's Exhibit 27 before?

16      A.      I have seen this.

17      Q.      Now, who maintains Defendant's Exhibit 27?

18      A.      I don't remember.  I don't know if that's

19  Shannon or Accounts Payable.  I don't know.

20      Q.      Did you input anything in Defendant's

21  Exhibit 27?

22      A.      I don't remember.  I don't recall.  There

23  was financial documents that Shannon maintained, and

24  then there was help that he asked for in some of that

25  maintenance.  But I don't remember if this was one of

1    those documents.

2         Q.    On here it lists in the fourth quarter

3    sponsorship Junior League Follies Boss Print Design.

4    Do you see that in October?

5         A.    Yes.

6         Q.    And who approved the sponsorship Junior

7    League Follies Boss Print Design cost for $2,323.40?

8         A.    The level of sponsorship of $2,500 had

9    been approved by Lisa De La Cruz in David Passman's

10   office.  And so I was asked on the board to consider

11   being a print sponsor instead, and so I let Shannon

12   know that we were going to be an in-kind sponsorship

13   in lieu of writing a $2,500 check.

14        Q.    But there were costs associated with the

15   Follies besides the in-kind sponsorship, right?

16        A.    What do you mean?  I'm sorry.

17        Q.    Well, didn't you have costs besides the

18   print signs?

19        A.    Who is -- me or the company --

20        Q.    Carmike.

21        A.    -- or Carmike?

22        Q.    Didn't you have costs besides the print

23   signs?

24        A.    The only other costs I'm aware of is

25   printing some brochures, some sponsorship brochures.

1      Q.     And how much were the sponsorship
2  brochures?
3      A.     Around close to 200, maybe.  I'm not --
4      Q.     That's all?
5      A.     I don't -- I really don't remember that
6  amount, but I remember it being low.
7      Q.     So it lists each quarter what month these
8  expenses are incurred, correct?
9      A.     Correct.
10      Q.     Look at sponsorship for Quadrille.  It's
11  listed in May.  Correct?
12      A.     Yes.  I don't know why that is.
13      Q.     Let me hand you what's been marked as
14  Defendant's Exhibit 27.  We talked about you sent
15  spreadsheets to yourself of Quadrille materials.  Can
16  you look at Defendant's Exhibit 27 and tell me if this
17  is one of those spreadsheets that you would send to
18  yourself on Quadrille materials?
19      A.     I have two 27's.
20             MS. HARWELL:  It will be 28.
21             MR. GERAKITIS:  I'm sorry.  Thank you.
22             (Defendant's Exhibit 28 was marked for
23         identification.)
24      Q.     (By Mr. Gerakitis)  Let me hand you what's
25  been marked as Defendant's Exhibit 28.  Is this a

1    Quadrille spreadsheet you would send to yourself?

2         A.    I might have if I was working on it.  But

3    I was working on it.  But I don't know whether or not

4    I did.

5         Q.    This lists 49 members for the 2015-2016

6    Quadrille membership directory, correct?

7         A.    Yes.

8         Q.    Cathryn Smitherman didn't go on the board

9    until the time Leslie Anne Heard Jones' year was

10   supposed to start, correct?

11        A.    No.  I had Cathryn Smitherman secured for

12   the treasurer position before Leslie Anne.

13        Q.    Cathryn Smitherman was not the treasurer

14   while Amy Bryan was the treasurer, was she?

15        A.    No.  But Amy wasn't active in the fall

16   that year.  I mean, to be honest, she wasn't active

17   the whole year, but --

18        Q.    So let's get our dates right, okay?

19        A.    Sure.

20             MS. PREBULA:  Objection, argumentative.

21             MR. GERAKITIS:  Objection is noted.

22             MS. PREBULA:  You don't have to note my

23        objections.  It's on the record.

24        Q.    (By Mr. Gerakitis)  You were president

25   from the summer of 2014 until October of 2015,

1    correct?

2         A.    Technically I was past president looking

3    for a new president during that time.

4         Q.    So you had no president for some period of

5    time?

6         A.    Basically.

7         Q.    Amy Bryan served as your treasurer for

8    2014-2015, correct?

9         A.    Correct.

10        Q.    Cathryn Smitherman did not serve as your

11   treasurer; she served as Leslie Anne Heard Jones'

12   treasurer, correct?

13        A.    Correct.

14        Q.    Cathryn Smitherman is listed on the board

15   on the first page of Defendant's Exhibit 28, correct?

16        A.    Correct.

17        Q.    And there are 49 members listed as of

18   2015-16, correct?

19        A.    Correct.

20        Q.    And there are 28 on Page 2 listed as

21   resigned, correct?

22        A.    Correct.

23        Q.    So you've gone from 99 members in 2010 to

24   49 members in 2015, correct?

25        A.    Correct.

1      Q.      And you list on Page 3 Cathryn Smitherman
2  as treasurer, correct?
3      A.      Yes.
4      Q.      And you list yourself as president,
5  correct?
6      A.      It's listed there, yes.
7      Q.      And vice president, president-elect is
8  blank, correct?
9      A.      Correct.
10     Q.      Did you prepare Page 3 of Defendant's
11  Exhibit 27?
12     A.      I did.  But this was very incomplete.
13  This was a working document.
14     Q.      Then on Page 4 you have Quadrille's dues
15  listed, correct?
16     A.      Correct.
17     Q.      You don't have anything inputted for the
18  amount of the dues, right?
19     A.      Not noted on this document, no.
20     Q.      And then farther in you have The Quadrille
21  membership directory for 2014-15 listed, correct?
22     A.      Okay.  I'm sorry.  Restate the question --
23     Q.      Sure.
24     A.      -- please.
25     Q.      Farther into Defendant's Exhibit 28, you

1  have The Quadrille membership directory 2014-2015,

2  correct?

3       A.    Correct.

4       Q.    And it doesn't list Ms. Smitherman on that

5  membership directory because she wasn't a member at

6  the time 2014-2015 came around, right?

7       A.    I'm sorry.  You're stating that Cathryn

8  Smitherman wasn't a member during '14-15?

9       Q.    She became a member in 2014-15.  In other

10 words, going into the 2014-15 year, Cathryn Smitherman

11 was not a member, right?

12      A.    I'm sorry.  Ask the question one more

13 time.

14      Q.    Sure.  When the 2014-15 year started for

15 you, Cathryn Smitherman was nominated to become a

16 member, right?

17      A.    I don't know.  I don't remember.

18      Q.    Who nominated Cathryn Smitherman?

19      A.    I don't know.

20      Q.    She's not listed in the 2014-2015 list in

21 Exhibit 48, is she?

22      A.    She's listed as a member in '14-15 on

23 Page 1 of The Quadrille membership directory.

24      Q.    As a member of 2014-15, right?

25      A.    Correct.

1      Q.      But not as an officer?

2      A.      Correct.

3      Q.      Okay.  And, again, the number is 49 that

4  were in the club at that time, right?

5      A.      This document was a working document.

6      Q.      Okay.  You have Party 1, Party 2, and

7  Party 3 listed within Defendant's Exhibit 28, correct?

8      A.      Correct.

9      Q.      And you don't have anything listed for

10  member expense or amount, correct?

11      A.      Correct.  But, again, this is

12  incomplete --

13      Q.      And then --

14      A.      -- and not the latest version.

15      Q.      I'm trying to build for us.

16      A.      Okay.

17      Q.      Then you get to three parties listed, a

18  Girls Night Out, a New Year's Eve, and a White Party,

19  correct?

20      A.      Correct.

21      Q.      You then have a list of the invitations

22  that were mailed out for Party 1, correct?

23      A.      Correct.

24      Q.      You then have a list of the invitations

25  for Party No. 2 that were mailed out, correct?

1      A.     It states that, but I don't know what was

2   electronic versus physically mailed.  We did Evites

3   for some things.

4      Q.     All I'm asking is -- I'm not asking you

5   were the invitations mailed out.  I'm asking you the

6   document has --

7      A.     It says that.

8      Q.     -- Party 1, Party 2, and now Party 3,

9   correct?

10     A.     Correct.

11            (Defendant's Exhibit 29 was marked for

12         identification.)

13     Q.     (By Mr. Gerakitis)  Let me hand you what's

14   been marked as Defendant's Exhibit 29.  Is this a

15   Quadrille spreadsheet, Defendant's Exhibit 29?

16     A.     Yes.

17     Q.     Turn to page Carmike 226.

18            MS. PREBULA:  They're all the same page

19         number.

20            MR. GERAKITIS:  Right.  It's the third

21         number.  But it's Carmike 226, okay.

22            MS. PREBULA:  They're all the same page

23         number.

24            MR. GERAKITIS:  I know.  It's Page 3 of

25         Carmike 226.

```
 1              MS. PREBULA:  Okay.

 2              MR. GERAKITIS:  I'm sorry.  I was trying

 3      to get there.

 4              MS. PREBULA:  Gotcha.

 5      Q.    (By Mr. Gerakitis)  Carmike 226, Page 3

 6  has a listing of Party 1, Party 2, Party 3.  Do you

 7  see that?

 8      A.    I do.

 9      Q.    In it it lists $593.95 as Party No. 1,

10  correct?

11      A.    Correct.

12      Q.    And it lists Crystal Trawick as having

13  those expenses of 593.95, correct?

14      A.    Correct.

15      Q.    Did you input that information or did

16  someone else?

17      A.    I did.

18      Q.    Party No. 2, it says Crystal Trawick Party

19  No. 2, 162.85.  Did you input that information?

20      A.    I did.

21      Q.    Do you remember the June 2015 e-mail we

22  saw where we referred to bank statements?

23      A.    Yes.

24      Q.    And you said you didn't recall seeing that

25  before?
```

1        A.      I said I did not remember it, yes.

2        Q.      You didn't remember it?

3        A.      Yeah.

4        Q.      Those numbers are consistent --

5        A.      Correlate, correct.

6        Q.      -- the 593.95 and 162.85 for Party No. 2,

7    correct?

8        A.      Correct.

9        Q.      And then the summary of those is listed as

10   an expense amount, but no one else has an expense

11   amount from Bryan down to Trawick, do they?

12       A.      At this time of this document, no one had

13   turned in receipts.

14       Q.      Did you get any receipts from anyone other

15   than yourself for the year you were president?

16       A.      We did.

17       Q.      Who else gave you receipts?

18       A.      Palmer Trawick did.  And I'm not sure

19   about Whitney O'Hara.  I felt like she did.  Amy Bryan

20   I know had some documentation as well.  But several of

21   their dues were held back; so if their out-of-pocket

22   expenses didn't exceed their dues that year, then it

23   was just taken out of the dues they owed.  Probably

24   not the best practice, but that's what we did.

25       Q.      Okay.  Turn, if you would, four pages to

1    where it says "Not Returning" and it says -- starts

2    with Collier Ezell.

3         A.     Uh-huh.

4         Q.     Do you know any of the reasons why Ezell

5    through Wilson did not return?

6         A.     Some of the responses were family,

7    children, time of life, age, those reasons.

8         Q.     Any of them give you one of those reasons?

9         A.     I mean, I don't remember which one of them

10   did or didn't.  I just know that was the general

11   feedback.

12        Q.     So turn to the next page.  It refers to a

13   2014-2015 balance.  And it says "Dues-Initial,

14   $10,610."  That's not the amount that was in the bank

15   at CB&T during 2014 and '15, was it?

16        A.     I mean, I don't recall it being that high.

17   But this was also a number based on everybody paying

18   their dues from the previous membership year, so,

19   again, an incomplete document.

20        Q.     So the Party 1 sum isn't inputted on the

21   page for 2014-2015 balance?

22        A.     A lot of this isn't inputted.

23        Q.     Well, the Party 1 balance is 593.95,

24   correct?

25        A.     Correct.

```
 1        Q.     So the Party 2 balance, the sum that you
 2   were owed of 162.85, it's not in this spreadsheet?
 3        A.     Huh-uh.
 4        Q.     No?
 5        A.     Huh-uh.
 6               MS. PREBULA:  You have to say yes or no.
 7               THE WITNESS:  Sorry.  No.
 8        Q.     (By Mr. Gerakitis)  So it says Party No. 2
 9   had a venue cost of $6,800.  Do you see that?
10        A.     I'm sorry.  Where?
11        Q.     Party No. 2, it says venue expense was
12   $6,800, correct?
13        A.     Correct.
14        Q.     And then another $1,800 for a band,
15   correct?
16        A.     Correct.
17        Q.     So that alone would be $8,600 for Party
18   No. 2, correct?
19        A.     Correct.
20        Q.     Were there any other expenses for Party
21   No. 1 other than the 593.95?
22        A.     Not that I'm aware of.
23        Q.     Were there any other expenses for the
24   Party No. 2 other than the $6,800 for the venue and
25   $1,800 for the band and your 162.85?
```

1      A.      Not that I'm aware of.

2      Q.      But you mentioned several people did have

3  expenses?  Your sister-in-law had expenses, right?

4      A.      Right.  But they would come out of the

5  dues that they had or had not paid at that time.

6      Q.      So they got to stay members but not pay

7  their dues?

8      A.      We that year decided we could hold -- it

9  was a decision that the board decided.  If you were

10  paying out-of-pocket expenses versus reimbursement,

11  just we'll take it out of your dues at the end of the

12  year based on how many receipts you had.

13      Q.      So if you add up all of these amounts, it

14  appears that the expenses are $9,356.80, taking what's

15  on for Party No. 2 and the expenses from Page 3 of

16  Defendant's Exhibit 29, correct?

17      A.      Can you ask the question one more time?

18      Q.      Sure.

19      A.      I'm sorry.

20      Q.      $6,800, and if we add $162.85 to it,

21  that's 8,600 plus 162.85.  Would you agree that's

22  8,762.85?

23      A.      If your calculations are correct, yes.

24      Q.      Okay.  And then if you add the Party 1,

25  it's 593.95.  That would be $9,356.80, correct?

1    A.    Correct.

2    Q.    And you weren't sure that you had 10,610

3 collected in dues because some people didn't pay dues

4 that year.  You held dues checks, right?

5    A.    Well, those were noted out of the 10,000.

6 You can see what was held back, I thought.  I think

7 they did.  And we had 22 members that we were still

8 trying to collect that weren't, it looks like,

9 calculated.  So there was $5,600 that could have

10 potentially come in.  I don't really know.  We had

11 outstanding 5600 according to this document.

12           (Defendant's Exhibit 30 was marked for

13       identification.)

14    Q.    (By Mr. Gerakitis)  Let me hand you what's

15 been marked as Defendant's Exhibit 30.  This is a

16 listing of members, who's on the board, new member,

17 and held checks for Quadrille's 2014-15, correct?

18    A.    Correct.

19    Q.    Amy Bryan's check was held.  In other

20 words, she didn't pay her dues, correct?

21    A.    Correct.

22    Q.    Jessica Tillery didn't pay her dues,

23 correct?

24    A.    Correct.

25    Q.    Crystal Trawick didn't pay her dues,

1    correct?

2         A.    Correct.

3         Q.    So according to this, the total paid is

4    9,925, correct?

5         A.    Correct, with an outstanding 7855.

6         Q.    But the bank records would show whether

7    that was collected, correct?

8         A.    Sure.

9         Q.    So $9,925 minus $9,356.80 is $568.20,

10   correct?

11        A.    Sure.

12        Q.    Where is the Carmike $2,000 sponsorship

13   listed in your income in either Defendant's Exhibit 29

14   or Defendant's Exhibit 30?

15        A.    It's not.  And this document, I think it

16   was originally prepared by Amy.  There's memberships

17   on here that I know have paid that are part of that

18   7855.  And both of these documents are incomplete.

19        Q.    And you don't know the amount of the

20   balance in the account at CB&T when it was turned over

21   to Cathryn Smitherman at the end of 2015?

22        A.    I don't recall the balance.

23        Q.    If you could, pick up again Defendant's

24   Exhibit 29.  And you have a listing of invitations

25   mailed out on 6/12.

1           MS. PREBULA:  What page are you looking

2      at, Richard?

3           MR. GERAKITIS:  It's the one right after

4      the balance sheet, invitations mailed out.

5           MS. PREBULA:  I think I've got it.  Yeah.

6      Keep going.

7           THE WITNESS:  This one (indicating)?

8           MS. PREBULA:  Yes.

9      Q.    (By Mr. Gerakitis)  So it shows

10   invitations mailed out on June 12th.  Was that for the

11   White Party at Columbus Country Club?

12      A.    I don't know.  I mean --

13      Q.    Well, we've gone over the save the date,

14   we've gone over the invitation and quite a few

15   documents from June 12th besides the W-9 that were all

16   being sent to your members.

17      A.    Uh-huh.

18      Q.    Yes?

19      A.    Yes.

20      Q.    So would it be fair to say on or about

21   June 12 you sent out invitations to the White Party?

22           MS. PREBULA:  Objection, asked and

23      answered.

24           MR. GERAKITIS:  Objection is noted.

25      Q.    (By Mr. Gerakitis)  You can answer.

1      A.    I mean, I don't know what document.  I

2   mean, it shows when it was mailed out, doesn't it, on

3   one of the exhibits?  Doesn't it say what date that

4   the invitation was mailed out?

5            MS. PREBULA:  Just answer his question.

6            THE WITNESS:  Repeat the question, please.

7      Q.    (By Mr. Gerakitis)  Would it be fair to

8   say that on or about June 12th, 2015, you sent out

9   invitations to the White Party at Columbus Country

10  Club?

11           MS. PREBULA:  Same objection.

12           THE WITNESS:  I'm not really sure when I

13      sent that invitation out.

14      Q.    (By Mr. Gerakitis)  Then turn to

15  June 27th, White Party heading --

16      A.    Okay.

17      Q.    -- in Defendant's Exhibit 29.

18      A.    Thank you.  Okay.

19      Q.    It lists who's attending, correct?

20      A.    It does.  But the very next document,

21  June 27th party, has June 12th.  I'm confused by the

22  dates on these documents.  There's two separate lists.

23      Q.    This is what I'm looking for, June 27th,

24  White Party.  Can you get to that?

25      A.    I do.  But right before it is another

1    mail-out list.  I don't know if those lists are the

2    same.

3         Q.    Well, it says the -- the page that's just

4    before it doesn't say anything about whether they're

5    attending.

6         A.    Okay.

7         Q.    It just says "invitations pending,"

8    correct?

9         A.    Yes.

10        Q.    Now, go to the one that says "dues

11   current, member's name, husband, attending."  Now,

12   this shows your dues as being current, correct?

13        A.    Yes.

14        Q.    But you've already said you held your

15   check for dues, correct?

16        A.    Yes.

17        Q.    And you held Amy Bryan, your treasurer's

18   check, correct?

19        A.    Correct.

20        Q.    And you held Jessica Tillery, your

21   secretary's check, correct?

22        A.    Correct.

23        Q.    And you held yours as president, correct?

24        A.    Correct.

25        Q.    And attending the June 27th party, you

1    have listed ten people, five members with other

2    guests:  Crystal Trawick, Heather Garrett, Jenny

3    McMillen, Laura Booker, and Palmer Trawick, correct?

4         A.    Yes.  But this list is incomplete.

5         Q.    Do you know of any other list that shows

6    who else attended other than as in Defendant's

7    Exhibit 29?

8         A.    I don't know of any other list.  But in

9    the top ten people, Ashley Varner was in attendance;

10   and she's not noted on this document.  And that's just

11   a glance.

12        Q.    So that would make maybe 11 or 12 people

13   who attended?

14        A.    I don't know how many attended.

15             MR. GERAKITIS:  Time for a break?

16             THE WITNESS:  Oh, my mike fell off.

17             MR. GERAKITIS:  This would be a good time

18        for a break because of the mike.

19             THE VIDEOGRAPHER:  Okay.  We are off

20        video.

21             (Recess from 12:02 p.m. to 12:23 p.m.)

22             THE VIDEOGRAPHER:  We are back on the

23        video record.

24        Q.    (By Mr. Gerakitis)  Earlier when we were

25   talking about the benefits of the sponsorship for

1   Carmike, you said it would give them exposure to

2   important people within Columbus.  Is that accurate?

3            MS. PREBULA:  I'm going to object.  That's

4        a nonspecific question or vague and ambiguous.

5        Which sponsorship?

6        Q.    (By Mr. Gerakitis)  Do you remember a

7   sponsorship that Carmike gave The Quadrille?

8        A.    Yes.

9        Q.    You do?

10       A.    Yes.

11       Q.    When did you get a check from Carmike for

12  it?

13       A.    I don't remember.

14       Q.    Did it land in your hands or in Jenny's

15  hands?

16       A.    I don't recall.

17       Q.    But you know you got paid?

18       A.    I know it was deposited, yes.

19       Q.    And who deposited it?

20       A.    I don't remember.

21       Q.    Who told you they deposited it?

22       A.    I don't remember.

23       Q.    Earlier you mentioned that in exchange for

24  that sponsorship by Carmike of Quadrille that it would

25  benefit them by exposing Carmike to influential

1    important people within Columbus, is that accurate?

2         A.    Yes.  That was my belief, yes.

3         Q.    What other competitors in the motion

4    picture exhibitor business are in Columbus?

5         A.    None.

6         Q.    Really?

7         A.    Other than the National Infantry Museum

8    which shows documentaries, none.

9         Q.    What were the costs for Party No. 3, the

10   White Party at Columbus Country Club?

11        A.    Maybe 2,800.

12        Q.    That's $2,800?

13        A.    Yes.

14        Q.    Okay.

15        A.    Again, give or take a few dollars.

16        Q.    When you arrived at the office on

17   Thursday, November 12, 2015, you found a spreadsheet

18   of donation records on your desk, right?

19        A.    Correct.

20        Q.    Let me hand you what's been marked as

21   Defendant's Exhibit 30.  Is Defendant's Exhibit 30 --

22   is it 31?  Have I done it again?

23              MS. PREBULA:  Yes, it's 31.

24              MR. GERAKITIS:  Thank you all.  How do I

25        do that?

1             (Defendant's Exhibit 31 was marked for

2       identification.)

3       Q.    (By Mr. Gerakitis)  I'm handing you

4  Defendant's Exhibit 31.  Is Defendant's Exhibit 31 the

5  spreadsheet of donation records --

6             MS. PREBULA:  You can just put all these

7       up here.

8             THE WITNESS:  Okay.  Yeah, they're all

9       getting crazy.

10      Q.    (By Mr. Gerakitis)  -- that you found on

11  your desk?

12      A.    Yes.

13            MS. PREBULA:  You don't have to organize

14      the exhibits.

15            THE WITNESS:  He referenced them, so I

16      kind of --

17            MS. PREBULA:  He can pull them for you.

18            THE WITNESS:  Okay.

19      Q.    (By Mr. Gerakitis)  Is this your

20  handwriting that says 15-2014-2015?

21      A.    No, I don't believe so.

22      Q.    Is it your handwriting that starts at the

23  date 12/2/2014 "L/C/S" all the way up to "S/J" for

24  Columbus Regional Medical Foundation?

25      A.    Yes.

```
1        Q.      And tell me what "L" stands for.

2        A.      Lisa De La Cruz.

3        Q.      What does "C" stand for?

4        A.      Crystal.

5        Q.      Crystal who?

6        A.      Trawick, me.

7        Q.      And who does "S" stand for?

8        A.      Shannon Sailors.

9        Q.      Then Children's Miracle Network, what does

10   "J" stand for?

11       A.      Jim Lucas.

12       Q.      And what does "S" stand for?

13       A.      Shannon Sailors.

14       Q.      What does "F" stand for?

15       A.      Fred Van Noy.

16       Q.      And what do those letters "L/C/S" or "L/C"

17   or "F/C" refer to?

18       A.      Communication regarding sponsorships that

19   I had presented to the company.

20       Q.      That's who you got approval from, is that

21   right?  Sinfonia, you got approval from Fred to do it,

22   right?

23       A.      Yes.  Definitely got, yes.

24       Q.      AVLF you got approval from Lisa De La Cruz

25   on it, correct?
```

1        A.      Yes.

2        Q.      Children's Miracle Network, you got

3   approval from Jim Lucas and Shannon on it, correct?

4        A.      No.  I wasn't involved at all.

5        Q.      Okay.  So then Columbus Symphony

6   Orchestra, you got approval from Lisa and did you get

7   approval from Shannon?

8        A.      Yes.

9        Q.      For Quadrille Club you only have Lisa and

10  Crystal --

11       A.      That's incorrect.

12       Q.      -- listed.

13       A.      I'm sorry.  It's incorrect.

14       Q.      What's incorrect about it?

15       A.      Because after speaking with Lisa, I spoke

16  to Shannon.

17       Q.      Tell me exactly what you remember telling

18  Lisa was the purpose for the Quadrille Club sponsor

19  donation.

20       A.      That I thought it would be a great

21  opportunity for Carmike to have access to a very

22  exclusive group of women in Columbus that were

23  influencers in the community.

24       Q.      Where else would those influential

25  exclusive group of women in Columbus go to a movie

```
 1   other than at Carmike?
 2        A.    Oh, they wouldn't unless they were
 3   traveling with their families outside in other
 4   communities.  But some of them were also teachers that
 5   would provide us with field trips and promote us to
 6   their schools.  Some of them had blogs that would
 7   write about things to --
 8        Q.    Where else?
 9             MS. PREBULA:  Let her finish her answer,
10        please.
11        Q.    (By Mr. Gerakitis)  Have you seen a blog
12   written about the --
13             MS. PREBULA:  Let her finish her answer,
14        please.
15        Q.    (By Mr. Gerakitis)  Tell me what else
16   there is that they would do.
17        A.    I'm just thinking of the membership body;
18   and some of them had, you know, business owners that
19   were, you know, potential vendors of ours.  It's just
20   a very important organization as far as their
21   membership body.  Most of them were very influential.
22        Q.    What's an important membership?
23        A.    I think that their ability to promote and
24   put the word out about Carmike, our culture was to
25   build brand equity in the communities that we were in
```

1  to where people, whether or not they had a choice,

2  would choose Carmike over sitting at home and watching

3  a movie in their house.

4       Q.    So you mentioned all of this in your

5  letters to your members in The Quadrille, that you saw

6  all these opportunities, correct?

7       A.    No, I did not.

8       Q.    Nothing prevented you from doing that, did

9  it?

10      A.    No, because I felt that was assumed by the

11  membership.

12      Q.    But the membership didn't know that you

13  were getting a sponsorship?  You didn't write any of

14  them.  We've gone through all those exhibits today.

15      A.    No, but I meant that they assumed that

16  there was importance of their membership since it was

17  what it was.

18      Q.    But you didn't mention the Carmike

19  sponsorship to any of your members in any writing, did

20  you?

21      A.    No, I did not.

22      Q.    If you look at Defendant's Exhibit 31, it

23  lists an AVLF PurSHOEing Justice sponsorship.  Do you

24  see that?

25      A.    I do.

1      Q.     And if you turn to Page PL-47 of

2  Defendant's Exhibit 31 --

3      A.     Yes.

4      Q.     -- so you wrote Alexandra Andersen and

5  Juanita Graham and told them to process a $2,500 check

6  for this event, right?

7      A.     I told them to get the check request, I

8  guess.  I don't know.  I don't see that.

9      Q.     Well, it says, "Please process a check for

10  $2,500 for this event," right?

11      A.     Yeah.  Sure.

12      Q.     It doesn't say check request.  It just

13  says process a check, right?

14      A.     That was their role in processing

15  payments, so --

16      Q.     That was Alexandra Andersen and Juanita

17  Grahams's role?

18      A.     At the time, yes.

19      Q.     Now, Ashley Heintz wrote you and asked for

20  Carmike to be a Ruby Slipper sponsor, correct?

21      A.     Is that what it says?  I don't know.

22      Q.     That's on PL-47.  "Crystal, please see the

23  attached."

24      A.     Oh, yes.  Sorry.

25      Q.     "I hope Carmike Cinemas will be a Ruby

1   Slipper sponsor," correct?

2        A.      Sure, yes.

3        Q.      And Ms. Heintz is your lawyer's daughter,

4   correct?

5        A.      Yes.

6        Q.      She is in your supper club, right?  She

7   hosts --

8        A.      She was in a wine club I think I was in

9   and a supper club, but she no longer lives in

10  Columbus.

11       Q.      But she's been in -- she's hosted your

12  Christmas Supper Club with you as a cohost, right?

13       A.      Yes.

14       Q.      And for the AVLF, for the Stiletto level,

15  the 2500, the logo is featured prominently on event

16  advertising, websites, newsletters, and e-mails from

17  AVLF about the event, prominent table and banner

18  placement.  Do you see all that?

19       A.      I do.

20       Q.      There was nothing listed about logo

21  features, signage, or anything in Defendant's

22  Exhibit 1, was there?

23       A.      No.

24       Q.      You were familiar with how sponsorships

25  are usually solicited, correct?

1      A.      Yes.

2      Q.      You thought it was important to see a

3  value in it, right?

4      A.      When not familiar with the event, yes.

5      Q.      And you wanted to know who the person was

6  who was making the request, right?

7      A.      I'm not sure of that relevance.

8      Q.      Ashley Heintz was someone known to you,

9  correct?

10     A.      Yes.

11     Q.      That influenced you in deciding to make

12  the sponsorship request, right?

13     A.      Her market influenced me.  It's Atlanta.

14     Q.      So you're saying that Ashley asking you

15  had no influence at all?

16     A.      If this request had come from anyone else

17  in the Atlanta market, which is a highly competitive

18  zone for us, I would have looked at it the same way.

19     Q.      Let me make sure I understand this.  You

20  said if someone else had sent it, you would have

21  looked at it.  How many other AVLF events after this

22  did you sponsor?

23     A.      I don't know that we did sponsor another

24  AVLF.

25     Q.      Are you saying that Ashley Heintz asking

1  you for it didn't influence you to participate?

2      A.    Yes, I am saying that.  This is -- Atlanta

3  is a very saturated market for us.

4      Q.    When you say "Atlanta," are you including

5  Camp Creek?

6      A.    I'm not really sure of the location of

7  Camp Creek.  I'm sorry.

8      Q.    What other theater in Atlanta can you

9  think of that's a Carmike theater?

10      A.    I can think that before the acquisition

11  AMC was one of our largest competitors, and they have

12  a strong presence here.

13      Q.    Well, AMC had not bought Carmike in 2014,

14  had they?

15      A.    That's my point.  They were our

16  competitor.

17      Q.    Right.  So I'm asking you:  What theaters

18  were in the Atlanta area in 2014 for Carmike?

19      A.    I can't recall.

20      Q.    Were there any inside the perimeter of

21  Atlanta, 285?

22      A.    I can't recall.

23      Q.    Were there any in the five-county

24  metropolitan area of Clayton, Fulton, DeKalb, Cobb, or

25  Gwinnett?

```
 1        A.      I have not looked at the demographics for
 2    theaters for this area in quite some time.  However,
 3    it was a very competitive zone when I was in
 4    marketing.
 5        Q.      Is the answer I don't know what theaters
 6    for Carmike were in the five-county metro area that I
 7    just named?
 8        A.      My answer is currently I still don't know
 9    where those locations are to date, right now.
10        Q.      Did you know in 2014 what theaters were in
11    the five-county metro area?
12        A.      In 2015 I would have known this area
13    fairly well.
14        Q.      I said in 2014.
15        A.      Okay.
16        Q.      When this request came in, did you know
17    what theaters were located for Carmike in the
18    five-county metro area I just named?
19        A.      I don't know where those areas are you
20    just named, so I can't answer that.  I do know during
21    that time I understood this market very well, and it
22    was very competitive.
23        Q.      What market theaters does Carmike consider
24    to be the Atlanta market?
25        A.      Inside Atlanta and just outside of
```

```
 1   Atlanta.
 2       Q.     Where are the theaters located?
 3       A.     I don't recall.
 4       Q.     A single theater in the Atlanta market
 5   where it's located?
 6       A.     I really can't.  I'm sorry.
 7       Q.     What kind of sign was placed at that
 8   event?  Was it an 8-1/2-by-11-inch Word document?
 9       A.     Are we talking at which event?
10       Q.     At the AVLF, this PurSHOEing Justice.
11       A.     Oh, I don't know.  I wasn't able to
12   attend.
13       Q.     Who attended from Carmike?
14       A.     No one.  I had asked Lisa if she had
15   anybody that could attend, and neither of us could
16   find anybody that could go.
17       Q.     What about any sort of managing directors
18   or assistant managers of theaters?
19       A.     No one was available.  And this happened a
20   lot when we sponsored events, our seat fillers.  I had
21   actually been asked to invite friends of mine to
22   tables that Lisa could not fill on behalf of the
23   executives.
24       Q.     For AVLF too?
25       A.     On that one we couldn't find anybody.  I
```

1   didn't send anybody up there.

2       Q.    So that benefit just went out the window?

3       A.    No.  We had exposure.

4       Q.    No.  The ten tickets, the benefit of

5   getting and using the ten tickets just went out the

6   window?

7       A.    Correct.

8       Q.    Nobody used them?

9       A.    We did not have anybody attend.

10              (Defendant's Exhibit 32 was marked for

11          identification.)

12      Q.    (By Mr. Gerakitis)  Let me hand you what's

13  been marked as Defendant's Exhibit 32.  This appears

14  to be an AVLF flyer from the PurSHOEing Justice event.

15  Is that what Defendant's Exhibit 32 is?

16      A.    I'm sorry.  What was the question?

17      Q.    The question is:  Is Defendant's

18  Exhibit 32 an AVLF flyer from the PurSHOEing Justice

19  event?

20      A.    Yes.

21      Q.    Did Carmike sponsor in the Stiletto level?

22      A.    Yes.

23      Q.    And Troutman Sanders sponsored in the

24  Stiletto level, didn't they?

25      A.    I didn't know.

1    Q.    So you never saw this flyer?  They never

2    provided it to you?

3    A.    Not that I recall.

4    Q.    You never saw Defendant's Exhibit 32?

5    A.    I don't remember.

6    Q.    You didn't check to see what kind of event

7    logo, materials were being used?

8    A.    I sent her a logo.

9    Q.    And that's it?

10   A.    And I trusted that these assets would be

11   honored.

12   Q.    And Ashley Heintz is a Kitten Heel level

13   participant and Prebula & Associates is a Kitten Heel

14   level participant, correct?

15   A.    I don't see that.  Where does it say that?

16   Q.    Kitten Heel level on the back page of

17   Defendant's Exhibit 32.

18   A.    Oh, sorry.  Yes.

19   Q.    So there are one, two, three, four, five,

20   six, seven, eight, nine, ten lawyers, it looks like,

21   on here.  The only businesses that are on here are

22   Carmike, Coast 2 Coast, and State Bank.

23   A.    Okay.

24   Q.    That's it?  That's all you saw?

25   A.    That's all I see right here.

1      Q.     Okay.  In this package in Defendant's

2  Exhibit 31 that was on your desk November 12th, there

3  are 12 2015 events listed, correct?

4             MS. PREBULA:  I'm sorry.  Which one are

5        you referring to, 31?

6             MR. GERAKITIS:  31, Defendant's

7        Exhibit 31.

8             MS. PREBULA:  Thank you.

9             THE WITNESS:  I count 11.

10     Q.     (By Mr. Gerakitis)  Well, the AVLF was in

11  2015.  In other words, the event happened in 2015,

12  right?  We just saw that?

13     A.     Okay.

14     Q.     So you have AVLF up to Columbus Regional

15  Medical Foundation, correct?

16     A.     Correct.

17     Q.     There's nothing for 2011 listed?

18     A.     I'm sorry?

19     Q.     In other words, there's nothing that you

20  submitted for 2011?

21     A.     Correct.

22     Q.     You weren't responsible then, right?

23     A.     Correct.

24     Q.     So there is four in 2011.  There are none

25  in 2012, correct?

1       A.      Correct.

2       Q.      There is one in 2013, correct?

3       A.      Correct.

4       Q.      And then three in 2014 until that donation

5    to AVLF that you first approved, correct?

6       A.      Correct.

7       Q.      At PL-40 in Defendant's Exhibit 31 is the

8    Carmike letter that you wrote and put Jenny McMillen's

9    name on, correct?

10      A.      Yes.

11              (Defendant's Exhibit 33 was marked for

12              identification.)

13      Q.      (By Mr. Gerakitis)  Let me hand you what's

14   been marked as Defendant's Exhibit 33.  This appears

15   to be a production by you of an e-mail on Sinfonia

16   donation, correct?

17      A.      Correct.

18      Q.      And Fred Van Noy approved it, correct?

19      A.      Correct.

20      Q.      And the reason Fred Van Noy approved it

21   was why?

22      A.      Because in Destin this is a market where

23   we were having extreme legal issues with our landlord

24   and because a request came by nature of that

25   particular landlord, I wanted to involve Fred.

1       Q.      And he approved it?

2       A.      Correct.

3       Q.      And you knew what you were getting as a

4   result of that $1,000 sponsorship?

5       A.      I believe so, yes.

6               (Defendant's Exhibit 34 was marked for

7           identification.)

8       Q.      (By Mr. Gerakitis)  Let me hand you what's

9   been marked as Defendant's Exhibit 34.  This is titled

10  "Audit of Advertising Department Expenses," correct?

11      A.      Correct.

12      Q.      Have you seen Defendant's Exhibit 34

13  before today?

14      A.      Yes.

15      Q.      When did you first see it?

16      A.      Yesterday.

17      Q.      Did you review it when you saw it?

18      A.      Yes.

19      Q.      Do you see where it says "As the result of

20  the review of an e-mail chain providing information

21  about a questionable donation"?

22      A.      Yes.

23      Q.      You do?

24      A.      I do.

25      Q.      Do you know what e-mail chain that's

1   referring to?

2       A.      After reviewing this document yesterday,

3   yes.

4       Q.      Has Jenny McMillen ever told you that she

5   had been contacted by Cathryn Smitherman at any point?

6       A.      Yes.

7       Q.      When did she tell you?  When did Jenny

8   McMillen tell you she had been contacted by Cathryn

9   Smitherman?

10      A.      She reached out to me and I don't remember

11  what week it was because I was opening a theater and I

12  was dual traveling that week because it was between a

13  theater opening and a marketing convention in LA,

14  so --

15      Q.      You were in Oklahoma, right?

16      A.      Was it?  Maybe.

17      Q.      And then you went to LA?

18      A.      Yeah.

19      Q.      Because that was a week before the

20  Steeplechase, right?

21      A.      Yeah.  I think, yeah.  Yeah.  Anyways, we

22  had a big opening and we didn't normally have two

23  things like that packed into one week, so it was a

24  busy week.  But, anyways, she either texted me or

25  e-mailed me.

1       Q.      And it's Jenny, right?

2       A.      Jenny.   Either texted me or e-mailed me

3   and said that Cathryn was asking about the sponsorship

4   and she was like -- I don't remember what her inquiry

5   was about it.   But she said, you know, what do I tell

6   her?   And I was like, well, tell her it was a

7   sponsorship for -- and I read the e-mail.   And I did

8   not mean to write New Year's Eve party.   I will be

9   clear.   That was a typo.   I meant the White Party.

10  But, anyways, I just told her to -- you know, that we

11  had gotten one sponsorship, it was one party, and that

12  we would not be duplicating that process moving

13  forward.

14      Q.      You spoke with Jenny McMillen or texted

15  with her?   Which was it?

16      A.      It was texting or -- it looks like it was

17  an e-mail that was sent.   So she may have -- she

18  e-mailed me.

19      Q.      So Cathryn Smitherman wrote Jenny McMillen

20  did Quadrille have sponsors last year, right?

21      A.      Uh-huh.   According to this, yes.

22      Q.      She was an officer at that time?

23              MS. PREBULA:   "She," who?

24      Q.      (By Mr. Gerakitis)   Cathryn Smitherman.

25  Thank you.   Cathryn Smitherman was an officer of The

1  Quadrille on November 2, 2015, correct?

2       A.      Correct.

3       Q.      You weren't an officer any longer, were

4  you?

5       A.      I was on the board as the past president.

6       Q.      Well, we've looked at the bylaws.

7       A.      Right.  I mean, based on the bylaws for

8  2010, no.

9       Q.      And any other bylaws you would know about,

10  right?

11       A.      To my knowledge, yes.

12       Q.      You have never seen any other bylaws that

13  list anybody other than a president, a

14  president-elect, a secretary and treasurer as being

15  officers, right?

16       A.      Correct.  I saw no bylaws past 2010,

17  actually.

18       Q.      And that's Defendant's Exhibit 5 is the

19  bylaws you're referring to.  Those are the only ones

20  you're aware of exist?

21       A.      Correct.

22       Q.      So Cathryn writes Jenny and says:  "I am

23  confused as to why Quadrille would have sponsors since

24  we are a social club.  I have a letter that is from

25  you asking for sponsorships."  It was not from Jenny

1    McMillen?  It was from you, right?

2         A.    I drafted that for Jenny so she could help

3    solicit sponsorships, period.

4         Q.    But Jenny didn't send you the letter?

5         A.    That's correct.

6         Q.    You took the letter and submitted it, not

7    Jenny, right?

8         A.    Yes.

9         Q.    You took the letter and submitted it?

10        A.    Yes.

11        Q.    Yes.  And Cathryn said, "I wanted to make

12   sure it was legitimate," correct?

13        A.    Correct.

14        Q.    Jenny could have answered without calling

15   you, couldn't she?

16        A.    Yeah.

17        Q.    Jenny could have said I don't know what

18   you're talking about, right?

19        A.    Correct.

20        Q.    But she reached out to you?

21        A.    Correct.

22        Q.    The first e-mail at 8:25, at 10:29 Jenny

23   writes:  "Please read below"?

24        A.    Uh-huh.

25        Q.    Did Jenny forward you Cathryn Smitherman's

1    e-mail of November 2nd?

2          A.    Yes.

3          Q.    Did you write:  "Tell her we solicited

4    support for our New Year's Eve party"?

5          A.    Yes.  And that was a typo.

6          Q.    Did you write:  "But only one company

7    signed on"?

8          A.    Yes.

9          Q.    Did you write:  "This was only last year

10   to raise funding and will not be duplicated going

11   forward"?

12         A.    Yes.

13         Q.    Did you write:  "Try not to get into who

14   because she works at Carmike and I would prefer she

15   wasn't involved"?

16         A.    Yes.

17         Q.    Well, it's not true that you supported --

18   that you solicited support for the New Year's Eve

19   party, correct?

20         A.    Correct.

21         Q.    But you wanted Jenny to tell her that?

22         A.    No.  I wanted Jenny to tell her about the

23   White Party.  That was a typo.  I wrote this obviously

24   from my phone in between openings and a lot of other

25   things going on.  That was a mistake.

1     Q.     It's a typo because New Year's Eve party
2  looks like White Party?
3              MS. PREBULA:  Objection, argumentative.
4              MR. GERAKITIS:  Objection is noted.
5              THE WITNESS:  It's the wrong party, and it
6        was a mistake.  I didn't mean to write New Year's
7        Eve party.  And that wouldn't have made sense in
8        context to any of that going out in the first
9        place.
10     Q.     (By Mr. Gerakitis)  And you said:  "But
11  only one company signed on"?
12     A.     Yeah.
13     Q.     That was Carmike, correct?
14     A.     Correct.
15     Q.     You didn't send that letter to anyone
16  else?
17     A.     I did not solicit from any other
18  companies.
19     Q.     Jenny did not send that letter to anyone
20  else?
21     A.     That I don't know.
22     Q.     Jenny didn't have the letter to send?
23     A.     She did have the letter.
24     Q.     You're certain of that?
25     A.     I gave it to her.

1    Q.    If Jenny had the letter, all she had to do
2    was say, I sent -- I approved the letter.  I sent the
3    letter.
4        A.    There's nothing about this Jenny was
5    unaware of because we discussed it.
6        Q.    You said:  "This was only last year to
7    raise funding"?
8        A.    Yes.
9        Q.    What was the need for funding?
10       A.    Any organization soliciting a sponsorship
11   dollar would be for funding.  What would be the other
12   purpose?
13       Q.    Do you consider The Quadrille to be a
14   charitable --
15       A.    I did at this time.  Now, I just don't --
16       Q.    Do you know what a charitable is?  Define
17   it for me.
18       A.    I can't.
19       Q.    When you thought it was a charitable at
20   that time, what were its charitable purposes?  What
21   was the Quadrille's charitable purposes when you
22   submitted the letter in June of 2015?
23       A.    By definition I don't understand what
24   you're inferring to as charitable.
25       Q.    I'm asking you.  You said at that time you

 1   thought it was charitable.

 2              MS. PREBULA:  Wait for his question.

 3        Q.    (By Mr. Gerakitis)  What do you define as

 4   charitable according to your knowledge in June of 2015

 5   when you submitted the letter?

 6        A.    I thought an organization that was a

 7   nonprofit would be considered charitable.

 8        Q.    And you said only one company signed on.

 9   Who else was solicited?

10        A.    I don't know.  I personally did not

11   solicit anyone else.

12        Q.    How would you know who all signed on?

13        A.    If they had written a check, I would have

14   known.

15        Q.    Are you saying that Amy Bryan knows that

16   there was a $2,000 check deposited?

17        A.    I would think so, but I don't know.

18        Q.    You said:  "Try not to get into who

19   because she works at Carmike."  Who is "she"?

20        A.    Cathryn Smitherman.

21        Q.    "And I would prefer she wasn't involved"?

22        A.    Correct.

23        Q.    What's the problem with somebody who's in

24   the financial analysis side of Carmike looking at

25   audit materials?

1      A.      Well, she would have seen that anyways.  I

2   think it was just our failure to get more sponsorships

3   on.  I mean, that was the embarrassing part of this.

4   I mean, there's nothing about Quadrille's financials

5   she didn't have access to.  She would have seen the

6   check come through.  I mean, she had access to

7   everything as treasurer.

8      Q.      Cathryn Smitherman had access is what

9   you're saying when this letter came through in

10  November?

11     A.      I would have thought she did.

12     Q.      Do you know when Cathryn Smitherman had to

13  change the bank account?

14     A.      No.

15     Q.      Would you believe the Columbus Bank &

16  Trust records on it?

17     A.      Yes.

18     Q.      Would you believe it was November 3rd was

19  when she was able to get on the bank account?

20     A.      I don't -- I mean, I don't know.

21     Q.      Do you think that Cathryn Smitherman knew

22  that you had complained about pay or promotions when

23  she reached out to Jenny McMillen to ask about the

24  source of this sponsorship?

25     A.      I don't know what Cathryn was aware of.

1    Q.    Do you think Cathryn Smitherman acted
2  improperly in raising this to Jenny McMillen about the
3  sponsorship?
4    A.    I didn't have anything to hide, so --
5    Q.    Did you think that Cathryn Smitherman
6  acted improperly in raising this to Jenny McMillen
7  about the sponsorship with Carmike?
8    A.    If she had a question as the treasurer,
9  she was obligated to ask.
10    Q.    How about under the code of conduct for
11  Carmike, did Cathryn Smitherman have an obligation to
12  inquire of Jenny McMillen as to the source of this
13  funding?
14    A.    If she questioned something on behalf of
15  the company based on the code of conduct, she would
16  have reported it to her supervisor.
17    Q.    And that's exactly what she did, right?
18    A.    I don't know.
19    Q.    She went to Greg Wiggins.
20    A.    Okay.
21    Q.    That was her supervisor, right, if you
22  know?  Was Greg Wiggins Cathryn Smitherman's
23  supervisor?
24    A.    I think she reported to him, but I don't
25  know if that's her direct report.

1      Q.      So where Melanie Powell writes "This is a
2   local social organization," that was accurate, wasn't
3   it?
4      A.      Yes.
5      Q.      "And does not have any public charity
6   status," that was accurate about The Quadrille, wasn't
7   it?
8      A.      If that's what she found, then yes,
9   because I don't know.  I couldn't tell you what a
10  501(c) was when I was asked.
11     Q.      Crystal Trawick was a member of the
12  organization, correct?
13     A.      Correct.
14     Q.      And you asked Carmike to contribute?
15     A.      Yes.
16     Q.      And Carmike was the only company to
17  contribute?
18     A.      Yes.
19     Q.      You told Fred Van Noy and Fred Friedel
20  that you were not aware that The Quadrille Club was
21  not a charitable organization, correct?
22     A.      Not correct.  I mean, I was asked if
23  Quadrille was a 501(c) and I said I didn't know and
24  they said it's not.
25     Q.      And you said I'm not aware --

1      A.      But to be clear, I didn't understand that

2   that meant -- I don't know what a 501(c) is.

3      Q.      Did you ask them what is a 501(c)(3) when

4   they asked you what it meant?

5      A.      No, because I didn't know what it was;

6   and, therefore, I did not know that Quadrille wasn't a

7   501(c)(3).

8      Q.      Did you look at the AVLF flyer or

9   materials when Ashley Heintz made the request of you

10  to see that it's a 501(c)(3)?

11     A.      No.

12     Q.      You told Fred Van Noy and Fred Friedel in

13  that meeting on November 12th that the Quadrille Club

14  solicited funds from other organizations, didn't you?

15     A.      I told them that we weren't the only ones

16  to my understanding that was asked.

17     Q.      But you didn't know who Jenny asked, did

18  you?

19     A.      No.

20     Q.      And if Jenny had asked someone, it would

21  have been very easy for Jenny to have responded to

22  Cathryn, wouldn't it?

23     A.      Probably.

24             MS. PREBULA:  Objection, calls for

25         speculation.

1        Q.      (By Mr. Gerakitis)   The Quadrille Club
2    provided you a W-9 is what you told them, correct?
3        A.      Yes.
4        Q.      You told Fred and Fred you had a W-9 from
5    the organization, right?
6        A.      I told them that I had secured a W-9 for
7    payment.
8        Q.      And you told them that the Quadrille Club
9    was an LLC, right?
10       A.      I don't remember telling them it was an
11   LLC because, I'll be honest, I don't know the
12   relevance.
13       Q.      And you also told them no Carmike
14   resources, staff, or equipment were used for the
15   benefit of the Quadrille Club too?
16       A.      I did not say that.
17       Q.      You told them that no Carmike resources
18   were used for the benefit of Follies?
19       A.      I did not tell them that either.  I was
20   asked if we had used resources and I had said yes and
21   several times in-kind.
22       Q.      Do you know how much time London Mahogany
23   spent on the Follies from March of 2015 through
24   October of 2015?
25       A.      No.

1          Q.      Have you asked him?

2          A.      I haven't spoken to London in years.

3          Q.      Is there a reason he's not listed on your

4   initial disclosures as someone with knowledge of the

5   facts and circumstances in this lawsuit?

6          A.      No.

7          Q.      When you came back from meeting with Fred

8   Van Noy and Fred Friedel, you went and got Jennifer

9   Therrien and took her into a prize closet, didn't you?

10         A.      No.  I did other -- I can't remember when

11  Shannon and I spoke that morning.  I went back to my

12  office, opened up some e-mails.  And then it was the

13  end of the week, so we always have projects and I went

14  to get her.  We went into the supply closet, which is

15  about the size of this room.  And I told her where the

16  advertisement stuff was and the marketing stuff was

17  and that we needed to get it cleaned up.  I needed her

18  to rally up the troops to help her do that because we

19  had so many theater openings coming in and out and we

20  were very disorganized with our materials.  And that

21  was the purpose.

22         Q.      My question was --

23         A.      Do you want to get to the next point?

24         Q.      My question was simply:  When you came

25  back from the meeting with Fred Friedel and Fred

1    Van Noy, you took Jennifer Therrien into the supply

2    closet, as you call it.  I call it a prize closet.

3    The supply closet, can we agree on using that term?

4         A.    The supply closet?

5         Q.    Yes.

6         A.    Yes.

7         Q.    You took Jennifer Therrien in there?

8         A.    Correct.

9              MS. PREBULA:  Objection, asked and

10        answered.

11             THE WITNESS:  To perform her duties, yes.

12        Q.    (By Mr. Gerakitis)  What was Jennifer

13   Therrien's job title on November 12, 2015?

14        A.    I can't remember.  Something

15   communications.  Marketing assistant maybe.  I don't

16   remember.

17        Q.    She served as your assistant?

18        A.    She was aide to me as head of marketing,

19   yes.

20        Q.    When you -- well, let's go back.  She was

21   hired about the time your son was born, that March,

22   April, May time frame of 2014?

23        A.    Oh, I don't remember.

24        Q.    Do you remember what the requirements were

25   for that marketing position that Jennifer Therrien was

1    hired for?

2         A.    No, I do not; but I know it changed.  She

3    got moved into a higher level of responsibility with a

4    pay increase at some point, so her responsibilities

5    changed.

6              (Defendant's Exhibit 35 was marked for

7         identification.)

8         Q.    (By Mr. Gerakitis)  Let me hand you what's

9    been marked as Defendant's Exhibit 35.  This appears

10   to be a job description for marketing communications

11   associate.  Is that what Defendant's Exhibit 35 is?

12        A.    I believe so.

13        Q.    Did you prepare Defendant's Exhibit 35?

14        A.    Yes.

15        Q.    Does it say education and/or experience,

16   Bachelor's degree?

17        A.    Where is that?

18        Q.    Page 2.

19        A.    Yes.

20        Q.    Jennifer had a Bachelor's degree, correct?

21        A.    She did.  It also says or at least two

22   years of demonstration experience.

23        Q.    But that's -- but Jennifer met it by

24   having a Bachelor's degree --

25        A.    Sure.

1      Q.      -- for education and/or experience, right?

2      A.      Yes.

3      Q.      And her --

4      A.      Well, along with experience, yes.

5      Q.      Now, you learned that Jennifer spoke with

6  Sadie Marshall, Fred Friedel, Dan Ellis, and Fred

7  Van Noy on November 12 --

8      A.      Yes.

9      Q.      -- 2015, correct?

10     A.      Yes.

11     Q.      And you understand that Jennifer was upset

12 when she went to speak to Marshall, Friedel, Ellis,

13 and Van Noy, correct?

14     A.      Based on the document I read, that was

15 their interpretation.

16     Q.      Did you ever talk to Jennifer to ask her

17 whether she had ever spoken to Sadie Marshall, Fred

18 Friedel, Dan Ellis, and Fred Van Noy about your

19 meeting in the supply closet?

20     A.      No, I did not.

21     Q.      Did anything prevent you from talking to

22 Jennifer Therrien about her meeting with Sadie

23 Marshall, Fred Friedel, Dan Ellis, and Fred Van Noy

24 about your meeting in the supply closet?

25     A.      I'm sorry?

1        Q.      I'll ask it again if you need me to.

2        A.      Thank you.  Please.

3        Q.      Sure.  Did anything prevent you from

4    talking to Jennifer Therrien about her meeting with

5    Sadie Marshall, Fred Friedel, Dan Ellis, and Fred

6    Van Noy about your meeting with her in the supply

7    closet on November 12th?

8        A.      No.

9        Q.      You understand that Jennifer Therrien

10   reported that you had told her you were being

11   investigated, correct?

12       A.      I'm aware that that was her statement.

13       Q.      You didn't learn that Jennifer Therrien

14   learned from anyone else that you were being

15   investigated, did you?

16       A.      I never talked to her about anything other

17   than those mail-outs and being in trouble over them

18   outside of the closet conversation, the supply closet

19   conversation.

20       Q.      So the only thing you talked to her about

21   were the mail-outs and being in trouble over the

22   mail-outs, correct?

23       A.      In addition to cleaning the closet and

24   organizing it and getting everybody in there, I asked

25   her about the mail-outs.  She apologized for doing it

1   because she knows she was told not to.  She said, "I'm

2   so sorry."  I said, "Well, it got me in a lot of

3   trouble."

4        Q.    Have you looked at anything in any part of

5   Defendant's Exhibit 34 that refers to a mail-out being

6   done incorrectly?

7        A.    I'm sorry.  What?

8        Q.    Hold Defendant's Exhibit 34.  Is there

9   anything that was reported to Fred Friedel or Fred

10  Van Noy about a mailing being done incorrectly?

11       A.    It was one of the questions they asked me

12  that morning.

13       Q.    My question is not what they asked you.

14  My question is:  Is there anything in Defendant's

15  Exhibit 34 about a mailing being done incorrectly?

16       A.    No.

17       Q.    Do you think Crystal -- check that.  Do

18  you think that when Jennifer Therrien was meeting with

19  you in that supply closet that she was aware before

20  she went in that supply closet that you were being

21  investigated?

22       A.    I wouldn't know.

23       Q.    Do you remember earlier you said that you

24  spoke to Shannon that morning?

25       A.    Yes.

1      Q.      You spoke to Lisa De La Cruz also that

2   morning, correct?

3      A.      Yes.

4      Q.      Good.

5      A.      And Jennifer Therrien helped prepare

6   documents for that morning as well.

7      Q.      Jennifer Therrien helped prepare

8   Defendant's Exhibit 31, didn't she?

9      A.      She was -- the check request, she had

10  copies of those.  She prepared those.

11     Q.      She helped put and organize that for you?

12     A.      And Shannon, yes.

13     Q.      Because you asked Shannon on November 11th

14  to pull that for you, correct?

15     A.      Yes.

16     Q.      And they did?

17     A.      Correct.

18     Q.      And they had it on your desk for you to go

19  to that meeting that morning, correct?

20     A.      Correct.

21     Q.      There's nothing in Defendant's Exhibit 31

22  that refers to a mailing being done incorrectly, is

23  there?

24     A.      No.

25     Q.      When Jennifer met with Sadie Marshall,

1    Fred Friedel, Dan Ellis, and Fred Van Noy, you weren't
2    on site at Carmike that day?  You had already left
3    that mid-morning, 11:00 or so, right?
4         A.    I don't know when they met, and I don't
5    know what I was doing that day.
6         Q.    Has anyone ever told you that Jennifer
7    Therrien did not report that you had told her you were
8    being investigated?
9         A.    What was the question?
10        Q.    Sure.  Has anyone at Carmike ever told you
11   that Jennifer Therrien did not report that you had
12   told her you were being investigated?
13        A.    Not -- I don't remember.  I don't recall.
14        Q.    Did you ever ask anyone if Jennifer
15   Therrien had ever not reported to anyone at Carmike
16   that you were being investigated?
17        A.    I don't recall.
18        Q.    Wouldn't you think that would be something
19   you would want to inquire about?
20             MS. PREBULA:  Objection, calls for
21        speculation.
22             THE WITNESS:  I don't remember what frame
23        of mind I was in during that time.  So rational
24        or not, I don't know.
25        Q.    (By Mr. Gerakitis)  Well, let's go back,

1    then.  That's almost three years ago now.

2         A.    Uh-huh.

3         Q.    Excuse me.  Two years ago now.  Ever since

4    then you haven't asked anyone, anybody on staff,

5    London, Tashara Fussell, Jamie Cox, anyone, if

6    Jennifer Therrien did not actually report that you had

7    told her you were under investigation?

8         A.    I'm going to ask you to rephrase the

9    question just because there were names and then an

10   open-ended statement in there.  So I just want to be

11   accurate in my response.  So what was the question

12   again?  Sorry.

13        Q.    Have you asked any of your members of your

14   marketing department whether Jennifer Therrien

15   reported that you had told her you were under

16   investigation?

17        A.    Not to my knowledge.

18        Q.    Was there anything preventing you from

19   asking anyone in the marketing department who worked

20   with you if Jennifer Therrien had reported you for

21   disclosing you were being investigated?

22        A.    During my employment or postemployment?

23   Either?

24        Q.    Until today, August 17, 19 -- 2017.  You

25   can tell how old I am.

1    A.    We all make mistakes.

2    Q.    I'm older than your father-in-law.

3    A.    Is there anything preventing me?  I

4  mean --

5    Q.    There's so many people listed in your

6  initial disclosures.  There's almost 60 people listed.

7    A.    Uh-huh.

8    Q.    Of those 60, did you ask any of the people

9  in your initial disclosures if Jennifer Therrien

10 actually reported you for telling her you were being

11 investigated?

12   A.    Not to my knowledge.

13         (Defendant's Exhibit 36 was marked for

14         identification.)

15   Q.    (By Mr. Gerakitis)  Let me hand you what's

16 been marked as Defendant's Exhibit 36.

17   A.    I'm sorry.  I'm just trying to --

18   Q.    This appears to be a program update,

19 rewards and various other functions, group sales,

20 social media, correct?

21   A.    Yes.

22   Q.    Is this your handwriting that appears on

23 Defendant's Exhibit 36?

24   A.    Yes.

25   Q.    And this is from November 9, 2015?

1      A.      I don't see a date.  I'm sorry.

2      Q.      Upper right corner.

3      A.      Oh, yes.  I assume.  I don't know.

4      Q.      Well --

5      A.      I know I see the date, but like I --

6      Q.      That would have been a Monday, correct?

7      A.      Yes.  I assume a Monday.

8      Q.      Well, this is what you would have reviewed

9  on a Monday morning meeting, correct?

10      A.      Yes.  These would be my notes.

11      Q.      So these are your notes on Monday,

12  November 9, all along the margins, all spread

13  throughout Defendant's Exhibit 36?  Nobody else's

14  writing is on here?

15      A.      No.

16      Q.      So you were unaware that there was an

17  investigation by Melanie Powell ongoing into the

18  advertising audit expenses at this point, correct?

19      A.      Yes.

20              (Defendant's Exhibit 37 was marked for

21         identification.)

22      Q.      (By Mr. Gerakitis)  Let me hand you what's

23  been marked as Defendant's Exhibit 37.  These appear

24  to be the Monday morning meeting notes from

25  November 16, that Monday.  Is that what Defendant's

1    Exhibit 37 is?

2          A.     Yes.

3          Q.     Is this your handwriting on it?

4          A.     Yes.

5          Q.     All of it?  All the handwriting is all

6    yours?

7          A.     Yes.

8          Q.     Now, you had already met as of November 16

9    with Fred Van Noy and with Fred Friedel on

10   November 12th, correct?

11         A.     Correct.

12         Q.     You had also met with Dan Ellis and Fred

13   Van Noy on Friday, November 13th, correct?

14         A.     Correct.

15         Q.     Now, you understand that Dan Ellis is a, I

16   would offer to say, fairly close friend of your

17   father-in-law, correct?

18         A.     Yes.

19         Q.     Bought his house?

20         A.     Yes.

21         Q.     Play golf together a lot?

22         A.     Yes.

23         Q.     You think Dan Ellis is a fair fellow,

24   don't you?

25         A.     In regards to my family, yes.

1    Q.    Well, you're a part of your family, aren't

2  you?

3    A.    Yes.

4    Q.    And you think Dan Ellis is a pretty fair

5  fellow, don't you?

6         MS. PREBULA:  Objection, asked and

7    answered.

8         MR. GERAKITIS:  Objection is noted.

9         THE WITNESS:  I personally like Dan Ellis.

10   Q.    (By Mr. Gerakitis)  Do you think Dan Ellis

11  is fair?

12        MS. PREBULA:  Same objection.

13        THE WITNESS:  It depends on in respect to

14    what.

15   Q.    (By Mr. Gerakitis)  Do you think Dan Ellis

16  is fair?

17        MS. PREBULA:  Same objection.

18        THE WITNESS:  I don't know how to answer

19    that.

20   Q.    (By Mr. Gerakitis)  Do you think Dan Ellis

21  jumps to conclusions and is wrong?

22        MS. PREBULA:  I'm going to object to

23    relevance.

24        MR. GERAKITIS:  Objection is noted.

25        THE WITNESS:  To give opinion on

1          somebody's fairness in the workforce seems unfair

2          when I know him personally, and I like Dan

3          personally.

4          Q.     (By Mr. Gerakitis)  Do you think Dan Ellis

5    would lie about what was reported to him by Jennifer

6    Therrien?

7               MS. PREBULA:  It calls for speculation.

8          Objection.

9          Q.     (By Mr. Gerakitis)  Do you think Dan Ellis

10   would lie about what was reported to him by Jennifer

11   Therrien?

12              MS. PREBULA:  Same objection.

13              THE WITNESS:  All I can say is I would

14         hope not.

15         Q.     (By Mr. Gerakitis)  Have you concluded

16   that Dan Ellis has lied about what was reported to him

17   by Jennifer Therrien on you disclosing to her that you

18   were under investigation?

19         A.     I don't know how I interpreted that

20   statement, what I read.  I just felt that parts of it

21   were untrue and I'm not sure of the source, so --

22         Q.     I'm asking you a very specific question.

23   Have you concluded that Dan Ellis has lied about what

24   was reported to him by Jennifer Therrien on you

25   disclosing to her that you were under investigation?

1          MS. PREBULA:  Objection, asked and noted.

2          MR. GERAKITIS:  Noted.

3          THE WITNESS:  I've made no conclusions.

4     Q.    (By Mr. Gerakitis)  How long have you

5   known that Dan Ellis had been approached by Jennifer

6   Therrien about you being under investigation?

7     A.    I never knew that Jennifer approached Dan

8   Ellis until I read the document yesterday, and I don't

9   even know it stated that either.

10    Q.    Jennifer Therrien, as far as you know,

11  spoke with Dan Ellis about you telling her you were

12  under investigation, correct?

13    A.    Based on the document I read yesterday,

14  yes.

15    Q.    You knew it before you saw a document

16  yesterday that Jennifer Therrien had spoken with Dan

17  Ellis about you telling Jennifer you were under

18  investigation, correct?

19    A.    I do not recall having knowledge of that.

20    Q.    You knew that Jennifer Therrien had

21  reported that you were under investigation as early as

22  November 17, 2015, when you were terminated, didn't

23  you?

24    A.    I don't know how or what I knew about

25  Jennifer Therrien in the investigation process at that

1  point.

2      Q.     In Defendant's Exhibit 37, there aren't

3  nearly as many notes as there are on Monday,

4  November 9th, in Defendant's Exhibit 36.  Were you

5  distracted?

6      A.     No.  Fred Van Noy directed most of my

7  responsibilities to Shannon in that meeting, most of

8  the things I would have reported on.  And I did report

9  on these.  But he directed action items to Shannon for

10  the first time.

11      Q.     What action items did he direct to

12  Shannon?

13      A.     Execution of campaigns, he didn't really

14  get into -- to my recollection, it wasn't anything

15  regarding like rewards and group sales and social

16  media and gift cards, but a lot of the campaign stuff

17  and communication with the studios, which I normally

18  strategically put together for the both of us, was

19  handed off to Shannon during that meeting.

20      Q.     How about openings?  Was that handed off

21  to Shannon in the November 16, 2015, meeting?

22      A.     No.  I don't remember how much of this

23  was -- I just remember there was a lot of dialogue

24  between Shannon and Fred Van Noy in that meeting that

25  typically would have been directed to me.

1      Q.      Was Shannon handed off pending approvals

2   in the November 16 meeting?

3      A.      I don't remember.

4      Q.      That's his responsibility, isn't it?

5      A.      What?

6      Q.      Programming.

7      A.      No.

8      Q.      Whose responsibility is pending approvals?

9      A.      So programming were strategic plans and

10   campaigns that we were putting together in different

11   markets.  So normally I would put that together and

12   submit to all the directors as to what the strategy

13   was and to the COO, Fred.  But within Shannon's

14   accountabilities, some of the assets that he would

15   create digitally would feed into those programs that I

16   was responsible for creating.

17      Q.      So Shannon wasn't handed off, then, the

18   pending approvals?  You said you don't remember --

19      A.      Yeah, I really don't remember.  We went

20   over some of the upcoming programming, but I just

21   don't remember.  Again, the dialogue was very heavy

22   between Shannon and Fred that morning, which was

23   unusual.

24      Q.      Well, Fred had already had two meetings

25   with you, correct?

1      A.      Correct.  But it was business as usual to

2  my understanding.

3      Q.      But Fred had had two meetings with you

4  about an investigation that was ongoing, correct?

5      A.      Correct.

6      Q.      At the time the November 16 meeting was

7  held, right?

8      A.      Yes.

9      Q.      The only reason you're aware of that has

10 ever been reported by anyone at Carmike within the HR

11 department or the senior leadership team is that you

12 were insubordinate, correct?

13             MS. PREBULA:  Objection, ambiguous.

14             MR. GERAKITIS:  Objection is noted.

15             MS. PREBULA:  I didn't follow your

16      question.

17             THE WITNESS:  I don't understand.

18      Q.      (By Mr. Gerakitis)  The only reason that

19 you're aware of that's ever been reported by anybody

20 at Carmike in the senior leadership team or in HR has

21 been that you were insubordinate?

22             MS. PREBULA:  Same objection.

23             MR. GERAKITIS:  Noted.

24             THE WITNESS:  I'm not sure if you're

25      referring -- I don't understand what you're

1         referring to.  I'm sorry.

2         Q.    (By Mr. Gerakitis)  There was one reason

3    given by the senior leadership team and Sadie Marshall

4    in HR as to why you were terminated, correct?

5         A.    And that they couldn't trust me, but yes.

6         Q.    Insubordination was the reason that was

7    given, correct?

8         A.    Correct.

9         Q.    And if someone is insubordinate, you could

10   lose trust in them?  That would be a reasonable

11   conclusion for them, wouldn't it?

12        A.    Yes.

13        Q.    There's no other reason other than

14   insubordination and lack of trust that's ever been

15   given by any Carmike officer as the reason for your

16   termination?

17        A.    Is that a questions or a statement?

18        Q.    Yes, that's a question.

19        A.    I mean, other than my

20   resignation/termination paperwork, I wouldn't know

21   what they discussed about me.

22        Q.    The only reason you are aware of for your

23   termination at Carmike that's ever been given by

24   anyone who's an officer or in HR is that you were

25   insubordinate and they lost trust in you or lost

1    confidence?

2          A.    That was the only statement I received

3    from Fred on the day of my termination.

4          Q.    That's the only statement you have ever

5    heard from any officer or HR personnel is that you

6    were insubordinate and they had lost confidence or

7    trust in you, correct?

8          A.    Correct.

9          Q.    They never said that you were terminated

10   for misappropriation at any point in time, did they?

11         A.    No.

12         Q.    No.  Now, I want to talk to you about your

13   education and work experience.

14         A.    Okay.

15         Q.    You went to high school, correct?

16         A.    Yes.

17         Q.    In Enterprise or Elba?

18         A.    Enterprise.  And then I was put into

19   foster care when I was 16, so I completed my high

20   school in Elba.

21         Q.    Was Lisa in foster care, too?

22         A.    She was.

23         Q.    You got out of Elba in 1997?

24         A.    Yes.

25         Q.    Where did you go after you got out of

1    Elba?

2         A.      Troy State University, main campus.

3         Q.      There in Pike County?

4         A.      I have no idea what county it's in.  I'm

5    bad with names.  I'm sorry.  I apologize.

6         Q.      In Troy -- the reason I ask is Troy -- it

7    was Troy State, I take it, when you were there?

8         A.      It was, I think, yes.

9         Q.      It's Troy University now --

10        A.      Right.

11        Q.      -- as you know.

12        A.      Right.

13        Q.      So because Troy has a number of other

14   campuses now, it's easier for me to say Pike County

15   because that's truly in Troy just above Enterprise,

16   right?

17        A.      Sure.

18        Q.      Okay.  What was your major at Troy State?

19        A.      I don't remember because it switched and I

20   was a freshman and I was only there for a year.

21        Q.      So you went one year to Troy State, and

22   then where was next after Troy State?

23        A.      I was visiting my father and his new bride

24   in Columbus in the summer of '98, and she was a

25   professor at CVCC.

1    Q.    That's Chattahoochee Valley Community

2    College?

3    A.    Right.  And so because I got a part-time

4    job at Carmike that summer, at the end of summer they

5    had offered me a supervisor position, so when I called

6    back to school at Troy -- I was on a full scholarship,

7    a leadership scholarship, which was a full ride; and

8    they stated that the way that my scholarship was

9    written I could take quarters -- I think back then the

10   way it was it was either a quarter or a semester off,

11   but only one in four years.  And so I opted to work

12   and go to school in Columbus.  And because my new

13   stepmother was a professor at CVCC, I was able to go

14   to school for free.  So I did both as much as I could

15   between work and school.

16   Q.    So if I can parse through that to make

17   sure I understand, my question was simply --

18   A.    I'm sorry.

19   Q.    -- where else did you go to school after

20   Troy State?

21   A.    Okay.  So CVCC.

22   Q.    So you went to Chattahoochee Valley?

23   A.    Correct.  And I completed my Associate's.

24   Q.    When did you get that Associate's degree?

25   A.    I don't remember, but it was -- it took me

1    a while because of work.  In the operations when I was
2    in the field, it was 12-to-14-hour days sometimes.  So
3    it was tough to go to school, especially as a city
4    manager.  But at some point, and I believe it was when
5    I was in the film department, education came up in a
6    conversation with David Passman.  And he said I really
7    think you need to finish.  And so the company offered
8    to pay for my school.  And so while I was in the film
9    department, I went to school at CVCC.  And it was
10   sometime either in film or in the transition of
11   marketing, I think I finished my Associate's.
12        Q.    So you went for your Associate's degree
13   from 1998 through 2012?
14        A.    Yes.
15        Q.    Correct?
16        A.    Yes, taking a class here and there as I
17   could.
18        Q.    So what did you do next from an education
19   standpoint after CVCC in 2012?
20        A.    Well, my next step was to enroll at Troy
21   State University next to CVCC and try to go to school.
22   At that time this was past the termination of Terrell
23   Mayton, and so my hours had severely increased.  And I
24   took two classes that I did not do very well in
25   because I just -- the timing of travel was very

```
1    difficult.  And that's as far -- I stopped there.
2         Q.    So you when say not very well in, did you
3    drop the classes?
4         A.    They're either incomplete or failure.  I'm
5    not sure how I ended up.  I called the professors and
6    said I can't.  So I don't know if I got an incomplete
7    on those or if I failed.
8         Q.    So you took a couple of classes, you said?
9         A.    I took two.
10        Q.    No more than two?
11        A.    I took two, and I wasn't able to manage
12   the workload.
13        Q.    And this would have been in 2013 or 2014?
14        A.    I don't remember.  I mean, I really don't.
15   I'm gray on that.  That was the last -- those were the
16   last classes I took or attempted to take because of
17   the responsibilities that had increased during that
18   time.
19        Q.    So the two classes you took at Troy, what
20   do you remember those were?
21        A.    Marketing and calculus.
22        Q.    Marketing and calculus?
23        A.    Yeah.
24        Q.    What kind of calculus?
25        A.    I have no idea.  But both classes were
```

1   online, and I just couldn't keep up.

2        Q.     Was it a business calculus class?

3        A.     I have no idea.  I really don't remember.

4   I just --

5        Q.     There are several calculus -- I mean,

6   there's sentential calculus, there's predicate

7   calculus.

8        A.     I know.

9        Q.     You don't remember anything about what

10  kind of it was?

11       A.     I really don't because I finished several

12  of my like Accounting I, Accounting II, and business

13  stats within my Associate's; and then I don't remember

14  why they required me to take a form of calculus.  I

15  passed all that in my getting going for my B.A., but I

16  don't remember.

17       Q.     So you took a marketing class and a

18  business or a calculus class.  You don't know if it

19  was business calculus or not, correct?

20       A.     Huh-uh.

21            MS. PREBULA:  Objection, asked and

22       answered.  You can answer it.

23            THE WITNESS:  I don't remember.  I just

24       know it was calculus.

25       Q.     (By Mr. Gerakitis)  You had a marketing

```
1    class, correct?
2         A.     Correct.
3         Q.     You failed it?
4              MS. PREBULA:  Objection, asked and
5         answered.
6              MR. GERAKITIS:  Objection is noted.
7              THE WITNESS:  It was either incomplete or
8         fail.  I don't remember.
9              (Defendant's Exhibit 38 was marked for
10        identification.)
11             MR. GERAKITIS:  Well, let me hand you,
12        then, what's been marked as Defendant's
13        Exhibit 38.  And, Mary, we need to put this aside
14        for purposes of the deposition because it has --
15        it's what was produced to us by the schools.  It
16        has Social Security and dates of birth on it.  So
17        as far as I'm concerned -- and I told you I would
18        give you a copy of everything that was responded
19        to by subpoena.  So there's your copy.  But I
20        don't want to include it in the transcript.
21             MS. PREBULA:  We can talk about it on a
22        break.
23             MR. GERAKITIS:  I'm just saying I don't
24        think we need to include it, but we need to at
25        least identify that it's produced.
```

1     Q.     (By Mr. Gerakitis)   Defendant's Exhibit 38
2   is the production of subpoenaed documents from Troy.
3     A.     Okay.
4     Q.     That includes CVCC since they are part of
5   the same university system.   On Page 2 of your actual
6   transcript from Troy, it lists principles of marketing
7   and business calculus, correct?
8     A.     Yes.
9     Q.     Were those the two classes you took?
10     A.     Yes.
11     Q.     And it shows a failing grade for both of
12   them in 2013, correct?
13     A.     Correct.
14     Q.     Did you take any other courses from Troy
15   other than principles of marketing and business
16   calculus after you failed both those classes?
17     A.     No.   I never went back to school.
18           MS. PREBULA:   So essentially you want to
19       show that it's been produced and we want to by
20       agreement not attach it to the deposition?
21           MR. GERAKITIS:   Correct.
22           MS. PREBULA:   Okay.   We have that
23       agreement.   It won't be attached.   And,
24       obviously, if you'll use it, you'll redact Social
25       Security numbers, et cetera.

 1              MR. GERAKITIS:  Correct, correct.

 2              MS. PREBULA:  And if this is or shortly

 3         soon, let's take a lunch break for --

 4              MR. GERAKITIS:  Oh, I thought we took a

 5         lunch break.

 6              MS. PREBULA:  No.

 7              MR. GERAKITIS:  I'm sorry.

 8              MS. PREBULA:  We ordered food at that

 9         break because nobody could decide before then.

10         So it's almost 2:00.

11              MR. GERAKITIS:  It's y'all's control.

12              MS. PREBULA:  Okay.  If now works --

13              MR. GERAKITIS:  That's fine.

14              MS. PREBULA:  Let's take a lunch break.

15              THE VIDEOGRAPHER:  We are off video.

16              (Recess from 1:35 p.m. to 2:04 p.m.)

17              THE VIDEOGRAPHER:  We are back on video.

18         Q.    (By Mr. Gerakitis)  Ms. Trawick, we looked

19    at Defendant's Exhibit 38 just to confirm your Troy

20    and Chattahoochee Valley State -- I would use the term

21    "matriculation," but we'll just call it your path to

22    your Associate's degree and then the last class you

23    took was in 2013.  Correct?

24         A.    If that's what that says, then yes.

25         Q.    You don't recall anything other than the

```
 1    calculus and marketing classes in 2013 that you took,
 2    correct?
 3         A.     I don't recall.
 4         Q.     How much did it cost to take those
 5    marketing and calculus classes?
 6         A.     I don't recall.
 7         Q.     Did your husband pay for it or did you pay
 8    for it?
 9         A.     Carmike paid for it.
10         Q.     How did Carmike pay for it?
11         A.     They wrote a check to the university for
12    me to continue my education.
13         Q.     Did you go back to Carmike and ask for
14    them to continue to pay?
15         A.     After I failed those two classes?
16         Q.     Right.
17         A.     No.
18         Q.     Was there anything preventing you from
19    going back to Carmike and saying I'd like you to
20    continue to pay for me to take classes at Troy?
21         A.     I didn't think I could balance my workload
22    and going to school during that time.
23         Q.     Was your son born in May of 2013?
24         A.     2014.
25         Q.     2014?
```

```
1        A.      Yes.

2        Q.      So it wasn't your son or son's birth that

3   complicated anything school-wise, right, in 2013?

4        A.      No.  I mean, I was pregnant in '13.  I had

5   him in May '14.

6        Q.      Well, you were pregnant in the fall,

7   right?

8        A.      Yeah, sure.

9        Q.      So that helps, because were you pregnant

10  when you were taking the classes?

11       A.      I don't remember the timing.  I don't

12  remember.  I don't know timing.  I'm sorry.

13       Q.      You didn't take a class in 2014, did you,

14  at Troy?

15       A.      I don't recall taking anything past those

16  two classes that I failed.

17       Q.      You didn't take a class in 2015 at Troy,

18  correct?

19       A.      I don't recall taking anything past those

20  two classes.

21       Q.      Let's go back, then.

22       A.      Okay.

23       Q.      Were those two classes taken before your

24  son was born?

25              MS. PREBULA:  Objection, asked and
```

1      answered.

2               MR. GERAKITIS:  Noted.

3               THE WITNESS:  If I look at that document

4      right now, it would say when I took those

5      classes.  Can we just --

6      Q.     (By Mr. Gerakitis)  Sure.

7      A.     I mean, I don't remember.  And I know my

8  son was born on May --

9               MS. PREBULA:  I'm going to caution you not

10     to put the birth date on the record for privacy

11     reasons.

12     Q.     (By Mr. Gerakitis)  This is 2013, two

13  classes.

14     A.     Okay.

15     Q.     There's no other --

16     A.     Those were when in the year?  Were they

17  fall?

18     Q.     I can't tell.  That's why we're going down

19  these questions.

20     A.     Sure, sure, okay.

21     Q.     They're in 2013.  These were in 19 --

22              MS. PREBULA:  Wait.  Let him finish his

23     question.

24     Q.     (By Mr. Gerakitis)  These earlier classes,

25  English comp down to general psychology, they were in

```
 1   1998.  Do you see that?
 2         A.    I do.
 3         Q.    And then the two classes marketing and
 4   calculus were in 2013.  Do you see that?
 5         A.    I do.
 6         Q.    Okay.  So you were not enrolled for any
 7   classes in 2014, correct?
 8         A.    Not that I recall.  I know what I'm
 9   looking at.  I'm just saying -- I just -- I don't
10   recall enrolling in any more schooling past these two
11   classes.
12         Q.    And those two classes were in 2013?
13         A.    Correct.
14         Q.    Did you go to Carmike and ask them to pay
15   for any classes outside of Troy after you took those
16   two classes in marketing and calculus at Troy?
17         A.    Not that I recall.
18         Q.    So you don't recall being enrolled in 2004
19   at Troy, correct?
20         A.    '14?
21         Q.    I'm sorry.  Thank you.  In 2014, correct.
22   So you don't recall -- you don't recall being enrolled
23   in 2014 at Troy, correct?
24         A.    Correct.
25         Q.    You don't recall being enrolled in 2015 at
```

```
1    Troy, correct?
2         A.    Correct.
3         Q.    You don't recall being enrolled at Troy in
4    2016, correct?
5         A.    Correct.
6         Q.    You do think you would remember being
7    enrolled in college classes for 2014 through 2016,
8    wouldn't you?
9         A.    I would think.  Expand?  Okay.  Then I
10   answered your -- did I answer your question?
11        Q.    I didn't know if -- I didn't want to step
12   on your answer.
13        A.    Okay.
14        Q.    I didn't know if you were through.
15        A.    I think I'm finished.  Thank you.
16              (Defendant's Exhibit 39 was marked for
17         identification.)
18        Q.    (By Mr. Gerakitis)  Let me hand you what's
19   been marked as Plaintiff's Exhibit 39.  This is a
20   resume of yours.
21              MS. HARWELL:  To be clear, that's
22         Defendant's Exhibit 39.
23              MR. GERAKITIS:  What did I say,
24         Plaintiff's?  Dad-gum it.  It is Defendant's.
25         You can tell for 17 years I did plaintiff's side.
```

1    Q.    (By Mr. Gerakitis)  Defendant's Exhibit 39

2    you've got in front of you, is that your resume?

3    A.    Yes.

4    Q.    And this says over nine years of

5    significant progressive management experience on it,

6    correct?

7    A.    Correct.

8    Q.    Just looking at this, you show summary,

9    experience, film department, and complex manager and

10   skills and expertise and then additional information,

11   groups and -- which has groups and associations and

12   honors and awards.  That's what makes up this

13   five-page Defendant's Exhibit 39, correct?

14   A.    Correct.

15   Q.    There's no education listed on it,

16   correct, no degree, no classes, nothing?

17   A.    Correct.

18   Q.    If in October of 2010 where you show

19   experience, social media, October 2010 through

20   present, one year nine months, do you see that?

21   A.    I do.

22   Q.    That would have gotten you up to about

23   July of 2012, correct?

24   A.    If the math works, then yes.

25   Q.    And then you recall your earlier testimony

1    about you received your Associate degree from CVCC in

2    2012?  You went from '98 to 2012 to obtain it?

3        A.    Yes.  But that was based on recollection

4    of when I got my degree.

5        Q.    If I show you again Plaintiff's

6    Exhibit 38 --

7              MS. PREBULA:  Defendant's.

8              MR. GERAKITIS:  I'm sorry, Mary.  Thank

9      you.  It's been a long 37 years.

10        Q.    (By Mr. Gerakitis)  If I show you

11    Defendant's Exhibit 38 and turn you to the page that

12    talks about an unofficial transcript, it refers to

13    academic term summer 2012?

14        A.    Uh-huh.

15        Q.    Yes?

16        A.    Yes.  I'm sorry.

17        Q.    You were taking classes at CVCC summer

18    of 2012, correct?

19        A.    Yes.  According to that document, yes.

20        Q.    You weren't taking classes at CVCC after

21    you got your Associate's degree, were you?

22        A.    No.

23        Q.    Okay.  So that's why I'm trying to make

24    sure we're correct on these dates because you said you

25    were uncertain about 2012.

1       A.      And I am.  I'm still -- timeline-wise with

2    education I'm still -- yeah.  I get it.

3       Q.      But it's clear from --

4       A.      Yes.

5       Q.      -- Defendant's Exhibit 38 that at least as

6    of the summer of 2012 you did not have your

7    Associate's degree because you were still taking

8    classes, correct?

9       A.      Correct.

10      Q.      So when you prepared Defendant's

11   Exhibit 39, you did not list education on your resume,

12   correct?

13      A.      Correct.

14      Q.      And you did not have an Associate's degree

15   as of July of 2012 because you were taking classes the

16   summer of 2012 at CVCC, correct?

17      A.      Correct.

18      Q.      Now, you were not in the marketing role

19   yet when you prepared Defendant's Exhibit 39, correct?

20      A.      Correct.

21              (Defendant's Exhibit 40 was marked for

22         identification.)

23      Q.      (By Mr. Gerakitis)  Let me hand you what's

24   been marked as Defendant's Exhibit 40.  This refers to

25   goal-driven professional with 15 years of experience.

1    Is this your resume, Defendant's Exhibit 40?

2         A.    I see it.

3         Q.    And it appears that it was prepared either

4    in 2013 or 2014 --

5         A.    Okay.

6         Q.    -- correct?

7         A.    I don't know when it appears to be

8    created.

9         Q.    Well, you've got Quadrille listed as

10   vice president 2013-2014 on it?

11        A.    Okay.

12        Q.    So it was sometime in that 2013-2014.

13   There's no dates beyond 2014.

14             MS. PREBULA:  Just review the document.

15        Review the document and then answer his question.

16             THE WITNESS:  Yes, it appears.

17        Q.    (By Mr. Gerakitis)  Okay.  So according to

18   your resume in Defendant's Exhibit 40, you listed your

19   education as having a CVCC Associate's degree,

20   correct?

21        A.    Correct.

22        Q.    And you said that you were pursuing a B.A.

23   in business from Troy, correct?

24        A.    Correct.

25        Q.    Did anyone at Troy tell you that they

1    offer a B.A. of business?

2         A.    I thought that's what my application for

3    the degree was, was a Bachelor's of business.

4         Q.    Well, a B.A. is a Bachelor of Arts.  A

5    B.S. is a Bachelor of Science.  It's the Alabama

6    University System.  I'm just questioning did you

7    understand or did someone tell you you were pursuing a

8    B.A. of business at Troy at the time you prepared

9    Defendant's Exhibit 40 in 2013 or 2014?

10        A.    Based on my recollection, yes, because

11   they didn't offer, to my understanding, a traditional

12   marketing degree at that university.

13        Q.    How long did you use Defendant's

14   Exhibit 40 as a resume?

15        A.    I don't remember.  Honestly, I don't

16   remember seeing this format.

17        Q.    And then you've got a marketing project

18   manager on the Page 2 under experience, October 2012

19   to present where it says "executes and maintains

20   program management processes and disciplines, social

21   media, national philanthropic campaigns, group sales"

22   and so forth.  So you see where I'm reading from at

23   the top?

24        A.    I do.

25        Q.    So those were all the things that your job

1   was as a marketing project manager when you

2   prepared Defendant's Exhibit 40 in 2013 or 2014?

3         A.     That was not all of my duties.  Those

4   were --

5         Q.     You just didn't list them all?

6         A.     I did not list them all.

7                (Defendant's Exhibit 41 was marked for

8         identification.)

9         Q.     (By Mr. Gerakitis)  Let me hand you what's

10  been marked as Defendant's Exhibit 41.  This appears

11  to be a resume of yours.  Is that what Defendant's

12  Exhibit 41 is?

13        A.     Yes.

14        Q.     In this one you said you had 17 years of

15  experience.  So if you add that to 1998 when you

16  started at Carmike, that would get you to 2015,

17  correct, your last year of employment there?

18        A.     Correct.

19        Q.     And it lists --

20               MS. PREBULA:  I'm going to have to object.

21        I think that math is wrong.

22               MR. GERAKITIS:  1998 and 15?  I mean, 17.

23        That's 2015.  18 is two to 2000 --

24               MS. PREBULA:  Don't be patronizing to me.

25               MR. GERAKITIS:  I'm not patronizing.  I'm

1      just saying --

2            MS. PREBULA:  Repeat your -- just repeat

3      your question.  Maybe I misheard your question.

4      Just read it back.

5      Q.    (By Mr. Gerakitis)  If you start -- let's

6   make sure.  You started at Carmike in 1998 in a

7   part-time position, right?

8      A.    Correct.

9      Q.    If you add ten years to 1998, it would be

10  2008, correct?

11     A.    Correct.

12     Q.    If you added seven more years to 2008, it

13  would be 2015, correct?

14     A.    Correct.

15     Q.    That would be 17 years from 1998 would get

16  you to 2015, correct?

17     A.    Correct.

18     Q.    In this you list your professional

19  experience with Carmike as communications management,

20  corporate brand management, program management, and

21  community outreach management, correct?

22     A.    Correct.

23     Q.    Shannon Sailors wasn't responsible for

24  communications management, was he?

25     A.    No.

1     Q.     Shannon Sailors wasn't responsible for
2  corporate brand management, was he?
3     A.     Kind of.  We both shared that.
4     Q.     Program management on the next page,
5  Shannon Sailors wasn't responsible for that?
6     A.     We both oversaw those assets.
7     Q.     Well, community outreach management, you
8  said that's all yours, correct?
9     A.     Yes.
10    Q.     Yes.  Now, turn to Page 3.  Under
11 education, you have enrolled Troy University.  That's
12 not correct, is it?
13    A.     No.
14    Q.     You shouldn't have put you were enrolled
15 at Troy in 2015, should you have?
16    A.     No.
17           (Defendant's Exhibit 42 was marked for
18      identification.)
19    Q.     (By Mr. Gerakitis)  Let me hand you what's
20 been marked as Defendant's Exhibit 42.  This appears
21 to be a resume you submitted at some point after or
22 prepared after you went to work for Fun Academy Motion
23 Pictures in August of 2016.  Is that what Defendant's
24 Exhibit 42 is?
25    A.     Yes.

```
1       Q.      Your base salary at Fun Academy, $100,000?

2       A.      Yes.

3       Q.      You got a two-year contract?

4       A.      Yes.

5       Q.      You get a bonus?

6       A.      Yes.

7       Q.      How much is the bonus?

8       A.      It's contingent on box office performance.

9       Q.      Between 100 million and 200 million?

10      A.      Yes.

11      Q.      Did you work this deal with Joe Wilkinson

12  or somebody else?

13      A.      Worked what deal?

14      Q.      The contract.

15      A.      No.  The founder of the company negotiated

16  those terms with our -- with the law firm.

17      Q.      Who was the law firm?

18      A.      Seyfarth & Shaw.

19      Q.      They represented you or they represented

20  the Fun Academy?

21      A.      Fun Academy.

22      Q.      Turn to Page PL-439 of your production in

23  Defendant's Exhibit 42.  In 2017 you list Troy

24  University as enrolled.  That's not correct, is it?

25      A.      No, it is not.
```

1      Q.      So you didn't change it at any point in

2  time to represent to people that you were enrolled at

3  Troy?

4      A.      I didn't update that segment of my resume.

5  I only updated the professional experience.

6      Q.      You think resumes ought to be accurate,

7  though, don't you?

8      A.      I think everything should be accurate.

9      Q.      Do you think Melanie Powell put an

10 adequate amount of time into her investigation of the

11 expenses that were spent within the advertising

12 department?

13     A.      I don't have a perception of her work flow

14 and what she put into that investigation.  I don't

15 have an opinion.

16             (Defendant's Exhibit 43 was marked for

17         identification.)

18     Q.      (By Mr. Gerakitis)  Let me hand you what's

19 been marked as Defendant's Exhibit 43.  This appears

20 to be your complaint filed in this lawsuit.  Is that

21 what Defendant's Exhibit 43 is?

22     A.      Yes.

23     Q.      Did you review the complaint before it was

24 filed in December 2016?

25     A.      I'm not sure of the date, but I did review

1    a complaint.

2        Q.    You said a complaint.  Did you review

3    Defendant's Exhibit 43 is the question.

4            MS. PREBULA:  I'm not sure she can answer

5        that, Richard, unless you give her time to review

6        the document.  It's up to you.

7        Q.    (By Mr. Gerakitis)  Did you receive a

8    complaint styled Crystal Trawick against Carmike

9    Cinemas to review?

10            MS. PREBULA:  And I'm going to object.  It

11        calls for attorney-client privilege and work

12        product.

13            MR. GERAKITIS:  Objection is noted.

14            MS. PREBULA:  You're instructed not to

15        answer.

16        Q.    (By Mr. Gerakitis)  Did you review it?

17    Did you review a complaint?

18            MS. PREBULA:  You're instructed not to

19        answer.  It's attorney-client privilege and work

20        product.

21        Q.    (By Mr. Gerakitis)  Did you review any

22    pleading in this case that was filed in the federal

23    court?

24            MS. PREBULA:  Is that the end of your

25        question?

```
 1              MR. GERAKITIS:  Yes.
 2              MS. PREBULA:  Object.  Attorney-client
 3         privilege and work product to the extent you
 4         reviewed any drafts, et cetera.  If you want to
 5         answer anything that was actually filed, you can
 6         answer that question.  Those are not privileged.
 7              THE WITNESS:  I'm not comfortable
 8         answering the question because I'm not sure at
 9         this point I understand it.
10         Q.    (By Mr. Gerakitis)  Do you see at the top
11    of that Defendant's Exhibit 43 it says it was filed
12    December 6, 2016?
13         A.    I do.
14         Q.    Was there anything preventing you from
15    filing that complaint, Defendant's Exhibit 43, earlier
16    than December 6, 2016?
17              MS. PREBULA:  Objection to the extent it
18         calls for attorney-client privilege and work
19         product.
20              MR. GERAKITIS:  Noted.
21              MS. PREBULA:  If you can answer it without
22         communications with counsel, then you can
23         respond.
24              THE WITNESS:  I don't understand the
25         question.
```

1    Q.    (By Mr. Gerakitis)  Was there anything

2   that prevented you from filing your complaint,

3   Defendant's Exhibit 43, earlier than the day it was

4   filed, December 6?  Did you not have enough money to

5   pay the filing fee?  Did you have to decide do I file,

6   do I not file?  That's what I'm looking for.

7              MS. PREBULA:  Same objection; same

8         instruction.

9    Q.    (By Mr. Gerakitis)  Was there anything

10  that prevented you from filing earlier than

11  December 6, 2016, Defendant's Exhibit 43?

12             MS. PREBULA:  Same objection; same

13        instruction.

14             THE WITNESS:  I just don't understand what

15        I'm being asked.

16   Q.    (By Mr. Gerakitis)  Did you try and file

17  your complaint earlier than December 6, 2016?

18             MS. PREBULA:  Same objection; same

19        instruction.

20             THE WITNESS:  I just don't feel

21        comfortable enough about the question to answer.

22   Q.    (By Mr. Gerakitis)  Are you aware of any

23  complaint you filed against Carmike earlier than

24  December 6, 2016?

25   A.    I don't recollect the timeline of when all

1    of this got started and how it got started.

2        Q.    My question is not do you recollect the

3    timing of how all this got started.  My question is:

4    Did you file any complaint against Carmike earlier

5    than December 6, 2016?

6                MS. PREBULA:  I think the question may be

7        ambiguous, which is why --

8                MR. GERAKITIS:  It's noted.

9                MS. PREBULA:  -- I noted my objection.

10       She may have a problem answering.

11               MR. GERAKITIS:  Noted.

12               THE WITNESS:  I just -- I'm not

13       comfortable enough to answer that around the

14       timelines of what my attorney and I -- I just

15       don't --

16       Q.    (By Mr. Gerakitis)  I'm not asking you

17   about what your attorney and you did or talked about.

18   I'm just asking you is there another complaint that

19   you filed before December 6, 2016, against Carmike?

20       A.    I don't -- I mean, I don't know when the

21   EEOC paperwork was filed.

22       Q.    That's a complaint in federal court,

23   agreed, that Defendant's Exhibit 43?  It says at the

24   top "United States District Court for the Middle

25   District of Georgia," correct?

1          A.      Uh-huh.

2          Q.      Yes?

3          A.      Yes.

4          Q.      Are you aware of anything you have filed

5    before December 6, 2016, against Carmike in the United

6    States District Court for the Middle District of

7    Georgia?

8          A.      I'm not aware.

9          Q.      Let's look at your preliminary statement,

10   particularly the third line, where it says

11   "retaliation in the form of withholding compensation."

12   Do you see that?

13              MS. PREBULA:  I think you're directing

14         her -- you said the third line.  I think you

15         mean --

16         Q.      (By Mr. Gerakitis)  I'm sorry.  I've

17   got -- you'll have to turn to Page 2.  I'm sorry.

18   It's in Paragraph 1.  Turn to Page 2.

19         A.      Yes.

20         Q.      And you said "the form of withholding

21   compensation."  Are you still owed money from Carmike

22   in the form of salary or bonus?

23         A.      Regarding bonus, I would have no idea

24   because they never gave me my evaluation.

25         Q.      So is your answer you don't know if you're

1   still owed something for bonus?

2       A.     My answer is I'm unsure of what they owe

3   me.

4       Q.     What components of compensation do they --

5   did they withhold?

6              MS. PREBULA:  I want to object.  That

7          calls for a legal conclusion.  You can answer.

8              THE WITNESS:  I don't know how to answer

9          that.

10      Q.     (By Mr. Gerakitis)  What promotion did

11  they withhold?

12      A.     The title of director.

13      Q.     Who was promoted into the title of

14  director other than you?

15      A.     I'm sorry.  What?

16      Q.     Who was promoted into the title of

17  director other than you for which you claim you were

18  retaliated against?

19      A.     No one.

20      Q.     What was the harassment that was

21  retaliation against you that you refer to in

22  Paragraph 1 of Defendant's Exhibit 43?

23      A.     I felt a change in Fred Van Noy and his

24  management style towards me once I started asking for

25  money and for promotion more directly.

1      Q.      And when did that happen that you felt a

2    change?

3      A.      I felt it started in early of 2015, and it

4    progressed aggressively through the fall of 2015.

5      Q.      You said you felt a change.  Did you see a

6    change?

7      A.      I did.

8      Q.      What did you see?

9      A.      His communications to me in writing became

10   more pointed, more direct, more harassing.

11     Q.      What were the harassing terms he used?

12             MS. PREBULA:  Let her finish.

13     Q.      (By Mr. Gerakitis)  I'm sorry.  I thought

14   you were through.  Go ahead.  His terms, as you say,

15   were more pointed, more direct, more harassing.  What

16   else?

17     A.      And aggressive.

18     Q.      Okay.  And aggressive.  What terms did he

19   use that were pointed, direct, harassing, or

20   aggressive?

21     A.      I don't recall.  We have e-mails from him

22   that indicate his language change, and you can see the

23   progression of his demeanor towards me towards the end

24   of '15.

25     Q.      You don't recall any particular words used

1    by Fred Van Noy that you thought were more pointed,

2    direct, harassing, or aggressive as we sit here?

3        A.    Sure.   There are no words that come to

4    mind outside of the written communication.   There were

5    several instances that I felt singled out and pointed

6    out as examples in front of my peers by Fred that were

7    not --

8        Q.    Who was present --

9              MS. PREBULA:  Can you let her finish her

10       answer.

11             MR. GERAKITIS:  I'm sorry.  I thought she

12       was through.

13             THE WITNESS:  That was not the situation

14       before.

15       Q.    (By Mr. Gerakitis)  Who was present that

16   were your peers when you were singled out by Fred?

17       A.    I think that Shannon can account for a lot

18   of the actions and the change in Fred.  Jim Lucas saw

19   a lot of it, the unfair treatment.  Jon Greer saw a

20   lot of the unfair treatment.  I believe David Pflegl

21   was even copied on some of the communications that

22   were aggressive in nature.

23       Q.    Anyone else?

24       A.    That's all I can think of today.

25       Q.    Has David Pflegl told you that he observed

1    Fred Van Noy treating you unfairly?

2         A.    I think in passing all of the names I just

3    mentioned had told me at one time or another that I

4    was being treated unfairly.

5         Q.    Well, let's stick with David Pflegl.  When

6    did David Pflegl tell you --

7         A.    I don't remember.

8         Q.    Did you understand the question I was

9    going to ask?

10              MS. PREBULA:  Objection.  That's

11         argumentative.  Just wait.

12              MR. GERAKITIS:  It is argumentative.

13              MS. PREBULA:  Wait for him to finish his

14         question.

15              MR. GERAKITIS:  It may stay that way.

16         Q.    (By Mr. Gerakitis)  But David Pflegl we're

17    on right now.  Did David Pflegl tell you that he

18    thought Fred Van Noy was treating you unfairly?

19         A.    In his version of that phrase, yes.

20         Q.    What did he say?  What did David Pflegl

21    say?

22         A.    I don't remember.

23         Q.    What did Jon Greer say that indicated to

24    you he thought Fred Van Noy was treating you unfairly?

25         A.    I don't remember.

1    Q.    What did Jim Lucas say that indicated to

2  you that he thought Fred Van Noy was treating you

3  unfairly?

4    A.    Jim Lucas told me that he had approached

5  Fred Van Noy on multiple occasions about my work

6  performance and how I was running the marketing

7  department as the director of marketing and they

8  should just give me that title, and Fred Van Noy told

9  him he would never promote me.

10    Q.    Now, there were directors of marketing

11  sought by Carmike after Terrell Mayton left, right?

12    A.    I was told that they were in search, but I

13  don't know whether they were actively searching or

14  not.  I just know I --

15    Q.    Who told you they were in search?

16    A.    Fred did.

17    Q.    Anybody besides Fred?

18    A.    No, not that I remember.

19    Q.    Did you ask who they were that were being

20  considered for the director of marketing position?

21    A.    I did not ask Fred that question.

22    Q.    When did Jim Lucas tell you that he told

23  Fred you should be promoted to director of marketing?

24    A.    I can't remember the date.

25    Q.    Did he tell you -- give you anything in

1   writing that says you should have been promoted to the
2   director of marketing position and he told Fred
3   Van Noy that?
4        A.      He did not give that to me in writing.
5        Q.      Have you told me everyone who has told you
6   that Fred Van Noy said pointed, aggressive, harassing
7   things to you?
8        A.      Those are the names that come to mind
9   today.
10       Q.      Well, are there going to come -- are there
11  going to be more later?
12       A.      I don't know.
13       Q.      All right.  At the end of Paragraph 1 of
14  your complaint, it says "her Family and Medical Leave
15  Act leave after the birth of her child."  We know that
16  happened in May of 2014, correct?
17       A.      Yes.
18       Q.      You were paid the entire time full amount
19  you're paid every week before you took leave, during
20  your leave, and after your leave, correct?
21       A.      Correct.
22       Q.      You had the same job when you returned
23  back from your leave?  No one gave you a different
24  job, put you into film buying again, correct?
25       A.      Correct.

1          Q.      You went right back into your marketing

2     role?

3          A.      Yes.

4          Q.      Right?

5          A.      Yes.

6          Q.      In Paragraph 2 you say that there is four

7     claims here, apparently a Title VII claim, an equal

8     pay claim, a Family Medical and Leave Act claim, and a

9     Fair Labor Standards Act claim.  Do you see that?

10          A.      I do.

11          Q.      Okay.  In Paragraph 4, it says that a true

12     and correct copy of your EEOC charge is attached as

13     Exhibit A.  Now, your counsel is free to look on the

14     court website, but there is no Exhibit A attached.

15     And that is exactly what's printed in full.  Have you

16     ever seen the Exhibit A, the notice of right to sue?

17          A.      I mean, I don't understand what you're

18     asking, what document that you're asking for.  I'm

19     sorry.

20          Q.      Have you ever seen a notice of right to

21     sue from the Equal Employment Opportunity Commission

22     for you?

23          A.      No.  I don't -- I don't know.

24          Q.      Have you seen your charge of

25     discrimination that was filed with the Equal

1    Employment Opportunity Commission?

2         A.    Yes.

3         Q.    Now, according to Paragraph 4 of your

4    complaint, it says on September 5, 2016, the EEOC

5    issued a notice of right to sue, correct?

6         A.    Yes.

7         Q.    And you filed this lawsuit on December 6,

8    2016, correct?

9         A.    Yes.

10        Q.    That's 92 days after September 5.  Would

11   you agree?

12        A.    If your math works.

13        Q.    Okay.  Do you understand how much or for

14   what period of time you can recover under the Equal

15   Pay Act?

16             MS. PREBULA:  Objection.  It calls for a

17        legal conclusion.

18        Q.    (By Mr. Gerakitis)  If you know, you know;

19   if you don't, you don't.

20        A.    I don't.

21        Q.    Good.  Turn, if you would, to

22   Paragraph 11.  When you started at Carmike in July

23   of 1998, was Lisa Wing employed by Carmike?

24        A.    No.

25        Q.    When was Lisa Wing first employed by

1    Carmike?

2         A.      I don't know.

3         Q.      Is Lisa older or younger than you?

4         A.      Younger than me.

5         Q.      When did Lisa stop working for Carmike?

6         A.      I don't remember.

7         Q.      When did Lisa start working for Carmike?

8         A.      I don't remember.

9         Q.      Do you remember Lisa Wing having a

10   relationship with Wynn Patrick?

11        A.      Yes, I do.

12        Q.      How long did that last?

13        A.      Maybe nearly eight years.

14        Q.      Do you know when it began?

15        A.      No.

16        Q.      Do you know when it ended?

17        A.      No.

18        Q.      Wynn Patrick's father was the CEO of

19   Carmike, correct?

20        A.      Yes.

21        Q.      Did you encourage Lisa to apply to Carmike

22   to work?

23        A.      I don't recall.

24        Q.      Did she ask you at any point in time about

25   your work at Carmike?

1      A.      I don't know that that's specific enough.
2  I don't --
3      Q.      Was Lisa -- Lisa was working there in
4  November 2015 when you were terminated?  She was
5  working for Carmike, wasn't she?
6      A.      I didn't think she was.
7      Q.      You think she was no longer employed by
8  Carmike in November of 2015?
9      A.      I don't -- I really don't know.  I don't
10 know when her employment stopped.
11     Q.      Let's make sure I've got the right exhibit
12 to show you next.  In Paragraph 11 you said that you
13 were one of only two employees with the company with
14 successful experience in operations, film buying, and
15 marketing.  Who was the other?
16     A.      David Glass.
17     Q.      You don't think there was anybody else
18 that you can recall in operations, film buying, and
19 marketing?
20     A.      No.
21     Q.      The entire time you were there?
22     A.      To my knowledge there was no one else that
23 had worked those three departments.
24     Q.      Did you keep a calendar during your
25 employment?

1      A.      I had an electronic calendar that was

2  connected to my laptop that was at work.

3      Q.      Did you continue to access it to put

4  important dates in, meetings, things like that?

5      A.      During what period of time?

6      Q.      Well, in Paragraph 12 you say:  "In

7  October 2012, Fred Van Noy approached Trawick about

8  joining Carmike's marketing department."  Do you see

9  that?

10      A.      I do.

11      Q.      Do you recall if you listed that meeting

12  in October 2012 with Fred?

13      A.      I don't recall if it's on the calendar.

14  But if I have one, it would be there.  I mean, I

15  believe that would be a date that I would have noted

16  because it was a meeting with three other people.

17      Q.      In Paragraph 13 it says:  "Van Noy set a

18  meeting to include Mayton and Shannon Sailors."  Do

19  you recall if you listed that in your calendar?

20      A.      I believe it was listed.

21      Q.      And then you were given the title of

22  marketing project manager and a set of

23  responsibilities, correct?

24      A.      Correct.

25      Q.      You produced to us a listing of those

1    marketing project manager jobs, correct?

2         A.     Correct.

3         Q.     So Terrell Mayton was the director of

4    marketing until August of 2013?

5         A.     I'm not sure of his exact termination

6    date, but I felt like it was around summer or after

7    summer that year.

8         Q.     Well --

9         A.     I mean, I'm just letting you know.

10        Q.     After summer would be September.

11        A.     Sure.  But August specifically I wouldn't

12   know.

13        Q.     But it was sometime either -- it was no

14   earlier than summer of 2013?

15        A.     No, I don't believe so.

16        Q.     There's nowhere to promote you while

17   Mayton was the director of marketing, correct?

18        A.     Not true.  Shannon Sailors was a director

19   of advertising.  He reported to director of marketing,

20   which was Shannon Sailors.  So --

21        Q.     You couldn't have two directors of

22   marketing at the same time, could you?  You didn't

23   have two directors of advertising, did you?

24        A.     No.  You could have had a director of any

25   of the projects I was over.

1    Q.    But you were specifically wanting to be

2    elevated to director of marketing, correct?

3    A.    Only in the absence of Shannon -- of

4    Terrell Mayton after assuming his duties.

5    Q.    So Terrell Mayton at some point left the

6    company; and Shannon Sailors had been a director of

7    advertising for somewhere around eight years by that

8    time, seven or eight years?

9    A.    I'm not sure of how long.

10   Q.    When you came on to the marketing

11   department, was he the director of advertising?

12   A.    He was.

13   Q.    Do you know how long he had been a

14   director of advertising?

15   A.    No.

16   Q.    Do you know how long Shannon Sailors

17   worked at Carmike?

18   A.    He had told me in passing a couple years

19   longer than me, but I didn't know specifically.

20   Q.    Only a couple?

21   A.    Yes.

22   Q.    You don't think he started earlier than

23   1996?

24   A.    I don't know.

25   Q.    Could he have started as early as 1994?

1       A.      He could have started in 1990.  I don't
2   know.
3       Q.      How long was Brian Dobson at Carmike?
4       A.      I'm not sure.
5       Q.      How long was David Pflegl at Carmike?
6       A.      Quite a while.  I don't know.
7       Q.      More than you?
8       A.      I have no idea.
9       Q.      How about Brian Dobson, was he there
10  longer than you were?
11      A.      No.
12      Q.      No?
13      A.      Brian Dobson, no, sir.  He was brought in
14  outside the company.
15      Q.      Well, he came in as part of an
16  acquisition, correct?
17      A.      Correct.  But he wasn't part of Carmike
18  longer than me.  I thought that was the question.
19      Q.      Well, he as far as being within the
20  Carmike family of companies, when they acquired
21  somebody, if they acquired somebody from Muvico or
22  Digiplex, those people didn't start over again.  I
23  mean, they didn't start from year zero.  They started
24  based on their time working for whoever they had
25  worked with, right?

1      A.      Yes.  But I'm not sure that he was part of

2  an acquisition.

3      Q.      You don't think Brian Dobson was?

4      A.      I didn't think he was.

5      Q.      And it's not Brian Dobbs; it's Brian

6  Dobson, correct?

7      A.      I believe so.

8      Q.      Okay.  Jon Greer, how long was Jon Greer a

9  division manager?

10      A.      Not very long.

11      Q.      How long was he with the company?

12      A.      I'm not sure.

13      Q.      Longer than you?

14      A.      I don't know.

15      Q.      Jim Lucas, how long was he a division

16  manager?

17      A.      I'm not sure.

18      Q.      Was he there longer than you?

19      A.      Yes.

20      Q.      Rob Lehman, vice president of concessions,

21  do you think he's a comparator to you?

22      A.      In what respect, that he was a department

23  head?

24      Q.      Do you think that his job compares with

25  your job?

```
 1              MS. PREBULA:  Objection, calls for a legal
 2         conclusion.  Could you tell me the name again?  I
 3         didn't catch it.
 4              MR. GERAKITIS:  Rob Lehman.
 5              MS. PREBULA:  Thank you.
 6    Q.      (By Mr. Gerakitis)  Do you think Rob
 7  Lehman's job was comparable to yours?
 8              MS. PREBULA:  Same objection.
 9              THE WITNESS:  I don't --
10              MS. PREBULA:  You can answer the question.
11              THE WITNESS:  I think that we had similar
12         responsibilities, very similar.
13    Q.      (By Mr. Gerakitis)  Do you think that John
14  Lundin had very similar responsibilities to you?
15    A.      As a department head and a manager of
16  people, yes.
17    Q.      Do you think Fred Van Noy had a job
18  comparable to yours?
19              MS. PREBULA:  Same objection.  You can
20         answer.
21              THE WITNESS:  Okay.  No.
22    Q.      (By Mr. Gerakitis)  Do you think Terra
23  Hardwick had a job comparable to yours?
24              MS. PREBULA:  Same objection.
25              THE WITNESS:  I don't know.
```

1      Q.     (By Mr. Gerakitis)  Why didn't Fred
2   Van Noy have a job comparable to yours?
3              MS. PREBULA:  Same objection.  You answer
4        it unless you're instructed not to answer.
5              THE WITNESS:  Okay.  Because he was the --
6        on the executive committee and he was an
7        executive, an officer of the company.
8      Q.     (By Mr. Gerakitis)  And you didn't
9   consider a vice president to be an officer of the
10  company?
11     A.     Some of them were not.
12     Q.     Name a vice president who was not an
13  officer of the company.
14     A.     I didn't think that Rob Lehman was an
15  officer of the company.
16     Q.     What led you to that conclusion?
17     A.     I don't remember seeing that on any
18  documents that he was.  I don't know.
19             THE VIDEOGRAPHER:  Is this a good time?
20             MR. GERAKITIS:  Sure.
21             THE VIDEOGRAPHER:  We're off video.
22             (Recess from 2:51 p.m. to 2:56 p.m.)
23             THE VIDEOGRAPHER:  We are back on the
24        video record.
25     Q.     (By Mr. Gerakitis)  In Defendant's

```
 1   Exhibit 43, Paragraph 14, it says in the summer
 2   of 2013 Terrell Mayton was terminated.  You don't know
 3   the date when he was terminated?
 4        A.    I do not.
 5        Q.    And you were given all of Mayton's job
 6   duties with the exception of a few of Mayton's
 7   advertising responsibilities, including invoice
 8   approval authorization, which were assigned to
 9   Sailors.  Did you ever see a writing that assigned you
10   Mayton's job duties?
11        A.    No.  We had a meeting with Fred Van Noy
12   upon termination of Mayton and were told to absorb his
13   responsibilities in his absence.
14        Q.    Did you get a job description of what
15   Terrell Mayton was doing at that meeting with Fred
16   Van Noy?
17        A.    No.
18        Q.    Did you get one after the meeting with
19   Fred Van Noy to tell you what Terrell Mayton's job
20   duties were?
21        A.    No.  I was actually asked to attend
22   meetings and to report on a lot of the
23   responsibilities that Mayton previously reported on
24   during meetings that I wasn't present to before
25   Mayton.
```

1      Q.     So you started attending monthly meetings
2   in September of 2013?
3      A.     Well, specifically, the focus group
4   meeting.
5      Q.     And how long were those focus group
6   meetings?
7      A.     They were supposed to be held once a
8   month.
9      Q.     Right.  That's why I was saying, they were
10  held once a month?
11     A.     Sure.  So how long were the --
12     Q.     How long were the meetings?
13     A.     One, two hours.  It depended on how much
14  we had to cover.
15     Q.     If Sailors started at Carmike in 1994, in
16  2013 he would have had 19 years at Carmike in the home
17  office when Terrell Mayton left, correct?
18     A.     Correct.
19     Q.     Did you ever report to anyone that you
20  thought Sailors was not doing an adequate performance
21  in his job in advertising?
22     A.     No.  I don't think so.
23     Q.     So at the time that Terrell Mayton left in
24  2013, you had been working for approximately one year
25  in marketing?

1      A.      I don't recall it being a year, but --

2      Q.      Was it shorter, longer?

3      A.      I thought it was less than that.

4      Q.      Okay.  So you had been working a little

5   less than one year in marketing when Mayton left?

6      A.      Yes.  But to be clear, the ten years of

7   operations experience I had was marketing and

8   advertising.

9      Q.      You didn't maintain a social media account

10   until 2010, correct?

11      A.      Which was an added responsibility given to

12   me by the vice president of concessions while I was in

13   the film department which wasn't also part of my job

14   duty.  I just absorbed it.

15      Q.      But my point is is that while you said you

16   had marketing experience, you were in operations as a

17   city manager at one theater or in the City of

18   Columbus, correct?  You never moved to a different

19   area, right?

20      A.      I had not moved out of Columbus.

21      Q.      So you only worked either at a theater or

22   within the -- how many, three theaters in the Columbus

23   area?

24      A.      There were four locations.

25      Q.      Hollywood?

```
 1        A.      The Ritz.

 2        Q.      The Ritz.

 3        A.      Carmike 15.

 4        Q.      15.

 5        A.      The Peachtree 8 and the Wynnsong 10.

 6        Q.      So you're counting also --

 7        A.      I was responsible for all of those.

 8        Q.      -- Fort Benning?  You had Fort Benning?

 9        A.      I did.

10        Q.      Okay.  So at the most you had four

11   theaters?

12        A.      Yes.

13        Q.      So --

14        A.      Plus the Hollywood Connection, which was

15   part of the Ritz complex.

16        Q.      But that's not a motion picture exhibitor?

17        A.      Sure.

18        Q.      Agreed?

19        A.      Agreed.

20        Q.      So you had been working in the marketing

21   department away from operations for about nine months,

22   away from film for about nine months, when Terrell

23   Mayton left, right?

24        A.      Yes.

25        Q.      And Shannon Sailors had been working for
```

1  about 19 years in advertising when Terrell Mayton

2  left, correct?

3      A.    Correct.

4      Q.    Now, in Paragraph 15 you said that Trawick

5  was the only female reporting directly to Van Noy at

6  the time of her dismissal, correct?

7      A.    Correct.

8      Q.    During the time you reported to Fred

9  Van Noy, though, other females reported to Fred

10 Van Noy, correct?

11     A.    At one time or another, he had had, I

12 believe -- he has an assistant.

13     Q.    Right.  Terra Hardwick used to report to

14 him, right?

15     A.    She did when she was put under finance.

16     Q.    And that was sometime in late '14 or early

17 '15, right?

18     A.    I don't remember when she was not under --

19     Q.    But certainly during the time you worked

20 in the marketing department, Terra Hardwick was also

21 reporting at that time to Fred Van Noy, just not at

22 the time of your dismissal?

23     A.    At some point, yes.

24     Q.    And then you said in Paragraph 15, Carmike

25 denied her the title of director as well as an

 1   adjustment of her salary commensurate with her new

 2   director-level responsibilities.  It's clear no one

 3   else served in the title role of director of marketing

 4   after Mayton left, correct?

 5        A.     That's correct.

 6        Q.     And when you say that "Carmike was aware

 7   of the discrepancy in pay between Trawick and

 8   comparable males" and then say "upon information and

 9   belief between female employees in the same class or

10   levels as males," do you have any pay records for

11   others?

12        A.     In my possession or ever saw, no.

13        Q.     Yes.

14        A.     No.

15        Q.     Either one?

16        A.     No.  It was what was told to me.

17        Q.     Who told you what Shannon Sailors made?

18        A.     Lisa De La Cruz.

19        Q.     When did Lisa De La Cruz tell you how much

20   Shannon Sailors made?

21        A.     I'm not sure.  It was sometime -- it was

22   at, I believe, ShowSouth; but I'm not sure.

23        Q.     It was what?

24        A.     ShowSouth.  It's a conference.

25        Q.     Who else did Lisa De La Cruz tell you how

1   much they made at Carmike besides Shannon Sailors?

2       A.      She didn't mention any other names other

3   than that I was severely underpaid.

4       Q.      Did she just volunteer this?

5       A.      Yeah.

6       Q.      So what did she tell you was the

7   difference between yours and Shannon Sailors' pay?

8       A.      She told me he made more than 80,000 a

9   year.

10      Q.      Did you ever ask him how much he made?

11      A.      No.

12      Q.      Did you ever ask her to show you how she

13  knew he made 80,000?

14      A.      No.

15      Q.      She wasn't in HR, was she?

16      A.      No.

17      Q.      She didn't tell you how she knew how much

18  he made, did she?

19      A.      Lisa had access to senior-level documents

20  of the company; so she saw a lot of the infrastructure

21  and the payroll, salaries that were coming through.

22  So she didn't show me anything.  She just made me

23  believe she had seen it herself.

24      Q.      My question was:  Lisa De La Cruz didn't

25  tell you she knew how much he made and from what

1    source she got it?

2         A.      She did not tell me source.

3         Q.      In Paragraph 16 you say "the same class or

4    levels as males."  What class are you referring to or

5    level of female employees?

6              MS. PREBULA:  You're going to have to read

7         the whole paragraph.  I think your question is

8         ambiguous the way you phrased it.  If you can

9         answer it after you read the paragraph, go ahead.

10             THE WITNESS:  There were, I believe, 14

11        district managers in operations, only one being

12        female.

13        Q.      (By Mr. Gerakitis)  District managers --

14        A.      Correct.

15        Q.      -- in operations?

16        A.      Sure.

17        Q.      You were never a district manager in

18   operations?

19        A.      No.  I think that the statement here is

20   saying that there were other women within the company

21   in their level with their male counterparts that were

22   not paid equal either.

23        Q.      But you weren't trying to become a

24   district manager, were you?

25        A.      No, no.

1      Q.     Do you know the tenures of those district

2   managers, how long they worked at Carmike?

3      A.     I know that Debra Triplett, which was the

4   example, had been there for many, many years.

5      Q.     And how much did Debra Triplett make?

6      A.     I don't know.

7      Q.     What did other district managers make?

8      A.     I don't know.

9      Q.     Who told you that Debra Triplett was paid

10  differently than other district managers?

11     A.     Jim Lucas.

12     Q.     When did Jim Lucas tell you that Debra

13  Triplett was paid less --

14     A.     I don't remember.

15     Q.     -- than other district managers?

16     A.     I don't remember.

17     Q.     Can you name all the female directors who

18  were directors at the time you were terminated at

19  Carmike?

20     A.     I can name some of them.

21     Q.     Who?

22     A.     Sadie Marshall.

23     Q.     Okay.

24     A.     Terra Hardwick.

25     Q.     Okay.

```
 1        A.      Dawn Saints -- maybe Dawn Smith is her

 2   married name.  I'm not sure.

 3        Q.      Okay.

 4        A.      She was the director of payroll.  That's

 5   all I can think of right now.

 6        Q.      Jodie Grayson?

 7        A.      I don't know who that is.

 8        Q.      How about Arlie Verville?

 9        A.      I didn't know she was a director.

10        Q.      If you'll turn to Paragraph 19.  It says:

11   "Upon information and belief, compensation paid to

12   male comparators, including salary and bonuses,

13   exceeded the compensation Carmike paid to Trawick."

14   Name for me, if you would, all the male comparators

15   that you are referring to in Paragraph 19.

16                MS. PREBULA:  Objection, calls for a legal

17        conclusion.

18                THE WITNESS:  I'll specifically mention

19        Shannon Sailors.

20        Q.      (By Mr. Gerakitis)  Anyone else?

21        A.      I don't recall.

22        Q.      What makes Shannon Sailors a comparator to

23   you?

24                MS. PREBULA:  Same objection.

25                THE WITNESS:  By absorbing Terrell
```

1              Mayton's responsibilities, we were either equal

2              in accountabilities in reporting to Fred, equal

3              in travel, equal in time commitments for the

4              company, and in some situations I was elevated in

5              responsibility to strategic planning and

6              programming that then directed Shannon.

7              Q.     (By Mr. Gerakitis)  Who else has concluded

8       that you were absorbing Terrell Mayton's

9       responsibilities, accountabilities, travel, time

10      commitments, and strategic planning obligations?

11             A.     Fred Van Noy, Jim Lucas, Jon Greer, David

12      Pflegl.  And that's all I can think of right now.

13             Q.     Has Fred Van Noy, Jim Lucas, Jon Greer,

14      and David Pflegl told you that you are a comparator to

15      Shannon Sailors?

16             A.     Jim Lucas did.

17             Q.     When did Jim Lucas tell you you were a

18      comparator to Shannon Sailors?

19             A.     On multiple occasions.  No, I don't know

20      the dates or times.

21             Q.     When is the latest time he did it?

22             A.     I don't know.

23             Q.     When is the first time he did it?

24             A.     I don't know.

25             Q.     Did you get a written statement from Jim

1    Lucas as a part of this litigation that reflects that

2    he thought you were a comparator to Shannon Sailors?

3         A.    No.

4         Q.    Look at Paragraph 23, if you would.  You

5    said that you were elected to serve on the advisory

6    board for nine organizations?

7         A.    Is that a question?

8         Q.    Yes.

9         A.    I believe so.

10         Q.    Is Quadrille one of those nine

11    organizations, The Quadrille?

12         A.    I'm not sure.  I had several.

13         Q.    Do you list them all on your resumes?

14         A.    I have a lot of them on there, but these

15    documents may or may not be complete.

16         Q.    When you say "these documents," you're

17    referring to your resumes?

18         A.    And some of the others produced today.

19         Q.    In Paragraph 24 of Defendant's Exhibit 43,

20    it says:  "Even while receiving positive evaluations

21    and peer recognition, Van Noy stated he would never

22    promote Trawick to a director position unless forced

23    to do so."

24         A.    Correct.

25         Q.    Did he say that to you?

```
 1        A.      No.
 2        Q.      Who did he say that to?
 3        A.      Jim Lucas.
 4        Q.      When did he say it to Jim Lucas?
 5        A.      I don't remember.
 6        Q.      When did Jim Lucas tell you Fred Van Noy
 7   said he would never promote you to a director
 8   position?
 9        A.      I don't remember.
10        Q.      Do you remember the words that were used
11   by Jim Lucas in saying what Van Noy is reported to
12   have said in Paragraph 24?
13        A.      He said that Jim Lucas said that I have
14   been acting as a director of marketing for some time
15   and I deserve that position.  And Fred Van Noy
16   responded that he would never promote me unless made
17   to and while pointing upstairs to the fifth floor.
18        Q.      Jim Lucas reported to Fred Van Noy?
19        A.      He did.
20        Q.      Did you ask Jim Lucas to say something to
21   Fred Van Noy or anyone else in management about you
22   becoming a director of marketing?
23        A.      No.
24        Q.      What prevented you from asking Jim Lucas
25   to say something to senior management about you
```

1    becoming a director of marketing?

2         A.     I wanted to handle that directly.

3         Q.     It says here on March 25, 2015, you met

4    with David Passman about a presentation you were going

5    to make?

6         A.     Yes.

7         Q.     Did you take any notes of what Passman

8    said during that meeting?

9         A.     I don't recall before, during, or after

10   that when I wrote that statement down.

11        Q.     You're going to my next question.

12        A.     My apologies.

13        Q.     No, no, that's fine.  You didn't take any

14   notes during the meeting.  You don't recall.  You

15   didn't take any notes after the meeting of what David

16   Passman may have said, correct?

17        A.     I didn't say I didn't take any notes.  I

18   said I don't recall.

19        Q.     That was my -- that's exactly what I asked

20   you.  You don't recall taking any notes during the

21   meeting or after the meeting with David Passman as

22   described in Paragraph 25?

23        A.     I wrote down David Passman's statement

24   after that meeting.  I do not remember when.

25        Q.     Where did you write down David Passman's

1    statement?

2         A.    I don't know.

3         Q.    Have you produced it?

4         A.    Yes.  I'm sorry.  The document itself?

5         Q.    Yes.

6         A.    I don't remember where it is.  I just --

7    once I write something down, I remember it; and that's

8    how I was able to recall it.

9         Q.    Did you handwrite it or type it out?

10         A.    I wrote it down.

11         Q.    In handwriting?

12         A.    In handwriting, yes.

13         Q.    Well, we'll have a chance to look at all

14    of the things that you've produced in discovery.

15              MS. PREBULA:  Let's just move on to the

16         next question.  That's a question for me, not for

17         her.  Let's just move on.

18         Q.    (By Mr. Gerakitis)  What did you write

19    down?  Tell me what you wrote down.

20         A.    I wrote down that his response to my

21    reading what I was going to say in front of a whole

22    audience full of women students that it is unfortunate

23    for them but it does exist, and it was in reference to

24    the glass ceiling comment.

25         Q.    Okay.  You're saying that David Passman

1  said and you wrote down it is unfortunate for them

2  that a glass ceiling does exist?

3      A.    No.

4      Q.    Okay.  What --

5      A.    I said I read him my statement regarding

6  glass ceilings that I was going to give to that

7  auditorium, and his response was:  "They do exist.

8  It's unfortunate for them, but it does exist."

9      Q.    Did you write down:  "They do exist.  It's

10 unfortunate for them, but it does exist"?

11     A.    Yes.

12     Q.    But you didn't write it down while you

13 were having the meeting with Passman?  You went out

14 later and wrote it down?

15     A.    Yes.

16     Q.    You were not there to meet with Passman

17 about your director-level position, correct?

18     A.    Not at that time, no.

19     Q.    You were not there to meet with Passman

20 about your pay as a marketing project manager,

21 correct?

22     A.    Correct.

23     Q.    You were not there to talk about what any

24 male employee was making --

25     A.    Correct.

```
 1        Q.      -- correct?  Then you said in Paragraph 26
 2   you later met with Van Noy and discussed your low pay
 3   and asked about the opportunity to be considered for
 4   the director's title, correct?
 5        A.      Correct.
 6        Q.      Based on three years running the marketing
 7   department successfully.  Well, how long had Terrell
 8   Mayton been gone when you met with Van Noy?
 9        A.      I don't know.
10        Q.      What date did you meet with Van Noy?
11        A.      It was sometime in early 2015.
12        Q.      Well --
13        A.      The first quarter.  I'm not sure.
14        Q.      So it was either January, February, or
15   March?
16        A.      Correct.
17        Q.      That meeting is not recited anywhere in
18   your EEOC charge.  Are you aware of that?
19        A.      I'm not aware of that.
20        Q.      In the first quarter of 2015, if Terrell
21   Mayton left in September of 2013, you had only been
22   working in marketing with him not around for a year
23   and a half, correct?
24        A.      If he was terminated on that date and the
25   math works, then I guess.  I don't -- I don't --
```

1          Q.      Who else was present with you and Van Noy
2     as you describe the meeting on Paragraph 26?
3          A.      Just the two of us.
4          Q.      Who all worked in marketing as of that
5     date you had the meeting with Van Noy?
6          A.      Shannon and I.
7          Q.      Who else?
8          A.      I'm not sure of the hire dates of the
9     customer service team and/or Jennifer Therrien and/or
10    London during that period.
11         Q.      Well, Fussell is one, F-u-s-s-e-l-l?
12         A.      Okay.
13         Q.      Do you know if she was working there in
14    the first quarter of 2015?
15         A.      I don't know when any of that team
16    actually started based on this conversation.
17         Q.      Do you know if Cox was working in the
18    first quarter of 2015?
19         A.      I don't remember.
20         Q.      Do you know if Therrien was working in the
21    first quarter of 2015?
22         A.      I don't know her start date.
23         Q.      Do you know if Mahogany was working in the
24    first quarter of '15?
25         A.      I believe so.

1      Q.      And who else was in marketing in the

2  first -- or at any time in 2015 at the time you left?

3      A.      That was the team that was in place when I

4  left.

5      Q.      Fussell, Cox, Therrien, and Mahogany?

6      A.      Oh, Troy Jackson.

7      Q.      Okay.  About how Joe Paull?

8      A.      And Joe Paull.  I'm sorry.

9      Q.      You hired Fussell?

10     A.      I did.

11     Q.      You hired Cox?

12     A.      Yes.

13     Q.      You hired Therrien?

14     A.      Yes.

15     Q.      You hired Paull?  You called him over from

16  the newspaper to come work there, right?

17     A.      Yeah.

18     Q.      And you hired Jackson?

19     A.      Yes.

20     Q.      Okay.  Did you discuss with Fred Van Noy

21  at this meeting you described in Paragraph 26 all the

22  customer service people that had been added to the

23  department?

24     A.      I don't remember.

25     Q.      In Paragraph 27 you said that Van Noy told

```
 1    you that Carmike was unsure whether they would hire a

 2    marketing director or chief marketing officer,

 3    correct?

 4         A.     Correct.

 5         Q.     Was that the same meeting as the meeting

 6    in 26, in Paragraph 26?

 7         A.     Yes, I believe so.

 8         Q.     And you knew that outsiders were being

 9    considered because you had heard that outsiders were

10    being considered for a marketing director position,

11    correct?

12         A.     I had heard from Fred that they were on a

13    search for that replacement and many apologies from

14    Fred regarding me taking on those extra

15    responsibilities and to be patient.

16         Q.     Because a chief marketing officer might

17    decide when they come on to reorganize the department?

18    You'd agree with that, wouldn't you?

19              MS. PREBULA:  Objection, calls for

20         speculation.

21              THE WITNESS:  That depends on how much

22         authority Fred Van Noy would have allowed for the

23         restructure.

24         Q.     (By Mr. Gerakitis)  You could foresee a

25    senior vice president, chief marketing officer
```

1    reorganizing the department when they came in,

2    correct?

3              MS. PREBULA:  Same objection.

4              MR. GERAKITIS:  Noted.

5              THE WITNESS:  If Fred allowed them to make

6        those changes, then they could have.

7        Q.    (By Mr. Gerakitis)  Do you understand

8    there were changes made when Rob Collins came on as

9    chief marketing officer?

10       A.    I don't know what changes were made when

11   he came on.

12       Q.    You didn't talk with Fussell after you

13   left?

14       A.    I don't recall ever speaking to Fussell.

15       Q.    You didn't talk with Cox after you left?

16       A.    I don't remember speaking to Cox.

17       Q.    You didn't talk to Therrien after you

18   left?

19       A.    I don't recall speaking to Therrien.

20       Q.    How about Jackson or Joe Paull?

21       A.    I have run into them on a couple of

22   occasions, but --

23       Q.    Did you ask them about what the department

24   was doing?

25       A.    No.  I asked them how they were doing.

1    Q.    That's it?

2    A.    I mean, it was a personal thing.  It was a

3    personal question.  When I spoke to Troy, he wasn't

4    employed at Carmike anymore when I ran into him.

5    Q.    A lot of people left in 2016 leading up to

6    the AMC sale at the end of the year, right?

7    A.    I don't know what year that the company

8    was severing, where people were leaving.  I don't -- I

9    don't know.

10    Q.    Did you read the newspaper at some point

11    about the sale to AMC?

12    A.    Sure.  But I don't know who at Carmike

13    stayed employed throughout the transition or got other

14    jobs.  I don't know any of that.

15    Q.    Did you talk to Therrien -- well, I know

16    you didn't talk to Therrien.  Did you ever learn that

17    Therrien had gone to work at TSYS?

18    A.    I saw it on Facebook.

19    Q.    You were Facebook friends with her?

20    A.    We still are.

21    Q.    And how many times have you reached out to

22    her while you have been on Facebook?

23    A.    Not one time.

24    Q.    Not one time?

25    A.    Not one time.

1      Q.      How many times has she reached out to you?

2      A.      Not one time.

3      Q.      How many times have you texted her since

4   you left?

5      A.      I haven't.

6      Q.      None?

7      A.      Not that I'm aware of.  Not that I recall.

8      Q.      In the end of Paragraph 27 it says:  "He

9   then asked her to provide a list of her

10  accomplishments."

11     A.      Uh-huh.

12     Q.      And you said he asked you to do this in

13  March, the first quarter of 2015, correct?

14     A.      It was during that meeting and discussion

15  about my director position.

16     Q.      There is no such document of your

17  accomplishments that's been provided, is there?

18     A.      Yes.

19     Q.      You promised you could provide it to the

20  EEOC; but you never provided it to the EEOC, did you?

21     A.      I don't remember.

22     Q.      What did the list of accomplishments say?

23     A.      It was an overview of my performance in

24  2014 per request of Fred Van Noy.

25     Q.      And that was a request that he made of all

1    the people who were reporting to him?

2         A.    No.

3         Q.    Pflegl?

4         A.    No.  Sorry.  I know.  I know.

5         Q.    Are you absolutely certain that Fred

6    Van Noy did not send an e-mail in January of 2015

7    asking Sailors, you, Pflegl, everybody who's reporting

8    to him, to give him a list of accomplishments to

9    report to a board meeting?

10        A.    To my recollection, Shannon Sailors was

11   not a recipient of that e-mail.

12        Q.    Who else was a recipient of an e-mail

13   asking for a list of accomplishments for the year 2014

14   besides you?

15        A.    To my recollection, Jim Lucas, John

16   Lundin, and maybe Jon Greer, and me.

17        Q.    So male directors and VPs, I take it, or

18   at least division managers were asked for a list of

19   accomplishments, the same as you were, correct?

20        A.    Correct.

21        Q.    But that was in January that you were

22   asked for that, correct?

23        A.    Correct.

24        Q.    Not in March at this meeting that you

25   refer to in Paragraph 27?

 1        A.      Correct.  I reminded him that my

 2   accomplishments that he had previously asked for were

 3   already sent to him.

 4        Q.      Look at Paragraph 27.  According to you,

 5   he asked you to provide a list of her accomplishments

 6   so he could discuss her potential promotion to

 7   director.  Is that right?

 8        A.      Correct.

 9        Q.      He did not ask you in that meeting to do

10   that.  You simply said you reminded him?

11        A.      No.  He asked me to provide a list of my

12   accomplishments.  When he said that, I reminded him I

13   had already sent him my 2014 numbers.

14        Q.      If you sent him the 2014 numbers, you

15   weren't the only one to send him 2014 numbers,

16   correct?

17        A.      Correct.

18        Q.      Others -- this was not unique to you.  He

19   didn't need your list of accomplishments alone.  He

20   needed everyone's list of accomplishments, correct?

21        A.      Correct.

22        Q.      In Paragraph 29 it says in or about

23   September 2015, Trawick met with Passman to discuss an

24   employer opportunity.  Who was that employer?

25        A.      I was being interviewed for the

1    president's position at a financial institution.

2         Q.     Name the financial institution for me.

3         A.     I'm trying to recall.

4         Q.     Who did you interview with?

5         A.     A headhunter and then three interviews

6    within the company.

7         Q.     And who within the company did you

8    interview with?

9         A.     Or one interview.  It was -- I met with

10   the entire -- I'm sorry.  This is from recollection.

11   I was interviewed by a headhunter.  Then I interviewed

12   with the entire board of the company.  And then I

13   interviewed with the either current president or the

14   COO of the company.

15        Q.     Name the people you interviewed with.

16        A.     I can't recall.

17        Q.     Name the company you interviewed with.

18        A.     Pritchett & Hatcher, Hatcher & Pritchett.

19   I'm not -- I can't remember.  I mean, I can look it up

20   and tell you.  I just can't --

21        Q.     What financial services did they provide?

22        A.     Education.  It was grants to students.

23        Q.     And who were the principals of this

24   company?

25        A.     I don't remember.

1      Q.    Were they based in Columbus?

2      A.    The company was -- the main office was

3 based in Columbus.

4      Q.    Did they ever hire a president to your

5 knowledge?

6      A.    They did.

7      Q.    Did you know anybody who worked there?

8      A.    Not -- I mean, I knew some of the -- I

9 knew -- well, I knew names of some of the people on

10 the board, but --

11      Q.    Who were some of the people on the board?

12      A.    I mean, I'm saying I knew them when I -- I

13 know of them, like I -- I just don't remember.  I'm

14 sorry, I don't.

15      Q.    You can't name a single person you

16 interviewed with for a job as president of a company

17 less than two years ago?

18      A.    That's correct.

19      Q.    You can't name a single person on the

20 board of a company you interviewed to be the president

21 of two years ago, less than two years ago?

22      A.    No.  But I can tell you the headhunter's

23 name if you would like his name.

24      Q.    What's the headhunter's name?

25      A.    Michael Silverstein.

1      Q.      Michael Silverstein?

2      A.      Correct.

3      Q.      Who is Mr. Silverstein with?

4      A.      I don't remember his company.

5      Q.      Did Mr. Silverstein ever tell you that he

6  had heard people from Carmike reporting that you had

7  misappropriated monies?

8      A.      No.

9      Q.      Why didn't you accept the president's job

10  at -- can we call it the Hatcher group?  Why didn't

11  you accept the job?

12      A.      I went back to the headhunter and told him

13  that I wanted a salary rate that was considerably high

14  because --

15      Q.      What were they offering?

16      A.      They hadn't made an offer.  It was between

17  me and one candidate, and they were trying to decide.

18      Q.      What were you proposing?

19      A.      Six figures a year, 100,000.

20      Q.      What's six figures, 100,000?

21      A.      Yeah.

22      Q.      Now, this September 2015 meeting with

23  David Passman, it's not listed in your EEOC charge, is

24  it?

25      A.      I don't know.  I don't recall.

1      Q.     Did you say anything to Passman other

2  than, as you describe in Paragraph 29, I asked if I

3  hit my glass ceiling at Carmike?

4      A.     I'm sorry.  What was the question?

5      Q.     Did you say anything to David Passman

6  other than as you describe in Paragraph 29, I asked if

7  I hit my glass ceiling at Carmike?

8      A.     We spoke about quite a few things.

9      Q.     What other than did I hit my glass ceiling

10 at Carmike did you speak with David Passman about as

11 described in Paragraph 29?

12     A.     I spoke to him about the headhunter

13 approaching me about a position.

14     Q.     That's one.

15     A.     I spoke to him about whether or not I'd

16 hit my glass ceiling.

17     Q.     Two.

18     A.     I spoke to him about my current situation

19 with the company regarding salary.

20     Q.     What did you say about your salary?

21     A.     That I had to disclose to the headhunter

22 because he asked what my current position and salary

23 was with Carmike.

24     Q.     Did he ask for salary or compensation?

25     A.     He asked for salary.  You're talking about

1   the headhunter?

2        Q.     Right.

3        A.     Yes.  Salary, what I currently made.

4        Q.     Okay.

5        A.     I told David that and I told David that

6   the headhunter's face told me everything I needed to

7   know, that I was not being compensated based on what

8   I'm doing.  And he said:  "You're right.  You should

9   be compensated."

10       Q.     Right.  Anything else?

11       A.     I told him that I had talked to Fred about

12  these things in a previous meeting, that I had also

13  mentioned to Fred that I am now under the

14  understanding that they are looking for a CMO, that a

15  director of marketing can report to a CMO, and there

16  shouldn't be any reason that I'm not promoted or paid

17  fairly, and that Shannon and I have the same line of

18  work, we work as hard, our responsibilities are equal,

19  and it's not -- it's not right.

20       Q.     Anything else?

21       A.     That's all I can remember right now.

22       Q.     Did Passman say anything other than stay

23  with Carmike and I want you to be part of the senior

24  management team one day?

25       A.     He told me I had not hit my glass ceiling.

1  He told me that he saw me -- he still saw me as

2  someone he wanted in upper management.  He did tell me

3  I needed to finish my education and that it's

4  something that men are going to require of me as I

5  move up in the industry.

6      Q.    And what efforts have you made to do that

7  since that meeting with David Passman in

8  September 2015?

9      A.    I didn't make any efforts to go back to

10  school.

11      Q.    You've got a six-figure job right now.

12  They're not requiring you to go get a degree --

13      A.    No.

14      Q.    -- at Fun Academy, are they?

15      A.    No, not at all.

16      Q.    You and Johnson are social friends with

17  Passman, correct?

18      A.    We were.

19      Q.    Okay.  What was the reason for you not to

20  remain social friends?

21      A.    I didn't know if it was appropriate to

22  talk to David Passman with all of this going on.

23      Q.    Did you take any notes of the meeting with

24  Passman as you describe in Paragraph 29 and 30?

25      A.    I don't remember.  I just -- it was such a

1    strong dialogue between the two of us, it was hard not

2    to remember.  And Lisa De La Cruz set the meeting and

3    was right around the corner, and she often heard what

4    was said around the corner.  So she might have

5    witnessed some of that.

6          Q.    I'm sorry.  Did you understand me to ask

7    you what Lisa De La Cruz was hearing?

8          A.    No.  I'm sorry.  No.  I apologize.

9          Q.    My question was:  Did you take any notes

10   of the meeting with David Passman --

11               MS. PREBULA:  Objection.  I'm sorry.  Go

12        ahead.  I thought you were finished.

13         Q.    (By Mr. Gerakitis)  -- as described in

14   Paragraphs 29 and 30 of your complaint?

15         A.    I don't recall if or when I wrote down

16   these statements.

17         Q.    As of September of 2015, you managed

18   Therrien, Jamie Cox, Jacob Jackson, Tashara Fussell,

19   and Joe Paull, correct?

20         A.    Joe Paull was hired -- well, we split.  He

21   reported to me and Shannon.

22         Q.    But you still had to manage part of his

23   work, right?

24         A.    I had to manage part of Shannon's work,

25   so -- I'm sorry.  Yes.

1          Q.      In what areas did you manage Shannon's

2    work?  Was it in trailer placement?

3          A.      Oh, no.

4          Q.      Why not?

5          A.      Because it had nothing to do with

6    marketing, not for me.

7          Q.      Why didn't it have anything to do -- why

8    did trailer placement not have anything to do with

9    marketing?

10          A.      Because my role was strategically planning

11    what assets go live in markets at a certain period

12    throughout campaigns that we approved and set out into

13    the markets in conjunction with studios and/or our

14    company, whether that was community or grand openings

15    or studio partnerships.

16          Q.      Do you think that David Passman never

17    intended to give you a promotion beyond marketing

18    project manager?

19          A.      At the end, yeah.  I don't think -- yes.

20    I don't -- at the end I'm not sure that David intended

21    to promote me.

22          Q.      Do you think David lost confidence in you

23    as a result of the investigation?

24          A.      I believe that David in this meeting that

25    we had knew he wasn't going to move me up.  That is my

1    belief.

2         Q.    My question was not what was David's

3    thinking in September --

4         A.    Uh-huh.

5         Q.    -- of 2015.  My question was:  Do you

6    think David Passman lost confidence in you as a result

7    of the November 2015 investigation?

8              MS. PREBULA:  Objection, asked and

9         answered.

10             THE WITNESS:  I don't know what David was

11        thinking.

12        Q.    (By Mr. Gerakitis)  Do all female

13   directors at Carmike have degrees?

14        A.    I don't know.

15        Q.    In Paragraph 33 of your complaint, you

16   say:  "Trawick did not report the issues to Human

17   Resources because the persons involved."  Who were the

18   persons involved?

19        A.    I'm sorry.  Can you repeat the question?

20        Q.    Yes.  In Paragraph 33 of your complaint

21   you say that you did not report the issues to Human

22   Resources because the persons involved.  My question

23   is:  Who were the persons involved?

24             MS. PREBULA:  I'm going to object.  That's

25        ambiguous.

1      Q.     (By Mr. Gerakitis)  If you can answer it,

2  answer it.  If you can't, you can't.

3      A.     I don't understand it.

4      Q.     You said:  "Trawick did not report the

5  issues to Human Resources because the persons involved

6  and to whom she complained about unequal pay and title

7  for her and males were officers of the company."  Who

8  were those persons that you thought were involved?

9      A.     I believe that through speaking with Fred

10 Van Noy and David Passman that they were involved.

11     Q.     Anyone else besides Fred Van Noy and David

12 Passman who you refer to in Paragraph 33 as being

13 those males who were officers of the company?

14     A.     I can't think of another name at this

15 time.

16     Q.     You realize that you could complain to HR,

17 correct?

18     A.     Yes.

19     Q.     And you never heard of anybody being

20 retaliated against for reporting to HR, did you?

21     A.     I had seen people.  I mean, I don't --

22     Q.     My question is:  You never heard of

23 anybody being retaliated against for reporting to HR a

24 workplace discrimination?

25     A.     I'm not aware of anybody who did.

1      Q.      If you're not aware of anybody who

2  complained to HR, is that what you're saying or

3  that --

4      A.      About equal pay or --

5      Q.      Any kind of workplace discrimination.  Are

6  you aware of anyone who complained about workplace

7  discrimination to HR?

8      A.      I can't recall a specific situation at

9  this time.

10      Q.      Going further, if you can't recall anybody

11  who spoke to HR about workplace discrimination, then

12  there's no one you can think of who was ever

13  retaliated against for speaking to HR about workplace

14  discrimination, correct?

15      A.      At this time, I can't recall anyone that

16  fits that.

17      Q.      You're aware there's a toll-free number, a

18  help line, to call that you could have called

19  anonymously, correct?

20      A.      I am.

21      Q.      And you didn't call the help line?

22      A.      No, because even based on the code of

23  conduct, going to your supervisor and manager was an

24  appropriate first step in resolving issues.

25      Q.      And that was a first step in your mind,

```
 1   but you still had HR.  As you say, you didn't go to
 2   HR?  You didn't call the toll-free number?
 3        A.      Huh-uh.
 4        Q.      Correct?
 5             MS. PREBULA:  Objection, argumentative and
 6        compound.
 7        Q.      (By Mr. Gerakitis)  You didn't go to HR to
 8   complain, did you?
 9        A.      I did not.
10        Q.      You didn't call the toll-free number, did
11   you?
12        A.      I did not.
13        Q.      You were aware of what you thought was
14   workplace discrimination and that those resources were
15   available to you, didn't you?
16        A.      I did.
17        Q.      There was nothing that prevented you from
18   calling HR and the toll-free number to complain about
19   what you thought was workplace discrimination,
20   correct?
21        A.      No, not correct.
22        Q.      Well, Cathryn Smitherman, as soon as she
23   was able to find out about a sponsorship on
24   November 2nd, reported it.  My question to you is:
25   When I asked you there was nothing that prevented you
```

```
 1   from calling HR and the toll-free number to complain
 2   about workplace discrimination, you said no.  When did
 3   you ever call HR or the toll-free number?
 4        A.    I did not call the number.  I just tried
 5   to resolve this with the two people that could promote
 6   me and give me the benefits and the salary that I
 7   deserved.  I thought based on their word they would
 8   honor their commitment to me.
 9        Q.    And in November 2015 when Fred Van Noy and
10   Fred Friedel met with you, they thought you would
11   honor the requirement that you keep confidential the
12   investigation, correct?
13        A.    I wasn't told not to talk about the
14   investigation.
15        Q.    You thought you were only told not to poll
16   your peers, correct?
17        A.    Correct.
18        Q.    You spoke with Shannon Sailors about the
19   investigation, didn't you?
20        A.    He asked me about it, and I responded.
21        Q.    He asked you how the meeting went?
22        A.    Yes.
23        Q.    Correct?  That's all he said?
24        A.    I don't remember all that he said.
25        Q.    And you spoke to him about the
```

1    investigation and you spoke to Lisa De La Cruz about

2    the investigation after the meeting with Fred Friedel

3    and Fred Van Noy, correct?

4         A.    I don't remember speaking to Lisa

5    De La Cruz.

6         Q.    Do you remember putting it under oath in

7    an EEOC charge that that's what you did?

8         A.    We communicated.

9         Q.    Let's go back.

10        A.    Okay.

11        Q.    I asked you about reporting to HR the

12   toll-free number; and I said there was nothing that

13   prevented you from calling HR from the time you

14   absorbed Terrell Mayton's job, as you said, in 2013

15   until 2015 in September when you told David Passman

16   you had a six-figure job ahead of you.  Nothing

17   prevented you from calling HR during those two years,

18   did it?

19        A.    Yes.

20        Q.    What prevented you from calling HR?

21        A.    The people I'm asking for a raise from I

22   wasn't going to go complain on.  I was afraid of

23   retaliation.

24        Q.    What indicated to you you would be

25   retaliated against by David Passman, who was your

1    friend, up until the time you were terminated?

2         A.     I was more afraid of Fred Van Noy.

3         Q.     What prevented you from reporting that

4    David Passman was discriminating against you to HR or

5    the toll-free number?

6         A.     I didn't want to comment negatively about

7    David.  He was someone we cared about.

8         Q.     You didn't care about Fred Van Noy, is

9    that accurate?

10        A.     We didn't have a relationship out of work.

11        Q.     Is Fred a number of Columbus Country Club?

12        A.     I don't know.

13        Q.     Is David?

14        A.     I don't know if he still is.  I don't

15   know.  I believe he was.

16        Q.     Was David?

17        A.     I think so.

18        Q.     Played golf with your father-in-law there?

19        A.     Yes.

20        Q.     Played golf with Johnson there?

21        A.     He did.

22        Q.     Did Fred ever play golf with your

23   father-in-law?

24        A.     I don't know.

25        Q.     Fred ever play golf with Johnson?

1    A.    I don't know.

2    Q.    Did you ever play golf with David?

3    A.    I don't remember.

4    Q.    Did you ever play golf with Fred?

5    A.    No.

6    Q.    In Paragraph 34 you refer to Sailors does

7    not have a Bachelor's or even an Associate's degree.

8    How long was Sailors in advertising before he became a

9    director?  Do you know?

10    A.    No.

11    Q.    Do you know if Sailors was involved in

12    studies with Carmike University?

13    A.    No.

14    Q.    Did Johnson try and help you with your

15    classes in computer programming work at Troy in your

16    classes?

17        MS. PREBULA:  Objection, relevance.

18        THE WITNESS:  I don't recall.  My husband

19    helps me with a lot of different things.

20    Q.    (By Mr. Gerakitis)  How long was Fred

21    Van Noy with the company?

22    A.    I don't know.

23    Q.    Longer than you?

24    A.    I would assume so.

25    Q.    And you know Sailors was there longer than

1    you at least?

2         A.      (Witness nods head affirmatively.)

3         Q.      Yes?

4         A.      Yes.

5         Q.      In Paragraph 36 you said that only two

6    months after Trawick's meeting in September informed

7    female employees were held to a higher educational

8    standard than male employees and she protested this

9    discriminatory standard.  Do you see that?

10        A.      I'm reading it.  Okay.

11        Q.      There's nothing in your EEOC charge about

12   you protesting a discriminatory standard about being

13   held to a higher educational standard from management,

14   right?

15        A.      I don't recall.

16        Q.      You said that you were going to be called

17   into a meeting regarding charitable donations,

18   correct?

19        A.      Correct.

20        Q.      Well, we've established The Quadrille is

21   not a charity, agreed?

22        A.      Agreed.

23        Q.      And you were supposed to submit charity

24   sponsorships for approval to Lisa De La Cruz, correct?

25        A.      There was no formal policy on sponsorship

1    approvals.

2         Q.    I didn't ask you was there a formal policy

3    on sponsorship approvals, and I hope that that's not

4    what you understood.  My question was:  It was your

5    practice to send a charity contribution request to

6    Lisa De La Cruz for approval, correct?

7         A.    I don't know that I feel comfortable

8    answering that yes or no.

9         Q.    Tell me when a charity reached out to you,

10   other than on Sinfonia when there was a problem with

11   the landlord, where you didn't go to Lisa on a

12   charitable request.  Like Junior League, would you go

13   for a charitable request for Junior League to Lisa?

14              MS. PREBULA:  Objection, compound.

15        Q.    (By Mr. Gerakitis)  I'll start back over.

16   Did you go to Lisa for the Junior League?

17        A.    I did.

18        Q.    Why did you go to Lisa for the Junior

19   League?

20        A.    It was my understanding to reach out to

21   her office to make sure that there was no conflict in

22   processing.

23        Q.    It had nothing to do with it being a

24   charitable event?

25        A.    No.

1    Q.    Well, you said that once approved all
2  charity sponsorship invoices were then approved by
3  Sailors prior to payment by Accounts Payable, correct?
4    A.    Correct.
5    Q.    You submitted The Quadrille request,
6  according to you, on the list that you received on
7  your desk that morning of November 12th where you
8  wrote "L/C" by it for Lisa/Crystal.  You're telling me
9  and have said you also got Shannon to approve The
10  Quadrille sponsorship, correct?
11    A.    Correct.
12    Q.    So the charity sponsorship -- as you say,
13  all charity sponsorship invoices were then approved by
14  Sailors prior to payment, correct?
15    A.    He went into Nexus and approved any checks
16  being cut on behalf of the company --
17    Q.    So Sailors --
18    A.    -- from our department.
19    Q.    So Sailors was required, as far as you
20  knew, to approve a charity sponsorship like The
21  Quadrille?
22    A.    He was to approve any payment of any kind
23  that came out of our department through Nexus.
24    Q.    In your complaint filed in federal
25  district court, you said once approved, all charity

1    sponsorships were then approved by Sailors prior to

2    payment by Accounts Payable, correct?

3         A.    Correct.

4         Q.    All charity sponsorships, correct?

5         A.    Correct.

6         Q.    You submitted The Quadrille as a

7    charitable contribution, correct?

8         A.    Correct.

9         Q.    When you sat down with Jenny McMillen at a

10   meeting to come up with the sponsorship idea, did you

11   use anything as a go-by?  How did you come up with

12   platinum and gold and bronze and silver and all that?

13        A.    I don't recall.

14        Q.    You didn't think there was something a

15   little less kind of -- I mean, that's kind of

16   overused, platinum, bronze.  I mean, at least the AVLF

17   uses Ruby Red, Stiletto, Kitten Heel.  You just

18   thought that's the most convincing way to describe the

19   sponsorship?

20        A.    I don't recall what I was thinking when we

21   put together the levels.

22        Q.    In Paragraph 39, Van Noy told you your

23   actions were being investigated, correct?

24        A.    Correct.

25        Q.    Even though you were told they were being

1    investigated, you decided you could at least tell

2    Jennifer Therrien you were being investigated, right?

3    Right?

4        A.    What was the question?

5        Q.    Even though Fred Van Noy told you you were

6    being investigated, you decided you could at least

7    tell Jennifer Therrien you were being investigated,

8    correct?

9        A.    I'm not sure I agree with that statement.

10   Yes or -- I don't have an answer.

11       Q.    You have already testified earlier about

12   it, so let me ask you this:  Jennifer Therrien was

13   involved in processing payment for Quadrille, correct?

14       A.    Yes.

15       Q.    That sponsor approval went next to

16   Jennifer to get the check for it, correct?

17       A.    I'm sorry.  What?

18       Q.    The sponsor approval for The Quadrille

19   went to Jennifer to get the check for it, correct?

20       A.    I'm not quite clear on the processing as

21   far as her getting a check.  She submitted paperwork.

22       Q.    Do you know how the check ended up in

23   anyone in Quadrille's hands?

24       A.    I don't remember.

25       Q.    Did you ever ask anybody how that check

1    ended up in Quadrille hands?

2         A.    I don't remember.

3         Q.    Did you give any other address other than

4    Jenny McMillen's address for the check?

5         A.    I don't remember.

6         Q.    In Paragraph 43 you said that Carmike

7    discriminated against Trawick in investigating her and

8    not investigating Sailors.  Do you see that?

9         A.    What paragraph?

10        Q.    43.

11        A.    Okay.

12        Q.    Sailors was not making a request for a

13   charitable contribution for The Quadrille, was he?

14        A.    No.

15        Q.    Jennifer McMillen and you were, correct?

16        A.    I'm sorry.  What was the question?

17        Q.    Jennifer McMillen and you were the persons

18   making a request for a charitable contribution for The

19   Quadrille, correct?

20        A.    Correct.

21        Q.    In Paragraph 46 it says after Trawick's

22   termination Carmike replaced her with a male from

23   outside the company.  You knew in September of 2015

24   that Carmike was looking outside the company for a

25   CMO, correct?

1       A.      No.

2       Q.      Passman, you said earlier, told you that

3   they were looking outside the company and considering

4   a chief marketing officer?

5       A.      No.  I feel like that was in the Fred

6   Van Noy conversation, and he said they weren't sure

7   which direction they were going in.

8       Q.      Well, then in September 2015 you knew from

9   Fred Van Noy they were thinking about having a chief

10  marketing officer?

11      A.      I knew they were considering direction.

12  They had not made that decision to my knowledge.

13      Q.      It was an option to consider getting a

14  chief marketing officer, correct?

15      A.      Correct.

16      Q.      Do you know when Collins was first

17  interviewed for that chief marketing officer job?

18      A.      I do not.

19      Q.      In Paragraph 47 you say defendant through

20  its agents stated at a community meeting that Trawick

21  was being investigated for misappropriation and misuse

22  of company assets.  Do you see that?

23      A.      I do.

24      Q.      Tell me the names of every agent of

25  Carmike who has done what is described in

Paragraph 47.

A.      The one that I am most aware of is Ricky
Love, who was a manager at the Hollywood Connection,
who spoke to a sales rep at PMB Radio and said that I
had been terminated for misappropriation of funds.

Q.      Ricky Love told somebody at PMB?

A.      Broadcasting.

Q.      Broadcasting?

A.      Yes.

Q.      Who did he tell at PMB Broadcasting?

A.      I don't have that name, but the
supervisor's name is Joseph.

Q.      Joseph what?

A.      Just give me a minute.  I'm not great with
names.  Brannon, B-r-a-n-n-o-n, I believe.

Q.      Joseph Brannon --

A.      Yes.

Q.      -- told you that Ricky Love told another
person at PMB Broadcasting that you had been
terminated for misappropriation of funds?

A.      Yes.

Q.      You don't know the name of that other
person?

A.      The employee of PMB that was told
directly?

1    Q.    Right.

2    A.    No, but Joseph does.

3    Q.    Have you gotten a statement from Joseph

4  Brannon about Ricky Love saying you were terminated

5  for misappropriation for funds?

6    A.    No.

7         MS. PREBULA:  I'm going to take a break

8    now because your voice and your tone are rising,

9    and I believe I feel that the whole tenor of the

10   deposition is now argumentative.

11        MR. GERAKITIS:  I'm sorry.

12        MS. PREBULA:  So we're going to take a

13   break.

14        MR. GERAKITIS:  You know what, I've got

15   two more questions to ask; and then let's take a

16   break, okay?

17        MS. PREBULA:  Okay.

18   Q.    (By Mr. Gerakitis)  How are you feeling

19  today?

20        MS. PREBULA:  No, we're not going there.

21   Q.    (By Mr. Gerakitis)  Are you feeling okay?

22        MS. PREBULA:  We're not going there.

23   Let's just --

24   Q.    (By Mr. Gerakitis)  Are you feeling okay?

25  Are you able to continue?  I just want to make sure.

1    Are you able to continue?

2                    MS. PREBULA:  You can answer that.

3                    THE WITNESS:  Okay.  I'm like --

4         Q.    (By Mr. Gerakitis)  Are you able to

5    continue?

6         A.    Sure.

7         Q.    Okay.  When was this meeting held between

8    Ricky Love and Joseph Brannon or, excuse me, the

9    employee with PMB Broadcasting?

10        A.    It was shortly after my

11   resignation/termination, however it's documented.

12        Q.    And what was the community meeting?

13        A.    My resume was circulated at the Museum of

14   Columbus, and there was discussions that I was an

15   inappropriate hire because of my behavior at Carmike.

16        Q.    Okay.  Who said you were an inappropriate

17   hire at the Museum of Columbus?

18        A.    I had heard that from multiple sources

19   and --

20        Q.    Who were the people who told you that you

21   were -- who told you that --

22        A.    I don't remember who told me that during

23   this time.

24        Q.    Let me ask the whole question.

25        A.    I'm sorry.

1      Q.      Who were the people who told you that you

2  were an inappropriate hire at the Museum of Columbus?

3      A.      I don't remember.

4              MS. PREBULA:  Now we're taking a break.

5      You're well beyond your two questions.

6              THE VIDEOGRAPHER:  We're off video.

7              (Recess from 3:59 p.m. to 4:12 p.m.)

8              THE VIDEOGRAPHER:  We are back on video.

9      Q.      (By Mr. Gerakitis)  Who besides Ricky Love

10 ever stated at a community meeting or at any other

11 gathering that disseminated false and misleading

12 communication about you?

13     A.      At my job at Childcare Network, the

14 director of marketing who had recruited me was called

15 by her cousin, Emily Neff, who told her that I had

16 been terminated from Carmike for misappropriation of

17 funds.  Emily Neff got that information to our

18 understanding from Heather Garrett.

19     Q.      Okay.  Help me out here.

20     A.      Sure.

21     Q.      Heather Garrett is on the board of

22 Quadrille.

23     A.      Uh-huh.

24     Q.      If Heather Garrett didn't approve you

25 asking for sponsorship monies, how does Carmike come

1     in on that?

2               MS. PREBULA:  Objection, assumes facts not

3          in evidence.

4          Q.    (By Mr. Gerakitis)  Let's start over

5     again.  Emily Neff was called by Heather Garrett

6     you're saying?

7          A.    Uh-huh.

8          Q.    Yes?

9          A.    Yes.

10         Q.    Heather Garrett is married to your

11    neighbor, Walker Garrett, correct?

12         A.    They're divorced.

13         Q.    They're divorced, just like Jenny and

14    David?

15         A.    Yes.

16         Q.    Heather is up here now, works for Nelson

17    Mullins, right?

18         A.    I don't know where she works.

19         Q.    You and Heather were in Supper Club

20    together, right?

21         A.    Yes.

22         Q.    You were in Supper Club even after you

23    left Carmike with Heather Garrett, right?

24         A.    I don't remember when she left Supper

25    Club.  I don't know the dates.

1      Q.     Do you know if anyone said they wanted to
2   drop out of Quadrille because of you?
3      A.     I'm not aware.
4      Q.     Did you check with Jessica Tillery?
5      A.     I'm not -- I don't recall.
6      Q.     Did you check with anyone about how
7   Heather Garrett found out why you were terminated from
8   Carmike?
9      A.     No.
10      Q.     Her husband, Walker Garrett, is friends
11   with your husband, Johnson Trawick, correct?
12      A.     Correct.
13      Q.     Did Walker Garrett tell Heather Garrett
14   why you were terminated at Carmike?
15      A.     I don't know what they discussed.
16      Q.     Was Heather Garrett an agent of Carmike
17   because her husband did Carmike legal work?
18      A.     I don't know.
19      Q.     What did Heather Garrett say to Emily
20   Neff?
21      A.     That I was fired.
22      Q.     You were fired?
23      A.     For stealing money or misappropriation of
24   funds.
25      Q.     You did submit a sponsorship for a

1    charitable contribution that wasn't a charitable

2    contribution.  You agreed with that, right?  Right?

3        A.    I agree that I submitted a sponsorship on

4    behalf of Quadrille at the time believing it was a

5    charitable organization.

6        Q.    And it wasn't?

7        A.    Correct.

8        Q.    So Heather Garrett was a board member of

9    The Quadrille, correct?

10       A.    Correct.

11       Q.    She could object to you submitting a

12   $2,000 sponsorship request under the name of Jenny

13   McMillen, couldn't she?

14       A.    I don't know.

15       Q.    Who else besides Joseph Brannon -- excuse

16   me.  Who else besides Ricky Love and Heather Garrett

17   has said anything to disseminate false and misleading

18   information about you that you complain of in

19   Paragraphs 46 through 51?

20       A.    I'm not sure of anyone else.

21       Q.    You got hired at Children's Network,

22   right?

23       A.    Yes.

24       Q.    Nothing Heather Garrett said to Emily Neff

25   prevented you from being hired there, correct?

1    A.    Correct.  But after that comment was made,

2  I had to go to HR and discuss that this was an open

3  situation.

4    Q.    Who did you discuss it with at HR?

5    A.    The head of HR.

6    Q.    Who?  What's the name?

7    A.    Her first name is Susan; last name I don't

8  remember.

9    Q.    Is she here in Columbus?

10    A.    Yes.

11    Q.    Excuse me.  I should say is she down there

12  in Columbus.

13    A.    Yes.

14    Q.    And it's Susan?

15    A.    Uh-huh.

16    Q.    Correct?

17    A.    Uh-huh.

18    Q.    Yes?

19    A.    Yes.

20    Q.    Did Susan take any notes to your knowledge

21  about her discussion with you?

22    A.    I don't know.

23    Q.    What did you tell Susan?

24    A.    That the situation between me and Carmike

25  was still open-ended.

1    Q.    And when did you meet with Susan and talk

2    to her?

3    A.    I'm not -- shortly after the comment was

4    made to me by Jenn Agnew.

5    Q.    When did Jenn Agnew make a comment to you?

6    A.    It was during my first few weeks with the

7    company.

8    Q.    So sometime in December of 2015 or January

9    of 2016?

10    A.    Sometime, yeah.

11    Q.    Is Jenn Agnew related to Emily Neff?

12    A.    They're cousins, I believe.

13    Q.    It is Columbus, after all.  What did you

14    tell Susan in HR at Children's Network other than it

15    was an open-ended -- it was open-ended or remained

16    open?

17    A.    I don't recall.  I just needed to let her

18    know that there was a situation with me and Carmike

19    still ongoing.

20    Q.    And what was ongoing that you understood?

21    A.    I don't remember our conversation.

22    Q.    What did you understand was remaining open

23    with Carmike?

24    A.    At this time I'm not sure if we had -- I

25    don't remember where we were on the resignation or the

1    termination that was offered.

2        Q.    And that's what you were negotiating with

3    Walker Garrett on behalf of Carmike?

4        A.    I believe so.

5        Q.    Anyone else besides Heather Garrett and

6    Ricky Love who said anything about you that, as you

7    say, you were not hired for certain jobs?

8        A.    Not that I'm aware of today.

9        Q.    And the jobs are what jobs you weren't

10   hired for?

11       A.    The rumors that got out in Columbus, I was

12   actively seeking employment for three weeks.  One of

13   them was a job at the museum, the Columbus Museum.

14       Q.    And who at the Columbus Museum learned

15   anything about the reason you were terminated at

16   Carmike that you thought prevented you from getting a

17   job there?

18       A.    I am not sure of a specific name.  I heard

19   that my resume was openly discussed in a board

20   meeting.

21       Q.    Who told you your resume was openly

22   discussed at a board meeting?

23       A.    I don't remember from them.  I don't.

24       Q.    Let's go to Paragraph 60 of your

25   complaint.  Actually, let's go to 58.  Let's start

1   there.  You say at all times relevant to this action

2   Trawick was a nonexempt employee within the meaning of

3   the FLSA.  Now, you taught OSHA and labor law programs

4   at Carmike, remember?

5       A.    During my operations time.

6       Q.    Right.  I mean, you were in operations

7   for, gosh, 12 years?

8       A.    It was --

9       Q.    No, longer than that.

10      A.    No, it was nine and a half to ten years.

11      Q.    Okay.  For nine and a half to ten years,

12  you taught OSHA and labor law, wage hour, all that

13  stuff, right?

14      A.    For a few years of that time.

15      Q.    Okay.  So you had a few years.  That's a

16  lot more experience than you had going to Troy for

17  your B.A. in business, correct?

18            MS. PREBULA:  Objection, ambiguous.

19      Q.    (By Mr. Gerakitis)  You spent four or so

20  years teaching those courses on OSHA and wage hour,

21  right?

22      A.    I covered company policy in reference to

23  the legality of those organizations but only what

24  Carmike gave us to cover in monthly meetings or

25  quarterly meetings.

1      Q.      So every month or quarter you went over it

2   with employees about OSHA and wage hour claims and

3   things like that, right?

4      A.      Or I submitted the document for them to

5   sign, and we put it in their file.

6      Q.      Okay.  So did you think you were a

7   nonexempt employee when you were a theater manager?

8              MS. PREBULA:  Objection, calls for a legal

9         conclusion.

10     Q.      (By Mr. Gerakitis)  To the extent you

11  know, were you a nonexempt employee while you were a

12  theater manager?

13             MS. PREBULA:  Same objection.

14             MR. GERAKITIS:  Objection is noted.

15             THE WITNESS:  I'm not really sure of the

16        overtime policies of a manager in operations

17        anymore.

18     Q.      (By Mr. Gerakitis)  Were you a nonexempt

19  employee while you were in the film department?

20             MS. PREBULA:  Same objection.

21             THE WITNESS:  I don't know.

22     Q.      (By Mr. Gerakitis)  Are you familiar with

23  the motion picture exhibitor exception under the Fair

24  Labor Standards Act for overtime pay?

25             MS. PREBULA:  Same objection.

1          THE WITNESS:  I'm not familiar anymore.

2     Q.     (By Mr. Gerakitis)  How long do you think

3 you were due overtime from Carmike?  From the time you

4 left in November of 2015, how far back to you think

5 you were owed overtime?

6          MS. PREBULA:  Same objection.

7          THE WITNESS:  I'm not sure.

8     Q.     (By Mr. Gerakitis)  You were paid on a

9 salary basis of at least $455 a week the whole time

10 that you worked in marketing, correct?

11    A.     I believe so.

12    Q.     And you managed the marketing department

13 after Terrell Mayton left according to Paragraph 26 of

14 your complaint, correct?

15    A.     Correct.

16    Q.     So you had all the responsibilities of

17 marketing according to your EEOC charge, too, correct?

18    A.     Correct.

19    Q.     And in Paragraph 60 you said you did

20 routine work from performing marketing all the way

21 down to employee interviews, hiring, training, and

22 evaluations, correct?

23    A.     Correct.

24    Q.     And employees under you as marketing

25 projects manager, they'd work in all of these areas

1    except for hiring, training, and evaluations, correct?

2        A.    I'm sorry.  Where is that?

3        Q.    In Paragraph 60, the only thing other

4    employees who worked under you as the marketing

5    projects manager didn't get to do was interview, hire,

6    train, and evaluate, correct?  They worked in group

7    sales, they worked in customer rewards, in customer

8    service response, right?

9        A.    I'm sorry.  What was the question?

10        Q.    In Paragraph 60, the only thing other

11    employees who worked under you as the marketing

12    projects manager didn't get to do was interview, hire,

13    train, and evaluate, correct?

14        A.    That is not correct.

15        Q.    Tell me what employees that worked under

16    you got to interview, hire, train, and evaluate other

17    employees.

18        A.    I understood the question to mean that

19    they performed all the other duties, which are not

20    correct.

21        Q.    No, what I'm saying is is in combination

22    with you, they performed marketing, right?  Those

23    employees, they performed marketing?

24        A.    Some marketing duties, yes.

25        Q.    Right.  They attended meetings, correct?

```
 1        A.      Yes.

 2        Q.      They traveled, correct?

 3        A.      Not all of them.

 4        Q.      I didn't ask if all of them did.

 5                MS. PREBULA:  Objection, argumentative.

 6        Q.      (By Mr. Gerakitis)  My question is:  Some

 7   of the employees traveled who worked under you, right?

 8        A.      Yes.

 9        Q.      Some of the employees did marketing

10   presentations and assisted on them, right?

11        A.      I don't -- formal presentations were done

12   by me and Shannon Sailors.

13        Q.      This doesn't say formal.  It just says

14   marketing presentations.

15                MS. PREBULA:  Objection, argumentative.

16        Q.      (By Mr. Gerakitis)  Did you understand me

17   to ask if there were formal presentations?

18        A.      I understand a marketing presentation to

19   be one that's delivered to an audience, and those were

20   not prepped by any of my team but me.

21        Q.      They didn't help on the PowerPoints that

22   were done?

23        A.      No.

24        Q.      Not at all?

25        A.      Not to my recollection.  I did those
```

1    myself.

2         Q.    They didn't do any of the graphics for

3    them?

4         A.    That would be Shannon Sailors.

5         Q.    London Mahogany helped you, too, right?

6         A.    In some situations.

7         Q.    Right.  And they were involved with

8    marketing, right?

9         A.    Yes.

10        Q.    Yeah.  They helped on national

11   philanthropic campaigns.  They inputed data.  They

12   processed letters, right?

13        A.    I thought I handled all of that.

14        Q.    You didn't get any assistance?  You did it

15   all by yourself?

16        A.    I did the strategic timing of those

17   campaigns and released communications to all the

18   managers for the company; and I collected the data

19   from our report department, prepared that, and sent it

20   up to appropriate members of executive teams.

21        Q.    Did they assist --

22        A.    I don't know that they were ever involved

23   in those.

24        Q.    Did they assist with theater openings?

25        A.    Yes.

 1        Q.      Did they assist with the special film

 2   series?

 3        A.      Yes.

 4        Q.      Okay.  Did they help with customer service

 5   response?

 6        A.      Yes.

 7        Q.      Did any of them do any hiring, training,

 8   evaluating, or interviewing?  That was your job,

 9   right?

10        A.      Yes.

11        Q.      Not their job, correct?

12        A.      Correct.

13                (Defendant's Exhibit 44 was marked for

14          identification.)

15        Q.      (By Mr. Gerakitis)  Let me hand you

16   Defendant's Exhibit 44.  This is a calendar you've

17   produced from October 2012 --

18                MS. PREBULA:  I'm sorry.  Did you say 44?

19                MR. GERAKITIS:  44.

20                MS. PREBULA:  44.

21        Q.      (By Mr. Gerakitis)  From October 2012

22   until January 2015, is that when this calendar is?

23        A.      Yes.

24        Q.      You don't have any hours listed on any of

25   the days from October 2012 until January 2015, do you?

1      A.     No.

2      Q.     Did you keep any listing of hours at all

3   of the days you worked anywhere?

4      A.     No.

5      Q.     Is there anything preventing you from

6   keeping the number of hours that you worked?

7      A.     No.

8      Q.     If you would, would you turn to Page 405

9   on June 2014.

10      A.     What date?

11      Q.     June 2014.  It shows department meeting on

12   June 30.  Do you see that at the bottom?

13      A.     I do.

14      Q.     Now, that was the end of your maternity

15   leave.  You took off April, May, June, correct?  Your

16   child was born in May.

17      A.     May -- I know.  I came back this date.

18      Q.     Correct.

19      A.     Yes.

20      Q.     So you took April, May, and June?

21      A.     Not all of April, though.

22      Q.     How much of April?

23      A.     It was a few weeks, but it wasn't the

24   whole month.

25      Q.     So in April there are two full days where

1    you have no meetings listed and three full days where

2    you have no meetings listed, except for one on Friday,

3    May 2nd, where it says "Maple Ridge Golf Tournament."

4    You didn't go to the Maple Ridge Golf Tournament that

5    day, did you?

6         A.    No.

7         Q.    So in May, again, there's YP Cocktails &

8    Company, some movies opening, "Jersey Boys," "Begin

9    Again," "Maleficent," and that's the only thing listed

10   for work, right?

11        A.    On this calendar, yes.

12        Q.    Yes.  And then in June 2014, you had a

13   number of items listed, "Think Like a Man" as far as

14   movies, "Transformers," "Wish I Was Here," "Deliver Us

15   From Evil," "The Fluffy Movie."  Do you see where all

16   those are listed throughout the month of June?

17        A.    Yes.

18        Q.    There are only in June, for instance, a

19   Tuesday, April 3 meeting -- Tuesday, June 3, meeting,

20   a Wednesday, June 4, meeting, a Monday, June 2,

21   meeting.  The YP executive committee was not -- you

22   didn't go to it.  That's just something you did as a

23   young professional, right?

24        A.    I did not attend that meeting, no.

25        Q.    Did you go to the group monthly managers

1    meeting on Tuesday, June 17?

2          A.    No.

3          Q.    Did you go to the YP Learn on the Go

4    meeting on June 24?

5          A.    No.

6          Q.    So the first meeting you come back for is

7    the department meeting on June 30th, correct?

8          A.    No.  I was there for the 8:00 meeting that

9    morning.

10         Q.    But it's just not listed?

11         A.    It's a lot not listed on this calendar.

12         Q.    But you kept the calendar yourself; you

13   didn't leave it up to somebody else to keep it for

14   you?

15         A.    No.  Jennifer added things to my calendar

16   too, and I don't see a lot of things on here that were

17   on the calendar.

18         Q.    So if they weren't added, it was Jennifer

19   who was responsible for adding them and should have?

20         A.    She just helped keep up my calendar.  So I

21   don't know.  All I know is that this calendar doesn't

22   reflect my work during these months.

23         Q.    But this is the only calendar you produced

24   to us --

25         A.    Correct.

1     Q.      -- correct?  Turn, if you would, to --

2  back to Page 403.  Do you remember when you started

3  having monthly manager meetings?

4     A.      For?  I'm sorry.  What meeting am I

5  looking at?

6     Q.      Well, let's go back.

7     A.      Until April.

8     Q.      You went to monthly manager meetings,

9  right?

10    A.      It depends on what -- can I see the

11 reference so I can answer that?

12    Q.      Well, if you look at -- it may be on

13 the -- I've been trying to find a monthly managers

14 meeting on here and haven't been able to find one, and

15 so I'm trying to contrast that with the morning

16 meetings.  I can't find -- you mentioned monthly

17 meetings earlier, like the focus group.  I can't find

18 those on here.

19    A.      Right.  And we had those scheduled as

20 well.  So I don't know why when these were printed

21 several of those items were not -- they didn't stay.

22 I just don't know.  I don't understand.  But those

23 focus group meetings were -- the dates and calendars

24 were all set by Fred.

25    Q.      So you didn't start going to the morning

1    once-a-week meetings in marketing until June of 2014?

2        A.    No.  It was before that.

3        Q.    Well, they're not listed in June.

4        A.    I know.  But I'm just saying I attended

5    those meetings.  I'm not sure when we started, but it

6    was around the time -- I'm sorry.

7        Q.    They're listed in July.

8        A.    Of what year?

9        Q.    2014.

10       A.    Okay.

11       Q.    Monday morning meeting.  Monday morning

12   meetings in August; Monday morning meetings in

13   September, October.  They're all listed, correct?

14       A.    Correct.

15       Q.    That was after Jennifer started keeping

16   your calendar, correct?

17       A.    I don't know.  I guess.

18       Q.    You didn't ask to take unpaid leave at

19   Carmike, did you?

20       A.    I was put on bed rest and told my company

21   that I was on leave.

22       Q.    Did you understand me to ask if you were

23   put on bed rest?

24            MS. PREBULA:  Objection, argumentative.

25            MR. GERAKITIS:  Objection is noted.

1      Q.     (By Mr. Gerakitis)  Did you understand my
2    question to be were you put on bed rest?
3      A.     What is your question?
4      Q.     My question is:  Did you ask for unpaid
5    leave?
6      A.     I asked for leave.
7      Q.     Did you take your MacBook home with you
8    when you went on leave?
9      A.     I had Lisa De La Cruz bring my office
10   computer to me and worked on bed rest until delivery.
11     Q.     And where was the MacBook?
12     A.     I don't know if it was home or at my
13   office.  I just didn't use it.
14     Q.     You've produced e-mails in this case.  Did
15   you produce all the e-mails while you were working
16   during your maternity leave?
17     A.     I produced as many as I had when I left
18   the company.
19     Q.     If you would, turn to Paragraph 80 of your
20   complaint.  Do you see where you refer to male
21   colleagues in there, in Paragraph 80?
22     A.     Yes.
23     Q.     Who are those male colleagues?
24            MS. PREBULA:  Objection.  It calls for a
25            legal conclusion.

1          THE WITNESS:  I considered Shannon my

2     peer.

3     Q.     (By Mr. Gerakitis)  Who else did you

4  consider were male colleagues that you're referring to

5  in Paragraph 80 of your complaint?

6          MS. PREBULA:  Same objection.

7          THE WITNESS:  I considered Jon Greer a

8     comparable.

9     Q.     (By Mr. Gerakitis)  Who else?

10         MS. PREBULA:  Same objection.

11         THE WITNESS:  Jim Lucas.

12    Q.     (By Mr. Gerakitis)  Who else?

13         MS. PREBULA:  Same objection.

14         THE WITNESS:  David Pflegl.

15    Q.     (By Mr. Gerakitis)  Who else?

16         MS. PREBULA:  Same objection.

17    Q.     (By Mr. Gerakitis)  My question is so it's

18 clear:  Who else did you consider to be a male

19 comparator that you're referring -- or a male

20 colleague, rather, as you refer to them, in

21 Paragraph 80 besides Jon Greer, Shannon Sailors, Jim

22 Lucas, and David Pflegl?

23         MS. PREBULA:  I'm going to have to object

24    that your question is ambiguous based upon the

25    language in Paragraph 80.  You can answer it if

1     you can.

2         Q.    (By Mr. Gerakitis)  Did I misstate

3    Paragraph 80?  I'm asking you, Ms. Trawick, not your

4    counsel.  Is Paragraph 80 ambiguous?  Do the words

5    "male colleagues" appear in Paragraph 80?

6         A.    They appear.

7         Q.    Okay.  Who are the male colleagues that

8    you're referring to in Paragraph 80 other than Jon

9    Greer, Shannon Sailors, Jim Lucas, and David Pflegl?

10             MS. PREBULA:  Same objection.

11             THE WITNESS:  Those are the only names I

12        can think of right now.

13        Q.    (By Mr. Gerakitis)  Look at Paragraph 89

14   of your complaint.  It says the willful failure to

15   consider Trawick for positions for which she was fully

16   qualified or was already performing without comparable

17   compensation which Carmike eventually hired with a

18   male.  Do you see that portion?

19        A.    I do.

20        Q.    Who is the person who Carmike eventually

21   hired with a male that you're referring to in

22   Paragraph 89?

23        A.    Rob Collins.

24        Q.    Do you consider yourself to be comparable

25   to Rob Collins?

```
 1              MS. PREBULA:  Same objection.
 2              MR. GERAKITIS:  Objection is noted.
 3              THE WITNESS:  I consider the
 4         responsibilities that I did that were absorbed by
 5         Rob Collins the same.
 6         Q.    (By Mr. Gerakitis)  Do you think that Rob
 7    Collins has more experience in marketing than you did?
 8         A.    Possibly.
 9         Q.    Have you looked to see?
10         A.    I have seen some of the documentation.
11         Q.    What documentation have you seen on
12    Mr. Collins?
13         A.    I saw -- I don't remember where I saw it,
14    but I just saw he or heard that he had been over some
15    big companies.
16         Q.    And how many years' experience did he have
17    at those big companies?
18         A.    I don't remember.
19         Q.    Did you do anything to look for it?
20         A.    Not recently.
21         Q.    Well, how long ago did you look for it if
22    you didn't do it recently?
23         A.    It might have been in 2015.
24         Q.    When did you learn that Rob Collins had
25    been hired by Carmike?
```

```
1        A.      I don't remember.

2        Q.      October, November of 2015?

3        A.      It was after I left.

4                (Defendant's Exhibit 45 was marked for

5        identification.)

6        Q.      (By Mr. Gerakitis)  Let me hand you, if I

7   could, Defendant's Exhibit 45.  I have no idea the

8   source of this other than it came from your attorney.

9   Do you know what Defendant's Exhibit 45 is?

10       A.      It says "Grievances Against Carmike."

11       Q.      Did you prepare Defendant's Exhibit 45?

12       A.      Yes.

13       Q.      Yes?

14       A.      Yes.

15       Q.      It refers to on the second page at the

16  bottom "in regards to the investigation."  Do you see

17  that?  Is that the investigation that Ms. Smitherman

18  started, the bottom of the page on Page 2?

19       A.      Oh, I'm sorry.  In regards to the

20  investigation, yes.

21       Q.      Was Defendant's Exhibit 45 prepared before

22  you were being investigated?

23       A.      No.

24       Q.      Was it prepared after you were terminated?

25       A.      Yes.
```

1      Q.     And what did you prepare Defendant's
2  Exhibit 45 for?
3      A.     For conversations with my attorney.
4             MS. PREBULA:  I'm going to have to correct
5         that so that there's not a waiver of
6         attorney-client privilege.  We would not have
7         produced this had this been a privileged
8         document.
9      Q.     (By Mr. Gerakitis)  Did you provide
10  Defendant's Exhibit 45 to anyone other than your
11  attorney?
12      A.     I don't recall.
13      Q.     Did you give it to the EEOC?
14      A.     I don't recall.
15      Q.     Could you look at Page 2 of Defendant's
16  Exhibit 45.  It reads at the paragraph that starts
17  with "in 2014" -- I'd like you to explain to me what
18  you mean this.  You wrote:  "Despite things being the
19  opportunity for a direct supervisor to address needs
20  of the employee and gain a better idea for
21  improvement."
22      A.     This was an evaluation that should have
23  been conducted with me going over each evaluation
24  point for opportunities for growth.  This was filled
25  out in my absence, submitted to HR, and then later

1    told to me had been completed.  If I wanted a copy, I

2    could go to HR.

3        Q.    You saw your October 2014 evaluation.  You

4    produced it to us, correct?

5        A.    I went to HR to get it.  Yes.

6        Q.    And you consider Defendant's Exhibit 45 to

7    be accurate, correct?

8        A.    Yes.

9        Q.    Look at the last page where it says "the

10   director of advertising."  Do you see that?

11       A.    Yes.

12       Q.    It says:  "The director of advertising is

13   the role responsible for signing off."  Did anyone

14   report Shannon Sailors for insubordination as part of

15   the Melanie Powell audit?

16       A.    I don't know.

17       Q.    You said I reported a district manager a

18   few months ago or a few months back for misusing

19   company funds?

20       A.    Yes.

21       Q.    Who did you report?

22       A.    Thad Morton.

23       Q.    And what did you report?

24       A.    That at a -- it wasn't -- I don't know if

25   it was a theater opening or revamp of a market; but,

1  regardless, he was the district manager there and I
2  saw him buying rooms unnecessarily and reported it to
3  Jim Lucas.
4       Q.     And what did Lucas do?
5       A.     He launched an investigation to my
6  understanding.
7       Q.     Okay.  And what happened according to
8  Lucas with that investigation?
9       A.     They found several other things that were
10  misappropriated underneath Thad Morton.
11       Q.     And Morton reports to Lucas, right?
12       A.     Yes.
13       Q.     Right.  So Lucas didn't fire Morton?
14       A.     It was my understanding from Jim Lucas
15  that he was told that David Passman and Fred had
16  reviewed the situation and said everyone gets another
17  chance.
18       Q.     Did Lucas agree with Van Noy and Passman
19  on the additional expense that was being charged by
20  Morton?
21       A.     I don't understand the question.
22       Q.     Did Lucas agree with Van Noy and Passman
23  that they'd let it go if he wasn't handling the
24  expense of the hotel rooms properly?
25       A.     And other issues in the investigation.

```
 1    It's my understanding from Jim Lucas that he was -- he
 2    did not agree with that decision to keep that employee
 3    employed.
 4        Q.    Did Thad Morton tell anyone that there was
 5    an investigation going on?
 6        A.    I don't know.
 7        Q.    For your bonus in 2015, did it include an
 8    amount for company earnings?
 9        A.    I think there was a segment directed to
10    that, yes.
11        Q.    Was there an amount for theater sales?
12        A.    I don't remember.
13        Q.    Was there an amount for social marketing?
14        A.    Yes.
15        Q.    Was there an amount for the Melbourne
16    market share?
17        A.    I believe so, that year.
18        Q.    Shannon Sailors' bonus compensation, do
19    you know how it was calculated, what went into it,
20    what were the factors?
21        A.    I did not see his bonus structure.
22        Q.    Do you know, then, if any of your factors
23    for bonus went in to his factors for bonus?
24        A.    I'm not sure which ones overlapped.
25    / / /
```

1              (Defendant's Exhibit 46 was marked for

2         identification.)

3         Q.    (By Mr. Gerakitis)  Let me hand you what's

4    been marked as Defendant's Exhibit 46.  Just make sure

5    this is your bonus structure for 2015.  Is that what

6    Defendant's Exhibit 46 is?

7         A.    This looks very similar to the bonus I

8    received; but I couldn't be certain about the

9    information on it, meaning I don't recall the targets

10   or anything from '15 and the data that's on there.

11        Q.    Does that look to be what your bonus

12   compensation was calculated according to, in other

13   words, earnings, theater sales, social marketing, and

14   Melbourne market share?

15        A.    I mean, the categories look correct.

16        Q.    Okay.  And you got a bonus of 10,952 in

17   2013, was that correct?

18        A.    I don't recall the amounts from that year.

19        Q.    Well, your target bonus in 2015 would have

20   been 17,000?

21        A.    Okay.

22        Q.    Correct?

23        A.    Correct.

24              (Defendant's Exhibit 47 was marked for

25         identification.)

```
 1        Q.     (By Mr. Gerakitis)  Now, let me hand you
 2   what's been marked as Defendant's Exhibit 46.
 3               MS. PREBULA:  47.
 4               MR. GERAKITIS:  Is it 47?
 5               MS. PREBULA:  Yes.
 6               MR. GERAKITIS:  I'm sorry.
 7        Q.     (By Mr. Gerakitis)  Defendant's
 8   Exhibit 47, is this a request from Fred Van Noy for a
 9   department overview?
10        A.     It's a request for major accomplishments
11   within your responsibility in 2014, and it's
12   pertaining to -- it asked us not to include anything
13   pertaining to ordinary course of business.
14               (Defendant's Exhibit 48 was marked for
15          identification.)
16        Q.     (By Mr. Gerakitis)  And that was on
17   Tuesday, the 6th.  And did you give Mr. Van Noy
18   Defendant's Exhibit 48, which I'm about to hand you?
19        A.     Do you want to mark that 48?  Do you want
20   to mark that?
21        Q.     Oh, I'm sorry.  Thank you.  It would have
22   been eventually.
23               So the question is:  Did you give
24   Mr. Van Noy Defendant's Exhibit 48 in response to
25   Defendant's Exhibit 47?
```

1      A.      Yes.

2      Q.      He asked you also for a little bit of

3   additional information and you gave him some on that

4   also just following it, right?

5      A.      I don't remember that.  I'm sorry.

6      Q.      So this 2014 department overview, you

7   don't have an e-mail or anything where you sent it to

8   him again after January the 6th or, excuse me, after

9   January the 7th, 2015, correct?

10     A.      I don't have any documentation, no.

11     Q.      And by February 16 of 2015, Mr. Van Noy

12   according to you was aware that you wanted a promotion

13   to director, right?

14          MS. PREBULA:  I think you misstated the

15      date or I heard it wrong.  Will you read it back.

16          MR. GERAKITIS:  I think you heard it

17      wrong.

18     Q.      (By Mr. Gerakitis)  By February 16 of 2015

19   Mr. Van Noy, according to you, was aware that you

20   wanted a promotion to marketing director, correct?

21     A.      Correct.

22          (Defendant's Exhibit 49 was marked for

23      identification.)

24     Q.      (By Mr. Gerakitis)  Let me hand you what's

25   been marked as Defendant's Exhibit 49.  This appears

1    to be an e-mail from Fred Van Noy to you regarding new

2    marketing personnel.  Do you see that?

3         A.    I do.

4         Q.    Mr. Van Noy was direct in responding

5    approved, correct?

6         A.    Correct.

7         Q.    He didn't go into much detail other than

8    approving the requested accesses, correct?

9         A.    Not in writing, no.

10        Q.    Well, he approved the hiring of Troy

11   Jackson, correct?

12        A.    Correct.

13        Q.    He approved the hiring of Tashara Fussell,

14   correct?

15        A.    Correct.

16        Q.    Those were people that you asked for and

17   advocated for, correct, to be hired?

18        A.    Well, this document is asking for specific

19   access to certain programs within the company.

20        Q.    That wasn't my question.  My question is:

21   You had asked for Tashara Fussell or Fussell to be

22   hired, right?

23        A.    Yes.

24        Q.    And you had also asked for Troy Jackson to

25   be hired, correct?

1      A.      Yes.

2      Q.      He never turned you down when you asked

3  for anyone to be hired into the marketing department,

4  did he?

5      A.      He did.

6      Q.      Who did he turn down?

7      A.      He did not allow me to increase my

8  personnel from two to three for some time until the

9  communication for customer service was -- the

10  frequency of the customer service department became so

11  difficult to manage with two that I was then finally

12  approved to have a third person.

13      Q.      And you ended up with five total, right --

14      A.      Three on customer service.

15      Q.      -- who work in marketing?  But you had

16  five total working under you in marketing, correct,

17  Fussell, Cox, Jackson, Therrien, and Mahogany,

18  correct?

19      A.      Correct.

20      Q.      And then Joe Paull also?

21      A.      Correct.

22      Q.      Okay.  That's six.  All approved by

23  Mr. Van Noy, correct?

24      A.      Correct.  But the department only

25  increased head count by one person in that entire

```
 1    period.  Everyone else was replacing an existing
 2    employee that had either been moved or quit the
 3    company.
 4          Q.      But he never denied you adding the people,
 5    did he?
 6          A.      He denied me adding department head
 7    increase for some time.  It was -- he declined my ask
 8    to have three people in that department managing
 9    customer service and group sales for some time.  We
10    started with two, and then we increased to three
11    because the customer service line became so heavy with
12    communications.
13                  (Defendant's Exhibit 50 was marked for
14          identification.)
15          Q.      (By Mr. Gerakitis)  Let me hand you what's
16    been marked as Defendant's Exhibit 50.  This appears
17    to be your responses to Carmike Cinemas' first request
18    for production of documents.  I didn't make a copy
19    because it's a pleading or it's a discovery item.  Is
20    that what Defendant's 50 is?
21                  MS. PREBULA:  You can answer.
22                  THE WITNESS:  I'm sorry.  What's the
23          question?  You're waiting on me.  I'm sorry.
24          What was the question?
25          Q.      (By Mr. Gerakitis)  Exhibit 50 is your
```

1   first -- is your response to defendant's first request

2   for production of documents, correct?

3               MS. PREBULA:  And cover letter.

4        Q.    (By Mr. Gerakitis)  And cover letter?

5        A.    Correct.

6        Q.    Well, there's -- it says, "As I indicated

7   to you, all the documents I have are scanned copies."

8   You didn't have any electronically stored documents

9   other than the recently found hard drive which was

10  damaged, correct?

11       A.    At this time, no.  Not that I was aware

12  of, no.  I mean --

13       Q.    Turn to Page 12.  And this says any and

14  all documents which refer to, relate to, evidence, or

15  reflect any complaints including internal complaints

16  of discrimination, harassment, or retaliation made by

17  you to defendant from January 2013 to the present,

18  correct?

19       A.    Correct.

20       Q.    Do you see your answer on Page 13,

21  plaintiff will produce?

22       A.    Yes.

23             (Defendant's Exhibit 51 was marked for

24       identification.)

25       Q.    (By Mr. Gerakitis)  Let me hand you what's

1  been marked as Defendant's Exhibit 51.  This appears

2  to be an e-mail from David Passman to Kelly Williams

3  that you're copied on.  Is that what Defendant's

4  Exhibit 51 is?

5       A.     Thank you.  Yes.

6       Q.     Can you tell me what in Defendant's

7  Exhibit 51 refers, relates, evidences, or reflects any

8  complaint of discrimination, harassment, or

9  retaliation by you?

10       A.     I don't see anything that reflects that in

11  this document.

12            (Defendant's Exhibit 52 was marked for

13        identification.)

14       Q.     (By Mr. Gerakitis)  Let me hand you what's

15  been marked as Defendant's Exhibit 52.  This appears

16  to be an e-mail from Fred Van Noy to you dated

17  April 6, 2015.  Is that what Defendant's Exhibit 52

18  is?

19            MS. PREBULA:  You gave me your copy,

20        Richard.

21            MR. GERAKITIS:  That's fine.  I mean, I

22        just had a number on it.  I'm sorry.  I've

23        already marked it for you.

24            MS. PREBULA:  Thank you.

25            THE WITNESS:  Can you repeat the question,

1      please?

2      Q.    (By Mr. Gerakitis)  Sure.  Is Defendant's

3   Exhibit 52 an e-mail from Fred Van Noy to Crystal

4   Trawick dated April 6, 2015?

5      A.    Yes.

6      Q.    By April 6, 2015, you had told Fred

7   Van Noy you wanted to be promoted, you wanted to be

8   paid much more money than you were making, right?

9      A.    Yes.

10     Q.    And he approved you going, taking and

11  doing an hour presentation to leadership in the

12  workplace, correct?

13     A.    Correct.

14     Q.    Can you tell me what in Defendant's

15  Exhibit 52 indicates that is a complaint of

16  discrimination, harassment, or retaliation made by

17  you?

18          MS. PREBULA:  I'm going to object because

19     in the last several questions you have truncated

20     the question but referred her to her response,

21     which does not -- is not limited.  Her response

22     is not limited to the limitations of your

23     question.

24          MR. GERAKITIS:  Those are all noted that

25     you can cover --

1           MS. PREBULA:  It's on the record.

2           MR. GERAKITIS:  -- at some point you need

3      to cover.

4           MS. PREBULA:  It's on the record.

5      Q.    (By Mr. Gerakitis)  So my question is:

6  What is there in Exhibit 52 that indicates a complaint

7  made by you to Carmike of discrimination, harassment,

8  or retaliation?

9      A.    This does not indicate a complaint.

10          (Defendant's Exhibit 53 was marked for

11      identification.)

12     Q.    (By Mr. Gerakitis)  Let me hand you what's

13  been marked as Defendant's Exhibit 53.  This appears

14  to be a letter to Dan Ellis from your counsel of

15  November 24, 2015.  Is that what Defendant's

16  Exhibit 53 is?

17     A.    What was the question?  I'm sorry.

18     Q.    Is Defendant's Exhibit 53 a letter from

19  your counsel to Dan Ellis of November 24, 2015?

20     A.    Yes.

21     Q.    You were terminated as of November 17 --

22  excuse me.  November 17 -- I'll start over.

23          You were terminated by Carmike as of

24  November 17, 2015, correct?

25     A.    Correct.

1        Q.      This letter, Defendant's Exhibit 53, is a

2    week later, correct?

3        A.      Correct.

4        Q.      So it does not indicate a complaint to

5    Carmike while you were employed about discrimination,

6    harassment, or retaliation, does it?

7        A.      Other than the word "damages," I see

8    nothing about a complaint.

9        Q.      Is Defendant's Exhibit 53 a complaint that

10   Carmike received before you were terminated?

11       A.      No.

12               (Defendant's Exhibit 54 was marked for

13          identification.)

14       Q.      (By Mr. Gerakitis)  Let me hand you what's

15   been marked as Defendant's Exhibit 54.  This appears

16   to be another document you produced to us on or in

17   response to Request No. 14 of our request for

18   production of documents; and this is an article on Rob

19   Collins, correct?

20       A.      Correct.

21       Q.      And this is two months after you -- excuse

22   me.  This is a full month after you were terminated,

23   correct?

24       A.      Correct.

25       Q.      Defendant's Exhibit 54 does not reflect a

1  complaint to Carmike during the time you were employed

2  of discrimination, harassment, or retaliation, does

3  it?

4           MS. PREBULA:  Same objection.

5           THE WITNESS:  No, it does not.

6           (Defendant's Exhibit 55 was marked for

7       identification.)

8       Q.    (By Mr. Gerakitis)  Let me hand you what's

9  been marked as Defendant's Exhibit 55.  This is a

10  letter of December 24, 2015, from your counsel to Dan

11  Ellis.  Is that what Defendant's Exhibit 55 is, a

12  letter from your counsel to Mr. Ellis?

13      A.    Yes.

14      Q.    Defendant's Exhibit 55 is not a complaint

15  you made about discrimination, harassment, or

16  retaliation at Carmike while you were employed, is it?

17      A.    I don't understand the question.

18      Q.    You were terminated November 17, 2015,

19  correct?

20      A.    Correct.

21      Q.    Defendant's Exhibit 55, this letter sent

22  in December after you were terminated is not a

23  complaint that was made while you were employed by

24  Carmike of discrimination, retaliation, or harassment,

25  correct?

1      A.      No.

2      Q.      Could you turn to Page 2 for just a

3    moment.  Well, actually it's Page 3.  It says:  "Upon

4    information and belief, the comparable employee,

5    Mr. Sailors."  It doesn't refer to Mr. Pflegl,

6    Mr. Greer, or Mr. Lucas, only Mr. Sailors, correct?

7      A.      Correct.

8      Q.      And you said -- it says:  "Upon

9    information and belief, Mr. Sailors received a salary

10   of twice Ms. Trawick's."  Who told you that

11   Mr. Sailors received a salary of twice yours?

12     A.      It was implied by Lisa De La Cruz.  And I

13   don't know that she meant twice as much as she meant

14   over 80, and I just assumed with bonus that that would

15   be over 90.

16     Q.      Well, it just says received a salary; and

17   then it says which would make his salary $95,000.  It

18   doesn't say anything about bonus.  Being $95,000 with

19   salary, right?

20     A.      Correct.

21     Q.      You assumed based on what Ms. De La Cruz

22   told you, is that right?

23     A.      Correct.

24     Q.      Have you talked to Ms. De La Cruz since

25   you were terminated?

1          MS. PREBULA:  Objection, asked and

2     answered.

3          MR. GERAKITIS:  I asked her about

4     Ms. Therrien.

5     Q.    (By Mr. Gerakitis)  But have you talked to

6  Ms. De La Cruz after you were terminated?

7          MS. PREBULA:  Same objection.

8          THE WITNESS:  I do not believe so.

9     Q.    (By Mr. Gerakitis)  I want you to turn now

10  to Page 5, and look at the third paragraph where it

11  says "Ms. Trawick was advised at the November 12,

12  2015, meeting."  Do you see that?  Yes?

13     A.    Yes.

14     Q.    Look at the first sentence that begins on

15  the fourth line, "after the meeting on the

16  investigation."  Do you see that?

17     A.    I do.

18     Q.    "She spoke to two people about it.

19  Mr. Sailors, who appeared to have prior knowledge, who

20  asked her how the meeting had gone, and Ms. Therrien,

21  who had improperly handled a matter with regard to

22  envelopes."  Right?

23     A.    Correct.

24     Q.    So you spoke to Mr. Sailors and

25  Ms. Therrien after the meeting with Fred Friedel and

1    Fred Van Noy, correct?

2          A.     Correct.

3          Q.     And you spoke to Ms. De La Cruz about the

4    investigation, correct?

5          A.     I do not recall speaking with De La Cruz.

6    We communicated via text.

7          Q.     You're certain of that?

8          A.     To my recollection.

9                 (Defendant's Exhibit 56 was marked for

10         identification.)

11         Q.     (By Mr. Gerakitis)  What in -- well, let

12   me hand you what's been marked as Defendant's

13   Exhibit 56.  This appears to be your charge of

14   discrimination filed with the Equal Employment

15   Opportunity Commission.  I'll ask you if that's what

16   Defendant's Exhibit 56 is.

17                MS. PREBULA:  It's an incomplete copy,

18         Richard.

19                MR. GERAKITIS:  Mary, it's what you

20         produced to us.

21                MS. PREBULA:  No.  We produced the other

22         part of it as well.

23                MR. GERAKITIS:  Mary, all I have is the

24         charge and the particulars.

25                MS. PREBULA:  You were produced a

1    supplement to this.

2         MR. GERAKITIS:  I don't have a supplement

3    to it.  All I have is this document, this charge,

4    I have a dismissal and notice of rights and

5    that's it, and an intake questionnaire.

6         MS. PREBULA:  And I believe the EEOC

7    produced it to you as well on your request for

8    documents, the rest of this.  But I think you

9    produced it to us.

10        MR. GERAKITIS:  If you think there's an

11   extra page --

12        MS. PREBULA:  There is.

13        MR. GERAKITIS:  -- beyond --

14        MS. PREBULA:  There is.

15        MR. GERAKITIS:  You think there's an extra

16   page --

17        MS. PREBULA:  There is.

18        MR. GERAKITIS: -- beyond A, B, C, and D?

19        MS. PREBULA:  There is.  There's a

20   supplement to the intake questionnaire.  You got

21   the intake questionnaire.

22        MR. GERAKITIS:  This isn't the intake

23   questionnaire.

24        MS. PREBULA:  Then I misunderstood your

25   question.

```
 1                    MR. GERAKITIS:  This is the charge,
 2        exactly.
 3                    MS. PREBULA:  I'm sorry.  Go ahead.
 4                    MR. GERAKITIS:  Thank you.
 5        Q.     (By Mr. Gerakitis)  This is your charge of
 6    discrimination with the Equal Employment Opportunity
 7    Commission, correct?
 8        A.     Correct.
 9        Q.     And that's Defendant's Exhibit 56,
10    correct?
11        A.     Correct.
12        Q.     You filed it or submitted it and signed it
13    on or about April 6, 2016, correct?
14        A.     Correct.
15        Q.     Defendant's Exhibit 56 is not a complaint
16    made to Carmike while you were employed of
17    discrimination, harassment, or retaliation, was it?
18        A.     No, it was not.
19        Q.     Could you look and tell me if you signed
20    under the penalty of perjury at the bottom of the page
21    on Page 2 of Defendant's Exhibit 56?
22        A.     The question?  I'm sorry.  What was the
23    question?
24        Q.     The question is:  Could you look and tell
25    me if you signed under the penalty of perjury at the
```

1    bottom of the page on Page 2 of Defendant's

2    Exhibit 56?

3        A.     I signed this document, yes.

4        Q.     And you signed it under penalty of

5    perjury, correct?

6        A.     Yes.

7        Q.     Would you look at the date January 2015

8    where you refer to "I had already requested to be

9    considered for the director of marketing role."  Do

10   you see that?

11       A.     Which section?  I'm sorry.

12       Q.     C, Section C on Page 2.  You claim that in

13   January of 2015 you "received no word even after

14   submitting my accomplishments to Fred Van Noy per his

15   request."  Do you see that?

16       A.     I'm reading it.  I see it.  What's the

17   question?

18       Q.     According to your sworn EEOC charge, in

19   January of 2015 you received no word even after

20   submitting your accomplishments to Fred Van Noy per

21   his request, correct?

22       A.     Yes.

23       Q.     And would you look down now, the next date

24   that appears after the date of January 2015 is

25   November 2015.  Do you see that?

```
 1        A.      I do.

 2        Q.      There's nothing about a September meeting

 3   with David Passman in your charge of discrimination in

 4   Defendant's Exhibit 56, is there?

 5        A.      What was the question?

 6        Q.      There's nothing about a September meeting

 7   with David Passman in your charge of discrimination

 8   which is Defendant's Exhibit 56, is there?

 9        A.      Correct.

10        Q.      Would you look now at November 2015 under

11   "D," date.  Do you see the words "Lisa De La Cruz"?

12        A.      I see it several times.

13        Q.      Okay.  Do you see in the third line?

14        A.      Yes.

15        Q.      Do you see the next time where it says

16   "prior to meeting"?

17        A.      Yes.

18        Q.      "I also spoke to Lisa De La Cruz regarding

19   the approvals she gave regarding nonprofits," do you

20   see that?

21        A.      I do.

22        Q.      "I had sent for her approval and again

23   once after meeting"?

24        A.      Yes.

25        Q.      So you spoke with not only Jennifer
```

1    Therrien about the investigation, you spoke with

2    Shannon Sailors and you spoke with Lisa De La Cruz,

3    correct?

4        A.      I recall speaking to Jennifer Therrien

5    about the mail-outs as part of the investigation,

6    Shannon Sailors because he asked me about the meeting.

7    I don't recall verbally speaking to Lisa De La Cruz,

8    but we communicated.

9        Q.      What you wrote in Defendant's Exhibit 56

10   is "I also spoke to Lisa De La Cruz regarding the

11   approvals she gave regarding nonprofit events and

12   again once after the meeting."

13       A.      Because we verbally spoke before the

14   meeting.

15       Q.      And apparently you spoke after the meeting

16   if you read your words, correct?

17       A.      I do not recall verbally speaking with her

18   after that meeting about this.

19       Q.      Defendant's Exhibit 56 is clear, though,

20   that you wrote and signed under penalty of perjury you

21   spoke to her regarding approvals prior to the meeting

22   and again once after the meeting, correct?

23       A.      That's what it says.

24       Q.      Can you find for me Defendant's Exhibit 45

25   in front of you?

```
1              MS. PREBULA:  Can you tell her what it is.
2         Q.    (By Mr. Gerakitis)  It's the grievances.
3    There it is.
4              In Defendant's Exhibit 45, you don't give
5    a -- you don't give any date for in 2004 I was told,
6    on Page 2, he had conducted the evaluation, correct?
7              MS. PREBULA:  I think you misspoke.  2014?
8              MR. GERAKITIS:  Yes.
9         Q.    (By Mr. Gerakitis)  In 2014 on Page 2 of
10   Defendant's Exhibit 45, you don't give a month for in
11   2014 about you were told that he had conducted an
12   evaluation, correct?
13        A.    Correct.
14        Q.    You don't give a month here in the next
15   paragraph in 2015 after no mention of pay or title
16   change?  You don't mention a date here either,
17   correct?
18        A.    Correct.
19        Q.    And you said "to date I have not heard
20   back," which is referring to the time you prepared
21   this at the time of the investigation in
22   November 2015, is that right?
23        A.    I'm sorry.  The question again?
24        Q.    Sure.
25              MS. PREBULA:  Could you sit down, Richard.
```

    1            MR. GERAKITIS:  It's the own way I can
    2        read it, Mary, at the same time she is.
    3            MS. PREBULA:  Well, here.  I think it's
    4        intimidating.
    5            MR. GERAKITIS:  That's hard for an old man
    6        to be.
    7            THE WITNESS:  Right.
    8        Q.    (By Mr. Gerakitis)  You don't give a
    9   date --
   10            MS. PREBULA:  He's looking at this
   11        document.
   12        Q.    (By Mr. Gerakitis)  -- in Defendant's
   13   Exhibit 45?
   14        A.    I don't get a date when.
   15        Q.    For the mention of pay or title change,
   16   correct?  You don't give a month at all?  It's just in
   17   2015?
   18        A.    Correct.
   19        Q.    And then you said "to date I have never
   20   heard back."  Well, this was prepared, as you say,
   21   after you were terminated, correct?
   22        A.    Correct.
   23        Q.    And "this" being Exhibit 45, correct?
   24        A.    Correct.
   25        Q.    And you said "in 2015 I met with the CEO."

1    You didn't give a date, month of the year in 2015 for

2    that one either, did you?

3         A.    Correct.

4               MS. PREBULA:  Richard, I think we've hit

5         our seven hours.

6               MR. GERAKITIS:  Well, I don't think that's

7         the way it's run, but we're close.

8               MS. PREBULA:  We'll give you a few

9         minutes' leeway.

10              MR. GERAKITIS:  Well, we'll slug along.

11        Let's just make sure we've got this right.

12              MS. PREBULA:  Well, let me just ask the

13        court reporter.  We've been in session seven

14        hours.

15              MR. GERAKITIS:  We haven't been going for

16        seven hours of testimony.

17              MS. PREBULA:  That's what I'm asking him.

18              MR. GERAKITIS:  We haven't been going for

19        seven hours of straight testimony.

20              THE VIDEOGRAPHER:  We're off the video

21        record.  I've been on.  That's my video run time.

22              MS. PREBULA:  So yes, we have.

23              MR. GERAKITIS:  That's your video run

24        time?

25              THE VIDEOGRAPHER:  Yes.

1           MR. GERAKITIS:  Right.

2           THE VIDEOGRAPHER:  That's how long I've

3      been on.

4           MR. GERAKITIS:  I mean, it's calculated

5      according to the amount of the testimony.  In

6      other words, if she's reading a document or

7      something like that --

8           MS. PREBULA:  No.  That's not how it

9      works.

10          MR. GERAKITIS:  Mary, it is the way

11     they've done it.

12          MS. PREBULA:  No, that's not.

13          MR. GERAKITIS:  It's not --

14          MS. PREBULA:  I'm not going to fight with

15     you about it.  Let's just see if we can get done.

16     But we've been on the record seven hours.  We'll

17     go back on.

18          THE VIDEOGRAPHER:  We are back on video.

19          MS. PREBULA:  We've been on the record

20     seven hours.  We're going to give you a little

21     bit of leeway, but we're not staying here beyond

22     the seven hours.

23          MR. GERAKITIS:  I'm not planning on

24     staying that much longer either, but I'm just

25     going to try and finish it up.

```
 1            MS. PREBULA:  Let's go.
 2       Q.    (By Mr. Gerakitis)  Still on Defendant's
 3  Exhibit 50 where we asked you for all internal
 4  complaints of discrimination from January 2013 to the
 5  present, and you had been reviewing your EEOC charge,
 6  correct?
 7       A.    When?  I'm sorry.
 8       Q.    Your EEOC charge is --
 9       A.    We were looking at Document 45.
10       Q.    -- Defendant's Exhibit 56.  Right.  The
11  question in Defendant's Exhibit 56, that's your EEOC
12  charge.  That was the last item, correct?
13            MS. PREBULA:  Actually, it wasn't, but --
14       Q.    (By Mr. Gerakitis)  That was the last item
15  you were given to review, numbered, correct?
16       A.    Where is it?
17            MS. PREBULA:  I have 56 as the last
18       exhibit you marked.
19            MR. GERAKITIS:  Correct.
20            THE WITNESS:  Okay.
21       Q.    (By Mr. Gerakitis)  Let me hand you
22  again --
23            MS. PREBULA:  Okay.  You don't have to
24       look through them.  Richard can find it.
25  / / /
```

1          (Defendant's Exhibit 57 was marked for

2      identification.)

3          Q.    (By Mr. Gerakitis)  Let me hand you

4  Defendant's Exhibit 57 and ask you if this is your

5  dismissal and notice of right to sue in this case?  Is

6  that what Defendant's 57 is?

7          A.    It's says dismissal and notice of rights.

8          Q.    And this dismissal and notice of rights

9  was not a complaint made by you about discrimination,

10  harassment, or retaliation while you were employed at

11  Carmike, correct?

12          A.    I'm sorry.  The question?

13          Q.    The dismissal and notice of rights in

14  Defendant's Exhibit 57 was not a complaint of

15  discrimination, harassment, or retaliation while you

16  were employed at Carmike, correct?

17          A.    No.  This document was not.

18          (Defendant's Exhibit 58 was marked for

19      identification.)

20          Q.    (By Mr. Gerakitis)  Let me hand you

21  Defendant's Exhibit 58.  This appears to be your

22  intake questionnaire, Pages 315 through 318.  Is that

23  what Defendant's Exhibit 58 is?

24          MS. PREBULA:  It's an incomplete copy.

25          MR. GERAKITIS:  Mary, it's the pages that

```
 1          you produced to us.  It's 313 -- excuse me, 315

 2          through 318 and the next page, as you will see,

 3          is 319.  Okay.

 4               MS. PREBULA:  There's a supplement to

 5          this.

 6               MR. GERAKITIS:  Mary, there may be a

 7          supplement; but it's not in your responses.

 8               MS. PREBULA:  Richard, you don't have to

 9          argue with me.

10               MR. GERAKITIS:  No, I'm not arguing.

11               MS. PREBULA:  Yes, you are.  I'm just

12          saying this is an incomplete copy because there

13          is a supplement.  That's on the record.  Now move

14          on.

15               MR. GERAKITIS:  You can supplement the

16          discovery responses --

17               MS. PREBULA:  Of course we can.

18               MR. GERAKITIS:  -- if you want to --

19               MS. PREBULA:  I'm just telling you.  Now

20          move on.

21               MR. GERAKITIS:  -- which will give us an

22          opportunity to cover that then.

23               MS. PREBULA:  We're not going to reconvene

24          this deposition.  Let's just move on.

25               MR. GERAKITIS:  Mary, you've produced a
```

1           ton of other documents.  We'll cover that when we

2           get to it.

3           Q.      (By Mr. Gerakitis)  You've got Defendant's

4      Exhibit 58 in front of you, the intake questionnaire?

5           A.      Yes.

6           Q.      This is not an -- this is not a complaint

7      made while you were employed at Carmike of

8      discrimination, harassment, or retaliation, is it?

9           A.      Correct.

10                  (Defendant's Exhibit 59 was marked for

11          identification.)

12          Q.      (By Mr. Gerakitis)  Let me hand you what's

13     been marked as Defendant's Exhibit 59.  It's Pages 319

14     through 341.  Is that what Defendant's Exhibit 59 is?

15          A.      The question?

16          Q.      Is Defendant's Exhibit 59 a letter from

17     your counsel to the EEOC of August 2, 2016?

18          A.      Yes.

19          Q.      This Defendant's Exhibit 59 was not a

20     complaint made while you were employed at Carmike

21     about discrimination, harassment, or retaliation, was

22     it?

23          A.      No.

24          Q.      Would you turn to Page 12 of Defendant's

25     Exhibit 59.

1        A.      I'm here.

2        Q.      Do you see under No. 9 the response and it

3    says "Ms. Trawick understood she was not to go to her

4    director and manager peers"?  Do you see that?

5        A.      I read 9.  What else was I supposed to

6    read?  I'm sorry.

7        Q.      I was just asking you, could you see in 9

8    about your response that you understood you were not

9    to go to your director and manager peers, and you

10   said?  Is that yes?

11       A.      I apologize for being confused, but I'm

12   still not understanding where I'm looking to respond

13   to you.

14       Q.      Do you mind if I stand and point it out to

15   you?

16             MS. PREBULA:  The response, he's saying --

17        that's 9, your response.

18       Q.      (By Mr. Gerakitis)  Here's 9.  Here's your

19   response.

20       A.      Okay.  I see.

21       Q.      I'm interested in "at the time the

22   instruction" portion is.

23       A.      What's the question?

24       Q.      You said you understood you were not to go

25   to your director and manager peers and discuss the

1    subject matter, correct?

2         A.     By "discuss," I understood that it's not

3    to poll my peers.

4         Q.     According to Page 12 of Paragraph -- under

5    Paragraph 9 it says, you understood you were not to go

6    to your director and manager peers and discuss the

7    subject matter, correct?

8         A.     In the same sentence I also understood it

9    not to be to poll your peers.

10        Q.     It says you were not to go to your

11   director, correct?  Is your director a peer?

12        A.     Which director?

13        Q.     What director are you referring to here?

14        A.     I understood this is not to poll my peers.

15        Q.     The question was:  What director are you

16   referring to in that sentence?

17        A.     I don't know that I meant any particular

18   director.

19        Q.     You said you did not go to your director

20   or manager peers and discuss the subject matter,

21   correct?

22        A.     That's not what this sentence says.

23        Q.     It says:  "Ms. Trawick understood she was

24   not to go to her director and manager peers and

25   discuss the subject matter."  That's what it says,

1      correct?

2          A.      But that's the second part of the

3      sentence.

4          Q.      Okay.  I'll start over again.  "At the

5      time the instruction not to poll your peers was given,

6      Ms. Trawick understood she was not to go to her

7      director and manager peers and discuss the subject

8      matter."  That's what it reads, doesn't it?

9          A.      That's what it reads.

10         Q.      And you said "she did not do so," correct?

11         A.      Yes.

12         Q.      And you said in your EEOC charge under

13     penalty of perjury you spoke with both Ms. De La Cruz

14     and Mr. Sailors after being given the instructions,

15     correct?

16         A.      Correct.

17                 (Defendant's Exhibits 60 through 63 were

18         marked for identification.)

19         Q.      (By Mr. Gerakitis)  I want to hand you

20     now, if I could, Exhibits 60, 61, 62.

21                 MR. GERAKITIS:  And then, Mary, if I can

22         have just two minutes, I think I'm done; but I

23         just want to -- I want to check one thing.

24                 MS. PREBULA:  Okay.

25         Q.      (By Mr. Gerakitis)  61, 62, and 63.

```
 1              MS. PREBULA:  And I may just have just a
 2         couple of clarity questions.
 3         Q.    (By Mr. Gerakitis)  Let me hand you what's
 4    been marked as Defendant's Exhibits 61, 62, and 63.
 5    Let me hand you what's been marked as Defendant's 60,
 6    and then I'll hand you what's been marked as
 7    Defendant's 61 and 63.
 8              MS. PREBULA:  62?
 9              MR. GERAKITIS:  60, 61, and 62, correct.
10              MS. PREBULA:  Do you have 62?
11              MR. GERAKITIS:  I do.  I'm handing it
12         right now.
13              MS. PREBULA:  Okay.  This has already been
14         marked.
15              MR. GERAKITIS:  It has, but it's --
16              MS. PREBULA:  We'll just move on.
17              MR. GERAKITIS:  It's in reference to the
18         discovery responses.
19         Q.    (By Mr. Gerakitis)  Okay.  Quickly,
20    Defendant's Exhibit 60 is a marketing projects manager
21    responsibilities and accountabilities?  Is that what
22    60 is?
23         A.    Yes.
24         Q.    This was not a complaint made to Carmike
25    during the time you were employed of harassment,
```

1    discrimination, or retaliation, was it?

2        A.    No.

3        Q.    Let me hand you -- or you've got

4    Defendant's Exhibit 61, the current occurrences.  When

5    did you prepare Defendant's Exhibit 61?

6        A.    I'm not sure of the time.  It was after my

7    termination.

8        Q.    Defendant's Exhibit 61 was not a complaint

9    of discrimination, harassment, or retaliation that you

10   made while you were employed at Carmike?

11       A.    Is that a question or a statement?  I'm

12   sorry.

13       Q.    That's a question.

14       A.    No, it's not.

15       Q.    And Defendant's Exhibit 62 is also not a

16   complaint of discrimination, harassment, or

17   retaliation while you were an employee at Carmike,

18   correct?

19       A.    Correct.

20       Q.    I want to hand you, if I could, your

21   Rule 26(a)(1) initial disclosures, which is

22   Defendant's Exhibit 63, and ask you if that's what

23   Defendant's Exhibit 63 is.

24            MR. GERAKITIS:  Mary, do you want a copy?

25            THE WITNESS:  I'm sorry.  The question?

1       Q.      (By Mr. Gerakitis)   Is Defendant's
2   Exhibit 63 your initial disclosures?
3       A.      Yes.
4       Q.      Would you please look at Page 5.
5       A.      I'm there.
6       Q.      Do you see the name Heather Garrett?
7       A.      Yes.
8       Q.      And it says "raising concerns into
9   plaintiff's use of charitable funds on behalf of
10  defendant within community during."  Can you explain
11  to me what you mean by that?
12      A.      She spoke about my termination.
13      Q.      But during what?  It just says "within
14  community during."
15      A.      I'm not sure of the implication of
16  "during" at the end of that statement.
17      Q.      If you look at Fred Friedel's name up
18  above in 20, it says "conversations with plaintiff and
19  others re complaint."  What complaint?  The complaint
20  by Cathryn Smitherman?  What?
21      A.      I believe that refers to comments being
22  made around the corporate office during the time of
23  the investigation.
24      Q.      Is it or you believe it to be?
25              MS. PREBULA:  Objection.  She's answered,

1           asked and answered.

2           Q.      (By Mr. Gerakitis)   You believe that

3   Mr. Friedel as part of the investigation spoke about

4   the investigation in his department in compliance?

5           A.      I do believe so.

6           Q.      Who did he speak to?

7           A.      I'm not certain.

8           Q.      If you're not certain, do you have any

9   idea who he spoke with?

10          A.      I had heard employees around the office

11  talking about my investigation.

12          Q.      What employees do you understand Fred

13  Friedel talked to that were talking about your

14  investigation?

15          A.      At this time, I'm not sure.  I'm not sure.

16          Q.      And then on Page 6 you mention Ricky Love

17  "raising concerns into plaintiff's use of charitable

18  funds within community during."  What is that in

19  reference to, what we talked about earlier?

20          A.      I'm not sure what "during" implies.

21          Q.      Let's look at, if we could, on Page 9,

22  Cathryn Smitherman.  It says "raised inquiries into

23  plaintiff's use of charitable funds."  Do you see

24  that?

25          A.      I'm reading it.  I'm sorry.  What's the

1  question?

2      Q.    On Page 9, you mentioned Cathryn

3  Smitherman.  It says "raised inquiries into

4  plaintiff's use of charitable funds."  Do you see

5  that?

6      A.    I do.

7      Q.    What charitable funds did Cathryn

8  Smitherman raise inquiry into your use of?

9      A.    Well, I knew of Quadrille.

10     Q.    Which is not a charity?

11           MS. PREBULA:  Objection, argumentative.

12     Q.    (By Mr. Gerakitis)  Okay.  I'll start

13  over.  What charity work does Quadrille do?

14           MS. PREBULA:  Asked and answered at least

15     20 times.

16     Q.    (By Mr. Gerakitis)  What charity work does

17  Quadrille do?

18           MS. PREBULA:  Same objection.

19     Q.    (By Mr. Gerakitis)  Ms. Trawick?

20     A.    I can't answer that.

21     Q.    Does Quadrille do any charity work?  Does

22  The Quadrille, rather, sorry, to be precise, does it

23  do any charity work?

24     A.    Can I get a definition of "charity work"?

25     Q.    You work in charity?

1      A.      I work in lots of nonprofits.  I assume
2    they were all the same.
3      Q.      Do you work in charity?
4      A.      I work with nonprofits.
5      Q.      How many nonprofits have as their purpose
6    the entertainment of their members at parties four
7    times a year?
8      A.      The Young Professionals do at least once a
9    year.
10     Q.      And they don't -- and the Young
11   Professionals is a charity?
12     A.      It's a nonprofit.
13     Q.      Is it a charity?  That's my question.
14             MS. PREBULA:  Objection, asked and
15         answered.
16             MR. GERAKITIS:  Noted.
17             THE WITNESS:  I'm not sure of their
18         charity status.  They're an extension of the
19         Chamber, and they volunteer in the community for
20         organizations that are also nonprofits.  I serve
21         in leadership.
22     Q.      (By Mr. Gerakitis)  Ms. Smitherman, you
23   said earlier and correct me if I'm wrong, she was
24   acting properly in raising questions to Jenny McMillen
25   about the sponsorship monies that The Quadrille was

1    getting, right?

2              MS. PREBULA:  Objection, asked and

3         answered.

4              MR. GERAKITIS:  Noted.

5              THE WITNESS:  The question again, please?

6         Q.    (By Mr. Gerakitis)  Ms. Smitherman was

7    acting properly in raising questions to Jenny McMillen

8    about the sponsorship monies that The Quadrille was

9    requesting?

10             MS. PREBULA:  Same objection.

11             THE WITNESS:  Yes.

12        Q.    (By Mr. Gerakitis)  This may wrap it up,

13   but I just want to make sure.  I want to make sure

14   that whatever you found that you produced this week in

15   documents that I have made a printout of, an index

16   alphabetically -- well, it's numerically

17             MS. PREBULA:  There's no way for her to do

18        that as we sit here today.

19        Q.    (By Mr. Gerakitis)  My question is:  Did

20   your husband help you find documents, because I would

21   love to talk to him about it tomorrow?  Did your

22   husband help you find documents related to this case?

23        A.    I don't know.  I don't recall.  I don't

24   know.

25        Q.    Did he help you find the hard drive you

1   found?

2         A.      No.  I actually found that.

3         Q.      And where did you find the hard drive?

4         A.      In a closet under a bunch of paperwork.

5   It was exposed, and I had forgotten where I put it.

6         Q.      Were the documents that you found and

7   produced this week, were they located on Carmike

8   servers when you worked there?

9         A.      I'm not sure.

10        Q.      Were the documents that you produced, were

11  they documents that were created by you in the regular

12  course of business or by another Carmike employee?

13        A.      What's the question?  I'm sorry.

14        Q.      Were the documents that you produced this

15  week, were they documents that were created by you in

16  the regular course of business or by another Carmike

17  employee?

18        A.      I'm not certain to the answer of that

19  based on all the materials that you've been sent.

20              (Defendant's Exhibit 64 was marked for

21        identification.)

22        Q.      (By Mr. Gerakitis)  And let me hand you

23  what's been marked as Defendant's Exhibit 64, which is

24  your supplemental response to Carmike's first request

25  for production of documents.  Is that what 64 is?

```
1       A.      I'm sorry.  The question?
2       Q.      Is Defendant's Exhibit 64 your
3   supplemental response to Carmike's first request for
4   production of documents?
5       A.      Yes.
6       Q.      And you responded to Request No. 9,
7   correct?
8       A.      Yes.
9       Q.      And you responded to Request No. 13,
10  correct?
11      A.      I sent what I had in my possession.
12      Q.      I didn't ask you a question about --
13      A.      Sorry.
14      Q.      -- what you had in your possession.  My
15  question was:  You responded to Request No. 13 as is
16  shown on Defendant's Exhibit 64, correct?
17      A.      Yes.
18      Q.      And you responded to Request No. 22,
19  correct?
20      A.      Yes.
21      Q.      And there was no response supplementing
22  any request in No. 14 of our requests which reads:
23  "Any and all documents which refer to, relate to,
24  evidence, or reflect any complaints including internal
25  complaints of discrimination, harassment, or
```

```
1    retaliation made by you to defendant from January 2013
2    to the present"?
3         A.    I'm sorry.  What was that?
4         Q.    There was no supplemental response in
5    Defendant's Exhibit 64.
6         A.    For what?
7         Q.    To Request No. 14 --
8         A.    I don't see 14 is why I'm asking.
9         Q.    -- in Defendant's Exhibit 50, which reads:
10   "Any and all documents which refer to, relate to,
11   evidence, or reflect any complaints including internal
12   complaints of discrimination, harassment, or
13   retaliation made by you to defendant from January 2013
14   to the present."
15             MS. PREBULA:  It's just the document
16        request --
17             THE WITNESS:  I'm sorry.  I don't --
18             MS. PREBULA:  -- the document request that
19        he's read to you earlier.
20             THE WITNESS:  Okay.  The question?
21        Q.    (By Mr. Gerakitis)  Defendant's
22   Exhibit 64 --
23        A.    Yes.
24        Q.    -- you didn't supplement our Request
25   No. 14, did you?
```

1       A.      No.

2               MR. GERAKITIS:  Do you want to take a

3       break?

4               MS. PREBULA:  If you're concluded.

5               MR. GERAKITIS:  I'm concluded.  Thank you.

6               MS. PREBULA:  We may have just a

7       clarification.

8               THE VIDEOGRAPHER:  We are off video.

9               (Recess from 6:03 p.m. to 6:09 p.m.)

10              THE VIDEOGRAPHER:  We are back on video.

11                      DIRECT EXAMINATION

12  BY MS. PREBULA:

13      Q.      When Mr. Gerakitis showed you Defendant's

14  Exhibit 61, did that refresh your recollection as to

15  when you prepared Defendant's Exhibit 45?

16      A.      Yes.

17      Q.      So when did you prepare Exhibit 45?

18      A.      A few days after or close to the current

19  occurrences.

20      Q.      And when did you prepare the current

21  occurrences, Defendant's 61?

22      A.      Shortly after my termination.

23      Q.      All right.  And what was the purpose in

24  preparing those two documents?

25      A.      To memorialize the current events so I

 1   wouldn't forget.

 2         Q.    Okay.  So when you said earlier that 45

 3   was prepared for counsel, it was prepared prior, just

 4   to memorialize, not for counsel?

 5         A.    Yes.

 6         Q.    All right.  And Mr. Gerakitis asked you a

 7   series of questions about whether documents were a

 8   complaint that you gave to Carmike before your

 9   termination.  Do you remember those questions?

10         A.    I do.

11         Q.    Were all of your complaints to Carmike

12   about discrimination, retaliation, unfair treatment

13   verbal?

14         A.    Yes.

15               MS. PREBULA:  Okay.  That's all I have.

16               MR. GERAKITIS:  Thanks.

17               MS. PREBULA:  She will read and sign.

18               THE VIDEOGRAPHER:  We are off video.

19               (Deposition concluded at 6:10 p.m.)

20               (Signature of the witness has been

21   reserved.)

22

23

24

25

1             CERTIFICATE OF COURT REPORTER

2

3    STATE OF GEORGIA:

4    COUNTY OF FULTON:

5

6             I hereby certify that the foregoing
     transcript was reported as stated in the caption and
7    the questions and answers thereto were reduced to
     writing by me; that the foregoing 352 pages represent
8    a true, correct, and complete transcript of the
     evidence given on Thursday, August 17, 2017, by the
9    witness, Crystal Wing Trawick, who was first duly
     sworn by me.
10
              I certify that I am not disqualified
11   for a relationship of interest under
     O.C.G.A. 9-11-28(c); I am a Georgia Certified Court
12   Reporter here as an independent contractor of
     JPA Reporting, LLC who was contacted by
13   Thompson Reporting Services, Inc. to provide court
     reporting services for the proceedings; I will not be
14   taking these proceedings under any contract that is
     prohibited by O.C.G.A. 15-14-37(a) and (b) or
15   Article 7.C. of the Rules and Regulations of the
     Board; and by the attached disclosure form I confirm
16   that neither I nor JPA Reporting, LLC are a party to a
     contract prohibited by O.C.G.A. 15-14-37(a) and (b) or
17   Article 7.C. of the Rules and Regulations of the
     Board.
18
              This 6th day of September, 2017.
19

20

21             _____
               LINDA C. RUGGERI
22             CERTIFIED COURT REPORTER
               GEORGIA CERTIFICATE NO. CCR-A-261
23

24

25

1                    DISCLOSURE OF NO CONTRACT

2

3              I, Lynn Pyles, do hereby disclose pursuant
   to Article 10.B of the Rules and Regulations of the
4  Board of Court Reporting of the Judicial Council of
   Georgia that JPA Reporting, LLC was contacted by
5  Thompson Reporting Services, Inc. to provide court
   reporting services for these proceedings and there is
6  no contract that is prohibited by O.C.G.A. 15-14-37(a)
   and (b) or Article 7.C. of the Rules and Regulations
7  of the Board for the taking of these proceedings.

8              There is no contract to provide reporting
   services between JPA Reporting, LLC or any person with
9  whom JPA Reporting, LLC has a principal and agency
   relationship nor any attorney at law in this action,
10 party to this action, party having a financial interest
   in this action, or agent for an attorney at law in
11 this action, party to this action, or party having a
   financial interest in this action.  Any and all
12 financial arrangements beyond our usual and customary
   rates have been disclosed and offered to all parties.

13           This 6th day of September, 2017

14

15

16         _____
           LYNN PYLES, FIRM REPRESENTATIVE
17         JPA REPORTING, LLC

18

19

20

21

22

23

24

25

1    DEPOSITION OF:   CRYSTAL WING TRAWICK /LCR

2        I do hereby certify that I have read all
     questions propounded to me and all answers given by me
3    on August 17, 2017, taken before Linda C. Ruggeri, and
     that:

4
         1)   There are no changes noted.
5        2)   The following changes are noted:

6        Pursuant to Rule 30(e) of the Federal Rules of
     Civil Procedure and/or the Official Code of Georgia
7    Annotated 9-11-30(e), both of which read in part:  Any
     changes in form or substance which you desire to make
8    shall be entered upon the deposition...with a
     statement of the reasons given...for making them.
9    Accordingly, to assist you in effecting corrections,
     please use the form below:

10

11   Page No.        Line No.        should read:

12   Reason for change:

13   Page No.        Line No.        should read:

14   Reason for change:

15   Page No.        Line No.        should read:

16   Reason for change:

17   Page No.        Line No.        should read:

18   Reason for change:

19   Page No.        Line No.        should read:

20   Reason for change:

21   Page No.        Line No.        should read:

22   Reason for change:

23   Page No.        Line No.        should read:

24   Reason for change:

25

```
 1   DEPOSITION OF:  CRYSTAL WING TRAWICK /LCR

 2   Page No.       Line No.        should read:

 3   Reason for change:

 4   Page No.       Line No.        should read:

 5   Reason for change:

 6   Page No.       Line No.        should read:

 7   Reason for change:

 8   Page No.       Line No.        should read:

 9   Reason for change:

10   Page No.       Line No.        should read:

11   Reason for change:

12

13   If supplemental or additional pages are necessary,
     please furnish same in typewriting annexed to this
14   deposition.

15

16                   CRYSTAL WING TRAWICK

17

18

19   Sworn to and subscribed before me,
     This the      day of             , 20   .
20

21   Notary Public
     My commission expires:
22

23

24

25
```

Crystal Trawick v.
Carmike Cinemas, Inc.

Crystal Wing Trawick
August 17, 2017

## $

**$1,000 (1)**
152:4
**$1,800 (2)**
127:14,25
**$10,610 (1)**
126:14
**$100,000 (1)**
207:1
**$162.85 (2)**
88:23;128:20
**$2,000 (7)**
33:17;37:9;90:23;
95:24;130:12;
160:16;285:12
**$2,323.40 (1)**
116:7
**$2,500 (4)**
116:8,13;142:5,10
**$2,800 (1)**
136:12
**$2000 (1)**
61:6
**$4,000 (7)**
30:7,10,15,17,20,
25;32:11
**$400 (2)**
72:22,25
**$455 (1)**
291:9
**$5,600 (1)**
129:9
**$568.20 (1)**
130:9
**$593.95 (1)**
124:9
**$6,800 (4)**
127:9,12,24;
128:20
**$8,600 (1)**
127:17
**$9,356.80 (3)**
128:14,25;130:9
**$9,925 (1)**
130:9
**$95,000 (2)**
322:17,18

## A

**abbreviation (1)**
77:19
**ability (1)**
140:23
**able (11)**
85:22;147:11;
161:19;187:13;
189:11;245:8;
267:23;280:25;
281:1,4;299:14
**above (2)**

**186:15;343:18**
**absence (4)**
94:8;226:3;231:13;
306:25
**absolutely (2)**
9:20;254:5
**absorb (1)**
231:12
**absorbed (3)**
233:14;269:14;
304:4
**absorbing (2)**
240:25;241:8
**academic (1)**
200:13
**Academy (6)**
15:11;206:22;
207:1,20,21;261:14
**accelerated (1)**
78:24
**accept (3)**
24:6;258:9,11
**accepted (2)**
69:18;70:7
**access (10)**
83:3,4,24;139:21;
161:5,6,8;224:3;
237:19;313:19
**accesses (1)**
313:8
**accomplishments (14)**
253:10,17,22;
254:8,13,19;255:2,5,
12,19,20;311:10;
327:14,20
**accordance (1)**
9:4
**according (23)**
29:22;38:19;57:2;
59:18;96:6;129:11;
130:3;154:21;160:4;
200:19;202:17;
221:3;255:4;274:6;
291:13,17;308:7;
310:12;312:12,19;
327:18;333:5;339:4
**account (30)**
61:13;81:8,8,11,13,
18,23;82:5,18,22,24;
83:3,8,14,23;86:3,7,
11,16,17,24;87:6;
89:11;96:25;113:22;
130:20;161:13,19;
216:17;233:9
**accountabilities (4)**
182:14;241:2,9;
341:21
**accounted (1)**
97:3
**Accounting (2)**
190:12,12
**Accounts (6)**
38:6;62:21;63:3;

**115:19;274:3;275:2**
**accurate (11)**
84:12;96:9;135:2;
136:1;163:2,6;
174:11;208:6,8;
270:9;307:7
**accurately (2)**
10:9,14
**accustomed (1)**
80:14
**acquired (4)**
15:3,5;227:20,21
**acquisition (3)**
145:10;227:16;
228:2
**Act (5)**
219:15;220:8,9;
221:15;290:24
**acted (2)**
162:1,6
**acting (3)**
243:14;346:24;
347:7
**action (3)**
181:9,11;289:1
**actions (2)**
216:18;275:23
**active (2)**
118:15,16
**actively (2)**
218:13;288:12
**activities (1)**
110:16
**actual (3)**
98:8;100:16;192:5
**actually (13)**
67:9;106:9;147:21;
155:17;174:6;
175:10;210:5;
231:21;248:16;
288:25;322:3;
334:13;348:2
**ad (2)**
66:11;115:13
**add (5)**
128:13,20,24;
204:15;205:9
**added (8)**
83:2,7;86:5;
205:12;233:11;
249:22;298:15,18
**adding (4)**
97:20;298:19;
315:4,6
**addition (1)**
170:23
**additional (3)**
199:10;308:19;
312:3
**address (15)**
11:21;40:2,7,11;
41:2,2,23,24;57:6,6;
80:7;100:2;277:3,4;

**306:19**
**adequate (2)**
208:10;232:20
**adhered (1)**
50:23
**adjustment (1)**
236:1
**admission (1)**
67:19
**ads (1)**
115:12
**advertisement (2)**
64:25;166:16
**advertising (18)**
115:3,8;143:16;
152:10;176:18;
208:11;225:19,23;
226:7,11,14;231:7;
232:21;233:8;235:1;
271:8;307:10,12
**advise (2)**
64:2,4
**advised (1)**
323:11
**advisory (1)**
242:5
**advocated (1)**
313:17
**affirmatively (1)**
272:2
**afford (1)**
11:2
**afraid (2)**
269:22;270:2
**afters (1)**
44:1
**again (37)**
32:18;37:1;45:17;
52:19;56:6,7;73:15;
74:14;100:14;
108:16;109:12;
111:15;114:13;
122:3,11;126:19;
130:23;136:15,22;
170:1;174:12;
182:21;200:5;
219:24;227:22;
229:2;283:5;297:7,9;
312:8;328:22;
329:12,22;330:23;
334:22;340:4;347:5
**against (14)**
209:8;211:23;
212:4,19;213:5;
214:18,21;265:20,23;
266:13;269:25;
270:4;277:7;305:10
**age (2)**
51:20;126:7
**agenda (1)**
66:7
**agent (2)**
278:24;284:16

**agents (1)**
278:20
**aggressive (7)**
25:9;215:17,18,20;
216:2,22;219:6
**aggressively (1)**
215:4
**aging (1)**
51:22
**Agnew (3)**
287:4,5,11
**ago (10)**
12:6,7;58:22;
174:1,3;257:17,21,
21;304:21;307:18
**agree (10)**
9:18;128:21;167:3;
221:11;250:18;
276:9;285:3;308:18,
22;309:2
**agreeable (1)**
9:16
**agreed (6)**
212:23;234:18,19;
272:21,22;285:2
**agreement (3)**
9:5;192:20,23
**ahead (8)**
24:13;78:1;115:7;
215:14;238:9;
262:12;269:16;326:3
**aide (1)**
167:18
**Alabama (2)**
12:22;203:5
**alcohol (1)**
54:15
**Alexander (2)**
78:10,21
**Alexandra (2)**
142:4,16
**Allen (4)**
29:9,12;54:25;
95:19
**allocations (1)**
31:15
**allow (1)**
314:7
**allowed (4)**
37:11;53:2;250:22;
251:24
**almost (3)**
174:1;175:6;
193:10
**alone (2)**
127:17;255:19
**along (5)**
62:20;63:2;169:4;
176:12;332:10
**alphabetically (1)**
347:16
**Altoona (1)**
66:6

**always (2)**
54:2;166:13
**ambiguous (11)**
34:4;52:18;98:17;
135:4;183:13;212:7;
238:8;264:25;
289:18;302:24;303:4
**ambitious (1)**
76:17
**AMC (4)**
145:11,13;252:6,
11
**among (3)**
76:10;111:24;
112:4
**Amongst (1)**
114:18
**amount (15)**
30:9;117:6;120:18;
122:10;125:10,11;
126:14;130:19;
208:10;219:18;
309:8,11,13,15;333:5
**amounts (2)**
128:13;310:18
**Amy (24)**
20:23;32:1,3,6;
55:7;58:15;61:19;
80:20;81:9,13,14,16,
20;82:4;84:3;87:19;
118:14,15;119:7;
125:19;129:19;
130:16;133:17;
160:15
**analysis (1)**
160:24
**and/or (5)**
168:15;169:1;
248:9,9;263:13
**Andersen (2)**
142:4,16
**Angela (1)**
28:18
**Ann (1)**
64:4
**Anne (12)**
28:9;46:12,16,16;
51:22;69:18;70:7;
86:24;107:12;118:9,
12;119:11
**announce (1)**
21:6
**announced (2)**
20:5;85:16
**announcement (2)**
78:4;102:12
**announcing (1)**
94:25
**annual (2)**
30:1,4
**anonymously (1)**
266:19
**Ansley (4)**

28:1,2;78:9,19
**answered (17)**
20:12;41:6;131:23;
156:14;167:10;
178:7;190:22;191:5;
196:1;198:10;264:9;
323:2;343:25;344:1;
345:14;346:15;347:3
**anymore (4)**
55:14;252:4;
290:17;291:1
**Anyways (4)**
153:21,24;154:10;
161:1
**apologies (3)**
24:6;244:12;
250:13
**apologize (3)**
186:5;262:8;
338:11
**apologized (1)**
170:25
**apparently (2)**
220:7;329:15
**appear (5)**
27:19;89:10;
176:23;303:5,6
**appeared (1)**
323:19
**appears (42)**
17:19;23:9,13;
24:4;26:21,25;38:10;
42:8;47:7;64:11;
65:10;72:4;79:16;
82:23;87:5;89:6,15;
95:9;99:6;106:8,10;
128:14;148:13;
151:14;168:9;
175:18,22;202:3,7,
16;204:10;206:20;
208:19;312:25;
315:16;317:1,15;
319:13;320:15;
324:13;327:24;
335:21
**Apple (1)**
15:1
**applicants (2)**
67:18;70:1
**application (2)**
67:19;203:2
**apply (2)**
45:23;222:21
**approached (4)**
180:5,7;218:4;
224:7
**approaching (1)**
259:13
**appropriate (3)**
261:21;266:24;
294:20
**approval (14)**
62:23;72:20;

138:20,21,24;139:3,
6,7;231:8;272:24;
273:6;276:15,18;
328:22
**approvals (8)**
182:1,8,18;273:1,
3;328:19;329:11,21
**approve (11)**
18:21,25;19:5,8;
99:17,20,23;274:9,
20,22;282:24
**approved (34)**
62:22;74:21;90:1,
5,7,10,15,16;91:6,7;
95:3;97:9,11;99:22;
116:6,9;151:5,18,20;
152:1;159:2;263:12;
274:1,2,13,15,25;
275:1;313:5,10,13;
314:12,22;318:10
**approving (3)**
21:10;74:20;313:8
**approximately (1)**
232:24
**April (12)**
167:22;296:15,20,
21,22,25;297:19;
299:7;317:17;318:4,
6;326:13
**area (11)**
13:21;31:22;
145:18,24;146:2,6,
11,12,18;233:19,23
**areas (3)**
146:19;263:1;
291:25
**argue (1)**
336:9
**arguing (1)**
336:10
**argumentative (12)**
50:17;67:4;118:20;
158:3;217:11,12;
267:5;280:10;293:5,
15;300:24;345:11
**Arlie (1)**
240:8
**around (13)**
46:13;96:13;117:3;
121:6;212:13;225:6;
226:7;247:22;262:3,
4;300:6;343:22;
344:10
**arrived (1)**
136:16
**Article (2)**
8:2;320:18
**Arts (1)**
203:4
**Ashley (8)**
51:24;134:9;
142:19;144:8,14,25;
149:12;164:9

**aside (1)**
191:13
**assets (5)**
149:10;182:14;
206:6;263:11;278:22
**assigned (2)**
231:8,9
**assist (3)**
294:21,24;295:1
**assistance (1)**
294:14
**assistant (4)**
147:18;167:15,17;
235:12
**assisted (1)**
293:10
**associate (2)**
168:11;200:1
**associated (1)**
116:14
**Associates (2)**
8:13;149:13
**Associate's (11)**
187:23,24;188:11,
12;190:13;193:22;
200:21;201:7,14;
202:19;271:7
**associations (1)**
199:11
**assume (8)**
10:19;16:11;66:2;
95:17;176:3,7;
271:24;346:1
**assumed (4)**
141:10,15;322:14,
21
**assumes (7)**
31:2;32:24;49:24;
50:18;103:15,23;
283:2
**assuming (1)**
226:4
**Athey (6)**
40:18,20,21;57:12;
58:17;61:19
**Athey's (1)**
41:22
**Atlanta (12)**
8:14;144:13,17;
145:2,4,8,18,21;
146:24,25;147:1,4
**attach (1)**
192:20
**attached (6)**
76:10;87:25;
142:23;192:23;
220:12,14
**attachment (2)**
65:22,25
**attachments (1)**
114:1
**attempt (1)**
82:23

**attempted (1)**
189:16
**attend (6)**
74:5;147:12,15;
148:9;231:21;297:24
**attendance (6)**
19:10,20;29:15;
32:4;100:21;134:9
**attended (6)**
134:6,13,14;
147:13;292:25;300:4
**attending (5)**
132:19;133:5,11,
25;232:1
**attorney (5)**
212:14,17;305:8;
306:3,11
**attorney-client (6)**
9:21;209:11,19;
210:2,18;306:6
**attorneys (1)**
8:16
**Auburn (1)**
96:16
**audience (2)**
245:22;293:19
**Audit (4)**
152:10;160:25;
176:18;307:15
**auditorium (1)**
246:7
**August (10)**
8:11;75:20;77:18;
113:18;174:24;
206:23;225:4,11;
300:12;337:17
**authority (1)**
250:22
**authorization (1)**
231:8
**authorized (6)**
9:2;55:4;56:14,17;
57:2;59:1
**availability (1)**
81:15
**available (3)**
103:6;147:19;
267:15
**Avenue (5)**
11:22,25;80:6;
88:18;100:1
**Averett (8)**
40:3,10,14;41:15,
16,19,22,25
**AVLF (15)**
138:24;141:23;
143:14,17;144:21,24;
147:10,24;148:14,18;
150:10,14;151:5;
164:8;275:16
**avoid (1)**
78:13
**awards (1)**

199:12
**aware (39)**
   28:16;47:13;53:5,
   17;56:16,18;111:25;
   112:6;113:9;116:24;
   127:22;128:1;
   155:20;161:25;
   163:20,25;170:12;
   171:19;183:9,19;
   184:22;211:22;
   213:4,8;236:6;
   247:18,19;253:7;
   265:25;266:1,6,17;
   267:13;279:2;284:3;
   288:8;312:12,19;
   316:11
**away (3)**
   12:1;234:21,22

# B

**BA (6)**
   190:15;202:22;
   203:1,4,8;289:17
**Bachelor (2)**
   203:4,5
**Bachelor's (5)**
   168:16,20,24;
   203:3;271:7
**back (63)**
   14:19;17:3;35:23;
   43:15,17,24;44:8,11;
   47:16;55:15;58:18,
   19;60:2;61:9;63:20;
   69:1,7,22;71:10;
   82:16;86:17;93:22;
   98:19;101:4;108:18;
   111:4;125:21;129:6;
   134:22;149:16;
   166:7,11,25;167:20;
   173:25;187:6,9;
   192:17;193:17;
   194:13,19;195:21;
   205:4;219:23;220:1;
   230:23;258:12;
   261:9;269:9;273:15;
   282:8;291:4;296:17;
   298:6;299:2,6;
   307:18;312:15;
   330:20;331:20;
   333:17,18;351:10
**backwards (2)**
   17:10;47:18
**bad (1)**
   186:5
**balance (9)**
   88:2;126:13,21,23;
   127:1;130:20,22;
   131:4;194:21
**band (3)**
   84:5;127:14,25
**bank (27)**
   61:15,17;81:8,11;

82:5,18,20;83:9,14;
84:11;86:1,7,8,10,13,
17;87:24;89:7,9;
96:25;124:22;
126:14;130:6;
149:22;161:13,15,19
**banner (1)**
   143:17
**bar (7)**
   100:13,15,16;
   101:5,6,24;102:6
**base (1)**
   207:1
**based (21)**
   31:13;75:8;126:17;
   128:12;155:7;
   162:15;169:14;
   180:13;200:3;
   203:10;227:24;
   247:6;248:16;257:1,
   3;260:7;266:22;
   268:7;302:24;
   322:21;348:19
**Basically (1)**
   119:6
**basis (1)**
   291:9
**Bates (1)**
   44:15
**became (6)**
   46:19;121:9;215:9;
   271:8;314:10;315:11
**Beck (2)**
   72:5,12
**become (8)**
   11:5;51:24;52:4;
   75:22;78:7;79:6;
   121:15;238:23
**becoming (5)**
   45:24;46:2,9;
   243:22;244:1
**bed (4)**
   300:20,23;301:2,
   10
**began (1)**
   222:14
**Begin (1)**
   297:8
**beginning (3)**
   53:24;54:3,4
**begins (1)**
   323:14
**behalf (7)**
   33:2;147:22;
   162:14;274:16;
   285:4;288:3;343:9
**behavior (1)**
   281:15
**behind (1)**
   71:1
**belief (1)**
   136:2;236:9;
   240:11;264:1;322:4,

9
**believing (1)**
   285:4
**Below (2)**
   71:13;156:23
**benefit (6)**
   110:17;135:25;
   148:2,4;165:15,18
**benefits (2)**
   134:25;268:6
**Benito (1)**
   71:13
**Benning (2)**
   234:8,8
**besides (22)**
   14:2;19:20;23:20,
   23;35:4,6;83:6;
   87:16;92:21;116:15,
   17,22;131:15;
   218:17;237:1;
   254:14;265:11;
   282:9;285:15,16;
   288:5;302:21
**best (4)**
   11:1;19:12;41:21;
   125:24
**better (1)**
   306:20
**beyond (8)**
   43:18;55:25;
   202:13;263:17;
   282:5;325:13,18;
   333:21
**Bickerstaffs (1)**
   14:19
**big (3)**
   153:22;304:15,17
**birth (5)**
   13:13;191:16;
   195:2;196:10;219:15
**birthday (1)**
   14:9
**bit (2)**
   312:2;333:21
**blank (1)**
   120:8
**blog (1)**
   140:11
**blogs (1)**
   140:6
**blonde (1)**
   71:9
**blurry (5)**
   106:16,21,25;
   107:1,3
**Board (68)**
   8:3;18:21,24;19:1,
   4,7;20:8,16;21:5;
   27:25;30:2;31:23;
   32:6;34:18,19;36:11;
   45:25;46:10,10,11,
   22;47:1,3;48:15;
   51:2,5,7;53:25;

54:20;59:2,8,11,12,
15,20;60:19,24;64:2;
70:3,3;77:11,19;78:1,
23;84:21;89:22;92:6,
9;101:15;110:15;
111:12,19;116:10;
118:8;119:14;128:9;
129:16;155:5;242:6;
254:9;256:12;
257:10,11,20;282:21;
285:8;288:19,22
**board-at-large (4)**
   59:10,12,16;77:12
**boards (1)**
   102:10
**Bob (1)**
   71:10
**body (3)**
   34:7;140:17,21
**bonus (18)**
   64:18;207:5,7;
   213:22,23;214:1;
   309:7,18,21,23,23;
   310:5,7,11,16,19;
   322:14,18
**bonuses (1)**
   240:12
**Booker (1)**
   134:3
**born (5)**
   167:21;194:23;
   195:24;196:8;296:16
**Boss (2)**
   116:3,7
**both (11)**
   16:12;27:10;
   130:18;181:18;
   187:14;189:25;
   192:11,16;206:3,6;
   340:13
**bottom (11)**
   44:15;48:2;59:3;
   73:23;74:9;80:20;
   296:12;305:16,18;
   326:20;327:1
**bought (2)**
   145:13;177:19
**box (3)**
   75:1,10;207:8
**boyfriend (1)**
   57:20
**Boys (1)**
   297:8
**Brad (1)**
   72:12
**Bradley (1)**
   72:5
**Branch (1)**
   52:4
**brand (3)**
   140:25;205:20;
   206:2
**Brannon (5)**

279:15,16;280:4;
281:8;285:15
**B-r-a-n-n-o-n (1)**
   279:15
**break (16)**
   11:5,8;63:14,18;
   134:15,18;191:22;
   193:3,5,9,14;280:7,
   13,16;282:4;351:3
**Brian (6)**
   227:3,9,13;228:3,5,
   5
**bride (1)**
   186:23
**bring (1)**
   301:9
**Broadcasting (5)**
   279:7,8,10,19;
   281:9
**brochures (3)**
   116:25,25;117:2
**broken (1)**
   114:24
**bronze (2)**
   275:12,16
**brought (3)**
   101:12,21;227:13
**Bryan (15)**
   20:23;32:1,6;55:7;
   58:15;61:19;80:20;
   84:3;87:20;118:14;
   119:7;125:11,19;
   133:17;160:15
**Bryan's (1)**
   129:19
**BS (1)**
   203:5
**build (2)**
   122:15;140:25
**bunch (1)**
   348:4
**business (18)**
   16:11;136:4;
   140:18;183:1;190:2,
   12,18,19;192:7,15;
   202:23;203:1,3,8;
   289:17;311:13;
   348:12,16
**businesses (1)**
   149:21
**busy (1)**
   153:24
**buy (2)**
   105:7,17
**buyer (1)**
   71:10
**buying (4)**
   219:24;223:14,18;
   308:2
**bylaws (33)**
   29:22;38:20;39:15;
   46:25;47:8,11,17,23;
   48:16,19,20;50:2,10;

51:2,5,6;52:17,25;
53:9;55:16;56:15;
57:3;59:18,24;64:5;
79:2;109:6;155:6,7,9,
12,16,19

# C

**calculated (4)**
129:9;309:19;
310:12;333:4
**calculations (1)**
128:23
**calculus (17)**
189:21,22,24;
190:2,5,6,7,14,18,19,
24;192:7,16;194:1,5;
197:4,16
**calendar (20)**
24:7,13;26:9;
42:11;76:7;223:24;
224:1,13,19;295:16,
22;297:11;298:11,12,
15,17,20,21,23;
300:16
**calendars (2)**
76:14;299:23
**call (12)**
44:5;54:18;167:2,
2;193:21;258:10;
266:18,21;267:2,10;
268:3,4
**called (10)**
54:20;90:25;93:21;
187:5;189:5;249:15;
266:18;272:16;
282:14;283:5
**calling (6)**
156:14;267:18;
268:1;269:13,17,20
**calls (12)**
164:24;173:20;
179:7;209:11;
210:18;214:7;
221:16;229:1;
240:16;250:19;
290:8;301:24
**Cam (1)**
52:9
**came (18)**
53:22;54:9;108:14;
121:6;146:16;
151:24;161:9;166:7,
24;188:5;226:10;
227:15;251:1,8,11;
274:23;296:17;305:8
**Camp (2)**
145:5,7
**campaign (1)**
181:16
**campaigns (6)**
181:13;182:10;
203:21;263:12;

294:11,17
**campus (1)**
186:2
**campuses (1)**
186:14
**can (93)**
9:13;10:7,14;17:6;
20:14;26:24;27:8;
32:14,18,20,25;34:5;
36:1,5;37:25;41:9,
10;45:17;49:13,15;
52:14,19,22;87:25;
94:19;104:1;105:13;
108:16;114:22;
117:15;128:17;
129:6;131:25;
132:24;137:6,17;
145:8,10;167:3;
174:25;179:13;
187:16;190:22;
191:21;196:5;
198:25;209:4;210:5,
21,22;214:7;215:22;
216:9,17,24;221:14;
223:18;229:10,19;
238:8;239:17,20;
240:5;241:12;
256:19;257:22;
258:10;260:15,21;
264:19;265:1;
266:12;281:2;
299:10,11;302:25;
303:1,12;315:21;
317:6,25;318:14,25;
329:24;330:1;331:1;
333:15;334:24;
336:15,17;340:21;
343:10;345:24
**candidate (1)**
258:17
**card (7)**
15:14,20;92:22;
103:4;105:14,22,24
**cards (3)**
72:10;73:1;181:16
**care (3)**
185:19,21;270:8
**cared (1)**
270:7
**Carmike (223)**
8:8,23;16:11,11;
28:3,6,10,20;29:4,13;
30:24;33:7,10,12;
34:8;35:4,6,12;45:9;
61:6,24;62:2,5;
67:10;68:3;71:10,13,
17,21,23;80:2,21,24;
90:4,6,7,19;91:6,20,
23;92:18;93:2,6,11,
14;94:12,22;95:4,24;
97:10,21;98:12,22,
25;99:10,11,20,23;
100:12,16,23;101:8,

9,11,13,15,22,25;
102:8,14,15,18;
103:12;104:2,3;
108:15,20,23;113:7,
21;116:20,21;123:17,
21,25;124:5;130:12;
135:1,7,11,24,25;
139:21;140:1,24;
141:2,18;142:20,25;
145:9,13,18;146:6,
17,23;147:13;
148:21;149:22;
151:8;157:14;
158:13;160:19,24;
162:7,11;163:14,16;
165:13,17;173:2,10,
15;183:10,20;184:15,
23;187:4;194:9,10,
13,19;197:14;
204:16;205:6,19;
209:8;211:23;212:4,
19;213:5,21;218:11;
221:22,23;222:1,5,7,
19,21,25;223:5,8;
226:17;227:3,5,17,
20;232:15,16;234:3;
235:24;236:6;237:1;
239:2,19;240:13;
250:1;252:4,12;
258:6;259:3,7,10,23;
260:23;264:13;
271:12;277:6,22,24;
278:25;281:15;
282:16,25;283:23;
284:8,14,16,17;
286:24;287:18,23;
288:3,16;289:4,24;
291:3;300:19;
303:17,20;304:25;
305:10;315:17;
319:7,23;320:5,10;
321:1,16,24;326:16;
335:11,16;337:7,20;
341:24;342:10,17;
348:7,12,16;352:8,11
**Carmike's (8)**
62:9;93:15,17,20,
25;224:8;348:24;
349:3
**Caroline (1)**
8:20
**case (10)**
8:7;68:7;114:2,8,
11,16;209:22;
301:14;335:5;347:22
**catch (1)**
229:3
**categories (1)**
310:15
**Cathryn (39)**
67:25;68:3;70:10;
71:4;118:8,11,13;
119:10,14;120:1;

121:7,10,15,18;
130:21;153:5,8;
154:3,19,24,25;
155:22;156:11,25;
160:20;161:8,12,21,
25;162:1,5,11,22;
164:22;267:22;
343:20;344:22;
345:2,7
**caution (1)**
196:9
**CB&T (6)**
61:13;82:5;89:8;
96:24;126:15;130:20
**Ceil (1)**
52:4
**ceiling (7)**
245:24;246:2;
259:3,7,9,16;260:25
**ceilings (1)**
246:6
**CEO (2)**
222:18;331:25
**certain (11)**
71:20;158:24;
254:5;263:11;288:7;
310:8;313:19;324:7;
344:7,8;348:18
**certainly (4)**
36:14;97:8,10;
235:19
**certification (2)**
36:24;37:5
**certified (1)**
57:6
**cetera (2)**
192:25;210:4
**chain (3)**
88:7;152:20,25
**challenge (2)**
78:15;82:6
**Chamber (2)**
81:3;346:19
**chance (2)**
245:13;308:17
**change (14)**
51:1,3;109:8,13;
161:13;208:1;
214:23;215:2,5,6,22;
216:18;330:16;
331:15
**changed (8)**
47:12;50:24,25;
51:4,6;110:25;168:2,
5
**changes (5)**
92:7;111:3;251:6,
8,10
**charge (19)**
220:12,24;247:18;
258:23;269:7;
272:11;291:17;
324:13,24;325:3;

326:1,5;327:18;
328:3,7;334:5,8,12;
340:12
**charged (1)**
308:19
**charitable (25)**
159:14,16,19,20,
21,24;160:1,4,7;
163:21;272:17;
273:12,13,24;275:7;
277:13,18;285:1,1,5;
343:9;344:17,23;
345:4,7
**charity (23)**
31:13;163:5;
272:21,23;273:5,9;
274:2,12,13,20,25;
275:4;345:10,13,16,
21,23,24,25;346:3,
11,13,18
**Chattahoochee (3)**
187:1,22;193:20
**check (34)**
37:15,24;62:21;
63:2;84:10;85:1,5;
116:13;129:19;
133:15,18,21;135:11;
142:5,7,9,12,13;
149:6;160:13,16;
161:6;171:17;172:9;
194:11;276:16;19,21,
22,25;277:4;284:4,6;
340:23
**checks (10)**
67:24;81:23;83:22;
84:1,4;85:8,22;129:4,
17;274:15
**check-signing (1)**
84:8
**Cherokee (5)**
11:22,25;80:6;
88:18;100:1
**chief (8)**
250:2,16,25;251:9;
278:4,9,14,17
**child (2)**
219:15;296:16
**Childcare (1)**
282:13
**children (3)**
11:15;58:20;126:7
**Children's (5)**
15:8;138:9;139:2;
285:21;287:14
**choice (1)**
141:1
**choose (1)**
141:2
**chose (3)**
27:23;50:15;
111:10
**chosen (1)**
69:16

**Christmas (1)**
143:12
**Cinemas (10)**
8:8,23;28:3,6,10;
29:4;30:24;68:4;
142:25;209:9
**Cinemas' (1)**
315:17
**circulate (1)**
76:9
**circulated (2)**
91:11;281:13
**circulating (1)**
72:19
**circumstances (1)**
166:5
**city (3)**
188:3;233:17,17
**Civil (1)**
9:3
**claim (6)**
214:17;220:7,8,8,
9;327:12
**claims (2)**
220:7;290:2
**clarification (1)**
351:7
**clarity (1)**
341:2
**class (11)**
188:16;190:2,17,
18;191:1;193:22;
195:13,17;236:9;
238:3,4
**classes (33)**
188:24;189:3,8,16,
19,25;192:9,16;
194:1,5,15,20;
195:10,16,20,23;
196:5,13,24;197:3,7,
11,12,15,16;198:7;
199:16;200:17,20;
201:8,15;271:15,16
**Clayton (1)**
145:24
**clean (4)**
104:12;106:14,15;
110:19
**cleaned (3)**
106:25;110:14;
166:17
**cleaner (1)**
106:19
**cleaning (1)**
170:23
**clear (15)**
16:24;24:24;25:8;
69:3;74:25;109:11;
154:9;164:1;198:21;
201:3;233:6;236:2;
276:20;302:18;
329:19
**close (6)**

96:15,16;117:3;
177:16;332:7;351:18
**closed (3)**
86:17,20,21
**closet (15)**
166:9,14;167:2,2,3,
4;169:19,24;170:7,
18,18,23;171:19,20;
348:4
**Club (45)**
17:5,14;21:19,24;
22:3,5,22;26:16;
38:18;39:14;48:23;
50:11,16;52:15,23;
55:19;57:7;61:22;
66:15;67:25;84:2;
90:25;108:7;111:21,
22;122:4;131:11;
132:10;136:10;
139:9,18;143:6,8,9,
12;155:24;163:20;
164:13;165:1,8,15;
270:11;283:19,22,25
**Club's (1)**
100:2
**CMO (3)**
260:14,15;277:25
**Coast (2)**
149:22,22
**Cobb (1)**
145:24
**Cocktails (1)**
297:7
**code (3)**
162:10,15;266:22
**cohost (1)**
143:12
**colleague (1)**
302:20
**colleagues (5)**
301:21,23;302:4;
303:5,7
**collect (1)**
129:8
**collected (3)**
129:3;130:7;
294:18
**College (2)**
187:2;198:7
**Collier (1)**
126:2
**Collins (9)**
251:8;278:16;
303:23,25;304:5,7,
12,24;320:19
**Columbus (46)**
8:10;11:23,24;
12:1;13:2,5,21,23;
14:18;26:16;61:22;
82:18,20;84:2;86:8;
100:1;131:11;132:9;
135:2;136:1,4,10;
137:24;139:5,22,25;

143:10;150:14;
161:15;186:24;
187:12;233:18,20,22;
257:1,3;270:11;
281:14,17;282:2;
286:9,12;287:13;
288:11,13,14
**combination (1)**
292:21
**comfortable (4)**
210:7;211:21;
212:13;273:7
**coming (2)**
166:19;237:21
**commensurate (1)**
236:1
**comment (5)**
245:24;270:6;
286:1;287:3,5
**comments (1)**
343:21
**Commerce (1)**
81:4
**Commission (4)**
220:21;221:1;
324:15;326:7
**commitment (2)**
70:5;268:8
**commitments (2)**
241:3,10
**committee (2)**
230:6;297:21
**commonly (1)**
113:24
**communicated (4)**
29:18;269:8;324:6;
329:8
**communication (8)**
93:12;106:10;
111:21;138:18;
181:17;216:4;
282:12;314:9
**communications (10)**
70:9;167:15;
168:10;205:19,24;
210:22;215:9;
216:21;294:17;
315:12
**communities (2)**
140:4,25
**community (15)**
33:22;34:3;110:10;
139:23;187:1;
205:21;206:7;
263:14;278:20;
281:12;282:10;
343:10,14;344:18;
346:19
**comp (1)**
196:25
**companies (5)**
34:10;158:18;
227:20;304:15,17

**company (61)**
15:6;33:4;37:6,12,
15,19,20;44:13;46:3;
102:19;116:19;
138:19;157:6;
158:11;160:8;
162:15;163:16;
188:7;207:15;
223:13;226:6;
227:14;228:11;
230:7,10,13,15;
237:20;238:20;
241:4;252:7;256:6,7,
12,14,17,24;257:2,
16,20;258:4;259:19;
263:14;265:7,13;
271:21;274:16;
277:23,24;278:3,22;
287:7;289:22;
294:18;297:8;
300:20;301:18;
307:19;309:8;
313:19;315:3
**company's (1)**
105:20
**comparable (9)**
229:7,18,23;230:2;
236:8;302:8;303:16,
24;322:4
**comparator (6)**
228:21;240:22;
241:14,18;242:2;
302:19
**comparators (2)**
240:12,14
**compares (1)**
228:24
**comparison (1)**
64:25
**compensated (2)**
260:7,9
**compensation (9)**
213:11,21;214:4;
240:11,13;259:24;
303:17;309:18;
310:12
**competitive (3)**
144:17;146:3,22
**competitor (1)**
145:16
**competitors (2)**
136:3;145:11
**complain (6)**
265:16;267:8,18;
268:1;269:22;285:18
**complained (4)**
161:22;265:6;
266:2,6
**complaint (46)**
208:20,23;209:1,2,
8,17;210:15;211:2,
17,23;212:4,18,22;
219:14;221:4;

262:14;264:15,20;
274:24;288:25;
291:14;301:20;
302:5;303:14;317:8;
318:15;319:6,9;
320:4,8,9;321:1,14,
23;326:15;335:9,14;
337:6,20;341:24;
342:8,16;343:19,19,
19;352:8
**complaints (8)**
316:15,15;334:4;
349:24,25;350:11,12;
352:11
**complete (6)**
39:9;44:3,6;67:19;
88:2;242:15
**completed (6)**
43:11,24;61:9;
185:19;187:23;307:1
**complex (2)**
199:9;234:15
**compliance (1)**
344:4
**complicated (1)**
195:3
**complies (1)**
107:21
**components (1)**
214:4
**compound (2)**
267:6;273:14
**computer (7)**
14:23;15:15,18;
115:9,10;271:15;
301:10
**Concern (1)**
82:13
**concerned (1)**
191:17
**concerns (2)**
343:8;344:17
**concessions (2)**
228:20;233:12
**concluded (6)**
179:15,23;241:7;
351:4,5;352:19
**conclusion (8)**
184:11;214:7;
221:17;229:2;
230:16;240:17;
290:9;301:25
**conclusions (2)**
178:21;180:3
**conducive (1)**
103:1
**conduct (3)**
162:10,15;266:23
**conducted (4)**
55:18;306:23;
330:6,11
**conference (4)**
115:2,4,8;236:24

**confidence (4)**
185:1,6;263:22;
264:6
**confidential (1)**
268:11
**confirm (1)**
193:19
**conflict (1)**
273:21
**confused (3)**
132:21;155:23;
338:11
**congratulatory (1)**
115:13
**conjunction (2)**
94:7;263:13
**connect (1)**
58:13
**connected (1)**
224:2
**connection (5)**
34:11;58:13;81:3;
234:14;279:3
**consider (15)**
106:23;107:2;
112:20,20;116:10;
146:23;159:13;
230:9;278:13;302:4,
18;303:15,24;304:3;
307:6
**considerably (1)**
258:13
**considered (9)**
54:5;160:7;218:20;
247:3;250:9,10;
302:1,7;327:9
**considering (2)**
278:3,11
**consistent (1)**
125:4
**constitution (14)**
38:20;39:15;47:8,
17,22;48:20;50:2;
52:17,25;53:8;55:15;
56:14;64:5;109:6
**contact (2)**
14:6,9
**contacted (2)**
153:5,8
**content (1)**
103:10
**context (2)**
54:1;158:8
**contingent (1)**
207:8
**continue (10)**
111:6,23;112:3;
194:12,14,20;224:3;
280:25;281:1,5
**continued (1)**
70:8
**continues (2)**
21:19,24

**contract (4)**
55:22;56:9;207:3,
14
**contracts (2)**
55:19;75:2
**contrast (1)**
299:15
**contribute (2)**
163:14,17
**contribution (6)**
273:5;275:7;
277:13,18;285:1,2
**control (1)**
193:11
**convention (1)**
153:13
**conversation (8)**
94:3,17;170:18,19;
188:6;248:16;278:6;
287:21
**conversations (2)**
306:3;343:18
**convincing (1)**
275:18
**COO (2)**
182:13;256:14
**copied (3)**
29:25;216:21;
317:3
**copies (3)**
48:16;172:10;
316:7
**copy (12)**
64:11,18;191:18,
19;220:12;307:1;
315:18;317:19;
324:17;335:24;
336:12;342:24
**corner (3)**
176:2;262:3,4
**corporate (3)**
205:20;206:2;
343:22
**corporation (2)**
45:24;46:3
**Correlate (1)**
125:5
**correlation (2)**
93:7,8
**cost (5)**
76:21;77:1;116:7;
127:9;194:4
**costs (5)**
116:14,17,22,24;
136:9
**Council (1)**
8:3
**counsel (11)**
9:5;210:22;220:13;
303:4;319:14,19;
321:10,12;337:17;
352:3,4
**count (3)**

42:15;150:9;
314:25
**counted (2)**
42:12;53:19
**counterparts (1)**
238:21
**counting (1)**
234:6
**Country (8)**
26:16;61:22;84:2;
100:2;131:11;132:9;
136:10;270:11
**county (4)**
12:25;186:3,4,14
**couple (6)**
80:4;189:8;226:18,
20;251:21;341:2
**course (4)**
311:13;336:17;
348:12,16
**courses (2)**
192:14;289:20
**Court (11)**
8:3,9;10:8,14;
209:23;212:22,24;
213:6;220:14;
274:25;332:13
**cousin (1)**
282:15
**cousins (1)**
287:12
**cover (10)**
9:23;37:25;232:14;
289:24;316:3,4;
318:25;319:3;
336:22;337:1
**covered (1)**
289:22
**Cox (8)**
174:5;248:17;
249:5,11;251:15,16;
262:18;314:17
**crazy (1)**
137:9
**create (1)**
182:15
**created (5)**
18:3;31:12;202:8;
348:11,15
**creating (3)**
25:23;26:5;182:16
**Creek (2)**
145:5,7
**CROSS-EXAMINATION (1)**
10:4
**Cruz (31)**
33:15,16;71:9;
91:12;116:9;138:2,
24;172:1;236:18,19,
25;237:24;262:2,7;
269:1,5;272:24;
273:6;301:9;322:12,
21,24;323:6;324:3,5;

328:11,18;329:2,7,
10;340:13
**Crystal (19)**
8:7;9:1;10:1;
11:11;80:21;89:16;
95:10;124:12,18;
129:25;134:2;138:4,
5;139:10;142:22;
163:11;171:17;
209:8;318:3
**crystalwing@gmail (2)**
89:16;95:10
**crystalwing@gmailcom (1)**
87:17
**cultivation (3)**
111:7,23;112:3
**culture (1)**
140:24
**current (14)**
12:16;58:6;69:13;
70:6;82:25;133:11,
12;256:13;259:18,
22;342:4;351:18,20,
25
**currently (2)**
146:8;260:3
**customer (10)**
248:9;249:22;
292:7,7;295:4;314:9,
10,14;315:9,11
**customers (1)**
102:22
**cut (1)**
274:16
**CVCC (12)**
186:25;187:13,21;
188:9,19,21;192:4;
200:1,17,20;201:16;
202:19

## D

**Dad-gum (1)**
198:24
**damaged (1)**
316:10
**damages (1)**
320:7
**Dan (27)**
71:1,12;169:6,18,
23;170:5;173:1;
177:12,15,23;178:4,
9,10,15,20;179:2,4,9,
16,23;180:5,7,11,16;
319:14,19;321:10
**data (5)**
16:7;40:22;294:11,
18;310:10
**date (50)**
8:11;13:13;42:19;
60:6;62:3,6;72:9;
73:1;74:10;81:25;
88:20;91:7,11;92:15,

22;94:25;97:18,21;
98:8;110:20;131:13;
132:3;137:23;146:9;
176:1,5;196:10;
208:25;218:24;
224:15;225:6;231:3;
247:10,24;248:5,22;
296:10,17;312:15;
327:7,23,24;328:11;
330:5,16,19;331:9,
14,19;332:1
**dated (15)**
17:20;23:10,13;
26:22;27:1;64:15,19;
65:12;75:20;77:18;
82:12;89:17;91:9;
317:16;318:4
**dates (14)**
24:15;49:17;73:15;
92:12;118:18;
132:22;191:16;
200:24;202:13;
224:4;241:20;248:8;
283:25;299:23
**dating (1)**
12:16
**daughter (1)**
143:3
**David (50)**
116:9;188:6;
216:20,25;217:5,6,
16,17,20;223:16;
227:5;241:11,14;
244:4,15,21,23,25;
245:25;258:23;
259:5,10;260:5,5;
261:7,22;262:10;
263:16,20,22,24;
264:6,10;265:10,11;
269:15,25;270:4,7,
13,16;271:2;283:14;
302:14,22;303:9;
308:15;317:2;328:3,
7
**David's (1)**
264:2
**Dawn (2)**
240:1,1
**day (14)**
24:1,3;67:9;77:4,7;
89:21;91:16,17;
173:2,5;185:3;211:3;
260:24;297:5
**days (9)**
42:13,15;188:2;
221:10;295:25;
296:3,25;297:1;
351:18
**De (31)**
33:15,16;71:9;
91:12;116:9;138:2,
24;172:1;236:18,19,
25;237:24;262:2,7;

269:1,5;272:24;
273:6;301:9;322:12,
21,24;323:6;324:3,5;
328:11,18;329:2,7,
10;340:13

**deal (2)**
207:11,13

**Debra (4)**
239:3,5,9,12

**December (20)**
73:14,23;82:12,16;
84:7;86:1;208:24;
210:12,16;211:4,11,
17,24;212:5,19;
213:5;221:7;287:8;
321:10,22

**decide (4)**
193:9;211:5;
250:17;258:17

**decided (4)**
128:8,9;276:1,6

**deciding (1)**
144:11

**decision (6)**
29:23;50:2,7;
128:9;278:12;309:2

**decline (1)**
75:13

**declined (1)**
315:7

**declines (1)**
60:4

**Defendant (7)**
8:23;9:2;278:19;
316:17;343:10;
350:1,13

**Defendant's (452)**
17:16,19,23;18:1,
17;21:4,12,18,22;
23:2,6,9,11,15,17,24;
24:2,2,5,25:16,19,22;
26:4,8,18,21,23,25;
27:4,9,10,16,19,22;
28:1,3,6,10,14,19,17;
30:8,23;32:10;33:12;
34:13,20,25;36:7,12,
23;37:4,8;38:2,7,10,
11,13,22;39:2,9,12,
19,23;40:2,7;41:1,2;
42:2,5,14,18,21,21,
25,25;43:3,6,10,17,
24;44:3,5,9,14;45:1,
8;46:23;47:4,7,9,25;
50:12,16;52:16;55:4,
24;56:10,15;57:1,5,7,
12;59:11,16,25;
60:24;61:8,10;62:13,
18;63:2;64:7,10;
65:2,5,10,13,15;
66:19,22,22,25;67:7,
10,14,21;68:9,13;
69:4,5,7,20,25;70:12,
15,15;71:18;72:1,4,6,

8;73:5,8,10,12;75:16,
19;76:3;77:11,14,17,
23;78:3;79:13,16,18,
23,25;80:16,19,20;
81:1,6,16;82:8,11,11,
13,21;83:6;86:2;
87:2,5,16;88:5;89:1,
12,15,21;91:19;92:2,
5,6,8,11;94:2,24;
95:6,9,15,23;96:2,25;
97:13,16;98:4,7,8,19,
23;99:1,3,6,10,17,21,
24;100:4,7;101:4;
104:9;105:6,11;
106:5,8,24;107:3,19,
22,25;108:2,14,18,
19;109:1,9,10,14,15,
17,19;110:11,18;
111:5;112:5,7,11,25;
113:8,11,14,17;
114:19,22,23;115:15,
17,20;117:14,16,22,
25;119:15;120:10,
25;122:7;123:11,14,
15;128:16;129:12,
15;130:13,14,23;
132:17;134:6;
136:21,21;137:1,4,4;
141:22;142:2;
143:21;148:10,13,15,
17;149:4,17;150:1,6;
151:7,11,14;152:6,9,
12;155:18;168:6,9,
11,13;171:5,8,14;
172:8,21;175:13,16,
23;176:13,20,23,25;
181:2,4;191:9,12;
192:1;193:19;
198:16,22,24;199:1,
13;200:7,11;201:5,
10,19,21,24;202:1,
18;203:9,13;204:2,7,
10,11;206:17,20,23;
207:23;208:16,19,21;
209:3;210:11,15;
211:3,11;212:23;
214:22;230:25;
242:19;295:13,16;
305:4,7,9,11,21;
306:1,10,15;307:6;
310:1,4,6,24;311:2,7,
14,18,24,25;312:22,
25;315:13,16,20;
316:1,23;317:1,3,6,
12,15,17;318:2,14;
319:10,13,15,18;
320:1,9,12,15,25;
321:6,9,11,14,21;
324:9,12,16;326:9,
15,21;327:1;328:4,8;
329:9,19,24;330:4,
10;331:12;334:2,10,
11;335:1,4,6,14,18,

21,23;337:3,10,13,
14,16,19,24;340:17;
341:4,5,7,20;342:4,5,
8,15,22,23;343:1;
348:20,23;349:2,16;
350:5,9,21;351:13,
15,21

**Define (2)**
159:16;160:3

**Definitely (2)**
101:16;138:23

**definition (2)**
159:23;345:24

**degree (17)**
168:16,20,24;
187:24;188:12;
193:22;199:16;
200:1,4,21;201:7,14;
202:19;203:3,12;
261:12;271:7

**degrees (1)**
264:13

**DeKalb (1)**
145:24

**Deliver (1)**
297:14

**delivered (1)**
293:19

**delivery (1)**
301:10

**Delta (1)**
40:22

**demeanor (1)**
215:23

**demographics (1)**
146:1

**demonstration (1)**
168:22

**denial (1)**
75:8

**denied (3)**
235:25;315:4,6

**department (39)**
74:16,18,19;
152:10;174:14,19;
183:11;188:5,9;
199:9;208:12;218:7;
224:8;226:11;
228:22;229:15;
233:13;234:21;
235:20;247:7;
249:23;250:17;
251:1,23;274:18,23;
290:19;291:12;
294:19;296:11;
298:7;311:9;312:6;
314:3,10,24;315:6,8;
344:4

**departments (1)**
223:23

**depended (1)**
232:13

**depends (3)**

178:13;250:21;
299:10

**deponent (1)**
9:12

**deposited (4)**
135:18,19,21;
160:16

**deposition (12)**
8:6,13;9:1,4,6,8,13;
191:14;192:20;
280:10;336:24;
352:19

**deposits (1)**
81:24

**Derby (1)**
77:7

**describe (6)**
53:20;248:2;259:2,
6;261:24;275:18

**described (9)**
50:12;52:15,16,24;
244:22;249:21;
259:11;262:13;
278:25

**describes (1)**
52:23

**description (2)**
168:10;231:14

**deserve (1)**
243:15

**deserved (1)**
268:7

**design (3)**
103:9;116:3,7

**desk (8)**
105:9,12,21;
136:18;137:11;
150:2;172:18;274:7

**Despite (1)**
306:18

**Destin (1)**
151:22

**detail (3)**
34:1;75:6;313:7

**details (5)**
31:21;32:15;72:12,
15,18

**developing (2)**
25:20;109:22

**device (2)**
15:14,15

**dialogue (3)**
181:23;182:21;
262:1

**difference (3)**
40:1;47:2;237:7

**different (12)**
31:8;33:3;41:2;
46:6;54:21;59:24;
70:6;103:5;182:10;
219:23;233:18;
271:19

**differently (2)**

75:3;239:10

**difficult (4)**
10:8;70:4;189:1;
314:11

**Digiplex (1)**
227:22

**digitally (1)**
182:15

**direct (9)**
162:25;181:11;
215:10,15,19;216:2;
306:19;313:4;351:11

**directed (5)**
181:6,9,25;241:6;
309:9

**directing (1)**
213:13

**direction (2)**
278:7,11

**directly (4)**
214:25;235:5;
244:2;279:25

**director (50)**
214:12,14,17;
218:7,20,23;219:2;
225:3,17,18,19,24;
226:2,6,11,14;
235:25;236:3;240:4,
9;242:22;243:7,14,
22;244:1;250:2,10;
253:15;255:7;
260:15;271:9;
282:14;307:10,12;
312:13,20;327:9;
338:4,9,25;339:6,11,
11,12,13,15,18,19,24;
340:7

**director-level (2)**
236:2;246:17

**directors (16)**
59:3,8,11,15,20;
60:19,24;147:17;
182:12;218:10;
225:21,23;239:17,18;
254:17;264:13

**director's (1)**
247:4

**directory (6)**
29:20;118:6;
120:21;121:1,5,23

**disciplines (1)**
203:20

**disclose (1)**
259:21

**disclosing (3)**
174:21;179:17,25

**disclosure (1)**
8:1

**disclosures (6)**
68:6;166:4;175:6,
9;342:21;343:2

**discovery (4)**
245:14;315:19;

336:16;341:18
**discrepancy (1)**
236:7
**discriminated (1)**
277:7
**discriminating (1)**
270:4
**discrimination (33)**
220:25;265:24;
266:5,7,11,14;
267:14,19;268:2;
316:16;317:8;
318:16;319:7;320:5;
321:2,15,24;324:14;
326:6,17;328:3,7;
334:4;335:9,15;
337:8,21;342:1,9,16;
349:25;350:12;
352:12
**discriminatory (2)**
272:9,12
**discuss (18)**
20:9;32:3,5;33:10;
54:20,22;78:15;
249:20;255:6,23;
286:2,4;338:25;
339:2,6,20,25;340:7
**discussed (13)**
30:25;31:21;33:14;
46:8;53:21;55:1;
101:19;159:5;
184:21;247:2;
284:15;288:19,22
**discussing (2)**
20:6;31:17
**discussion (5)**
29:7;46:13,15;
253:14;286:21
**discussions (1)**
281:14
**dismissal (7)**
235:6,22;325:4;
335:5,7,8,13
**disorganized (1)**
166:20
**display (3)**
102:7,14,19
**displayed (1)**
100:12
**displays (1)**
100:11
**dispute (2)**
103:13;104:4
**disseminate (1)**
285:17
**disseminated (1)**
282:11
**distracted (1)**
181:5
**distribution (1)**
92:13
**District (17)**
8:9,10;212:24,25;

213:6,6;238:11,13,
17,24;239:1,7,10,15;
274:25;307:17;308:1
**Division (4)**
8:11;228:9,15;
254:18
**divorce (2)**
12:23,25
**divorced (2)**
283:12,13
**Dobbs (1)**
228:5
**Dobson (3)**
227:3,9,13;228:3,6
**document (58)**
18:3;50:22,23;
59:23;62:20;80:5;
87:21;88:8;91:22;
99:16;102:3,8,15,18;
110:13;112:10,23;
113:6;115:14;
120:13,19;122:5,5;
123:6;125:12;
126:19;129:11;
130:15;132:1,20;
134:10;147:8;153:2;
169:14;180:8,13,15;
196:3;200:19;
202:14,15;209:6;
220:18;245:4;
253:16;290:4;306:8;
313:18;317:11;
320:16;325:3;327:3;
331:11;333:6;334:9;
335:17;350:15,18
**documentaries (1)**
136:8
**documentation (4)**
125:20;304:10,11;
312:10
**documented (1)**
281:11
**documents (37)**
111:19;114:10,15,
18;115:23;116:1;
130:18;131:15;
132:22;172:6;192:2;
230:18;237:19;
242:15,16;315:18;
316:2,7,8,14;320:18;
325:8;337:1;347:15,
20,22;348:6,10,11,
14,15,25;349:4,23;
350:10;351:24;352:7
**dollar (1)**
159:11
**dollars (2)**
115:12;136:15
**donation (6)**
136:18;137:5;
139:19;151:4,16;
152:21
**donations (2)**

115:12;272:17
**done (17)**
15:23;71:23;91:3;
97:25;102:16;
105:14;136:22;
171:6,10,15;172:22;
278:25;293:11,22;
333:11,15;340:22
**doors (1)**
12:2
**doorstep (1)**
14:8
**dots (1)**
58:14
**down (27)**
9:15;10:9;12:2;
73:13;125:11;
196:18,25;244:10,23,
25;245:7,10,19,19,
20;246:1,9,12,14;
262:15;275:9;
286:11;291:21;
314:2,6;327:23;
330:25
**draft (1)**
76:3
**drafted (5)**
112:10,11,22,25;
156:2
**drafts (1)**
210:4
**drawer (1)**
105:21
**drive (12)**
15:16;40:3,10,15;
41:15,16,19,22,25;
316:9;347:25;348:3
**drop (3)**
51:18;189:3;284:2
**dropped (1)**
55:11
**dual (1)**
153:12
**due (3)**
100:20,21;291:3
**dues (27)**
22:20;60:22,23,23;
61:2;97:4,6;110:22,
25;120:14,18;125:21,
22,23;126:18;128:5,
7,11;129:3,3,4,20,22,
25;133:10,12,15
**Dues-Initial (1)**
126:13
**duly (2)**
8:24;10:2
**duplicated (1)**
157:10
**duplicating (1)**
154:12
**during (39)**
14:8;31:16;40:12;
119:3;121:8;126:15;

146:20;173:23;
174:22;181:19;
189:17;194:22;
219:19;223:24;
224:5;231:24;235:8,
19;244:8,9,14,20;
248:10;253:14;
269:17;281:22;
287:6;289:5;298:22;
301:16;321:1;
341:25;343:10,13,14,
16,22;344:18,20
**duties (11)**
55:17;59:1;70:2;
167:11;204:3;226:4;
231:6,10,20;292:19,
24
**duty (1)**
233:14

---

**E**

---

**earlier (22)**
85:15;88:15;
134:24;135:23;
171:23;196:24;
199:25;210:15;
211:3,10,17,23;
212:4;225:14;
226:22;276:11;
278:2;299:17;
344:19;346:23;
350:19;352:2
**early (8)**
45:19;51:13,23;
180:21;215:3;
226:25;235:16;
247:11
**earnings (2)**
309:8;310:13
**easier (1)**
186:14
**easy (1)**
164:21
**editing (1)**
111:2
**edits (3)**
23:1;110:18;111:2
**education (13)**
168:15;169:1;
185:13;188:5,18;
194:12;199:15;
201:2,11;202:19;
206:11;256:22;261:3
**educational (2)**
272:7,13
**EEOC (18)**
212:21;220:12;
221:4;247:18;
253:20,20;258:23;
269:7;272:11;
291:17;306:13;
325:6;327:18;334:5,

8,11;337:17;340:12
**efforts (2)**
261:6,9
**eight (6)**
59:15;74:9;149:20;
222:13;226:7,8
**either (24)**
20:20;29:10;
130:13;153:24;
154:2;165:19;
174:23;180:9;
187:10;188:10;
189:4;191:7;202:3;
225:13;233:21;
236:15;238:22;
241:1;247:14;
256:13;315:2;
330:16;332:2;333:24
**Elba (4)**
185:17,20,23;
186:1
**ELCA (1)**
74:5
**elected (2)**
107:8;242:5
**election (2)**
69:11,13
**electronic (2)**
123:2;224:1
**Electronically (2)**
27:12;316:8
**elevated (2)**
226:2;241:4
**Ellie (1)**
51:20
**Ellis (28)**
71:1,12;169:6,12,
18,23;170:5;173:1;
177:12,15,23;178:4,
9,10,15,20;179:4,9,
16,23;180:5,8,11,17;
319:14,19;321:11,12
**else (66)**
19:10,20;23:20;
33:23;34:18,19,24;
35:6;57:22,23;58:10;
67:2;71:7;72:16;
78:11;84:6;96:1;
101:17,18,20;115:8,
10;124:16;125:10,
17;134:6;139:24;
140:8,15;144:16,20;
158:16,20;160:9,11;
170:14;187:19;
207:12;215:16;
216:23;223:17,22;
236:3,25;240:20;
241:7;243:21;248:1,
7;249:1;254:12;
260:10,20;265:11;
285:15,16,20;288:5;
298:13;302:3,9,12,
15,18;315:1;338:5

**else's (1)**
176:13
**e-mail (36)**
23:4;64:11;65:11,
16;87:6,23;88:7;
89:16,22;94:11,15,
21;95:10;96:5;
104:10,11;106:10;
111:20;113:18,21;
124:21;151:15;
152:20,25;154:7,17;
156:22;157:1;254:6,
11,12;312:7;313:1;
317:2,16;318:3
**e-mailed (3)**
153:25;154:2,18
**e-mailing (3)**
81:16;95:18;97:17
**e-mails (5)**
143:16;166:12;
215:21;301:14,15
**embarrassing (1)**
161:3
**Emily (6)**
282:15,17;283:5;
284:19;285:24;
287:11
**employed (18)**
16:13;221:23,25;
223:7;252:4,13;
309:3;320:5;321:1,
16,23;326:16;335:10,
16;337:7,20;341:25;
342:10
**employee (16)**
71:16;246:24;
279:24;281:9;289:2;
290:7,11,19;291:21;
306:20;309:2;315:2;
322:4;342:17;
348:12,17
**employees (17)**
71:17;223:13;
236:9;238:5;272:7,8;
290:2;291:24;292:4,
11,15,17,23;293:7,9;
344:10,12
**employer (2)**
255:24,24
**employment (10)**
45:9;174:22;
204:17;220:21;
221:1;223:10,25;
288:12;324:14;326:6
**encourage (1)**
222:21
**end (20)**
84:24;85:10,11,12,
14,18;97:5;128:11;
130:21;166:13;
187:4;209:24;
215:23;219:13;
252:6;253:8;263:19,

20;296:14;343:16
**ended (6)**
113:6;189:5;
222:16;276:22;
277:1;314:13
**engagement (1)**
26:11
**English (1)**
196:25
**enough (4)**
211:4,21;212:13;
223:1
**enroll (1)**
188:20
**enrolled (10)**
197:6,18,22,25;
198:3,7;206:11,14;
207:24;208:2
**enrolling (1)**
197:10
**Enterprise (3)**
185:17,18;186:15
**entertainment (8)**
26:11;48:25;49:7;
67:12,16;108:10;
109:2;346:6
**entire (7)**
10:24;16:22;
219:18;223:21;
256:10,12;314:25
**envelope (3)**
104:18;105:7,15
**envelopes (8)**
94:1,22;104:16;
105:8,12,17,19;
323:22
**environments (1)**
109:23
**equal (12)**
220:7,21,25;
221:14;238:22;
241:1,2,3;260:18;
266:4;324:14;326:6
**equipment (3)**
115:9,10;165:14
**equity (1)**
140:25
**error (1)**
112:23
**especially (1)**
188:3
**essentially (1)**
192:18
**established (5)**
111:13;112:16,17,
18;272:20
**et (2)**
192:25;210:4
**evaluate (3)**
292:6,13,16
**evaluating (1)**
295:8
**evaluation (6)**

213:24;306:22,23;
307:3;330:6,12
**evaluations (3)**
242:20;291:22;
292:1
**Eve (11)**
76:24;77:2;84:4,
14,15;122:18;154:8;
157:4,18;158:1,7
**even (15)**
10:9;32:5;69:4;
78:23;96:15;180:9;
216:21;242:20;
266:22;271:7;
275:25;276:5;
283:22;327:13,19
**event (27)**
9:12;24:7;26:12,
15;53:16,20,21;54:3,
4,8,16;72:17;73:3;
101:12;102:10;
142:6,10;143:15,17;
144:4;147:8,9;
148:14,19;149:6;
150:11;273:24
**events (8)**
24:14;76:7;102:9;
144:21;147:20;
150:3;329:11;351:25
**eventually (3)**
303:17,20;311:22
**everybody (4)**
71:21;126:17;
170:24;254:7
**everyone (3)**
219:5;308:16;
315:1
**everyone's (1)**
255:20
**evidence (9)**
31:3;32:25;49:25;
50:18;103:24;283:3;
316:14;349:24;
350:11
**evidences (1)**
317:7
**Evil (1)**
297:15
**Evites (1)**
123:2
**exact (1)**
225:5
**exactly (6)**
46:14;139:17;
162:17;220:15;
244:19;326:2
**EXAMINATION (1)**
351:11
**examined (1)**
10:2
**example (1)**
239:4
**examples (1)**

216:6
**exceed (2)**
75:10;125:22
**exceeded (1)**
240:13
**except (6)**
9:10,18;63:10;
92:7;292:1;297:2
**exception (2)**
231:6;290:23
**exceptional (1)**
61:21
**exchange (3)**
30:7,14;135:23
**exchanged (3)**
36:1,5,10
**exclusive (2)**
139:22,25
**excuse (10)**
17:2;103:19;174:3;
281:8;285:15;
286:11;312:8;
319:22;320:21;336:1
**execute (1)**
55:19
**executes (1)**
203:19
**Execution (1)**
181:13
**executive (6)**
59:12;77:11;230:6,
7;294:20;297:21
**executives (1)**
147:23
**Exhibit (454)**
17:16,19,23;18:1,
17;21:4,12,18,22;
23:2,6,9,11,15,17,24;
24:2,2,5,25:16,19,22;
26:4,8,18,21,23,25;
27:4,9,10,16,20,23;
28:1,3,7,11,14;29:17;
30:8,23;32:11;33:12;
34:13,20,25;36:7,12,
23;37:4,8;38:2,7,10,
11,13,22;39:3,9,12,
19,24;40:2,8;41:1,3;
42:2,5,14,18,21,21,
25;43:1,4,7,11,17,24;
44:3,6,9,14;45:1,9;
46:24;47:4,7,9,25;
50:13,16;52:17,25;
55:4,24;56:10,15;
57:1,5,7,13;59:11,16,
25;60:25;61:8,10;
62:14,18;63:2;64:7,
10;65:2,5,10,13,15;
66:19,22,23,25;67:8,
10,15,21;68:9,12,13;
69:8,20,25;70:12,15,
16;71:18;72:1,4,6,8;
73:5,8,10,13;75:16,
19;76:3;77:11,14,17,

23;78:3;79:13,16,18,
23,25;80:16,19,20;
81:1,6,17;82:8,11,12,
14,21;83:7;86:2;
87:2,5,16;88:5;89:1,
12,15,22;91:20;92:2,
5,7,8,11;94:2,24;
95:6,9,15,23;96:2;
97:1,13,16;98:4,7,9,
20,23;99:1,3,6,11,17,
21,24;100:4,7;101:4;
104:10;105:6,11;
106:5,8,24;107:3,19,
22,25;108:2,14,18,
19;109:2,10,10,14,
15,17,19;110:10,14;
111:5;112:5,8,11,25;
113:8,11,14,17;
114:19,22,23;115:15,
17,21;117:14,16,22,
25;119:15;120:11,
25;121:21;122:7;
123:11,14,15;128:16;
129:12,15;130:13,14,
24;132:17;134:7;
136:21,21;137:1,4,4;
141:22;142:2;
143:22;148:10,13,15,
18;149:4,17;150:2,7;
151:7,11,14;152:6,9,
12;155:18;168:6,9,
11,13;171:5,8,15;
172:8,21;175:13,16,
23;176:13,20,23;
177:1;181:2,4;191:9,
13;192:1;193:19;
198:16,19,22;199:1,
13;200:6,11;201:5,
11,19,21,24;202:1;
18;203:9,14;204:2,7,
10,12;206:17,20,24;
207:23;208:16,19,21;
209:3;210:11,15;
211:3,11;212:23;
214:22;220:13,14,16;
223:11;231:1;
242:19;295:13,16;
305:4,7,9,11,21;
306:2,10,16;307:6;
310:1,4,6,24;311:2,8,
14,18,24,25;312:22,
25;315:13,16,25;
316:23;317:1,4,7,12,
15,17;318:3,15;
319:6,10,13,16,18;
320:1,9,12,15,25;
321:6,9,11,14,21;
324:9,13,16;326:9,
15,21;327:2;328:4,8;
329:9,19,24;330:4,
10;331:13,23;334:3,
10,11,18;335:1,4,14,
18,21,23;337:4,10,

13,14,16,19,25;
341:20;342:4,5,8,15,
22,23;343:2;348:20,
23;349:2,16;350:5,9,
22;351:14,15,17
exhibitor (3)
136:4;234:16;
290:23
exhibits (7)
85:15;132:3;
137:14;141:14;
340:17,20;341:4
exist (7)
155:20;245:23;
246:2,7,8,9,10
existing (1)
315:1
Expand (1)
198:9
expansive (1)
77:22
expected (1)
24:8
expense (8)
64:25;88:1;122:10;
125:10,10;127:11;
308:19,24
expenses (20)
84:6,17,25;87:24;
89:5,8;115:2;117:8;
124:13;125:22;
127:20,23;128:3,3,
10,14,15;152:10;
176:18;208:11
experience (22)
31:13,22,23;
168:15,22;169:1,4;
185:13;199:5,9,19;
201:25;203:18;
204:15;205:19;
208:5;223:14;233:7,
16;289:16;304:7,16
experiences (1)
98:13
expertise (1)
199:10
explain (3)
37:11;306:17;
343:10
exposed (1)
348:5
exposing (1)
135:25
exposure (2)
135:1;148:3
extension (1)
346:18
extent (3)
210:3,17;290:10
extra (3)
250:14;325:11,15
extreme (1)
151:23

Ezell (2)
126:2,4

F

F/C (1)
138:17
face (1)
260:6
Facebook (3)
252:18,19,22
facility (1)
102:20
fact (2)
44:12;67:9
factors (3)
309:20,22,23
facts (8)
31:2;32:25;49:24;
50:18;103:15,23;
166:5;283:2
fail (1)
191:8
failed (5)
189:7;191:3;
192:16;194:15;
195:16
failing (1)
192:11
failure (3)
161:2;189:4;
303:14
fair (8)
131:20;132:7;
177:23;178:4,11,16;
220:9;290:23
fairly (4)
71:20;146:13;
177:16;260:17
fairness (1)
179:1
fall (5)
46:21;118:15;
195:6;196:17;215:4
false (2)
282:11;285:17
familiar (5)
50:8;143:24;144:4;
290:22;291:1
families (1)
140:3
family (10)
13:20,22;14:18;
35:24;126:6;177:25;
178:1;219:14;220:8;
227:20
far (12)
33:24;62:17;84:4;
140:20;180:10;
189:1;191:17;
227:19;274:19;
276:21;291:4;297:13
farther (2)

120:20,25
father (2)
186:23;222:18
father-in-law (4)
175:2;177:17;
270:18,23
featured (1)
143:15
features (1)
143:21
February (3)
247:14;312:11,18
Federal (4)
9:3;209:22;212:22;
274:24
fee (2)
115:11;211:5
feed (1)
182:15
feedback (1)
126:11
feel (4)
211:20;273:7;
278:5;280:9
feeling (3)
280:18,21,24
fees (3)
60:23,23;61:2
fell (2)
57:10;134:16
fellow (2)
177:23;178:5
felt (10)
26:8;125:19;
141:10;179:20;
214:23;215:1,3,5;
216:5;225:6
female (7)
235:5;236:9;238:5,
12;239:17;264:12;
272:7
females (1)
235:9
few (14)
14:20;92:7;131:14;
136:15;231:6;259:8;
287:6;289:14,15;
296:23;307:18,18;
332:8;351:18
fewer (1)
24:10
field (2)
140:5;188:2
fifth (1)
243:17
fight (1)
333:14
figure (1)
59:13
figures (2)
258:19,20
file (7)
90:18,19;211:5,6,

16;212:4;290:5
filed (15)
208:20,24;209:22;
210:5,11;211:4,23;
212:19,21;213:4;
220:25;221:7;
274:24;324:14;
326:12
files (4)
45:12,14,20;
110:14
filing (5)
9:8;210:15;211:2,
5,10
fill (3)
39:2;76:10;147:22
filled (1)
306:24
fillers (1)
147:20
film (12)
71:10;188:5,8,10;
199:9;219:24;
223:14,18;233:13;
234:22;290:19;295:1
final (4)
26:12,15;61:21;
72:20
finally (2)
70:7;314:11
finance (1)
235:15
financial (5)
115:23;160:24;
256:1,2,21
financials (1)
161:4
find (15)
76:5;109:11;
147:16,25;267:23;
299:13,14,16,17;
329:24;334:24;
347:20,22,25;348:3
fine (3)
193:13;244:13;
317:21
finish (13)
11:3;12:18;44:22;
115:5;140:9,13;
188:7;196:22;
215:12;216:9;
217:13;261:3;333:25
finished (4)
188:11;190:11;
198:15;262:12
fire (1)
308:13
fired (2)
284:21,22
firm (2)
207:16,17
first (42)
10:2;17:5;21:20,

16;212:4;290:5
25;34:10;36:22;
53:16,20;54:9;74:8;
79:17;80:13;88:15;
114:24;119:15;
151:5;152:15;
156:22;158:8;
181:10;221:25;
241:23;247:13,20;
248:14,18,21,24;
249:2;253:13;
266:24,25;278:16;
286:7;287:6;298:6;
315:17;316:1,1;
323:14;348:24;349:3
fits (1)
266:16
five (6)
42:15;53:6;134:1;
149:19;314:13,16
five-county (4)
145:23;146:6,11,
18
five-page (1)
199:13
fix (2)
68:23;108:19
fixed (1)
60:24
floor (1)
243:17
flow (2)
103:2;208:13
Flowers (1)
51:21
FLSA (1)
289:3
Fluffy (1)
297:15
flyer (4)
148:14,18;149:1;
164:8
flyers (2)
72:10;73:2
focus (4)
232:3,5;299:17,23
folded (1)
102:4
folks (2)
76:9,13
Follies (11)
16:4;66:2,9,11,13,
17;116:3,7,15;
165:18,23
follow (2)
94:18;183:15
followed (1)
47:14
following (2)
83:2;312:4
follows (2)
10:3;55:18
follow-up (1)
14:24

**food (1)**
193:8
**forced (1)**
242:22
**foresee (1)**
250:24
**forget (1)**
352:1
**forgotten (1)**
348:5
**form (8)**
9:10;19;38:11;
76:11;190:14;
213:11,20,22
**formal (6)**
53:23;272:25;
273:2;293:11,13,17
**formalities (1)**
9:7
**formality (1)**
53:6
**formalizing (2)**
46:5,13
**formally (3)**
51:3;83:1,7
**format (2)**
102:25;203:16
**former (1)**
58:5
**Forsberg (4)**
28:1,2;78:9,19
**Fort (2)**
234:8,8
**forth (3)**
52:7;58:18;203:22
**forward (6)**
19:12;42:15;70:8;
154:13;156:25;
157:11
**forwarding (1)**
104:11
**foster (2)**
185:19,21
**found (10)**
136:17;137:10;
163:8;284:7;308:9;
316:9;347:14;348:1,
2,6
**Foundation (2)**
137:24;150:15
**founder (1)**
207:15
**four (18)**
24:17;25:1,5;31:8;
63:11;76:14,16;
108:14,20;125:25;
149:19;150:24;
187:11;220:6;
233:24;234:10;
289:19;346:6
**fourth (4)**
47:16;114:25;
116:2;323:15

**frame (2)**
167:22;173:22
**Fred (5)**
138:15,21;151:18,
20,25;163:19,19;
164:12,12;165:4,4;
166:7,8,25,25;169:6,
6,17,18,23,23;170:5,
5;171:9,9;173:1,1;
177:9,9,12;181:6,24;
182:13,22,24;183:3;
185:3;214:23;216:1,
6,16,18;217:1,18,24;
218:2,5,8,16,17,21,
23;219:2,6;224:7,12;
229:17;230:1;
231:11,15,19;235:8,
9,21;241:2,11,13;
243:6,15,18,21;
249:20;250:12,14,22;
251:5;253:24;254:5;
260:11,13;265:9,11;
268:9,10;269:2,3;
270:2,8,11,22,25;
271:4,20;276:5;
278:5,9;299:24;
308:15;311:8;313:1;
317:16;318:3,6;
323:25;324:1;
327:14,20;343:17;
344:12
**free (2)**
187:14;220:13
**frequency (2)**
75:9;314:10
**freshman (1)**
186:20
**Friday (9)**
42:10,16,17;79:21;
80:11;91:13,15;
177:13;297:2
**Friedel (17)**
163:19;164:12;
166:8,25;169:6,12,
18,23;170:5;171:9;
173:1;177:9;268:10;
269:2;323:25;344:3,
13
**Friedel's (1)**
343:17
**friend (2)**
177:16;270:1
**friends (6)**
76:10;147:21;
252:19;261:16,20;
284:10
**front (6)**
47:19;199:2;216:6;
245:21;329:25;337:4
**fulfilled (1)**
24:7
**full (11)**
11:10;83:3,4;

187:6,7;219:18;
220:15;245:22;
296:25;297:1;320:22
**full-blooded (1)**
14:5
**full-on (1)**
34:17
**fully (2)**
26:10;303:15
**Fulton (1)**
145:24
**Fun (6)**
15:11;206:22;
207:1,20,21;261:14
**functions (1)**
175:19
**funding (6)**
61:3;157:10;159:7,
9,11;162:13
**fund-raising (1)**
74:4
**funds (14)**
83:3,4;164:14;
279:5,20;280:5;
282:17;284:24;
307:19;343:9;
344:18,23;345:4,7
**further (2)**
9:9;266:10
**Fussell (11)**
174:5;248:11;
249:5,9;251:12,14;
262:18;313:13,21,21;
314:17
**F-u-s-s-e-l-l (1)**
248:11

**G**

**gain (1)**
306:20
**Garrett (28)**
20:16;28:5;95:18,
19;96:3;101:2;
103:11;104:2;134:2;
282:18,21,24;283:5,
10,11,23;284:7,10,
13,13,16,19;285:8,
16,24;288:3,5;343:6
**gather (1)**
74:12
**Gathering (3)**
74:5;79:17;282:11
**gave (5)**
43:5,9;44:8;94:16;
112:14;125:17;
135:7;158:25;
213:24;219:23;
289:24;312:3;
317:19;328:19;
329:11;352:8
**general (2)**
126:10;196:25

**Generally (1)**
9:18
**generate (1)**
88:2
**Georgia (8)**
8:4,10,14;11:23,
24;13:21;212:25;
213:7
**GERAKITIS (336)**
8:22,22,25;9:23;
10:5;13:17;17:18;
20:13,14;23:8;26:20;
31:4,7;33:6;34:5;
38:9;41:7,9,16;42:12,
17;43:22;44:25;47:6;
50:1,6,9,19;51:1;
52:20;53:8;56:2,21,
24,25;57:11;63:22;
64:9;65:4,7,9;66:21;
67:7;68:16,23;69:1,6,
7;70:14;72:3;73:7;
75:18;77:16;79:15;
80:18;82:10;87:4;
89:14;92:4;95:8;
97:15;98:6,18;99:5;
100:6;103:17,18,21,
25;104:1,8,9;106:7;
113:16;114:21;
115:7;117:21,24;
118:21,24;123:13,20,
24;124:2,5;127:8;
129:14;131:3,9,24,
25;132:7,14;134:15,
17,24;135:6;136:24;
137:3,10,19;140:11,
15;148:12;150:6,10;
151:13;152:8;
154:24;158:4,10;
160:3;165:1;167:12;
168:8;173:25;
175:15;176:22;
178:8,10,15,20,24;
179:4,9,15;180:2,4;
183:14,18,23;184:2;
190:25;191:6,11,23;
192:1,21;193:1,4,7,
11,13,18;196:2,6,12,
24;198:18,23;199:1;
200:8,10;201:23;
202:17;204:9,22,25;
205:5;206:19;
208:18;209:7,13,16,
21;210:1,10,20;
211:1,9,16,22;212:8,
11,16;213:16;
214:10;215:13;
216:11,15;217:12,15,
16;221:18;229:4,6,
13,22;230:1,8,20,25;
238:13;240:20;
241:7;245:18;
250:24;251:4,7;
262:13;264:12;

265:1;267:7;271:20;
273:15;280:11,14,18,
21,24;281:4;282:9;
283:4;289:19;
290:10,14,18,22;
291:2,8;293:6,16;
295:15,19,21;300:25;
301:1;302:3,9,12,15,
17;303:2,13;304:2,6;
305:6;306:9;310:3;
311:1,4,6,7,16;
312:16,18,24;315:15,
25;316:4,25;317:14,
21;318:2,24;319:2,5,
12;320:14;321:8;
323:3,5,9;324:11,19,
23;325:2,10,13,15,
18,22;326:1,4,5;
330:2,8,9;331:1,5,8,
12;332:6,10,15,18,
23;333:1,4,10,13,23;
334:2,14,19,21;
335:3,20,25;336:6,
10,15,18,21,25;
337:3,12;338:18;
340:19,21,25;341:3,
9,11,15,17,19;
342:24;343:1;344:2;
345:12,16,19;346:16,
22;347:4,6,12,19;
348:22;350:21;
351:2,5,13;352:6,16
**gets (1)**
308:16
**gift (1)**
181:16
**Girls (7)**
53:16,20;54:3,4,7,
15;122:18
**given (14)**
15:6;16:10;36:17;
62:20;184:3,7,15,23;
224:21;231:5;
233:11;334:15;
340:5,14
**giving (2)**
44:10,10
**glance (1)**
134:11
**Glass (9)**
223:16;245:24;
246:2,6;259:3,7,9,16;
260:25
**Gmail (2)**
87:6;113:22
**goal-driven (1)**
201:25
**go-by (1)**
275:11
**gold (1)**
275:12
**golf (9)**
177:21;270:18,20,

22,25;271:2,4;297:3,
4
**Good (9)**
10:24;11:3;65:8;
96:7,22;134:17;
172:4;221:21;230:19
**gosh (1)**
289:7
**Gotcha (1)**
124:4
**grade (1)**
192:11
**Graham (1)**
142:5
**Grahams's (1)**
142:17
**grammar (1)**
112:21
**grand (1)**
263:14
**grants (1)**
256:22
**Graphicom (2)**
15:20,23
**graphics (1)**
294:2
**gray (1)**
189:15
**Grayson (1)**
240:6
**great (3)**
34:11;139:20;
279:14
**Greer (11)**
216:19;217:23;
228:8,8;241:11,13;
254:16;302:7,21;
303:9;322:6
**greet (1)**
80:13
**Greg (2)**
162:19,22
**Grievances (2)**
305:10;330:2
**group (16)**
51:20,21;52:6;
139:22,25;175:19;
181:15;203:21;
232:3,5;258:10;
292:6;297:25;
299:17,23;315:9
**groups (3)**
74:13;199:11,11
**grow (2)**
21:19,25
**growth (1)**
306:24
**guess (5)**
18:20;53:18;142:8;
247:25;300:17
**guessing (2)**
22:7,7
**guests (5)**

49:2,8;108:11;
109:3;134:2
**Gwinnett (1)**
145:25

**H**

**half (6)**
13:9;16:22,22;
247:23;289:10,11
**hand (72)**
17:18;23:8;26:20;
36:21;38:9;47:6;
64:9;65:4,9;66:21;
70:3,14;72:3;73:7;
74:24;75:18;77:16;
79:15;80:18;82:10;
87:4;89:14;92:4;
95:8;97:15;98:6;
99:5;100:6;106:7;
113:16;114:21;
117:13,24;123:13;
129:14;136:20;
148:12;151:13;
152:8;168:8;175:15;
176:22;191:11;
198:18;201:23;
204:9;206:19;
208:18;295:15;
305:6;310:3;311:1,
18;312:24;315:15;
316:25;317:14;
319:12;320:14;
321:8;324:12;
334:21;335:3,20;
337:12;340:19;
341:3,5,6;342:3,20;
348:22
**handed (6)**
86:24;181:19,20;
182:1,17
**handing (2)**
137:3;341:11
**handle (1)**
244:2
**handled (3)**
83:15;294:13;
323:21
**handling (2)**
92:13;308:23
**handlings (1)**
44:12
**handoff (1)**
46:10
**hands (4)**
135:14,15;276:23;
277:1
**handwrite (1)**
245:9
**handwriting (8)**
112:8;137:20,22;
175:22;177:3,5;
245:11,12

**Hannah (1)**
51:21
**happen (4)**
83:12;85:11;105:2;
215:1
**happened (5)**
105:5;147:19;
150:11;219:16;308:7
**harassing (6)**
215:10,11,15,19;
216:2;219:6
**harassment (19)**
214:20;316:16;
317:8;318:16;319:7;
320:6;321:2,15,24;
326:17;335:10,15;
337:8,21;341:25;
342:9,16;349:25;
350:12
**hard (7)**
15:15;260:18;
262:1;316:9;331:5;
347:25;348:3
**Hardwick (4)**
229:23;235:13,20;
239:24
**Harwell (3)**
8:20;117:20;
198:21
**Hatcher (3)**
256:18,18;258:10
**head (10)**
10:9;17:8;71:15;
167:18;228:23;
229:15;272:2;286:5;
314:25;315:6
**headhunter (6)**
256:5,11;258:12;
259:12,21;260:1
**headhunter's (3)**
257:22,24;260:6
**heading (1)**
132:15
**healthier (2)**
25:25;110:1
**healthy (1)**
25:23
**heard (23)**
10:7;46:12,16,16;
64:4;86:24;118:9;
119:11;185:5;250:9,
12;258:6;262:3;
265:19,22;281:18;
288:18;304:14;
312:15,16;330:19;
331:20;344:10
**hearing (1)**
262:7
**Heather (25)**
20:16;28:5;95:18,
19;101:2;103:11;
104:2;134:2;282:18,
21,24;283:5,10,16,

19,23;284:7,13,16,
19;285:8,16,24;
288:5;343:6
**heavier (1)**
103:4
**heavy (2)**
182:21;315:11
**Heel (4)**
149:12,13,16;
275:17
**Heintz (6)**
142:19;143:3;
144:8,25;149:12;
164:9
**held (22)**
8:9;35:23;53:10;
80:9,11,13;108:24;
125:21;129:4,6,17,
19;133:14,17,20,23;
183:7;232:7,10;
272:7,13;281:7
**help (20)**
34:18;64:2;70:9;
103:7;104:13;
106:19;113:7,10;
115:24;156:2;
166:18;266:18,21;
271:14;282:19;
293:21;295:4;
347:20,22,25
**helped (10)**
34:19,24;80:3;
99:15;172:5,7,11;
294:5,10;298:20
**helpful (1)**
110:9
**helps (2)**
195:9;271:19
**Here's (2)**
338:18,18
**herself (1)**
237:23
**hide (1)**
162:4
**High (5)**
12:1;126:16;
185:15,19;258:13
**higher (3)**
168:3;272:7,13
**highest (1)**
31:25
**high-level (1)**
32:16
**highly (1)**
144:17
**hire (9)**
248:8;250:1;257:4;
281:15,17;282:2;
292:5,12,16
**hired (19)**
167:21;168:1;
249:9,11,13,15,18;
262:20;285:21,25;

288:7,10;303:17,21;
304:25;313:17,22,25;
314:3
**hiring (5)**
291:21;292:1;
295:7;313:10,13
**hit (6)**
259:3,7,9,16;
260:25;332:4
**hold (3)**
53:14;128:8;171:8
**Hollywood (3)**
233:25;234:14;
279:3
**home (8)**
78:17;114:4,11,16;
141:2;232:16;301:7,
12
**honest (2)**
118:16;165:11
**honestly (5)**
29:7;104:21;
203:15
**honor (3)**
24:12;268:8,11
**honored (3)**
53:18;97:7;149:11
**honors (1)**
199:12
**hope (5)**
24:5;84:15;142:25;
179:14;273:3
**hosted (1)**
143:11
**hosts (1)**
143:7
**hotel (1)**
308:24
**hour (4)**
289:12,20;290:2;
318:11
**hours (12)**
188:23;232:13;
295:24;296:2,6;
332:5,14,16,19;
333:16,20,22
**house (8)**
20:1,3,9;80:9;
88:18;93:13;141:3;
177:19
**HR (31)**
183:10,20;184:4,
24;185:5;237:15;
265:16,20,23;266:2,
7,11,13;267:1,2,7,18;
268:1,3;269:11,13,
17,20;270:4;286:2,4,
5;287:14;306:25;
307:2,5
**Huh-uh (4)**
127:3,5;190:20;
267:3
**Human (3)**

264:16,21;265:5
**hundred (1)**
22:4
**husband (11)**
12:16;16:1;40:22;
133:11;194:7;
271:18;284:10,11,17;
347:20,22
**husband's (1)**
11:12

# I

**idea (15)**
21:13,13,14;31:7,8,
10;186:4;189:25;
190:3;213:23;227:8;
275:10;305:7;
306:20;344:9
**identification (64)**
17:17;23:7;26:19;
36:24;37:5;38:8;
47:5;64:8;65:3;
66:20;70:13;72:2;
73:6;75:17;77:15;
79:14;80:17;82:9;
83:13;87:3;89:13;
92:3;95:7;97:14;
98:5;99:4;100:5;
106:6;113:15;
114:20;117:23;
123:12;129:13;
137:2;148:11;
151:12;152:7;168:7;
175:14;176:21;
191:10;198:17;
201:22;204:8;
206:18;208:17;
295:14;305:5;310:2,
25;311:15;312:23;
315:14;316:24;
317:13;319:11;
320:13;321:7;
324:10;335:2,19;
337:11;340:18;
348:21
**identified (1)**
68:24
**identify (1)**
191:25
**identifying (1)**
109:8
**II (2)**
11:13;190:12
**III (2)**
53:12,13
**immediately (2)**
70:23;76:1
**implication (1)**
343:15
**implied (1)**
322:12
**implies (1)**

344:20
**importance (1)**
141:16
**important (7)**
34:6;135:2;136:1;
140:20,22;144:2;
224:4
**improperly (3)**
162:2,6;323:21
**improvement (1)**
306:21
**inappropriate (3)**
281:15,16;282:2
**Inc (1)**
8:8
**include (8)**
46:11;54:21;70:10;
191:20,24;224:18;
309:7;311:12
**included (4)**
33:4;46:15;72:12;
111:10
**includes (1)**
192:4
**including (6)**
145:4;231:7;
240:12;316:15;
349:24;350:11
**income (3)**
61:5;97:4;130:13
**incoming (3)**
78:4,7;94:25
**incomplete (11)**
120:12;122:12;
126:19;130:18;
134:4;189:4,6;191:7;
324:17;335:24;
336:12
**incorrect (3)**
139:11,13,14
**incorrectly (4)**
171:6,10,15;
172:22
**increase (3)**
168:4;314:7;315:7
**increased (4)**
188:23;189:17;
314:25;315:10
**increasing (3)**
111:7,23;112:3
**incredible (1)**
76:6
**incurred (1)**
117:8
**index (1)**
347:15
**indicate (3)**
215:22;319:9;
320:4
**indicated (4)**
217:23;218:1;
269:24;316:6
**indicates (2)**

318:15;319:6
**indicating (1)**
131:7
**individual/sole (2)**
39:17,20
**individuals (1)**
83:2
**industry (1)**
261:5
**Infantry (1)**
136:7
**inferring (1)**
159:24
**influence (3)**
34:3;144:15;145:1
**influenced (2)**
144:11,13
**influencers (2)**
33:22;139:23
**influential (4)**
36:18;135:25;
139:24;140:21
**information (17)**
14:9;36:17;66:13;
68:7;76:11;124:15,
19;152:20;199:10;
236:8;240:11;
282:17;285:18;
310:9;312:3;322:4,9
**informed (1)**
272:6
**infrastructure (1)**
237:20
**initial (6)**
68:6;166:4;175:6,
9;342:21;343:2
**in-kind (3)**
116:12,15;165:21
**input (4)**
113:4;115:20;
124:15,19
**inputted (4)**
120:17;126:20,22;
294:11
**inquire (2)**
162:12;173:19
**inquiries (2)**
344:22;345:3
**inquiry (2)**
154:4;345:8
**inside (2)**
145:20;146:25
**instance (1)**
297:18
**instances (1)**
216:5
**instead (1)**
116:11
**institution (2)**
256:1,2
**instruct (2)**
41:12;53:4
**instructed (5)**

93:16,19;209:14,
18;230:4
**instruction (5)**
211:8,13,19;
338:22;340:5
**instructions (4)**
94:15,16;104:16;
340:14
**insubordinate (5)**
183:12,21;184:9,
25;185:6
**Insubordination (3)**
184:6,14;307:14
**intake (6)**
325:5,20,21,22;
335:22;337:4
**intend (2)**
10:21;26:10
**intended (2)**
263:17,20
**intentions (1)**
29:18
**interest (1)**
19:12
**interested (1)**
338:21
**internal (4)**
316:15;334:3;
349:24;350:11
**interpretation (1)**
169:15
**interpreted (1)**
179:19
**interview (6)**
256:4,8,9;292:5,12,
16
**interviewed (9)**
255:25;256:11,11,
13,15,17;257:16,20;
278:17
**interviewing (1)**
295:8
**interviews (2)**
256:5;291:21
**intimidating (1)**
331:4
**into (35)**
46:11;78:24;
114:24;120:25;
121:10;153:23;
157:13;160:18;
166:9,14;167:1;
168:3;176:17;
181:14;182:15;
185:18;208:10,14;
214:13,16;219:24;
220:1;251:21;252:4;
263:12;272:17;
274:15;309:19;
313:7;314:3;343:8;
344:17,22;345:3,8
**introduce (1)**
8:17

**investigated (15)**
170:11,15;171:21;
173:8,12,16;174:21;
175:11;275:23;
276:1,2,6,7;278:21;
305:22
**investigating (2)**
277:7,8
**investigation (37)**
174:7,16;176:17;
179:18,25;180:6,12,
18,21,25;183:4;
208:10,14;263:23;
264:7;268:12,14,19;
269:1,2;305:16,17,
20;308:5,8,25;309:5;
323:16;324:4;329:1,
5;330:21;343:23;
344:3,4,11,14
**invitation (12)**
60:4,5;62:10;
79:17;88:15;99:7,18,
22;105:18;131:14;
132:4,13
**invitations (12)**
61:25;77:25;92:12;
122:21,24;123:5;
130:24;131:4,10,21;
132:9;133:7
**invite (2)**
98:8;147:21
**invited (5)**
49:14,19,22;52:9,
12
**invoice (4)**
15:13,19,20;231:7
**invoices (2)**
274:2,13
**involve (1)**
151:25
**involved (19)**
16:1;33:19;34:9;
67:2;83:21;139:4;
157:15;160:21;
264:17,18,22,23;
265:5,8,10;271:11;
276:13;294:7,22
**involvement (1)**
35:8
**issue (1)**
104:18
**issued (2)**
60:5;221:5
**issues (6)**
151:23;264:16,21;
265:5;266:24;308:25
**item (3)**
315:19;334:12,14
**items (3)**
84:21;94:19;181:9,
11;297:13;299:21

## J

**Jackson (7)**
249:6,18;251:20;
262:18;313:11,24;
314:17

**Jacob (1)**
262:18

**Jamie (2)**
174:5;262:18

**January (17)**
17:2;247:14;254:6,
21;287:8;295:22,25;
312:8,9;316:17;
327:7,13,19,24;
334:4;350:1,13

**Jenn (3)**
287:4,5,11

**Jennifer (65)**
37:23;38:1;39:5;
62:13,18;63:7;70:23;
71:1,5;93:18;94:3;
104:13,19;105:1;
106:2,12;166:8;
167:1,7,12,25;
168:20,23;169:5,11,
16,22;170:4,9,13;
171:18;172:5,7,25;
173:6,11,14;174:6,
14,20;175:9;179:5,
10,17,24;180:5,7,10,
16,17,20,25;248:9;
276:2,7,12,16,19;
277:15,17;298:15,18;
300:15;328:25;329:4

**Jenny (93)**
17:24;18:3,6,10;
19:14,20;21:12;23:1,
19;29:7,15;31:17;
34:21;35:1,2,8;39:7,
8,11;40:10;42:7;
43:5,10,15,16,23,25;
44:2,8;46:23;51:14,
18;55:22;56:8;57:1,
11,15,18;58:23;
60:18;75:25;83:9,15,
16;85:9,21;86:2;
89:25;90:4;91:15;
95:18;101:16;112:7,
13;113:4,6,11;134:2;
151:8;153:4,7;154:1,
2,14,19;155:22,25;
156:2,4,7,14,17,22,
25;157:21,22;158:19,
22;159:1,4;161:23;
162:2,6,12;164:17,
20,21;275:9;277:4;
283:13;285:12;
346:24;347:7

**Jenny's (3)**
18:12;31:7;135:14

**Jersey (1)**
297:8

**Jessica (6)**
20:19;55:9;95:18;
129:22;133:20;284:4

**Jim (29)**
138:11;139:3;
216:18;218:1,4,22;
228:15;239:11,12;
241:11,13,16,17,25;
243:3,4,6,11,13,18,
20,24;254:15;302:11,
21;303:9;308:3,14;
309:1

**job (31)**
33:4;167:13;
168:10;187:4;
203:25;219:22,24;
228:24,25;229:7,17,
23;230:2;231:5,10,
14,19;232:21;
233:13;257:16;
258:9,11;261:11;
269:14,16;278:17;
282:13;288:13,17;
295:8,11

**jobs (6)**
95:20;225:1;
252:14;288:7,9,9

**Jodie (1)**
240:6

**Joe (7)**
207:11;249:7,8;
251:20;262:19,20;
314:20

**John (2)**
229:13;254:15

**Johnson (6)**
11:13;261:16;
270:20,25;271:14;
284:11

**Johnson's (1)**
28:25

**join (3)**
49:19,23;63:7

**joined (1)**
22:3

**joining (1)**
224:8

**Jon (10)**
216:19;217:23;
228:8,8;241:11,13;
254:16;302:7,21;
303:8

**Jones (6)**
28:9;46:17;64:4;
86:25;111:13,20

**Jones' (2)**
118:9;119:11

**Joseph (7)**
279:12,13,16;
280:2,3;281:8;
285:15

**Jr (1)**

11:13

**Juanita (2)**
142:5,16

**Judicial (1)**
8:3

**July (4)**
199:23;201:15;
221:22;300:7

**jumps (1)**
178:21

**June (54)**
16:16;17:5,14,20;
20:20,24;22:6;23:10,
13;26:22;27:1;42:9,
10,13,16,18;61:13,
22;89:17;91:5,23;
93:2;95:17;97:8,9;
124:21;131:10,15,21;
132:8,15,21,21,23;
133:25;159:22;
160:4;296:9,11,12,
15,20;297:12,16,18,
19,20,20;298:1,4,7;
300:1,3

**Junior (8)**
16:4;64:21;116:3,
6;273:12,13,16,18

**Justice (4)**
141:23;147:10;
148:14,18

## K

**Katie (7)**
40:17;41:14,17,22;
58:17;61:19;83:19

**keep (11)**
70:7;74:6;115:7;
131:6;190:1;223:24;
268:11;296:2;
298:13,20;309:2

**keeping (2)**
296:6;300:15

**Kelly (3)**
78:10,21;317:2

**kept (3)**
22:13,15;298:12

**kind (13)**
51:21;53:22;
114:23;137:16;
147:7;149:6;189:24;
190:10;206:3;266:5;
274:22;275:15,15

**Kitten (4)**
149:12,13,16;
275:17

**knew (24)**
91:5;93:14;97:8,
10;152:3;161:21;
180:7,15,20,24;
237:13,17,25;250:8;
257:8,9,9,12;263:25;
274:20;277:23;

278:8,11;345:9

**knowledge (16)**
43:19;56:1,8;93:6;
96:11;155:11;160:4;
166:4;174:17;
175:12;180:19;
223:22;257:5;
278:12;286:20;
323:19

**known (6)**
38:19;108:5;144:8;
146:12;160:14;180:5

**knows (2)**
160:15;171:1

## L

**L/C (2)**
138:16;274:8

**L/C/S (2)**
137:23;138:16

**La (33)**
33:15,16;71:9;
91:12;116:9;138:2,
24;153:13,17;172:1;
236:18,19,25;237:24;
262:2,7;269:1,5;
272:24;273:6;301:9;
322:12,21,24;323:6;
324:3,5;328:11,18;
329:2,7,10;340:13

**Labor (4)**
220:9;289:3,12;
290:24

**lack (3)**
79:8,9;184:14

**ladies (8)**
28:19;76:19,21;
79:20;80:9;88:11,12,
16

**lake (1)**
58:19

**land (1)**
135:14

**landlord (3)**
151:23,25;273:11

**language (3)**
79:24;215:22;
302:25

**Lanier (2)**
35:15,17

**laptop (1)**
224:2

**largest (1)**
145:11

**last (16)**
12:22;14:6;154:20;
157:9;159:6;189:15,
16;193:22;204:17;
222:12;286:7;307:9;
318:19;334:12,14,17

**late (1)**
235:16

**later (7)**
57:21;60:5;219:11;
246:14;247:2;
306:25;320:2

**latest (2)**
122:14;241:21

**launched (1)**
308:5

**Laura (1)**
134:3

**law (4)**
207:16,17;289:3,
12

**lawsuit (4)**
45:6;166:5;208:20;
221:7

**lawyers (1)**
149:20

**lawyer's (1)**
143:3

**leadership (10)**
76:6;111:7,24;
112:4;183:11,20;
184:3;187:7;318:11;
346:21

**leading (1)**
252:5

**League (8)**
16:4;64:21;116:3,
7;273:12,13,16,19

**learn (5)**
37:7;170:13;
252:16;298:3;304:24

**learned (5)**
36:22;37:3;169:5;
170:14;288:14

**least (16)**
22:19;72:25;73:2;
96:17;103:4;168:21;
191:25;201:5;
254:18;272:1;
275:16;276:1,6;
291:9;345:14;346:8

**leave (18)**
14:14;43:20;106:2;
219:14,15,19,20,20,
23;220:8;296:15;
298:13;300:18,21;
301:5,6,8,16

**leaving (1)**
252:8

**led (1)**
230:16

**leeway (2)**
332:9;333:21

**left (28)**
14:8;16:13;45:9;
70:24;71:15;173:2;
218:11;226:5;
232:17,23;233:5;
234:23;235:2;236:4;
247:21;249:2,4;
251:13,15,18;252:5;

253:4;283:23,24;
291:4,13;301:17;
305:3
**legacy (1)**
26:12
**legal (8)**
151:23;214:7;
221:17;229:1;
240:16;284:17;
290:8;301:25
**legality (1)**
289:23
**legitimate (1)**
156:12
**Lehman (3)**
228:20;229:4;
230:14
**Lehman's (1)**
229:7
**Leslie (13)**
28:9;46:12,16,16;
51:22;64:4;69:18;
70:7;86:24;107:12;
118:9,12;119:11
**less (8)**
78:24;87:22;233:3,
5;239:13;257:17,21;
275:15
**letter (52)**
17:20;21:22;23:10,
13;26:22;27:1,9,10;
29:25;32:10,21;55:3;
59:11;65:24;66:23;
75:20;77:18;82:12;
83:10,11;91:23;92:6,
9;93:4,9;106:9;
108:15;111:4;151:8;
155:24;156:4,6,9;
158:15,19,22,23;
159:1,2,3,22;160:5;
161:9;316:3,4;
319:14,18;320:1;
321:10,12,21;337:16
**letterhead (9)**
17:21;23:11,14;
26:23;27:1;66:9;
93:25;94:12,22
**letters (5)**
32:14;34:20;
138:16;141:5;294:12
**letting (1)**
225:9
**level (22)**
30:17;31:11;32:21,
23;33:8,10,11,15,18;
36:2,6;62:22;116:8;
143:14;148:21,24;
149:12,14,16;168:3;
238:5,21
**levels (12)**
31:6,8,12,16,19,21,
24;33:4;35:9;236:10;
238:4;275:21

**liability (2)**
45:24;46:3
**lie (2)**
179:5,10
**lied (2)**
179:16,23
**lieu (1)**
116:13
**life (4)**
25:23,25;110:1;
126:7
**limitations (1)**
318:22
**limited (4)**
45:24;46:3;318:21,
22
**line (15)**
21:20,25;64:12;
65:12,16;74:7;80:24;
213:10,14;260:17;
266:18,21;315:11;
323:15;328:13
**lines (1)**
74:9
**Lisa (51)**
13:24;14:2,4,7;
33:15,16;71:9,14;
91:12;116:9;138:2,
24;139:6,9,15,18;
147:14,22;172:1;
185:21;221:23,25;
222:3,5,7,9,21;223:3,
3;236:18,19,25;
237:19,24;262:2,7;
269:1,4;272:24;
273:6,11,13,16,18;
301:9;322:12;
328:11,18;329:2,7,10
**Lisa/Crystal (1)**
274:8
**list (36)**
32:22;36:11;55:3,
7,9;64:22;86:10;
93:22;113:18;120:1,
4;121:4,20;122:21,
24;133:1;134:4,5,8;
155:13;201:11;
204:5,6;205:18;
207:23;242:13;
253:9,22;254:8,13,
18;255:5,11,19,20;
274:6
**listed (49)**
27:25;30:7;59:16;
68:6;77:10;86:8;
95:20;109:1;115:1;
117:11;119:14,17,20;
120:6,15,21;121:20,
22;122:7,9,17;125:9;
130:13;134:1;
139:12;143:20;
150:3,17;166:3;
175:5,6;199:15;

202:9,18;224:11,19,
20;258:23;295:24;
297:1,2,9,13,16;
298:10,11;300:3,7,13
**listing (5)**
124:6;129:16;
130:24;224:25;296:2
**lists (18)**
39:17;40:2;41:1;
77:24;80:6;98:12;
114:24;116:2;117:7;
118:5;124:9,12;
132:19,22;133:1;
141:23;192:6;204:19
**litigation (1)**
242:1
**little (4)**
233:4;275:15;
312:2;333:20
**live (2)**
12:21;263:11
**lives (5)**
40:14;41:14,18,25;
143:9
**living (5)**
13:2,20,25;14:18;
40:12
**LLC (6)**
39:18,25;46:9,15;
165:9,11
**local (1)**
163:2
**located (4)**
146:17;147:2,5;
348:7
**location (1)**
145:6
**locations (2)**
146:9;233:24
**logo (19)**
72:9;73:1;97:21;
98:22;101:9;102:11,
15,18,22;103:10;
106:16,21,23;107:1;
110:19;143:15,20;
149:7,8
**logos (1)**
100:12
**London (11)**
80:3;97:17;99:13;
104:10;106:2,11;
165:22;166:2;174:5;
248:10;294:5
**London's (1)**
106:19
**long (30)**
13:7;102:10;105:7,
7,14,17,19;180:4;
200:9;203:13;
222:12;226:9,13,16;
227:3,5;228:8,10,11,
15;232:5,11,12;
239:2;247:7;271:8,

20;291:2;304:21;
333:2
**longer (15)**
51:16;111:12;
143:9;155:3;223:7;
226:19;227:10,18;
228:13,18;233:2;
271:23,25;289:9;
333:24
**look (38)**
27:25;31:14,18;
42:13;48:2,19;59:2;
88:10;117:10,16;
141:22;164:8;196:3;
213:9;220:13;242:4;
245:13;255:4;
256:19;299:12;
303:13;304:19,21;
306:15;307:9;
310:11,15;323:10,14;
326:19,24;327:7,23;
328:10;334:24;
343:4,17;344:21
**looked (8)**
112:15;144:18,21;
146:1;155:6;171:4;
193:18;304:9
**looking (14)**
119:2;131:1;
132:23;160:24;
197:9;199:8;211:6;
260:14;277:24;
278:3;299:5;331:10;
334:9;338:12
**looks (7)**
74:13;114:24;
129:8;149:20;
154:16;158:2;310:7
**lose (1)**
184:10
**lost (5)**
184:25,25;185:6;
263:22;264:6
**lot (24)**
50:24;52:7;53:6;
57:24;58:12;99:15;
126:22;147:20;
157:24;171:2;
177:21;181:16,23;
216:17,19,20;231:22;
237:20;242:14;
252:5;271:19;
289:16;298:11,16
**lots (1)**
346:1
**Love (10)**
279:3,6,18;280:4;
281:8;282:9;285:16;
288:6;344:16;347:21
**low (2)**
117:6;247:2
**Lucas (36)**
138:11;139:3;

20;291:2;304:21;
216:18;218:1,4,22;
228:15;239:11,12;
241:11,13,16,17;
242:1;243:3,4,6,11,
13,18,20,24;254:15;
302:11,22;303:9;
308:3,4,8,11,13,14,
18,22;309:1;322:6
**lunch (3)**
193:3,5,14
**Lundin (2)**
229:14;254:16

**M**

**MacBook (15)**
15:1,3,5,7,10,24;
16:2,5,7,10,12;22:16;
102:1;301:7,11
**magazine (1)**
115:12
**magazines (1)**
115:13
**Mahogany (9)**
97:17;99:13;
104:11;106:11;
165:22;248:23;
249:5;294:5;314:17
**mailed (11)**
67:25;74:10;92:24;
122:22,25;123:2,5;
130:25;131:4,10;
132:2,4
**mailing (9)**
77:24;92:21;93:1,
3;105:1,4;171:10,15;
172:22
**mailings (1)**
74:13
**mail-out (2)**
133:1;171:5
**mail-outs (6)**
93:24;170:17,21,
22,25;329:5
**mailroom (4)**
93:15,17,20;94:1
**main (2)**
186:2;257:2
**maintain (3)**
45:14,20;233:9
**maintained (1)**
115:23
**maintaining (1)**
111:16
**maintains (2)**
115:17;203:19
**maintenance (1)**
115:25
**major (3)**
111:2;186:18;
311:10
**makes (2)**
199:12;240:22

**making (6)**
67:6;144:6;246:24;
277:12,18;318:8
**male (16)**
238:21;240:12,14;
246:24;254:17;
272:8;277:22;
301:20,23;302:4,18,
19;303:5,7,18,21
**Maleficent (1)**
297:9
**males (5)**
236:8,10;238:4;
265:7,13
**man (3)**
49:22;297:13;
331:5
**manage (5)**
189:11;262:22,24;
263:1;314:11
**managed (3)**
75:4;262:17;
291:12
**management (16)**
199:5;203:20;
205:19,20,20,21,24;
206:2,4,7;214:24;
243:21,25;260:24;
261:2;272:13
**manager (34)**
188:4;199:9;
203:18;204:1;
224:22;225:1;228:9,
16;229:15;233:17;
238:17,24;246:20;
263:18;266:23;
279:3;290:7,12,16;
291:3,8;307:17;
308:1;338:4,9,25;
339:6,20,24;340:7;
341:20
**managers (11)**
147:18;238:11,13;
239:2,7,10,15;
254:18;294:18;
297:25;299:13
**managing (2)**
147:17;315:8
**many (26)**
11:17;14:18;20:8;
22:2,5;47:14;49:10,
19;100:8,18;128:12;
134:14;144:21;
166:19;175:5;181:3;
233:22;239:4,4;
250:13;252:21;
253:1,3;301:17;
304:16;346:5
**Maple (2)**
297:3,4
**March (6)**
165:23;167:21;

244:3;247:15;
253:13;254:24
**margins (1)**
176:12
**Margo (1)**
52:6
**mark (2)**
311:19,20
**marked (130)**
17:16,19;23:6,9;
26:18,21;36:21;38:7,
10;42:1;47:4,7;64:7,
10;65:2,5,10;66:19,
22;68:15,22;69:5;
70:12,15;72:1,4;73:5,
8;74:24;75:16,19;
77:14,17;79:13,16;
80:16,19;82:8,11;
87:2,5;89:12,15;92:2,
5;95:6,9;97:13,16;
98:4,7;99:3,6;100:4,
7;106:5,8;113:14,17;
114:19,22;117:13,22,
25;123:11,14;129:12,
15;136:20;137:1;
148:10,13;151:11,14;
152:6,9;168:6,9;
175:13,16;176:20,23;
191:9,12;198:16,19;
201:21,24;204:7,10;
206:17,20;208:16,19;
295:13;305:4;310:1,
4,24;311:2,14;
312:22,25;315:13,16;
316:23;317:1,12,15,
23;319:10,13;320:12,
15;321:6,9;324:9,12;
334:18;335:1,18;
337:10,13;340:18;
341:4,5,6,14;348:20,
23
**market (11)**
144:13,17;145:3;
146:21,23,24;147:4;
151:22;307:25;
309:16;310:14
**marketing (106)**
31:14,18;33:17;
36:2,7,10;64:24;72:9,
13;146:4;153:13;
166:16;167:15,18,25;
168:10;174:14,19;
188:11;189:21,22;
190:17,25;192:6,15;
194:1,5;197:3,16;
201:18;203:12,17;
204:1;218:6,7,10,20,
23;219:2;220:1;
223:15,19;224:8,22;
225:1,4,17,19,22;
226:2,10;232:25;
233:5,7,16;234:20;
235:20;236:3;

243:14,22;244:1;
246:20;247:6,22;
248:4;249:1;250:2,2,
10,16,25;251:9;
260:15;263:6,9,17;
278:4,10,14,17;
282:14;291:10,12,17,
20,24;292:4,11,22,
23,24;293:9,14,18;
294:8;300:1;304:7;
309:13;310:13;
312:20;313:2;314:3,
15,16;327:9;341:20
**marketplace (1)**
75:9
**markets (3)**
182:11;263:11,13
**marking (1)**
76:13
**marriages (1)**
12:3
**married (8)**
12:5,16;13:3,5,8,
11;240:2;283:10
**Marshall (8)**
169:6,12,17,23;
170:5;172:25;184:3;
239:22
**Mary (17)**
8:19;29:9,12;
54:25;68:17;95:19;
191:13;200:8;
324:19,23;331:2;
333:10;335:25;
336:6,25;340:21;
342:24
**material (1)**
102:25
**materials (10)**
16:4;100:12;
102:21;117:15,18;
149:7;160:25;164:9;
166:20;348:19
**maternity (2)**
296:14;301:16
**math (4)**
199:24;204:21;
221:12;247:25
**matriculation (1)**
193:21
**matter (6)**
323:21;339:1,7,20,
25;340:8
**May (31)**
13:13;14:11;78:4;
82:13;85:15,19,21;
117:11;154:17;
167:22;194:23;
195:5;196:8;212:6,
10;217:15;219:16;
242:15,15;244:16;
296:15,16,17,20;
297:3,7;299:12;

336:6;341:1;347:12;
351:6
**maybe (12)**
12:17;13:9;58:22;
117:3;134:12;
136:11;153:16;
167:15;205:3;
222:13;240:1;254:16
**Mayton (21)**
188:23;218:11;
224:18;225:3,17;
226:4,5;231:2,12,15,
23,25;232:17,23;
233:5;234:23;235:1;
236:4;247:8,21;
291:13
**Mayton's (7)**
231:5,6,10,19;
241:1,8;269:14
**McMillen (55)**
17:24;19:14,21;
23:1,19;31:18;39:7,8,
11;43:10,15,16,23;
44:2,8;46:23;51:14,
18;55:22;56:8;57:2,
12,15,18;58:1,24;
60:18;75:25;83:16;
85:9,21;86:3;89:25;
90:4;95:19;96:3;
101:16;112:7;
113:12;134:3;153:4,
8;154:14,19;156:1;
161:23;162:2,6,12;
275:9;277:15,17;
285:13;346:24;347:7
**M-c-M-i-l-l-e-n (1)**
18:18
**McMillen's (5)**
21:13;40:11;42:7;
151:8;277:4
**M-c-M-i-l-l-o-n (1)**
18:18
**mean (65)**
17:22;22:14;24:10;
27:18;34:6;37:14;
42:13;44:13;45:4;
50:24;54:2;57:24;
58:11;59:22;60:14;
79:11;88:7;92:23;
102:1;106:15;112:8,
22;116:16;118:16;
126:9,16;131:12;
132:1,2;154:8;155:7;
158:6;161:3,4,6,20;
163:22;175:4;
184:19;189:14;
190:5;195:4;196:7;
204:22;212:20;
213:15;220:17;
224:14;225:9;
227:23;252:2;
256:19;257:8,12;
265:21;275:15,16;

289:6;292:18;
306:18;310:15;
316:12;317:21;
333:4;343:11
**meaning (2)**
289:2;310:9
**means (1)**
24:12
**meant (9)**
66:3;79:9;141:15;
154:9;164:2,4;
322:13,13;339:17
**media (5)**
175:20;181:16;
199:19;203:21;233:9
**Medical (4)**
137:24;150:15;
219:14;220:8
**meet (5)**
80:13;246:16,19;
247:10;287:1
**meeting (101)**
19:24;20:5,9;21:2;
32:6;45:25;46:10;
53:9,14;54:21;80:13;
101:19;164:13;
166:7,25;169:19,22,
24;170:4,6;171:18;
172:19;176:9,24;
181:7,19,21,24;
182:2;183:6;224:11,
16,18;231:11,15,18;
232:4;244:8,14,15,
21,21,24;246:13;
247:17;248:2,5;
249:21;250:5,5;
253:14;254:9,24;
255:9;258:22;
260:12;261:7,23;
262:2,10;263:24;
268:21;269:2;272:6,
17;275:10;278:20;
281:7,12;282:10;
288:20,22;296:11;
297:19,19,20,21,24;
298:1,4,6,7,8;299:4,
14;300:11;323:12,15,
20,25;328:2,6,16,23;
329:6,12,14,15,18,21,
22
**meeting/event (1)**
54:6
**meetings (26)**
53:12,25;54:18,20;
182:24;183:3;224:4;
231:22,24;232:1,6,
12;289:24,25;
292:25;297:1,2;
299:3,8,16,17,23;
300:1,5,12,12
**Meg (4)**
28:18;78:10,12,17
**Melanie (4)**

163:1;176:17;
208:9;307:15
**Melbourne (2)**
309:15;310:14
**member (22)**
20:16;49:20;51:8,
10,11,15,25;52:4,10;
55:14;60:4;121:5,8,9,
11,16,22,24;122:10;
129:16;163:11;285:8
**members (49)**
13:20;20:8;22:2,6,
13,19;26:10;33:21;
34:2;36:3,8,11;
48:16;49:1,8,10,11,
17,18;54:7,9;58:6;
62:7,10;67:12,16;
84:21;93:9;96:22;
107:14;108:11;
109:3;110:6;111:24;
112:4;118:5;119:17,
23,24;128:6;129:7,
16;131:16;134:1;
141:5,19;174:13;
294:20;346:6
**member's (1)**
133:11
**Membership (28)**
21:5,6,9;29:19;
34:7;51:12;53:17,22,
24;60:4;80:14;93:13;
96:6,13;97:6,7;
118:6;120:21;121:1,
5,23;126:18;140:17,
21,22;141:11,12,16
**memberships (2)**
95:12;130:16
**memorialize (2)**
351:25;352:4
**men (4)**
49:10,13,19;261:4
**mention (14)**
62:5;91:19,23;
95:24;98:25;103:12;
104:3;141:18;237:2;
240:18;330:15,16;
331:15;344:16
**mentioned (11)**
29:11;101:10;
108:17;109:5;128:2;
135:23;141:4;217:3;
260:13;299:16;345:2
**mentioning (2)**
99:20,23
**mentions (4)**
109:18,22,25;
110:3
**message (3)**
57:21;58:2,4
**met (12)**
168:23;172:25;
173:4;177:8,12;
244:3;247:2,8;

255:23;256:9;
268:10;331:25
**metro (3)**
146:6,11,18
**metropolitan (1)**
145:24
**Michael (2)**
257:25;258:1
**Middle (5)**
8:10;71:16,20;
212:24;213:6
**mid-morning (1)**
173:3
**mid-November (1)**
104:23
**might (6)**
55:1;74:4;118:2;
250:16;262:4;304:23
**mike (2)**
134:16,18
**million (2)**
207:9,9
**mind (5)**
74:6;173:23;216:4;
219:8;266:25;338:14
**mine (5)**
31:9;105:10,20;
112:24;147:21
**minus (1)**
130:9
**minute (2)**
37:25;279:14
**minutes (1)**
340:22
**minutes' (1)**
332:9
**Miracle (2)**
138:9;139:2
**misappropriated (2)**
258:7;308:10
**misappropriation (7)**
185:10;278:21;
279:5,20;280:5;
282:16;284:23
**misheard (1)**
205:3
**misleading (2)**
282:11;285:17
**missing (1)**
68:19
**mission (5)**
111:6,21,22;112:1,
2
**misspelled (2)**
18:12,18
**misspoke (1)**
330:7
**misstate (1)**
303:2
**misstated (1)**
312:14
**misstating (1)**
56:22

**mistake (7)**
93:3,5,10;105:1,4;
157:25;158:6
**mistaken (1)**
93:9
**mistakes (1)**
175:1
**misunderstood (1)**
325:24
**misuse (1)**
278:21
**misusing (1)**
307:18
**Mize (1)**
51:21
**moment (2)**
48:19;322:3
**Monday (11)**
176:6,7,9,11,24,25;
181:3;297:20;
300:11,11,12
**money (13)**
61:12;68:10;86:15,
23;89:4;96:24;97:3;
108:23;211:4;
213:21;214:25;
284:23;318:8
**monies (4)**
258:7;282:25;
346:25;347:8
**Montgomery (1)**
12:22
**month (11)**
117:7;232:8,10;
290:1;296:24;
297:16;320:22;
330:10,14;331:16;
332:1
**monthly (7)**
232:1;289:24;
297:25;299:3,8,13,16
**months (12)**
67:8,9;108:14,20;
199:20;234:21,22;
272:6;298:22;
307:18,18;320:21
**More (36)**
12:6,7;36:4,17;
49:1,7;57:24;72:18;
77:22;78:23;87:21;
96:13;108:10;109:2;
121:12;128:17;
161:2;189:10;
197:10;205:12;
214:25;215:10,10,10,
15,15,15;216:1;
219:11;227:7;237:8;
270:2;280:15;
289:16;304:7;318:8
**morning (16)**
166:11;171:12,24;
172:2,6,19;176:9,24;
182:22;274:7;298:9;

299:15,25;300:11,11,
12
**Morton (5)**
307:22;308:10,11,
13,20;309:4
**most (9)**
50:22;51:12;54:9;
140:21;181:6,7;
234:10;275:18;279:2
**motion (4)**
136:3;206:22;
234:16;290:23
**move (9)**
19:12;245:15,17;
261:5;263:25;
336:13,20,24;341:16
**moved (5)**
24:15;168:3;
233:18,20;315:2
**movie (3)**
139:25;141:3;
297:15
**movies (2)**
297:8,14
**moving (2)**
70:8;154:12
**much (29)**
15:22;52:5;61:12;
69:15;78:24;86:15,
23;96:24;97:3;117:1;
165:22;181:22;
187:14;194:4;207:7;
221:13;232:13;
236:19;237:1,10,17,
25;239:5;250:21;
296:22;313:7;318:8;
322:13;333:24
**Mullins (1)**
283:17
**multiple (3)**
218:5;241:19;
281:18
**Muscogee (1)**
13:1
**Museum (7)**
136:7;281:13,17;
282:2;288:13,13,14
**mute (1)**
63:15
**Muvico (1)**
227:21
**myself (2)**
114:1;294:1

---

# N

**name (39)**
11:10,12;12:19;
18:12;27:13,19;
38:14;39:14;40:17;
48:20;55:19;86:11;
133:11;151:9;229:2;
230:12;239:17,20;

240:2,14;256:2,15,
17;257:15,19,23,23,
24;265:14;279:11,12,
22;285:12;286:6,7,7;
288:18;343:6,17
**named (2)**
146:7,18,20
**names (9)**
174:9;186:5;217:2;
219:8;237:2;257:9;
278:24;279:15;
303:11
**National (4)**
74:5;136:7;203:21;
294:10
**nature (2)**
151:24;216:22
**nearly (1)**
181:3;222:13
**necessarily (1)**
9:14
**necessary (2)**
9:20;103:9
**need (13)**
11:5;37:15;81:17;
87:9;93:24;159:9;
170:1;188:7;191:13,
24,24;255:19;319:2
**needed (19)**
34:18;36:24;37:4,
13;38:3,5;43:25;
44:13;81:12;83:11;
106:18,25;114:2;
166:17,17;255:20;
260:6;261:3;287:17
**needing (1)**
81:7
**needs (1)**
306:19
**Neff (6)**
282:15,17;283:5;
284:20;285:24;
287:11
**negatively (1)**
270:6
**neglect (1)**
32:22
**negotiated (1)**
207:15
**negotiating (1)**
288:2
**neighbor (1)**
283:11
**neither (1)**
147:15
**Nelson (1)**
283:16
**Network (7)**
15:8;109:19;138:9;
139:2;282:13;
285:21;287:14
**new (35)**
37:12,14;38:3;

46:11,12;53:22;
67:18;70:3;76:24;
77:1;80:13;81:14;
84:4,14,15;85:16;
86:22;90:17,18,19,
21;110:14;111:19;
119:3;122:18;
129:16;154:8;157:4,
18;158:1,6;186:23;
187:12;236:1;313:1
**newsletters (1)**
143:16
**newspaper (2)**
249:16;252:10
**next (27)**
28:17;39:6;55:16;
59:3;60:2;69:14,16;
71:4,11;74:6;77:10;
126:12;132:20;
166:23;186:22;
188:18,20,21;206:4;
223:12;244:11;
245:16;276:15;
327:23;328:15;
330:14;336:2
**Nexus (2)**
274:15,23
**Night (8)**
76:19,21;79:20;
80:9;88:11,13,16;
122:18
**nine (9)**
149:20;199:4,20;
234:21,22;242:6,10;
289:10,11
**Nobody (3)**
148:8;176:13;
193:9
**nod (1)**
10:9
**nods (1)**
272:2
**nominated (2)**
121:15,18
**nominates (1)**
69:14
**nominating (1)**
70:10
**nominations (1)**
77:24
**None (6)**
49:12,21;136:5,8;
150:24;253:6
**nonexempt (4)**
289:2;290:7,11,18
**nonprofit (3)**
160:7;329:11;
346:12
**nonprofits (7)**
110:8,12;328:19;
346:1,4,5,20
**nonspecific (1)**
135:4

**nor (1)**
23:19
**normally (5)**
102:7,13;153:22;
181:17;182:11
**Nos (1)**
44:15
**notary (2)**
9:14,15
**note (3)**
14:8;21:15;118:22
**noted (37)**
20:13;31:4;50:6,
19;56:21,24;103:17,
21,25;104:8;118:21;
120:19;129:5;
131:24;134:10;
158:4;178:8,24;
180:1,2;183:14,23;
191:6;196:2;209:13;
210:20;212:8,9,11;
224:15;251:4;
290:14;300:25;
304:2;318:24;
346:16;347:4
**notes (13)**
94:5;176:10,11,24;
181:3;244:7,14,15,
17,20;261:23;262:9;
286:20
**notice (14)**
9:6,7;24:16;61:9;
62:6,9;220:16,20;
221:5;325:4;335:5,7,
8,13
**notification (1)**
62:3
**November (49)**
15:23;16:13;45:16,
21;104:23,24;105:3;
110:20;111:1;
136:17;150:2;155:1;
157:1;161:10,18;
164:13;167:13;
169:7;170:7;172:13;
175:25;176:12,25;
177:8,10,13;180:22;
181:4,21;182:2;
183:6;223:4,8;264:7;
267:24;268:9;274:7;
291:4;305:2;319:15,
19,21,22,24;321:18;
323:11;327:25;
328:10;330:22
**nowhere (3)**
68:9;95:23;225:16
**Noy (84)**
138:15;151:18,20;
163:19;164:12;
166:8;167:1;169:7,
13,18,23;170:6;
171:10;173:1;177:9,
13;181:6,24;214:23;

216:1;217:1,18,24;
218:2,5,8;219:3,6;
224:7,17;229:17;
230:2;231:11,16,19;
235:5,9,10,21;
241:11,13;242:21;
243:6,11,15,18,21;
247:2,8,10;248:1,5;
249:20,25;250:22;
253:24;254:6;
265:10,11;268:9;
269:3;270:2,8;
271:21;275:22;
276:5;278:6,9;
308:18,22;311:8,17,
24;312:11,19;313:1,
4;314:23;317:16;
318:3,7;324:1;
327:14,20
**number (25)**
42:1,4;61:10;72:9;
75:10;83:14;122:3;
123:19,21,23;126:17;
186:13;266:17;
267:2,10,18;268:1,3,
4;269:12;270:5,11;
296:6;297:13;317:22
**numbered (1)**
334:15
**numbers (5)**
125:4;192:25;
255:13,14,15
**Numeral (5)**
49:4;53:12;60:3,8,
22
**numerically (1)**
347:16

## O

**oath (1)**
269:6
**object (15)**
9:20;32:24;56:20;
98:16;103:17;135:3;
178:22;204:20;
209:10;210:2;214:6;
264:24;285:11;
302:23;318:18
**Objection (102)**
20:11,13;31:2,4;
34:4;41:5,8;43:18,
20;49:24;50:5,6,17,
19;52:18;53:1;55:25;
56:21,24;67:4;
103:15,20,21,25;
104:6,8;118:20,21;
131:22,24;132:11;
158:3,4;164:24;
167:9;173:20;178:6,
8,12,17,24;179:8,12;
180:1;183:13,14,22;
190:21;191:4,6;

195:25;209:13;
210:17;211:7,12,18;
212:9;217:10;
221:16;229:1,8,19,
24;230:3;240:16,24;
250:19;251:3;
262:11;264:8;267:5;
271:17;273:14;
283:2;289:18;290:8,
13,14,20,25;291:6;
293:5,15;300:24,25;
301:24;302:6,10,13,
16;303:10;304:1,2;
321:4;323:1,7;
343:25;345:11,18;
346:14;347:2,10
**objections (3)**
9:10,22;118:23
**obligated (1)**
162:9
**obligation (3)**
55:23;56:9;162:11
**obligations (2)**
55:20;241:10
**observed (1)**
216:25
**obtain (1)**
200:2
**obviously (6)**
9:20;14:18;37:15;
110:21;157:23;
192:24
**occasions (3)**
218:5;241:19;
251:22
**occurrences (3)**
342:4;351:19,21
**October (28)**
74:10,14,14,15;
79:21;80:11;104:19;
105:2;106:9,11;
107:16;111:14,17,17;
116:4;118:25;
165:24;199:18,19;
203:18;224:7,12;
295:17,21,25;300:13;
305:2;307:3
**off (20)**
57:10;63:16,17;
70:3;86:24;134:16,
19;181:19,20;182:1,
17;187:10;193:15;
230:21;282:6;
296:15;307:13;
332:20;351:8;352:18
**offer (4)**
177:16;203:1,11;
258:16
**offered (3)**
187:5;188:7;288:1
**offering (1)**
258:15
**office (15)**

75:1;10:9;93:23;
94:8;116:10;136:16;
166:12;207:8;
232:17;257:2;
273:21;301:9,13;
343:22;344:10
**officer (23)**
46:24;47:3,12;
48:12;122:1;154:22,
25;155:3;184:15,24;
185:5;230:7,9,13,15;
250:2,16,25;251:9;
278:4,10,14,17
**officers (11)**
36:12;48:3,5;55:4,
16,18;59:2;107:14;
155:15;265:7,13
**officer's (1)**
57:6
**often (2)**
80:12;262:3
**O'Hara (2)**
28:18;125:19
**Oklahoma (1)**
153:15
**old (6)**
11:19;13:10,18;
110:13;174:25;331:5
**older (4)**
52:6,8;175:2;222:3
**omitted (1)**
32:17
**Once (12)**
83:24;88:1;214:24;
232:7,10;245:7;
274:1,25;328:23;
329:12,22;346:8
**once-a-week (1)**
300:1
**One (87)**
11:18;34:9;35:7,
14;36:4;49:1,7;53:9;
54:10;68:15,20;
73:12;85:15;86:22;
89:19;90:7;98:12;
107:2,8;108:10;
109:2;115:25;
117:17;121:12;
125:10,12;126:8,9;
128:17;131:3,7;
132:3;133:10;
145:11;147:14,19,25;
149:19;150:4;151:2;
153:23;154:11,11;
157:6;158:11;160:8;
171:11;184:2;
186:21;187:11;
199:20;204:14;
214:19;217:3;
219:23;223:13,22;
224:14;231:18;
232:13,24;233:5,17;
235:11;236:2,15;

238:11;242:10;
248:11;252:23,24,25;
253:2;255:15;256:9;
258:17;259:14;
260:24;266:12;
279:2;288:12;
293:19;297:2;
299:14;314:25;
332:2;340:23
**ones (3)**
155:19;164:15;
309:24
**ongoing (4)**
176:17;183:4;
287:19,20
**online (1)**
190:1
**only (56)**
11:6;14:4,5;25:9;
53:16,20;54:3,4,8,15;
90:15;109:1,5;
110:24,24;114:4;
116:24;139:9;
149:21;155:19;
157:6,9;158:11;
159:6;160:8;163:16;
164:15;170:20;
183:9,18;184:22;
185:2,4;186:20;
187:11;208:5;
223:13;226:3,20;
233:21;235:5;
238:11;247:21;
255:15;268:15;
272:5;289:23;292:3,
10;297:9,18;298:23;
303:11;314:24;
322:6;328:25
**open (4)**
47:16;286:2;
287:16,22
**opened (1)**
166:12
**open-ended (4)**
174:10;286:25;
287:15,15
**opening (7)**
66:6;93:21;153:11,
13,22;297:8;307:25
**openings (5)**
157:24;166:19;
181:20;263:14;
294:24
**openly (2)**
288:19,21
**operating (1)**
25:14
**operation (2)**
59:7,19
**operations (12)**
188:1;223:14,18;
233:7,16;234:21;
238:11,15,18;289:5,

6;290:16
**opinion (2)**
178:25;208:15
**opportunities (3)**
72:9;141:6;306:24
**opportunity (10)**
109:18;139:21;
220:21;221:1;247:3;
255:24;306:19;
324:15;326:6;336:22
**opted (1)**
187:11
**option (1)**
278:13
**options (1)**
70:6
**Orchestra (1)**
139:6
**order (3)**
37:8;70:4;83:11
**ordered (1)**
193:8
**ordinary (1)**
311:13
**organization (17)**
19:13;33:20;34:9;
50:21;67:11,15;70:8;
107:23;108:3;
140:20;159:10;
160:6;163:2,12,21;
165:5;285:5
**organizations (5)**
164:14;242:6,11;
289:23;346:20
**organize (2)**
137:13;172:11
**organizing (1)**
170:24
**original (1)**
24:12
**originally (1)**
130:16
**OSHA (4)**
289:3,12,20;290:2
**others (6)**
54:13;87:15;
236:11;242:18;
255:18;343:19
**ought (1)**
208:6
**ours (1)**
140:19
**out (84)**
24:13,16;33:13,17;
35:20;39:2,7;42:1;
51:18,22;55:11;
59:13;72:8;74:13,16;
76:10,19,22;77:22;
78:14;80:3;83:22;
84:22;88:11,16;
92:12;93:1,3,6,10,14,
24;94:12,21;100:20;
105:18;107:19;

109:17;122:18,22,25;
123:5;125:23;128:4,
11;129:5;130:25;
131:4,10,21;132:2,4,
8,13;140:24;148:2,5;
153:10;156:20;
158:8;161:23;
166:19;185:23,25;
216:5,6,16;233:20;
245:9;246:13;
252:21;253:1;
263:12;267:23;
270:10;273:9,20;
274:23;282:19;
284:2,7;288:11;
306:25;338:14
**outdoor (1)**
100:19
**outline (1)**
36:6
**out-of-pocket (4)**
84:6,24;125:21;
128:10
**outreach (2)**
205:21;206:7
**outside (13)**
32:5;53:25;78:17;
90:21;140:3;146:25;
170:18;197:15;
216:4;227:14;
277:23,24;278:3
**outsiders (2)**
250:8,9
**outstanding (2)**
129:11;130:5
**over (30)**
46:22;67:8;70:2;
94:6,12;109:10,14;
110:14;111:19;
130:20;131:13,14;
141:2;170:17,21;
182:20;199:4;
225:25;227:22;
249:15;273:15;
283:4;290:1;304:14;
306:23;319:22;
322:14,15;340:4;
345:13
**overlap (1)**
85:13
**overlapped (1)**
309:24
**overlooked (1)**
79:11
**oversaw (1)**
206:6
**Oversight (4)**
79:7,8,9,10
**overtime (4)**
290:16,24;291:3,5
**overused (1)**
275:16
**overview (3)**

253:23;311:9;
312:6
**owe (1)**
214:2
**owed (5)**
125:23;127:2;
213:21;214:1;291:5
**own (3)**
35:24;112:9;331:1
**owners (1)**
140:18

**P**

**package (2)**
72:20;150:1
**packed (1)**
153:23
**Page (66)**
47:15,16,19,20,23;
55:16;59:4;60:2;
73:9;77:10;78:3;
119:15,20;120:1,10,
14;121:23;123:17,18,
22,24;124:5;126:12,
21;128:15;131:1;
133:3;142:1;149:16;
168:18;192:5;
200:11;203:18;
206:4,10;207:22;
213:17,18;296:8;
299:2;305:15,18,18;
306:15;307:9;
316:13,20;322:2,3;
323:10;325:11,16;
326:20,21;327:1,1,
12;330:6,9;336:2;
337:24;339:4;343:4;
344:16,21;345:2
**pages (4)**
125:25;335:22,25;
337:13
**paginated (1)**
47:15
**paid (20)**
15:22;22:19;84:20;
91:24;108:20;128:5;
130:3,17;135:17;
194:9;219:18,19;
238:22;239:9,13;
240:11,13;260:16;
291:8;318:8
**Palmer (10)**
28:23;29:2;54:25;
58:8;95:19;96:3;
104:12;105:13;
125:18;134:3
**paper (3)**
102:4,5;103:4
**paperwork (4)**
184:20;212:21;
276:21;348:4
**Paragraph (67)**

253:23;311:9;

218:18;214:22;
219:13;220:6,11;
221:3,22;223:12;
224:6,17;231:1;
235:4,24;238:3,7,9;
240:10,15;242:4,19;
243:12;244:22;
247:1;248:2;249:21,
25;250:6;253:8;
254:25;255:4,22;
259:2,6,11;261:24;
264:15,20;265:12;
271:6;272:5;275:22;
277:6,9,21;278:19;
279:1;288:24;
291:13,19;292:3,10;
301:19,21;302:5,21,
25;303:3,4,5,8,13,22;
306:16;323:10;
330:15;339:4,5
**Paragraphs (2)**
262:14;285:19
**parliamentarian (5)**
60:12,16,19;63:23,
25
**parse (1)**
187:16
**part (24)**
45:12;46:1;55:17;
83:21;102:9;130:17;
161:3;171:4;178:1;
192:4;227:15,17;
228:1;233:13;
234:15;242:1;
260:23;262:22,24;
307:14;324:22;
329:5;340:2;344:3
**participant (2)**
149:13,14
**participate (2)**
49:14;145:1
**participated (1)**
97:7
**participating (2)**
35:20,24
**particular (4)**
80:5;151:25;
215:25;339:17
**particularly (1)**
213:10
**particulars (1)**
324:24
**parties (14)**
24:10,17;25:1,5,9;
49:1,7;63:11;76:14,
16;108:10;109:2;
122:17;346:6
**partnerships (1)**
263:15
**parts (1)**
179:20
**part-time (2)**
187:3;205:7

**Party (86)**
26:16;53:19;54:5,
6;61:21,22,25;62:3,6,
10;76:24;77:2,4,7;
84:4,14,18;88:10,15,
20,23;89:2;92:15;
93:2;95:12,14,15,21;
99:7;100:8,11,17,19,
25;101:14,15,21;
103:8,13;104:3;
108:24;122:6,6,7,18,
22,25;123:8,8,8;
124:6,6,6,9,18,18;
125:6;126:20,23;
127:1,8,11,17,20,24;
128:15,24;131:11,21;
132:9,15,21,24;
133:25;136:9,10;
154:8,9,11;157:4,19,
23;158:1,2,5,7
**passed (1)**
190:15
**passing (2)**
217:2;226:18
**Passman (34)**
188:6;244:4,7,16,
21;245:25;246:13,16,
19;255:23;258:23;
259:1,5,10;260:22;
261:7,17,22,24;
262:10;263:16;
264:6;265:10,12;
269:15,25;270:4;
278:2;308:15,18,22;
317:2;328:3,7
**Passman's (3)**
116:9;244:23,25
**past (16)**
19:9,14,21;47:1;
48:12;61:19;63:24;
81:12;94:25;119:2;
155:5,16;188:22;
195:15,19;197:10
**path (1)**
193:21
**patient (1)**
250:15
**Patrick (1)**
222:10
**Patrick's (1)**
222:18
**patronizing (2)**
204:24,25
**Patty's (1)**
77:4
**Paull (7)**
249:7,8,15;251:20;
262:19,20;314:20
**pay (28)**
37:8;128:6;129:3,
20,22,25;161:22;
168:4;188:8;194:7,7,
10,14,20;197:14;

211:5;220:8;221:15;
236:7,10;237:7;
246:20;247:2;265:6;
266:4;290:24;
330:15;331:15
**payable (9)**
38:6;62:21;63:3;
67:25;110:22;111:1;
115:19;274:3;275:2
**paycheck (1)**
37:14
**paying (3)**
90:23;126:17;
128:10
**payment (11)**
62:14,15,19;63:1,
5;165:7;274:3,14,22;
275:2;276:13
**payments (1)**
142:15
**payroll (5)**
71:15;237:21;
240:4
**Peachtree (3)**
8:14,15;234:5
**peer (3)**
242:21;302:2;
339:11
**peers (14)**
216:6,16;268:16;
338:4,9,25;339:3,6,9,
14,20,24;340:5,7
**penalty (5)**
326:20,25;327:4;
329:20;340:13
**pending (5)**
11:7;133:7;182:1,
8,18
**Pennsylvania (1)**
66:6
**people (40)**
35:23;36:18;58:12;
73:2;83:25;100:8,18;
110:12;128:2;129:3;
134:1,9,12;135:2;
136:1;141:1;175:5,6,
8;208:2;224:16;
227:22;229:16;
249:22;252:5,8;
254:1;256:15;257:9,
11;258:6;265:21;
268:5;269:21;
281:20;282:1;
313:16;315:4,8;
323:18
**per (3)**
253:24;327:14,20
**perception (1)**
208:13
**perform (1)**
167:11
**performance (4)**
207:8;218:6;

232:20;253:23
**performed (3)**
292:19,22,23
**performing (2)**
291:20;303:16
**perhaps (2)**
54:25;113:11
**perimeter (1)**
145:20
**period (8)**
90:22;119:4;156:3;
221:14;224:5;
248:10;263:11;315:1
**perjury (5)**
326:20,25;327:5;
329:20;340:13
**Perkins (4)**
28:18;78:10,12,17
**permanently (1)**
29:19
**permitted (1)**
75:12
**person (11)**
40:17;68:7;96:16;
144:5;257:15,19;
279:19,23;303:20;
314:12,25
**personal (4)**
89:10;105:9;252:2,
3
**personally (6)**
26:9;100:16;
160:10;178:9;179:2,
3
**personnel (3)**
185:5;313:2;314:8
**persons (9)**
21:15;70:16;
264:17,18,22,23;
265:5,8;277:17
**pertaining (2)**
311:12,13
**Pflegl (16)**
216:20,25;217:5,6,
16,17,20;227:5;
241:12,14;254:3,7;
302:14,22;303:9;
322:5
**philanthropic (2)**
203:21;294:11
**phone (2)**
94:6;157:24
**photo (1)**
71:21
**photograph (2)**
70:16;71:8
**photos (1)**
71:23
**phrase (1)**
217:19
**phrased (1)**
238:8
**physically (2)**

22:15;123:2
**pick (1)**
130:23
**picture (5)**
70:19;71:22;136:4;
234:16;290:23
**Pictures (1)**
206:23
**Pike (2)**
186:3,14
**pitch (1)**
63:13
**PL-4 (1)**
44:15
**PL-40 (1)**
151:7
**PL-439 (1)**
207:22
**PL-47 (2)**
142:1,22
**place (5)**
9:7;76:6;79:2;
158:9;249:3
**placed (1)**
147:7
**placement (4)**
115:13;143:18;
263:2,8
**plaintiff (4)**
8:20,21;316:21;
343:18
**Plaintiff's (8)**
198:19,24,25;
200:5;343:9;344:17,
23;345:4
**plan (3)**
25:1;30:19;64:19
**planned (2)**
76:16;100:20
**planning (4)**
241:5,10;263:10;
333:23
**plans (1)**
182:9
**platinum (10)**
30:10,15,20;31:1,
11;32:11;33:7,9;
275:12,16
**play (6)**
58:20;177:21;
270:22,25;271:2,4
**Played (2)**
270:18,20
**pleading (2)**
209:22;315:19
**please (17)**
8:16;13:16;76:9;
106:14,15;114:13;
120:24;132:6;
140:10,14;142:9,22;
156:23;170:2;318:1;
343:4;347:5
**plus (2)**

128:21;234:14
**PMB (6)**
279:4,6,10,19,24;
281:9
**pocket (1)**
84:22
**point (25)**
10:15;16:5,8;
36:23;37:3;45:5;
145:15;153:5;
166:23;168:4;
176:18;181:1;
185:10;188:4;
206:21;208:1;210:9;
222:24;226:5;
233:15;235:23;
252:10;306:24;
319:2;338:14
**pointed (6)**
215:10,15,19;
216:1,5;219:6
**pointing (1)**
243:17
**points (1)**
16:12
**policies (1)**
290:16
**policy (3)**
272:25;273:2;
289:22
**poll (5)**
268:15;339:3,9,14;
340:5
**portion (2)**
303:18;338:22
**position (15)**
118:12;167:25;
187:5;205:7;218:20;
219:2;242:22;243:8,
15;246:17;250:10;
253:15;256:1;
259:13,22
**positions (1)**
303:15
**positive (1)**
242:20
**possession (9)**
42:20,24;43:3;
45:5,8;105:20;
236:12;349:11,14
**Possibly (1)**
304:8
**postemployment (1)**
174:22
**potential (2)**
140:19;255:6
**potentially (1)**
129:10
**Powell (4)**
163:1;176:17;
208:9;307:15
**PowerPoints (1)**
293:21

**practice (5)**
50:25;102:17,21;
125:24;273:5
**pre-2005 (1)**
12:8
**Prebula (236)**
8:13,19,19;9:17;
13:14;20:11;31:2;
32:24;34:4;41:5,8,10,
12;42:11;43:18;
44:22;49:24;50:5,17;
52:18;53:1,3;55:25;
56:20,22;57:9;63:14,
17;65:6;67:4;68:15,
18,20,22,24;69:3;
98:16;103:15,19,23;
104:6;115:5;118:20,
22;123:18,22;124:1,
4;127:6;131:1,5,8,22;
132:5,11;135:3;
136:23;137:6,13,17;
140:9,13;149:13;
150:4,8;154:23;
158:3;160:2;164:24;
167:9;173:20;178:6,
12,17,22;179:7,12;
180:1;183:13,15,22;
190:21;191:4,21;
192:18,22;193:2,6,8,
12,14;195:25;196:9,
22;200:7;202:14;
204:20,24;205:2;
209:4,10,14,18,24;
210:2,17,21;211:7,
12,18;212:6,9;
213:13;214:6;
215:12;216:9;
217:10,13;221:16;
229:1,5,8,10,19,24;
230:3;238:6;240:16,
24;245:15;250:19;
251:3;262:11;264:8,
24;267:5;271:17;
273:14;280:7,12,17,
20,22;281:2;282:4;
283:2;289:18;290:8,
13,20,25;291:6;
293:5,15;295:18,20;
300:24;301:24;
302:6,10,13,16,23;
303:10;304:1;306:4;
311:3,5;312:14;
315:21;316:3;
317:19,24;318:18;
319:1,4;321:4;323:1,
7;324:17,21,25;
325:6,12,14,17,19,
24;326:3;330:1,7,25;
331:3,10;332:4,8,12,
17,22;333:8,12,14,
19;334:1,13,17,23;
335:24;336:4,8,11,
17,19,23;338:16;

340:24;341:1,8,10,
13,16;343:25;345:11,
14,18;346:14;347:2,
10,17;350:15,18;
351:4,6,12;352:15,17
**preceding (1)**
25:8
**precise (1)**
345:22
**predicate (1)**
190:6
**prefer (2)**
157:14;160:21
**pregnant (3)**
195:4,6,9
**preliminary (1)**
213:9
**prepare (23)**
18:5;23:17,19,24;
27:4;38:22;39:2;
61:24;62:2;66:25;
79:23;82:13;113:7,
11;120:10;168:13;
172:5,7;305:11;
306:1;342:5;351:17,
20
**prepared (30)**
24:1,2,3;27:7;28:2,
6,10;30:23;39:19;
79:24,25;92:19;
99:10,11;130:16;
172:10;201:10,19;
202:3;203:8;204:2;
206:22;294:19;
305:21,24;330:20;
331:20;351:15;
352:3,3
**preparing (3)**
67:3;99:14;351:24
**prepped (1)**
293:20
**presenatation (1)**
66:4
**presence (3)**
26:5;110:4;145:12
**present (16)**
8:16;20:8,21;21:1,
15;100:22;199:20;
203:19;216:8,15;
231:24;248:1;
316:17;334:5;350:2,
14
**presentation (4)**
66:3;244:4;293:18;
318:11
**presentations (4)**
293:10,11,14,17
**presented (3)**
30:23;101:13;
138:19
**presidency (2)**
69:18;78:15
**president (69)**

16:15,23;17:1,4,
13;19:9,14,21;22:9;
25:2;30:5;46:12,19;
47:1;48:6,8,12,15;
53:15;54:19;55:18;
63:24;69:8,14,14,16,
24;70:5,7;75:23,25;
78:5,8;79:1,2,5,6;
80:12;81:12;83:1;
85:16;86:18;95:1;
96:22;107:6,7,11,17;
111:14;118:24;
119:2,3,4;120:4,7;
125:15;133:23;
155:5,13;202:10;
228:20;230:9,12;
233:12;250:25;
256:13;257:4,16,20
**president-elect (3)**
79:5;120:7;155:14
**president's (2)**
256:1;258:9
**pretty (4)**
69:15;96:15,16;
178:4
**prevent (2)**
169:21;170:3
**prevented (14)**
34:12;94:14;141:8;
211:2,10;243:24;
267:17,25;269:13,17,
20;270:3;285:25;
288:16
**preventing (6)**
79:4;174:18;175:3;
194:18;210:14;296:5
**prevents (1)**
49:22
**previous (6)**
12:3,19;29:25;
31:13;126:18;260:12
**previously (3)**
12:5;231:23;255:2
**principals (1)**
256:23
**principles (2)**
192:6,15
**print (14)**
101:24;102:8,14,
17,21,25;103:7;
105:13,25;116:3,7,
11,18,22
**printed (6)**
92:12;100:13,15;
101:5;220:15;299:20
**printing (1)**
116:25
**printout (2)**
73:9;347:15
**prior (7)**
274:3,14;275:1;
323:19;328:16;
329:21;352:3

**Pritchett (2)**
256:18,18
**privacy (2)**
13:15;196:10
**privilege (6)**
9:21;209:11,19;
210:3,18;306:6
**privileged (2)**
210:6;306:7
**privileges (1)**
84:8
**prize (2)**
166:9;167:2
**probably (7)**
14:23;31:25;51:19,
22;57:24;125:23;
164:23
**problem (3)**
160:23;212:10;
273:10
**problems (1)**
57:20
**Procedure (1)**
9:3
**process (13)**
46:1;62:14,15,18,
25;69:19;70:9;
111:18;142:5,9,13;
154:12;180:25
**processed (1)**
294:12
**processes (3)**
46:13;54:21;
203:20
**processing (4)**
142:14;273:22;
276:13,20
**produce (2)**
301:15;316:21
**produced (29)**
15:13;22:18;44:14,
25;191:15,25;
192:19;224:25;
242:18;245:3,14;
295:17;298:23;
301:14,17;306:7;
307:4;320:16;
324:20,21,25;325:7,
9;336:1,25;347:14;
348:7,10,14
**product (5)**
9:22;209:12,20;
210:3,19
**production (8)**
151:15;192:2;
207:22;315:18;
316:2;320:18;
348:25;349:4
**professional (4)**
201:25;205:18;
208:5;297:23
**Professionals (2)**
346:8,11

**professor (2)**
186:25;187:13
**professors (1)**
189:5
**program (6)**
34:17;102:2;
175:18;203:20;
205:20;206:4
**Programming (5)**
182:6,9,20;241:6;
271:15
**programs (3)**
182:15;289:3;
313:19
**progressed (1)**
215:4
**progression (1)**
215:23
**progressive (1)**
199:5
**project (5)**
203:17;204:1;
224:22;225:1;
246:20;263:18
**projects (6)**
166:13;225:25;
291:25;292:5,12;
341:20
**prominent (1)**
143:17
**prominently (1)**
143:15
**promised (1)**
253:19
**promote (9)**
140:5,23;218:9;
225:16;242:22;
243:7,16;263:21;
268:5
**promoted (6)**
214:13,16;218:23;
219:1;260:16;318:7
**promotion (6)**
214:10,25;255:6;
263:17;312:12,20
**promotions (1)**
161:22
**properly (3)**
308:24;346:24;
347:7
**propose (2)**
33:9,11
**proposed (4)**
9:6;19:9,15;23:2
**proposing (1)**
258:18
**proprietor (2)**
39:17,21
**prospect (2)**
65:24;66:23
**prospective (1)**
60:3
**protested (1)**

272:8
**protesting (1)**
272:12
**provide (9)**
26:10;83:13;140:5;
253:9,19;255:5,11;
256:21;306:9
**provided (7)**
9:9;67:10,11;
149:2;165:2;253:17,
20
**provides (1)**
67:15
**providing (1)**
152:20
**psychology (1)**
196:25
**public (3)**
9:14;102:19;163:5
**pull (5)**
102:2;107:19;
109:17;137:17;
172:14
**purchased (1)**
84:21
**purpose (20)**
48:25;49:3,6;
50:11,15;52:15,23;
75:14;108:9,13,17;
109:1,5,9,13;139:18;
159:12;166:21;
346:5;351:23
**purposes (5)**
9:2;90:6;159:20,
21;191:14
**PurSHOEing (4)**
141:23;147:10;
148:14,18
**pursuant (1)**
8:1
**pursuing (5)**
202:22;203:7
**put (27)**
50:15;67:14;85:15;
86:16;102:22;
103:19;137:6;
140:24;151:8;
172:11;181:18;
182:11;185:18;
191:13;196:10;
206:14;208:9,14;
219:24;224:3;
235:15;275:21;
290:5;300:20,23;
301:2;348:5
**putting (2)**
182:10;269:6

## Q

**QD (3)**
77:19,19;113:18
**Quadrille (192)**

16:15;17:2,4,13,
20;18:21,24;19:4,7,
11;20:19;21:5,19,24;
22:3,5,22;23:10,14;
25:2;26:22;27:1;
29:19;30:2,5;35:20;
36:3,3,8;37:18;38:14,
17,18,19;39:6,14,20,
24;45:14,20,23;46:2,
8,20,25;47:8;48:3,21,
23;49:7,10,11,14,20,
23;50:11,16;51:8,10;
52:15,23;55:11;57:3;
58:6,13;59:7,20,25;
60:13,16;61:12;63:7,
25;64:5,15;65:20,24;
66:23;67:16,25;69:8;
70:11;75:20;77:20;
78:8;81:7,11,18,22;
82:5,25;83:2,8,23;
85:5,12,14,18,24;
87:12;89:5;90:1,5,
25;91:25;92:8;93:4,
9;94:17;95:11;96:6,
24;97:4,11,17;98:11,
19;99:7;100:9;
105:18;106:21,23;
107:6,13;108:5,7;
109:9,14;110:6,12;
111:6,16,21,22;
112:2,2;113:10,18,
24;114:3,11,16;
117:10,15,18;118:1,
6;120:20;121:1,23;
123:15;135:7,24;
139:9,18;141:5;
154:20;155:1,23;
159:13;163:6,20,23;
164:6,13;165:1,8,15;
202:9;242:10,11;
272:20;274:5,10,21;
275:6;276:13,18;
277:1,13,19;282:22;
284:2;285:4,9;345:9,
13,17,21,22;346:25;
347:8
**Quadrille's (9)**
16:7;20:23;26:12;
45:12;120:14;
129:17;159:21;
161:4;276:23
**qualified (1)**
303:16
**quality (3)**
25:23,25;110:1
**quarter (15)**
114:24,25,25,25;
116:2;117:7;187:10;
247:13,20;248:14,18,
21,24;253:13;290:1
**quarterly (1)**
289:25
**quarters (1)**

187:9
**questionable (1)**
152:21
**questionnaire (6)**
325:5,20,21,23;
335:22;337:4
**quick (2)**
69:2;95:11
**Quickly (1)**
341:19
**quit (1)**
315:2
**quite (6)**
14:20;131:14;
146:2;227:6;259:8;
276:20

## R

**Radio (1)**
279:4
**rained (1)**
100:20
**raise (3)**
68:10;157:10;
159:7;269:21;345:8
**raised (2)**
344:22;345:3
**raising (6)**
162:2,6;343:8;
344:17;346:24;347:7
**rally (1)**
166:18
**ran (1)**
252:4
**rate (1)**
258:13
**rather (3)**
112:17;302:20;
345:22
**rational (1)**
173:23
**re (1)**
343:19
**reach (2)**
78:14;273:20
**reached (7)**
39:7;153:10;
156:20;161:23;
252:21;253:1;273:9
**read (22)**
9:12,17;50:12;
91:22;154:7;156:23;
169:14;179:20;
180:8,13;205:4;
238:6,9;246:5;
252:10;312:15;
329:16;331:2;338:5,
6;350:19;352:17
**reading (7)**
59:22;203:22;
245:21;272:10;
327:16;333:6;344:25

**reads (6)**
29:17;306:16;
340:8,9;349:22;
350:9
**real (1)**
69:2
**realize (1)**
265:16
**really (18)**
46:6;52:1;94:4;
101:1;117:5;129:10;
132:12;136:6;145:6;
147:6;181:13;
182:19;188:6;
189:14;190:3,11;
223:9;290:15
**reason (15)**
51:11;75:2;151:20;
166:3;183:9,18;
184:2,6,13,15,22;
186:6;260:16;
261:19;288:15
**reasonable (1)**
184:10
**reasons (5)**
13:15;126:4,7,8;
196:11
**Rebecca (1)**
8:23
**recall (99)**
13:7;27:8;31:17;
33:24;39:16;42:20;
44:4,9,11;48:18;
52:3;54:24;57:14;
58:4;62:17;82:19;
86:12,14;87:19,21;
94:13,19,23;96:1,4,
12;97:2;99:12,13;
100:10;101:23;
111:2;113:5,13;
115:22;124:24;
126:16;130:22;
135:16;145:19,22;
147:3;149:3;173:13,
17;180:19;193:25;
194:3,6;195:15,19;
197:8,10,17,18,22,22,
25;198:3;199:25;
215:21,25;222:23;
223:18;224:11,13,19;
233:1;240:21;244:9,
14,18,20;245:8;
251:14,19;253:7;
256:3,16;258:25;
262:15;266:8,10,15;
271:18;272:15;
275:13,20;284:5;
287:17;306:12,14;
310:9,18;324:5;
329:4,7,17;347:23
**receipts (6)**
30:1,4;125:13,14,
17;128:12

**receive (10)**
21:9;30:8,16,25;
32:11,16,22;37:14;
42:23;209:7
**received (15)**
32:15;33:1;42:19;
57:21;93:13;185:2;
200:1;274:6;310:8;
320:10;322:9,11,16;
327:13,19
**receiving (3)**
58:2;110:9;242:20
**recent (1)**
55:13
**recently (4)**
55:12;304:20,22;
316:9
**Recess (6)**
63:19;134:21;
193:16;230:22;
282:7;351:9
**recipient (2)**
254:11,12
**recipients (1)**
96:4
**recited (2)**
108:13;247:17
**recognition (1)**
242:21
**recognized (1)**
46:24
**recollect (2)**
211:25;212:2
**recollection (11)**
39:10,13;181:14;
200:3;203:10;
254:10,15;256:10;
293:25;324:8;351:14
**reconcile (1)**
88:1
**reconvene (1)**
336:23
**record (19)**
8:6;13:15;24:24;
43:21;63:21;68:25;
69:3;103:20;109:11;
118:23;134:23;
196:10;230:24;
319:1,4;332:21;
333:16,19;336:13
**recorded (2)**
10:14;87:25
**records (9)**
16:12;22:13;84:11;
111:17;130:6;
136:18;137:5;
161:16;236:10
**recover (1)**
221:14
**recruited (2)**
52:6;282:14
**Red (1)**
275:17

**redact (1)**
  192:24
**refer (13)**
  76:13;138:17;
  214:21;254:25;
  265:12;271:6;
  301:20;302:20;
  316:14;322:5;327:8;
  349:23;350:10
**reference (7)**
  80:25;114:2;
  245:23;289:22;
  299:11;341:17;
  344:19
**referenced (2)**
  95:15;137:15
**referred (4)**
  59:10;69:4;124:22;
  318:20
**Referring (17)**
  81:20;87:9;150:5;
  153:1;155:19;
  183:25;184:1;238:4;
  240:15;242:17;
  302:4,19;303:8,21;
  330:20;339:13,16
**refers (16)**
  61:3;68:10;79:20;
  81:7;89:1,19;105:6;
  108:2;126:12;171:5;
  172:22;200:12;
  201:24;305:15;
  317:7;343:21
**reflect (7)**
  87:24;89:8;298:22;
  316:15;320:25;
  349:24;350:11
**reflects (3)**
  242:1;317:7,10
**refresh (1)**
  351:14
**regard (1)**
  323:21
**regarding (15)**
  24:6;95:11;138:18;
  181:15;213:23;
  246:5;250:14;
  259:19;272:17;
  313:1;328:18,19;
  329:10,11,21
**regardless (1)**
  308:1
**Regards (4)**
  21:5;177:25;
  305:16,19
**Regional (2)**
  137:24;150:14
**regular (5)**
  53:9,14,25;348:11,
  16
**regulated (1)**
  75:3
**Regulations (1)**

8:2
**reimbursed (1)**
  84:25
**reimbursement (1)**
  128:10
**relate (3)**
  316:14;349:23;
  350:10
**related (3)**
  14:23;287:11;
  347:22
**relates (1)**
  317:7
**relationship (2)**
  222:10;270:10
**released (1)**
  294:17
**relevance (4)**
  144:7;165:12;
  178:23;271:17
**relevant (1)**
  289:1
**remain (1)**
  261:20
**remained (1)**
  287:15
**remaining (1)**
  287:22
**remember (156)**
  12:6,15;13:10;
  15:22;18:23;19:6,10,
  23;20:4,15,20,22;
  22:24;29:11,14,16,
  24;30:3,6,31:5,15,20;
  32:7,8,9;43:8,14;
  44:1,10,13;46:14;
  52:2;58:11,21;61:14;
  63:12;67:6;80:1,12;
  82:1,4,7;85:16;
  86:14;87:1;88:8,14;
  92:23;94:4,10;97:5;
  100:19,21;101:1,3;
  107:12;115:18,22,25;
  117:5,6;121:17;
  124:21;125:1,2;
  126:9;135:6,13,20,
  22;139:17;149:5;
  153:10;154:4;
  165:10;166:10;
  167:14,16,23,24;
  171:23;173:13,22;
  181:22,23;182:3,18,
  19,21;186:19;
  187:25;189:14,20;
  190:3,9,13,16,23;
  191:8;195:11,12;
  196:7;198:6;203:15,
  16;217:7,22,25;
  218:18,24;222:6,8,9;
  230:17;235:18;
  239:14,16;243:5,9,
  10;244:24;245:6,7;
  248:19;249:24;

251:16;253:21;
  256:19,25;257:13;
  258:4;260:21;
  261:25;262:2;
  268:24;269:4,6;
  271:3;276:24;277:2,
  5;281:22;282:3;
  283:24;286:8;
  287:21,25;288:23;
  289:4;299:2;304:13,
  18;305:1;309:12;
  312:5;352:9
**reminded (3)**
  255:1,10,12
**remove (2)**
  29:19;86:2
**reorganize (1)**
  250:17
**reorganizing (1)**
  251:1
**rep (1)**
  279:4
**repaid (1)**
  84:23
**repair (1)**
  15:23
**repaired (1)**
  16:2
**repay (1)**
  85:6
**repeat (7)**
  10:17;26:24;132:6;
  205:2,2;264:19;
  317:25
**rephrase (2)**
  10:17;174:8
**replaced (1)**
  277:22
**replacement (1)**
  250:13
**replacing (1)**
  315:1
**report (17)**
  162:25;173:7,11;
  174:6;181:8;231:22;
  232:19;235:13;
  254:9;260:15;
  264:16,21;265:4;
  294:19;307:14,21,23
**reported (27)**
  61:5;162:16,24;
  170:10;171:9;
  173:15;174:15,20;
  175:10;179:5,10,16,
  24;180:21;181:8;
  183:10,19;225:19;
  231:23;235:8,9;
  243:11,18;262:21;
  267:24;307:17;308:2
**Reporter (4)**
  8:1;10:8,15;332:13
**Reporting (11)**
  8:3;235:5,21;

241:2;254:1,7;258:6;
  265:20,23;269:11;
  270:3
**Reports (2)**
  64:12;308:11
**represent (1)**
  208:2
**represented (3)**
  50:21;207:19,19
**representing (1)**
  26:11
**request (49)**
  28:20;29:3;35:11;
  37:24;62:21;63:2;
  72:5;74:21;78:7;
  83:1;107:21;142:7,
  12;144:6,12,16;
  146:16;151:24;
  164:9;172:9;253:24,
  25;273:5,12,13;
  274:5;277:12,18;
  285:12;311:8,10;
  315:17;316:1;
  320:17,17;325:7;
  327:15,21;348:24;
  349:3,6,9,15,18,22;
  350:7,16,18,24
**requested (5)**
  37:6;90:7,12;
  313:8;327:8
**requesting (5)**
  18:25;19:5,8;21:7;
  347:9
**requests (4)**
  73:9;74:1;75:7;
  349:22
**require (1)**
  261:4
**required (5)**
  37:8;90:18,19;
  190:14;274:19
**requirement (1)**
  268:11
**requirements (1)**
  167:24
**requiring (2)**
  54:2;261:12
**reserve (1)**
  9:18
**reserved (3)**
  9:11;103:22;
  352:21
**residence (1)**
  11:21
**resignation (1)**
  287:25
**resignation/termination (2)**
  184:20;281:11
**resigned (1)**
  119:21
**resolve (1)**
  268:5
**resolving (1)**

266:24
**resources (7)**
  165:14,17,20;
  264:17,22;265:5;
  267:14
**respect (2)**
  178:13;228:22
**respond (3)**
  22:8;210:23;
  338:12
**responded (8)**
  164:21;191:18;
  243:16;268:20;
  349:6,9,15,18
**responding (1)**
  313:4
**response (22)**
  10:7,14;37:10;
  174:11;245:20;
  246:7;292:8;295:5;
  311:24;316:1;
  318:20,21;320:17;
  338:2,8,16,17,19;
  348:24;349:3,21;
  350:4
**responses (5)**
  126:6;315:17;
  336:7,16;341:18
**responsibilities (17)**
  168:4;181:7;
  189:17;224:23;
  229:12,14;231:7,13,
  23;236:2;241:1,9;
  250:15;260:18;
  291:16;304:4;341:21
**responsibility (8)**
  59:6,19;168:3;
  182:4,8;233:11;
  241:5;311:11
**responsible (11)**
  26:9;34:17;74:20;
  150:22;182:16;
  205:23;206:1,5;
  234:7;298:19;307:13
**rest (5)**
  300:20,23;301:2,
  10;325:8
**Restate (1)**
  120:22
**restructure (1)**
  250:23
**result (5)**
  31:11;152:4,19;
  263:23;264:6
**resume (12)**
  198:20;199:2;
  201:11;202:1,18;
  203:14;204:11;
  206:21;208:4;
  281:13;288:19,21
**resumes (3)**
  208:6;242:13,17
**retaliated (5)**

214:18;265:20,23;
266:13;269:25
**retaliation (22)**
213:11;214:21;
269:23;316:16;
317:9;318:16;319:8;
320:6;321:2,16,24;
326:17;335:10,15;
337:8,21;342:1,9,17;
350:1,13;352:12
**return (2)**
72:14;126:5
**returned (1)**
219:22
**returning (2)**
29:18;126:1
**revamp (1)**
307:25
**review (15)**
27:6;59:1;152:17,
20;202:14,15;208:23,
25;209:2,5,9,16,17,
21;334:15
**reviewed (5)**
18:10;112:13;
176:8;210:4;308:16
**reviewing (2)**
153:2;334:5
**rewards (3)**
175:19;181:15;
292:7
**Richard (9)**
8:22;131:2;209:5;
317:20;324:18;
330:25;332:4;
334:24;336:8
**Ricky (9)**
279:2,6,18;280:4;
281:8;282:9;285:16;
288:6;344:16
**ride (1)**
187:7
**Ridge (2)**
297:3,4
**right (174)**
29:20;35:24;46:21;
51:21;56:3,19;59:23;
60:20;63:5,11;65:22;
69:1;74:6;75:6,22;
76:22;78:1;90:11,17,
20,24;91:1,2;94:15;
95:1;96:13;97:9,11,
25;98:2;104:16;
106:24;107:6;108:2,
3,21;111:11;114:12,
17;116:15;118:18;
120:18;121:6,11,16,
24;122:4;123:20;
128:3,4;129:4;131:3;
132:25;136:18;
138:21,22;142:6,10,
13;143:6,12;144:3,6,
12;145:17;146:9;

149:25;150:12,22;
153:15,20;154:1,20;
155:7,10,15;156:1,7,
18;162:17,21;165:5,
9;169:1;173:3;176:2;
183:7;186:10,12,16;
187:3;194:16;195:3,
7;196:4;205:7;
217:17;218:11;
219:13;220:1,4,16,
20;221:5;223:11;
227:25;232:9;
233:19;234:23;
235:13,14,17;240:5;
241:12;249:16;
252:6;255:7;260:2,8,
10,19,21;261:11;
262:3,23;272:14;
276:2,3;280:1;
283:17,20,23;285:2,
2,22;289:6,13,21;
290:3;292:8,22,25;
293:7,10;294:5,7,8,
12;295:9;297:10,23;
299:9,19;303:12;
308:11,13;312:4,13;
313:22;314:13;
318:8;322:19,22;
323:22;330:22;
331:7;332:11;333:1;
334:10;335:5;
341:12;347:1;
351:23;352:6
**rights (4)**
325:4;335:7,8,13
**rising (1)**
280:8
**Ritz (3)**
234:1,2,15
**Road (2)**
8:14,15
**Rob (11)**
228:20;229:4,6;
230:14;251:8;
303:23,25;304:5,6,
24;320:18
**role (9)**
78:24;142:14,17;
201:18;220:2;236:3;
263:10;307:13;327:9
**roles (3)**
111:7,24;112:4
**Roman (5)**
49:4;53:12;60:3,8,
22
**room (2)**
36:14;166:15
**rooms (2)**
308:2,24
**Roughly (3)**
13:9;15:2;22:4
**routine (1)**
291:20

**Ruby (3)**
142:20,25;275:17
**Rule (1)**
342:21
**Rules (3)**
8:2;9:3,24
**rumors (1)**
288:11
**run (4)**
251:21;332:7,21,
23
**running (2)**
218:6;247:6
**runs (1)**
73:12

## S

**S/J (1)**
137:23
**Sadie (7)**
169:6,17,22;170:5;
172:25;184:3;239:22
**Sailors (52)**
62:16;91:12;138:8,
13;205:23;206:1,5;
224:18;225:18,20;
226:6,16;231:9;
232:15,20;234:25;
236:17,20;237:1;
240:19,22;241:15,18;
242:2;254:7,10;
268:18;271:6,8,11,
25;274:3,14,17,19;
275:1;277:8,12;
293:12;294:4;
302:21;303:9;
307:14;322:5,6,9,11;
323:19,24;329:2,6;
340:14
**Sailors' (2)**
237:7;309:18
**Saints (1)**
240:1
**salaries (1)**
237:21
**salary (18)**
207:1;213:22;
236:1;240:12;
258:13;259:19,20,22,
24,25;260:3;268:6;
291:9;322:9,11,16,
17,19
**sale (2)**
252:6,11
**sales (10)**
63:13;66:11;
175:19;181:15;
203:21;279:4;292:7;
309:11;310:13;315:9
**same (59)**
11:2;24:1,3;41:8;
50:5,20;53:1;89:21;

91:16,16;94:17;
104:6;123:18,22;
132:11;133:2;
144:18;178:12,17;
179:12;183:22;
192:5;211:7,7,12,12,
18,18;219:22;
225:22;229:8,19,24;
230:3;236:9;238:3;
240:24;250:5;251:3;
254:19;260:17;
290:13,20,25;291:6;
302:6,10,13,16;
303:10;304:1,5;
321:4;323:7;331:2;
339:8;345:18;346:2;
347:10
**sand (1)**
12:1
**Sanders (1)**
148:23
**sat (1)**
275:9
**saturated (1)**
145:3
**save (10)**
62:3,6;73:1;92:11,
15,22;97:17,21;98:8;
131:13
**saw (25)**
14:16;22:14;61:8;
88:14;124:22;141:5;
149:1,4,24;150:12;
152:17;155:16;
180:15;216:18,19;
236:12;237:20;
252:18;261:1,1;
304:13,13,14;307:3;
382
**saying (25)**
24:13;25:21;81:17;
110:19;144:14,25;
145:2;160:15;161:9;
191:23;194:19;
197:9;205:1;232:9;
238:20;243:11;
245:25;257:12;
266:2;280:4;283:6;
292:21;300:4;
336:12;338:16
**scanned (1)**
316:7
**Scarborough (1)**
71:10
**schedule (3)**
24:13;25:10;77:23
**scheduled (1)**
299:19
**scholarship (3)**
187:6,7,8
**School (15)**
12:1;185:15,20;
187:6,12,14,15,19;

188:3,8,9,21;192:17;
194:22;261:10
**schooling (1)**
197:10
**schools (2)**
140:6;191:15
**school-wise (1)**
195:3
**Science (1)**
203:5
**scope (2)**
43:18;55:25
**SD (2)**
15:13,20
**search (3)**
218:12,15;250:13
**searching (1)**
218:13
**seat (1)**
147:20
**second (5)**
57:9;65:8;114:25;
305:15;340:2
**secretary (3)**
20:20;48:10;
155:14
**secretary's (1)**
133:21
**section (2)**
327:11,12
**secured (2)**
118:11;165:6
**Security (5)**
42:1,4;61:10;
191:16;192:25
**seeing (8)**
14:14,15;87:21;
102:11;106:24;
124:24;203:16;
230:17
**seeking (1)**
288:12
**seems (1)**
179:1
**segment (2)**
208:4;309:9
**selected (1)**
107:17
**semester (1)**
187:10
**send (29)**
18:5;23:4;28:14;
43:13;62:21;63:3;
74:12;88:5;93:16,19;
94:9,11,12,20,21;
105:18;113:24;
114:10,15;117:17;
118:1;148:1;156:4;
158:15,19,22;254:6;
255:15;273:5
**sending (7)**
43:14;44:11;83:6;
87:19,23;89:7;94:14

**senior (6)**
183:11,20;184:3;
243:25;250:25;
260:23
**senior-level (1)**
237:19
**sense (1)**
158:7
**sent (50)**
24:16;28:2,6,10;
35:11,14;61:18;
64:11,14,18,21,24;
65:11,16;74:16;
82:20;83:25;87:15;
89:21,22;93:4,6,9,10,
15;96:2,25;108:20;
113:21;114:1,7;
117:14;131:16,21;
132:8,13;144:20;
149:8;154:17;159:2,
2;255:3,13,14;
294:19;312:7;
321:21;328:22;
348:19;349:11
**sentence (5)**
323:14;339:8,16,
22;340:3
**sentential (1)**
190:6
**separate (1)**
132:22
**September (25)**
65:17;69:9,12;
73:13,16;80:21;
81:23;82:17;221:4,
10;225:10;232:2;
247:21;255:23;
258:22;261:8;
262:17;264:3;
269:15;272:6;
277:23;278:8;
300:13;328:2,6
**series (2)**
295:2;352:7
**serve (3)**
119:10;242:5;
346:20
**served (7)**
54:15;60:18;63:24;
119:7,11;167:17;
236:3
**servers (1)**
348:8
**service (9)**
248:9;249:22;
292:8;295:4;314:9,
10,14;315:9,11
**services (1)**
256:21
**serving (1)**
109:18
**session (1)**
332:13

**set (6)**
24:13;224:17,22;
262:2;263:12;299:24
**Seth (2)**
12:20,21
**sets (1)**
33:12;72:8;77:22
**setting (1)**
35:8
**seven (10)**
149:20;205:12;
226:8;332:5,13,16,
19;333:16,20,22
**several (15)**
49:15;54:20;70:6;
94:7;125:20;128:2;
165:21;190:5,11;
216:5;242:12;
299:21;308:9;
318:19;328:12
**severely (2)**
188:23;237:3
**severing (1)**
252:8
**Seyfarth (1)**
207:18
**shake (1)**
10:9
**shall (8)**
48:5;55:18,19;
59:7,20;60:4,23;
108:9
**Shannon (60)**
62:15,22;91:12;
115:19,23;116:11;
138:8,13;139:3,7,16;
166:11;171:24;
172:12,13;181:7,9,
12,19,21,24;182:1,
17,22;205:23;206:1,
5;216:17;224:18;
225:18,20;226:3,6,
16;234:25;236:17,
20;237:1,7;240:19,
22;241:6,15,18;
242:2;248:6;254:10;
260:17;262:21;
268:18;274:9;
293:12;294:4;302:1,
21;303:9;307:14;
309:18;329:2,6
**Shannon's (3)**
182:13;262:24;
263:1
**share (2)**
309:16;310:14
**shared (1)**
206:3
**Shaw (1)**
207:18
**sheet (4)**
88:2;102:4,5;131:4
**short (3)**

15:14;63:14,18
**shorter (1)**
233:2
**shortly (4)**
193:2;281:10;
287:3;351:22
**show (12)**
65:19,24;66:2;
130:6;192:19;199:8,
18;200:5,10;223:12;
237:12,22
**showed (1)**
351:13
**showing (1)**
22:19
**shown (2)**
40:7;349:16
**shows (9)**
42:14;64:14;131:9;
132:2;133:12;134:5;
136:8;192:11;296:11
**ShowSouth (2)**
236:22,24
**sibling (2)**
14:4,5
**side (5)**
13:21;14:17;60:3;
160:24;198:25
**sign (21)**
9:13,17;27:16;
30:17;55:22;56:9,12,
15,18;57:2;81:7,23;
82:5;83:22;85:22;
91:17;102:19;103:8;
147:7;290:5;352:17
**signage (9)**
100:12,13,15;
101:6;102:7,14;
103:12;104:2;143:21
**signatories (1)**
81:13
**signature (3)**
27:14;42:7;352:20
**signed (28)**
27:10,22;34:15;
39:24;46:23;57:1;
81:10,17,22,25;82:2,
4,17,21,24;84:3,9;
91:15;157:7;158:11;
160:8,12;326:12,19,
25;327:3,4;329:20
**significant (2)**
54:13;199:5
**signing (2)**
34:12;307:13
**signs (6)**
100:15;101:5,7,24;
116:18,23
**Silk (1)**
8:23
**silver (3)**
33:14,17;275:12
**Silverstein (4)**

257:25;258:1,3,5
**similar (5)**
92:6;229:11,12,14;
310:7
**simply (3)**
166:24;187:17;
255:10
**sincerest (1)**
24:6
**Sinfonia (3)**
138:21;151:15;
273:10
**single (6)**
32:20,21;112:1;
147:4;257:15,19
**singled (2)**
216:5,16
**single-member (2)**
39:18,25
**sister (3)**
13:24;28:25;71:14
**sister-in-law (4)**
28:23;58:7;104:12;
128:3
**sisters (1)**
14:2
**sit (3)**
216:2;330:25;
347:18
**site (1)**
173:2
**sitting (2)**
102:6;141:2
**situation (7)**
216:13;259:18;
266:8;286:3,24;
287:18;308:16
**situations (2)**
241:4;294:6
**six (4)**
149:20;258:19,20;
314:22
**six-figure (2)**
261:11;269:16
**size (1)**
166:15
**sizes (1)**
66:11
**skills (3)**
25:20;109:23;
199:10
**skinny (5)**
105:7,7,14,17,19
**Slides (1)**
52:6
**Slipper (2)**
142:20;143:1
**slowly (1)**
10:25
**slug (1)**
332:10
**small (2)**
44:15;73:22

**smaller (3)**
22:22,23,24
**Smith (3)**
35:14,17;240:1
**Smitherman (37)**
68:1,3;70:10;71:4;
86:21;118:8,11,13;
119:10,14;120:1;
121:4,8,10,15,18;
130:21;153:5,9;
154:19,24,25;160:20;
161:8,12,21;162:1,5,
11;267:22;305:17;
343:20;344:22;
345:3,8;346:22;
347:6
**Smitherman's (2)**
156:25;162:22
**Snow (5)**
12:20,21,23;13:3,8
**social (20)**
26:11;42:1,4;
61:10;107:23;108:3;
109:23;155:24;
163:2;175:20;
181:15;191:16;
192:24;199:19;
203:20;233:9;
261:16,20;309:13;
310:13
**solicit (7)**
18:4;19:11;35:2,6;
156:3;158:17;160:11
**solicitation (1)**
34:17
**solicitations (2)**
33:2;54:23
**solicited (5)**
143:25;157:3,18;
160:9;164:14
**soliciting (6)**
19:15;25:17;29:13;
34:24;36:19;159:10
**somebody (10)**
34:18;72:16;74:4;
80:2;160:23;207:12;
227:21,21;279:6;
298:13
**somebody's (1)**
179:1
**someone (13)**
30:19,25;37:17;
90:12;124:16;144:8,
20;164:20;166:4;
184:9;203:7;261:2;
270:7
**sometime (10)**
69:19,20;188:10;
202:12;225:13;
235:16;236:21;
247:11;287:8,10
**sometimes (1)**
188:2

**somewhere (1)**
226:7
**son (5)**
167:21;194:23;
195:2,24;196:8
**son's (2)**
14:9;195:2
**soon (2)**
193:3;267:22
**sorry (144)**
11:14;12:11,18;
17:6,9,15;18:9,20;
19:3,19;21:21;23:12,
21;24:22,25;26:1;
29:16;30:11,13,21;
32:2,19;34:23;36:4;
37:1,2;38:21;39:1,
16;40:6,13,25;41:15,
19,25;42:23;45:17;
46:4;50:8;52:21;
53:11;58:14;60:7,14;
65:14;68:14,21;
73:15,20,20,20;
79:10;87:11;88:9,24,
24,25,25;90:2;104:7;
107:24;108:16;
114:14;116:16;
117:21;120:22;
121:7,12;124:2;
127:7,10;128:19;
139:13;142:24;
145:7;147:6;148:16;
149:18;150:4,18;
169:25;171:2,7;
174:12;175:17;
176:1;184:1;186:5;
187:18;193:7;
195:12;197:21;
200:8,16;213:16,17;
214:15;215:13;
216:11;220:19;
245:4;249:8;254:4;
256:10;257:14;
259:4;262:6,8,11,25;
264:19;276:17;
277:16;280:11;
281:25;292:2,9;
295:18;299:4;300:6;
305:19;311:6,21;
312:5;315:22,23;
317:22;319:17;
326:3,22;327:11;
330:23;334:7;
335:12;338:6;
342:12,25;344:25;
345:22;348:13;
349:1,13;350:3,17
**sort (2)**
10:25;147:17
**sought (3)**
90:13;91:20;
218:11
**source (6)**

161:24;162:12;
179:21;238:1,2;
305:8
**sources (1)**
281:18
**speak (3)**
169:12;259:10;
344:6
**speaker (1)**
115:11
**speaking (11)**
139:15;251:14,16,
19;265:9;266:13;
269:4;324:5;329:4,7,
17
**special (2)**
54:18;295:1
**specific (5)**
179:22;223:1;
266:8;288:18;313:18
**specifically (8)**
92:24;93:23;99:16;
225:11;226:1,19;
232:3;240:18
**speculation (4)**
164:25;173:21;
179:7;250:20
**spent (4)**
89:4;165:23;
208:11;289:19
**split (2)**
16:21;262:20
**spoke (35)**
58:18;100:16;
113:5;139:15;
154:14;166:11;
169:5;171:24;172:1;
180:11;252:3;259:8,
12,15,18;266:11;
268:18,25;269:1;
279:4;323:18,24;
324:3;328:18,25;
329:1,2,10,13,15,21;
340:13;343:12;
344:3,9
**spoken (5)**
58:3,5;166:2;
169:17;180:16
**sponsor (25)**
30:8,10,15,17;
31:11;32:12,14,20,
22;33:8,14,18;35:11;
97:23;108:15;111:4;
116:11;139:18;
142:20;143:1;
144:22,23;148:21;
276:15,18
**Sponsored (4)**
101:8,15;147:20;
148:23
**sponsoring (3)**
62:5,9;98:12
**sponsors (6)**

25:17;28:15;34:25;
55:1;154:20;155:23
**sponsor's (3)**
28:20;29:3;55:3
**sponsorship (94)**
29:13;30:15,20,24;
31:1,6,8,10,19,24;
32:16,21,23;33:8,9,
12;34:20;35:9;36:2,
6,19;38:2;54:22;
61:3,6;62:22;64:22;
72:5,14,20;73:9;
74:1;75:1;80:22,25,
25;89:25;90:4,8,10,
16,22;91:6,8,20,24;
95:4,24;97:9,10;
101:21;108:20;
115:12;116:3,6,8,12,
15,25;117:1,10;
130:12;134:25;
135:5,7,24;141:13,
19,23;144:12;152:4;
154:3,7,11;159:10;
161:24;162:3,7;
267:23;272:25;
273:3;274:2,10,12,
13,20;275:10,19;
282:25;284:25;
285:3,12;346:25;
347:8
**sponsorships (25)**
18:22,25;19:5,8,11,
16;20:6,10;21:2,7,10,
16;33:2;68:11;90:15;
101:19;102:11;
138:18;143:24;
155:25;156:3;161:2;
272:24;275:1,4
**spouses (2)**
49:17;54:11
**spouse's (1)**
12:19
**spread (1)**
176:12
**spreadsheet (10)**
64:15;65:19;87:25;
113:19;114:23;
118:1;123:15;127:2;
136:17;137:5
**spreadsheets (4)**
22:19;113:25;
117:15,17
**Springer (1)**
28:18
**St (1)**
77:4
**staff (6)**
61:24;62:2;92:18,
19;165:14;174:4
**stand (6)**
138:3,7,10,12,14;
338:14
**standard (4)**

272:8,9,12,13
**Standards (2)**
220:9;290:24
**standing (3)**
71:1;96:7,22
**standpoint (1)**
188:19
**stands (1)**
138:1
**start (19)**
12:18;17:11;47:19;
86:16;98:18;115:4;
118:10;205:5;222:7;
227:22,23;248:22;
273:15;283:4;
288:25;299:25;
319:22;340:4;345:12
**started (23)**
45:6,19;121:14;
204:16;205:6;212:1,
1,3;214:24;215:3;
221:22;226:22,25;
227:1,23;232:1,15;
248:16;299:2;300:5,
15;305:18;315:10
**starting (1)**
86:22
**starts (4)**
80:19;126:1;
137:22;306:16
**state (10)**
43:22;149:22;
186:2,7,18,21,22;
187:20;188:21;
193:20
**stated (5)**
180:9;187:8;
242:21;278:20;
282:10
**statement (18)**
112:2;170:12;
174:10;179:20;
184:17;185:2,4;
213:9;238:19;
241:25;244:10,23;
245:1;246:5;276:9;
280:3;342:11;343:16
**statements (10)**
61:15,17;86:10,13;
87:24;89:8,9,11;
124:22;262:16
**States (4)**
8:9;123:1;212:24;
213:6
**stating (1)**
121:7
**stationery (2)**
105:9,12
**stats (1)**
190:13
**status (2)**
163:6;346:18
**stay (4)**

128:6;217:15;
260:22;299:21
**stayed (1)**
252:13
**staying (2)**
333:21,24
**stealing (1)**
284:23
**Steeplechase (1)**
70:17;153:20
**step (5)**
78:24;188:20;
198:11;266:24,25
**stepmother (1)**
187:13
**stick (1)**
217:5
**Stiletto (4)**
143:14;148:21,24;
275:17
**still (23)**
61:18;69:8,24;
75:13;85:22;97:6;
111:16;129:7;146:8;
201:1,2,7;213:21;
214:1;252:20;261:1;
262:22;267:1;
270:14;286:25;
287:19;334:2;338:12
**stipulations (1)**
9:16
**stock (4)**
103:4;105:14,22,
24
**Stop (2)**
47:20;222:5
**stopped (2)**
189:1;223:10
**storage (2)**
15:14,15
**stored (1)**
316:8
**straight (1)**
332:19
**strategic (4)**
182:9;241:5,10;
294:16
**strategically (2)**
181:18;263:10
**strategy (1)**
182:12
**strike (1)**
13:16
**strong (2)**
145:12;262:1
**stronger (2)**
26:5;110:3
**structure (2)**
309:21;310:5
**students (2)**
245:22;256:22
**studies (1)**
271:12

studio (3)
75:11,12;263:15
studios (2)
181:17;263:13
stuff (6)
84:5;114:3;166:16,
16;181:16;289:13
style (1)
214:24
styled (1)
209:8
subject (12)
64:12;65:12,16;
77:19;80:21,24;87:7;
339:1,7,20,25;340:7
submit (4)
83:11;182:12;
272:23;284:25
submitted (19)
37:23;42:5,22,25;
69:25;83:10;150:20;
156:6,9;159:22;
160:5;206:21;274:5;
275:6;276:21;285:3;
290:4;306:25;326:12
submitting (7)
28:20;29:3;36:23;
37:4;285:11;327:14,
20
subpoena (4)
57:21;58:2,24;
191:19
subpoenaed (1)
192:2
subsequent (1)
60:5
successful (1)
223:14
successfully (1)
247:7
sue (8)
220:16,21;221:5;
335:5
suffered (1)
100:21
sufficient (1)
102:12
suggesting (1)
21:2
suggestion (3)
19:22,25;20:2
sum (4)
88:23;89:2;126:20;
127:1
summary (3)
33:25;125:9;199:8
summer (14)
46:22;118:25;
186:24;187:4,4;
200:13,17;201:6,16;
225:6,7,10,14;231:1
Sunday (3)
42:9,14;91:10

supervisor (6)
162:16,21,23;
187:5;266:23;306:19
supervisor's (1)
279:12
Supper (7)
66:15;143:6,9,12;
283:19,22,24
supplement (8)
325:1,2,20;336:4,7,
13,15;350:24
supplemental (3)
348:24;349:3;
350:4
supplementing (1)
349:21
supply (10)
166:14;167:1,3,4;
169:19,24;170:6,18;
171:19,20
support (3)
74:21;157:4,18
supported (1)
157:17
supposed (6)
54:22;93:15;
118:10;232:7;
272:23;338:5
sure (115)
10:6,11;12:14,17;
14:1,25;16:24;17:7,
10,12;22:10,12;
24:24;25:15;26:1;
27:15;29:5,6,8,10;
31:20;32:20;35:19,
22;37:3,10;44:20;
45:18;47:2;52:20;
62:24;71:15;80:4;
108:17;109:11;
114:15;118:19;
120:23;121:14;
125:18;128:18;
129:2;130:8,11;
132:12;142:11;
143:2;144:7,19;
145:6;156:12;
168:25;170:3;
173:10;179:21;
183:24;186:17;
187:17;189:5;195:8;
196:6,20,20;200:24;
205:6;208:25;209:4;
210:8;216:3;223:11;
225:5,11;226:9;
227:4;228:1,12,17;
230:20;232:11;
234:17;236:21,22;
238:16;240:2;
242:12;247:13;
248:8;252:12;
263:20;273:21;
276:9;278:6;280:25;
281:6;282:20;

285:20;287:24;
288:18;290:15;
291:7;300:5;309:24;
310:4;318:2;330:24;
332:11;342:6;
343:15;344:15,15,20;
346:17;347:13,13;
348:9
surveys (1)
77:24
Susan (6)
286:7,14,20,23;
287:1,14
sweet (1)
76:10
Swift (1)
52:9
switched (1)
186:19
sworn (4)
8:18,24;10:2;
327:18
symbol (3)
98:11,19,22
Symphony (1)
139:5
syntax (1)
112:21
system (2)
192:5;203:6

T

tab (1)
88:1
table (1)
143:17
tables (1)
147:22
talk (25)
10:25;11:1;41:20;
57:15,18;58:1,12,15,
19,23;78:10,12;
169:16;185:12;
191:21;246:23;
251:12,15,17;252:15,
16;261:22;268:13;
287:1;347:21
talked (13)
46:2;57:12;78:9;
100:22;117:14;
170:16,20;212:17;
260:11;322:24;
323:5;344:13,19
talking (8)
134:25;147:9;
156:18;169:21;
170:4;259:25;
344:11,13
talks (2)
45:25;200:12
target (1)
310:19

targets (1)
310:9
Tashara (4)
174:5;262:18;
313:13,21
taught (2)
289:3,12
tax (1)
83:13
taxpayer (2)
36:24;37:5
teachers (1)
140:4
teaching (1)
289:20
team (8)
183:11,20;184:3;
248:9,15;249:3;
260:24;293:20
teams (1)
294:20
technically (2)
69:10;119:2
telling (8)
77:25;94:11,21;
106:14;139:17;
165:10;175:10;
180:11,17;274:8;
336:19
ten (9)
134:1,9;148:4,5;
149:20;205:9;233:6;
289:10,11
tenor (1)
280:9
tenures (1)
239:1
term (4)
46:4;167:3;193:20;
200:13
terminated (27)
104:22;180:22;
184:4;185:9;223:4;
231:2,3;239:18;
247:24;270:1;279:5,
20;280:4;282:16;
284:7,14;288:15;
305:24;319:21,23;
320:10,22;321:18,22;
322:25;323:6;331:21
termination (12)
184:16,23;185:3;
188:22;225:5;
231:12;277:22;
288:1;342:7;343:12;
351:22;352:9
terms (4)
207:16;215:11,14,
18
Terra (4)
229:22;235:13,20;
239:24
Terrell (18)

188:22;218:11;
225:3;226:4,5;231:2,
15,19;232:17,23;
234:22;235:1;
240:25;241:8;247:7,
20;269:14;291:13
terrible (1)
100:20
testified (2)
10:3;276:11
testimony (4)
199:25;332:16,19;
333:5
texted (5)
58:18;153:24;
154:2,14;253:3
texting (1)
154:16
Thad (3)
307:22;308:10;
309:4
thanking (1)
97:23
Thanks (1)
352:16
theater (14)
145:8,9;147:4;
153:11,13;166:19;
233:17,21;290:7,12;
294:24;307:25;
309:11;310:13
theaters (10)
145:17;146:2,5,10,
17,23;147:2,18;
233:22;234:11
therefore (1)
164:6
Therrien (59)
37:23;38:1;39:5;
62:13,18;70:23;71:2,
5;93:18;94:3;104:19;
105:2;106:12;166:9;
167:1,7,25;169:22;
170:4,9,13;171:18;
172:5,7;173:7,11,15;
174:6,14,20;175:9;
179:6,11,17,24;
180:6,10,16,20,25;
248:9,20;249:5,13;
251:17,19;252:15,16,
17;262:18;276:2,7,
12;314:17;323:4,20,
25;329:1,4
Therrien's (1)
167:13
thinking (3)
140:17;264:3,11;
275:20;278:9
third (7)
114:25;123:20;
213:10,14;314:12;
323:10;328:13
though (7)

10:10;208:7;235:9;
275:25;276:5;
296:21;329:19
**thought (31)**
34:10;65:7;129:6;
139:20;144:2;
159:19;160:1,6;
161:11;193:4;203:2;
215:13;216:1,11;
217:18,24;218:2;
227:18;232:20;
233:3;242:2;262:12;
265:8;267:13,19;
268:7,10,15;275:18;
288:16;294:13
**thousand (2)**
73:1,2
**Three (23)**
11:20;13:9;25:9;
28:13,17,19;67:8,9;
122:17;149:19;
151:4;174:1;223:23;
224:16;233:22;
247:6;256:5;288:12;
297:1;314:8,14;
315:8,10
**throughout (6)**
24:14;110:16;
176:13;252:13;
263:12;297:16
**Thursday (3)**
8:11;89:17;136:17
**tickets (5)**
74:25;75:1,9;
148:4,5
**tied (1)**
75:1
**Tillery (7)**
20:19;55:9;95:18;
96:2;129:22;133:20;
284:4
**timeline (2)**
17:8;211:25
**timelines (2)**
66:17;212:14
**timeline-wise (1)**
201:1
**times (9)**
165:21;241:20;
252:21;253:1,3;
289:1;328:12;
345:15;346:7
**timing (5)**
188:25;195:11,12;
212:3;294:16
**tired (1)**
11:5
**title (14)**
86:8;167:13;
214:12,13,16;218:8;
220:7;224:21;
235:25;236:3;247:4;
265:6;330:15;331:15

**titled (1)**
152:9
**today (10)**
59:22;141:14;
152:13;174:24;
216:24;219:9;
242:18;280:19;
288:8;347:18
**Today's (1)**
8:11
**together (9)**
58:20;71:22;88:1;
177:21;181:18;
182:10,11;275:21;
283:20
**told (83)**
28:15;33:19;43:25;
63:10,12;74:2;83:11;
86:1;101:14;135:21;
142:5,7;153:4;
154:10;163:19;
164:12,15;165:2,4,6,
8,13,17;166:15;
170:10;171:1;173:6,
7,10,12;174:7,15;
191:17;216:25;
217:3;218:4,8,12,15,
22;219:2,5,5;226:18;
231:12;236:16,17;
237:8;239:9;241:14;
249:25;258:12;
260:5,5,6,11,25;
261:1;268:13,15;
269:15;275:22,25;
276:5;278:2;279:6,
18,18,24;281:20,21,
22;282:1,15;288:21;
300:20;307:1;
308:15;318:6;
322:10,22;330:5,11
**toll-free (8)**
266:17;267:2,10,
18;268:1,3;269:12;
270:5
**tomorrow (1)**
347:21
**ton (1)**
337:1
**Tondee (5)**
29:9,12;54:25;
95:19;96:3
**tone (1)**
280:8
**took (23)**
71:22;156:6,9;
166:9;167:1,7;
187:25;188:24;
189:8,9,11,16,19;
190:17;192:9;193:4,
23;194:1;196:4;
197:15;219:19;
296:15,20
**top (8)**

38:16;47:23;73:16;
81:6;134:9;203:23;
210:10;212:24
**total (3)**
130:3;314:13,16
**touch (1)**
78:16
**tough (1)**
188:3
**Tournament (2)**
297:3,4
**towards (3)**
214:24;215:23,23
**traditional (1)**
203:11
**traffic (2)**
102:10;103:1
**trailer (2)**
263:2,8
**train (3)**
292:6,13,16
**training (3)**
291:21;292:1;
295:7
**transcribes (1)**
9:15
**transcript (5)**
9:8,13;191:20;
192:6;200:12
**transferred (1)**
46:22
**Transformers (1)**
297:14
**transit (3)**
114:2,5,8
**transition (2)**
188:10;252:13
**transitioning (1)**
111:18
**translating (1)**
109:25
**travel (3)**
188:25;241:3,9
**traveled (2)**
293:2,7
**traveling (2)**
140:3;153:12
**Trawick (50)**
8:7,8;9:1,5;10:1,6;
11:11,13;28:23;29:2;
54:25;58:8;64:19;
80:21;89:17;95:11,
20;96:3;104:12;
124:12,18;125:11,18;
129:25;134:2,3;
138:6;163:11;
193:18;209:8;224:7;
235:4;236:7;240:13;
242:22;255:23;
264:16;265:4;277:7;
278:20;284:11;
289:2;303:3,15;
318:4;323:11;338:3;

339:23;340:6;345:19
**Trawick/Hatcher (1)**
14:17
**Trawick's (3)**
272:6;277:21;
322:10
**treasurer (16)**
20:23;48:10;61:19;
70:10;81:12,14;
118:12,13,14;119:7,
11,12;120:2;155:14;
161:7;162:8
**treasurer's (1)**
133:17
**treated (1)**
217:4
**treating (4)**
217:1,18,24;218:2
**treatment (3)**
216:19,20;352:12
**tremendous (2)**
67:11,15
**tried (4)**
78:9,12,14;268:4
**Triplett (4)**
239:3,5,9,13
**trips (1)**
140:5
**troops (1)**
166:18
**trouble (4)**
75:11;170:17,21;
171:3
**Troutman (1)**
148:23
**Troy (40)**
186:2,6,6,7,9,13,
15,18,21,22;187:6,
20;188:20;189:19;
192:2,6,14;193:19;
194:20;195:14,17;
197:15,16,19,23;
198:1,3;202:23,25;
203:8;206:11,15;
207:23;208:3;249:6;
252:3;271:15;
289:16;313:10,24
**true (3)**
157:17;220:11;
225:18
**truly (1)**
186:15
**truncated (1)**
318:19
**Trust (10)**
82:18,21;84:11;
86:8;161:16;184:5,
10,14,25;185:7
**trusted (1)**
149:10
**Try (6)**
157:13;160:18;
188:21;211:16;

271:14;333:25
**trying (18)**
17:8,10;24:24;
25:11;59:13;70:3;
81:14;97:6;122:15;
124:2;129:8;175:17;
200:23;238:23;
256:3;258:17;
299:13,15
**TSYS (1)**
252:17
**Tuesday (6)**
58:22;104:24;
297:19,19;298:1;
311:17
**Turn (25)**
47:15,19,19;60:2;
110:14;123:17;
125:25;126:12;
132:14;142:1;
200:11;206:10;
207:22;213:17,18;
221:21;240:10;
296:8;299:1;301:19;
314:6;316:13;322:2;
323:9;337:24
**turned (4)**
125:13;130:20;
314:2
**Turner (1)**
51:24
**twice (4)**
20:12;322:10,11,
13
**Two (50)**
12:2;29:15;85:13;
117:19;132:22;
149:19;153:22;
168:21;174:3;
182:24;183:3;
188:24;189:9,10,11,
19;192:9;194:15;
195:16,20,23;196:12;
197:3,10,12,16;
204:23;223:13;
225:21,23;232:13;
248:3;257:17,21,21;
259:17;262:1;268:5;
269:17;272:5;
280:15;282:5;
296:25;314:8,11;
315:10;320:21;
323:18;340:22;
351:24
**two-year (1)**
207:3
**type (1)**
245:9
**typically (1)**
181:25
**typo (7)**
80:8;112:19,20;
154:9;157:5,23;

158:1

## U

**unacceptable (2)**
106:17,20
**unaware (2)**
159:5;176:16
**uncertain (1)**
200:25
**under (47)**
9:23;48:20;49:4;
52:17,25;53:12;
55:16,17;59:3,16;
60:3,8;61:2;79:2;
162:10;174:7,15;
179:18,25;180:6,12,
17,21;203:18;
206:10;221:14;
235:15,18;260:13;
269:6;285:12;
290:23;291:24;
292:4,11,15;293:7;
314:16;326:20,25;
327:4;328:10;
329:20;338:2;339:4;
340:12;348:4
**underneath (1)**
308:10
**underpaid (1)**
237:3
**understood (20)**
10:8,13,22;11:8;
30:21;46:7;70:2;
146:21;273:4;
287:20;292:18;
338:3,8,24;339:2,5,8,
14,23;340:6
**unequal (1)**
265:6
**unfair (4)**
179:1;216:19,20;
352:12
**unfairly (5)**
217:1,4,18,24;
218:3
**unfamiliar (1)**
72:17
**unfortunate (4)**
245:22;246:1,8,10
**unique (1)**
255:18
**United (3)**
8:9;212:24;213:5
**University (10)**
186:2,9;188:21;
192:5;194:11;203:6,
12;206:11;207:24;
271:12
**unless (12)**
9:19;10:18;41:10;
53:3;89:25;90:4,7;
140:2;209:5;230:4;

242:22;243:16
**unnecessarily (1)**
308:2
**unofficial (1)**
200:12
**unpaid (2)**
300:18;301:4
**unsure (1)**
214:2;250:1
**untrue (1)**
179:21
**unusual (1)**
182:23
**up (52)**
34:8;38:16,16;
42:13;74:8,9,9,12;
94:18;102:2;104:13,
18;106:2,15,15,25;
108:14;110:14,19;
113:6;128:13;
130:23;137:7,23;
148:1;150:14;
166:12,17,18;188:5;
189:5;190:1;199:12,
22;209:6;252:5;
256:19;261:5;
263:25;270:1;
275:10,11;276:22;
277:1;283:16;
294:20;298:13,20;
314:13;333:25;
343:17;347:12
**upcoming (3)**
46:11;53:22;
182:20
**update (3)**
95:11;175:18;
208:4
**updated (3)**
87:25;110:21;
208:5
**upon (6)**
231:12;236:8;
240:11;302:24;
322:3,8
**Upper (2)**
176:2;261:2
**upset (1)**
169:11
**upstairs (1)**
243:17
**usage (1)**
14:23
**use (26)**
10:13;15:6,7,10;
18:3;93:25,25;94:1;
102:2;103:3,4,5,6;
104:16;105:24;
192:24;193:20;
203:13;215:19;
275:11;301:13;
343:9;344:17,23;
345:4,8

**used (12)**
14:25;102:3;103:1;
148:8;149:7;165:14,
18,20;215:11,25;
235:13;243:10
**uses (1)**
275:17
**using (2)**
148:5;167:3
**usual (2)**
102:24;183:1
**usually (2)**
103:3;143:25

## V

**vague (1)**
135:4
**Valley (3)**
187:1,22;193:20
**value (11)**
31:14;33:17,19,21;
34:1;35:18;36:2,7,9;
72:13;144:3
**values (1)**
31:18
**Van (84)**
138:15;151:18,20;
163:19;164:12;
166:8;167:1;169:7,
13,18,23;170:6;
171:10;173:1;177:9,
13;181:6,24;214:23;
216:1;217:1,18,24;
218:2,5,8;219:3,6;
224:7,17;229:17;
230:2;231:11,16,19;
235:5,9,10,21;
241:11,13;242:21;
243:6,11,15,18,21;
247:2,8,10;248:1,5;
249:20,25;250:22;
253:24;254:6;
265:10,11;268:9;
269:3;270:2,8;
271:21;275:22;
276:5;278:6,9;
308:18,22;311:8,17,
24;312:11,19;313:1,
4;314:23;317:16;
318:3,7;324:1;
327:14,20
**various (1)**
175:19
**Varner (1)**
134:9
**vendor (7)**
37:13,14;38:4;
90:17,18,20,21
**vendors (1)**
140:19
**venue (4)**
84:3;127:9,11,24

**verbal (2)**
10:13;352:13
**verbally (3)**
329:7,13,17
**verify (1)**
112:15
**version (5)**
33:3;66:15;106:19;
122:14;217:19
**versus (3)**
8:8;123:2;128:10
**Verville (1)**
240:8
**vested (2)**
59:7,20
**VI (2)**
60:3,8
**via (1)**
324:6
**vice (10)**
48:8;79:1,5;120:7;
202:10;228:20;
230:9,12;233:12;
250:25
**video (20)**
8:5;10:10;63:16,
17,21;134:20,23;
193:15,17;230:21,24;
282:6,8;332:20,21,
23;333:18;351:8,10;
352:18
**VIDEOGRAPHER (19)**
8:5;63:16,20;
134:19,22;193:15,17;
230:19,21,23;282:6,
8;332:20,25;333:2,
18;351:8,10;352:18
**VII (2)**
220:7
**visiting (1)**
186:23
**voice (1)**
280:8
**volunteer (2)**
237:4;346:19
**vote (3)**
21:15;107:7,14
**voted (2)**
107:6,11
**VPs (1)**
254:17

## W

**W-9 (31)**
36:24;37:4,7,13,16,
17;38:1,3,11;39:6,18;
43:14,25;44:11,13;
45:1;55:23;56:12;
67:10;89:24;90:3,9,
12,13,18,19;91:16;
131:15;165:2,4,6
**W-9s (1)**

90:14
**wage (3)**
289:12,20;290:2
**wait (5)**
16:17;160:2;
196:22;217:11,13
**waiting (1)**
315:23
**waived (1)**
9:9
**waiver (1)**
306:5
**Walker (4)**
283:11;284:10,13;
288:3
**Walter (1)**
11:13
**Warmest (1)**
21:4
**watching (1)**
141:2
**way (17)**
13:18;43:23;86:16;
87:9;108:19;137:23;
144:18;187:8,10;
217:15;238:8;
275:18;291:20;
331:1;332:7;333:10;
347:17
**weather (1)**
100:20
**website (1)**
220:14
**websites (1)**
143:16
**wedge (1)**
12:1
**Wednesday (1)**
297:20
**week (18)**
57:16,19;58:6,15,
22;92:13;153:11,12,
19,23,24;166:13;
219:19;291:9;320:2;
347:14;348:7,15
**weeks (3)**
287:6;288:12;
296:23
**weren't (15)**
47:13,14;67:3;
129:2,8;150:22;
155:3;164:15;173:1;
200:20;238:23;
255:15;278:6;288:9;
298:18
**what's (85)**
11:21;17:18;23:8,
12;26:20;36:21;38:9,
17;47:6;50:9,22;
52:24;64:10;65:4,9;
66:21;70:14;72:3;
73:7;74:24;75:19;
77:16;79:15;80:18;

82:10;87:4;89:14;
92:4;95:8;97:15;
98:6;99:5;100:6;
103:6;106:7;109:10,
14;110:11;113:16;
114:21;117:13,24;
123:13;128:14;
129:14;136:20;
139:14;140:22;
148:12;151:13;
152:8;160:23;168:8;
175:15;176:22;
191:12;198:18;
201:23;204:9;
206:19;208:18;
220:15;257:24;
258:20;286:6;310:3;
311:2;312:24;
315:15,22;316:25;
317:14;319:12;
320:14;321:8;
324:12;327:16;
337:12;338:23;
341:3,5,6;344:25;
348:13,23
**whereabouts (1)**
14:1
**White (28)**
26:15;61:21,25;
62:3,6,10;92:15;
93:2;95:15;99:7;
100:8,11,17,25;
103:8,12;104:3;
108:24;122:18;
131:11,21;132:9,15,
24;136:10;154:9;
157:23;158:2
**Whitney (2)**
28:17;125:19
**whole (12)**
30:22;34:22;38:24;
41:20;44:22;118:17;
238:7;245:21;280:9;
281:24;291:9;296:24
**whomever (1)**
14:19
**who's (6)**
74:4;129:16;
132:19;160:23;
184:24;254:7
**whose (3)**
42:4;61:9;182:8
**Wiggins (2)**
162:19,22
**Wilkinson (1)**
207:11
**willful (1)**
303:14
**Williams (1)**
317:2
**Wilson (1)**
126:5
**window (2)**

148:2,6
**wine (1)**
143:8
**Wing (7)**
9:1;10:1;11:11;
13:21;221:23,25;
222:9
**Wish (1)**
297:14
**wishes (1)**
9:12
**wishing (1)**
14:10
**withhold (2)**
214:5,11
**withholding (2)**
213:11,20
**Within (23)**
37:19,20;60:12,16;
113:10;122:7;135:2;
136:1;182:13;
183:10;190:13;
208:11;227:19;
233:22;238:20;
256:6,7;289:2;
311:11;313:19;
343:10,13;344:18
**without (5)**
75:10;110:9;
156:14;210:21;
303:16
**witness (86)**
8:17,24;31:5;33:1;
41:11,14;44:24;50:7,
20;52:19;53:2,5;
57:10;67:5;68:19,21;
104:7;107:21;127:7;
131:7;132:6,12;
134:16;137:8,15,18;
150:9;158:5;167:11;
173:22;178:9,13,18,
25;179:13;180:3;
183:17,24;190:23;
191:7;196:3;202:16;
210:7,24;211:14,20;
212:12;214:8;
216:13;229:9,11,21,
25;230:5;238:10;
240:18,25;250:21;
251:5;264:10;
271:18;272:2;281:3;
290:15,21;291:1,7;
302:1,7,11,14;
303:11;304:3;
315:22;317:25;
321:5;323:8;331:7;
334:20;342:25;
346:17;347:5,11;
350:17,20;352:20
**witness' (2)**
43:19;56:1
**witnessed (1)**
262:5

**woman (1)**
71:20
**women (10)**
25:20;33:20;34:2;
52:8;59:15;109:19;
139:22,25;238:20;
245:22
**Woods (1)**
71:14
**Word (10)**
102:3,8,15,18;
140:24;147:8;268:7;
320:7;327:13,19
**words (14)**
77:25;110:15;
121:10;129:20;
150:11,19;215:25;
216:3;243:10;303:4;
310:13;328:11;
329:16;333:6
**work (53)**
9:21;15:7,10,23;
17:10;65:12,17;78:1;
88:1;110:7,8,12;
114:11,16;185:13;
187:11,15;188:1;
206:22;207:11;
208:13;209:11,19;
210:3,18;218:5;
222:22,25;224:2;
249:16;252:17;
260:18,18;262:23,24;
263:2;270:10;
271:15;284:17;
291:20,25;297:10;
298:22;314:15;
345:13,16,21,23,24,
25;346:1,3,4
**worked (23)**
68:3;114:3;174:19;
207:13;223:23;
226:17;227:25;
233:21;235:19;
239:2;248:4;257:7;
291:10;292:4,6,7,11,
15;293:7;296:3,6;
301:10;348:8
**workforce (1)**
179:1
**working (20)**
118:2,3;120:13;
122:5;222:5,7;223:3,
5;227:24;232:24;
233:4;234:20,25;
247:22;248:13,17,20,
23;301:15;314:16
**workload (2)**
189:12;194:21
**workplace (12)**
26:5;110:4,7;
265:24;266:5,6,11,
13;267:14,19;268:2;
318:12

**works (10)**
69:15;157:14;
160:19;193:12;
199:24;221:12;
247:25;283:16,18;
333:9
**world (1)**
31:13
**worthy (1)**
75:14
**wrap (1)**
347:12
**write (16)**
85:1,5;112:7;
140:7;141:13;154:8;
157:3,6,9,13;158:6;
244:25;245:7,18;
246:9,12
**writes (3)**
155:22;156:23;
163:1
**writing (11)**
52:14,22;112:9;
116:13;141:19;
176:14;215:9;219:1,
4;231:9;313:9
**written (6)**
87:13;140:12;
160:13;187:9;216:4;
241:25
**wrong (10)**
38:17;68:15,22;
69:5;158:5;178:21;
204:21;312:15,17;
346:23
**wrote (19)**
85:8;142:4,19;
151:8;154:19;
157:23;194:11;
244:10,23;245:10,19,
20;246:1,14;262:15;
274:8;306:18;329:9,
20
**Wynn (2)**
222:10,18
**Wynnsong (1)**
234:5

## Y

**y'all (1)**
11:15
**y'all's (1)**
193:11
**year (75)**
12:18;14:9,12;
16:21,23;19:11;
24:11,14,17;25:2,7,
10;26:12,15;46:11;
49:1,8;51:19;53:10,
16,22;54:3,5;63:11;
64:2;73:19;74:6;
84:24;85:10,12,14,

18;88:3,15;97:4,6;
108:10;109:3;
110:16;118:9,16,17;
121:10,14;125:15,22;
126:18;128:8,12;
129:4;154:20;157:9;
159:6;186:20,21;
196:16;199:20;
204:17;225:7;
233:1,5;237:9;
247:22;252:6,7;
254:13;258:19;
300:8;309:17;
310:18;332:1;346:7,
9
**year-end (1)**
95:11
**years (42)**
12:6,7;13:9,18;
25:8;47:14;50:23;
53:7,24;85:13;166:2;
168:22;174:1,3;
187:11;198:25;
199:4;200:9;201:25;
204:14;205:9,12,15;
222:13;226:7,8,18;
232:16;233:6;235:1;
239:4;247:6;257:17,
21,21;269:17;289:7,
10,11,14,15,20
**years' (1)**
304:16
**year's (14)**
24:7;26:9;76:6,24;
77:1;84:4,14,15;
122:18;154:8;157:4,
18;158:1,6
**Yesterday (5)**
152:16;153:2;
181:8;83,13,16
**young (5)**
25:20;109:19;
297:23;346:8,10
**younger (3)**
28:25;222:3,4
**youth (2)**
74:5,5
**YP (3)**
297:7,21;298:3

## Z

**Zach (1)**
71:13
**zero (2)**
25:19;227:23
**zone (2)**
144:18;146:3

## 1

**1 (68)**

17:16,19,23;18:1,
17;21:4,12,18,22;
23:2;24:2;27:16,20,
23;28:3,7,11,14;30:8,
23;32:11;33:12;
34:13,25;36:7,12,23;
37:4,8;38:2,16;40:8;
41:3;42:21;43:1;
50:13,16;55:4;62:14,
18;63:2;66:15;67:15;
81:1;88:10,20;
107:19;109:17;
112:5,8,11,25;113:8,
11;121:23;122:6,22;
123:8;124:6,9;
126:20,23;127:21;
128:24;143:22;
213:18;214:22;
219:13

**1:35 pm (1)**
193:16

**10 (6)**
72:1,4,6,8;74:10;
234:5

**10,000 (1)**
129:5

**10,610 (1)**
129:2

**10,952 (1)**
310:16

**10/26 (1)**
107:5

**10:18 am (1)**
63:19

**10:28 am (1)**
63:19

**10:29 (1)**
156:22

**100 (2)**
96:13;207:9

**100,000 (2)**
258:19,20

**10B (1)**
8:2

**10th (3)**
74:15;79:21;80:11

**11 (10)**
73:5,8,10,13;
89:17;91:5;134:12;
150:9;221:22;223:12

**11:00 (1)**
173:3

**11th (2)**
91:23;172:13

**12 (23)**
12:6,7;69:9,12;
75:16,19;76:3;77:11,
23;95:17;97:9;
131:21;134:12;
136:17;150:3;
167:13;169:7;224:6;
289:7;316:13;
323:11;337:24;339:4

**12/2/2014 (1)**
137:23

**12:02 pm (1)**
134:21

**12:23 pm (1)**
134:21

**12th (14)**
42:10,16,18;91:13;
97:8;131:10,15;
132:8,21;150:2;
164:13;170:7;
177:10;274:7

**12-to-14-hour (1)**
188:2

**13 (8)**
77:14,17;78:3;
195:4;224:17;
316:20;349:9,15

**13th (1)**
177:13

**14 (19)**
16:22;70:20;73:13,
14;79:13,16,18,23,
25;195:5;197:20;
231:1;235:16;
238:10;320:17;
349:22;350:7,8,25

**14-15 (2)**
121:8,22

**15 (22)**
16:22,23;46:21;
50:21;75:20;77:18;
80:16,19,20;81:6,17;
126:15;201:25;
204:22;215:24;
234:3,4;235:4,17,24;
248:24;310:10

**150 (2)**
73:1,2

**15-2014-2015 (1)**
137:20

**16 (16)**
82:8,11,12,14,21;
83:7;86:2;176:25;
177:8;181:21;182:2;
183:6;185:19;238:3;
312:11,18

**162.85 (6)**
89:2;124:19;125:6;
127:2,25;128:21

**17 (24)**
8:11;16:17,17;
45:16,21;87:2,5,16;
88:5;89:1,22;104:24;
105:3;174:24;
180:22;198:25;
204:14,22;205:15;
298:1;319:21,22,24;
321:18

**17,000 (1)**
310:20

**18 (5)**
89:12,15;91:20;

92:7;204:23

**19 (12)**
92:2,5,8,11;94:2,
24;174:24;196:21;
232:16;235:1;
240:10,15

**1916 (1)**
80:6

**1926 (3)**
11:22,25;88:18

**1979 (1)**
13:13

**1990 (1)**
227:1

**1994 (2)**
226:25;232:15

**1996 (1)**
226:23

**1997 (1)**
185:23

**1998 (8)**
188:13;197:1;
204:15,22;205:6,9,
15;221:23

**1st (1)**
74:14

---

**2**

---

**2 (51)**
23:6,9,11,15,17,24;
24:2,5,25:16,19,22;
26:4,8;27:10;42:14;
49:4;78:3;88:23;
89:2;119:20;122:6,
25;123:8;124:6,18,
19;125:6;127:1,8,11,
18,24;128:15;
149:22;155:1;
168:18;192:5;
203:18;213:17,18;
220:6;297:20;
305:18;306:15;
322:2;326:21;327:1,
12;330:6,9;337:17

**2,000 (1)**
30:9

**2,800 (1)**
136:11

**2:00 (1)**
193:10

**2:04 pm (1)**
193:16

**2:51 pm (1)**
230:22

**2:56 pm (1)**
230:22

**20 (8)**
95:6,9,15,23;96:2;
97:1;343:18;345:15

**200 (2)**
117:3;207:9

**2000 (1)**

204:23

**2004 (3)**
12:16;197:18;
330:5

**2008 (2)**
205:10,12

**2010 (12)**
22:3,23,24;52:5;
96:12,17;119:23;
155:8,16;199:18,19;
233:10

**2011 (3)**
150:17,20,24

**2012 (18)**
150:25;188:13,19;
199:23;200:2,2,13,
18,25;201:6,15,16;
203:18;224:7,12;
295:17,21,25

**2013 (29)**
15:1;70:19;151:2;
189:13;192:12;
193:23;194:1,23;
195:3;196:12,21;
197:4,12;202:4;
203:9;204:2;225:4,
14;231:2;232:2,16,
24;247:21;269:14;
310:17;316:17;
334:4;350:1,13

**2013-2014 (2)**
202:10,12

**2014 (52)**
50:21;70:21;73:18,
24;75:22;77:18;
82:12,16,17,25;84:7,
14;86:2;88:21;
118:25;126:15;
145:13,18;146:10,14;
151:4;167:22;
189:13;194:24,25;
195:13;197:7,21,23;
198:7;202:4,13;
203:9;204:2;219:16;
253:24;254:13;
255:13,14,15;296:9,
11;297:12;300:1,9;
306:17;307:3;
311:11;312:6;330:7,
9,11

**2014-15 (7)**
64:15;120:21;
121:9,10,14,24;
129:17

**2014-2015 (8)**
21:5;25:2;119:8;
121:1,6,20;126:13,21

**2015 (129)**
16:13,16,18,19;
17:5,14,20;20:20,24;
22:6,11,22;23:10,14;
26:22;27:1;45:16,21;
61:9,13;64:21;65:12,

17:15;69:9,12;
71:24;78:4;85:11,21;
89:17;91:5;93:2;
95:17;96:21;97:4,10;
104:19,23,24;105:2,
3;106:11;107:5;
109:6;110:20;
111:17;118:25;
119:24;124:21;
130:21;132:8;
136:17;146:12;
150:3,11,11;155:1;
159:22;160:4;
165:23,24;167:13;
169:9;175:25;
180:22;181:21;
195:17;197:25;
204:16,23;205:13,16;
206:15;215:3,4;
223:4,8;244:3;
247:11,20;248:14,18,
21;249:2;253:13;
254:6;255:23;
258:22;261:8;
262:17;264:5,7;
268:9;269:15;
277:23;278:8;287:8;
291:4;295:22,25;
304:23;305:2;309:7;
310:5,19;312:9,11,
18;317:17;318:4,21;
319:15,19,24;321:10,
18;323:12;327:7,13,
19,24,25;328:10;
330:15,22;331:17,25;
332:1

**2015-16 (1)**
119:18

**2015-2016 (3)**
69:17;78:8;118:5

**2016 (25)**
15:23;66:2,9,11,13,
17;113:18;198:4,7;
206:23;208:24;
210:12,16;211:11,17,
24;212:5,19;213:5;
221:4,8;252:5;287:9;
326:13;337:17

**2017 (4)**
8:12;12:7;174:24;
207:23

**20s (1)**
51:13

**21 (3)**
13:13;97:13,16

**22 (9)**
13:12;98:4,7,9,20,
23;99:1;129:7;
349:18

**226 (4)**
123:17,21,25;
124:5

**23 (6)**

99:3,6,11,21,24;
242:4
**23's (1)**
99:17
**24 (11)**
100:4,7;104:10;
105:6,11;242:19;
243:12;298:4;
319:15,19;321:10
**25 (20)**
106:5,8,24;107:3,
22;108:1,2,14,18,19;
109:2,10,14,19;
110:11,19;111:5;
113:18;244:3,22
**2500 (1)**
143:15
**26 (16)**
73:13;104:19;
105:2;106:9,11;
107:16;111:14,17;
113:14,17;247:1;
248:2;249:21;250:6,
6;291:13
**2610 (1)**
100:1
**26a1 (1)**
342:21
**26th (1)**
73:16
**27 (13)**
114:19,22,23;
115:15,17,21;117:14,
16;120:11;249:25;
253:8;254:25;255:4
**2715 (6)**
40:3,10,14;41:16,
22,24
**27's (1)**
117:19
**27th (1)**
61:22;132:15,21,
23;133:25
**28 (8)**
65:17;117:20,22,
25;119:15,20;
120:25;122:7
**285 (1)**
145:21
**29 (14)**
123:11,14,15;
128:16;130:13,24;
132:17;134:7;
255:22;259:2,6,11;
261:24;262:14
**2nd (4)**
74:14;157:1;
267:24;297:3

## 3

**3 (27)**
26:18,21,23,25;

27:4,9;28:1;29:17;
42:14;55:18;59:11,
16;95:14,21;120:1,
10;122:7;123:8,24;
124:5,6;128:15;
136:9;206:10;
297:19,19;322:3
**3:59 pm (1)**
282:7
**30 (19)**
78:4;80:21;81:23;
82:12,16,17;84:7;
85:15,19,21;86:1;
129:12,15;130:14;
136:21,21;261:24;
262:14;296:12
**30s (2)**
51:13,23
**30th (1)**
298:7
**31 (14)**
136:22,23;137:1,4,
4;141:22;142:2;
150:2,5,6,7;151:7;
172:8,21
**313 (1)**
336:1
**315 (2)**
335:22;336:1
**318 (2)**
335:22;336:2
**319 (2)**
336:3;337:13
**32 (6)**
148:10,13,15,18;
149:4,17
**33 (5)**
151:11,14;264:15,
20;265:12
**34 (7)**
152:6,9,12;171:5,8,
15;271:6
**3400 (1)**
8:14
**341 (1)**
337:14
**35 (4)**
168:6,9,11,13
**36 (6)**
175:13,16,23;
176:13;181:4;272:5
**37 (5)**
176:20,23;177:1;
181:2;200:9
**38 (9)**
13:18;51:12;191:9,
13;192:1;193:19;
200:6,11;201:5
**39 (8)**
198:16,19,22;
199:1,13;201:11,19;
275:22
**3A3 (1)**

55:17
**3rd (3)**
73:14,23;161:18

## 4

**4 (43)**
38:7,10,11,13,24;
39:3,9,12,19,24;40:2;
41:1;42:2,5,18,21,25;
43:4,7,11,17,24;44:3,
6,9,14;45:1,9;46:24;
55:24;56:10,15;57:1,
5,7,13;61:8,10;67:10;
120:14;220:11;
223:1;297:20
**4:12 pm (1)**
282:7
**40 (7)**
201:21,24;202:1,
18;203:9,14;204:2
**403 (1)**
299:2
**405 (1)**
296:8
**40s (1)**
51:14
**41 (3)**
204:7,10,12
**42 (4)**
206:17,20,24;
207:23
**43 (14)**
208:16,19,21;
209:3;210:11,15;
211:3,11;212:23;
214:22;231:1;
242:19;277:6,10
**44 (5)**
295:13,16,18,19,20
**45 (18)**
305:4,7,9,11,21;
306:2,10,16;307:6;
329:24;330:4,10;
331:13,23;334:9;
351:15,17;352:2
**46 (6)**
277:21;285:19;
310:1,4,6;311:2
**47 (7)**
278:19;279:1;
310:24;311:3,4,8,25
**48 (5)**
121:21;311:14,18,
19,24
**49 (6)**
118:5;119:17,24;
122:3;312:22,25

## 5

**5 (17)**
44:17;47:4,7,9,25;

52:17,25;59:3,25;
60:25;109:12,15;
155:18;221:4,10;
323:10;343:4
**5/26/15 (1)**
64:19
**50 (6)**
315:13,16,20,25;
334:3;350:9
**501c (3)**
163:10,23;164:2
**501c3 (3)**
164:3,7,10
**51 (7)**
96:7,22;285:19;
316:23;317:1,4,7
**52 (6)**
317:12,15,17;
318:3,15;319:6
**53 (6)**
319:10,13,16,18;
320:1,9
**54 (3)**
320:12,15,25
**55 (5)**
321:6,9,11,14,21
**56 (14)**
324:9,13,16;326:9,
15,21;327:2;328:4,8;
329:9,19;334:10,11,
17
**5600 (1)**
129:11
**57 (4)**
335:1,4,6,14
**58 (5)**
288:25;335:18,21,
23;337:4
**59 (6)**
337:10,13,14,16,
19,25
**593.95 (5)**
124:13;125:6;
126:23;127:21;
128:25

## 6

**6 (22)**
44:19;60:3,10;
64:7,10;110:20;
111:1;210:12,16;
211:4,11,17,24;
212:5,19;213:5;
221:7;317:17;318:4,
6;326:13;344:16
**6/12 (1)**
130:25
**6/7 (1)**
42:15
**6/7/15 (1)**
64:15
**6:03 pm (1)**

351:9
**6:09 pm (1)**
351:9
**6:10 pm (1)**
352:19
**60 (12)**
175:6,8;288:24;
291:19;292:3,10;
340:17,20;341:5,9,
20,22
**61 (10)**
340:20,25;341:4,7,
9;342:4,5,8;351:14,
21
**62 (7)**
340:20,25;341:4,8,
9,10;342:15
**63 (7)**
340:17,25;341:4,7;
342:22,23;343:2
**64 (7)**
348:20,23,25;
349:2,16;350:5,22
**6th (2)**
311:17;312:8

## 7

**7 (22)**
16:16;17:5,14,20;
20:20,24;23:10,13;
26:22;27:1;44:21;
61:13;65:2,6,10,13,
15;68:16,19,20,24;
91:9
**7855 (2)**
130:5,18
**7th (3)**
42:9,13;312:9

## 8

**8 (16)**
65:5;66:19,22,23,
25;67:8,21;68:9,13,
18;69:4,5,8,20,25;
234:5
**8,600 (1)**
128:21
**8,762.85 (1)**
128:22
**8:00 (1)**
298:8
**8:25 (1)**
156:22
**80 (10)**
301:19,21;302:5,
21,25;303:3,4,5,8;
322:14
**80,000 (2)**
237:8,13
**8-1/2-by-11 (2)**
102:8,14

**8-1/2-by-11-inch (2)**
  102:18;147:8
**89 (2)**
  303:13,22
**8-by-11 (1)**
  102:4

---

**9**

---

**9 (16)**
  68:12;70:12,15,16;
  71:18;175:25;
  176:12;338:2,5,7,17,
  18;339:5;344:21;
  345:2;349:6
**9,925 (1)**
  130:4
**9/28 (1)**
  65:12
**9:09 (1)**
  8:12
**90 (1)**
  322:15
**92 (1)**
  221:10
**98 (2)**
  186:24;200:2
**99 (5)**
  96:14,15,16,17;
  119:23
**9th (1)**
  181:4