**In the Matter Of:**

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.

---

# DEPOSITION OF

# DAVID PASSMAN

*October 11, 2017*

---



1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999

Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 2 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                    DEPOSITION OF
DAVID PASSMAN on 10/11/2017

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE MIDDLE DISTRICT OF GEORGIA
 2                    COLUMBUS DIVISION

 3

 4

 5   CRYSTAL TRAWICK,              )
                                  )
 6            Plaintiff,          ) Case File No.
                                  ) 4:16-CV-380-CDL
 7   vs.                          )
                                  )
 8   CARMIKE CINEMAS, INC.,       )
                                  )
 9            Defendant.          )

10

11

12          Oral deposition of DAVID PASSMAN, witness,

13      called by the plaintiff, before Eric Cavanaugh,

14      Certified Court Reporter, held at Page, Scrantom,

15      Sprouse, Tucker & Ford, 1111 Bay Avenue, Third

16      Floor, Columbus, Georgia, 31901, on the 11th day of

17      October, 2017, commencing at 9:36 a.m.

18

19

20

21

22

23

24

25
```



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 2

```
 1                 APPEARANCE OF COUNSEL

 2

 3

 4    On Behalf of the Plaintiff:

 5

 6                 Mary A. Prebula
                Prebula & Associates LLC
 7         3483 Satellite Boulevard, N.W.
           Suite 200 The Crescent Building
 8            Duluth, Georgia 30096
                   770.495.9090
 9           mprebula@prebulallc.com

10

11    On Behalf of the Defendant:

12

13               Richard Gerakitis
              Troutman Sanders LLP
14      600 Peachtree Street, NE, Suite 5200
              Atlanta, Georgia 30308
15        richard.gerakitis@troutman.com
                 404.885.3328
16

17

18

19

20

21

22

23

24

25
```



1

2

3

4

5                    INDEX OF EXAMINATION

6                                              Page

7     By Ms. Prebula                           06

8     _____

9

10                    INDEX OF EXHIBITS

11    Plaintiff's                              Page

12    44     Duties of Marketing Projects Manager  57

13    45     Payroll authorization form, 10/2012   138

14    46     Payroll authorization form, 8/2013    140

15    47     Payroll authorization form, 3/2014    142

16    48     Employee Policies Manual              148

17    49     Copy of Plaintiff's Exhibit 42        190

18    50     Payroll authorization form, 11-17-15  235

19    51     Separation Notice                     236

20    52     Email from Mr. Passman                243

21    53     Email from Mr. Passman                243

22    54     Statement for Q-A presentation        244

23

24

25



```
1              INDEX OF EXHIBITS  (Continued)

2     Plaintiff's                               Page

3     55      Press Release                     246

4     56      Re:  Carmike Gift Cards           247

5     57      2012 TRC Kick-Off                 254

6     58      Trade agreement with TRC          255

7     59      Young Professional Group          257

8     60      Biddin' on the Banks Auction      258

9     61      Corporate contract for Young      260
              Professionals
10
      62      Comparison of Carmike Sponsorships  261
11            2014 to 2015

12    63      Email dated 1-30-15 from Mr. Passman  263
              to Crystal Trawick and husband
13
      64      Email from Mr. Passman to Mr. Ames  265
14            dated March 2015

15

16

17

18

19

20

21

22

23

24

25
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 6 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                    DEPOSITION OF
DAVID PASSMAN on 10/11/2017                                        Page 5

```
 1              S T I P U L A T I O N S

 2

 3       IT IS STIPULATED AND AGREED by and between

 4  counsel appearing for the respective parties that:

 5       (1)  The oral deposition of DAVID PASSMAN,

 6  called by the plaintiff, taken before Eric

 7  Cavanaugh, at 1111 Bay Avenue, Third Floor,

 8  Columbus, Georgia, commencing at 9:36 a.m. on the

 9  11th day of October, 2017;

10       (2)  ALL FORMALITIES with reference to notice

11  or taking, notice of time and place of taking,

12  qualifications of the court reporter, and all

13  other matters precedent to the taking of

14  deposition, are WAIVED;

15       (3)  With consent of deponent, the reading and

16  signing of the deposition by deponent is NOT

17  WAIVED;

18       (4)  ALL OBJECTIONS, EXCEPT as to the form of

19  the question and responsiveness of the answer, are

20  RESERVED to the time of the hearing of the case;

21  and

22       (5)  ALL FORMALITIES with reference to the

23  filing of deposition, including notice of filing,

24  et cetera, are WAIVED.

25
```



```
 1          MS. PREBULA:  This will be the deposition of
 2    David Passman taken for purposes of discovery,
 3    cross-examination and all other purposes permitted
 4    by law.
 5          We agreed in the Sailors' deposition to
 6    reserve objections except as to the form of the
 7    question and the responsiveness of the answer and
 8    attorney-client privilege.
 9          Do you agree to that still, Mr. Gerakitis?
10          MR. GERAKITIS:  Same stipulation.  And we
11    stipulated in Sailors and the other depositions
12    that the witness can read and sign his deposition
13    before any notary public; not necessarily the
14    notary who takes down or transcribes the
15    deposition.
16          MS. PREBULA:  Right.  Agreed.
17          And you are going to read and sign,
18    Mr. Passman?
19          DEPONENT PASSMAN:  I assume so.
20          MS. PREBULA:  Will you swear in the witness.
21                DAVID PASSMAN,
22          Having been duly sworn, testified under oath
23    as follows:
24                E X A M I N A T I O N
25                BY MS. PREBULA:
```



1      Q.    Mr. Passman, my name is Mary Prebula.  And I'm

2    sure Mr. Gerakitis has told you, I represent the

3    plaintiff in this case, Crystal Trawick.  And I'm

4    going to ask you a series of questions.

5          Have you ever had your deposition taken

6    before?

7      A.    I have.

8      Q.    Okay.  So you know how it works.  It's easier

9    for the court reporter if you let me finish my

10   question and we try not to talk over each other so he

11   can take it down.

12         And if you answer my question, I'm going to

13   assume you understood it.  So if you don't understand

14   a question, if you will please let us know so we have

15   a clean record.

16     A.    Okay.

17     Q.    So if you would state your full legal name.

18     A.    Sidney David Passman, III.

19     Q.    And how do you spell Sidney?

20     A.    S-i-d-n-e-y.

21     Q.    All right.  Where do you currently reside?

22   You don't have to give me your street address.

23     A.    In Columbus, Georgia.

24     Q.    All right.  And how long have you lived in

25   Columbus, Georgia?



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 8

1    A.    Off and on since 2009.

2    Q.    You moved to Columbus, Georgia in 2009 from

3    Atlanta?

4    A.    Well, I commuted back and forth to Atlanta.  I

5    had an apartment here and a home in Atlanta in 2009.

6    Q.    And when did you permanently move to Columbus?

7    A.    I don't remember.

8    Q.    Sometime in 2009.

9    A.    No.

10   Q.    No?

11   A.    No.  In 2009 through probably 2012 or '13, I

12   commuted back and forth.  Stayed here on weekdays.

13   Went home to Atlanta on weekends.  And then somewhere

14   in 2011, '12, or '13, I stayed here more than in

15   Atlanta.  So I would say it became my permanent

16   residence.

17   Q.    Did you change your voter registration?

18   A.    I did.

19   Q.    When did you change that?

20   A.    I don't remember.

21   Q.    And did you buy a house here?

22   A.    I did.

23   Q.    When did you buy the house?

24   A.    In November, 2015.

25   Q.    Okay.  And are you related to any persons in



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1   Columbus, Georgia?

 2      A.    Not -- not that I recall, no.

 3      Q.    Okay.  But you're married, right?

 4      A.    Yes, I am.

 5      Q.    And what is your wife's name?

 6      A.    Brigitte.

 7      Q.    How do you spell Brigitte?

 8      A.    B-r-i-g-i-t-t-e.

 9      Q.    And what is her full name?

10      A.    Brigitte Grace Passman.

11      Q.    What is her birth name?

12      A.    Brigitte Grace Buehlman.  B-u-e-h-l-m-a-n.

13      Q.    And she lives in Columbus, correct?

14      A.    She does.

15      Q.    All right.  When did you get married?

16      A.    In July of 2015.

17      Q.    Have you been married before?

18      A.    Yes.

19      Q.    Does your ex-wife live in Columbus, Georgia?

20      A.    No, she does not.

21      Q.    Okay.  And do you have any children that live

22   in Columbus, Georgia?

23      A.    No, I do not.

24      Q.    And with regard to all those persons, do any

25   of them live within Muscogee County?
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    A.    No, they do not.

2    Q.    Okay.  Do you know if any of them -- and you

3    may not know this -- live within the Middle District

4    of Georgia as the federal court where this case is

5    designated?

6    A.    I don't know.  I don't know.

7    Q.    Okay.  Any of them live within a hundred miles

8    of Columbus, Georgia?  I guess Atlanta is within a

9    hundred miles.

10   A.    I don't know.

11   Q.    Okay.  Just don't know.

12         All right.  When you were at Carmike -- when

13   were you hired into Carmike?

14   A.    Can you be more specific?

15   Q.    Yes.  Were you an owner of Carmike?

16   A.    A stockholder?

17   Q.    Either an owner or a stockholder.  They both

18   have ownership interest, whether or not you were a

19   sole owner or a stockholder.

20   A.    Am I --

21   Q.    No --

22   A.    -- when you say was I --

23   Q.    I'm trying to back into when you started work

24   with Carmike.

25   A.    Well, are you talking about full time



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                          DEPOSITION OF
DAVID PASSMAN on 10/11/2017                                              Page 11

1   employment?

2      Q.   No, sir.  When did you first start working

3   with Carmike?

4      A.   It was probably in early 2003.

5      Q.   And did you join it as an employee?

6      A.   I did not.

7      Q.   You joined as stockholder?

8      A.   I did not.

9      Q.   How did you join it?

10      A.   As a board of director.

11      Q.   Okay.  And you were an independent board of

12   director at that point?

13      A.   I was.

14      Q.   And who were you working for at that time?

15      A.   I don't think I was working for anyone.  I was

16   retired.

17      Q.   What did you retire from?

18      A.   The last job I had prior to joining the board

19   of Carmike, which was not a full time position, was

20   as president of the check printing division of the

21   John Harland Company.

22      Q.   Okay.  And how long were you president of the

23   check printing division of Harland?

24      A.   I don't recall.

25      Q.   More than 10 years?



1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      A.    No.

2      Q.    More than five?

3      A.    I didn't have the title president for more

4    than five, but I was with Harland for more than five.

5      Q.    Okay.  And who asked you to join the board of

6    directors of Carmike?

7      A.    I don't know how to answer who asked me to

8    join.  I was contacted by general counsel -- outside

9    counsel for Carmike and asked if I had an interest in

10   discussing possible board membership with them.

11     Q.    And who was that outside counsel?

12     A.    It was King and Spalding.

13     Q.    And who was the lawyer?

14     A.    Alan Prince.

15     Q.    And that was shortly before 2003?

16     A.    It was shortly before I joined the board in

17   2003.

18     Q.    Were you elected or selected, if you will?

19     A.    I was elected.

20     Q.    Okay.  And it was a paid position?

21     A.    It was -- it did carry compensation, yes.

22     Q.    But it was pretty low.

23     A.    It depends on what you call pretty low.

24     Q.    What was compensation then as board of

25   director?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 13

1    A.    I don't remember the amount.

2    Q.    How long were you on the board of directors of

3    Carmike?

4    A.    Until the company was merged into AMC.

5    Q.    And that was in 2016?

6    A.    '16.  December, I think, 21st.

7    Q.    When did you first become a stockholder in

8    Carmike?

9    A.    On or about the time I joined the board.

10   Q.    Okay.  Were you given shares as part of your

11   compensation or did you purchase them?

12   A.    Both.

13   Q.    Okay.  And when did you become an employee of

14   Carmike?

15   A.    I'm not sure how to answer that.  But the year

16   was 2009.

17   Q.    All right.  And what happened in 2009 that put

18   you as an employee of Carmike?

19   A.    The CEO was ousted by the board and I was

20   recently re-retired and serving as chairman of the

21   board of Carmike.  And my fellow directors asked me

22   to oversee it until we could hire a new CEO.

23   Q.    And that lasted to 2016?

24   A.    Well, sort of.

25   Q.    Okay.



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 14

1    A.   I began overseeing it in the middle of

2   January, 2009.  We created a search for a CEO.  And

3   by April of 2009, my fellow board members asked me if

4   I would consider doing it on a permanent or full time

5   basis.  And in June of 2009, I became president and

6   CEO of Carmike.  I resigned as chairman, but remained

7   on the board.

8    Q.   Was there -- were you acting president and CEO

9   in the interim or --

10    A.   No, I was chairman of the board.

11    Q.   And just overseeing it as chairman?

12    A.   Yes.

13    Q.   Okay.  The -- do you recall who your fellow

14   board members were in 2009?

15    A.   I recall some of them, for sure.

16    Q.   Tell me who you recall.

17    A.   Allen Hirschfield.

18    Q.   You don't have to wait for me to write.  You

19   can keep going.

20    A.   Okay.  Roland Smith.  And those are the only

21   two that I recall from 2009.

22    Q.   Do you recall how many there were?

23    A.   In 2009?

24    Q.   Correct.

25    A.   I think there were seven or eight.  But, no, I



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 15

1   don't recall the exact number.

2      Q.   Did you vote to oust the CEO in 2009 as a

3   member of the board?

4      A.   I did.

5      Q.   And did you vote on --

6      A.   Oh, I just remembered one other board member

7   in 2009.  It was the former CEO's brother.  And I

8   don't recall -- Carl was his name.  Carl Patrick.

9      Q.   Okay.  Did you vote to serve -- for yourself

10  to serve as president and CEO of Carmike?

11     A.   I did not.

12     Q.   You abstained from that vote?

13     A.   I believe I abstained.

14     Q.   So when you -- were you then given additional

15  shares of stock as a result of upholding those

16  positions for Carmike?

17     A.   Sorry.  Which positions?

18     Q.   President and CEO.

19     A.   Yes.

20     Q.   And they were given to you as compensation?

21     A.   I believe they were compensation, yes.

22     Q.   Were they outright ownership of shares or was

23  it a stock option arrangement?

24     A.   Both.

25     Q.   Okay.



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 16

1    A.   But the outright ownership was restricted,

2  time based.

3    Q.   So when AMC was ultimately sold -- excuse me

4  -- when AMC came in in 2016, do you know what

5  percentage of stock you owned in Carmike?

6    A.   I don't.

7    Q.   Were you the majority shareholder?

8    A.   No.

9    Q.   Who was?

10    A.   There was no majority shareholder.

11    Q.   Were you one of the largest shareholders?

12    A.   No.

13    Q.   Okay.  And you don't know your percentage?

14    A.   No.

15    Q.   Was it -- who was the largest shareholder

16  then?

17    A.   I don't recall.  It was a hedge fund, but I

18  don't recall the name.

19    Q.   When AMC took over from Carmike, you sold or

20  redeemed all your shares; is that correct?  In

21  Carmike.

22    A.   That is correct.

23    Q.   Now, you referred to the Carmike merging into

24  AMC.  Was the transaction a merger or acquisition of

25  assets or something else?



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 17

1     A.    I believe it was something else.

2     Q.    What do you believe it was?

3     A.    I believe they formed -- AMC formed a

4  subsidiary.  The subsidiary purchased the stock of

5  Carmike and merged it into that subsidiary.

6     Q.    What was the name of the subsidiary?

7     A.    I don't recall.

8     Q.    Did you sign those documents as president and

9  CEO of Carmike?

10     A.    Which documents?

11     Q.    The documents that formed the sub when the sub

12  purchased the stock of Carmike.

13     A.    I did not.  I was not the acquiror.

14     Q.    Did you sign any contract to allow for the

15  acquisition by -- of AMC?

16     A.    Yes.

17     Q.    What documents did you sign?

18     A.    I don't recall.

19     Q.    Did you retain copies?

20     A.    No.

21     Q.    Where were the copies left?

22     A.    I don't know.

23     Q.    Who did you turn them over to?

24     A.    I would have signed any documents that I was

25  required to sign in the presence of the general



1    counsel of Carmike.

2      Q.   Dan Ellis?

3      A.   That would be Dan Ellis.

4      Q.   And you left the documents with him?

5      A.   Or he took them.  Yes, I don't recall the

6    exact mechanism used to do those.

7      Q.   But you didn't retain them?

8      A.   I did not.

9      Q.   Okay.  And do you -- and I apologize if I've

10   asked you.  Do you recall when AMC formed the

11   subsidiary to purchase Carmike?

12     A.   I do not.

13     Q.   When did you first hear that that had

14   occurred?

15     A.   I actually never heard that it occurred; but

16   it was all part of the plan for the acquisition

17   approved by the shareholders, board of directors, et

18   cetera.

19     Q.   Okay.  So as a member of the board of

20   directors, you approved the sub of AMC purchasing the

21   shares of Carmike?

22     A.   We approved the transaction, yes.

23     Q.   Did the board of directors keep minutes?

24     A.   Yes.

25     Q.   And who was the secretary of the board in



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 19

1    2015-2016?

2        A.    I believe it was Dan Ellis, general counsel.

3        Q.    Where were the minutes kept?

4        A.    I don't know.

5        Q.    As president and CEO, did you keep minute

6    books or records of Carmike?

7        A.    A hard copy, no.

8        Q.    You kept an online version?

9        A.    We had an online board book that basically had

10   historical records.  All board members did.

11       Q.    And where was the online board book

12   maintained?

13       A.    I don't know.

14       Q.    How did you access it?

15       A.    On my desk top computer.

16       Q.    Okay.  And obviously you left your desk top

17   computer with Carmike when you left and it was sold?

18       A.    That is correct.

19       Q.    Did you sign into a network to obtain access

20   to the online board book?  Meaning it wasn't sitting

21   on your laptop by itself.  It was on some network

22   that you signed into?

23       A.    It was online.  The service provider, for lack

24   of a better term, I'm going to use the term cloud --

25       Q.    Okay.



1    A.    -- it was in a cloud.  And I would -- in order

2    to get onto my desk top computer, I had to sign onto

3    our internal network.  And then I could gain access

4    to the internet which is where that was.

5    Q.    Do you know as part of this transition how the

6    internal network was transitioned to AMC?

7    A.    I do not.

8    Q.    Could you access this -- since it's in the

9    cloud, could you access the online board book from a

10   home laptop and those kinds of things if you signed

11   in?

12   A.    Yes, you could.

13   Q.    Do you remember the cloud provider?

14   A.    I do not.

15   Q.    Do you know if it was a local area network as

16   opposed to out in the cloud, meaning Carmike

17   maintained it?

18   A.    Carmike did not maintain the board book online

19   version.

20   Q.    Do you know who did?

21   A.    I don't.

22   Q.    Who would know that?

23   A.    Dan Ellis.

24   Q.    Okay.  Okay.  Let's go backwards, Mr. Passman.

25   I'm assuming you graduated from high school?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        A.    I did.

 2        Q.    Did you go to college?

 3        A.    I did.

 4        Q.    Do you have a degree?

 5        A.    I do.

 6        Q.    What's your degree?

 7        A.    It was a Bachelor of Business Administration,

 8   Major in Accounting.

 9        Q.    Where'd you get that from?

10        A.    The degree was from University of North

11   Florida.

12        Q.    Do you recall the year?

13        A.    I recall close to the year.

14        Q.    Okay.

15        A.    I think it was 1976.  It might have been '75.

16   I think it was '76 though.

17        Q.    Do you have any other post high school degree?

18        A.    Degrees?

19        Q.    Correct.

20        A.    No.

21        Q.    Obviously, you worked on a -- did you work on

22   a second degree?

23        A.    Not a degree, no.

24        Q.    What college courses did you take or what post

25   secondary work are you referring to?
```



1    A.    Advance management programs at Harvard,

2    Columbia, Northwestern.

3    Q.    Do you remember the years you did those?

4    A.    I do not.

5    Q.    Was it before Carmike?

6    A.    Yes.

7    Q.    So sometime before 2009?

8    A.    Yes.

9    Q.    And did you obtain certificates as opposed to

10    degrees from those courses?

11    A.    I think -- I know I did from one.  I believe I

12    did from all three, but I just don't recall.  I

13    completed all of the courses that were in the

14    programs.

15    Q.    Okay.  Which one do you know you got the

16    certificate from?

17    A.    Harvard.

18    Q.    And did any of those advance management

19    degrees include training in human resources?

20         MR. GERAKITIS:  Object to the form.

21         DEPONENT PASSMAN:  None of those were degrees.

22    BY MS. PREBULA:

23    Q.    Excuse me.  I apologize.

24         Did any of those post graduate courses include

25    any training in human resources?



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                    DEPOSITION OF
DAVID PASSMAN on 10/11/2017                                        Page 23

1    A.   Can you be more specific about human

2    resources?

3    Q.    In terms of any personnel management,

4    discrimination, personnel policies, et cetera; what's

5    normally covered by a human resources department.

6    A.    Well, I believe each one of them had

7    components of management of people, but not -- you

8    mentioned some very specific technical areas of human

9    resources but none of them had those.

10   Q.   Did you have any training that would be

11   considered training in human resources and employment

12   policies?

13   A.    In the majority of the companies that I have

14   worked for, we have had periodic in-house or led by

15   outside counsel training in various areas of human

16   resource management.

17   Q.    But no other outside courses like Harvard,

18   Columbia, or Northwestern?

19   A.    No, not specifically for that.

20   Q.    Okay.  Did you also have in-house training at

21   Carmike on human resources issues?

22   A.    Yes.

23   Q.    And who led those?

24   A.    I believe they were each led by outside

25   counsel, Troutman Sanders.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations

Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    Q.   When is the last such course that was offered

2    at Carmike prior to its sale of its stock?

3    A.   I don't know.

4    Q.   Was it more than a year, more than two years?

5    A.   I don't know.

6    Q.   Do you recall the most recent course you took

7    as in-house training at Carmike on human resources

8    matters?

9    A.   Do I recall..

10   Q.   The course itself or the training itself.

11   A.   Yes.

12   Q.   Okay.  And do you recall how close it was or

13   how much before the end of Carmike?

14   A.   I don't.

15   Q.   Was there any policy as to how often that

16   training would occur at Carmike?

17   A.   I don't know.

18   Q.   Who would?

19   A.   I would assume the human resources department.

20   Q.   When the AMC sub acquired Carmike, was there a

21   -- who took the liability for this claim by

22   Ms. Trawick?

23   A.   I don't know.

24   Q.   Did AMC acquire assets and liabilities or just

25   stock?



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 25

1    A.    I believe it acquired the stock.

2    Q.    Okay.   What happened to the liabilities?

3    A.    I would assume the liabilities transferred

4  with all assets.

5    Q.    So did AMC acquire stock and assets?

6    A.    No, I believe it acquired stock.  But those

7  documents can be found in the public records.   I

8  don't remember the exact form of the transaction.

9    Q.    But it's your understanding that the liability

10  for this lawsuit went to AMC?

11    A.    I don't know.

12    Q.    Was there a reserve set aside for this

13  lawsuit?

14    A.    Not that I'm aware of, but I don't know.

15    Q.    There was no reserve set aside at Carmike?

16    A.    I don't know.

17    Q.    Would you have known as president if a reserve

18  was set aside for this lawsuit?

19    A.    It depends on how material it would have been.

20    Q.    At the time of Ms. Trawick's termination in

21  2015 and the year before, was there any insurance in

22  place for lawsuits such as this for discrimination

23  and retaliation and harassment?

24    A.    I don't know.

25    Q.    Who carried your insurance, what company?



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 26

```
 1       A.    I don't know what the insurer was.

 2       Q.    Did the company have general casualty

 3   liability insurance?

 4       A.    Yes, we did.

 5       Q.    And you don't know the company that carried

 6   it?

 7       A.    I don't recall.  Sorry.

 8       Q.    Did the company have officer's and director's

 9   liability insurance?

10       A.    It did.

11       Q.    And you don't know the company that carried

12   that.

13       A.    No.  I believe it was more than one, but

14   I don't recall their names.

15       Q.    Did you have an insurance broker that handled

16   your insurance?

17       A.    We did.

18       Q.    And what was the insurance broker?

19       A.    I believe it was Jay Lanier and Smith.

20       Q.    Here in Columbus?

21       A.    Out of the office here in Columbus, yes.

22       Q.    And do you know whether or not you were

23   offered insurance coverage to cover cases such as

24   this for discrimination and harassment and

25   retaliation and the other claims?
```



1      A.    I don't.

2      Q.    Do you know -- do you recall that you declined

3    such coverage?

4      A.    I don't.

5      Q.    Has Carmike ever been charged at the EEOC

6    level with discrimination or harassment before

7    Ms. Trawick's case?

8      A.    I don't know.

9      Q.    During your tenure as president from 2009 to

10   2016, were there any EEOC charges filed against

11   Carmike?

12     A.    I don't know.

13     Q.    Who would know that other than the EEOC?

14     A.    General counsel.

15     Q.    Who is Dan Ellis, correct?

16     A.    You said during my tenure?

17     Q.    Correct.

18     A.    Dan was not there during my entire tenure.

19     Q.    Okay.

20     A.    So Dan Ellis or his predecessor.

21     Q.    And who was that?

22     A.    His predecessor?

23     Q.    Correct.

24     A.    Lee Champion.

25     Q.    Is that a L-e-e, a man's name?



1    A.    Yes, it is.

2    Q.    Do you know where he is now?

3    A.    I do not.

4    Q.    Do you know where Dan Ellis is now?

5    A.    I have a pretty good idea where he is, but I

6    don't know with absolute certainty.

7    Q.    Where is your idea that he is?

8    A.    Kansas City area.

9    Q.    He went with AMC.

10   A.    He's with AMC.  Last I heard, he's with AMC.

11   Q.    Is he employed by AMC holding company or the

12   sub that referenced earlier?

13   A.    I don't know.

14   Q.    When is the last time you talked to Dan Ellis?

15   A.    Probably December of 2016.

16   Q.    And did you discuss this lawsuit?

17   A.    I did not.  The last time I talked to him, I

18   did not discuss this lawsuit.

19   Q.    Okay.  Going back to the question of whether a

20   reserve or set-aside was established for this

21   lawsuit, if there was one set aside at Carmike, would

22   you know about it?

23   A.    Not necessarily.

24   Q.    Why?

25   A.    Because many of the accounting reserves that



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 29

1   were set aside were done at the CFO or below level

2   that would not have -- would not have had need to

3   come to my office for approval.

4      Q.   When the sale occurred in 2016, were there any

5   other lawsuits other than Ms. Trawick's lawsuit

6   pending against Carmike?

7      A.   I don't remember.

8      Q.   Okay.  What were your duties as president and

9   CEO?

10     A.   Generally, my duties were to guide and lead

11  the company in its strategic execution as directed by

12  the board of directors.

13     Q.   As part of that function, did anyone report to

14  you on pending litigation?

15     A.   Yes.

16     Q.   Who?

17     A.   Dan Ellis.

18     Q.   Okay.  Was this lawsuit reported to you when

19  it was filed?

20     A.   I believe it was.

21     Q.   When is the first time you heard about this

22  lawsuit?

23     A.   I don't recall.

24     Q.   Before the sale?

25     A.   Yes.



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                    DEPOSITION OF
DAVID PASSMAN on 10/11/2017                                       Page 30

1      Q.    Was Carmike a publicly held company?

2      A.    Yes.

3      Q.    Were lawsuits not required to be included in

4    your accounting reports?

5      A.    It depends on the lawsuits.

6      Q.    Did you review the accounting reports and

7    annual reports before they were submitted or

8    published?

9      A.    Yes.

10     Q.    Are you aware of prior lawsuits against

11   Carmike for sexual harassment and discrimination

12   prior to when you were president?

13     A.    No.

14     Q.    Have you ever responded to an EEOC charge

15   alleging sexual harassment and discrimination against

16   Carmike?

17     A.    Not that I recall.

18     Q.    Was there a break room or gathering room at

19   Carmike for employees?

20     A.    Would you explain what you mean by gathering

21   room?

22     Q.    I think -- I can't even imagine that you don't

23   understand that.  A place where employees could get

24   together when they're not working.

25     A.    Well, you told me to make sure that if I



1    wasn't clear on a question, to let you know.  I'm not

2    clear on what a gathering room is.

3        Q.   Was there a break room?

4        A.   Yes.

5        Q.   Was there a room set aside for employees to

6    get together to communicate or meet other than the

7    break room?

8        A.   Yes.

9        Q.   Okay.  So where was the break room?

10       A.   It was on the second floor of our headquarter

11   building.

12       Q.   Were there bulletin boards in the room?

13       A.   I believe so.

14       Q.   Were anti-discrimination or harassment

15   policies posted on those boards?

16       A.   I don't recall.

17       Q.   Where was the gathering room or the communal

18   room we discussed earlier?

19       A.   Well, again, I'm not real sure what you mean

20   by gathering room.  Let me just explain what rooms we

21   had where --

22       Q.   Sure.

23       A.   -- more than one employee would meet that

24   wasn't in their own office.

25       Q.   I'm talking about a room -- not a conference



1  room like where we're sitting.  Not for official

2  business.  But some other room other than the break

3  room where employees could go on breaks, et cetera.

4      A.   There was a break room as well on the fourth

5  floor --

6      Q.   Okay.

7      A.   -- but...

8      Q.   But?

9      A.   I'm not sure it was -- it's going to meet your

10  definition of a gathering room.  There was a coffee

11  pot in there.  There was a television running Fox or

12  CNN.  And when we were celebrating someone's

13  birthday, they would often serve the cake in that

14  room.  But it was pretty rare that you would see

15  employees in there doing non-work.

16      Q.   Was there a bulletin board in that room?

17      A.   I don't know.

18      Q.   Was there a harassment or discrimination

19  policy posted in that room?

20      A.   I don't know.

21      Q.   Was there a anti-discrimination or harassment

22  policy posted anywhere at the company?

23      A.   I don't know.

24      Q.   Did you ever see one posted anywhere at the

25  company?



1    A.    I don't recall seeing one.

2    Q.    And we are talking about the corporate

3    offices, correct; because that's where your office

4    was.

5    A.    That's what I was speaking of, yes.  The

6    corporate office.

7    Q.    I just wanted to make sure.  I wasn't trying

8    to confuse you that we were talking about any

9    theater.

10    A.    Sure.

11    Q.    Okay.  So when you were president and CEO, I'm

12    assuming the employees that reported to you changed

13    over time; is that fair?  Some people came and some

14    people left.

15    A.    Well, I don't know if it's fair; but that is

16    true.

17    Q.    I mean it's a fair statement that the

18    employees changed over time.

19    A.    The employees did change over time.

20    Q.    So as president and CEO, can you tell me what

21    jobs reported to you?  For example, did district

22    managers report directly to you?

23    A.    They did not.

24    Q.    So what jobs -- what persons and jobs reported

25    directly to you?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    A.    At which -- at what point in time?

2    Q.    Did it change over time?

3    A.    It did.

4    Q.    Okay.  So when you started in 2009, what jobs

5    reported to you?

6    A.    When I became president and CEO in 2009 as

7    opposed to chairman...

8    Q.    Correct.

9    A.    Yes.  When I became president and CEO in 2009,

10   the COO reported to me; the CFO reported to me; and

11   the general counsel reported to me.

12   Q.    Okay.  And how did that change over time?

13   A.    In 2016, the CMO reported to me as well as

14   those three positions.  And in 2000 -- I'm sorry, I

15   don't recall whether it was 2014, but I think it was,

16   the president of alternative programming reported to

17   me.

18   Q.    Okay.  So from 2009 to 2014, it was just those

19   three:  COO, CFO, and general counsel?

20   A.    I believe that's correct.

21   Q.    And did you have an administrative assistant

22   who reported to you?

23   A.    Yes, I did.  Sorry.

24   Q.    And she was called administrative assistant?

25   A.    I don't know -- I don't recall what her title



1   was during that period.

2       Q.   Do you recall what her title was in 2015 when

3   Ms. Trawick was terminated?

4       A.   I don't recall with absolute clarity what her

5   title was, no.

6       Q.   Okay.  Did you have the same administrative

7   assistant or secretary or whatever her title was from

8   2009 to 2015 when Ms. Trawick was terminated?

9       A.   At some point in 2009, she became my

10  administrative assistant.  The former CEO's

11  administrative assistant was my administrative

12  assistant for a period of time in 2009.

13      Q.   Okay.  And so your administrative assistant

14  beginning sometime in 2009 was Lisa De La Cruz?

15      A.   That's correct.

16      Q.   And she remained your administrative assistant

17  until AMC bought the company?

18      A.   That's true.

19      Q.   Where is Lisa De La Cruz now; do you know?

20      A.   I do not.

21      Q.   Did you prepare for this deposition?

22      A.   I'm not sure what -- what you mean?  Did I

23  talk --

24      Q.   Did you take any action to prepare for this

25  deposition?



1    A.    I thought about it a lot.

2    Q.    Okay.  Anything else?

3    A.    I talked to my attorney about it.

4    Q.    Okay.  Is it your testimony that -- and who is

5  your attorney?

6    A.    Troutman Sanders.

7    Q.    Okay.  Did you personally hire Troutman

8  Sanders?

9    A.    What do you mean personally hire?  I was an

10  officer of the company and as such, the company hired

11  Troutman Sanders.

12    Q.    Okay.  That's my question.  You didn't hire

13  Troutman Sanders to represent you individually.  The

14  company is providing you with counsel, correct?

15    A.    I'm not sure what the technical --

16    Q.    Did you sign an individual contract with

17  Troutman Sanders and pay him a retainer?

18    A.    I'm not paying him individually, no.

19    Q.    So the company is providing you counsel as an

20  officer of the company.

21    A.    That's correct.

22    Q.    And do you know if AMC is paying for that or

23  Carmike?

24    A.    There is no Carmike.

25    Q.    And no reserve funds set to pay fees?



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 37

1    A.   Not that I'm aware of, but I don't know.

2    Q.   All right.  Other than Mr. Gerakitis, did --

3  and I assume that's the counsel you talked to because

4  you nodded at him; is that fair?

5    A.   Yes, that is correct.

6    Q.   Okay.  Other than Mr. Gerakitis, have you

7  talked to anyone about this deposition or the

8  substance of your testimony?

9    A.   No.

10    Q.   You hesitated.  Have you talked to someone

11  about the deposition itself?

12    A.   Well, we have counsel here as well.  And the

13  gentleman I met for the first time yesterday, but I

14  don't remember him attending any discussions that

15  Richard and I had about this deposition.  But I do

16  know he represents us.

17    Q.   And who is that?

18    A.   Thomas.  I don't know what his last name is.

19    Q.   Gristina?

20    A.   I don't know.

21    Q.   Here at Page Scrantom?

22    A.   Yes.

23        MR. GERAKITIS:  Scrantom.

24        MS. PREBULA:  I said it.  I said it that way.

25        MR. GERAKITIS:  I thought you said Scranthem.



```
1          MS. PREBULA:  No, I didn't.  But thank you for
2      the correction.
3          MR. GERAKITIS:  Sorry.  I didn't want you to
4      make a mistake in case you didn't.
5   BY MS. PREBULA:
6   Q.   It's your understanding Mr. Gristina
7   represents Carmike?
8   A.   I don't have an understanding.  I met him for
9   the first time yesterday.
10  Q.   Well, when you said we have a lawyer here who
11  represents us, who is us?
12  A.   I believe -- I believe that he is that -- that
13  person.  But, again, I didn't hire him.  I have not
14  consulted with him.  He came in yesterday and was
15  talking about subpoenas in this case; but we did not
16  talk about my deposition.
17  Q.   Okay.  Here's why that's important.  If you
18  talked to Mr. Gristina and he does not represent
19  Carmike, then what you discussed with him is not
20  privileged.
21  A.   Okay.  I did not discuss anything with him.  I
22  was in the room when he came in, but I did not
23  discuss anything with him at all.
24  Q.   Okay.  And is it your understanding that he
25  represents Carmike as well?
```



1    A.    It is not my understanding.

2    Q.    Okay.  You said we have another lawyer here

3  and his name is Thomas.  Who is we?  Carmike?

4    A.    Richard and I -- he came into the room

5  yesterday.

6    Q.    But that's not what you said, Mr. Passman.

7  You said:  We have another lawyer here.  So I'm

8  asking you who the "we" is.  Carmike?

9    A.    Carmike does not exist.  I stand corrected.

10    Q.    Well, who is the "we"?

11    A.    What I was trying to say is Richard and I were

12  talking to another -- or Richard was talking to

13  another attorney from Page that came into the room.

14  I assumed -- assumed -- I don't assume today, but I

15  assumed at the time that he had something to do with

16  this case.

17    Q.    And you assumed he represented Carmike?

18    A.    I did not assume he represented Carmike

19  because Carmike does not exist.

20    Q.    Then why did you say that "we had another

21  lawyer here"?

22    A.    Let me go back and try to restate it for you.

23  Thomas introduced himself.  Came into the room.  He

24  and Richard were talking about subpoenas.  But I had

25  no words with him, other than to introduce myself and



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 40

1   he introduced himself to me.  I assumed that he had

2   something to do with this case against Carmike and

3   then successor AMC.

4       Q.   That doesn't answer the question I asked.  So

5   why did you say "we", and who is the "we"?

6       A.   I don't know why I said we.

7       Q.   Okay.  So other than Mr. Gerakitis, did you

8   talk to anyone else to prepare for this deposition

9   today?

10      A.   Did not.

11      Q.   Have you talked to anyone else about this

12  lawsuit other than Mr. Gerakitis?

13      A.   Well, the "about this lawsuit", my wife knows

14  I'm here giving this deposition.  She knows there's a

15  lawsuit against the company.  And I haven't talked to

16  her about the particulars of it.  But I don't know if

17  that constitutes talking about it or not.  But my

18  wife.

19      Q.   Anyone else?

20      A.   No.

21      Q.   Have you reached out to any former employees

22  of Carmike to talk about this lawsuit since it was

23  filed?

24      A.   I have not.

25      Q.   Have you talked to anyone at AMC about this



1  lawsuit since it was filed?

2     A.    I have not.

3     Q.    Okay.  Did you review any documents in

4  preparation for the deposition?

5     A.    Well, I'm not sure what I can say about

6  talking to counsel about the documents that have been

7  produced previously.  I have no documents to review

8  or to have reviewed, but I've talked to my counsel.

9     Q.    I did not ask you what you discussed with your

10  counsel.  Have you reviewed any documents in

11  preparation of this deposition?

12     A.    I have gone over documents with counsel.  But

13  I have not, on my own, reviewed any documents.

14     Q.    So what documents have you reviewed in

15  preparation for the deposition?

16     A.    I don't recall what they would be titled or

17  how to describe them.

18     Q.    You don't recall a single document you looked

19  at for this deposition?

20     A.    Well, I looked at a lot of papers and

21  screenshots.

22     Q.    Mr. Passman, are you taking any medication

23  that would affect your memory today?

24     A.    No.

25     Q.    Have you taken any medication that would have


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1  affected your memory within the last two years?
 2     A.    I don't believe so.
 3     Q.    Have you taken any medication that would
 4  affect your ability to tell the truth today?
 5     A.    No.
 6     Q.    Have you been diagnosed with any condition or
 7  illness which would affect your memory?
 8     A.    No.
 9     Q.    Have you taken any medication this morning?
10     A.    No.
11     Q.    Any medication within the last 48 hours?
12     A.    No, other than vitamins.
13         MR. GERAKITIS:  That's not medication.
14   BY MS. PREBULA:
15     Q.    Have you had any alcohol to drink within the
16  last 48 hours?
17     A.    Yes.
18     Q.    When is the last alcohol you had?
19     A.    Yesterday evening.
20     Q.    And what did you drink?
21     A.    A scotch.
22     Q.    One scotch?
23     A.    One scotch.
24     Q.    Any alcohol issues that would affect your
25   memory today?
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1        A.    No.
 2        Q.    Is there anything else that would affect your
 3   memory today, any other events, occurrences or
 4   conditions?
 5        A.    Not that I recall or would be aware of, no.
 6        Q.    How old are you?
 7        A.    65.
 8        Q.    Have you had any recent hospitalizations?
 9        A.    Out-patient, not overnight stay.
10        Q.    Okay.  And what were your recent
11   hospitalizations --
12        A.    Kidney stone.
13        Q.    -- outpatient?
14        A.    Kidney stone.
15        Q.    I'm sorry.
16        A.    Thank you.
17        Q.    And when was that?
18        A.    The last was -- the most recent was last
19   month.
20        Q.    Okay.  And --
21        A.    I'm sorry.  We're in October.  It would have
22   been in August.
23        Q.    And I presume that you were not -- you did not
24   get a general anesthesia for that treatment?
25        A.    I think I did.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    Q.   You did.  Okay.  Have you had any difficulties

2  with anesthesia or with it having long term effects

3  affecting your memory?

4    A.   Not that I'm aware of.

5    Q.   Okay.  Did you hire Crystal Trawick to work

6  for Carmike?

7    A.   I did not.

8    Q.   Who did?

9    A.   I don't know.

10   Q.   Did you know Crystal before she began working

11 at Carmike?

12   A.   I did not.

13   Q.   Did you know her husband's family before she

14 began working at Carmike?

15   A.   No.

16   Q.   Do you know the first position she was hired

17 into?

18   A.   I do not.

19   Q.   When did you first become aware that

20 Ms. Trawick was an employee?

21   A.   I think it would have been in January of 2009.

22   Q.   And what was that circumstances?

23   A.   We had just terminated the CEO and we had an

24 all employee meeting at a local theater.  And I

25 informed the employees that the CEO was no longer

DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    there and that we were establishing an office of the

2    chairman and how I saw that as working.

3           And when that meeting was over, Crystal along

4    with several other employees introduced herself to me

5    as an employee of Carmike.

6    Q.    When you say a meeting with all employees, was

7    that all employees of Carmike?

8    A.    Corporate.   Corporate.

9    Q.    Corporate.

10   A.    We then had telephone conferences with all

11   theater managers and field employees.

12   Q.    Is that what you call theater employees, field

13   employees?

14   A.    Well, I just want to make sure that -- some of

15   the theaters -- all of the theater managers would

16   have been included in that.  We had district offices

17   that were remote from corporate and those were not,

18   quote, theater employees.  They would have been

19   included in that as well.

20   Q.    And you refer to them as field employees?

21   A.    Yeah.  People out in the field, away from

22   corporate.

23   Q.    So field employees refers to everybody away

24   from corporate?

25   A.    To me, it does.



1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 46

1    Q.   Okay.

2    A.   That was not a Carmike term.

3    Q.   Understood.  Did -- how many employees were at

4  that meeting in 2009?

5    A.   I don't know.

6    Q.   Okay.  Carmike was a smaller company then than

7  it was when it was sold, fair?

8    A.   You know, I'm not a hundred percent sure

9  whether it was smaller at the time in 2009 than when

10  it was sold.  Carmike has had ups and downs.  We

11  closed a lot of theaters between 2009 and 2011, and

12  then we started growing the company back.  So I'm not

13  certain.

14    Q.   Do you remember how many people were in that

15  corporate office in 2009 when you took over as

16  president and CEO?

17    A.   I don't.  It was in excess of a hundred, but I

18  couldn't tell you how many.

19    Q.   Including all the district offices, how many

20  corporate employees were there when Ms. Trawick was

21  fired in November of 2015?

22    A.   I don't know.

23    Q.   More than a hundred?

24    A.   I would assume so, but I don't know.

25    Q.   How many over -- how many employees overall



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 47

1  did Carmike have in November of 2015?

2     A.    Company wide?

3     Q.    Correct.

4     A.    Part-time and full time?

5     Q.    Correct.

6     A.    Including part-time?

7     Q.    Correct.

8     A.    That probably would be in excess of 12,000.

9     Q.    Okay.  And do you know how many full time

10  employees it had in November of 2015?

11    A.    I don't.

12    Q.    It's more than 6,000 though, wasn't it?

13    A.    No, ma'am.

14    Q.    Okay.  How many employees --

15    A.    It would have been less than 1,000.

16    Q.    More than 500?

17    A.    I don't know.

18    Q.    Who would know that?

19    A.    HR.

20    Q.    Okay.  Are you aware that Carmike has not

21  disputed that there were more than 500 employees at

22  the time this happened?

23    A.    I'm not aware of that.

24    Q.    Okay.  Have you reviewed the complaint in this

25  case?



1     A.    The one filed in court?

2     Q.    Correct.

3     A.    Yes, ma'am.

4     Q.    Okay.  When did you review the complaint?

5     A.    About the time it was filed, I got a copy of

6  it or we -- our executive team at one of our

7  executive team meetings was briefed on it by our

8  general counsel and --

9     Q.    Did you read it?

10     A.    -- I've seen it.  I don't recall if I read the

11  entire complaint or whether I read parts of it that

12  were pointed out to me.  And then since then in

13  discussions with my counsel, I have seen parts of the

14  complaint.

15     Q.    Did you see the EEOC charge when it was filed?

16     A.    I've seen parts of it.

17     Q.    Sorry.  I'm losing ink here.

18     A.    There's several pens behind you.

19     Q.    Oh, no.  I prefer mine, but we all have our

20  own little ones that we like.

21          Did the vice presidents ever report to you as

22  president and CEO?

23     A.    Any vice president?

24     Q.    Correct.

25     A.    Is that what you mean?  Not that I recall.



1    Q.    And district managers did not report to you as
2    president and CEO?
3    A.    That's correct.
4    Q.    Did you have anything to do with moving
5    Ms. Trawick into the marketing department?
6    A.    I believe I approved it.
7    Q.    Why would you have had to approve Ms. Trawick
8    moving into the marketing department?
9    A.    I wouldn't have to.
10    Q.    Then why did you approve it?
11    A.    We had regularly scheduled executive team
12    meetings, my direct reports and myself; and we would
13    talk about things going on during the day or during
14    the week.  We generally met weekly.
15         And as I recall, Fred brought it up at an
16    executive team meeting that it was being done and the
17    rest of the executive team all concurred that it
18    sounded like the right thing to do.  And I personally
19    thought it was the right thing to do.
20    Q.    And when you say Fred, you mean Fred
21    Vanderway?
22    A.    Fred Vanderway, COO.  Marketing and film
23    departments both reported to Fred.  This was a
24    transfer between two of those departments.
25    Q.    Why would something at that level have come to



1  you as president and CEO for approval?

2      A.    It didn't come to me for approval.

3      Q.    Mr. Passmore, you just said you approved it.

4      A.    I did.  I did approve it.  I approved of it

5  and the rest of the executive team did as well.  But

6  it didn't require our approval, but we did approve

7  it.

8      Q.    Did you similarly approve making Shannon

9  Sailors a director?

10     A.    No, ma'am.

11     Q.    Okay.  So why would a lower position be

12 approved by you but moving Sailors in as a director

13 not be approved by you?

14     A.    I think Sailors was a director of advertising

15 when I came into the company.

16     Q.    Okay.  Respectfully, that does not answer my

17 question.

18     A.    It wouldn't.  It wouldn't.  And it didn't.

19     Q.    Do you remember the year that Ms. Trawick was

20 moved into marketing?

21     A.    I don't.

22     Q.    Were there any other job promotions or hirings

23 that you had to approve?

24     A.    We had a general operating policy between

25 myself and my direct reports that any of their direct



 1   reports, hire, fire, promotion would be approved by

 2   someone other than them.  It, in some cases, could be

 3   the CFO, CLO or myself.  But no one could have sole

 4   authority for a direct report of themselves.  So,

 5   yes, there were several during my tenure that I would

 6   have had to approve.

 7       Q.   Okay.  This is the first time you mentioned

 8   CLO.  Who is the CLO?

 9       A.   Chief legal officer of the company.  That

10   would be Dan Ellis.

11       Q.   Okay.  So you were calling him -- instead of

12   the general counsel, you were calling him CLO?

13       A.   Yeah.

14       Q.   And was that his title?

15       A.   I don't recall his title.

16       Q.   It was either general counsel or CLO?

17       A.   It would have been.  I refer to him as -- sea

18   level positions to me were what I generally referred

19   to them as.  I can't tell you whether they were

20   senior vice presidents, executive vice presidents or

21   vice presidents.  They were chief -- he was the chief

22   legal officer of the company.

23       Q.   Okay.  Was this general operating policy in

24   writing?

25       A.   No, it was not.  At least I don't believe it



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 52

```
 1   was.
 2       Q.   So it was an informal policy?
 3       A.   I would say it was formal.
 4       Q.   But not in writing?
 5       A.   But not in writing.
 6       Q.   Were there any other general operating
 7   policies that were formal but not in writing that
 8   affected personnel?
 9       A.   There may have been, but not that I recall.
10       Q.   You said you had regularly scheduled executive
11   team meetings.  When were those -- what was the
12   regular schedule?
13       A.   They were most often on Mondays.
14       Q.   Every week?
15       A.   Every week, Mondays.  There were clearly
16   exceptions:  Travel, events, any number of things.
17   But we had a standing meeting on Mondays.
18       Q.   Okay.  If I tell you that Ms. Trawick was
19   moved into marketing at the end of 2012, does that
20   sound right to you?
21       A.   I don't know if it's right or not.
22       Q.   No way for you to recall?
23       A.   I have no reason to dispute it.
24       Q.   Did you approve Crystal Trawick moving into
25   the marketing department in writing?
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 53

1    A.   I did not.  Again, I tried to describe.  It

2  was not even a required approval.  It was brought up

3  and mentioned.

4    Q.   Under your general operating policy that your

5  direct reports, which were all sea level, right?

6  Except for your administrative assistant.

7    A.   That's right.

8    Q.   And that all sea level direct reports had to

9  be approved by another executive.  Were those

10  approvals in writing?

11    A.   I don't know, but I don't think so.  It wasn't

12  required that they be approved in writing.  Changes

13  in pay were all in writing.

14    Q.   Did you have to approve those for every

15  employee?

16    A.   For every employee of the company?  No, ma'am.

17    Q.   Every corporate employee.  Obviously I'm not

18  talking about the people way out in the field.

19    A.   No, not for every corporate employee.

20    Q.   What level did you have to approval salary

21  changes --

22    A.   Pay changes?

23    Q.   -- for?

24    A.   The aforementioned direct reports of direct

25  reports and --



1      Q.   Wait a minute.  Let me make sure I understand

2    that.  The sea level people and the direct reports to

3    the sea level people?

4      A.   That's correct.

5      Q.   Okay.

6      A.   And any pay increase over a percentage

7    threshold that we had set.

8      Q.   And what was that threshold?

9      A.   I believe it was four percent, but I don't

10   recall specifically.  It may have been slightly

11   lower.

12     Q.   So from 2009 to 2015 -- let me back up because

13   Ms. Trawick was not at that level.

14          From 2012 to the end of 2015, did you approve

15   Crystal Trawick's pay increases?

16     A.   I don't recall.  But if she received pay

17   increases that were above the threshold, I would have

18   -- they would have had to come to me.

19     Q.   Well, I thought you said you approved pay

20   changes for direct reports to sea level people.

21   Didn't she directly report to Mr. Van Noy?

22          MR. GERAKITIS:  Object to the form.

23          DEPONENT PASSMAN:  Not in 2012, I don't think

24    she did.

25    BY MS. PREBULA:



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    Q.   Okay.  And Mr. Van Noy was -- what title did

2    he hold?

3    A.   Chief operating officer.

4    Q.   And he was COO from the time you started in

5    2009?

6    A.   If not, immediately after.  But I believe his

7    title at that time was chief operating officer as

8    well.  I just don't recall.

9    Q.   When Ms. Trawick moved into marketing, she

10   reported directly to Terrell Mayton, right?

11   A.   I believe that's correct.

12   Q.   And he was the director of marketing?

13   A.   I believe that's correct.

14   Q.   Okay.

15   A.   I don't recall his title.  I'm sorry.

16   Q.   Once he was terminated in the summer, early

17   fall of 2013, Ms. Trawick then directly reported to

18   Mr. Van Noy, right?

19   A.   I believe that's correct.

20   Q.   Did you approve Crystal Trawick's pay changes

21   from summer or early fall 2013 to the time of her

22   termination?

23   A.   I believe I would have.

24   Q.   Would you have signed the forms?

25   A.   I believe I would have.



```
 1      Q.    Would the same be true for Shannon Sailors,
 2  that you would have approved pay increases for him?
 3      A.    During that period of time?
 4      Q.    Correct.
 5      A.    I believe I would have.
 6      Q.    And you believe you would have signed the
 7  forms?
 8      A.    I believe I would have.
 9      Q.    And I'm presuming you would have approved
10  Crystal Dela -- not Crystal --
11      A.    Lisa.
12      Q.    -- Lisa De La Cruz's pay increases since she
13  reported directly to you?
14      A.    Yeah.  She also reported directly to the CFO.
15  And generally he would recommend the pay increase.
16  He and I would discuss it and arrive at it.
17      Q.    And who was the CFO between 2013 and end of
18  2015?
19      A.    Richard Hare.
20      Q.    H-a-r-e?
21      A.    Right.
22      Q.    Okay.  When you approved Crystal moving into
23  the marketing department, what was your understanding
24  of what her job responsibilities were going to be?
25      A.    I don't have specific memory of it.  But as I
```



1   recall it, they were making a spot in the marketing

2   department to give her an opportunity to learn and

3   grow in marketing skills.

4       Q.   Do you remember any of her job

5   responsibilities?

6       A.   I believe it was going to be on a project

7   basis.

8       Q.   What does that mean?

9       A.   It means specific marketing projects would be

10  assigned to her from Terrell at the time, and she

11  would handle those.

12      Q.   Do you have to approve the projects that were

13  given to her?

14      A.   I did not.

15      Q.   I'm looking to see if we marked this document

16  as an exhibit already.  Did you have an understanding

17  of what the projects were that were going to be given

18  to Ms. Trawick?

19      A.   I do not.

20      Q.   None?

21      A.   I don't recall any off the top of my head.

22      Q.   Let me show you what has been marked as

23  Plaintiff's Exhibit 44.  Have you seen this document

24  before?

25      A.   Not that I recall.



1     Q.    Do you recall reviewing this document in

2    preparation for this deposition?

3     A.    I do not.

4     Q.    Does this refresh your recollection at all as

5    to the responsibilities of Ms. Trawick when she moved

6    into marketing?

7     A.    It does not.

8     Q.    When I asked if you had seen it before -- and

9    perhaps I misunderstood you.  You said you don't

10   recall.  Does that mean you don't recall one way or

11   the other, or you don't recall seeing the document?

12    A.    I don't recall seeing the document.

13    Q.    Okay.  Did you approve Ms. Trawick moving into

14   marketing without a title?

15    A.    I don't recall a title being discussed.

16    Q.    Ever, or just at the time she moved into --

17    A.    At the time she moved in.

18    Q.    Now, this particular document, Plaintiff's 44,

19   was prepared after she was given the title marketing

20   project manager.

21         MR. GERAKITIS:   Object.

22    BY MS. PREBULA:

23    Q.    You see that on there.

24         MR. GERAKITIS:   Object.

25    BY MS. PREBULA:



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1      Q.    It says marketing projects manager.
 2            MR. GERAKITIS:  Object to form.
 3            DEPONENT PASSMAN:  I do see that.
 4    BY MS. PREBULA:
 5      Q.    Okay.  Do you know whether or not her duties
 6    were different when she first moved into marketing as
 7    opposed to when she became marketing projects
 8    manager?
 9      A.    I don't know because I don't know what duties
10    she was given when she moved into the marketing
11    department.
12      Q.    If you approved that transfer, how can you not
13    know what duties she was given?
14      A.    In a -- in an environment such as Carmike, I
15    did not know the specific duties of many of our
16    corporate employees.
17      Q.    But you approved this one.
18      A.    Approved.  As I said, it was mentioned.  Fred
19    brought it up at an executive team meeting that we
20    were going to -- or he was going to or the company
21    was going to transfer her from film into marketing
22    and marketing was making a position for her.  And we
23    discussed it.  We all agreed it sounded good.  We
24    individually had different feelings about Crystal's
25    strengths and weaknesses, and marketing seemed like a
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    good spot for her to go to.

2      Q.   And just because there's more than one Fred,

3    you're talking about Fred Van Noy.

4      A.   That's correct.

5      Q.   So what was your understanding she was going

6    to do when she was moved from film to marketing?

7      A.   That marketing -- that Terrell was making a

8    spot for her and would find discreet projects for her

9    to do.

10     Q.   But it's your testimony you had no idea what

11   those projects were going to be?

12     A.    It is my testimony that I had no idea at that

13   time what those projects might be.  We had many needs

14   in marketing.  I did not get into the weeds over what

15   projects would be assigned to what employees in the

16   marketing department.

17     Q.   Well, did you approve anybody else being moved

18   into marketing?

19     A.   Transfers from other departments?

20     Q.   Yes, sir.

21     A.   I don't recall any other transfers from other

22   departments into --

23     Q.   Did you --

24     A.   -- marketing.

25     Q.   I'm sorry.  Didn't mean to talk over you.



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 61

1      Did you approve any hirings into the marketing

2  department?

3     A.    Indirectly.

4     Q.    Did you approve whether or not Ms. Trawick

5  would get a raise from being moved from film to

6  marketing?

7     A.    I don't recall compensation being a part of

8  the discussion on moving from film to marketing.

9     Q.    Do you know that she did not get a raise when

10  she moved into marketing?

11     A.    I don't know that.  That wouldn't surprise me.

12     Q.    Why?

13     A.    Because I believe she was a film buyer and --

14  and marketing was making a spot for her, which would

15  not necessarily be a more senior level role.  It

16  would be, I would think, either a lateral or maybe

17  even a lesser role initially.

18     Q.    Did you tell her that?

19     A.    I don't recall telling her that, no.

20     Q.    Did anyone tell her, to your knowledge, that

21  this was going to be a demotion or a lateral move?

22     A.    I have no idea.

23     Q.    So to your knowledge, no one told her that?

24     A.    To my knowledge, no one told her that.

25     Q.    When she moved into marketing, would you have



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   had to approve what her salary was going into the

2   marketing department in 2012?

3       A.   I would not.

4       Q.   Do you know why she was not given a title in

5   2012 when they moved her into marketing?

6       A.   I do not.

7       Q.   Okay.  Do you recognize on Plaintiff's Exhibit

8   44 any responsibilities that she had prior to

9   becoming marketing projects manager?

10      A.   I'm sorry, I don't.

11      Q.   Did you have a discussion with Ms. Trawick in

12  April of 2013 that it was -- that she wanted a title

13  and she wanted a pay raise?

14      A.   I don't recall that specifically.

15      Q.   Do you remember how long after it was you

16  discussed moving Ms. Trawick into marketing that she

17  actually moved into marketing?

18      A.   No, I don't.

19      Q.   Do you recall that it was after October 2012?

20      A.   I don't.

21      Q.   Somewhere in that time frame?

22      A.   I don't recall.

23      Q.   Okay.  Did you keep a daily diary?

24      A.   No, I did not.

25      Q.   Did you keep a calendar?



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    A.    Yes.

2    Q.    Where was your calendar kept?

3    A.    On Microsoft Outlook.

4    Q.    And how was that maintained?

5    A.    Either I or my assistant would book

6   appointments, travel, that kind of thing.  I believe

7   a few other people had access to it, but I don't know

8   if they had access and write capabilities to it.

9    Q.    That was my next question.  Who were the other

10  people who had access to it?

11   A.    I believe that each person on the executive

12  team could see my calendar, but I don't know that for

13  a fact.

14   Q.    And when you say executive team, who are you

15  defining as the executive team?

16   A.    It would be the chief financial officer who my

17  assistant also reported to, it would be the chief

18  operating officer, and the chief legal officer.  And

19  later, the chief marketing officer and the president

20  of alternative programming.  And I think I said my

21  assistant, but I'm not sure.

22   Q.    Right.  But I was asking -- you didn't

23  consider your assistant to be part of the executive

24  team, did you?

25   A.    No, I did not.



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 64

1    Q.   Okay.  When you use the term executive team,
2  does that include any vice presidents?
3    A.   I believe all of them were vice presidents,
4  either senior vice presidents or vice presidents
5  other than my assistant.
6    Q.   What happened to the calendar, the Outlook
7  calendar?
8    A.   I don't understand the question.  What happens
9  to it?
10    Q.   No, what happened to it?  When the company was
11  sold, what happened to it?
12    A.   You'll have to ask the company.
13    Q.   Did you just literally get up and walk out of
14  your office and leave everything there?
15    A.   No, not everything.  I had personal items that
16  we boxed up that I took home.  They included trophies
17  and awards and that kind of stuff.  I had some
18  personal files.  I got -- I basically kept country
19  club statements and that kind of thing, and most of
20  those I put into a trash bin in my office.  And I
21  left my desk top computer as it was and literally did
22  get up and walk out.  I took a laptop computer with
23  me.  I took an Ipad with me.  I had a printer at home
24  that I was able to retain.
25    Q.   And were the laptop, Ipad and home printer



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 65

```
 1   purchased by Carmike?
 2      A.    They were.
 3      Q.    Have you made any changes to the laptop, Ipad
 4   and home printer?
 5      A.    Since -- help me.
 6      Q.    Since you left.
 7      A.    You mean changes, have I used them?
 8      Q.    No.
 9      A.    I use them constantly.
10      Q.    Okay.  That isn't what I meant.  Have you
11   deleted any documents?
12      A.    No.
13      Q.    Have you --
14      A.    They were -- all of -- the printer had no
15   documents.  The laptop and --
16      Q.    The printer might have documents in the
17   memory.
18      A.    Okay.  It was -- nothing was done to the
19   printer.  It was at home and I rarely used it.
20      Q.    Okay.
21      A.    But nothing was done to that.  But the laptop
22   and the Ipad were given or taken by the IT department
23   on the day of my departure.  They were returned to
24   me.  I think they were given a day or two before that
25   and returned me completely wiped clean and no
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   software, no nothing on them.  No Microsoft anything,

2   no emails, nothing.  And I was given those.  I took

3   them home and set up my email and all that kind of

4   stuff.

5       Q.   Has Carmike demanded that you return the

6   laptop, Ipad and home printer?

7       A.   Carmike did not exist when I took those home.

8   It was AMC that permitted me to take them.

9       Q.   And they haven't asked you --

10      A.   And they have not asked for them back, no.

11      Q.   When the lawsuit was filed in December of 2016

12  --

13      A.   I'm sorry.  When?

14      Q.   December of 2016.

15      A.   Uh-huh.  (indicating in the affirmative).

16      Q.   -- had AMC already acquired Carmike?

17      A.   I think the lawsuit was filed the week before,

18  but I'm not a hundred percent sure.

19      Q.   But you saw the lawsuit before the acquisition

20  was completed or the sale was completed?

21      A.   I was made aware of it and I believe I saw

22  either excerpts or pieces of it, but I don't know

23  whether I saw the entire suit.

24      Q.   Before --

25      A.   Before closing, yes.



1    Q.   So you saw -- you knew the lawsuit had been

2    filed before AMC closed on the sale of Carmike?

3    A.   That's correct.

4    Q.   All right.   And you think you saw parts of it

5    at least?

6    A.   Yes.

7    Q.   When you were notified of the lawsuit, did you

8    issue any litigation hold to preserve documents

9    related to this lawsuit?

10   A.   Did I personally or did the company?   I'm not

11   sure what you're asking.

12   Q.   Did you, as president and CEO of the company,

13   issue a litigation hold to preserve documents?

14   A.   I did not personally issue a hold.

15   Q.   Did anyone at Carmike issue a litigation hold?

16   A.   Yes.

17   Q.   Who did that?

18   A.   Dan Ellis.

19   Q.   Where were those documents preserved?

20   A.   I don't know.

21   Q.   Was the wiping of your Ipad and laptop

22   consistent with a litigation hold?

23   A.   I don't know, but I assume it was.

24   Q.   Did you email Crystal Trawick during her

25   employment at Carmike?



```
 1      A.   At any time?

 2      Q.   Yes.

 3      A.   Yes.

 4      Q.   Did you preserve those emails?

 5      A.   I did not erase those emails.

 6      Q.   Did you preserve them?

 7      A.   I -- I'm not sure.

 8      Q.   Okay.  You didn't preserve them on a flash

 9   drive or a disk or anywhere?

10      A.   No.  No, I did not.

11      Q.   Okay.  What was the litigation hold that was

12   issued?

13      A.   I don't recall.  You'll need to check that

14   with the company.

15      Q.   What was your understanding of the hold?

16      A.   That anything having to do with Crystal

17   Trawick was to be retained.

18      Q.   And who was that sent to?

19      A.   I believe it was sent to all corporate

20   employees, but I don't know.

21      Q.   In writing?

22      A.   Yes.

23      Q.   In what format?

24      A.   In writing.

25      Q.   Was it an email, a letter, something you
```



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 69

1  passed out?

2     A.   Oh, I believe it was an email.  But, again,

3  I'm not a hundred percent sure.

4     Q.   When you got the litigation hold from Dan

5  Ellis, what did you do to preserve records?

6     A.   I didn't -- I didn't delete anything.

7     Q.   Did you do anything else?

8     A.   I don't recall doing anything else.

9     Q.   Did you instruct anybody to do anything else

10  other than Dan Ellis?

11        MR. GERAKITIS:  Object to the form.

12        MS. PREBULA:  Sure.  I'll try again.

13   BY MS. PREBULA:

14     Q.   Did you instruct anybody to take any action to

15  preserve this or do anything other than what Dan

16  Ellis did?

17     A.   I did not.  I -- I may have told my assistant

18  to make sure that she paid attention to that as well,

19  but...

20     Q.   You may have told Ms. De La Cruz?

21     A.   I may have, but I don't recall a specific

22  discussion on it.  Dan was pretty clear in his

23  communication.

24     Q.   Do you have a copy of the litigation hold?

25     A.   I don't have a copy of any Carmike documents.



1      Q.   Did the litigation hold instruct anyone -- let

2    me start over.

3          Did the litigation hold tell the corporate

4    employees who the documents that were being preserved

5    should be sent to?

6      A.   I don't recall.

7      Q.   Did it put anyone in charge of the litigation

8    hold?

9      A.   I don't recall.

10     Q.   But it wasn't you?

11     A.   It was not me.

12     Q.   Was an electronic database of all the

13   documents that were stored online relevant to

14   Ms. Trawick created as part of the litigation hold?

15     A.   I don't know.

16     Q.   Do you know anything that was done as part of

17   the litigation hold?

18     A.   I don't.

19     Q.   When you told Ms. De La Cruz to be aware of

20   the litigation hold, what did you have her do?

21     A.    I don't recall specifically talking to her

22   about it.  But it would be very customary for me to

23   tell her -- when something that crossed my desk of

24   importance like a litigation hold, to tell her not to

25   destroy anything.



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 71

1    Q.   Who would know where these documents that were
2    supposedly put on litigation hold were stored?
3    A.   I believe Dan Ellis would be able to answer
4    that.
5    Q.   Is Dan Ellis IT literate?
6    A.   You'll have to ask Dan that.
7    Q.   Okay.  When you had -- when you had IT issues,
8    did you go to Dan Ellis for IT issues?
9    A.   Not generally, no.
10   Q.   Who did you go to?
11   A.   The IT people.
12   Q.   Which is who?
13   A.   Well, it depends on what period of time you're
14   talking about.
15   Q.   In December of 2016, who was in charge of IT?
16   A.   Jeff Butkovsky.
17   Q.   Can you spell the last name?
18   A.   I cannot.
19   Q.   Okay.  Let's see...
20        Okay.  Let me show you what's marked
21   previously as Plaintiff's Exhibit 43.  And under IT
22   it says Jeff Butkovsky.
23   A.   Uh-huh.  (indicating in the affirmative).
24   Q.   Okay.  So we will provide Exhibit 43 to the
25   court reporter.  And that's the Jeff you're talking



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 72

1   about?

2   A.   That is the Jeff I'm talking about.

3   Q.   Do you know where he is now?

4   A.   I do not.

5   Q.   Have you seen him since the company was sold?

6   A.   I have not.

7   Q.   And there it says CTO.  What is CTO?

8   A.   I believe it's chief technology officer.

9   Q.   And was he a part of your executive team?

10  A.   He was not.

11  Q.   So he's at sea level.  Why is he not part of

12  the executive team?

13  A.   Because he was not a direct report of mine.

14  Q.   Okay.  Were there any other sea level

15  employees who were not a direct report of yours?

16  A.   Not that I recall.

17  Q.   This particular document, Plaintiff's 43, is

18  dated at the bottom as revised January 21, 2015.  Do

19  you see that?

20  A.   I do see that.

21  Q.   It's for corporate office, correct?

22  A.   That's what it looks like.

23  Q.   Do you recognize this document as a directory

24  of the employees and phone numbers at the corporate

25  office?



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    A.   It looks like phone numbers that we
2  periodically receive from HR.
3    Q.   Was this changed from January 2015 to the date
4  of Ms. Trawick's termination?
5    A.   The format or the people?
6    Q.   The people.
7    A.   I'm sure there were changes between January
8  and November.
9    Q.   Do you have copies of those?
10   A.   I do not.
11   Q.   Who would have copies of those?
12   A.   I don't know.
13   Q.   Who maintained that list?
14   A.   I'm not certain, but I think it came from
15  human resources department.
16   Q.   Are there any changes you know for sure
17  occurred between January 21, 2015 and mid-December
18  when Ms. Trawick was terminated?
19   A.   Change in employees?
20   Q.   Yes.  That would have been changed from
21  Plaintiff's Exhibit 43.
22   A.   You want me to tell you as I see them?  It's
23  going to take me a while to go through all of this.
24  Do you want me to tell you as I see differences?
25   Q.   Sure.  Just the ones you know, however you



1  know them.

2     A.    Okay.   Under the controller group, I'm not

3  sure that all of these people were there in November

4  of 2015.   Kathy Schoonover, was, I believe, an

5  accounting manager.   I don't know when she left the

6  company.

7          Under COO, Megan Copner.   She left the company

8  and came back, and I don't know if it was during that

9  period where she also came back.   But she left at

10 some point and came back.

11    Q.    And when you say under COO, you're not

12 implying she was a COO, are you?

13    A.    No.   Under the COO grouping, Fred Van Noy,

14 Gloria White and Megan Copner.

15    Q.    Right.

16    A.    Under financial reporting, there's Greg

17 Wiggins and Cathryn Smitherman.   And I don't think

18 Cathryn was there at the time of Crystal's departure.

19         But I -- these are very difficult for me as

20 president and CEO to be looking down the list of

21 employees, but I'm --

22    Q.    You can only tell me what you know.

23    A.    I'm telling you what I think rather than what

24 I know for certain.

25    Q.    Well, if you know for certain, tell me.   And



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 75

1  if it's what you think, tell me.

2      A.    In the legal department, it lists Linda Day

3  and Rebecca Jones.  I'm not sure when Linda's last

4  day was, but I think it was sometime in November of

5  2015.  She retired.

6          In real estate, the name Thomas Wilkerson.  I

7  don't recall when he left the company, but I believe

8  it was sometime in 2015.

9          Just for point of clarification, we have on

10 this telephone listing Westfield, New Jersey's

11 office.  That was considered part of corporate even

12 though it was not here in Columbus.  And in that, I

13 don't -- I don't know, again, the exact time frame.

14         But Chuck Goldwater left the company, I

15 believe, sometime in 2015.  Brett Marks is shown here

16 on the listing in January.  I'm not sure he was even

17 an employee in January of 2015.  He was not in

18 November of 2015.

19         And these are the only ones that I can think

20 of that would be there.  Now, I don't specifically

21 recall people that we hired during that period --

22     Q.    You can leave it there.

23     A.    -- that might be on there in November that

24 weren't on there in January.

25     Q.    Okay.



1    A.   But just by way of example, if Kathy

2    Schoonover the controller's office was gone in

3    November, she would have been replaced by another

4    accounting manager and I don't know who that person

5    might be.

6         MS. PREBULA:  Now is a good time to take a

7      short break.  We've been going for a little while

8      so let's do that.

9         (Brief break)

10         (Upon resuming)

11   BY MS. PREBULA:

12    Q.   So let's go back to April of 2013.  At that

13   point, Ms. Trawick had been in the marketing

14   department for a while.  And I asked you if you

15   recalled a conversation with her in April of 2013

16   with regard to having a title and a pay raise.  And I

17   believe you said you didn't recall a specific

18   conversation.

19    A.   Not in April of 2013.

20    Q.   Do you recall a conversation with her before

21   she was given the title of marketing projects

22   manager?

23    A.   I don't recall if it was before she was given

24   the title.

25    Q.   Okay.  Did you direct Mr. Van Noy in April of



```
 1    2013 to speak with Ms. Trawick about the title and

 2    the pay raise?

 3        A.   I don't recall that specifically.

 4        Q.   After she had been on the job about six

 5    months, did you discuss with Fred Van Noy a pay raise

 6    and a title for Ms. Trawick?

 7        A.   I don't recall discussing both of those.

 8        Q.   Ms. Trawick says that occurred.  Do you have

 9    any reason to believe that's not correct?

10        A.   My recollection is that a title was not

11    discussed.

12        Q.   Were Ms. Trawick's additional job

13    responsibilities discussed at that time?

14        A.   I don't recall discussing job

15    responsibilities.  I only recall discussing pay.

16        Q.   Okay.  Did you direct Mr. Van Noy to have a

17    meeting with Ms. Trawick the next morning?

18        A.   I don't recall directing him to have a meeting

19    with her the next morning, no.

20        Q.   And then after that meeting in April of 2013,

21    this Plaintiff's Exhibit 44 was provided to

22    Ms. Trawick.  Do you have any knowledge of that?

23        A.   I do not.

24        Q.   Okay.  And these -- well, Plaintiff's Exhibit

25    44 -- well, let me back up.  You were not in a
```



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 78

1  meeting with Mr. Van Noy and Mr. Mayton

2  and Mr. Sailors and Crystal Trawick in April of 2013

3  to discuss her job duties; correct?

4      A.    That is correct.

5      Q.    Okay.  Did you come to learn that these were

6  the job duties provided to Ms. Trawick in April of

7  2013?

8      A.    Not specifically, no.

9      Q.    Okay.  Is it your understanding today that

10  those were the job duties she was given in April of

11  2013?

12      A.    It is not.  I have no basis in which to say

13  those were or were not.

14      Q.    Do you know who prepared Plaintiff's 44?

15      A.    I do not.

16      Q.    Okay.  What do you recall about the pay raise

17  being discussed?

18      A.    That Crystal and I had an informal discussion

19  where she said she had not had a pay raise in a long

20  time.  And I told her I would speak to Fred about

21  making sure that her pay was considered and updated

22  if necessary.

23      Q.    Do you remember when that happened?

24      A.    I don't.

25      Q.    Did you speak to Fred?



1      A.    I did.

2      Q.    Fred Van Noy?

3      A.    Yes.

4      Q.    Did you have more than one such conversation

5    with Ms. Trawick?

6      A.    About her pay?

7      Q.    Correct.

8      A.    I believe Ms. Trawick commented about wanting

9    more pay several times informally.

10     Q.    What do you mean by informally?

11     A.    Crystal was not a direct report of mine.  She

12   would schedule appointments with me periodically and

13   ask my advice on a variety of issues or to tell me

14   about things that were going on in her life.  I would

15   say it was informal career discussions.

16     Q.    You consider an employee telling you that she

17   wants a pay raise to be an informal discussion?

18     A.    Yes.

19     Q.    Even when you then direct her supervisor to

20   talk to her about it?

21     A.    Yes.

22     Q.    Why?  Why is that not formal when she has

23   scheduled a meeting with you?

24     A.    The meeting that she scheduled with me was not

25   to talk about pay.



1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 80

1    Q.    Nevertheless, it was discussed.

2    A.    She mentioned that she felt she was underpaid.

3    Q.    And why is that informal?

4    A.    Because I believe it was.

5    Q.    I'm trying -- I'm asking you your basis for

6    why you think that's informal when an employee has

7    scheduled a meeting with you.  You took the meeting,

8    right?  And you discussed the pay.

9    A.    It was -- it was a very small part of the

10   discussion that we had each and every time.  I must

11   say, lots of employees have told me they believe they

12   were underpaid.

13   Q.    Did you discuss with Mr. Van Noy when

14   Ms. Trawick would be considered for a pay increase

15   after April 2013?

16   A.    Would you repeat the question?

17   Q.    Yeah.  I'm asking you a timing element.  Did

18   you discuss with Mr. Van Noy when or what time

19   Ms. Trawick would be considered for a pay raise after

20   April of 2013?

21   A.    No.

22   Q.    Did you ever tell Mr. Van Noy to direct her

23   that she would be evaluated for a pay raise and

24   considered for a director's position six months after

25   April of 2013?



1       A.    No.

2       Q.    In the late summer, early fall of 2013 Terrell

3   Mayton was terminated, correct?

4       A.    When was...

5       Q.    Late summer, early fall, 2013.

6       A.    That sounds right.

7       Q.    Do you recall which -- which of those?

8   August, September?

9       A.    I don't recall.

10      Q.    Okay.  But that time frame?

11      A.    I -- I think so.

12      Q.    Okay.  And at that point, Ms. Trawick and

13  Mr. Sailors reported directly to Terrell Mayton

14  before his termination.

15      A.    I believe that's correct.

16      Q.    Okay.  And then after Mr. Mayton left, those

17  two:  Mr. Sailors and Ms. Trawick reported directly

18  to Mr. Van Noy.

19      A.    I believe that's correct.

20      Q.    Did you have anything to do with that

21  termination?

22      A.    Of Mr. Mayton?

23      Q.    Correct.

24      A.    Yes.

25      Q.    And what was the reason for the termination,



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 82

1  generally?  I'm not asking you to go into his life.

2  But generally, why was he terminated?

3      A.    There were a whole host of reasons, including

4  the lack of success and progress of the marketing

5  department.  Studio relationships which was a

6  significant part of the job were at a state of

7  irrepair.

8      Q.    Did you make the decision that Ms. Trawick and

9  Mr. Sailors would report directly to Mr. Van Noy at

10  that point?

11      A.    The executive team discussed what to do with

12  regard to the marketing department.  We considered a

13  couple of options.  And the final conclusion, which

14  was mine, was to ask Fred to oversee it until we

15  could find a suitable replacement or someone to

16  oversee the marketing department.

17      Q.    Were you involved in -- and, again, Fred

18  Van Noy?

19      A.    That's correct.  Sorry.

20      Q.    Were you involved in assigning the

21  responsibilities to Ms. Trawick after Mr. Mayton

22  left?

23      A.    No.

24      Q.    Who did that?

25      A.    Fred Van Noy.



1    Q.   All right.  Are you aware that from April 2013

2    through when Mr. Mayton left, that Ms. Trawick was

3    already requesting a pay raise and a title before she

4    got increased responsibilities?

5         MR. GERAKITIS:  Object to the form.

6         DEPONENT PASSMAN:  Again, as to title, I don't

7     recall that.

8    BY MS. PREBULA:

9    Q.   But yes as to pay raise?

10   A.   But yes as to pay raise or compensation.

11   Q.   Is it your testimony that there was never any

12   discussion with you with regard to Ms. Trawick

13   becoming a director?

14   A.   I do not recall any conversation with her as

15   to title of director.

16   Q.   Is it your understanding that after Mr. Mayton

17   left, that his duties were divided up and the

18   marketing duties were given to Ms. Trawick at that

19   point?

20   A.   No, that's not my understanding.

21   Q.   What's your understanding?

22   A.   Most of the duties of Mr. Mayton were

23   supervising the tasks of the people of the marketing

24   department, including advertising.  And some of those

25   duties or responsibilities of oversite were given to



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 84

1    Crystal.  Some of those, as I understand it, were
2    given to Shannon.  And it was a band-aid approach, if
3    you will, to make sure the marketing department was
4    being administered.
5        Q.   When you say Shannon, you mean Shannon
6    Sailors?
7        A.   Shannon Sailors.
8        Q.   Okay.  Did you have an understanding of what
9    Mayton's daily responsibilities and duties were?
10       A.   I did not.
11       Q.   Okay.  Did he do press releases and PR copy?
12       A.   When you say did he do them, did he author
13   them?  Is that what you mean?
14       Q.   Yes, did he author them?  Did he control them?
15   Did he supervise them?
16       A.   I don't know that he authored them.  He should
17   have supervised them.  Whether he did or not, I can't
18   speak to.
19       Q.   Did that task then pass to Ms. Trawick upon
20   Mr. Mayton's termination?
21       A.   You'll have to ask Mr. Van Noy that.
22       Q.   You don't know?
23       A.   I don't know with certainty.  I received
24   emails from her that included draft press releases.
25   I don't know who authored them, who supervised them.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 85

1  I just know who transmitted them.

2     Q.   Is it fair to say that after Mr. Mayton left,

3  that Ms. Trawick did get some increased

4  responsibilities?

5     A.   I don't know if it's fair to say.  You'll have

6  to ask Mr. Van Noy what duties of hers changed.

7  Again, Mr. Mayton and Ms. Trawick have different

8  skill sets.  Fred decided which of those skill sets

9  to utilize.

10     Q.   Is it your testimony that you do not know that

11  Ms. Trawick got increased responsibilities after

12  Mr. Mayton left?

13     A.   It is my testimony that I do not know that.

14     Q.   Are you aware that Ms. Trawick worked on the

15  marketing strategy for both advertising and marketing

16  after Mr. Mayton left?

17     A.   No, I am not aware of that.

18     Q.   Did Ms. Trawick work or be involved in hiring

19  and management of personnel for both marketing and

20  advertising after Mr. Mayton left?

21     A.   I don't know.

22     Q.   Was Ms. Trawick asked to travel more after

23  Mr. Mayton left?

24     A.   I do not know.

25     Q.   At some point after Mr. Mayton left, did she



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 86

1   then start attending the Monday meetings and make

2   marketing presentations?

3       A.   I do not know.  I did not attend those Monday

4   meetings.

5       Q.   Were you in attendance at the manager's

6   conference each year?

7       A.   Theater managers?

8       Q.   Correct.

9       A.   Yes, I was.

10      Q.   And did Ms. Trawick make marketing

11  presentations to the entire company at the manager's

12  conference in 2013?

13      A.   Not the entire company.  Those in attendance,

14  she made presentations.  I don't know how many

15  presentations or which years.

16      Q.   Is it fair to say she made them every year for

17  2013, '14 and '15 before she was terminated?

18      A.   I didn't catch part of your --

19      Q.   Did Ms. Trawick make presentations to the

20  manager's conference with regard to marketing and

21  advertisement every year of 2013, 2014, and '15 after

22  Mayton left?

23      A.   I don't know with certainty.  She made

24  presentations at manager conferences.  I just don't

25  recall which years.



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 87

1   Q.   And more than 600 people attended those

2   manager conferences each year?

3   A.   No.

4   Q.   No.   How many people attended those

5   conferences generally?

6   A.   It would have been all of the theater managers

7   which numbered at most 260 or so.   Maybe 280 in the

8   last year.   Probably 30 or so from corporate.   I

9   would guess the total attendance at those meetings of

10  Carmike employees would have been between 300 and

11  400.

12  Q.   And you do know that she did make

13  presentations on marketing to at least some of those

14  manager conferences after Mr. Mayton left?

15  A.   Yes, she did.   And as did Shannon.

16  Q.   And she had not made those presentations

17  before Mr. Mayton left, correct?

18  A.   That, I don't -- I don't recall.   It would not

19  have been unusual for her to make a presentation

20  prior to him leaving.

21  Q.   But you just don't know.

22  A.   I just don't recall.

23  Q.   It would not have been unusual for her to make

24  a marketing presentation at the manager's conference

25  prior to Mayton leaving?



1    A.   Yeah, she was what I would call a subject

2   matter expert working for Terrell on discreet

3   projects.   And if she was working on a project that

4   would be of interest to the theater managers, she

5   would be asked to make a presentation on it, as would

6   other corporate employees.

7    Q.   In fact, wasn't Ms. Trawick kind of the face

8   of Carmike in Columbus?   Didn't she appear in the ads

9   and the promotions and the brochures?

10    A.   I don't recall her appearing in ads and

11   promotions and brochures.   I believe I was the face

12   of Carmike in Columbus.

13    Q.   Do you have any pictures of you presenting in

14   ads, et cetera for Carmike?

15    A.   I don't recall any pictures of me in ads for

16   Carmike.

17    Q.   And Crystal did television interviews for

18   Carmike; did she not?

19    A.   I don't know if she did.   I wouldn't be

20   surprised.

21    Q.   And wasn't -- after Mr. Mayton left, wasn't

22   Ms. Trawick in charge of all social media for

23   Carmike?

24    A.   I don't know.

25    Q.   I don't want to belabor the point, but if I



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 89

1  ask you about any specific task or duty that

2  Ms. Trawick had, is your response going to be the

3  same, you don't know?  I don't want to waste your

4  time or hours.

5      A.    It probably will.

6      Q.    Okay.  Can you tell me any specific duties

7  that you're aware of that Ms. Trawick took on after

8  Mr. Mayton left?

9      A.    I cannot.

10     Q.    You just don't recall?

11     A.    I just don't.

12     Q.    Okay.  Did you have anything to do with her

13  evaluation in October of 2013?

14     A.    I don't recall.

15     Q.    Did you have anything to do with her

16  performance evaluation in 2012?

17     A.    I don't recall.

18     Q.    How about 2014?

19     A.    I don't recall.

20     Q.    Was she given a performance evaluation in

21  2015?

22     A.    I don't recall.

23     Q.    Was it an operating policy of the company for

24  an employee to have a performance evaluation each

25  year?



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 90

1    A.    I don't know if it was a written policy.

2    Q.    Was it a -- I mean, you've already told me

3  there are informal policies.  Was it the policy of

4  the company to do a performance evaluation each year?

5    A.    I think so, but I don't know with certainty.

6    Q.    Did you do performance evaluations of your

7  reports each year?

8    A.    No, not each year.

9    Q.    Were you involved at all other than approval,

10  which you told me earlier, in setting Ms. Trawick's

11  pay from 2012 to 2015?

12    A.    I don't recall.

13    Q.    Was it a policy of the company when a

14  performance evaluation was done that the evaluation

15  must be discussed with the employee?

16    A.    I don't know if that was policy.

17    Q.    Were there any written policies with regard to

18  pay, title, promotion, et cetera of which you are

19  aware?

20    A.    Could you reask the question?

21    Q.    Sure.  Were there any written policies with

22  regard to pay, promotion or title of which you are

23  aware?

24    A.    No, not for which I'm aware.

25    Q.    Was there a policy manual -- policies and



1   procedure manual at Carmike that dealt with human

2   resource issues such as pay, promotion, et cetera?

3        A.   We had an employee handbook.  We had a code of

4   conduct.  We had IT policies and procedures.  I don't

5   know if those would be included in your question or

6   not.

7        Q.   Did you review those three documents before

8   your deposition in preparation?

9        A.   No.

10       Q.   So there was not a separate policies and

11   procedures manual other than those three?

12       A.   There may have been, but those are the ones

13   that I recall.  I think there may have been something

14   for field personnel like theater managers as well.

15   But I just don't recall if it was a separate

16   document.

17       Q.   Did you discuss with Mr. Van Noy at the end of

18   2013 that Ms. Trawick's pay was exceedingly low for

19   the market?

20       A.   No.

21       Q.   Is it your testimony that you never discussed

22   promoting Ms. Trawick with Mr. Van Noy?

23       A.   No, that's not my testimony.

24       Q.   Okay.  Did you discuss promoting Ms. Trawick?

25       A.   Yes.



1    Q.   And what discussions were those with
2  Mr. Van Noy?
3    A.   Ms. Trawick had said that she wanted to be in
4  charge of marketing overall.  And Fred and I
5  discussed -- Fred Van Noy and I discussed it.  The
6  executive team discussed it and concluded that she
7  had not -- she did not qualify for that role.
8    Q.   Did you ever tell her that?
9    A.   I had a conversation with her in which I told
10 her that I thought she needed to work under an
11 experienced seasoned executive in marketing and learn
12 as much as possible before she would be able to
13 assume that type of responsibility.
14   Q.   When did you have that conversation?
15   A.   I don't recall.
16   Q.   It was after Mr. Mayton left certainly.
17   A.   Yes, it was.
18   Q.   And how long before she was terminated?
19   A.   I don't know.
20   Q.   Was that the same conversation where you and
21 Ms. Trawick discussed a glass ceiling at Carmike?
22   A.   No.
23   Q.   Do you recall that conversation, discussing
24 the glass ceiling at Carmike?
25   A.   I do.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    Q.    When was that discussion?

2    A.    I don't know the date.

3    Q.    Was it how long before she left?

4    A.    I don't know.

5    Q.    Tell me what you recall about that discussion.

6    A.    She scheduled an appointment with me.  Told me

7    that she had been asked to appear on a panel, I think

8    at a junior college seminar dealing with -- I don't

9    even remember the title.  But she said that she had

10   planned to discuss the corporate America glass

11   ceiling and how difficult it is being a woman in the

12   work place, and give advice to those in attendance as

13   to how to be successful.

14   Q.    And did you tell her she had not reached her

15   glass ceiling?

16   A.    I don't remember she and I talking about her

17   glass ceiling.

18   Q.    Did you tell her that in order for her to be

19   promoted, she had to have a degree?

20   A.    No.

21   Q.    You deny that?

22   A.    Absolutely.

23   Q.    Did you know that she already had a degree?

24   A.    I did not.

25   Q.    Did you tell her there was not a glass ceiling



```
 1   at Carmike?

 2      A.    I told her that I did not believe there was a

 3   glass ceiling at Carmike, yes.

 4      Q.    In fact, didn't you tell her that it was

 5   unfortunate but that's the way it was; that there was

 6   a glass ceiling?

 7      A.    At Carmike?

 8      Q.    In general.

 9      A.    No, that's not what I told her.

10      Q.    Did you tell her:  Unfortunately, the reality

11   is there is a glass ceiling for women.  It's

12   unfortunate, but it's tougher.

13      A.    No, that's not what I said.

14      Q.    Did you deny that there was a glass ceiling at

15   Carmike?

16      A.    I told -- I don't believe she accused Carmike

17   of having a glass ceiling.  So there was nothing to

18   deny with regard to a glass ceiling at Carmike.

19      Q.    Well, in fact, hadn't she discussed with you

20   on several occasions that Shannon Sailors had a title

21   of director and was making more money.  And she

22   repeatedly asked for more money.  You don't remember

23   the title, but she asked for more money?

24      A.    Not repeatedly, but -- and not in comparison

25   to Shannon Sailors.
```



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 95

1    Q.   Did -- when you had that discussion with

2    Ms. Trawick about the glass ceiling, do you recall

3    that that was in March of 2015, about six months

4    before she was terminated?

5    A.   I don't recall the date, but I certainly don't

6    dispute that date.

7    Q.   Okay.  You recall it was in 2015?

8    A.   I don't recall whether it was or not, but I

9    don't dispute it.

10   Q.   At the time you had that discussion with --

11   well, do you recall that the -- I think you said the

12   presentation she was doing was for a junior college.

13   Do you recall that that was in the spring of 2015?

14   A.   I don't recall the date.

15   Q.   Okay.

16   A.   I do remember that was the theme.  And it may

17   or may not have been a junior college.  I just seem

18   to remember that it was a junior college.

19   Q.   And whenever that discussion was, you had this

20   conversation shortly before that?

21   A.   That's correct.

22   Q.   Before that panel?

23   A.   That's correct.

24   Q.   At that point in time when you specifically

25   discussed the glass ceiling for women and Ms. Trawick



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 96

```
1   has been asking for a pay raise, did you report that

2   to human resources?

3       A.   Ms. Trawick did not discuss a pay raise in

4   that discussion.

5       Q.   But you had many discussions with her about

6   the pay raise.

7       A.   She had complained about being underpaid

8   several times.

9       Q.   And you deny she said anything with regard to

10  Sailors.  But now she's talking to you about a glass

11  ceiling for women and the top challenges that women

12  face in the work force.  And she specifically asked

13  you has she reached her glass ceiling at Carmike.

14           MR. GERAKITIS:  Object to the form.

15   BY MS. PREBULA:

16     Q.   Do you recall that?

17     A.   No.

18           MR. GERAKITIS:  Object to form.

19   BY MS. PREBULA:

20     Q.   After that discussion, did you report it to

21  human resources?

22     A.   I did not.

23     Q.   Why not?

24     A.   I didn't believe it was a reportable event.

25     Q.   When someone makes any statement to you that
```



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 97

1  is any indication of discrimination based on gender,

2  did you understand that you had a duty to report that

3  to human resources?

4      A.   She did not make a claim on discrimination

5  based on gender.  She said she felt she was

6  underpaid.

7      Q.   So her comments to you about a glass ceiling

8  for women is not a statement of discrimination based

9  on gender?

10     A.   We were not talking about a glass ceiling at

11  Carmike.

12     Q.   And if she says that she were, do you dispute

13  that?

14     A.   I do.

15     Q.   Okay.  So let's assume that your understanding

16  was she was talking about a glass ceiling for women.

17  Did you report that conversation to human resources?

18     A.   I did not.

19     Q.   Okay.  Did you understand that if you have any

20  indication of any discrimination on the part of any

21  employee, that as an officer of the company, you had

22  a duty to report that to human resources?

23          MR. GERAKITIS:  Object to form.

24          DEPONENT PASSMAN:  I don't believe she made a

25       discrimination complaint.



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 99 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                    DEPOSITION OF
DAVID PASSMAN on 10/11/2017                                          Page 98

1          MS. PREBULA:  Would you read back my question,

2      please.

3              (Question read back as requested)

4          DEPONENT PASSMAN:  If someone reported it or

5      suggested discrimination, I would report it to HR.

6      BY MS. PREBULA:

7      Q.    And a female talking to you about a glass

8   ceiling for women is not an indication of

9   discrimination to you?

10     A.    It is not necessarily an indication of

11  discrimination to me, no.

12     Q.    The -- do you know how many women directors

13  there were at Carmike between 2012 and 2015?

14     A.    I do not.

15     Q.    Do you know how many women in a nonclerical

16  position reported to Mr. Van Noy during his tenure at

17  Carmike?

18     A.    I do not.

19     Q.    Have you discussed with Mr. Van Noy any

20  testimony he is going to give in this case?

21     A.    I have not.

22     Q.    The -- were you aware that prior to you taking

23  over as president and CEO, that Carmike had, in fact,

24  been sued for discrimination more than once?

25     A.    I am not.



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 99

1    Q.   No one at human resources or the board made

2  you aware that claims had been filed against Carmike

3  in the past for discrimination or harassment?

4         MR. GERAKITIS:  Object to the form.

5         DEPONENT PASSMAN:  No.

6   BY MS. PREBULA:

7    Q.   No one on the board made you aware that claims

8  had been filed for discrimination against Carmike

9  prior to your coming in?

10   A.   No.

11   Q.   Would it be your understanding of your

12 corporate policy that if Ms. Trawick discussed with

13 her immediate supervisor that she should have pay and

14 promotion similar to Mr. Sailors, and that she felt

15 she was being treated differently, that that is

16 something that should have been reported to human

17 resources?

18         MR. GERAKITIS:  Object to form.

19         DEPONENT PASSMAN:  I don't know.

20   BY MS. PREBULA:

21   Q.   You don't understand your policy?

22   A.   I don't -- I don't know how to answer that

23 question that -- if someone complained to me about

24 discrimination, I would take it to HR and legal and

25 ask them to investigate it.



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 100

1    Q.   So is it your testimony that someone had to

2    use the word discrimination before it would be

3    reported under your policy?

4    A.   No.

5    Q.   So back to my earlier question, if someone had

6    complained to their immediate supervisor that they

7    felt that they were being treated unfairly in terms

8    of pay and promotion as compared to a male employee,

9    is that something that should have been reported to

10   human resources?

11   A.   I don't know.

12   Q.   You don't know under your policy?

13   A.   I don't.

14   Q.   Have you read the policy?

15   A.   Yes.

16   Q.   Did you read it when you were president of the

17   company?

18   A.   Yes.

19   Q.   Were there any internal complaints of

20   discrimination or harassment by women while you were

21   president of the company?

22   A.   At corporate?

23   Q.   At any point.

24        MR. GERAKITIS:  From founding in the 70s?

25        MS. PREBULA:  No, I said while he was



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 101

```
 1       president of the company.
 2            MR. GERAKITIS:  He asked for clarification.
 3       Go ahead.
 4    BY MS. PREBULA:
 5       Q.   At any point while he was president of the
 6    company.
 7       A.   Claims -- could you repeat the question one
 8    more time?
 9       Q.   Sure.  Were there any internal complaints of
10    discrimination at Carmike while you were president of
11    the company?
12       A.   I believe there were.
13       Q.   And what were those complaints?
14       A.   Those were field level part-time or full time.
15    I believe part-time employees at the theater level.
16       Q.   And what was the basis of the complaint?
17       A.   I don't know that there was.  They were
18    investigated and resolved through human resources.
19       Q.   I think you misunderstood my question.  Was
20    the basis of the complaint gender discrimination,
21    racial discrimination, religious discrimination?
22    What was the basis?
23       A.   I don't recall.
24       Q.   Did you get reports from human resources when
25    there were internal complaints of discrimination?
```



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 102

1    A.    From human resources, no.

2    Q.    Did you get reports from anyone when there

3  were internal complaints of discrimination?

4    A.    Yes.

5    Q.    And who was that from?

6    A.    Dan Ellis.

7    Q.    How many such reports did you receive while

8  you were president?

9    A.    I believe we received reports quarterly.

10    Q.    And in each of those reports, was there a

11  claim of discrimination?

12    A.    In each of those reports, no.

13    Q.    So how many reports of internal complaints of

14  discrimination did you receive while you were

15  president?

16    A.    I don't know.

17    Q.    More than a hundred?

18    A.    No.

19    Q.    Do you have any reasonable basis for giving me

20  your best estimate?

21    A.    They were fairly rare.

22    Q.    What does that mean?

23    A.    They were very infrequent.  There might have

24  been a couple a year.  And generally they were about

25  abusive behavior of supervisors at the theater level.



1      Q.    Toward women?

2      A.    No.

3      Q.    Toward which group?

4      A.    Not toward any specific group.  It might be a

5    woman.  It might be -- it might be anything.  But I

6    don't remember gender based complaints as opposed to

7    other complaints.

8      Q.    And -- you just don't remember?

9      A.    I just don't.

10     Q.    Who would have been in charge of that?  Human

11   resources?

12     A.    Well, we had outside -- we had an outside

13   service with a help line.  The help line would

14   summarize those.  They would go to the general

15   counsel or legal department.  And each of those

16   complaints received would be investigated through the

17   human resource department and/or other folks as

18   necessary.  It could be a district manager or legal.

19     Q.    And can you also make complaints to -- could

20   an employee also make such complaint to their

21   supervisor?

22     A.    They could.

23     Q.    And any member of the executive team?

24     A.    They could.

25     Q.    So you didn't have to go through this



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 104

1    anonymous 800 number?

2    A.    No.

3         MR. GERAKITIS:   Object to form.

4    BY MS. PREBULA:

5    Q.    The -- when the complaints were made, would

6    you be made aware of the names of the employees?

7    A.    I don't recall seeing names of employees.

8    Q.    Would it be different whether the complaint

9    was made to -- personally to an individual or

10   reported on the 800 number whether or not you would

11   see the name of the employee?

12   A.    I don't know.

13   Q.    Okay.  When a company -- so it's fair to say

14   that once someone made a complaint of discrimination

15   or harassment to a supervisor, that that was reported

16   to legal or HR or both?

17   A.    I don't know if it's fair to say.  Any

18   complaint made was investigated through HR.  And

19   where necessary, legal would also be involved.

20   Q.    Okay.  I misunderstood your earlier testimony

21   then.  So if someone made a complaint of

22   discrimination or harassment, they could make it to

23   the supervisor, any member of the executive team or

24   the 800 number?

25   A.    That's correct.



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 105

1    Q.   Okay.  And then that information was provided

2    -- let me back up.  Could they also make such a

3    complaint directly to HR?

4    A.   They could.

5    Q.   Okay.  So if it was made directly to a

6    supervisor, a complaint of discrimination or

7    harassment, that supervisor had a duty to report it

8    to HR?

9    A.   Yes, I believe so.

10    Q.   And then HR would investigate and bring in

11    legal if they needed to; is that right?

12    A.   Yes, I believe so.

13    Q.   Okay.  The -- when the litigation hold came in

14    for this case, did you segregate any documents or

15    emails regarding this case?

16    A.   I did a search on my emails to see if I had

17    any communications to or from Crystal or where her

18    name was in the subject matter.  I did not.  And so

19    there was -- there was no segregation necessary.

20    Q.   Did you search any of your other documents?

21    A.   I thought about other documents that could

22    include Crystal; but I had very little in the way of

23    documents in my office of any kind.  And I don't

24    remember rifling through every document that was in

25    my office to see if they would contain.  I looked at



1    the obvious places.

2       Q.    And you're talking about paper at this point,

3    right?

4       A.    Yes, that's right.

5       Q.    But you had access to the Carmike network,

6    right, where documents were stored?

7       A.    I did have access to the Carmike network.

8       Q.    Did you search that as part of the litigation

9    hold?

10      A.    I did not.

11      Q.    Did you search any backup tapes or media --

12      A.    I did not.

13      Q.    -- as part of the litigation hold?

14      A.    I did not.

15      Q.    Did you direct anybody to do that?

16      A.    I did not.

17      Q.    You said you used Outlook for your calendar.

18   Did you use Outlook for email as well?

19      A.    I did.

20      Q.    Was your Outlook hosted by a network provider?

21      A.    We use Microsoft Exchange and I believe it was

22   all internally controlled.

23      Q.    Did you -- do you know who contained -- who

24   had or controlled your domain name at that time?

25      A.    I don't.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    Q.    Okay.  Did you conduct any searches on the

2    external domain?

3    A.    I did not.

4    Q.    Did you direct anybody to?

5    A.    I did not.

6    Q.    Did you conduct any searches of any deleted

7    files on your computer or network?

8    A.    I looked at my email deleted files, yes.

9    Q.    How far back did you keep email deleted files?

10   A.    I permanently deleted emails periodically so

11   I'm not sure what period of time would have been

12   covered in my deleted email search.

13   Q.    Did you make any attempt to recover any

14   deleted files on any computer or network?

15   A.    I did not.

16   Q.    Did you instruct anybody to?

17   A.    I did not.

18   Q.    Did you make any copies or images of any hard

19   drives or any files on your computer or network?

20   A.    I did not.

21   Q.    How -- do you know how you back up your

22   network?

23   A.    I don't back it up.

24   Q.    Understood.  Do you understand how Carmike

25   backed up your network?



1    A.    I only generally understand how it's backed

2    up.

3    Q.    What's your understanding?

4    A.    That it's backed up nightly.

5    Q.    Onto what media?

6    A.    Onto, I believe, tape.

7    Q.    Did you instruct anyone to research or

8    preserve or make a copy of those backup tapes so that

9    they were preserved after the litigation hold was

10   issued?

11   A.    I did not.

12   Q.    Are you aware of anybody doing so?

13   A.    I am not.

14   Q.    Do you know how often your backup tapes are

15   over-written?

16   A.    I don't.

17   Q.    Do you have any written policy as to how often

18   backup tapes are over-written?

19   A.    I don't know.

20   Q.    I'm assuming that the same person that you

21   told me before, your IT director, would know that.

22   You told me Jeff Butkovsky.  I'm assuming he would

23   know that; is that correct?

24   A.    He should.

25   Q.    Okay.  The -- did you hire any outside service



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 109

1   to come in and preserve any documents for a

2   litigation hold?

3      A.   I did not.

4      Q.   Did anybody at Carmike?

5      A.   I don't know.

6      Q.   Did you discuss with Ms. Trawick having the

7   director's title at any point other than the one

8   conversation you told me about?

9      A.   I don't recall having a discussion with

10  Ms. Trawick about a director title.

11     Q.   Did -- did Mr. Van Noy have any discussion

12  with you in March of 2015 around the same time as the

13  panel presentation Ms. Trawick was going to make that

14  if she was made director of marketing, that she would

15  still report to a CMO and would not impede a hiring

16  of a CMO?

17         MR. GERAKITIS:   Object to the form.

18   BY MS. PREBULA:

19     Q.   You can answer.

20     A.   I'm sorry.  That was a very long question.

21  Would you repeat it?

22     Q.   Did you have any discussion with Mr. Van Noy

23  in April of -- excuse me -- in March of 2015 around

24  the same time as the panel that Ms. Trawick had

25  discussed if she was made director of marketing, that



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 110

1  would not prevent you from hiring a CMO?

2      A.   I don't recall that.

3      Q.   Did Fred Van Noy ever raise that issue with

4  the executive team in spring of 2015?

5      A.   I don't recall that.

6      Q.   The -- and does that "you don't recall" mean

7  you don't recall it happening or you don't recall one

8  way or the other?

9      A.   I don't recall it happening.

10     Q.   Did Mr. Van Noy promote any woman to a

11 director's position while he was at Carmike?

12     A.   I don't know.

13     Q.   In September of 2015, did you have a

14 discussion with Ms. Trawick where she told you that

15 she had been contacted about another job opportunity?

16     A.   I don't recall the date.  I -- I did have a

17 conversation with her about being contacted by -- or

18 for another job opportunity.

19     Q.   And that was several months before she was

20 terminated, correct?

21     A.   I don't know the date.

22     Q.   Do you recall that it was shortly before she

23 was terminated?

24     A.   I do not recall that.

25     Q.   Did -- and did she discuss with you again that



1  her lack of compensation and the lack of the title of

2  director?

3      A.   Not that in that conversation, no.

4      Q.   You do not recall her telling you that her

5  compensation was low compared to what she had found

6  in looking at this other position, and the lack of

7  director title was also inappropriate based upon

8  Mr. Sailors?

9      A.   No.

10     Q.   Didn't she also tell you that Mr. Sailors had

11  a director title and was performing similar job

12  functions and she asked you again, based on the

13  conversation we had earlier regarding glass ceilings,

14  have I hit mine with the company?

15     A.   No.

16     Q.   You deny that that occurred?

17     A.   I do.

18     Q.   When a female employee tells you that their

19  pay is low compared to a man and their title is

20  missing compared to a man who has a director's title

21  performing the same job functions, do you understand

22  that to be discrimination?

23     A.   I do not.

24     Q.   Regardless of what female says that to you?

25     A.   I do not.  If a person told me they felt they



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   were being discriminated against, I would go to HR

2   and ask them to investigate.

3      Q.   So, again, is it your testimony that they must

4   use that word discrimination?

5      A.   It is not.

6      Q.   So if a female tells you that her pay is low

7   and she does not have the same title as a male

8   performing the same functions, do you consider that

9   discrimination?

10         MR. GERAKITIS:  Object to the form.

11         DEPONENT PASSMAN:  I don't know if it's

12      discrimination.  I would take it to HR and ask

13      them to investigate it.

14    BY MS. PREBULA:

15     Q.   Did you ever take any of Ms. Trawick's

16   comments to HR?

17     A.   No.

18     Q.   Did you ever investigate whether Mr. Sailors

19   was actually performing similar job duties to

20   Ms. Trawick?

21     A.   I did not.

22     Q.   Did you ever investigate whether Mr. Sailors'

23   pay was higher than Ms. Trawick's?

24     A.   I did not.

25     Q.   The -- at that time in September of 2015, did



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   you tell Ms. Trawick to be considered for management

2   the way men look at it, you're going to have to have

3   a degree?

4          MR. GERAKITIS:  Objection.

5          DEPONENT PASSMAN:  I did not.

6    BY MS. PREBULA:

7    Q.   Did you ever tell Ms. Trawick that in order to

8   be in management, she had to have a degree?

9    A.   I did not.

10   Q.   Did -- do you understand whether or not

11  Mr. Sailors has a degree?

12   A.   I don't.

13   Q.   Do you know whether or not Mr. Mayton had a

14  degree?

15   A.   I did not investigate Mr. Mayton at the time

16  he was being hired, but I believe it was on his --

17  but I think I saw it on his resume.

18   Q.   Do you know whether Mr. Van Noy has a degree?

19   A.   I don't.

20   Q.   Do you know whether Mr. Hare has a degree?

21   A.   I do.

22   Q.   And what's the answer?

23   A.   Yes.

24   Q.   Did you ever investigate whether Mr. Van Noy

25   had a degree?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 114

1    A.    No.

2    Q.    From 2012, when Ms. -- at the end of 2012 when

3  Ms. Trawick went into marketing through the date of

4  her termination, how many managers were in the

5  company?

6    A.    I don't know.

7    Q.    How many directors were in the company for

8  that period of time?

9    A.    I don't know.

10    Q.    Did the company keep such records?

11    A.    I don't know with certainty, but I would

12  assume it did.

13    Q.    Assuming that would be HR?

14    A.    Yes.

15    Q.    Are you aware of any female directors in the

16  company from 2012 to Ms. Trawick's termination in

17  November of 2015?

18    A.    I'm not aware one way or the other.

19    Q.    What role did you play in Ms. Trawick's

20  termination?

21    A.    I think the first discussion I had was with

22  general counsel and Fred Van Noy telling me that

23  there was an issue and they reviewed the -- the issue

24  and then made the recommendation that she be

25  terminated for insubordination.  And that was



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1  reviewed not only with me, but Richard Hare.  And

2  based on that recommendation, I reluctantly but

3  nevertheless felt it was the right thing to do to

4  terminate her.

5      Q.   So what role did you play in her termination?

6      A.   The discussion on the termination and the

7  conclusion by the executive team to terminate her.

8      Q.   Okay.  And the -- so what reason were you

9  given for termination?  Insubordination?

10     A.   Yes.

11     Q.   Did Carmike ever report that Ms. Trawick

12 resigned?

13     A.   Not that I'm aware.

14     Q.   Did Carmike ever state that Ms. Trawick was

15 terminated for misuse of funds?

16     A.   Not that I'm aware.

17     Q.   Did Carmike ever state that Ms. Trawick was

18 terminated for -- as a result of the investigation

19 you talked about with regard to approvals of

20 sponsorships?

21     A.   Not that I'm aware.

22     Q.   You were aware that it was part of

23 Ms. Trawick's job to promote Carmike in the community

24 and community events and those kinds of things,

25 right?



```
 1        A.   Yes.

 2        Q.   And when the discussion was had with you as to

 3   the nature of the insubordination, what were you

 4   told?

 5        A.   I was given a recap of the events leading --

 6   the couple of days leading up to the termination.

 7        Q.   And what were you told?

 8        A.   I was told that there were some questionable

 9   expenditures.  That Crystal was -- Ms. Trawick was

10   told that there would be an investigation, it was a

11   serious matter.  And that she was instructed not to

12   discuss the investigation with anyone.

13             And that she violated that and discussed it

14   with at least two other people, one being a

15   subordinate, one being a peer, and the third being my

16   assistant in violation of that directive.

17             And that because of that, she was -- it was

18   recommended that she be terminated.  And that the

19   people involved:  Fred, Dan, Richard and myself felt

20   that -- that insubordination created a lack of

21   confidence and trust.

22        Q.   Did -- and you said Fred Van Noy?

23        A.   Yes, I'm sorry.

24        Q.   And Dan Ellis?

25        A.   Correct.
```



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 117

```
1        Q.    And Richard Hare?

2        A.    And Richard Hare.

3        Q.    Did you do any independent investigation to

4   determine what Ms. Trawick was actually told in that

5   meeting?

6             MR. GERAKITIS:  Object to the form.

7             DEPONENT PASSMAN:  I'm not sure what an

8        independent investigation would entail.  But we

9         had a fairly thorough discussion between Fred,

10        Dan, Richard and myself.

11   BY MS. PREBULA:

12       Q.    And did you have any discussion with

13   Ms. Trawick as to what she was actually told in that

14   meeting?

15       A.    I did not.

16       Q.    Did HR?

17       A.    I don't know.

18       Q.    Did -- and this investigation and meeting

19   occurred in November 2015?

20       A.    Yes.

21       Q.    And that occurred after she had the

22   discussions of the glass ceiling with you, correct?

23             MR. GERAKITIS:  Object to the form.

24             DEPONENT PASSMAN:  Yes, that would have been

25        after the discussion we had on her presentation.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations

Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1     Yes.

2   BY MS. PREBULA:

3     Q.   And that was after the discussion where you

4   say you told her she needed to work under someone

5   else, correct?

6     A.   Yes.

7     Q.   And that would have been after the discussion

8   where -- that you had in early September of 2015 --

9   spring of 2015 where she told you that she was going

10  to present at the panel with regard to the glass

11  ceiling for women and how women had to work harder;

12  correct?

13        MR. GERAKITIS:  Object to the form.

14        DEPONENT PASSMAN:  That's correct.

15  BY MS. PREBULA:

16    Q.   And the -- that was also after she had

17  requested pay increases on several occasions,

18  correct?

19    A.   That's correct.

20    Q.   And you do not recall whether or not that was

21  after she requested the director's title or you do

22  now recall that?

23    A.   I don't recall her requesting a director

24  title.

25    Q.   When you told her that she had to work under



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1 someone before she could move up into management,

2 what were you talking about if not a director's

3 title?

4       MR. GERAKITIS:  Object to form.

5       DEPONENT PASSMAN:  I rarely talk to people

6    about titles within the company.  We're a fairly

7     flat organization.  We talked a lot more about

8     roles and opportunities than we did titles.

9  BY MS. PREBULA:

10   Q.   So what were you talking about if not the

11 director's title?

12   A.   I was not talking about the director's title.

13   Q.   So what were you talking about?

14   A.   I was talking about gaining experience in

15 marketing so that she could become a marketing

16 executive.

17   Q.   And that's not a director?

18   A.   Not to me, it's not.

19   Q.   What is it to you?

20   A.   It's -- it's -- it is -- it is learning and

21 growing professionally.

22   Q.   So what is a marketing executive if the next

23 step is not a director, what is it?

24   A.   I'm terribly sorry, but I don't -- I don't

25 have a title for you.



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 120

1    Q.   Well, when you said to her so that you can

2   become a marketing executive, what were you referring

3   to?

4    A.   I was referring to becoming eventually a CMO.

5    Q.   And so this investigation was after that

6   conversation as well, correct?

7         MR. GERAKITIS:  Object to the form.

8         DEPONENT PASSMAN:  Yes.

9    BY MS. PREBULA:

10   Q.   The -- were you a party to any emails between

11  Fred Van Noy and Ms. Trawick while she was on

12  maternity leave?

13   A.   Not that I recall.

14   Q.   Okay.  You do recall that Ms. Trawick took

15  maternity leave, right?

16   A.   Paid maternity leave?  Yes.

17   Q.   Either one.

18   A.   Yes.

19   Q.   Wasn't she on bed rest for a while?

20   A.   Yes.

21   Q.   And then out after delivery of the baby?

22   A.   Yes.  But she was paid during that time.

23   Q.   Right.  Does that matter to you?

24   A.   No.

25   Q.   Okay.  Do you recall how long she was out on



```
 1   bed rest for the pregnancy?

 2     A.   No, I don't.

 3     Q.   Did you pay that at full salary or a reduced

 4   salary?

 5     A.   I don't know.

 6     Q.   Okay.

 7     A.   I believe it was full.

 8     Q.   And maternity leave was paid at full or part

 9   salary?

10        MR. GERAKITIS:  Object to the form.

11        DEPONENT PASSMAN:  I don't know.  Again, I

12     believe it was full pay.

13    BY MS. PREBULA:

14     Q.   Okay.  Did -- is it your policy that in order

15   for a woman to take maternity leave, she must file a

16   formal written request?

17        MR. GERAKITIS:  Object to the form.

18        DEPONENT PASSMAN:  I don't recall a policy on

19     maternity leave.  I'm sorry.

20    BY MS. PREBULA:

21     Q.   You don't recall one way or the other?

22     A.   I do not recall one way or the other.

23     Q.   Okay.  The -- and I asked you this and I don't

24   recall your answer.  Do you know how long she was out

25   on bed rest?
```



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 122

1      A.    I do not.

2      Q.    Do you know how long she was out on maternity

3   leave?

4      A.    I do not.

5      Q.    Do you understand that Ms. Trawick had to work

6   during her maternity leave?

7            MR. GERAKITIS:   Object to the form.

8            DEPONENT PASSMAN:   I do not.

9    BY MS. PREBULA:

10     Q.    And you didn't see the emails between Fred

11  Van Noy and her during the maternity leave period?

12           MR. GERAKITIS:   Object to the form.

13           DEPONENT PASSMAN:   I don't recall seeing

14  emails.

15   BY MS. PREBULA:

16     Q.    Did you see any emails between her and Fred

17  Friedel during the maternity leave?

18     A.    I don't recall seeing any.

19     Q.    Did you visit Crystal at her house during her

20  maternity leave?

21     A.    I did.

22     Q.    And on one occasion, did you look over her

23  shoulder at her laptop and see that she was, in fact,

24  working on Carmike work during her maternity leave?

25     A.    I questioned whether she was, yes.



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 123

1    Q.   And you looked at her laptop?

2    A.   I looked at the screen and I saw something on

3   it that, to me, looked like Carmike work.

4    Q.   Carmike work.  Are you aware that conference

5   calls were scheduled during her maternity leave?

6         MR. GERAKITIS:  Object to the form.

7         DEPONENT PASSMAN:  It's second-hand.  But,

8     yes.

9    BY MS. PREBULA:

10    Q.   What's your second-hand?

11    A.   Just to hear afterwards that there were calls.

12    Q.   And who'd you hear that from?

13    A.   I believe it would have been Fred or Crystal.

14   Fred Van Noy or Crystal Trawick.

15    Q.   And do you understand that Ms. Trawick had to

16   attempt to hire people while she was out on maternity

17   leave?

18         MR. GERAKITIS:  Object to the form.

19         DEPONENT PASSMAN:  No, I -- no.

20    BY MS. PREBULA:

21    Q.   Do you -- are you aware that she conducted

22   interviews for a job position while she was on

23   maternity leave?

24    A.   I'm aware of that.

25    Q.   The day that you were at Ms. Trawick's house,



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 124

1    wasn't she having labor pains?

2      A.   Not that I recall.

3      Q.   You don't recall saying:  I feel sorry for

4    you, poor you, poor thing?

5      A.   No.

6      Q.   You don't recall that she was having labor

7    pains --

8      A.   No.

9      Q.   -- while she was working on Carmike work?

10     A.   No.

11     Q.   The -- did you visit Ms. Trawick more than

12   once at her home while she was on maternity leave?

13     A.   I don't know.

14     Q.   Would your calendar show that?

15     A.   Probably not.

16     Q.   The -- other than the two discussions we

17   talked about briefly earlier where the glass ceiling

18   for women was discussed --

19          MR. GERAKITIS:  Object to the form.  Go ahead.

20     I want to make sure it's clear.  Go ahead.  Sorry.

21    BY MS. PREBULA:

22     Q.   Other than the two discussions we talked about

23   earlier where the glass ceiling was discussed with

24   Ms. Trawick, did you have any other conversations

25   with her about it being difficult for women at



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations

Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
1    Carmike?
2            MR. GERAKITIS:  Object to the form.
3            DEPONENT PASSMAN:  In the discussions that we
4       had, I did not.
5     BY MS. PREBULA:
6       Q.   Did you --
7       A.   I did not say that I thought it was more
8    difficult for women at Carmike; nor at any time after
9    did I say that.
10      Q.   Did you have any discussions with Ms. Trawick
11   about it being difficult for women at Carmike at all?
12      A.   No.
13      Q.   Do you -- with regard to the discussions on
14   the glass ceiling, I understand you deny the specific
15   statements but recall having the discussion with her;
16   is that fair?
17           MR. GERAKITIS:  Object to the form.
18           DEPONENT PASSMAN:  About the glass ceiling in
19      corporate America, yes.
20    BY MS. PREBULA:
21      Q.   Okay.  And did that -- did you have those
22   discussions on more than one occasion?
23      A.   I don't believe so.
24      Q.   Do you recall when Jim Lucas was hired at
25   Carmike?
```



```
 1     A.    No.

 2     Q.    Was he there when you became president?

 3     A.    He was.

 4     Q.    Did Jim Lucas have any discussions with you

 5  with regard to promoting Ms. Trawick to director?

 6     A.    No.

 7     Q.    Did Jim Lucas -- excuse me -- did Mr. Van Noy

 8  report to you that Jim Lucas had come to him and told

 9  him that he should promote Trawick to director?

10     A.    Not that I recall, no.

11     Q.    Are you at all familiar with the Comdata

12  system?

13     A.    Very, very vaguely.

14     Q.    Okay.  Did you use it?

15     A.    Yes.

16     Q.    Okay.  And did -- did you use it to approve

17  expenses for the company?

18     A.    Expenses of individuals?

19     Q.    Correct.  For the company.

20     A.    Within the company, yes.

21     Q.    And was your approval -- were your approvals

22  for your sea level employees only?

23     A.    And my assistant.

24     Q.    Okay.

25     A.    Yes.
```



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 127

1    Q.   And is it your understanding that all expenses

2    for the company --

3    A.   Can I back up?

4    Q.   Uh-huh.  (indicating in the affirmative).

5    A.   I'm sorry.  The president of alternative

6    programming did not have a C in his title.  He was

7    president of alternative programming, but I also

8    approved his expense reports.

9    Q.   And that was a very short period of time

10   before the company was sold, wasn't it?  I think just

11   a year or so.

12   A.   Well, it was in excess of a year.  It might

13   have been two years or so.

14   Q.   Okay.

15   A.   Yes.

16   Q.   And it's your understanding for expenses to be

17   approved, that they had to go through that Comdata

18   system?

19   A.   Not necessarily.

20   Q.   What's the other way they could be approved?

21   A.   They could be approved by paper.

22   Q.   You also had a paper trail?

23   A.   In some cases.

24   Q.   What cases?

25   A.   Where people didn't have access to the Comdata



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 128

1   system.

2     Q.   And what were those situations?

3     A.   They never occurred for my director boards.  I

4   insisted that they use the Comdata.

5     Q.   Okay.  So what situations are you talking

6   about?

7     A.   I was -- I was told Comdata was not one

8   hundred percent.

9     Q.   By whom?

10    A.   By our controller.

11    Q.   And what was the other method of approval?

12    A.   I would assume it would be the same method

13  that we used prior to adopting the Comdata system,

14  which I'm not sure how long we actually had it in

15  place.  But it certainly wasn't the entire time of my

16  tenure.

17    Q.   But someone had to sign off on lower

18  employee's expenses?

19    A.   That would be correct.

20    Q.   Who approved yours?

21    A.   Mine were approved -- they were submitted to

22  the CFO and then they were reviewed, I believe, by

23  the board chairman.

24    Q.   Okay.

25    A.   Or the audit committee chairman.  I'm not sure



1    which.

2        Q.    So someone else had to sign off on all

3    expenses before they were approved?

4        A.    That's correct.

5        Q.    And that would include credit card -- company

6    credit card expenses?

7        A.    Yes.

8        Q.    Okay.  So it would be the case that

9    Ms. Trawick could not approve her own expenses,

10   right?

11       A.    That should be right.

12       Q.    Somebody else had to sign off in order for

13   them to be paid?

14       A.    Someone should have to sign off.  That's

15   correct.

16       Q.    Well, someone had to for the accounting to

17   issue the check, right?

18       A.    Well, I didn't audit the accounting

19   department; but I would assume that's correct.

20       Q.    That was your understanding?

21       A.    Yes, that was my understanding.

22       Q.    Okay.

23       A.    Thank you.

24       Q.    And the short version is that Crystal Trawick

25   couldn't write a check for her own expenses or



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 130

1    invoices for Carmike.  She didn't have that

2    authority.

3        A.    That's correct.  She did not have that

4    authority.

5        Q.    Did you participate at all in the

6    investigation that you described earlier of

7    Ms. Trawick with regard to expenditures?

8        A.    I did not.

9        Q.    Did you -- I'm trying to find the name.  I'll

10   find the name at lunch.  Did you participate in any

11   investigation of anyone -- any other employee in

12   regard to questioned expenditures while you were

13   president?

14       A.    No.

15       Q.    Are you aware of an investigation of any other

16   employee for expenditures while president?

17       A.    Yes, but not directly.

18       Q.    Who was that?

19       A.    I believe it was a district manager in -- I

20   want to say Tennessee.

21       Q.    Do you know his name?

22       A.    Thad.

23       Q.    Morton?

24       A.    Morton, yes.

25       Q.    And Thad Morton was male, correct?



```
 1        A.    Yes.

 2        Q.    And was he terminated with regard to

 3   inappropriate expenditures?

 4        A.    He was not terminated with regard to

 5   inappropriate expenditures.

 6        Q.    He was warned, right?

 7        A.    I don't recall the actions that were taken as

 8   a part of that investigation.

 9        Q.    But you know he was not terminated?

10        A.    I know he was not terminated.

11        Q.    Okay.  Did -- prior to November 2015, were

12   there any written instructions with regard to how

13   expenditures had to be approved and processed?

14        A.    How expenditures?

15        Q.    Correct?

16        A.    I don't know.  I would assume there were.

17        Q.    What would -- what are you assuming?  What

18   would they be?

19        A.    As part of our policies and procedures, I

20   would assume the compliance department issued some

21   type of written communication regarding expenditures.

22        Q.    Can you tell me what those were?

23        A.    I cannot.

24        Q.    Are you aware of any documents that you've

25   described prior to November of 2015?
```



```
1       A.    I'm not.
2       Q.    Are you aware of any written policies and
3   procedures prior to November of 2015 with regard to
4   credit card usage?
5       A.    I am not.
6       Q.    Are you aware of any written policies and
7   procedures at all with regard to sponsorships?
8       A.    No.
9       Q.    Are you aware of any written policies and
10  procedures with regard to expenses for community
11  involvement such as Chamber of Commerce events?
12      A.    No.
13      Q.    Are you aware of any written policies or
14  procedures for client entertainment?
15      A.    No.
16      Q.    Are you aware of any written policies or
17  procedures for studio entertainment?
18      A.    No.
19      Q.    Are you aware of any written policies or
20  procedures with regard to airline tickets?
21      A.    No.
22      Q.    Okay.  Are you aware of any written policies
23  or procedures with regard to any expenditures made by
24  Carmike?
25      A.    No.
```



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 133

1    Q.   Okay.

2         MS. PREBULA:  All right.  I think that's a

3    good place to break for lunch.  We've been going a

4    little over an hour.

5         MR. GERAKITIS:   Okay.

6         (Lunch break)

7         (Upon resuming)

8         MS. PREBULA:  Okay.  We're back on.

9    BY MS. PREBULA:

10   Q.   Did the company have any policy that any

11   written request had to be made for short term

12   disability leave?

13   A.   I don't know.

14   Q.   Did the company have any policy that any

15   written request had to be made for FMLA leave?

16   A.   I don't know.

17   Q.   Have you ever seen any written policies to

18   that effect?

19   A.   I have not.

20   Q.   Who is Terra Hardwick?

21   A.   She is in the IT department -- or was in the

22   IT department.  I don't know what her title was.

23   Q.   Did Terra Hardwick have a baby before Crystal

24   Trawick?

25   A.   I don't know.



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 134

1    Q.   Did you have a discussion with Crystal Trawick

2    about Terra Hardwick's pregnancy when you found out

3    that Crystal was pregnant?

4    A.   About Terra's pregnancy?

5    Q.   Correct.

6    A.   No, ma'am.

7    Q.   Did you tell Crystal Trawick not to be like

8    Terra Hardwick?

9    A.   I don't recall that at all.

10   Q.   Did you have any discussion with Ms. Trawick

11   as to the effect that children were going to have on

12   her and her work performance?

13   A.   No.

14   Q.   You deny that?

15   A.   I did not have a discussion with her about how

16   it would affect her work performance.

17   Q.   I asked you if you knew how long Ms. Trawick

18   had been out on maternity leave and I think you said

19   you don't recall; is that right?

20   A.   That is correct.

21   Q.   Do you remember when she was out on maternity

22   leave?

23   A.   I don't remember with certainty.  I think it

24   was in the early summer or late spring of 2014.

25   Q.   Okay.  Did -- were you on a call with her with



1  theater managers shortly after her son was born,

2  couple of weeks after her son was born?

3      A.   I don't recall that.

4      Q.   The -- in 2014, was a male division manager

5  terminated for cause?

6      A.   Summer of 2014?

7      Q.   No, just 2014.  I don't know if it was in the

8  summer or not.  But in 2014, was a male division

9  manager terminated for cause?

10     A.   I don't recall --

11     Q.   You don't recall that at all?

12     A.   -- if it was for cause.  I recall a division

13 manager leaving the company.

14     Q.   And who was that?

15     A.   Thomas Bridgman.

16     Q.   And was he given a year's severance?

17     A.   I don't know.  I don't recall.

18     Q.   You didn't have to approve that?

19     A.   I probably did; but I don't recall it.

20     Q.   And where was Thomas Bridgman, what physical

21 location?

22     A.   At the time of his termination or now?

23     Q.   Correct.

24     A.   At the time of his termination, I believe he

25 lived in Columbus.



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 136

1   Q.   Georgia?

2   A.   Georgia.

3   Q.   Okay.  And when Mr. Morton was terminated --

4   excuse me.  When Mr. Morton was investigated, was it

5   determined that he had, in fact, taken Carmike funds?

6   A.   I don't know that.

7   Q.   Would you have not have had to approve that

8   one as well?

9   A.   Approve him taking Carmike funds?

10  Q.   No.  Approve the fact that there was no action

11  taken against him and he was allowed to stay at the

12  company?

13  A.   No, I would not.

14  Q.   You did not have to approve a district

15  manager?

16  A.   I did not.

17  Q.   Who would have approved that?

18  A.   Can you tell me what year we're talking about?

19  Q.   I believe that was -- I want to say that was

20  in 2014 as well, but I could be -- I don't know for

21  sure.

22  A.   Yeah.  The reason I ask is there was a point

23  in time that there was a position between the

24  division managers and Fred.  That position was

25  eliminated.  And so I think during that period of



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 137

1   time, that general manager role was not present.  So

2   it would have been Fred Van Noy.

3       Q.    Then when you were made aware of the

4   investigation into Crystal, did you make any notes?

5       A.    No, ma'am.

6       Q.    Okay.  Other than the people you've talked to

7   me about, did you -- meaning Fred Hare, Fred Van Noy,

8   and Dan Ellis, did you discuss --

9            MR. GERAKITIS:  Object.

10            DEPONENT PASSMAN:  Richard Hare.

11    BY MS. PREBULA:

12       Q.    -- did you discuss the investigation with

13   anyone else?

14       A.    No.

15       Q.    Okay.  Did -- as part of that investigation,

16   was Shannon Sailors also investigated?

17       A.    I don't know.

18       Q.    Was Crystal (SIC) De La Cruz investigated?

19       A.    I don't know.

20            MR. GERAKITIS:  Object to the form.

21    BY MS. PREBULA:

22       Q.    Were you -- when you were made aware of the

23   investigation into Crystal Trawick, did you request

24   that Shannon Sailors, who approved her expenses, also

25   be investigated?



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 138

1      A.   I did not.

2      Q.   And did you make any requests at that time

3   that -- I always want to call her Crystal -- Lisa

4   De La Cruz be investigated because she approved some

5   of those expenses as well?

6      A.   I did not.

7      Q.   Do you know whether either Shannon Sailors or

8   Crystal (SIC) De La Cruz were reprimanded as a result

9   of that investigation into charities and expense

10  reports?

11     A.   I do not.

12     Q.   Do you know -- you do know that neither

13  Sailors nor De La Cruz were terminated, correct?

14     A.   I know neither of them were terminated.

15     Q.   Was there any written policy guidelines that

16  any sponsorships had to be with entities that were

17  approved as 501(c)(3) charities under the tax code?

18     A.   No, I don't recall reading such policy.

19     Q.   Okay.

20          (Brief break)

21          (Upon resuming)

22   BY MS. PREBULA:

23     Q.   Let me show you what's been marked as

24  Defendant's 45.

25          MR. GERAKITIS:  Plaintiff's 45?



Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 140 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                DEPOSITION OF
DAVID PASSMAN on 10/11/2017                                      Page 139

```
 1            MS. PREBULA:  Excuse me.  Plaintiff's 45.
 2            MR. GERAKITIS:  Okay.
 3     BY MS. PREBULA:
 4       Q.   Do you recognize that as the payroll
 5     authorization form that Carmike used?
 6       A.   It's a different size.
 7       Q.   It is?
 8       A.   But it looks like a form that we would use.
 9       Q.   Okay.  And you see that this is dated 10-2012
10     and it's for Crystal Trawick moving into marketing?
11       A.   I do see that.
12       Q.   And you see that there's no pay increase?
13            MR. GERAKITIS:  Object to the form.
14     BY MS. PREBULA:
15       Q.   I mean, it actually shows that her present
16     rate of pay is zero.  But it does show that there's
17     no increase, correct?
18            MR. GERAKITIS:  Object to the form.
19            DEPONENT PASSMAN:  I see that there is no
20        percentage increase indicated on it, yes.
21     BY MS. PREBULA:
22       Q.   Okay.  And you indicated you would have to
23     approve those.  Is one of the initials at the top
24     your initials?
25       A.   No, I don't think so.
```



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 140

```
1       Q.    Whose initials are at the top?
2       A.    I believe what I said earlier about approving
3   was if they crossed certain thresholds, I would have
4   to approve them.  This would clearly not be one that
5   I would normally approve.
6       Q.    Whose initials are at the top?
7       A.    I'm not a hundred percent sure.  It looks like
8   Fred's -- Fred Van Noy's and perhaps Terrell Mayton.
9       Q.    Do you recognize those as --
10      A.    No, I don't recognize their signatures or
11  initials all that well.  They're not all that
12  legible.
13      Q.    Is there anyone else who would have approved
14  this transfer?
15      A.    No, not that I'm aware of.
16      Q.    Let me show you what's been marked as
17  Plaintiff's Exhibit 46.  This also is a payroll
18  authorization form for Crystal Trawick.  And you see
19  it's for August of 2013.  Do you see that?
20      A.    I see August 15th crossed out to 16th, 2013.
21      Q.    Right.
22      A.    Yes, I do see that.
23      Q.    And there is -- it appears that she got a
24  reduction in pay, but it shows an increase in the
25  percentage column.  Do you see that?
```



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 141

1    A.    No.  Would you explain it to me?

2    Q.    Well, the typed in numbers are stricken and

3    reduced for her current -- her present rate.  Do you

4    see that?

5    A.    For her present and new rates?

6    Q.    Uh-huh.  (indicating in the affirmative).

7    A.    Yes, I do see that.  It looks like a

8    correction.

9    Q.    And can you tell me whose signatures -- whose

10    initials are at the top of that page?

11    A.    That -- it could be mine.  I don't write very

12    legibly either, but I'm not sure.  It was either Fred

13    or mine.

14    Q.    And to the left with the date?

15    A.    I think that would be Sadie Marshall.

16    Q.    And how about the bottom after the back pay

17    entry?

18    A.    I think that would be Sadie Marshall as well.

19    It could be someone else.  But Sadie is head of the

20    HR group.

21    Q.    Okay.

22    A.    And would ordinarily sign these kinds of

23    things.

24    Q.    And on this particular form, there's a partial

25    copy of a calendar which purports to be a vacation



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 142

1  record.  Are you familiar with that form?

2      A.    I am not.

3      Q.    Have you ever seen that form before?

4      A.    I have not.

5      Q.    Okay.  Do you know what it purports to show?

6      A.    I do not.

7      Q.    The -- would there be a similar calendar for

8  when Ms. Trawick took maternity leave?

9      A.    I don't know.

10     Q.    Was it a policy and procedure of Carmike to

11 record maternity leave as separate from any other

12 kind of leave?

13     A.    I don't know.

14     Q.    Let me show you what I have marked as

15 Plaintiff's Exhibit 47.  Again, this is a payroll

16 authorization form for Ms. Trawick.  And can you tell

17 me -- this is for 2014.  August of 2014, right?

18     A.    Yes, it appears so.

19     Q.    And can you tell me whose initials are at the

20 top right?

21     A.    That looks like Fred Van Noy.

22     Q.    Fred Van Noy.  And Sadie Marshall's are to the

23 left?

24     A.    Again, I'm speculating but I would assume

25 those are Sadie Marshall's.



1     Q.    That's whose you think you are -- whose you

2   think --

3     A.    That's who I think it would be.

4     Q.    Got it.   And then how about to the left of the

5   changed numbers, again the typewritten numbers are

6   stricken and reduced.

7         MR. GERAKITIS:   Object to the form.

8         DEPONENT PASSMAN:   Once again, it looks like

9     the present rate was corrected.   It looks like it

10     must have been an error and it was corrected.   And

11     then, of course, the new rate.

12   BY MS. PREBULA:

13     Q.    And whose initials are to the left of that,

14   the changes?

15     A.    That looks like Fred Van Noy.

16     Q.    Okay.   And then this shows a three percent

17   increase, right?

18     A.    That's correct.

19     Q.    And whose initials are at the bottom after the

20   back pay due?

21     A.    Once again, I'm speculating that's Sadie

22   Marshall.

23     Q.    And on both Plaintiff's 46 and 47 under the

24   reason that says:   Doing a very good job, annual

25   review.   Right?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 144

1      A.    It does.

2      Q.    The -- I don't know why there's a second page

3  to that, but that's the way it printed.  Did your

4  form normally consist of one page?

5      A.    I believe so.

6      Q.    Okay.  It may just be a ghost.  You know how

7  that will print.

8      A.    Yeah.

9      Q.    So do you -- is it your understanding that

10  these forms where they are corrected accurately

11  reflect Ms. Trawick's salary in 2013 and 2014?

12      A.    I would assume so.

13      Q.    You don't know?

14      A.    I don't know.

15      Q.    Can you explain why both the 2013 and 2014

16  originally had incorrect numbers on them?

17      A.    I cannot.

18      Q.    Is there a reason why that was not retyped, if

19  you will?

20      A.    I don't know.

21      Q.    Are you familiar with the income that

22  Mr. Sailors was making during this same period?

23      A.    I am not.

24      Q.    The -- was there any kind of corporate chart

25  that indicated salary ranges for different levels of



1   employees?

2       A.   I don't believe so.

3       Q.   Was there any standard or policy for what the

4   pay would be for any level of employee?

5       A.   I don't know.

6       Q.   For example, was there a chart that showed or

7   a policy that showed a director's salary would be

8   between X and Y, that that was the salary range?

9       A.   Not that I'm aware of.

10      Q.   Would that be true for anybody else in the

11  marketing department that there was no official

12  salary range for any particular job function?

13      A.   I don't know.

14      Q.   Are you aware of any?

15      A.   I'm not aware of any.

16      Q.   Was there a salary range for clerical workers?

17      A.   Not that I'm aware of.

18      Q.   Okay.  And I'm presuming that there would not

19  be a salary range for any executive?

20      A.   I wouldn't make that assumption.

21      Q.   Okay.

22      A.   We had annual -- we had outside -- the board

23  of directors had an outside consultant that reviewed

24  salary ranges and compared them to other public

25  companies in the market place.



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

```
1       Q.    For executives?

2       A.    For only the executives, yes.

3       Q.    And was there a published list of salary

4   ranges for each position?

5       A.    No.

6       Q.    Did -- before I mark this, let me ask you a

7   couple of questions about it because I don't think

8   it's relevant.  This is an employee handbook that was

9   produced in the case and it starts with Carmike

10  number 2947.  If you -- and this is an employee

11  handbook that shows --

12            MR. GERAKITIS:  Do you have a copy?

13            MS. PREBULA:  Oh, I'm so sorry.  Watch the

14      staples.  Something is going on with these.  I

15      don't know why it did it that way.

16  BY MS. PREBULA:

17      Q.    If you would look at numbered page one.

18            MR. GERAKITIS:  Can I just check one thing?

19            MS. PREBULA:  The regular number one.

20            MR. GERAKITIS:  And we haven't marked this

21      yet.

22            MS. PREBULA:  We haven't marked it yet because

23      I don't think this applies and I'm just going to

24      ask him before -- no need to mark it if it doesn't

25      apply.
```


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 148 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                    DEPOSITION OF
DAVID PASSMAN on 10/11/2017                                          Page 147

```
 1          DEPONENT PASSMAN:  Not small letter or small
 2     --
 3   BY MS. PREBULA:
 4     Q.   No, the regular number one.  Okay.  At the
 5   bottom, it says that this manual -- if you have any
 6   questions about this policy and procedures, you
 7   should contact the theater manager or the human
 8   resource director.
 9          And I think that this manual applies to
10   theater employees and not to corporate employees.
11   And I want to show you why.  That same reference
12   appears on pages seven, 18 and 25 and two.  And then
13   you also produced, meaning Carmike, a corporate
14   employee policies manual which I will show you.
15          Am I correct -- and that started at Carmike
16   number 3000 -- am I correct that the document labeled
17   employee handbook only applies to theater employees
18   and the document that says corporate employee
19   policies manual applies to corporate office
20   employees?
21     A.   Would you reask your question?  I'm sorry.
22     Q.   Sure.  Am I correct that the document labeled
23   employee handbook does not apply to corporate office
24   employees.  And the document labeled corporate
25   employee policies manual does apply to corporate
```



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 148

1    office employees?

2       A.    That would appear so.

3       Q.    Okay.  So the document labeled employee

4    handbook starting on page 2947 would not apply to

5    Crystal Trawick from 2012 to her termination in 2015?

6       A.    That would appear so.

7       Q.    Okay.  So just let me not mark that.  Save

8    that tree.  And let me mark the corporate employee

9    manual as Plaintiff's Exhibit 48.

10          Okay.  And you recognize this corporate

11   employee policies manual as a document that Carmike

12   prepared or had prepared?

13      A.    It looks familiar.

14      Q.    Okay.  It says on the front it was effective

15   May of 2011.  Do you see that?

16      A.    I do.

17      Q.    Was this revised at any time between May of

18   2011 and November of 2015?

19      A.    I don't know.

20      Q.    Are you aware of any other employee policies

21   manual that would have applied to Ms. Trawick from

22   2012 through November 2015, other than Plaintiff's

23   48?

24      A.    Does this include the IT policies and

25   procedure manual?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   Q.   It does not.  There is an IT policies and

2   procedure manual you produced as well.

3   A.   Okay.  Does include the code of conduct?

4   Q.   It does not.  So those are two additional

5   documents I'm going to ask you about.  There is also

6   an IT policies manual, right?

7   A.   Yes, I believe so.

8   Q.   Okay.  And there is a code of conduct.

9   A.   I believe so.

10   Q.   All right.  Then we'll just go ahead and

11   identify those and then we'll go back and talk about

12   them.

13         So let me show you what's previously been

14   marked as Plaintiff's Exhibit 39.  Is that the IT

15   manual you're talking about?

16   A.   It appears so.

17   Q.   Okay.  And let me show you what's previously

18   marked as Plaintiff's Exhibit 37 and ask you if

19   that's the code of conduct you were referencing?

20   A.   Yes, I believe so.

21   Q.   Okay.  So knowing there's an IT manual and

22   knowing there's a code of conduct, my question is is

23   there any other employee policies manual that would

24   have applied to Crystal Trawick between 2012 and

25   2015?



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 150

1    A.   I don't recall any other corporate policies

2    manual.

3    Q.   Were there any other written policies and

4    procedures that would have applied to Ms. Trawick

5    between 2012 and 2015?

6    A.   I don't know.

7    Q.   Okay.  Let's look at Plaintiff's 48.  This

8    document, if you'll look at page three, contains an

9    Equal Employment Opportunity policy.  Do you see

10   that?

11   A.   I do.

12   Q.   Is this the only EEO policy that Carmike had?

13   A.   I don't know.

14   Q.   All right.  If you will look at the -- under

15   -- let's still look at page three.  Under the EEO

16   policy in the last paragraph of the policy, it says:

17   Any person that has a question or concern with regard

18   to any type of discrimination or harassment must

19   report it to his or her supervisor, to human

20   resources or to the help line.  Do you see that?

21   A.   I do.

22   Q.   Do you understand that -- was that your

23   understanding of how reporting was to occur?

24   A.   Yes.

25   Q.   Okay.  Did -- and you see the sentence at the



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 151

1  end of there that says:  There will be no

2  retaliation against or harassment or intimidation of

3  any employee who makes a complaint in good faith.  Do

4  you see that?

5     A.    I do.

6     Q.    Did you understand that was the policy?

7     A.    Yes.

8     Q.    The policy also says at the top, if you'll

9  look at the second, it says:  All employment

10 decisions, et cetera, are to be made without regard

11 to --- and it lists categories.  And then it says:

12 without regard to any other characteristic which is

13 protected under federal or state law.  Do you see

14 that?

15    A.    Yes.

16    Q.    What's that referring to?

17    A.    I would say it's referring to

18 nondiscrimination.

19    Q.    What's the "any other characteristic"?

20    A.    I don't know.

21    Q.    So did you understand this policy to be that

22 all employment decisions including hiring, promotion

23 and compensation and termination were to be made

24 without regard to age, race, gender, pregnancy, et

25 cetera?



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1       A.   Yes.

 2            MR. GERAKITIS:  I object to the form.

 3    BY MS. PREBULA:

 4       Q.   Okay.  Did you understand that any promotion,

 5    evaluation, compensation, access to benefits, or

 6    termination were to specifically be made without

 7    regard to gender?

 8       A.   Yes.

 9       Q.   Okay.  Did -- let's look at page six.  Pages

10    six and seven contain sexual harassment policy.  Do

11    you see that?

12       A.   I see no harassment policy.

13       Q.   Okay.  Which would include sexual harassment.

14    You would agree with that?

15       A.   (Witness perusing documents).  Yes.

16       Q.   Okay.  Did -- is there any other harassment

17    policy other than this one that Carmike had between

18    2012 and 2015?

19       A.   I don't know.  Not that I'm aware of.

20       Q.   Now, you note that in the harassment policy --

21    see the bullet points?  It says on page six that:

22    Carmike will provide discrimination free work place.

23    Do you see that?  The first bullet point.

24       A.   Yes.

25       Q.   And it says:  Carmike will provide an
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 153

1  opportunity to present any complaint to the

2  appropriate company representative.  Do you see that?

3      A.   Yes.

4      Q.   And those appropriate company representatives

5  included supervisors and their supervisor's

6  supervisors; right?

7      A.   I would assume so.

8      Q.   Is that your understanding?

9      A.   Yes.

10     Q.   Okay.  And then it also says:  Carmike will

11 provide a full and partial and prompt investigation

12 by management in conjunction with human resources.

13 Do you see that?  Third bullet point.

14     A.   Yes.

15     Q.   Then it says:  Appropriate corrective action

16 if necessary, right?

17     A.   Yes.

18     Q.   And then:  Freedom from reprisal and

19 retaliation in making a good faith complaint is also

20 one of the bullet points, right?

21     A.   That we will endeavor.  Yes.

22     Q.   Now, those exist under the non-harassment

23 policy, right?

24     A.   Yes, they appear to.

25     Q.   But if you turn back to page three, those same



1   provisions do not exist under the EEO discrimination

2   policy, correct?

3           MR. GERAKITIS:  Object to form.

4           DEPONENT PASSMAN:  I'm not sure whether

5      they're included or not.

6    BY MS. PREBULA:

7      Q.   They're not -- they're not on page three, are

8    they?

9      A.   Those identical bullet points are not on page

10   three.

11     Q.   And page three doesn't include any reference

12   to section 3.01, no harassment; correct?

13          MR. GERAKITIS:  Object to the form.

14          DEPONENT PASSMAN:  I don't see a reference to

15      harassment.

16   BY MS. PREBULA:

17     Q.   So when you told me that there would be an

18   investigation if Crystal had made a complaint of pay

19   and title being discriminatory because she was a

20   woman, what policy were you referring to?

21     A.   I don't know that I was referring to a policy.

22   I said that it would be reported to HR and

23   investigated.

24     Q.   And in this particular case, there was no

25   investigation, to your knowledge, of any complaint by



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 155

```
 1   Crystal Trawick?

 2      A.    That's correct.

 3      Q.    Did -- was there any other written policy that

 4   you were referring to when you said there would be an

 5   investigation of discrimination claims?

 6      A.    No.

 7      Q.    Would you consider taking -- a senior male

 8   employee taking a younger female employee out for a

 9   dinner and drinks to be prohibited under either of

10   these policies?

11      A.    No.

12      Q.    Would you consider a male employee attempting

13   to kiss a younger female employee to be a violation

14   of any of these policies?

15      A.    Not necessarily.

16      Q.    What does that mean?  When is it okay?

17      A.    Consensual.  If a complaint were made in that

18   regard, I would refer it to HR and legal to

19   investigate.  They would have the skill set and

20   experience necessary to make a determination as to

21   whether that was harassment.

22      Q.    If it was an unwelcome attempt to kiss a

23   female employee by an older male employee, would that

24   be considered harassment?

25      A.    It might be.
```



1    Q.   Did -- I'm so sorry.  It's pollen this time.

2    The -- if you look on page seven, the sexual

3    harassment policy specifically includes unwelcomed

4    physical contact; correct?

5    A.   Yes.

6    Q.   Okay.  Excuse me again.

7         On page eight of Plaintiff's Exhibit 48,

8    there's a code of conduct.  Do you see that?

9    A.   Yes.

10   Q.   Did the code of conduct -- and we'll look at

11   it in just a second -- apply to all employees?

12   A.   I believe it did, yes.

13   Q.   Okay.  So you show in that 3.02 regarding code

14   of conduct that Carmike has a website,

15   www.carmike.com.  Do you see that?  Last paragraph.

16   A.   Yes.

17   Q.   Do you know who hosted that website?

18   A.   No.

19   Q.   Okay.  Did you also have prior to this, a

20   website lma.carmike.com?

21   A.   I don't know.

22   Q.   Do you know if your email came through that

23   website to Outlook or through a different provider?

24   A.   I don't know.

25   Q.   Does the carmike.com website still exist?



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 157

1    A.    I don't know.

2    Q.    You'd said earlier that Carmike no longer

3    exists.  Is it your understanding that the entity

4    itself is out of existence?

5    A.    I believe it is, but I don't know.

6    Q.    Is it your understanding that all theaters

7    have been changed from Carmike to AMC?

8    A.    I'm sorry.  The ownership or the signage?

9    Q.    No, no.  The signage.

10    A.    No, that's not my understanding.

11    Q.    So there are still some Carmike theaters

12    sitting out there?

13    A.    I don't know whether there are or not.

14    Q.    Okay.  Okay.  On page 10, the top 3.05 has

15    electronic communications provision, if you will,

16    that just incorporates the other handbook which you

17    identified earlier.

18    A.    Yes, it seems to.

19    Q.    Do you see that?

20    A.    Yes.

21    Q.    Okay.  The -- are you aware of any misuse of

22    Carmike's email, voicemail, telephone or computer

23    systems that was reported to Carmike during your

24    employment as president?

25    A.    The only thing I can think of is when Crystal



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 158

1    left, she kept without permission some devices.  I

2    can't think of any other employee separation or any

3    other misuse of employees while employed at Carmike.

4        Q.   Did anyone ask Crystal to turn in her laptop

5    or computer when she left?

6        A.   I don't know.

7        Q.   Do you have any understanding as to whether or

8    not Crystal understood those belonged to her

9    personally?

10       A.   I do not.

11       Q.   The -- if you would look at page 12, there is

12   a specific provision for children visiting in the

13   work place.  Do you see that?

14       A.   Yes, I do.

15       Q.   And it was the norm for employees to

16   occasionally bring their children to the office,

17   correct?

18       A.   Norm and occasionally, it certainly was

19   permitted.

20       Q.   Didn't happen every day.

21       A.   That's correct.

22       Q.   Okay.  But various employees, including

23   Ms. Trawick, Mr. Sailors, Ms. De La Cruz, would bring

24   their kids to the office?

25       A.   Yes, that's correct.



```
 1      Q.   Mr. Hare brought his kids to the office on
 2   occasion.
 3      A.   I don't know that.
 4      Q.   And that was not -- it was a permitted event.
 5      A.   Yes.
 6      Q.   If you will.  Okay.
 7           On the bottom of page 12, it notes that there
 8   is a progressive discipline policy in section 3.08.
 9   Do you see that?
10      A.   I do.
11      Q.   All right.  And the procedure calls for four
12   steps:  For verbal warning, written warning, final
13   written warning, and termination.  Do you see that?
14   One, two, three, four.
15           MR. GERAKITIS:  You're reading on procedure?
16           MS. PREBULA:  Uh-huh.  (indicating in the
17      affirmative).  It's the only one, two, three, four
18      on the page.
19           MR. GERAKITIS:  Okay.
20           DEPONENT PASSMAN:  Yes, I see it.
21    BY MS. PREBULA:
22      Q.   So the first occasion, verbal warning.  And
23   you document it in the file, right?  That's what
24   documented means?
25      A.   Yes.
```



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 160

1   Q.   The second occasion, written warning.  Do you
2   see that?
3   A.   I do.
4   Q.   And third occasion, final written warning.  Do
5   you see that?
6   A.   I do.
7   Q.   And fourth occasion, termination.  Do you see
8   that?
9   A.   Yes.
10   Q.   And it also says that you could proceed right
11   to the final procedure for serious misconduct, right?
12   A.   Would you say that again?
13   Q.   That -- I'm looking at the sentence under the
14   four numbers.  It says:  Serious misconduct could
15   result in final written warning or termination.
16   A.   Yes.
17   Q.   Okay.  Ms. Trawick had no written warnings in
18   her file at all, correct?
19   A.   I don't know.
20   Q.   You've not looked at her personnel file?
21   A.   I have not.
22   Q.   Are you aware of any written warnings that was
23   in Ms. Trawick's personnel file?
24   A.   I am not.
25   Q.   If there had been a written warning in her



1  personnel file, would Carmike have produced it?

2    A.   I don't know.  I would assume so.

3    Q.   Are you aware of whether Mr. Morton got

4  written warnings when he was retained and not

5  terminated when there was alleged misuse of funds by

6  him?

7    A.   I am not.

8    Q.   Was it Carmike's general policy to follow the

9  progressive discipline policy and not go directly to

10  termination?

11    A.   I don't know.

12    Q.   Respectfully, you're the president of the

13  company.  You don't know if the company followed that

14  policy?

15    A.   I would assume so, but I don't know.

16    Q.   The -- if you'll turn to page 18, I'm looking

17  at section 4.07 --

18    A.   Family and medical leave?

19    Q.   Right.  Which provides family and medical

20  leave.  The -- so you know that Carmike was large

21  enough, it offered FMLA leave, right?  It had to.

22    A.   I see that.

23    Q.   And that that FMLA leave specifically includes

24  birth in the first bullet point?

25    A.   It's talking about unpaid leave, yes.



Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 163 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                    DEPOSITION OF
DAVID PASSMAN on 10/11/2017                                        Page 162

1    Q.   No, the first types of family medical leave.

2    A.   It says all eligible employees -- I'm just

3   trying to read to get to the first option or first --

4   an eligible employee may take up to 12 work weeks of

5   unpaid leave during the 12 month period for the

6   following reasons.  Is that what you're referring to?

7    Q.   Right.  And I'm saying that birth was one of

8   the types of family medical leave listed.

9    A.   It is one of types of unpaid leave listed.

10    Q.   Okay.  And the -- then on page 19, the first

11   full paragraph says that:  The family medical leave

12   for the birth of a child had to occur within the 12

13   months of the birth or placement, right?

14        MR. GERAKITIS:  Object to the form.

15        DEPONENT PASSMAN:  It does say that.

16   BY MS. PREBULA:

17    Q.   Okay.  And the -- on page 29, the notice

18   provision provides that --

19    A.   I'm sorry.  Where are you?

20    Q.   Page 20.  I said 25.  Page 20.  It says:  An

21   employee who wants to take family and medical leave

22   ordinarily must provide his or her supervisor with at

23   least 30 days notice of the need for leave if the

24   need is foreseeable.  Do you see that?

25    A.   No, ma'am.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    Q.    First sentence?

2    A.    I'm having trouble catching up to you.

3    Q.    Okay.

4    A.    Under compensation and benefits?

5    Q.    Under notice and certification.

6    A.    Oh.

7    Q.    The first sentence on the page.

8    A.    Yes, I see that.

9    Q.    It does not say the employee has to submit

10   anything in writing, does it?

11   A.    Not in that sentence, no.

12   Q.    In fact, the second sentence says:  It is then

13   the supervisor's responsibility to submit such notice

14   to the human resources director, correct?

15   A.    It does.

16   Q.    And then at the bottom, compensation and

17   benefits, the section --

18   A.    Yes.

19   Q.    -- it says:  Generally FMLA leave is unpaid

20   leave.  However, employees may elect to use accrued

21   vacation, sick leave, or special leave to receive

22   compensation during the period of leave; right?

23   A.    It does say that.

24   Q.    All right.  Did -- and then it goes on in the

25   last sentence of that paragraph -- next to the last



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 164

1  -- no, I think it's the last sentence in that

2  paragraph to discuss if an employee is receiving

3  short term disability benefits, et cetera, that it

4  runs concurrently with family medical leave.  Do you

5  see that?  The last sentence.

6      A.   I do see the last sentence.

7      Q.   Did Carmike treat maternity leave the same as

8  it treated short term disability leave?

9      A.   I don't know.

10      Q.   So when you made the point that Ms. Trawick's

11  FMLA leave was paid, it was consistent with this

12  policy on page 20, wasn't it?

13      A.   I didn't -- I didn't say it was FMLA leave.  I

14  said she had --

15      Q.   You said maternity leave.

16      A.   -- I said she was paid during her maternity

17  leave, yes.

18      Q.   And that was consistent with this policy noted

19  on page 20, correct?

20          MR. GERAKITIS:  Object to form.

21          DEPONENT PASSMAN:  I don't know if it's

22      consistent with this statement or not.

23   BY MR. PREBULA:

24      Q.   You don't know if her paid maternity leave was

25  consistent with her ability to choose accrued



1  vacation, sick leave or special leave to receive

2  compensation during a period of leave?

3      A.   No, I don't.

4      Q.   Are you aware of any policy that requires the

5  employee to request in writing that they be able to

6  use their accrued vacation, sick leave, or special

7  leave to receive compensation during maternity leave?

8      A.   No, I'm not.

9      Q.   And this document does not say that, does it?

10     A.   I don't see it in the pieces that we have

11 looked at.

12     Q.   Does Carmike have -- if you'll look at the

13 last page, page 48.  Does Carmike have an

14 acknowledgement form signed by Crystal Trawick?

15     A.   I don't know.

16     Q.   Where would that be maintained?

17     A.   I don't know.  I would assume it would be

18 maintained in the HR department.

19     Q.   Let's look at your code of conduct which is

20 Plaintiff's Exhibit 37.  Can I see it one second?  I

21 think my copy may be different, I just want to make

22 sure I've got the same thing here.  Yeah, it just

23 looks different because it's darker.

24          The -- you'll note that on the last page of

25 the document, there's also a compliance and



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 166

1    disclosure statement?

2      A.    I see that.

3      Q.    And the compliance and disclosure statement

4    says that:  Every director and employee is required

5    to comply and failure to do so may require

6    disciplinary action.  Do you see that?  Third

7    paragraph.

8      A.    Yes.

9      Q.    And then the fourth paragraph says:  If I

10   become aware of or suspect a violation or possible

11   violation of our code, I will inform my supervisor,

12   human resource director, the compliance officer, or

13   business ethics committee.  Do you see that?

14     A.    Yes.

15     Q.    And it says:  Currently, I'm not aware of any

16   violation or possible violation of our code or other

17   company policy.  Do you see that?

18     A.    I do.

19     Q.    Did you sign this every year, 2012 to 2015?

20     A.    I believe I did.

21     Q.    Did Crystal Trawick sign this every year?

22     A.    I don't know.

23     Q.    Do you have any copies of her signing this

24   statement?

25     A.    I do not.



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 167

```
1      Q.    Where would they be kept?

2      A.    I'm not certain, but I would expect either in

3   the general counsel's office or HR.

4      Q.    When Crystal Trawick discussed with you the

5   pay issue and the glass ceiling issue, did you not

6   consider that to be a possible violation of the code

7   of company policy?

8           MR. GERAKITIS:  Object to the form.

9           DEPONENT PASSMAN:  I did not.

10   BY MS. PREBULA:

11      Q.    Did -- and so you didn't report it under this

12   code of conduct, correct?

13      A.    That is correct.

14           MS. PREBULA:  I apologize.  Let's just take a

15       five minute break and let me see if I can get rid

16       of this.  It's 2:00 anyway.

17           (Brief break)

18           (Upon resuming)

19   BY MS. PREBULA:

20      Q.    Okay.  Let's go back on.  We were looking at

21   Plaintiff's 37.  If you would look at the last

22   sentence -- excuse me -- the last paragraph on the

23   first page, it says:  Insensitivity to or disregard

24   of these policies will constitute an important

25   element in the evaluation of employee for attention,
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 168

1  assignment and promotion.  Do you see that?

2     A.    I do.

3     Q.    Any conduct of failure to report any conduct

4  in violation of our code may be grounds for

5  disciplinary action up to and including termination.

6  Do you see that?

7     A.    I do.

8     Q.    Would you consider that your lack of response

9  to Ms. Trawick talking to you about a glass ceiling

10 and pay raise was insensitivity?

11          MR. GERAKITIS:   Object.

12          DEPONENT PASSMAN:   I would not.

13  BY MS. PREBULA:

14     Q.    You would not.

15     A.    No.

16     Q.    And you were certainly not disciplined for not

17 reporting that after this lawsuit was filed, correct?

18     A.    I was not.

19     Q.    The corporate secretary is, I believe you said

20 Dan Ellis at the time in November of 2015?

21     A.    That's correct.

22     Q.    And on page three, this code of conduct

23 charges the corporate secretary with the ultimate

24 authority to determine applicability, et cetera.  Do

25 you see that, paragraph B-1?



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 169

1    A.    I'm looking at it.  Yes.

2    Q.    So the same person who investigated Crystal

3  Trawick, recommended to you that Crystal Trawick be

4  terminated is also charged with deciding whether or

5  not your failure to report would be a violation of

6  these policies; correct?

7         MR. GERAKITIS:  Object to the form.

8         DEPONENT PASSMAN:  I don't believe so.  And

9    the reason I don't believe so is because I believe

10   he would have a responsibility to go to the board

11   of directors if there were an issue on me.  I

12   believe that would be the "if necessary".

13        But, yeah, he would have the ultimate

14   authority.

15  BY ME. PREBULA:

16   Q.    To make all those decisions, correct?

17   A.    And if necessary with the board.

18   Q.    The -- when you -- start over.

19        When AMC purchased the stock of Carmike, your

20  stock was bought out; correct?

21   A.    That's correct.

22   Q.    Did you sign a severance agreement with AMC?

23   A.    I don't know if it was labeled severance

24  agreement, but I did sign an agreement -- a

25  separation agreement.



1      Q.    Separation agreement?

2      A.    I don't recall what it was called, but I did

3   sign one.

4      Q.    Did you get severance pay?

5      A.    I am receiving severance pay as we speak.

6      Q.    Does your agreement provide that you cannot

7   voluntarily testify against Carmike?

8      A.    I don't know if it does or not.

9      Q.    Have you been told that if you testified in

10  favor of Carmike -- excuse me -- in favor of Crystal

11  Trawick that your separation pay will be affected?

12     A.    No, I have not.

13     Q.    Do you know if the form of separation

14  agreement you signed is the same as any other

15  director or executive of AMC -- excuse me -- Carmike

16  signed when they did not continue with AMC?

17     A.    I do not know.

18     Q.    Okay.  Did you ever attend any community

19  events that Ms. Trawick set up on behalf of Carmike?

20     A.    I'm not sure what you mean by community events

21  that she set up.  You mean where Carmike was in

22  attendance or a sponsor or --

23     Q.    Either one.

24     A.    I'm not sure what you mean.

25     Q.    Either one.



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      A.   Yes, I attended several.

2      Q.   Did you consider that to be a violation of

3  your code of conduct?

4      A.   I do not.

5      Q.   So let's look at Plaintiff's Exhibit 39, which

6  you have previously identified as the IT policy.

7      A.   Yes.

8      Q.   The -- it shows on the third page in that

9  doesn't appear to be -- well, it's numbered 519 at

10  the bottom -- that the document was revised several

11  times but the last revision was February of 2013.  Do

12  you see that?

13      A.   I do see that.

14      Q.   Okay.  Are you aware of any revisions to this

15  policy from February of 2013 through November of

16  2015?

17      A.   I am not aware of any.

18      Q.   Okay.  The -- the revision in October of 2012

19  which is about the same time that Ms. Trawick moved

20  into marketing shows that it was updated for PCI

21  compliance by Fred Friedel.  Do you see that?

22      A.   I see he was the author.  Is that what you

23  mean?

24      Q.   Correct.

25      A.   Yes.



1    Q.    Do you know what updates were made in 2012?

2    A.    I don't know specifically.

3    Q.    Do you know what changes were made on PCI

4    compliance?

5    A.    No, but I do know that PCI compliance was an

6    industry-wide issue in retail and all of that.  So I

7    would assume it was to comply with changes.

8    Q.    As you look at this document, you can't tell

9    me what was changed though?

10    A.    No, I cannot.

11    Q.    Okay.  The bottom of the handbook on some of

12    the pages -- let me make sure I'm not missing it.  I

13    think my copy accidentally has a copy of the code of

14    conduct behind it.  I just have more than I need.

15    Yours ends with page -- the distribution list at the

16    bottom.

17         Yes.  Okay.  I just have an improperly stapled

18    document.

19         All right.  The bottom of the document on the

20    left corner shows a document number and then V3,

21    which usually means version three.  Are you aware if

22    there were two other versions of this final policy in

23    2013?

24    A.    I am not.

25    Q.    Do you have or have you seen version one or



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 173

1    version two?

2       A.    I don't know.

3       Q.    Do you have a copy?

4       A.    I do not.

5       Q.    Okay.   The -- there is a provision in here on

6    laptops.   Let me see if I can find it.   On page nine,

7    item 14.

8       A.    Roman numeral 14?

9       Q.    Yes, sir.   Do you see that?

10      A.    I do.

11      Q.    It says the My Documents folder for desk top,

12   notebooks and certain hand-held computers is

13   automatically synchronized to a server by the IT

14   department.   Do you see that?

15      A.    I do.

16      Q.    Okay.   How were laptops -- notebooks or

17   laptops backed up or synchronized to the server?

18      A.    You're asking me how they were backed up?

19      Q.    Uh-huh.   (indicating in the affirmative).

20      A.    I don't know.

21      Q.    Did you have a laptop?

22      A.    I did.

23      Q.    When you took it into the office, did you have

24   to plug it in and back it up?

25      A.    I was asked occasionally by IT to let them



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 174

1    back it up.

2        Q.    Okay.

3        A.    But, yes.

4        Q.    So it was not a normal policy for every time

5    the laptop came into the office to be backed up?

6        A.    Every time, no.

7        Q.    Okay.  For example, there are certain systems

8    where any time you go into the office and you dock

9    it, it automatically synchronizes.  Did you have that

10   function?

11       A.    I don't know.

12       Q.    When you went into the office, did you have to

13   dock your laptop?

14       A.    I rarely brought my laptop into the office.

15       Q.    Okay.

16       A.    I used it for email.

17       Q.    All right.  And this document indicates --

18   meaning Plaintiff's Exhibit 39 indicates that email

19   is not backed up because it's not included in the My

20   Documents folder; is that fair?

21       A.    I don't know if it's fair or not.

22       Q.    On your system was email included in your My

23   Documents folder?

24       A.    I don't know.

25       Q.    Did you have a Microsoft office system for all



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 175

```
 1   other documents as well as the Microsoft Outlook
 2   email?
 3      A.   Yes.
 4      Q.   When you signed in to look at documents, did
 5   you have to click on the word icon and then click on
 6   My Documents to get to your documents?
 7      A.   Yes, I believe so.
 8      Q.   Could you get to email that way?
 9      A.   I don't know.
10      Q.   Could you click on My Documents and get to
11   email or did you have to go to Outlook?
12      A.   I went to Outlook.
13      Q.   Okay.  Did you have any way to backup email to
14   a network at Carmike?
15      A.   I believe my desk top was backed up.
16      Q.   Your desk top email?
17      A.   Yeah.
18      Q.   Okay.  Did you have other folders on your desk
19   top, notebook, and any PDA or hand-held computer
20   which would be an Ipad that was not saved to a My
21   Documents folder?
22      A.   I don't know.  I don't think of it in terms of
23   My Documents.
24      Q.   Did you save any Adobe documents on your
25   laptop or Ipad?
```



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 176

1    A.   No, I didn't use Adobe except to read

2   documents.

3    Q.   Did you have it on your laptop or Ipad?

4    A.   The feature?

5    Q.   Correct.

6    A.   To read, yes.

7    Q.   On your laptop?

8    A.   Yes.

9    Q.   Okay.  But not your Ipad?

10    A.   No, I don't think -- I don't think that Apple

11   Ipad and Adobe were --

12    Q.   Certainly not back in 2015.

13    A.   I don't think so.

14    Q.   Okay.  The -- under the laptop slash remote

15   users, it says:  If the network is not available,

16   users must insure that their files are regularly

17   backed up using external media such as compact disks

18   and zip drives until the time that they can make a

19   connection to the Carmike network.  Do you see that?

20    A.   I do.

21    Q.   Okay.  Did you do that?

22    A.   I didn't have anything to back up.

23    Q.   You had emails on your lab top; did you not?

24    A.   My emails on my laptop were synchronized with

25   my emails on my desk top.



1   Q.   And you didn't create any documents on your

2   laptop?

3   A.   I did not.  I would read documents and then

4   I would delete them.

5   Q.   And is it your testimony that if you opened an

6   email on your laptop and deleted it, that it would

7   still be on your hard drive of your desk top?

8   A.   It would be in the deleted file on my desk top

9   until I cleaned my deleted file because they were

10  synchronized.

11  Q.   I did not see a destruction policy in the IT

12  policy.  Did Carmike have a policy that -- or a

13  retention policy for electronic data?

14  A.   I don't see it in this document.  But I am

15  reasonably sure we had a retention policy that was in

16  writing.

17  Q.   What was it called?

18  A.   I don't know.

19  Q.   Who issued it?

20  A.   I believe it would have been drafted or

21  controlled through the legal department.

22  Q.   What was the policy?

23  A.   I don't know.

24  Q.   So when you deleted your emails, was that

25  consistent with the policy?



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 178

1    A.    I don't know what the policy was.

2    Q.    Okay.  Is there -- you'll note that in the --

3    excuse me -- in Roman numeral six on page three, it

4    says that there's no expectation of privacy for

5    electronic communications and information.  Do you

6    see that?

7    A.    I see the title.

8    Q.    Okay.  Did -- and it goes on to say that

9    Carmike can inspect and monitor.  Did Carmike ever

10   inspect or monitor anyone's laptop?

11   A.    I don't know.

12   Q.    Did Carmike inspect or monitor Crystal

13   Trawick's laptop?

14   A.    I don't know.

15   Q.    Or her email?

16   A.    I don't know.

17   Q.    Or her Ipad?

18   A.    I don't know.

19   Q.    Are you aware of Carmike inspecting or

20   monitoring anybody's devices?

21   A.    I have -- I have no recollection of any

22   monitoring.

23   Q.    Okay.  Did -- it also says in the third bullet

24   point at the end:  Only Carmike authorized encryption

25   may be utilized.  What was Carmike authorized



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 179

1  encryption?

2      A.    I don't know.

3      Q.    Did you ever send any encrypted documents?

4      A.    None that I recall.

5      Q.    Let me show you what has been marked

6  previously Plaintiff's Exhibit 40 which is an email

7  from Fred Van Noy to several folks.  You are not on

8  there, I don't think.

9      A.    I don't see my name on here.

10     Q.    Have you seen that email before?

11     A.    Not that I recall, no.

12     Q.    Okay.  The document itself -- and I'm sorry,

13  we have to share.

14     A.    That's all right.

15     Q.    I might be able to find one.

16         (Brief pause)

17         (Upon resuming)

18   BY MS. PREBULA:

19     Q.    The documents itself is dated November 12,

20  2015 and deals with credit card usage, air travel,

21  meals, and hotel.  Do you see that?

22     A.    Air travel, meals and -- under the title of

23  credit card usage.  Yes, I see that.

24     Q.    Prior to this email on November 12, 2015, was

25  there any written policy on those items?



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    A.    I don't know that there was.

2    Q.    Are you aware of any?

3    A.    I am not.

4    Q.    Did -- do you know why you didn't get that

5    document?

6    A.    No, I don't.

7    Q.    Did you have any discussions before this

8    document came out that it was going to be sent out?

9    A.    Not specifically that this document was going

10   to be sent out, no.

11   Q.    Was there any investigation done on any person

12   other than Crystal Trawick with regard to any of

13   these expenses shown in Plaintiff's 40?

14   A.    I don't know.

15   Q.    You didn't participate in any, correct?

16   A.    No, I did not.

17   Q.    Do you know after Crystal moved into the

18   marketing department in 2012, how many people

19   reported to her?

20   A.    I don't.

21   Q.    Do you know how many people reported to

22   Shannon Sailors after that time period?

23   A.    I don't.

24   Q.    Are you aware of -- you had said earlier that

25   Terrell Mayton was terminated primarily for one of



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 181

1  the reasons because of the performance and not

2  meeting marketing goals.  Do you remember that?

3      A.    I do.

4      Q.    Have you reviewed any numbers as to what

5  Crystal Trawick did to increase market share and

6  increase dollars and receipts while she was doing

7  marketing functions after Mr. Mayton left?

8      A.    I reviewed marketing department results.  I

9  reviewed marketing department goals and objectives.

10 And those were periodic reviews that were done for

11 virtually all departments.

12     Q.    Who prepared those for the marketing

13 department?

14     A.    I don't know.

15     Q.    After Mr. Mayton left and Crystal took that

16 over, was marketing -- after 2012 when Crystal was in

17 the marketing department and Mayton had left, did

18 Crystal prepare those reports for you?

19         MR. GERAKITIS:  Object to the form.

20         DEPONENT PASSMAN:  I do not know.

21  BY MS. PREBULA:

22     Q.    Are you aware of any reports of marketing

23 results that Crystal Trawick prepared?

24     A.    I assume Crystal participated in the marketing

25 and reports after Terrell left.  But I didn't know to



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 182

1   what degree.

2      Q.    Do you know that she became completely

3   responsible for budgeting for both marketing and

4   advertising?

5          MR. GERAKITIS:   Object to the form.

6          DEPONENT PASSMAN:   No.

7    BY MS. PREBULA:

8      Q.    Is that something you would have assigned or

9   someone else?

10     A.    It would have been someone else.

11     Q.    Fred Van Noy?

12     A.    Fred Van Noy.

13     Q.    Were you made aware of any complaints with

14   regard to reports prepared by Shannon Sailors after

15   Mr. Mayton left?

16     A.    I need to make sure I understood.

17     Q.    Were you made aware of any complaints about

18   reports that Shannon Sailors made after Mr. Mayton

19   left?

20     A.    No.

21     Q.    Were you made aware of any customer relation

22   issues with regard to Shannon Sailors after

23   Mr. Mayton left?

24     A.    No.

25     Q.    Were you made aware of any studio relation



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 183

1  issues with Shannon Sailors after Mr. Mayton left?

2     A.    Studio relations?

3     Q.    Issues.

4     A.    No.

5     Q.    Does it -- we talked earlier and said that we

6  weren't sure when Mayton was terminated.  If I tell

7  you that it was in June of 2013, does that refresh

8  your recollection?

9          MR. GERAKITIS:  Object to the form.

10          DEPONENT PASSMAN:  It does not refresh my

11     recollection.

12   BY MS. PREBULA:

13     Q.    Do you know if that is right?

14     A.    I don't know if it's right.  I think it was in

15  2013.  I just don't recall when.

16     Q.    So we're still in that summer, early fall time

17  period?

18     A.    I don't know.  I'm sorry.

19     Q.    Well, I think that's what you said earlier,

20  summer, early fall 2013.  Is that right?  Don't know?

21     A.    I'm not sure that was Terrell Mayton we were

22  taking about in summer, early fall.  I thought it was

23  Crystal's maternity.

24     Q.    No, that was 2014.

25     A.    Okay.



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 184

1    Q.    Okay.

2    A.    I would have no reason to dispute that.

3    Q.    Now, with regard to Crystal, you -- she was

4  not made a director; correct?

5    A.    I don't know.

6    Q.    You don't know if Crystal was ever made a

7  director of marketing?

8    A.    I do not know.

9    Q.    Okay.  You do know that Crystal was not made

10 the chief marketing officer, correct?

11   A.    I do.

12   Q.    Then the answer is no, she was not; correct?

13   A.    I do know she was not made the chief marketing

14 officer.

15   Q.    Okay.  And instead you hired a male from

16 outside the company to take over that role, correct?

17   A.    No, that's not correct.  There was no taking

18 over of a role.  That was a new role within the

19 company.

20   Q.    So you hired a male from outside the company

21 as chief marketing officer?

22   A.    We did.

23   Q.    And when Sadie Marshall was being considered

24 for VP of human resources, she did not get that

25 promotion either; did she?



1          MR. GERAKITIS:  Object to the form.

2          DEPONENT PASSMAN:  It is true that Sadie did

3      not become VP of human resources.  I don't know

4       that she applied for it and interviewed for it.

5    BY MS. PREBULA:

6     Q.   And a male was brought in from outside the

7    company to be vice president of human resources,

8    correct?

9     A.    That is correct.  That also was a new title.

10    Q.    The -- Terra Hardwick that we talked about

11    earlier was also passed over for promotion to vice

12    president in 2015; was she not?

13         MR. GERAKITIS:  Object to form.

14         DEPONENT PASSMAN:  No.

15    BY MS. PREBULA:

16    Q.    Didn't you bring a male in from outside the

17    company and make him chief technical officer, Jeff

18    Butkovsky?

19         MR. GERAKITIS:  Object to form.

20         DEPONENT PASSMAN:  Jeff came as part of the

21      DigiPlex acquisition.  He was chief technology

22       officer for that company.

23    BY MS. PREBULA:

24    Q.    And you brought him in over Terra Hardwick,

25    correct?



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 186

```
 1            MR. GERAKITIS:  Object to form.
 2            DEPONENT PASSMAN:  Yes.
 3     BY MS. PREBULA:
 4      Q.    And Terra Hardwick did not get that position
 5     as chief technical officer, correct?
 6      A.    Chief technology officer.  She did not get
 7     that position; nor did she apply for it.
 8      Q.    Of the 14 female district managers in 2015,
 9     there is only one female, correct?  Debra Triplet.
10      A.    I think you need to restate -- you said the 14
11     female directors --
12      Q.    Of the 14 -- if I misstated, I'll try again.
13     Of the 14 district managers in 2015, there was only
14     one female, Debra Triplet; correct?
15      A.    I think that's correct.
16      Q.    The -- and Wanda Sinkel (phonetic) was head of
17     restaurant services, correct?
18      A.    No.
19      Q.    She was not head over restaurant operations?
20      A.    She -- she was head over some of the
21     restaurant operations.
22      Q.    And then the company promoted a male, Scott
23     Dunaway, who had been her peer, over her to head
24     restaurant operations; correct?
25      A.    Yes.
```



1    Q.   The -- in November -- from -- from -- excuse

2    me.  I'll try again.

3         From October 2012 when Ms. Trawick moved into

4    the marketing department, the only female director in

5    the company was Terra Hardwick; correct?

6    A.   I don't know.

7    Q.   Has there ever been a female officer of the

8    company?

9    A.   I don't know.

10   Q.   Was there a female officer of the company in

11   2015?

12   A.   No.

13   Q.   2014?

14   A.   No.

15   Q.   2013?

16   A.   No.

17   Q.   2012?

18   A.   No.

19   Q.   At any time while you were president from 2009

20   until the company was sold, was there a female

21   officer of the company?

22   A.   No.

23   Q.   The -- is there any other woman of which you

24   are aware who was not promoted but had a male brought

25   in over her, in terms of a higher position other than



1    the ones we just discussed?

2            MR. GERAKITIS:  Object to the form.

3            DEPONENT PASSMAN:  I don't recall any.

4     BY MS. PREBULA:

5        Q.    Is there any woman who was employed at the

6     company who was ever given stock as compensation?

7        A.    I don't know.

8        Q.    Can you name one?

9        A.    I don't know.

10       Q.    Is there any woman at the company who was ever

11    given stock options?

12       A.    I don't know.

13       Q.    Are you aware of any?

14       A.    I just don't know.

15       Q.    Do you have the reports from the outside --

16    not you.  Did Carmike retain the reports from the

17    outside consultant that compared salaries at the

18    management level to other companies?

19       A.    Are you referring to the reports that I had

20    mentioned earlier?

21       Q.    Yes, sir.

22       A.    That was management.  That was the named

23    executive officers.

24       Q.    Okay.  Did Carmike retain those reports during

25    the time you were there?



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 189

1    A.   I would assume they are part of the minute

2    books of the board.

3    Q.   Did those -- was there ever a similar

4    consultant report with regard to the director

5    positions?

6    A.   Not that I'm aware of.

7    Q.   For example, director of HR, director of IT,

8    director of restaurants?

9    A.   Not that I'm aware of.

10   Q.   Okay.  Were the women in the department, the

11   various departments, the ones we've discussed today,

12   were they paid the same as their male counterparts?

13   A.   If they had the same duties, and the same

14   tenure, and the same performance, then I would assume

15   they were paid the same thing.

16   Q.   Do you have any documents that show that?

17   A.   No, nor do I have any complaints that show it

18   wasn't.

19   Q.   Do you -- I mean, obviously, at some point HR

20   had the reports of who made what money, right?

21   A.   Oh, yes.

22   Q.   Were those documents turned over to AMC?

23   A.   I don't know.

24   Q.   Were all Carmike documents turned over to AMC?

25   A.   I don't know.  I would assume so.



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 190

1    Q.   Did you destroy anything?

2    A.   I didn't, no.

3    Q.   Did you tell anybody to destroy anything?

4    A.   I did not.

5    Q.   To your knowledge, did anybody destroy

6    anything?

7    A.   To my knowledge, no one destroyed anything.

8    Q.   So when y'all left, the management team at

9    Carmike, you left the data in place?

10   A.   I left my data in place.  I can't speak for

11   everyone.

12   Q.   The -- is it your understanding that the data

13   that was left in place would include salary and

14   compensation history back to at least 2009?

15   A.   I do not know.

16   Q.   But you didn't instruct anybody to destroy it?

17   A.   No, I did not.

18   Q.   And, similarly, you didn't instruct anybody to

19   preserve it either?

20   A.   I did not.

21   Q.   Let me show you Plaintiff's 49.  This was

22   previously marked --

23        MR. GERAKITIS:  You're calling this

24   Plaintiff's 49?

25        MS. PREBULA:  I am.



Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 192 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                    DEPOSITION OF
DAVID PASSMAN on 10/11/2017                                    Page 191

 1        MR. GERAKITIS:  Have you produced the actual

 2   Excel spread sheet for this?  I'm going to ask

 3   you.

 4        MS. PREBULA:  I produced it at the last

 5   deposition, if not before.

 6        MR. GERAKITIS:  Have you produced the actual

 7   Excel spread sheet?  Not a copy.

 8        MS. PREBULA:  I don't have an electronic

 9   version.  I think we went through that in the last

10   deposition.

11        MR. GERAKITIS:  No, no.  I'm just asking you:

12   Have you produced a copy of an Excel spread sheet

13   of Plaintiff's Exhibit 49?  Yes or no.

14        MS. PREBULA:  I do not think we have an

15   electronic copy and so --

16        MR. GERAKITIS:  So you're answering a

17   different question.  Have you produced --

18        MS. PREBULA:  I'm not -- it's on the record.

19   I have answered the question.

20        MR. GERAKITIS:  No --

21        MS. PREBULA:  I'm moving on.  I have answered

22   the question.

23        MR. GERAKITIS:  I'm going -- I'm going to

24   object to Plaintiff's Exhibit 49, which is

25   obviously not an original spread sheet.  There is



Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 193 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                    DEPOSITION OF
DAVID PASSMAN on 10/11/2017                                           Page 192

1   no way to tell where it came from.  It has folded

2   pages.  It has lines that don't match up.  It has

3   information that I can tell you is plainly

4   incomplete if you run the numbers either

5   vertically or horizontally.

6       So I'm telling you, you haven't produced it

7   and I find it -- well, I find it to be highly,

8   highly inappropriate to go over this with a

9   witness who, unless he created it -- and if you

10  want to ask him if he created it, we may resolve

11  everything.

12      So maybe you need to ask him whether he

13  created it, but I know you haven't produced it.

14      MS. PREBULA:  Are you finished?

15      MR. GERAKITIS:  You haven't produced it,

16  right?

17      MS. PREBULA:  Are you finished?

18      MR. GERAKITIS:  It's on the record you haven't

19  produced it.

20      MS. PREBULA:  You are wrong.  We -- and if you

21  allowed me to ask my question, you would have

22  heard it.  We produced this at --

23      MR. GERAKITIS:  You --

24      MS. PREBULA:  Let me finish, Richard.  We

25  produced this at Shannon Sailors' deposition.



```
 1            MR. GERAKITIS:  As a copy.

 2            MS. PREBULA:  And as -- as a copy.  And I have

 3       said in both --

 4            MR. GERAKITIS:  And there --

 5            MS. PREBULA:  Will you let me finish.

 6       I have said in depositions I do not believe we

 7       have an electronic copy of it.  So let me finish

 8       my question, what I was saying to you and perhaps

 9       this will clear up his problem.

10            MR. GERAKITIS:  During the break, I will bring

11       up Mr. Shannon Sailors' deposition so you can hear

12       exactly what you said.

13     BY MS. PREBULA:

14     Q.   Plaintiff's 49 is a copy of Plaintiff's 42,

15     which was produced at Mr. Sailors' deposition.  And

16     what I was going to show you is that at the last

17     deposition, Mr. Gerakitis had issues with it because

18     part of it were on different pages because we

19     produced a hard copy.

20            So what we have done so that it's easier is we

21     have, in fact, cut and pasted Plaintiff's 42 onto

22     Plaintiff's 49.

23            So having said that, both are available for

24     your review.

25            MR. GERAKITIS:  Object to the form.  This is
```



```
 1        not an original Excel spread sheet.  Either 42 or
 2        49.
 3              MS. PREBULA:  It's paper.  It's clearly paper.
 4              MR. GERAKITIS:  It's not even a spread sheet.
 5     BY MS. PREBULA:
 6     Q.    Mr. Passman, in November of 2015 -- and I know
 7     that some of these are post-Ms. Trawick leaving.  So
 8     those are the questions I'm going to ask you.
 9              In November of 2015, was Fred Van Noy COO?
10     A.    Yes, he was.
11     Q.    And Richard Hare was CFO?
12     A.    Yes, he was.
13     Q.    And Dan Ellis was general counsel, spelled
14     wrong?
15     A.    Yes, he was.
16     Q.    And Bud Mayo was the president of the
17     alternative programming that you discussed?
18     A.    Yes, he was.
19     Q.    Did -- and you were president and CEO?
20     A.    Yes, I was.
21     Q.    Okay.  The numbers next to Mr. Van Noy show
22     male 22, female two.  Is that the number of people
23     that reported to Mr. Van Noy in November of 2015?
24     A.    I do not know.
25     Q.    So if I ask you with regard to each of these
```



1 other report numbers, would your answer be the same

2 that you do not know how many people reported to each

3 individual?

4    A.    It would.

5    Q.    All right. In November of 2015, were Rob

6 Lehman, John Lundin and Rob Collins the VPs and CMOs

7 listed?

8        MR. GERAKITIS:   In when?

9        DEPONENT PASSMAN:   Can we go back over that

10    again?

11  BY MS. PREBULA:

12    Q.    I said November 2015.

13    A.    Can we go over the names slowly so I can --

14    Q.    Sure.   I'll do you one of each.

15    A.    Thank you.

16    Q.    Okay.

17    A.    Thank you.

18    Q.    In November 2015, Rob Lehman was a vice

19 president, right?

20    A.    I don't know his title.

21    Q.    Okay.   But he was there in November of 2015?

22    A.    He was.

23    Q.    In November 2015, was John Lundin a vice

24 president?

25    A.    I don't know if he was a vice president, but



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1    he was there.

2        Q.    Do you know what Rob Lehman, what

3    responsibilities he had or what department he was

4    over?

5        A.    Rob Lehman?

6        Q.    Correct.

7        A.    Yes.

8        Q.    What?

9        A.    We called it concessions or food and beverage

10   eventually.

11       Q.    And how about John Lundin?

12       A.    John Lundin was film buyer.  He was the head

13   film buyer.  He oversaw the film department.

14       Q.    And in November 2015, Rob Collins was not

15   there, was he?

16       A.    No, he wasn't.

17       Q.    He was hired in later as chief marketing

18   officer?

19       A.    That's correct.

20       Q.    In November of 2015, was Jeff Cole there?

21       A.    Yes, he was.

22       Q.    And he's listed as a vice president.

23       A.    I don't know his title.  I'm sorry.

24       Q.    What was he over?

25       A.    He was the controller of the company.



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 197

1    Q.   And Jeff Butkovsky is listed as chief

2    technical officer?

3    A.   That's correct.

4    Q.   Now, I've said chief technical officer and

5    occasionally you've said chief technology officer.

6    Which is correct?

7    A.   Technology.

8    Q.   Okay.  And then Patrick Railey is listed as a

9    vice president.  He was not there in November 2015,

10   was he?

11   A.   No, he wasn't.

12   Q.   Okay.  When was he hired in?

13   A.   I believe it was in January of '16.

14   Q.   And he was hired in as vice president of human

15   resources over Sadie Marshall?

16        MR. GERAKITIS:  Object to the form.

17        DEPONENT PASSMAN:  Yes, I believe that was his

18     title.

19   BY MS. PREBULA:

20   Q.   And Sadie then reported to him, correct?

21   A.   That is correct.

22   Q.   Prior to his hiring, did Sadie Marshall report

23   to anybody other than you?

24        MR. GERAKITIS:  Object to form.

25        DEPONENT PASSMAN:  Yes.



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 198

1    BY MS. PREBULA:

2    Q.    Who?

3    A.    Dan Ellis.

4    Q.    Okay.  Dan Ellis was not a vice president,

5    correct?

6    A.    I don't think so.  I think he was a senior

7    vice president.

8    Q.    Okay.  In November 2015, was Chuck Goldwater a

9    vice president?

10   A.    I'm not sure Chuck was with us in November of

11   2015.  I don't remember when he left.

12   Q.    Okay.  So he -- he was not a later hire.  He

13   had been there and left?

14   A.    He was part of the DigiPlex acquisition.

15   Q.    When was that?

16   A.    I believe we completed it, I want to say mid

17   to late -- give me a moment.  I've got a calculator.

18   Q.    Sure.

19   A.    I think it was in the fall of 2014.

20   Q.    That he left?

21   A.    No, that we did the acquisition.

22   Q.    Okay.  So he came in in fall of 2014 and then

23   left before November of 2015?

24   A.    I believe so.

25   Q.    And what was he in charge of?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 199

1    A.   He was -- he was in charge of the special

2   projects for Fred Van Noy.

3    Q.   So he reported to Fred?

4    A.   He did.

5    Q.   Do you know what kind of special projects?

6    A.   Yes.

7    Q.   What?

8    A.   He did research and analysis on theater

9   conversions from traditional small chairs to luxury

10  seating.  He did analysis and research on whether to

11  convert to dine-in, among other things.

12   Q.   How about John Halecky, was he a vice

13  president in November 2015?

14   A.   I don't know his title, but he was there in

15  November of 2015.

16   Q.   What was his department?

17   A.   He was a marketing communications guy for

18  alternative programming primarily, but it included

19  some Carmike marketing as well.

20   Q.   I think I know what you mean.  But what do you

21  mean when you say alternative programming?

22   A.   Alternative programming was -- it included

23  things that were nontraditional first run movie

24  business.  It might be plays, opera, sporting,

25  gaming.  Any number of nontraditional venues where



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations

Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 200

```
 1   patrons would come to the movie theater and sit in
 2   movie theater seats but do something other than watch
 3   a first run movie.
 4       Q.   Okay.  What about Doreen Sayegh?  Is that how
 5   you say it, Sayegh?
 6       A.   If you say so.
 7       Q.   Okay.  Was she a vice president in November of
 8   2015?
 9       A.   I don't know her title, but she worked for Bud
10    Mayo.  I believe these were all vice presidents, but
11   I'm not certain.
12       Q.   Do you think -- and Bud Mayo was the president
13   of alternative programming?
14       A.   That is correct.
15       Q.   And what was her area, what was her
16   department?
17       A.   She was also in marketing.
18       Q.   For alternative?
19       A.   Well, we ran a fairly flat organization,
20   fairly lean on personnel.  The people in marketing,
21   whether it be alternative programming or a new
22   theater opening or just traditional operations, it
23   was whatever hands on desk were needed would
24   contribute.  But she was primarily AP.  And Joe
25   Solomon, same thing.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 201

1   Q.   And you don't know -- what was her title?  You

2   don't know?  Same thing.

3   A.   I think these are accurate at vice president,

4   but I don't know.

5   Q.   And they're VP of the alternative programming

6   division, not the whole company.

7   A.   That's correct.

8   Q.   Okay.  And Gary Green?

9   A.   Gary was a -- a technical resource.  He was

10  there.  He actually was an old -- whatever you call

11  it -- old line Carmike person who transferred into

12  alternative programming.  He headed up alternative

13  programming for Carmike at the time that we acquired

14  DigiPlex.  So he just moved into their group.  He was

15  in charge of it.

16  Q.   And he was still there in November of 2015?

17  A.   Yes.

18  Q.   So the -- if we drew a line like to the left

19  of Bud Mayo, the Bud Mayo column, that's a subset of

20  everything to the right is alternative programming

21  and is a subset of the main Carmike company?  In

22  other words, those five individuals:  Bud Mayo -- I

23  guess it's six -- Goldwater, Halecky, Sayegh, Solomon

24  and Green were not officers of Carmike but officers

25  of alternative programming.



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 202

1    A.    They were not officers of Carmike, but Bud

2    Mayo was.

3    Q.    Okay.  I'm with you.  All right.  And then if

4    we go back to the left column under COO, Fred Van

5    Noy, there are three directors listed:  Shannon,

6    David Pflegal, Brad Dobson.  Were each of those

7    directors in November of 2015?

8    A.    I don't know what their titles were, but they

9    were each at Carmike.

10   Q.    And Sailors --

11   A.    I say they each were.  Brian Dobson, I think

12   joined us in 2015.  I just don't know what month.

13   Whether he was there in November or not, I can't -- I

14   can't say.

15   Q.    And Shannon Sailors was in advertising.

16   A.    That's correct.

17   Q.    What was David Pflegal?

18   A.    I believe the department was labeled

19   technical.  They did everything from put up the movie

20   screens, to the curtains in the theaters, to

21   replacing seats, speaker systems, projectors.

22   Anything technical within a theater.

23   Q.    And were both -- but Sailors was there in

24   November 2015, right?

25   A.    Yes.



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 203

1     Q.   And was Pflegal still there in November 2015?

2     A.   Yes.

3     Q.   So if you think Dobson came in in 2015, do you

4  think he was there by the end of the year?

5     A.   I think so.

6     Q.   But we don't know for sure.

7     A.   I don't know for sure.

8     Q.   All right.  And let's just go down the rest of

9  that column.  Under -- still under COO is two

10  division managers are listed:  John Greer and Jim

11  Lucas.  Were they the only two division managers?

12     A.   At that point, yes.

13     Q.   Okay.  And they were both there in November of

14  2015?

15     A.   Yes.

16     Q.   Okay.  What is the difference in -- or what

17  was the difference in Carmike in November of 2015

18  between a division manager and a district manager?

19     A.   The two division managers oversaw the roll-

20  out, if you will, of half of all the theaters each.

21     Q.   Okay.

22     A.   So the district managers would report to the

23  division managers.  And I don't know that it was

24  split seven and seven.

25     Q.   Okay.  And Crystal Trawick is listed under



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations

Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 204

1  there and she did report to Fred Van Noy in November

2  of 2015, right?

3     A.   That is correct.

4     Q.   And I think we've already said she was the

5  manager of marketing projects manager.

6          MR. GERAKITIS:  Is that a question?

7          MS. PREBULA:  No, I'm just -- I think we've

8      already said that.

9   BY MS. PREBULA:

10    Q.   Right?  At that point, she was marketing

11 projects manager?

12    A.   You'll have to pull the title up.  I don't

13 remember what the title was.

14    Q.   It's Plaintiff's 44 is what I was looking at.

15    A.   This says marketing projects manager.

16    Q.   Okay.

17    A.   I assume this is correct.  I just don't know.

18    Q.   Also under the COO Fred Van Noy's column is

19 John Kellin --

20    A.   Yes.

21    Q.   -- as a supervisor.  What did he do?

22    A.   John -- his primary responsibility was

23 supervising the Carmike seat shop.  We would take old

24 seats, take them to that shop.  They'd sandblast

25 them, get the rust off of them.  Build new seat



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 205

1  cushions and then send them out to theaters as

2  needed.  There were other things he was responsible

3  for as well, but the lion share of it was seats.

4      Q.  So what was he supervisor of?

5      A.  All the people who made the seats plus all the

6  people who repaired the popcorn machines and those

7  kinds of things.

8      Q.  Kind of mechanical?  Was he mechanical --

9      A.  I wouldn't call it mechanical.

10     Q.  Okay.

11     A.  I would -- you know, the seat construction was

12 more reconditioning things.  There weren't automated

13 parts or that kind of thing.  The popcorn machines --

14 if the popper was broken, he would order a new popper

15 and install it in the machine, make sure it worked

16 and then send it out.  But he had a pretty good size

17 crew.  Several thousand square feet of space in which

18 they did all of that.

19     Q.  And he reported to Fred Van Noy?

20     A.  I don't think so.

21     Q.  Okay.  Who do you think he reported to?

22     A.  I think he reported to David Pflegal.

23     Q.  Who then reported to Fred Van Noy?

24     A.  That's correct.

25     Q.  And was Mr. Kellin there in November of 2015?



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 206

1    A.    Yes, he was.

2    Q.    And where we show the district managers under

3  Fred Van Noy, did the district managers -- I think I

4  understood you to say they would report to division

5  managers and then the division managers report to

6  Fred Van Noy?

7    A.    That's correct.

8    Q.    Okay.  All right.  And then under the CFO,

9  Richard Hare --

10    A.    Yes.

11    Q.    -- we have one, two, three, four, five, six,

12  seven, eight directors.  Do you see that?

13    A.    I do see it.

14    Q.    I'm not going to go through all those names

15  unless we need to.  Were all of those directors at --

16    A.    I don't know if they were directors or not.

17    Q.    Okay.

18    A.    But they were not all direct reports to

19  Richard.

20    Q.    Oh, okay.  So then let's do that.  Are you

21  aware of any corporate organization chart that would

22  show how the lines of reporting were?

23    A.    Yes.

24    Q.    What did it -- what was it called?

25    A.    I think it was called an organizational chart.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 207

1    Q.    And who had it?

2    A.    I don't know who maintained it.  I would guess

3    the corporate secretary would have it.

4    Q.    Did your corporate secretary, who is also your

5    general counsel, act as a traditional secretary

6    keeper of records?

7    A.    His department did.

8    Q.    Okay.  And who was -- well, who was his main

9    report, who would be in charge of records retention?

10   A.    He had a -- I'm going to call it a paralegal

11   or legal assistant.  I'm not sure what the technical

12   terms are.

13   Q.    What was his or her name?

14   A.    Her name was Rebecca.  And I'd have to look at

15   the phone chart to give you her last name.

16   Q.    Okay.

17   A.    But in November of 2015, I think she was in

18   place.

19   Q.    It's the last page.

20   A.    I think she was in place.  This is January of

21   '15.

22   Q.    Yeah.

23   A.    Let's see if she was there then.  Yeah,

24   Rebecca Jones.

25   Q.    Do you know where she is now?



1     A.    I do not.

2     Q.    Okay.  So back looking under Richard Hare,

3  what was -- was Fred Friedel there in November of

4  2015?

5     A.    Yes, he was.

6     Q.    And what was his role?

7     A.    He was our compliance officer.

8     Q.    Was he an officer of the company or was that

9  just his title?

10     A.    I don't believe he was an officer of the

11  company.  I think that was just his title, but I'm

12  not a hundred percent certain.

13     Q.    Do you know if he was director level?

14     A.    I don't.  I will tell you I don't know any of

15  these, whether they were directors or what their

16  titles were.

17     Q.    Okay.  So what was -- what was Greg Wiggins'

18  role?

19     A.    Greg Wiggins was responsible for external

20  reporting.

21     Q.    And what does that mean?

22     A.    Filings with the Securities and Exchange

23  Commission, stockholder reports.

24     Q.    Anything --

25     A.    Yeah, yeah.  There was -- I'm just going to



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 209

1    get to that.
2        Q.    Anything legal?
3        A.    Legal?
4        Q.    Yeah, I mean it was like the legal reporting
5    requirements, SEC, stockholder?
6        A.    He was responsible for that, but he was also
7    responsible for producing the financial statements
8    that we -- that we relied on to manage the company.
9    But he also was the lead on -- he and Jeff Cole
10   shared budgeting process for the company.
11       Q.    Who did he report to?
12       A.    He reported to Richard Hare.
13       Q.    Okay.  And was he there in November of 2015?
14       A.    Yes.
15       Q.    Terra Hardwick was in IT?
16       A.    That's correct.
17       Q.    You don't know her title?
18       A.    That's right.
19       Q.    Was she there in November of 2015?
20       A.    Yes, she was.
21       Q.    Who did she report to?
22       A.    Richard.
23       Q.    Hare?
24       A.    Hare.
25       Q.    Arlie Verville, is that man or a woman?



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 210

1     A.    It's a female.

2     Q.    And was she there in November of 2015?

3     A.    Yes, she was.

4     Q.    What was her function?

5     A.    Her primary function -- and I think she had

6  several that handled reporting to Fred on theater

7  operations.  But she was in the -- I'm going to call

8  it the data management system or information

9  management systems area.

10     Q.    When you say she reported to Fred, which Fred?

11     A.    I'm sorry.  I didn't mean to say she reported

12  to Fred.  I said she provided reports to Fred that he

13  used in turn to manage the theater operations.  She

14  reported to Richard.

15     Q.    So she provided reports to Fred Friedel?

16     A.    No, Fred Van Noy.

17     Q.    All right.  And she reported to Richard Hare?

18     A.    Yes.

19     Q.    All right.  Thomas Wilkerson?

20     A.    I don't think he was there in November of

21  2015.  But if he was, he reported to Dan Ellis.  And

22  he was in charge of real estate development.

23     Q.    Does that include theater locations?

24     A.    It does.

25     Q.    And I don't --



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 211

1    A.    Primarily new theater locations.

2    Q.    And I don't recall if I asked you was

3  Ms. Verville there in November of 2015?

4    A.    Yes, she was.

5    Q.    Thomas Zehr?  What was his role?

6    A.    Jim Zehr?

7    Q.    Jim Zehr.  You're correct.

8    A.    Jim Zehr was also in real estate development.

9  And I assume you want to know what that means?

10    Q.    Unless it's the same as Wilkinson.

11    A.    It's not the same.

12    Q.    All right.

13    A.    His primary responsibility -- again, if you go

14  back to my comment about being fairly lean, they

15  traded off and helped each other a lot.  But his

16  primary responsibility was legacy properties.  So it

17  might be a lease renewal or refurbishment of an old

18  theater.

19    Q.    Okay.  Was he there in November of 2015?

20    A.    Yes, he was.

21    Q.    And Gus McMurray?

22    A.    Gus McMurray was our tax director.  I don't

23  know if director was his title, but...

24    Q.    Who did he report to?

25    A.    He reported to Richard Hare.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 212

1    Q.    Was he there in November of 2015?

2    A.    He was.

3    Q.    And the last person in that category is Patti

4    Gaddis.  Was she there in November of 2015?

5    A.    She was.

6    Q.    What was her role?

7    A.    I'm going to call it risk management.

8    Insurance with property and liability insurance kind

9    of issues.

10   Q.    Did she handle officers and directors as well?

11   A.    Handle it?

12   Q.    You said she was responsible for property and

13   liability insurance.  Did that include responsible

14   for --

15   A.    Paying the bills, yes.

16   Q.    Okay.

17   A.    But she did not assess officers and director's

18   liability.  Dan Ellis did that.  And I don't recall

19   if she reported to Richard Hare or Dan Ellis.

20   Q.    Are all the people in this list under

21   directors, even though you don't know if they're a

22   director under Richard Hare, were they all at the

23   same level of the company or different levels?

24         MR. GERAKITIS:  Object to the form.

25         DEPONENT PASSMAN:  I can't answer that.  We



1      did not think of it that way.

2     BY MS. PREBULA:

3      Q.   Well, on the organizational chart that you had

4     the privilege of seeing --

5      A.   Uh-huh.  (indicating in the affirmative).

6      Q.   -- were they on the same level?

7      A.   I don't recall.

8      Q.   And then under here, we have listed Dawn

9     Smith.  And I think we discovered last time that she

10    had a different name as well.

11     A.   Maybe Dawn Saint?

12     Q.   Yeah.  Because she got married or divorced or

13    something.

14          MR. GERAKITIS:  Object to the form.  You may

15       have said that in the deposition.  That's not an

16       accurate statement if you're asking him to adopt

17       it.

18          MS. PREBULA:  I'm not asking him.

19          MR. GERAKITIS:  That she has a different name

20       because of a divorce or something.

21     BY MS. PREBULA:

22     Q.   Are Dawn Smith and Dawn Saint the same person?

23     A.   I don't know.

24     Q.   Did her name change while she was at Carmike?

25     A.   I don't know.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      Q.    Do you know who Dawn Smith is?

2      A.    I know who Dawn is, the payroll manager.

3      Q.    Okay.

4      A.    And I thought her name was Dawn Saint.

5      Q.    And I think the payroll manager is listed on

6  Plaintiff's Exhibit 43.  It's listed as Dawn Smith as

7  well on Plaintiff's 43.  Is that the same Dawn you're

8  referring to?  She's listed under payroll as manager.

9      A.    Yes, that's the same person I'm referring to.

10     Q.    Okay.  Did her name change to Saint at some

11  point?

12     A.    I do not know.

13     Q.    Did you know her as Dawn Saint?

14     A.    I did.  I always thought of her as Dawn Saint,

15  but I don't know if that was accurate.

16     Q.    A/k/a Dawn Saint.  What was her name in

17  November of 2015?

18     A.    Dawn.

19     Q.    You don't know the last name?

20     A.    No, no.  And her extension was 2826.

21     Q.    So there is only one Dawn and she was the

22  payroll manager as far as you know?

23     A.    There's only one Dawn in payroll that I'm

24  aware of.

25     Q.    All right.  And did she report to Richard


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    Hare?

2      A.    Yes.

3      Q.    Okay.

4      A.    I take that back.  I'm not sure that's

5    accurate.  I think she may have reported to the

6    controller.  I'm not sure.

7      Q.    In November of 2015, who would that be?

8      A.    That would be Jeff Cole.

9      Q.    And then Jeff Cole would report to Richard

10   Hare?

11     A.    That's correct.

12     Q.    Okay.  Did you ever see any documents with the

13   name Dawn Saint on it?

14     A.    I honestly don't recall.

15     Q.    Okay.  Do you know if she was a manager --

16   manager level?

17     A.    I'm sorry.  I don't know.  She was definitely

18   in management because she supervised several people

19   in the payroll department.

20     Q.    How many people did she supervise?

21     A.    Several.  I don't know.

22     Q.    What does several mean to you?  That means

23   different things to different people.

24     A.    Sure.  More than three or four.

25     Q.    Okay.  All right.  And then under the same



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 216

1   column under CFO, we have three supervisors listed.

2   Was supervisor a title of the company or is this just

3   a descriptor?

4       A.   Respectfully, I paid very little attention to

5   titles within the company.  So I can't answer that

6   question.

7       Q.   All right.

8       A.   I just don't know.

9       Q.   Do you know who Melissa Costello was?

10      A.   I don't recall.

11      Q.   Okay.  You just don't recall her at all?

12      A.   I recall the name.  I just don't recall what

13  she did for Carmike.  And the same would be true of

14  Amanda Hodge.  Jamie Brooks, I don't recall that name

15  either.

16      Q.   Are all three of them women?

17      A.   Yes.  I'm assuming Jamie is.

18      Q.   You don't know?

19      A.   I don't recall Jamie Brooks.  Amanda and

20  Melissa, I have seen.  Yes, they are women.

21      Q.   And you don't know what their functions was?

22      A.   I don't recall.

23      Q.   Okay.  And then under general counsel, we have

24  already talked about Sadie Marshall.  Who is Hugh

25  Shedrick?



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 217

1    A.   Hugh was responsible for our building

2  maintenance, mail room, and going to and from the

3  post office in addition to any other duties that

4  people would assign him.

5    Q.   And did he report to Dan Ellis?

6    A.   Yes.

7    Q.   Do you know why he reported to legal counsel?

8    A.   We were a fairly thin or lean organization and

9  we divided things up that were either based on time

10  consuming or based on a particular skill set.  And

11  Dan ended up with Hugh.

12    Q.   Okay.  And you haven't seen Plaintiff's 42 or

13  49 before today, correct?

14    A.   No.  In fact, I'm trying to figure out where

15  this even came from because I don't know that there

16  are names that should be on here.

17    Q.   And that was actually going to be my next

18  question which is in November of 2015, are you aware

19  of anyone who is missing on this organization chart

20  from the supervisor level up?

21    A.   That's going to take a while for me be able to

22  answer.

23         MR. GERAKITIS:  Mary, are you representing

24     that there are 73 women listed on Plaintiff's

25     Exhibit 49?



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 218

1        MS. PREBULA:  I'm not representing anything.

2    I'm asking questions.

3        MR. GERAKITIS:  Well, the witness asked if you

4    wanted him to go through and look at it.  I am

5    happy to point out that at page 315, lines seven

6    through eight and 12 through 13 of Mr. Sailors'

7    deposition back on September 11th, you represented

8    expressly:  This is an Excel spread sheet that we

9    produced, referring to Plaintiff's Exhibit 42,

10   which is what you have tried to use as Plaintiff's

11   Exhibit 49 today.

12       I said:  You have not produced Plaintiff's

13   Exhibit 42.  You said:  I'm saying we produced it.

14   You're saying we haven't.  Move on.

15       You have not produced an Excel spread sheet of

16   Shannon Sailors' Exhibit 42 or of Plaintiff's

17   Exhibit 49 that you have been going over with this

18   witness.

19       And my question to you is if you want him to

20   review it for accuracy, we'd like to know does it,

21   Plaintiff's Exhibit 49, have 73 women listed on

22   it?

23  BY MS. PREBULA:

24  Q.   Mr. Passman, as you sit here today, do you

25  know if there's anyone missing as of November 2015



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 219

1   from this list?  I realize you may not.  It may not

2   be a complete response because you're doing it in a

3   quick situation.

4          MR. GERAKITIS:  He can take all the time he

5      needs to look at it to find all 73.

6          DEPONENT PASSMAN:  Part of the problem I've

7      got with it by saying I don't know how this thing

8      was created is that we had senior people in the

9      organization -- not officers of the company, but

10      senior people in the organization that are not on

11      here that are six figure income people.

12   BY MS. PREBULA:

13   Q.    Okay.  Who do you know that is not on there?

14   A.    Well, in John Lundin's group, there is Bob

15   Scarborough.  He was a film buyer.  And Jawan Taylor.

16   Bob's a male.  Jawan is a female.

17   Q.    Can you spell that one because that's not on

18   anywhere.  J-e-w-a-n?

19   A.    J-a-w-a-n.

20          MR. GERAKITIS:  When you say it's not on

21      anywhere, you mean on Plaintiff's Exhibit 49?

22          MS. PREBULA:  I'm just asking about the

23      spelling.  I don't see that spelling anywhere.

24      It's J-a-w-a-n?

25          DEPONENT PASSMAN:  I believe it is J-a-w-a-n.



```
 1              MR. GERAKITIS:  J-u-w-a-n.

 2              MS. PREBULA:  Can I ask that the witness

 3        testify instead of you, Mr. Gerakitis?

 4              MR. GERAKITIS:  I'm just trying to help with

 5        the spelling for you.

 6              DEPONENT PASSMAN:  J-a-w-a-n on here.

 7     BY MS. PREBULA:

 8        Q.   And how is the last name spelled?

 9        A.   Taylor.  T-a-y-l-o-r.

10        Q.   Okay.  And that's a female?

11        A.   Yes.

12        Q.   Bob Scarborough is missing?

13        A.   Right.  I don't know, again, organizationally

14     these people under them.

15        Q.   Okay.

16        A.   Whether they were supervisors or staff in the

17     film department.

18        Q.   So you're looking back at Plaintiff's Exhibit

19     43.

20        A.   I am.

21        Q.   And you can't -- can you tell me if, as you

22     look at 43, if any of those people would have been --

23     clearly wouldn't have been on the executive

24     committee, right?  We've got the whole executive

25     committee here.
```



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 221

1    A.    Well, there's another issue.

2    Q.    Okay.

3    A.    There is no executive committee within

4  management.

5    Q.    Okay.

6    A.    We called it the executive team.  The

7  executive committee was a board role.

8    Q.    As in board of directors?

9    A.    As in board of directors.

10    Q.    Okay.  When I said the executive committee, I

11  really was not looking at that number because that

12  seems to be undefined to me.  I was looking at -- if

13  we look at what you had said earlier, that your

14  executive team was the COO, CFO, general counsel.

15  And then Bud Mayo was added, the president of AP.

16  And then eventually you added the CMO, Rob Collins.

17    A.    That's correct.

18    Q.    That's what you defined as the executive

19  group.

20    A.    The executive team.

21    Q.    All right.  You called it the executive team.

22  Okay.

23    A.    That's right.

24    Q.    All right.  And is that the complete list of

25  the executive team?



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 222

1    A.   Yes, it is.

2    Q.   Okay.  I mean, it's pretty clear if you look

3  at this piece of paper.  There's not 73 names listed

4  or 56 names listed.  That's pretty clear.  I'm not

5  representing anything to you about numbers.  I'm

6  simply using this to go over an organizational chart

7  because we have not been provided one.

8         So is there anyone else that was on the

9  executive team that we have not talked about?

10    A.   No.

11    Q.   Is there any other vice president -- I realize

12  you said some of these were not vice presidents --

13  any other vice president in November of 2015 that's

14  not listed?

15    A.   I don't know.

16    Q.   Okay.  If you look --

17    A.   You've asked me about omissions on whatever

18  this document is.

19    Q.   Right.  Plaintiff's 49.

20    A.   While I'm still looking at it, I believe that

21  the legal -- paralegal was a -- would be at a pay

22  level that would be commensurate with some of these

23  managers and certainly above supervisor level.

24    Q.   Rebecca Jones?

25    A.   Yes.  And Linda Day before her.



1    Q.    And she was the legal assistant before Rebecca

2    Jones?

3    A.    Yes.  Again, I'm not sure whether her title

4    was legal assistant.

5    Q.    Or paralegal.

6    A.    Yes, whatever it was.  Yes.

7    Q.    Was she there, Linda Day, between 2012 and

8    2015?

9    A.    Yes, for a substantial portion of that time.

10   Yes.

11   Q.    And you would consider both of those at

12   manager level?

13   A.    I would consider both of those to be above

14   several of these people on this list.

15   Q.    Okay.  Did you happen to keep a copy of the

16   organizational chart?

17   A.    No, I kept no Carmike records whatsoever.

18   Q.    So you're looking to see if you see anybody

19   else missing?

20   A.    Yes.

21   Q.    Okay.

22   A.    In the controller's office, I believe Leah

23   Reynolds.

24   Q.    Was what?

25   A.    She was either at or very, very close to six



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 224

1    figure income level.  She was above, again, several

2    other people on this list.  Melissa Costello, Jamie

3    Brooks, Amanda Hodge, John Kellin, Hugh Shedrick.

4        Q.   So you would put her at manager level; is that

5    what you're saying?

6        A.   Yes, yes.  Kathy Schoonover.  And I don't

7    recall if Kathy was with us in November of 2015.  But

8    her position as accounting manager would clearly

9    belong somewhere on this list.

10       Q.   At the manager level?

11       A.   Again, I don't know what her title was.  But

12   she was accounting manager so I would assume it would

13   be a manager or director.  I just don't know.

14       Q.   And she would have reported to CFO?

15       A.   No, she would have reported to the controller.

16       Q.   Who was?

17       A.   Leah Reynolds would have -- I believe at that

18   time, reported also to the controller.

19       Q.   And who was the controller in November of

20   2015?

21       A.   Jeff Cole.

22       Q.   Just making sure we're on the same page.

23       A.   Sure.

24       Q.   Megan Copner.  This, as of January 2015, shows

25   her working for Fred Van Noy in the COO's office.



1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      A.   I'm not sure at that point in time whether

2   that's where she was or whether she was in the

3   accounting department.

4      Q.   Was she there in November of 2015?

5      A.   I believe she was.

6      Q.   When you --

7      A.   Megan -- Megan left us and then came back to

8   us.  And I don't remember the separation dates.

9      Q.   When you say she was in Van Noy's office, what

10  did she do when she was in Van Noy's office?

11     A.   She was his -- I'm going to use a term that

12  Carmike is not even familiar with.  But to me, she

13  was a business analyst.

14     Q.   Do you know her title was or her job function?

15     A.   It was to do anything that Fred needed in

16  terms of analysis.  Fred had upwards of almost 300

17  movie theaters that he tried to keep a pulse on.  And

18  he would have her do projects, analyzing, comparing,

19  new contracts with vendors, any number of things.

20  But typical analyst type work.

21          We had fixed assets.  I want to say manager.

22  Again, I'm not trying to use a title but she was

23  responsible for all fixed assets of the company and I

24  believe she would be above other folks on this list

25  as well.



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 226

1    Q.   What other folks?  Are you putting her as a

2    manager --

3    A.   She would be above the supervisors.

4    Q.   Above the supervisors.

5    A.   She would either be a manager or a director

6    kind of person.

7    Q.   What was her name?

8    A.   Gabi.

9    Q.   G-a-b-b-y?

10   A.   No.  G-a-b-i.

11   Q.   Okay.

12   A.   Murray.  M-u-r-r-a-y.

13   Q.   And was she there in November of 2015?

14   A.   Yes.  And she would have reported to Jeff

15   Cole, the controller.

16   Q.   Would you agree that Crystal Trawick was, as a

17   manager, a marketing projects manager, that she's in

18   the right category on this chart?

19       MR. GERAKITIS:  Object to the form.

20    BY MS. PREBULA:

21   Q.   Would you move her up or down?

22   A.   Well, I wouldn't agree that several of these

23   people are in right category on this chart.

24   Q.   Okay.  You've told me --

25   A.   I would not at all say that a division manager



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1   is the same as a district manager or a manager.
 2       Q.   They would be above --
 3       A.   Way above.
 4       Q.   We've already talked about that, that the
 5   district managers were --
 6       A.   Reporting to --
 7       Q.   -- reporting to division managers.
 8       A.   Right.  And the division managers didn't have
 9   a corporate title.
10       Q.   Okay.
11       A.   If they did, it would be at the vice president
12   kind of level.
13       Q.   And would you agree that Crystal Tra -- is it
14   your position that Crystal Trawick was at the manager
15   level as marketing projects manager?
16       A.   I don't know.  What I do know is what you've
17   presented to me as her title and what I understood
18   her job to be, which was managing projects.
19       Q.   So would you consider her to be a manager
20   level employee?
21       A.   Yes.
22       Q.   Okay.
23       A.   Yes.
24       Q.   And she had people that reported to her?
25       A.   Yes, I believe she did.
```



```
 1      Q.    Okay.

 2      A.    No, I know she did.  Yes, I know she did.

 3  Yes.

 4      Q.    Are you still looking to see if there are

 5  others?  I don't want to interrupt that if you are.

 6      A.    Yes, I am.

 7      Q.    I know it will be incomplete because you're

 8  doing it under the gun.

 9      A.    Right.  David Glass.  He was like Bob

10  Scarborough and Jawan Taylor, but he was not as

11  tenured nor carried as many responsibilities for

12  numbers of theaters that he booked films for.  But he

13  was a film booker.

14      Q.    As opposed to --

15      A.    That's my term.  Not a title.

16      Q.    As opposed to a film buyer?

17      A.    He was a film buyer, yeah.  Thank you for the

18  correction.

19      Q.    All right.  And was he there in November of

20  2015?

21      A.    Yes.

22      Q.    So you'd put him at the same level as

23  Scarborough and Taylor?

24      A.    Yes.  Linda Stroud -- and that's S-t-r-o-u-d

25  -- shows up on this telephone directory as a
```



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 229

1    supervisor for film rent.  She -- I believe her job

2    in November of 2015 was to reconcile and pay studios

3    whatever film rent we owed them.

4        Q.   And what level would you put her at?

5        A.   I believe she would be a supervisor kind of

6    level.

7        Q.   Okay.

8        A.   Sam McQuagg.  He was our chief pilot.

9        Q.   As in airplane?

10       A.   As in airplane.

11       Q.   Okay.

12       A.   And I don't know his title.

13       Q.   And I did not ask you if Linda Stroud was

14   there in November of 2015?

15       A.   I believe she was.

16       Q.   And who did she report to?

17       A.   She would have reported to someone in the film

18   department or John Lundin.  I'm speculating it would

19   be John Lundin.

20       Q.   Okay.  And who did the pilot report to?

21       A.   He reported to Fred Van Noy.

22       Q.   And he was there in November of 2015?

23       A.   Yes, he was.

24       Q.   And what level would you put him on?

25       A.   Again, I -- he was six figure guy.  So he



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 230

1  would be probably in the director or vice president

2  level.  Probably a director.  I don't -- again,

3  without -- without knowing these and where this came

4  from, I'm struggling with how I classify people who

5  aren't on it.

6     Q.   In your mind, were division managers above

7  directors?  Are they in the wrong place on this

8  chart?

9     A.   Yes.

10    Q.   So should division managers be listed above

11 the directors in an organizational chart?

12    A.   Yes.

13    Q.   Okay.

14    A.   Or at least the way you have these directors

15 classified -- or whoever has these directors

16 classified.  Yes, division managers would be well

17 above those.

18    Q.   Okay.  But they would be below vice

19 presidents?

20    A.   Not necessarily.

21    Q.   Really?  So if the division manager -- a

22 division manager could be a division manager and a

23 vice president?

24    A.   I suppose they could be.  But, again, we just

25 didn't view the world in those clear cut categories



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

 1   that you're describing.

 2      Q.   Were vice presidents of Carmike considered

 3   officers of the company?

 4      A.   I don't think so.

 5      Q.   Yeah, because some -- a lot of times like bank

 6   vice presidents are not officers.

 7      A.   Right.

 8      Q.   So, for example, would Jon Greer and Jim Lucas

 9   have been a level down from Rob Lehman, John Lundin,

10   Jeff Cole, et cetera?  Were they a level down?

11        MR. GERAKITIS:  If you know.

12        DEPONENT PASSMAN:  Well, Rob Collins is listed

13     here as a vice president.  He wasn't even there.

14    BY MS. PREBULA:

15      Q.   He's not listed as a vice president.  He's

16   listed as a CMO.  And I understand he was not there

17   in November of 2015.

18      A.   Well, forgive me.  I may be misreading this

19   chart.

20      Q.   No, I see what you're saying that the black

21   header says vice presidents, too.

22      A.   Everything underneath it.

23        MR. GERAKITIS:  Is this your document?

24        MS. PREBULA:  I did not prepare this.  I think

25     Crystal Trawick prepared it, but I did not.



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 232

```
 1      BY MS. PREBULA:

 2      Q.    Were the CMO and the CTO above the vice

 3   president level?

 4      A.    The CMO would be.

 5      Q.    Okay.

 6      A.    The CTO would not be.

 7      Q.    Okay.

 8      A.    I might note that while he's on both lists, on

 9   one he's listed as a vice president and on the other,

10   he's listed as a director.

11      Q.    He who?

12      A.    Gary Green.

13      Q.    Well, you already told me you didn't think he

14   was a vice president.

15      A.    I don't know.

16      Q.    You don't know whether he was a vice president

17   or a director?

18      A.    I really don't.

19      Q.    So we don't know where he falls on the

20   organizational chart.

21      A.    No.

22      Q.    Okay.

23      A.    You're not suggesting that this is the

24   organizational chart for the company?

25      Q.    No, I'm not because we don't have one and
```



```
 1   that's why I'm asking you the questions I'm asking
 2   you.
 3         MR. GERAKITIS:  Did you make a request for an
 4      organizational chart?
 5         MS. PREBULA:  Can we have that fight off the
 6      record?  I believe we did.  I believe it was
 7      called for under our discovery request.
 8         MR. GERAKITIS:  I'll tell you what, I'll go
 9      over them with you during a break and you can
10      point it out.
11         MS. PREBULA:  I'll send you a letter.
12         MR. GERAKITIS:  You can point it out when
13      we're on a break.
14         MS. PREBULA:  I will send you a letter.  I'm
15      not going to do that today.
16         MR. GERAKITIS:  I'll print it off and have it
17      for you in the morning.
18    BY MS. PREBULA:
19    Q.   Have you completed looking at the -- I think
20   it's a phone list?
21    A.   Yes.
22    Q.   That's what you know today?
23    A.   Again, with reservation, I don't know that
24   this is a complete list.  I don't know that this is a
25   complete list.  I'm commenting based on what I'm
```



1    looking at and my recollection.

2      Q.   Understood.   Did -- going back to the

3    conversation you had with Crystal Trawick with regard

4    to the panel discussion she was doing.

5      A.   Yes.

6      Q.   Did she present you with any written documents

7    for you to review as to what her comments were going

8    to be?

9      A.   I don't recall her handing me a written

10   document.   She had notes and/or a presentation with

11   her that she was referring to as we discussed it.

12     Q.   And did you look at it?

13     A.   I don't recall seeing a written document.

14     Q.   Well, you just told me she had one with you so

15   you did see it.   Did you look at it?

16     A.   Yes, she did have it.   I don't recall

17   reviewing it.

18     Q.   Okay.   You believe she went over it with you.

19   She was looking at those notes as she was talking to

20   you?

21     A.   I believe she was going over what she believed

22   was important in those notes.

23     Q.   Okay.   And did -- I gather you did not get or

24   keep a copy of those notes?

25     A.   No, I did not.



1    Q.   Okay.  And you wouldn't have that today?

2    A.   I would not.

3    Q.   Did you review any of the results -- written

4   results of the investigation that was ongoing into

5   Ms. Trawick or did you just hear about the

6   investigation from the people you discussed?

7    A.   I did not, to the best of my recollection,

8   receive or review any report.

9    Q.   Okay.  Did you -- that's that document I was

10  looking for earlier.  Let me show you what's been

11  marked as Plaintiff's Exhibit 50.  And you see this

12  is a2nother payroll authorization form for Crystal

13  Trawick.  Do you see that?

14   A.   Yes.

15   Q.   It's dated November 17, 2015?

16   A.   Yes, it is.

17   Q.   It's noted termination, right?

18   A.   Yes.

19   Q.   And on this form, the form was requested by

20  Fred Van Noy; is that right?

21        MR. GERAKITIS:  Object to the form.

22   BY MS. PREBULA:

23   Q.   But it doesn't --

24   A.   Yes.

25   Q.   -- there's no approval initials on this form,



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 236

```
1    Plaintiff's 50?
2        A.    I don't see any.
3        Q.    Okay.  And the reason for this payroll
4    authorization form says:  Resigned 11-17-15; does it
5    not?
6        A.    It does.
7        Q.    Let me show you what's been marked as
8    Plaintiff's Exhibit 51.
9        A.    Okay.
10       Q.    And Plaintiff's Exhibit 51 is a separation
11   notice, correct?
12       A.    It says separation notice at the top.
13       Q.    For Crystal Trawick?
14       A.    Yes.
15       Q.    And on this separation notice, it says
16   resigned; correct?
17       A.    Reason for separation, voluntary quit, resign.
18   Yes.
19       Q.    And this form is signed by Sadie Marshall?
20       A.    It appears to be, yes.
21       Q.    Do you recognize that as her signature?
22       A.    I don't.
23       Q.    Do you know if this form was submitted to the
24   Georgia Department of Labor?
25       A.    I do not know.
```



1    Q.   Do you know if Ms. Trawick was actually given

2    a copy of this form?

3    A.   I do not.

4    Q.   Both Exhibit 50 and 51 are accurate; are they

5    not --

6         MR. GERAKITIS:   Object to the form.

7    BY MS. PREBULA:

8    Q.   -- in that Ms. Trawick did not resign?

9    A.   No, she did not resign.  At the time she was

10   terminated, she was offered the opportunity to resign

11   rather than being terminated.

12   Q.   And so both 50 and 51 are incorrect in that

13   Ms. Trawick did not resign, correct?

14        MR. GERAKITIS:   Object to the form.

15        DEPONENT PASSMAN:   To the best of my

16     knowledge, she never took us up on the offer to

17     resign and was, in fact, terminated.

18   BY MS. PREBULA:

19   Q.   And so Plaintiff's 50 and 51 are not accurate,

20   are they?

21        MR. GERAKITIS:   Object to the form.

22        DEPONENT PASSMAN:   No.

23   BY MS. PREBULA:

24   Q.   And these documents, as you can see in the

25   bottom right corner, both were produced by Carmike;



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 238

1    correct?

2      A.   I don't know that they were or were not.

3      Q.   Do you see the Carmike with the number in the

4    bottom right corner of both 50 and 51, correct?

5      A.   I do see that.

6          MR. GERAKITIS:  For the record, they were both

7       provided to Plaintiff's counsel.  They came from

8       Ms. Trawick's personnel file, left in her

9       personnel file.

10    BY MS. PREBULA:

11      Q.   Prior to today, have you seen Exhibits 50 and

12    51?

13      A.   I have not.

14      Q.   To your knowledge, have those documents,

15    Exhibits 50 or 51 been provided to any third party

16    outside of Carmike?

17      A.   To my knowledge, no.

18      Q.   Did you meet with Ms. Trawick when she was

19    terminated?

20      A.   I did not.

21      Q.   Did you meet with her after she was

22    terminated?

23      A.   I did not.

24      Q.   Have you seen Ms. Trawick since her

25    termination?



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 239

```
 1      A.    Yes, I have seen her.

 2      Q.    Have you told her you're sorry?

 3      A.    Not to my recollection, no.

 4      Q.    Have you walked up to her and given her a hug?

 5      A.    No, I don't think so; not since her

 6   termination.

 7      Q.    Have you discussed with anyone in the industry

 8   Ms. Trawick's termination or employment at Carmike?

 9      A.    I have not.

10           MS. PREBULA:  I'm looking for a document.  Do

11      you want to take a short break, mindful of your

12      request?

13           MR. GERAKITIS:  I would appreciate that.

14           MS. PREBULA:  Okay.

15           (Brief break)

16           (Upon resuming)

17    BY MS. PREBULA:

18      Q.    Let me show you what has previously been

19   marked as Plaintiff's Exhibit 20.  Have you seen that

20   document before?

21      A.    I don't recall seeing this specific document,

22   but I've seen reports that are similar in terms of

23   content.

24      Q.    Do you understand this report was prepared by

25   Crystal Trawick?
```



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 240

1    A.    I don't understand that, no.

2    Q.    Did Fred Van Noy ever discuss this report and

3    the numbers in this report with you or the executive

4    team?

5    A.    Generally, yes.  And with respect to each of

6    these individual items, I don't know.

7    Q.    In the context of discussing Plaintiff's

8    Exhibit 20 with you and the executive team, did Fred

9    Van Noy tell you that Crystal Trawick had provided

10   this to him at his request in support of her seeking

11   additional pay?

12         MR. GERAKITIS:  Object to the form.

13         DEPONENT PASSMAN:  No, he did not.

14    BY MS. PREBULA:

15   Q.    Did he -- did Van Noy bring any information to

16   the executive team in support of Crystal Trawick

17   getting an increase in pay or title?

18         MR. GERAKITIS:  Object to form.

19         DEPONENT PASSMAN:  No, not that I recall.

20    BY MS. PREBULA:

21   Q.    Ever.

22   A.    Not that I recall, no.

23   Q.    Okay.  And certainly not in 2015 to your

24   recollection?

25   A.    To my recollection, no.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 241

1   Q.   Okay.  When you said that Plaintiff's 20 and

2   the numbers were generally discussed with you but not

3   specifics, does that mean that you are aware of the

4   increases that are shown in Plaintiff's 20?

5   A.   I would have been aware at the time of this.

6   This looks to me like a year-end review.  I prepared

7   every year, a year-end review for the board.  And I

8   asked my direct reports to give me summaries of their

9   activities.  That's more what this looks like.  This

10  doesn't look like a personal achievement sheet.

11  Q.   And it's for 2014 year-end, you think?

12  A.   That's what it looks like.

13  Q.   And is it true that the numbers that are shown

14  -- the marketing numbers generally increased from

15  2012 to 2014?  They got better?

16  A.   Some of them did.  I can't say that they all

17  did.  But it's not because I don't think they did.  I

18  just don't recall.

19  Q.   And some increased more than others, too.

20  A.   Yes.

21  Q.   Okay.  Is it fair to say that between 2012 and

22  2014, the general trend was an increase in marketing

23  results?

24  A.   An increase in marketing results?

25  Q.   In other words, you had more effective



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 242

1  marketing from 2012 to 2014 than you had before?

2       MR. GERAKITIS:  Object to form.

3       DEPONENT PASSMAN:  I wouldn't say that, no.

4   BY MS. PREBULA:

5    Q.   You had said earlier that you had bad years

6   from 2009 to 2011 and then you started rebuilding in

7   2012.  Did I understand that correctly?

8    A.   We -- we had -- 2009 was a very, very good

9   year.  2008 was a very, very poor year for company

10  performance.

11   Q.   For everybody?

12   A.   For our company.

13   Q.   It was a bad year economically in this

14  country.

15   A.   It was a bad year economically.  But 2009 was

16  a very successful year for our company.  The period

17  from 2012 to 2014, we had improving results in part

18  because of acquisitions we made; in part because of

19  specific projects that we were doing; and in part

20  just trying to get us into the 21st century.

21   Q.   Do you have any documents or reason to believe

22  that the numbers in this Plaintiff's Exhibit 20 are

23  not accurate?

24   A.   I do not.

25   Q.   Showing you what's been marked as Plaintiff's



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 243

1   Exhibit 52.  This is appears to be an email from you.
2   Do you see that?
3      A.   I do.
4      Q.   And does this refresh your recollection that
5   Ms. Trawick did interviews for Carmike on television?
6      A.   I didn't dispute earlier; but I do remember
7   sending this note.
8      Q.   And you said:  A star is born.  Great
9   interview, right?
10      A.   Right.
11      Q.   And referring to Ms. Trawick's interview?
12      A.   Yes.
13      Q.   Let me show you what's been marked as
14   Plaintiff's Exhibit 53.  Do you recognize this as an
15   email from you?
16      A.   I do.
17      Q.   And this is concerning the panel discussion
18   we've discussed several times that was to be held on
19   March 25th, 2015; right?
20         MR. GERAKITIS:  Object to the form.
21         DEPONENT PASSMAN:  Just a second.  Did you say
22      March 15th or 25th?
23    BY MS. PREBULA:
24      Q.   25th.
25      A.   Yes.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 244

1    Q.   And does that refresh your recollection that
2    you had a conversation with Crystal about the panel
3    sometime in March of 2015?
4    A.   Yes.
5    Q.   In fact, you sent this email back to Ms. Kelly
6    Williams-Sowers at Chattahoochee Valley Community
7    College on March 9, 2015; right?
8    A.   That's correct.
9    Q.   And you say in the email:  That's a wonderful
10   acknowledgement of Crystal's accomplishments and
11   value at Carmike and the community; correct?
12   A.   I did.
13   Q.   And you said:  I can't speak for her or her
14   schedule.  But would, of course, be proud to have her
15   as a part of the event.  And I put the "as" in there.
16   The "as" is missing.  You said that, correct?
17   A.   I didn't mean to say as.
18   Q.   A part of the event.
19   A.   To have her a part of the event.
20   Q.   And that's what you said in this email?
21   A.   That is.
22   Q.   Let me show you what's been marked as
23   Plaintiff's Exhibit 54.
24        MR. GERAKITIS:  Does this have Bates numbers
25     to it?



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 245

```
1          MS. PREBULA:  No, this is in that group that
2     we've been discussing.
3          MR. GERAKITIS:  What do you mean it's in that
4     group we've been discussing?
5          MS. PREBULA:  About whether or not we were
6     each going to Bates number emails and things that
7     were sent.  I don't see a Bates number on this
8     copy.
9          MR. GERAKITIS:  All right.  Are you saying
10    Plaintiff's 54 has been produced?
11         MS. PREBULA:  It is my understanding it has
12     been produced, yes.
13   BY MS. PREBULA:
14    Q.    Mr. Passman, do you recognize Plaintiff's 54?
15    A.    I'm going to have to read it to tell you.
16    Q.    Of course, you are.  Take your time.
17    A.    (Witness perusing document).  I don't remember
18  this document specifically, but I remember this type
19  of interview or document -- this type of document.
20    Q.    Do you recognize this as a statement that was
21  prepared for you to deliver for a Q-A presentation by
22  marketing?
23    A.    It could very well be.  I just simply don't
24  recall this specifically.
25    Q.    Do you recognize that this statement was
```



1    prepared by Crystal Trawick at your request?

2        A.    I do not.

3        Q.    You did request her to make -- to prepare

4    statements for you from time to time, correct?

5        A.    I requested either Crystal, or Shannon, or

6    Fred to prepare statements, press releases for new

7    theater openings, things like this.  Yes.

8        Q.    But you just don't recognize this particular

9    one?

10       A.    There were many times that I was asked

11   questions on panels or made presentations, and I just

12   don't have specific recall of this one.

13       Q.    Okay.  Let me show you what's been marked as

14   Plaintiff's Exhibit 55.  Do you recognize this as a

15   statement that Crystal Trawick prepared for you for a

16   press release?

17       A.    I don't remember this one specifically either.

18       Q.    Do you remember the content?

19       A.    I don't remember -- I don't remember this

20   specifically, no.  But I do remember that we did that

21   to that theater and I'm sure we issued a release or

22   made a statement about it.

23       Q.    And you don't remember that Crystal prepared

24   this for you?

25       A.    No, I don't.



1    Q.    Did you keep a copy of your press releases?

2    A.    No.

3    Q.    A personal copy?

4    A.    No.

5    Q.    Do you have scrapbook or anything somewhere?

6    A.    No.

7    Q.    Did your wife?

8    A.    No.

9    Q.    No file of press releases?

10   A.    No.

11   Q.    I'm going to show you what's been marked as

12   Plaintiff's Exhibit 56.  The reason I'm showing this

13   to you is this is a request from Crystal Trawick to

14   Stored Value Solutions for production of Carmike gift

15   cards in 2013, correct?

16   A.    It appears to be, yes.

17   Q.    Is it true that you had to personally approve

18   orders for Carmike gift cards?

19   A.    No.

20   Q.    Who approved them?

21   A.    Anyone on the executive team could approve

22   them.

23   Q.    Who did approve them?

24   A.    I don't recall approving this specific one.  I

25   do recall looking at designs of the cards, but I



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 248

1  didn't approve the quantity purchase.  That would

2  have been -- it should have been Fred Van Noy.

3      Q.   And would these kinds of expenses also been

4  paid through the Comdata system?

5      A.   I don't believe so, no.

6      Q.   How would these be paid?

7      A.   I believe they would be paid through the

8  accounts payable system.

9      Q.   Which is what?  Doesn't it have another name?

10     A.   I don't know.  I'm sorry.

11     Q.   I want to say Nexus?

12     A.   That's probably correct.

13     Q.   Okay.  And, again, in the accounts payable

14  system whether it's called Nexus or not --

15     A.   Right.

16     Q.   -- Ms. Trawick couldn't approve expenditures

17  like this?

18     A.   I don't know what her approval level was.  We

19  did have assigned approval levels throughout the

20  company.

21     Q.   Was that in writing?

22     A.   It was.

23     Q.   Who kept that document?

24     A.   I'm guessing it was the compliance department.

25     Q.   And who would be in charge of that?



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

```
 1     A.    In 2013, I'm not sure.

 2     Q.    How about November?

 3     A.    Fred Friedel would be today or as of November

 4  of 2015.

 5     Q.    What is TRC?

 6     A.    Total Resource Campaign, I believe, is what

 7  you're referring to.  Chamber of Commerce.

 8     Q.    Can you explain Carmike's participation in

 9  that?

10     A.    I can try.  The Chamber of Commerce tried to

11  raise funds on an annual basis in a real short period

12  of time by selling sponsorship to future Chamber

13  events throughout the calendar year.  And Carmike was

14  an important member of the Chamber of Commerce and,

15  therefore, participated in and I personally

16  participated in the campaigns.

17     Q.    Okay.  And do you know how many TRC

18  sponsorships Carmike did?

19     A.    I don't.

20     Q.    It was a lot, wasn't it?

21     A.    It was several.

22     Q.    Okay.  The -- when you say that you

23  participated in sponsorships for the Chamber, did you

24  participate -- meaning Carmike, not you personally --

25  but Carmike participated in many sponsorships
```



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 250

1   throughout the community; did it not?

2     A.   I would say several.  I don't know that many

3   is an accurate definition.  Certainly several.

4     Q.   And several you said is more than three or

5   four?

6     A.   It is.

7     Q.   Okay.  And part of Ms. Trawick's job was to

8   seek out those sponsorships, was it not, to promote

9   Carmike?

10    A.   I don't know that I would say it was to seek

11  out sponsorships.  But it was to certainly be

12  responsive to requests for sponsorships.

13    Q.   Okay.  Did -- did you consider sponsorships to

14  be marketing of Carmike?

15    A.   I did.

16    Q.   And were there any written rules on which

17  sponsorships could be accepted?

18    A.   Not that I recall.

19    Q.   Is it -- was it the normal or general

20  procedure that if Ms. Trawick saw a sponsorship or

21  got a request for a sponsorship, that she would

22  present it to Crystal (SIC) De La Cruz for your

23  review before that was approved?

24    A.   That would not be unusual, but I don't believe

25  that one hundred percent of the sponsorships that



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   were requested of Carmike made it to my office.    I

2   would hope that they would be screened.

3       Q.    By whom?

4       A.    By Crystal.

5       Q.    And then all sponsorship checks would have to

6   go into one of the two systems:    Comdata or Nexus or

7   whatever it was called, for approval by somebody

8   else?

9       A.    No.

10      Q.    Crystal had check writing authority for a

11  sponsorship?

12      A.    No, she did not.

13      Q.    Okay.   So what was the procedure according to

14  your understanding?

15      A.    Depending on what the activity was, whether --

16  and in what category of marketing we deemed

17  appropriate, it might be out of our benevolence fund

18  if it was a 501(c)(3) or a charitable organization;

19  or something that included employees outside the

20  corporate office.   And those were handwritten checks.

21      Q.    Okay.   So there was a separate benevolence

22  fund for charitable organizations?

23      A.    Yes.

24      Q.    And who was in charge of that fund, if you

25  will?



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1      A.    The executive team.

2      Q.    So you would have to approve 501(c)(3)

3   donations or sponsorships?

4      A.    Most.

5      Q.    Most.  And -- but Crystal couldn't approve

6   those?

7      A.    Not that I'm aware of.

8      Q.    When you say something for employees outside

9   the company, do you mean like the Steeple Chase

10  events and other Columbus events that people went to?

11     A.    No.

12     Q.    What do you mean?

13     A.    No, I meant things like -- John Kellin, for

14  instance, the supervisor on the seat job wanted to do

15  a United Way benefit bowling tournament.  Carmike's

16  contribution toward that event came out of the

17  benevolence fund.

18     Q.    And Carmike did routinely sponsor Steeplechase

19  in Columbus, right?

20     A.    Carmike was a pretty significant sponsor of

21  the Steeplechase since 2009, I believe, or 2010.

22     Q.    And you were involved in that personally,

23  weren't you?

24     A.    I was not.

25     Q.    So prior to Ms. Trawick being in the marketing



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 253

```
 1    department, Carmike was a significant sponsor of

 2    Steeplechase?

 3      A.    Yes.

 4      Q.    And it took employees to Steeplechase?

 5      A.    I don't know that.  All members of the

 6    executive team were offered tickets.  Beyond that,

 7    I'm not sure how.  But we didn't actually take people

 8    to it.

 9      Q.    I don't mean physically put them on the bus.

10      A.    I'm sorry.

11      Q.    I mean, you allowed employees to go to

12    Steeplechase on Carmike tickets.

13      A.    As tickets were available.

14      Q.    Right.  If the executive team didn't need it,

15    you offered them to employees.  And if you couldn't

16    fill the tent, you included spouses and employees.

17      A.    That's quite possible.

18      Q.    Okay.  The -- was -- other than you, was

19    anyone else at Carmike involved in the support of the

20    Chamber?

21      A.    Yes.

22      Q.    Who?

23      A.    My assistant.

24      Q.    Crystal (SIC) De La Cruz?

25      A.    It's Lisa De La Cruz.
```



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 254

1      Q.    Why do I do that?  Lisa De La Cruz.  Actually,

2   I know a Crystal De La Cruz.  That's the problem.

3      A.    Oh.

4      Q.    So I apologize for that, to both of them.

5   Anyone else?

6      A.    Yes.

7      Q.    Who?

8      A.    Crystal Trawick.

9      Q.    Anybody else?

10     A.    Yes, but I can't tell you their names.  The

11  Chamber created a program called the Young

12  Professionals or -- I think it was called the Young

13  Professionals.  And with our sponsorship, our

14  corporate sponsorship of the Chamber and our

15  activities and my involvement in the Chamber, we were

16  offered a certain number of Young Professional

17  memberships and we basically offered it to several

18  corporate employees.

19     Q.    Okay.  Let me show you what's been marked as

20  Plaintiff's Exhibit 57.  And this is a 2012 TRC

21  kick-off for the Chamber.  Do you see that?

22     A.    I do.

23     Q.    And do you see that you were a vice chair that

24  year as well as Dan Ellis from Carmike on the 8-27

25  time slot?



1    A.   Yes, I do.

2    Q.   And that's accurate?

3    A.   Yes, it is.

4    Q.   Does that refresh your recollection that Dan

5  Ellis was involved?

6    A.   He certainly was.

7    Q.   Let me show you what's been marked as

8  Plaintiff's Exhibit 58.  This appears to be a trade

9  agreement contract with the TRC.  And I can't read

10  that date.  But can you read that date?  It appears

11  to be 2012 based upon the signature line.

12    A.   That date there?

13    Q.   Yes.

14    A.   It appears to be 2012 to me as well.

15    Q.   Okay.  And this appears to be signed by Dan

16  Ellis, correct?

17    A.   I think so.

18    Q.   Okay.  Do you recognize that as his signature?

19    A.   I wouldn't dispute this being his signature,

20  no.

21    Q.   Do you recognize it as his handwriting?

22    A.   I don't.

23    Q.   Okay.  And this appears to be a 52-week

24  Carmike pass that you are donating to the TRC

25  auction; is that correct?



1    A.    This appears to me to be an item that we were

2    donating to Biddin' on the banks auction.

3    Q.    For the TRC campaign.  I mean, it's the symbol

4    at the top.

5    A.    Well, I see TRC at the top.  But it was a

6    sponsorship probably sold in the TRC campaign.  Is

7    that what you mean?

8    Q.    Correct.

9    A.    Yes.

10    Q.    What did you expect to get out of this one?

11    A.    Out of this one?

12    Q.    Out of any of these sponsorships?

13    A.    Out of any sponsorships that we did in the

14    TRC?

15    Q.    Sure.  Any sponsorships in general.  I mean,

16    wasn't it to promote Carmike?

17    A.    There were several reasons.  One was to be a

18    good corporate citizen.  Whether that's promotion of

19    not, I don't know.  But to be a good corporate

20    citizen.

21         The second is to promote Carmike and make

22    people see that Carmike is a good corporate citizen

23    so that hopefully they would frequent our theaters.

24         And the third and final was to be a desired or

25    preferred employer in the community.



1    Q.   Let me show you what's been marked as

2    Plaintiff's 59.  Does the top of this refresh your

3    recollection that these were some of the individuals

4    who were involved in the Young Professional's group?

5    A.   I think they were.

6    Q.   Okay.  And they include Ms. Trawick, Ms. De La

7    Cruz, Mr. Sailors, Mr. Mayton, Ms. Woods, Ms. Watley

8    and Mr. Harris.  But Mr. Harris was not a Carmike

9    employee, right?

10   A.   I don't -- that's Ms. Harris.  Ryan is a

11   female.

12   Q.   I apologize.

13   A.   She was the membership director at Country

14   Club of Columbus, I think.

15   Q.   But she was not also an employee of Carmike,

16   correct?

17   A.   She was not.  Heather Watley was not.  This

18   was the TRC, for lack of a better term, sales team.

19   Q.   Got you.

20   A.   It included Carmike employees and non-Carmike

21   employees.

22   Q.   Okay.  And did Carmike sponsor events at the

23   Columbus Country Club?

24   A.   We had our annual Christmas or holiday party

25   at the Country Club of Columbus.  We may have



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 258

1   sponsored other things.  I just don't know.

2       Q.   And you did that for the same reasons you just

3   stated, right?

4       A.   Well, the holiday party was employee

5   relations.

6       Q.   And the other reasons for sponsoring events

7   there was...

8       A.   Would have been to promote Carmike as we

9   discussed.

10      Q.   Right.  Right.  Let me show you what's been

11  marked as Plaintiff's Exhibit 60.  This appears to be

12  again a sponsorship for the Biddin' on the Banks

13  auction and dinner as part of TRC.  Is that an

14  accurate depiction?

15      A.   Yeah.  Well, again, I take exception to it

16  being a part of TRC.  The sponsorship was sold

17  through TRC.  But it was for an event that was not

18  TRC -- we weren't sponsoring TRC.  We were sponsoring

19  an event of the Chamber and it was sold in the TRC

20  campaign.

21      Q.   And this one is a dinner that you are

22  sponsoring, correct?

23      A.   It says name of sponsorship, Biddin' on the

24  Banks auction and dinner as presenting sponsor.

25      Q.   And then as a part of this, you got two



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 259

1    reserved tables of eight.

2       A.    That's what this says.

3       Q.    And that would mean that 16 people from

4    Carmike could go to this event.

5       A.    It would mean 16 people could go paid for by

6    Carmike.  They may or may not be from Carmike.

7       Q.    You tried with the executive team first and

8    work your way down?

9       A.    Well, generally when we had community

10   sponsorship, we would revert first to the executive

11   team so that they, in fact, would be in the

12   community.  And from there it could go anywhere.  We

13   could take a vendor.  We could give them to

14   employees.  It could be any number of things.

15      Q.    Okay.  And this was signed by Dan Ellis?

16      A.    It appears to be Dan's signature, yes.

17      Q.    What does the instruction on the first page:

18   Allocate to Shannon, Crystal and Kim mean?

19      A.    I think this is for sales credit in the TRC

20   campaign.

21      Q.    Okay.  And I just noticed two things are

22   attached and the second sheet should not be part of

23   it.  If you'll just pull that off.  It's not part of

24   the exhibit, it's a separate document.

25            MR. GERAKITIS:  So 696 is not part of



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 260

```
 1       Plaintiff's Exhibit 60?
 2            MS. PREBULA:  No, they're separate documents.
 3            MR. GERAKITIS:  Okay.
 4   BY MS. PREBULA:
 5       Q.   So you think that the allocate to Shannon and
 6   Crystal and Kim was just for sales credit?
 7       A.   Yes.
 8       Q.   And for sales credit through Carmike or
 9   through the Chamber?
10       A.   Through the TRC campaign.  During the campaign
11   in order to incentivize people to go sell
12   sponsorships, TRC had awards and rewards.  And this
13   was, I believe, allocating that $7500 to those three
14   people.
15       Q.   Okay.  And let me show you what's been marked
16   as Plaintiff's 61.
17       A.   Okay.
18       Q.   And this is a similar corporate sponsor
19   contract?
20       A.   Appears to be, yes.
21       Q.   But this time it's for Young Professionals,
22   Cocktails and Company, right?
23       A.   That's what it appears to be, yes.
24       Q.   What was the purpose of sponsoring a cocktail
25   party for Young Professionals?
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 261

1      A.    The purpose would be to promote Carmike.

2      Q.    And that's consistent with any other

3  sponsorship you might do?

4      A.    It is.

5      Q.    And this one says:  Allocate to Lisa.  So that

6  would be Lisa De La Cruz?

7      A.    I assume so.

8      Q.    And, again, signed by Dan Ellis.

9      A.    Looks like it.

10     Q.    Okay.  The -- did Mr. Ellis sign or approve

11  all TRC requests or sponsorships?

12     A.    I don't know.

13     Q.    Was he -- I mean, was he responsible for doing

14  that or you don't -- do you know?

15     A.    Not necessarily.

16     Q.    Okay.  So someone else could have approved it.

17  We just happen to have reports that he did?

18     A.    Yeah.  I wish we had dates on these so I could

19  answer your question more fully.

20     Q.    Uh-huh.  (indicating in the affirmative).

21  Some of them -- the first couple had a date where he

22  put it in there, but these last two do not.

23           Let me show you what's been marked as

24  Plaintiff's Exhibit 52 -- excuse me -- 62. This

25  appears to be a comparison of Carmike sponsorships



1  during 2014 compared to what you might do in 2015.

2  The -- and were all of these through Total Resource

3  Campaign?

4     A.   I don't know.

5     Q.   Okay.  Do you recognize them all?  You clearly

6  recognize the Young Professionals as part of the

7  Chamber, right?

8     A.   Yeah, I recognize each one of these events.

9     Q.   Okay.

10    A.   I just can't state with accuracy whether the

11 numbers are right for each of the years or whether

12 it's a complete listing.

13    Q.   Right.  But in 2 -- do you recognize that the

14 numbers for 2014 are accurate?

15    A.   I don't recognize that.

16    Q.   Okay.  But it shows that Carmike did various

17 things from being just investors to sponsors to

18 sponsoring a T-shirt or a party or a frame?

19         MR. GERAKITIS:  Object to the form.

20  BY MS. PREBULA:

21    Q.   Is that right?

22    A.   Would you ask that again?  Sorry.

23    Q.   The -- Plaintiff's 62 shows that Carmike had

24 different kinds of sponsorships.  This one shows

25 you're the investor starting at the bottom and the



1  Chamber membership.  You were presenting sponsor for

2  some of these.  You were a T-shirt sponsor.  You were

3  a party sponsor.  And you were a frame sponsor for an

4  art event.  I mean, you did different things.

5      A.    That's correct.  Yes.

6      Q.    And you recognize each of these events on

7  Plaintiff's 62?

8      A.    I do recognize each of these events.

9      Q.    Okay.  And is your statement the same that the

10 reason for Carmike sponsoring each of these events is

11 promoting Carmike and being a good corporate citizen?

12     A.    Yes.

13     Q.    Okay.  Let me show you what's been marked as

14 Plaintiff's Exhibit 63.  At the top is an email from

15 you dated January 30, 2015 to Crystal Trawick and her

16 husband; correct?

17     A.    I'm sorry.  What was your question?

18     Q.    It's an email from you to Crystal Trawick and

19 her husband dated January 30th, 2015.

20     A.    Yes.

21     Q.    And you copied your then fiance on it -- or

22 was she your wife at that time?

23     A.    She was not my wife at that time.

24     Q.    Okay.  And it's a promotion of Crystal based

25 upon her performance for TRC from the Columbus



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 264

1    Regional Research Institute, right?

2       A.   I'm sorry.  I have to read it.  I don't recall

3    what this is for.

4       Q.   You can always take time to read it.

5       A.   (Witness perusing document).  Let me ask you

6    to repeat the question.

7       Q.   Sure.  Basically this email -- the bottom of

8    it is from Joel Ames at Liberty Utilities, right?

9       A.   Yes.

10      Q.   And he's saying:  Crystal is one of the top

11   three performers overall on TRC for 2015.

12      A.   I'm sorry.  I don't see where he's saying

13   that.

14      Q.   Look at page two:  Top performers overall.

15   Crystal Trawick.  Keep going, run your finger down

16   the page.  Top performers overall.  Keep going.

17   There it is.  Do you see that?

18      A.   I do.

19      Q.   So she was one of the top performers overall,

20   right?

21      A.   Yes.

22      Q.   And so Joel Ames shared that news with

23   Christine Senn and she shared it with you.

24      A.   Yes.

25      Q.   And she says:  I've seen these three same



1    three  fabulous women -- because there are two other

2    listed -- be top performers at least two years in a

3    row now.  You thought that was a good thing?

4       A.   I did.

5       Q.   And so you shared it with Mr. and Ms. Trawick.

6       A.   I did.

7       Q.   And as part of this, Crystal was getting good

8    press for Carmike.

9       A.   Yes.

10      Q.   Did you -- and I think you may have answered

11   this and I apologize if you have.  Did you review

12   every sponsorship that went through that Crystal

13   proposed?

14      A.   For the TRC?

15      Q.   For any sponsorship?

16      A.   No, I did not.

17      Q.   Let me show you what has been marked as

18   Plaintiff's Exhibit 64.  Do you recognize this as an

19   email from you to Joel Ames?

20      A.   I do.

21      Q.   And then there's an email below from Joel to

22   you.

23      A.   Yes.

24      Q.   Okay.  And it's again saying -- it's in March

25   19 of 2015, that Crystal has had tremendous success



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 266

1 | with the Total Resource Campaign, correct?

2 |    A.   It does.

3 |    Q.   And you replied to him:  Thanks, Joel.

4 | Crystal is a very special person.  We're lucky to

5 | have her in the community and at Carmike.  You said

6 | that?

7 |    A.   Yes.

8 |    Q.   And, again, you thought that was important for

9 | Carmike?

10 |    A.   I thought it was a good thing, yes.

11 |    Q.   I mean, you wouldn't have made sponsorships if

12 | you didn't think it was going to promote the

13 | business, right?

14 |    A.   That's correct.

15 |    Q.   So were you involved at all in sponsorships

16 | that Crystal did for Quaderal; do you recognize that?

17 |    A.   I do not.

18 |    Q.   And were you --

19 |    A.   The first time I heard Quaderal was during

20 | this termination process.

21 |    Q.   So you were not involved at all in --

22 |    A.   No.

23 |    Q.   -- the approval of Quaderal or reviewing

24 | Quaderal at all?

25 |    A.   No, I was totally unaware of Quaderal.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 267

1    Q.    Did Lisa De La Cruz bring Quaderal to you as a

2    proposed sponsor?

3    A.    No, she did not.

4    Q.    Did she have the power or the authority to

5    approve sponsorships to then be sent on for further

6    approval up the line?

7    A.    She did not.

8    Q.    You had told me earlier that it was not

9    unusual for Ms. Trawick to bring a proposed

10   sponsorship to De La Cruz who would then say David

11   likes it or he doesn't like it.  That that was not

12   unusual, right?

13   A.    That was not unusual.

14   Q.    And it's your testimony that Lisa De La Cruz

15   did not tell you about Quaderal?

16   A.    It is.

17   Q.    Did -- were you involved in the Pursuing

18   Justice sponsorship?

19   A.    I don't know what that is.

20   Q.    Okay.  So that would be a no?

21   A.    That would definitely be a no.

22   Q.    Okay.  And were you involved in any

23   sponsorships at the Country Club -- Columbus Country

24   Club for Carmike?

25          MR. GERAKITIS:  Object to the form.



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 268

```
 1    BY MS. PREBULA:
 2    Q.    Any sponsorship that might have been held at
 3  the Country Club, were you involved in those?
 4    A.    That the Country Club was putting on?
 5    Q.    Either way.  Either the Country Club was
 6  putting on some -- could have been part of the
 7  Chamber, anything that was held there?
 8    A.    Oh, none that I recall.  But I would not be
 9  surprised if events were held at the Country Club of
10  Columbus that we were sponsoring, the Chamber or
11  whatever.
12    Q.    Okay.  You said to me that you were not sure
13  if Cathryn Smitherman was still at Carmike in
14  November of 2015.
15    A.    That's correct.
16    Q.    Do you recall whether or not she left early?
17    A.    I believe that was about the time she left.  I
18  just don't recall the dates.
19    Q.    Was she terminated?
20    A.    No.
21    Q.    Did -- did you ever discuss the investigation
22  with Cathryn Smitherman?
23    A.    No.
24    Q.    And, obviously, I'm talking about the
25  investigation of Ms. Trawick.
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1     A.    I understood.

2     Q.    In addition to the people that we discussed on

3   Plaintiff's 49, I'm just wondering if this is a

4   different person.   There's a Brian Dobson listed.

5     A.    Yes.

6     Q.    Was there also a Brian Dobbs or is that --

7     A.    I think it's probably a typo.

8     Q.    It's the same guy.   Okay.

9     A.    My guess is it's the same guy.

10    Q.    My guess as well.

11          MR. GERAKITIS:   I'm going to object to the

12     form of the question.

13   BY MS. PREBULA:

14    Q.    Are you aware of a Carmike employee named

15   Brian Dobbs?

16    A.    I am not.

17    Q.    Okay.   All right.   So who was responsible for

18   doing the annual reviews for Crystal Trawick from

19   2012 to November 2015?

20    A.    Fred Van Noy.

21    Q.    Okay.   Was there anyone else who would have

22   done a review with her?

23    A.    No, not to my knowledge.

24    Q.    Okay.   It was not company policy for other

25   people with whom she worked to do a performance



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    review?

2       A.    There might have been like a 360 evaluation

3    form that could have been part of that process.  But

4    the actual review performance review would be her

5    supervisor, Fred Van Noy.

6       Q.    If there were there any 360 evaluation forms,

7    would they be part of her personnel file?

8       A.    I don't know.

9       Q.    Should they?

10      A.    Not necessarily.

11      Q.    Where would they be stored?

12      A.    I don't know where they would be stored.

13      Q.    What would a 360 evaluation form do or be?

14      A.    Well, I can't answer with regard to Crystal.

15   But I can tell you with regard to the CFO.  I would

16   send a survey to all members of the audit committee

17   of the board of directors.  And I would list out

18   several things to evaluate Richard's performance on.

19   And then that would become a part of his bonus

20   computation for his performance.

21         That type of thing was repeated in various

22   areas of the company.  I don't know how many.  I

23   don't know who.  But that process that I used was

24   used by others in the company for similar type things

25   at employee levels rather than board levels.

1    Q.    And you call those 360 evaluation forms?

2    A.    I'm calling them that today.  I don't know

3    what they would have been called then.  It might have

4    been a peer evaluation.  It might have been a

5    department -- I don't recall a title.

6    Q.    That was my next question.

7    A.    And it wasn't a form.

8    Q.    It was not a form.  It would be an email?

9    A.    It again would be up to evaluator of the

10   employee as to whether to consult or get input from

11   any number of parties whether they be inside or

12   outside the company.

13   Q.    So when you say a 360 evaluation form, you

14   just mean there might be some input from somebody

15   else?

16   A.    That's correct.

17   Q.    Not a specific form that it would be on.

18   A.    That is correct.

19   Q.    Did -- other than the people that you

20   discussed the investigation with, which you have told

21   me are Fred Van Noy, Dan Ellis, and I believe you

22   said Fred Friedel.

23   A.    No, Richard Hare.

24   Q.    Richard Hare.  Other than that, did you

25   discuss the investigation of Ms. Trawick with



1    anybody?

2        A.   I did not.

3        Q.   Okay.   The -- have you asked anybody to

4    prepare any written statement or email to you about

5    Ms. Trawick's performance between 2012 and 2015?

6        A.   I have not.

7        Q.   Okay.   Have you asked anybody to prepare any

8    email or statement with regard to the investigation?

9        A.   I have not.

10       Q.   Have you asked anybody to prepare a statement

11   with regard to her termination?

12       A.   I have not.

13       Q.   Okay.   I know we've been here a long time

14   today and you couldn't tell me the name of the AMC

15   sub.  Has that come into your memory yet?

16       A.   No.

17       Q.   Did you sign the papers for the sale with the

18   AMC sub or with AMC corporate?

19       A.   I don't recall.  Most of the paperwork that

20   was signed was signed by Dan Ellis, not by me.

21       Q.   Did the employees that went to work for AMC go

22   to work for AMC corporate or the AMC sub?

23       A.   I don't know with certainty.  I would assume

24   AMC corporate.

25       Q.   What employees do you know other than Shannon



```
 1   Sailors and Dan Ellis have gone to work for AMC?
 2      A.   David Glass.  Probably the majority of our
 3   theater managers.  A few of our district managers.
 4   And those are all that I can recall off the top of my
 5   head.
 6      Q.   Which district managers do you know?
 7      A.   I have forgotten.  With AMC, you mean?
 8      Q.   Correct.
 9      A.   I have forgotten.
10      Q.   Do you know any of them?
11      A.   Not with -- not with certainty, no.
12      Q.   Do you know -- you don't even have a
13   reasonable basis for saying who they are?
14      A.   I'm sorry, I just don't have the recollection.
15      Q.   Understood.  The -- when -- did you have any
16   input into the discovery responses to interrogatories
17   and requests for production of documents in this
18   case?
19      A.   I did not.
20      Q.   Did you review any of the responses?
21      A.   I did not.
22      Q.   Did -- are you aware of any investigation of
23   Ms. Trawick's claims in her EEOC charge or complaint
24   that were conducted by counsel?  Don't tell me what
25   they were.  Just let me know if counsel actually
```



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 274

1    conducted any investigation.

2        A.    I'm not aware.

3        Q.    Meaning you're not aware of any investigation

4    conducted by counsel?

5        A.    I'm not aware of any investigation conducted

6    by counsel.

7        Q.    Did you have -- I understand that you were not

8    the decision-maker on all compensation requests or

9    increases?  Did you -- were you the decision-maker on

10   any bonuses or bonus structures for Ms. Trawick?

11       A.    Yes.

12       Q.    When Ms. Trawick was out on maternity leave in

13   2014, why was her bonus structure based on a whole

14   year without taking into consideration her leave of

15   absence?

16       A.    I don't know.

17       Q.    So what input did you have in establishing the

18   bonus or bonus structure for Ms. Trawick?

19       A.    I would have approved all of Fred's direct

20   reports' bonus plans.  And then together with the

21   controller of the company, would review the

22   performance reported for bonus payouts.

23       Q.    And that's Fred Van Noy?

24       A.    No, the controller would be Jeff Cole.

25       Q.    No, you said you would have approved all of



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 275

1     Fred's direct reports?

2        A.     Oh, yes.   I'm sorry.

3        Q.     Fred Van Noy.

4        A.     Fred Van Noy.

5        Q.     And you would review the bonus then with Jeff

6     Cole, the controller.

7        A.     After year-end.

8        Q.     If two employees were both given fours and

9     fives, how would they have different bonus

10    structures?

11       A.     I'm not sure I understand the question.   What

12    do you mean bonus structure?

13       Q.     On your performance evaluations, you rate your

14    employees one through five on various categories,

15    right?

16       A.     Okay.

17       Q.     And different employees could achieve

18    different dollar amounts, right?

19       A.     Yes.

20       Q.     And they had different bonus structures.

21       A.     Yes.

22       Q.     So can you explain to me why -- just

23    specifically in this case, why Shannon Sailors' bonus

24    structure would be higher than Ms. Trawick's?

25       A.     I can't without reviewing it.



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 276

1    Q.    And what would you need to review it?

2    A.    What the duties were, what the bonus criteria

3   were.

4    Q.    When you set up a bonus structure, did you

5   establish written criteria?

6    A.    We established specific objectives to be met

7   and allocated a percentage of the bonus target for

8   each individual.

9    Q.    And was that in writing?

10    A.    Yes, it was.

11    Q.    Provided to the individual?

12    A.    Yes.

13    Q.    The -- so when you say you were involved in

14   establishing the bonuses, you didn't come up with the

15   criteria, et cetera.  Fred Van Noy would present it

16   to you and you would either agree or make changes or

17   disagree; is that fair?

18    A.    That is correct.

19    Q.    Did you ever make any changes to the bonus

20   structure proposed for Crystal Trawick?

21    A.    I don't recall.

22    Q.    Did you ever make any changes to the bonus

23   structure proposed for Shannon Sailors?

24    A.    I don't recall.

25    Q.    Was there a policy of the company of having



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 277

1    written job descriptions for each position?

2       A.    I don't know.

3       Q.    Did you ever see written job descriptions for

4    each position?

5       A.    I've seen written job descriptions, but I

6    don't know for each position.

7       Q.    Was there a manual or book in which job

8    descriptions were maintained?

9       A.    I don't know.

10      Q.    You've never seen one?

11      A.    I've never seen a book with all job

12   descriptions.

13      Q.    Okay.  What role did Dan Ellis play in the

14   decision to terminate Ms. Trawick?

15           MR. GERAKITIS:  Object to the form.

16           DEPONENT PASSMAN:  Dan was included in the

17      discussions with Crystal about the investigation

18      and was part of the decision to terminate her.

19      And I believe he was also part of the discussion

20      at termination, the meeting with her.

21    BY MS. PREBULA:

22      Q.    What role did Richard Hare play in the

23   termination?

24      A.    Member of the executive team that listened to

25   Dan and Fred's -- Fred Van Noy's report on the



1   activities that were going on and the recommendation.

2       Q.   Anything else for Richard Hare?

3       A.   I don't think so.

4       Q.   And what role did Fred Van Noy play?

5       A.   Fred was the -- same role as Dan.  He was the

6   one who met with Crystal and -- both before and at

7   termination.  And he, along with Dan, reported to the

8   rest of the executive team that was there.

9       Q.   And was the rest of the executive team anyone

10  other than you -- I mean, were there only four people

11  there:  You, Dan Ellis, Richard Hare and Fred Van

12  Noy?

13      A.   That's correct.

14      Q.   So the other members of the executive team

15  were not present.

16      A.   There was only one other member and he was not

17  present.

18      Q.   Okay.  And the -- who actually made the

19  recommendation to you for termination?

20      A.   Fred and Dan.

21      Q.   Both of them said it at the same time?

22      A.   I don't recall which one of them might have

23  said it first, but I would -- I would guess it would

24  be Dan.

25      Q.   Did you discuss with HR, the -- meaning Sadie



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 279

1   Marshall, the decision to terminate?

2       A.   I did not.

3       Q.   When we asked you in interrogatories about the

4   duties and responsibilities in the marketing

5   department, you referred us back to documents which

6   we produced.  Are you -- is it your position -- and

7   you may not know.  Is it your position that the

8   documents that we produced with regard to the duties

9   and responsibilities of the persons in the marketing

10  department are correct and complete?

11      A.   I never received an interrogatory and,

12  therefore, I --

13      Q.   You don't know?

14      A.   -- I have no response to it.

15      Q.   Okay.  The -- did you have any input into

16  making a decision as to whether you would treat

17  Crystal Trawick as an exempt or nonexempt employee?

18      A.   At the time of her termination or just

19  general?

20      Q.   Any time while she was employed in the

21  marketing department.

22      A.   No.  No, I did not.

23      Q.   Who made that decision?

24      A.   I don't know who made it.

25      Q.   And Crystal Trawick routinely worked more than



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 280

1    40 hours a week, right?

2       A.   I don't know.

3       Q.   Well, you know her travel schedule, don't you?

4       A.   I don't.

5       Q.   You don't.  Are you aware of any documents

6    that would show her actual work hours?

7       A.   No.

8       Q.   Did Carmike -- Carmike didn't require people

9    to clock in and clock out, right?

10      A.   Not at corporate.

11      Q.   Yeah.  Okay.  And when I say clock in and

12   clock out, I don't mean like a factory.  Crystal

13   didn't have to turn in her hours that she worked to

14   you and Carmike did not keep a record of them, right?

15      A.   I believe that's correct.

16      Q.   Okay.  Are you aware of any -- I think I asked

17   you earlier if there were any warnings or warning

18   notices in Crystal's personnel file.  I think you

19   said no, that you weren't aware of any.

20      A.   I'm not aware of any.

21      Q.   Are you aware of any reprimands or any other

22   disciplinary actions that Ms. Trawick received prior

23   to her termination in November of 2015?

24      A.   I don't know that I would call them

25   reprimands.  But I do know there were areas where we



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1   were -- we were faced with either customer complaints

2   in the customer call center for unresponsiveness by

3   the people that she was managing, or studio

4   complaints regarding our marketing efforts that were

5   unsatisfactory to them.

6           I don't know that that resulted in a

7   reprimand, but they certainly raised the interest

8   level of the executive team.  And Fred met with

9   Crystal over, I believe, each of those.

10      Q.   Weren't those complaints actually against

11  Shannon Sailors?

12      A.   I don't believe so, no.

13      Q.   Wasn't there a studio that absolutely refused

14  to work with Shannon Sailors because he was

15  nonresponsive?

16      A.   I don't believe so.  I don't know though.

17      Q.   And it's your understanding that she did not

18  receive any reprimands and there's nothing in her

19  personnel file?

20      A.   Not that I'm aware of, no.

21      Q.   The -- when you completed the sale with AMC,

22  did you -- did anyone prepare a list of documentation

23  that was being turned over to AMC?

24      A.   I don't know.

25      Q.   Have you seen such a list?



1      A.    I have not.

2      Q.    Did the IT department or anyone from the IT

3  department go to AMC?

4      A.    Not that I'm aware of.  You mean permanent?

5      Q.    Permanent or temporary.

6      A.    Well, during the period preceding and

7  following the acquisition, several employees in

8  accounting and IT were retained for a period of time

9  as part of that transition.

10     Q.    Do you know who they were?  In IT, let's start

11 there.

12     A.    I only know a few.

13     Q.    Tell me who you know.

14     A.    I believe Terra was one of them.

15     Q.    Terra Hardwick?

16     A.    Yes.  The rest that I would know would be in

17 the accounting group.

18     Q.    And who were they?

19     A.    Jeff Cole, Greg Wiggins.  And I think Dawn

20 Saint or Smith.

21     Q.    And --

22     A.    Gus -- I'm not done.

23     Q.    Okay.  Gus.

24     A.    Gus McMurray.  Fred Friedel, although he was

25 not technically in the accounting group.  He was in



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

1    compliance.

2        Q.    Uh-huh.  (indicating in the affirmative).

3        A.    Did I say Greg Wiggins?

4        Q.    You did.

5        A.    Yes, those are the names that I recall.

6        Q.    Okay.  Did anyone in HR stay for the

7    transition period?

8        A.    I think so, but I don't recall with

9    specificity.

10       Q.    Did Carmike retain any documents that were

11   records of any social media accounts in which Carmike

12   participated?

13       A.    I don't know.

14       Q.    Did Carmike issue paychecks or was it direct

15   deposit system?

16       A.    The vast majority were on direct deposit.

17       Q.    And were employees provided simply with pay

18   stubs?

19       A.    Electronic copies of what you might call a pay

20   stub, but pay record.

21       Q.    Pay record.  Okay.  Did Carmike retain copies

22   of those?

23       A.    I don't know.

24       Q.    Okay.  Are you aware of any medically related

25   leave that Ms. Trawick took other than the maternity



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 284

```
1   leave we previously discussed?
2     A.    I am not.
3           MS. PREBULA:  I think I may be through if we
4       can just take a five minute break, I'll double-
5       check.
6           (Brief break)
7           (Upon resuming)
8    BY MS. PREBULA:
9     Q.    The one person I have on my list that we have
10   not discussed is John Greer.  Can you tell me what
11   his function was?
12    A.    John Greer was a -- it depends on what year
13   you're talking about.  But in November of 2015, John
14   Greer was a division manager.  He and Jim Lucas each
15   handled about half of the theater locations in terms
16   of management oversite.
17    Q.    Okay.  I thought -- and I had two of them
18   listed with the same name.  Was there a second
19   employee named John Greer?
20    A.    Not to my knowledge.
21    Q.    And did he, between October 2012 and November
22   of 2015, was he in the same division manager role?
23           MR. GERAKITIS:  We're still talking about John
24       Greer?
25           MS. PREBULA:  We are.
```



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 285

1        DEPONENT PASSMAN:  At one point -- and I don't

2     remember the year that he was promoted.  But at

3     one point, he was a district manager.  And I'm

4     guessing it would have been in 2012, but I just

5     don't recall.  I'm sorry.  Fred Van Noy would be

6     able to give you that.

7   BY MS. PREBULA:

8     Q.    The -- how did you make the decision of

9   whether a sponsorship would be sent to the

10  benevolence group or to accounts payable to be paid

11  or benevolence fund?

12    A.    Yeah.  It was basically boiled down to two

13  things.  It might be that the benevolence fund didn't

14  have funds sufficient to pay, in which case it would

15  go directly to AP.  In other cases, it didn't feel

16  like it was benevolence.  It felt more like it was

17  advertising and in which case it would go to AP.

18    Q.    And who would make that call?

19    A.    Usually it would be me in conjunction with the

20  entire executive team or a member of the executive

21  team.  The Chamber would be one of those categories

22  that's really hard to define whether it's a donation

23  or a, if you will, an advertising type expenditure.

24    Q.    So generally donations would go to benevolence

25  and advertising would go to accounts payable.



1      A.    Generally.

2      Q.    And how was the benevolence fund funded?

3      A.    We would take a small percentage of ticket

4   sales and every quarter or so calculate the amount of

5   money that was -- that it would derive and put it

6   into the benevolence fund.  It would be transferred

7   out of general corporate.

8      Q.    And who would approve that?

9      A.    The transfer?

10     Q.    Uh-huh.  (indicating in the affirmative).

11     A.    It was done by the controller's office based

12  on the formula that was in effect for that year.

13     Q.    And the board would approve the formula?

14     A.    The board of directors?

15     Q.    Correct.

16     A.    No.

17     Q.    Who would approve the formula?

18     A.    I would or the executive team would.  The

19  formula had not changed, by the way, in all of my

20  tenure at Carmike.  And I can't tell you what that

21  was, whether it was a penny or a quarter or what

22  monetary amount per ticket sale.

23     Q.    And when you say your tenure, you mean while

24  you were president or on the board, too?

25     A.    Both.



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 287

1    Q.    Okay.

2    A.    I was told it had been in existence forever.

3    Q.    And you just don't remember what it was?

4    A.    I don't.

5    Q.    The -- did you receive quarterly reports from

6    Comdata to track credit card and other expenses?

7    A.    I did not.

8    Q.    Did someone?

9    A.    I can't answer with certainty, but I would

10   assume so.

11   Q.    Did you receive quarterly reports from Nexus?

12   A.    I did not.  Same answer.

13   Q.    Okay.  Did -- you had to have a password to

14   enter both of those systems, right?

15   A.    That is right.

16   Q.    And you had to have certain level of authority

17   in order to approve expenses on those systems.

18   A.    That is also correct.

19   Q.    So if someone tried to approve an expense that

20   was above their level of authority, the system

21   wouldn't let them do it?

22   A.    That's correct.

23   Q.    And then once the expense or charge was

24   approved on the systems, accounts payable would take

25   care of making sure it was paid?



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 288

```
 1      A.    I believe that's correct.
 2      Q.    All right.  And was there a similar system for
 3   payroll, meaning there was a software system that ran
 4   payroll?
 5      A.    There was an automated system that ran
 6   payroll, yes.
 7      Q.    Do you know what it was?
 8      A.    I do not.
 9      Q.    The controller was in charge of that?
10      A.    The payroll person that ran the department
11   reported to the controller, yes.
12      Q.    Okay.  Did you see the quarterly tax returns
13   on payroll?
14      A.    I did not.
15      Q.    Again, through the accounting department, they
16   would deal with that?
17      A.    Yes, yes.
18      Q.    Did you see a quarterly breakdown of how
19   payroll was being paid out per department or per
20   division or anything like that?
21      A.    No, not specifically for payroll.
22      Q.    Okay.
23            MS. PREBULA:  I think that's all the questions
24   I have for you.  And Mr. Gerakitis will coordinate
25      with you about signature.
```



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 289

1    DEPONENT PASSMAN:   Okay.

2

3

4    (Deposition concluded at 5:14 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 291 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                    DEPOSITION OF
DAVID PASSMAN on 10/11/2017                                       Page 290

1   STATE OF GEORGIA

2   COUNTY OF MUSCOGEE

3

4

5              C E R T I F I C A T E

6

7

8        The forgoing transcript of the proceedings

9   was taken before me as a Certified Court Reporter

10  in and for the State of Georgia and reduced to

11  typewriting under my direction and supervision, and

12  I certify that it is a true and correct transcript

13  to the best of my ability of the proceedings.

14

15

16            This 20th day of October, 2017.

17

18

19

20  _____

21        Eric Cavanaugh

22        Certified Court Reporter

23        No. 2560

24

25



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 292 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                    DEPOSITION OF
DAVID PASSMAN on 10/11/2017                                  Page 291

```
 1         COURT REPORTER'S DISCLOSURE STATEMENT

 2

 3         I, ERIC CAVANAUGH, Georgia Certified Court

 4     Reporter, Certificate Number 2560, in compliance

 5     with Code Section 9-11-28 and Code Section

 6     15-14-37, make the following disclosure about all

 7     arrangements, financial and otherwise, involving

 8     the foregoing deposition:

 9

10  1.)    I was contacted directly by telephone

11  regarding scheduling of the deposition as to date,

12  time and place by the office of the scheduling

13  attorney, or received a message from the office of

14  the scheduling attorney by answering machine and

15  returned the call, with scheduling of the deposition

16  as to date, time and place confirmed, and no prior

17  financial arrangements were negotiated between

18  counsel and myself.

19

20         This 10th day of October, 2017.

21

22

23

24              Eric Cavanaugh

25              Eric Cavanaugh, CCR #2560.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Page 292

1    DEPOSITION ERRATA SHEET

2    Assignment No. 37430

3    Case Caption:  CRYSTAL TRAWICK

4    vs.  CARMIKE CINEMAS, INC.

5    Witness: DAVID PASSMAN - October 11, 2017

6

7    DECLARATION UNDER PENALTY OF PERJURY

8    I declare under penalty of perjury

9    that I have read the entire transcript of

10   my Deposition taken in the captioned matter

11   or the same has been read to me, and

12   the same is true and accurate, save and

13   except for changes and/or corrections, if

14   any, as indicated by me on the DEPOSITION

15   ERRATA SHEET hereof, with the understanding

16   that I offer these changes as if still under

17   oath.

18   Signed on the _____ day of

19   _____, 20____.

20   _____

21   DAVID PASSMAN

22   Sworn to and subscribed before me this _____ day
     of _____, 20___.

23   _____

24   Notary Public

25   My commission expires_____



1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                      DEPOSITION OF
DAVID PASSMAN on 10/11/2017                                    Page 293

```
 1              DEPOSITION ERRATA SHEET
 2     Page No._____Line No._____Change to:_____
 3     _____
 4     Reason for change:_____
 5     Page No._____Line No._____Change to:_____
 6     _____
 7     Reason for change:_____
 8     Page No._____Line No._____Change to:_____
 9     _____
10     Reason for change:_____
11     Page No._____Line No._____Change to:_____
12     _____
13     Reason for change:_____
14     Page No._____Line No._____Change to:_____
15     _____
16     Reason for change:_____
17     Page No._____Line No._____Change to:_____
18     _____
19     Reason for change:_____
20     Page No._____Line No._____Change to:_____
21     _____
22     Reason for change:_____
23
24     SIGNATURE:_____  DATE:_____
25                    DAVID PASSMAN
```



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                    DEPOSITION OF
DAVID PASSMAN on 10/11/2017                                        Page 294

```
 1              DEPOSITION ERRATA SHEET
 2   Page No._____Line No._____Change to:_____
 3   _____
 4   Reason for change:_____
 5   Page No._____Line No._____Change to:_____
 6   _____
 7   Reason for change:_____
 8   Page No._____Line No._____Change to:_____
 9   _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____ DATE:_____
25                  DAVID PASSMAN
```



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 296 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                                    DEPOSITION OF
DAVID PASSMAN on 10/11/2017                                                  Index: $7500..2015

## Exhibits

**37430 Passman.
David Plaintiff'
s Exhibit 44**
 3:12 57:23
62:7,8 77:21,
24,25

**37430 Passman.
David Plaintiff'
s Exhibit 45**
 3:13 138:25
139:1

**37430 Passman.
David Plaintiff'
s Exhibit 46**
 3:14 140:17

**37430 Passman.
David Plaintiff'
s Exhibit 47**
 3:15 142:15

**37430 Passman.
David Plaintiff'
s Exhibit 48**
 3:16 148:9
156:7

**37430 Passman.
David Plaintiff'
s Exhibit 49**
 3:17 190:24
191:13,24
217:25 218:11,
17,21 219:21

**37430 Passman.
David Plaintiff'
s Exhibit 50**
 3:18 235:11
237:4

**37430 Passman.
David Plaintiff'
s Exhibit 51**
 3:19 236:8,10

**37430 Passman.
David Plaintiff'
s Exhibit 52**
 3:20 243:1
261:24

**37430 Passman.
David Plaintiff'
s Exhibit 53**
 3:21 243:14

**37430 Passman.
David Plaintiff'
s Exhibit 54**
 3:22 244:23

**37430 Passman.
David Plaintiff'
s Exhibit 55** 4:3
 246:14

**37430 Passman.
David Plaintiff'
s Exhibit 56** 4:4
 247:12

**37430 Passman.
David Plaintiff'
s Exhibit 57** 4:5
 254:20

**37430 Passman.
David Plaintiff'
s Exhibit 58** 4:6
 255:8

**37430 Passman.
David Plaintiff'
s Exhibit 59** 4:7
 257:2

**37430 Passman.
David Plaintiff'
s Exhibit 60** 4:8
 258:11 260:1

**37430 Passman.
David Plaintiff'
s Exhibit 61** 4:9
 260:16

**37430 Passman.
David Plaintiff'
s Exhibit 62**
 4:10 261:24

**37430 Passman.
David Plaintiff'
s Exhibit 63**
 4:12 263:14

**37430 Passman.
David Plaintiff'
s Exhibit 64**
 4:13 265:18

## $

**$7500** 260:13

## 1

**1,000** 47:15

**10** 11:25
157:14

**10-2012** 139:9

**11-17-15** 236:4

**11th** 218:7

**12** 8:14 158:11
159:7 162:4,5,
12 179:19,24
218:6

**12,000** 47:8

**13** 8:11,14
218:6

**14** 86:17 173:7,
8 186:8,10,12,
13

**15** 86:17,21
207:21

**15th** 140:20
243:22

**16** 13:6 197:13
259:3,5

**16th** 140:20

**17** 235:15

**18** 147:12
161:16

**19** 162:10
265:25

**1976** 21:15

## 2

**2** 262:13

**20** 162:20
164:12,19
239:19 240:8
241:1,4 242:22

**2000** 34:14

**2003** 11:4
12:15,17

**2008** 242:9

**2009** 8:1,2,5,8,
11 13:16,17
14:2,3,5,14,21,
23 15:2,7 22:7
27:9 34:4,6,9,
18 35:8,9,12,
14 44:21 46:4,
9,11,15 54:12
55:5 187:19
190:14 242:6,
8,15 252:21

**2010** 252:21

**2011** 8:14
46:11 148:15,
18 242:6

**2012** 8:11
52:19 54:14,23
62:2,5,19

**2013** 55:17,21
56:17 62:12
76:12,15,19
77:1,20 78:2,7,
11 80:15,20,25
81:2,5 83:1
86:12,17,21
89:13 91:18
140:19,20
144:11,15
171:11,15
172:23 183:7,
15,20 187:15
247:15 249:1

**2014** 34:15,18
86:21 89:18
134:24 135:4,
6,7,8 136:20
142:17 144:11,
15 183:24
187:13 198:19,
22 241:11,15,
22 242:1,17
262:1,14
274:13

**2015** 8:24 9:16
25:21 35:2,8
46:21 47:1,10
54:12,14 56:18

---

89:16 90:11
98:13 114:2,16
148:5,22
149:24 150:5
152:18 166:19
171:18 172:1
180:18 181:16
187:3,17 223:7
241:15,21
242:1,7,17
254:20 255:11,
14 269:19
272:5 284:21
285:4



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Index: 2015-2016..able

72:18 73:3,17
74:4 75:5,8,15,
17,18 89:21
90:11 95:3,7,
13 98:13
109:12,23
110:4,13
112:25 114:17
117:19 118:8,9
131:11,25
132:3 148:5,
18,22 149:25
150:5 152:18
166:19 168:20
171:16 176:12
179:20,24
185:12 186:8,
13 187:11
194:6,9,23
195:5,12,18,
21,23 196:14,
20 197:9
198:8,11,23
199:13,15
200:8 201:16
202:7,12,24
203:1,3,14,17
204:2 205:25
207:17 208:4
209:13,19
210:2,21
211:3,19
212:1,4 214:17
215:7 217:18
218:25 222:13
223:8 224:7,
20,24 225:4
226:13 228:20
229:2,14,22
231:17 235:15
240:23 243:19
244:3,7 249:4
262:1 263:15,
19 264:11
265:25 268:14

269:19 272:5
280:23 284:13,
22

**2015-2016** 19:1

**2016** 13:5,23
16:4 27:10
28:15 29:4
34:13 66:11,14
71:15

**21** 72:18 73:17

**21st** 13:6
242:20

**22** 194:22

**25** 147:12
162:20

**25th** 243:19,22,
24

**260** 87:7

**280** 87:7

**2826** 214:20

**29** 162:17

**2947** 146:10
148:4

**2:00** 167:16

---

**3**

**3.01** 154:12

**3.02** 156:13

**3.05** 157:14

**3.08** 159:8

**30** 87:8 162:23
263:15

**300** 87:10
225:16

**3000** 147:16

**30th** 263:19

**315** 218:5

**360** 270:2,6,13
271:1,13

**37** 149:18
165:20 167:21

**39** 149:14
171:5 174:18

---

**4**

**4.07** 161:17

**40** 179:6
180:13 280:1

**400** 87:11

**42** 193:14,21
194:1 217:12
218:9,13,16

**43** 71:21,24
72:17 73:21
214:6,7
220:19,22

**44** 57:23 58:18
62:8 77:21,25
78:14 204:14

**45** 138:24,25
139:1

**46** 140:17
143:23

**47** 142:15
143:23

**48** 42:11,16
148:9,23 150:7
156:7 165:13

**49** 190:21,24
191:13,24
193:14,22
194:2 217:13,

25 218:11,17,
21 219:21
222:19 269:3

---

**5**

**50** 235:11
236:1 237:4,
12,19 238:4,
11,15

**500** 47:16,21

**501(c)(3)**
138:17 251:18
252:2

**51** 236:8,10
237:4,12,19
238:4,12,15

**519** 171:9

**52** 243:1
261:24

**52-week** 255:23

**53** 243:14

**54** 244:23
245:10,14

**55** 246:14

**56** 222:4
247:12

**57** 254:20

**58** 255:8

**59** 257:2

**5:14** 289:4

---

**6**

**6,000** 47:12

**60** 258:11
260:1

**600** 87:1

**61** 260:16

**62** 261:24
262:23 263:7

**63** 263:14

**64** 265:18

**65** 43:7

**696** 259:25

---

**7**

**70s** 100:24

**73** 217:24
218:21 219:5
222:3

**75** 21:15

**76** 21:16

---

**8**

**8-27** 254:24

**800** 104:1,10,
24

---

**9**

**9** 244:7

---

**A**

**A/k/a** 214:16

**a2nother**
235:12

**ability** 42:4
164:25

**able** 64:24 71:3
92:12 165:5
179:15 217:21
285:6



**DISCOVERY LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 298 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                    DEPOSITION OF
DAVID PASSMAN on 10/11/2017                         Index: about..after

**about** 10:25
13:9 23:1
28:22 29:21
31:25 33:2,8
36:1,3 37:7,11,
15 38:15,16
39:24 40:11,
13,16,17,22,25
41:5,6 48:5
49:13 53:18
59:24 60:3
70:22 71:14
72:1,2 77:1,4
78:16,20 79:6,
8,14,20,25
89:1,18 93:5,
16 95:2,3 96:5,
7,10 97:7,10,
16 98:7 99:23
102:24 105:21
106:2 109:8,10
110:15,17
115:19 119:2,
6,7,10,12,13,
14 124:17,22,
25 125:11,18
128:6 134:2,4,
15 136:18
137:7 140:2
141:16 143:4
146:7 147:6
149:5,11,15
161:25 168:9
171:19 182:17
183:22 185:10
196:11 199:12
200:4 211:14
216:24 219:22
222:5,9,17
227:4 235:5
244:2 245:5
246:22 249:2
267:15 268:17,
24 272:4
277:17 279:3

284:13,15,23
288:25

**above** 54:17
222:23 223:13
224:1 225:24
226:3,4 227:2,
3 230:6,10,17
232:2 287:20

**absence**
274:15

**absolute** 28:6
35:4

**absolutely**
93:22 281:13

**abstained**
15:12,13

**abusive** 102:25

**accepted**
250:17

**access** 19:14,
19 20:3,8,9
63:7,8,10
106:5,7 127:25
152:5

**accidentally**
172:13

**accomplishment
s** 244:10

**according**
251:13

**accounting**
21:8 28:25
30:4,6 74:5
76:4 129:16,18
224:8,12 225:3
282:8,17,25
288:15

**accounts**
248:8,13

283:11 285:10,
25 287:24

**accrued** 163:20
164:25 165:6

**accuracy**
218:20 262:10

**accurate** 201:3
213:16 214:15
215:5 237:4,19
242:23 250:3
255:2 258:14
262:14

**accurately**
144:10

**accused** 94:16

**achieve** 275:17

**achievement**
241:10

**acknowledgeme
nt** 165:14
244:10

**acquire** 24:24
25:5

**acquired** 24:20
25:1,6 66:16
201:13

**acquiror** 17:13

**acquisition**
16:24 17:15
18:16 66:19
185:21 198:14,
21 282:7

**acquisitions**
242:18

**act** 207:5

**acting** 14:8

**action** 35:24
69:14 136:10

153:15 166:6
168:5

**actions** 131:7
280:22

**activities** 241:9
254:15 278:1

**activity** 251:15

**actual** 191:1,6
270:4 280:6

**actually** 18:15
62:17 112:19
117:4,13
128:14 139:15
201:10 217:17
237:1 253:7
254:1 273:25
278:18 281:10

**added** 221:15,
16

**addition** 217:3
269:2

**additional**
15:14 77:12
149:4 240:11

**address** 7:22

**administered**
84:4

**Administration**
21:7

**administrative**
34:21,24 35:6,
10,11,13,16
53:6

**Adobe** 175:24
176:1,11

**adopt** 213:16

**adopting**
128:13

**ads** 88:8,10,14,
15

**advance** 22:1,
18

**advertisement**
86:21

**advertising**
50:14 83:24
85:15,20 182:4
202:15 285:17,
23,25

**advice** 79:13
93:12

**affect** 41:23
42:4,7,24 43:2
134:16

**affected** 42:1
52:8 170:11

**affecting** 44:3

**affirmative**
66:15 71:23
127:4 141:6
159:17 173:19
213:5 261:20
283:2 286:10

**aforementioned**
53:24

**after** 55:6
58:19 62:15,19
77:4,20 80:15,
19,24 81:16
82:21 83:16
85:2,11,16,20,
22,25 86:21
87:14 88:21
89:7 92:16
96:20 108:9
117:21,25
118:3,7,16,21
120:5,21 125:8



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 299 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                    DEPOSITION OF
DAVID PASSMAN on 10/11/2017                        Index: afterwards..anesthesia

135:1,2 141:16
143:19 168:17
180:17,22
181:7,15,16,25
182:14,18,22
183:1 238:21
275:7

**afterwards**
123:11

**again** 31:19
38:13 53:1
69:2,12 75:13
82:17 83:6
85:7 110:25
111:12 112:3
121:11 142:15,
24 143:5,8,21
156:6 160:12
186:12 187:2
195:10 211:13
220:13 223:3
224:1,11
225:22 229:25
230:2,24
233:23 248:13
258:12,15
261:8 262:22
265:24 266:8
271:9 288:15

**against** 27:10
29:6 30:10,15
40:2,15 99:2,8
112:1 136:11
151:2 170:7
281:10

**age** 151:24

**agree** 6:9
152:14 226:16,
22 227:13
276:16

**agreed** 6:5,16
59:23

**agreement**
169:22,24,25
170:1,6,14
255:9

**ahead** 101:3
124:19,20
149:10

**air** 179:20,22

**airline** 132:20

**airplane** 229:9,
10

**Alan** 12:14

**alcohol** 42:15,
18,24

**all** 6:3 7:21,24
9:15,24 10:12
13:17 16:20
18:16 19:10
22:12,13 25:4
37:2 38:23
44:24 45:6,7,
10,15 46:19
48:19 49:17
53:5,8,13 58:4
59:23 64:3
65:14 66:3
67:4 68:19
70:12 73:23
74:3 83:1 87:6
88:22 90:9
106:22 125:11
126:11 127:1
129:2 130:5
132:7 133:2
134:9 135:11
140:11 149:10
150:14 151:9,
22 156:11
157:6 159:11
160:18 162:2
163:24 169:16
172:6,19

174:17,25
179:14 181:11
189:24 195:5
200:10 202:3
203:8,20
205:5,18
206:8,14,15,18
210:17,19
211:12 212:20,
22 214:25
215:25 216:7,
11,16 219:4,5
221:21,24
225:23 226:25
228:19 241:16
245:9 251:5
253:5 261:11
262:2,5
266:15,21,24
269:17 270:16
273:4 274:8,
19,25 277:11
286:19 288:2,
23

**alleged** 161:5

**alleging** 30:15

**Allen** 14:17

**allocate** 259:18
260:5 261:5

**allocated** 276:7

**allocating**
260:13

**allow** 17:14

**allowed** 136:11
192:21 253:11

**almost** 225:16

**along** 45:3
278:7

**already** 57:16
66:16 83:3

90:2 93:23
204:4,8 216:24
227:4 232:13

**also** 23:20
56:14 63:17
74:9 103:19,20
104:19 105:2
111:7,10
118:16 127:7,
22 137:16,24
140:17 147:13
149:5 151:8
153:10,19
156:19 160:10
165:25 169:4
178:23 185:9,
11 200:17
204:18 207:4
209:6,9 211:8
224:18 248:3
257:15 269:6
277:19 287:18

**alternative**
34:16 63:20
127:5,7 194:17
199:18,21,22
200:13,18,21
201:5,12,20,25

**although**
282:24

**always** 138:3
214:14 264:4

**am** 9:4 10:20
85:17 98:25
108:13 132:5
142:2 144:23
147:15,16,22
160:24 161:7
170:5 171:17
172:24 177:14
180:3 190:25
218:4 220:20

228:6 269:16
284:2

**Amanda**
216:14,19
224:3

**AMC** 13:4 16:3,
4,19,24 17:3,
15 18:10,20
20:6 24:20,24
25:5,10 28:9,
10,11 35:17
36:22 40:3,25
66:8,16 67:2
157:7 169:19,
22 170:15,16
189:22,24
272:14,18,21,
22,24 273:1,7
281:21,23
282:3

**America** 93:10
125:19

**Ames** 264:8,22
265:19

**among** 199:11

**amount** 13:1
286:4,22

**amounts**
275:18

**analysis** 199:8,
10 225:16

**analyst** 225:13,
20

**analyzing**
225:18

**and/or** 103:17
234:10

**anesthesia**
43:24 44:2



**annual** 30:7
143:24 145:22
249:11 257:24
269:18

**anonymous**
104:1

**another** 39:2,7,
12,13,20 53:9
76:3 110:15,18
221:1 248:9

**answer** 6:7
7:12 12:7
13:15 40:4
50:16 71:3
99:22 109:19
113:22 121:24
184:12 195:1
212:25 216:5
217:22 261:19
270:14 287:9,
12

**answered**
191:19,21
265:10

**answering**
191:16

**anti-
discrimination**
31:14 32:21

**anybody** 60:17
69:9,14 106:15
107:4,16
108:12 109:4
145:10 190:3,
5,16,18 197:23
223:18 254:9
272:1,3,7,10

**anybody's**
178:20

**anyone** 11:15
29:13 37:7

40:8,11,19,25
61:20 67:15
70:1,7 102:2
108:7 116:12
130:11 137:13
140:13 158:4
217:19 218:25
222:8 239:7
247:21 253:19
254:5 269:21
278:9 281:22
282:2 283:6

**anyone's**
178:10

**anything** 36:2
38:21,23 43:2
49:4 66:1
68:16 69:6,7,8,
9,15 70:16,25
81:20 89:12,15
96:9 103:5
163:10 176:22
190:1,3,6,7
202:22 208:24
209:2 218:1
222:5 225:15
247:5 268:7
278:2 288:20

**anyway** 167:16

**anywhere**
32:22,24 68:9
219:18,21,23
259:12

**AP** 200:24
221:15 285:15,
17

**apartment** 8:5

**apologize** 18:9
22:23 167:14
254:4 257:12
265:11

**appear** 88:8
93:7 148:2,6
153:24 171:9

**appearing**
88:10

**appears** 140:23
142:18 147:12
149:16 236:20
243:1 247:16
255:8,10,14,
15,23 256:1
258:11 259:16
260:20,23
261:25

**Apple** 176:10

**applicability**
168:24

**applied** 148:21
149:24 150:4
185:4

**applies** 146:23
147:9,17,19

**apply** 146:25
147:23,25
148:4 156:11
186:7

**appointment**
93:6

**appointments**
63:6 79:12

**appreciate**
239:13

**approach** 84:2

**appropriate**
153:2,4,15
251:17

**approval** 29:3
50:1,2,6 53:2,
20 90:9 126:21

128:11 235:25
248:18,19
251:7 266:23
267:6

**approvals**
53:10 115:19
126:21

**approve** 49:7,
10 50:4,6,8,23
51:6 52:24
53:14 54:14
55:20 57:12
58:13 60:17
61:1,4 62:1
126:16 129:9
135:18 136:7,
9,10,14 139:23
140:4,5
247:17,21,23
248:1,16
252:2,5 261:10
267:5 286:8,
13,17 287:17,
19

**approved**
18:17,20,22
49:6 50:3,4,12,
13 51:1 53:9,
12 54:19 56:2,
9,22 59:12,17,
18 127:8,17,
20,21 128:20,
21 129:3
131:13 136:17
137:24 138:4,
17 140:13
247:20 250:23
261:16 274:19,
25 287:24

**approving**
140:2 247:24

**April** 14:3

62:12 76:12,
15,19,25 77:20
78:2,6,10
80:15,20,25
83:1 109:23

**area** 20:15 28:8
200:15 210:9

**areas** 23:8,15
270:22 280:25

**aren't** 230:5

**Arlie** 209:25

**around** 109:12,
23

**arrangement**
15:23

**arrive** 56:16

**art** 263:4

**aside** 25:12,15,
18 28:21 29:1
31:5

**ask** 7:4 41:9
64:12 71:6
79:13 82:14
84:21 85:6
89:1 99:25
112:2,12
136:22 146:6,
24 149:5,18
158:4 191:2
192:10,12,21
194:8,25 220:2
229:13 262:22
264:5

**asked** 12:5,7,9
13:21 14:3
18:10 40:4
58:8 66:9,10
76:14 85:22
88:5 93:7
94:22,23 96:12



Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 301 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                    DEPOSITION OF
DAVID PASSMAN on 10/11/2017                              Index: asking..based

101:2 111:12
121:23 134:17
173:25 211:2
218:3 222:17
241:8 246:10
272:3,7,10
279:3 280:16

**asking** 39:8
63:22 67:11
80:5,17 82:1
96:1 173:18
191:11 213:16,
18 218:2
219:22 233:1

**assess** 212:17

**assets** 16:25
24:24 25:4,5
225:21,23

**assign** 217:4

**assigned** 57:10
60:15 182:8
248:19

**assigning**
82:20

**assignment**
168:1

**assistant**
34:21,24 35:7,
10,11,12,13,16
53:6 63:5,17,
21,23 64:5
69:17 116:16
126:23 207:11
223:1,4 253:23

**assume** 6:19
7:13 24:19
25:3 37:3
39:14,18 46:24
67:23 92:13
97:15 114:12
128:12 129:19

131:16,20
142:24 144:12
153:7 161:2,15
165:17 172:7
181:24 189:1,
14,25 204:17
211:9 224:12
261:7 272:23
287:10

**assumed**
39:14,15,17
40:1

**assuming**
20:25 33:12
108:20,22
114:13 131:17
216:17

**assumption**
145:20

**Atlanta** 8:3,4,5,
13,15 10:8

**attached**
259:22

**attempt** 107:13
123:16 155:22

**attempting**
155:12

**attend** 86:3
170:18

**attendance**
86:5,13 87:9
93:12 170:22

**attended** 87:1,4
171:1

**attending** 37:14
86:1

**attention** 69:18
167:25 216:4

**attorney** 36:3,5

39:13

**attorney-client**
6:8

**auction** 255:25
256:2 258:13,
24

**audit** 128:25
129:18 270:16

**August** 43:22
81:8 140:19,20
142:17

**author** 84:12,
14 171:22

**authored** 84:16,
25

**authority** 51:4
130:2,4 168:24
169:14 251:10
267:4 287:16,
20

**authorization**
139:5 140:18
142:16 235:12
236:4

**authorized**
178:24,25

**automated**
205:12 288:5

**automatically**
173:13 174:9

**available**
176:15 193:23
253:13

**awards** 64:17
260:12

**aware** 25:14
30:10 37:1
43:5 44:4,19

47:20,23 66:21
70:19 83:1
85:14,17 89:7
90:19,23,24
98:22 99:2,7
104:6 108:12
114:15,18
115:13,16,21,
22 123:4,21,24
130:15 131:24
132:2,6,9,13,
16,19,22
137:3,22
140:15 145:9,
14,15,17
148:20 152:19
157:21 160:22
161:3 165:4
166:10,15
171:14,17
172:21 178:19
180:2,24
181:22 182:13,
17,21,25
187:24 188:13
189:6,9 206:21
214:24 217:18
241:3,5 252:7
269:14 273:22
274:2,3,5
280:5,16,19,
20,21 281:20
282:4 283:24

**away** 45:21,23

—————
B
—————

**B-1** 168:25

**B-r-i-g-i-t-t-e**
9:8

**B-u-e-h-l-m-a-n**
9:12

**baby** 120:21

133:23

**Bachelor** 21:7

**back** 8:4,12
10:23 28:19
39:22 46:12
54:12 66:10
74:8,9,10
76:12 77:25
98:1,3 100:5
105:2 107:9,
21,23 127:3
133:8 141:16
143:20 149:11
153:25 167:20
173:24 174:1
176:12,22
190:14 195:9
202:4 208:2
211:14 215:4
218:7 220:18
225:7 234:2
244:5 279:5

**backed** 107:25
108:1,4
173:17,18
174:5,19
175:15 176:17

**backup** 106:11
108:8,14,18
175:13

**backwards**
20:24

**bad** 242:5,13,
15

**band-aid** 84:2

**bank** 231:5

**banks** 256:2
258:12,24

**based** 16:2
97:1,5,8 103:6



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

111:7,12 115:2
217:9,10
233:25 255:11
263:24 274:13
286:11

basically  19:9
64:18 254:17
264:7 285:12

basis  14:5 57:7
78:12 80:5
101:16,20,22
102:19 249:11
273:13

Bates  244:24
245:6,7

became  8:15
14:5 34:6,9
35:9 59:7
126:2 182:2

because  28:25
33:3 37:3
39:19 54:12
59:9 60:2
61:13 72:13
80:4 116:17
138:4 146:7,22
154:19 165:23
169:9 174:19
177:9 181:1
193:17,18
213:12,20
215:18 217:15
219:2,17
221:11 222:7
228:7 231:5
232:25 241:17
242:18 265:1
281:14

become  13:7,
13 44:19
119:15 120:2
166:10 185:3

270:19

becoming  62:9
83:13 120:4

bed  120:19
121:1,25

before  6:13 7:6
9:17 12:15,16
22:5,7 24:13
25:21 27:6
29:24 30:7
44:10,13 57:24
58:8 65:24
66:17,19,24,25
67:2 76:20,23
81:14 83:3
86:17 87:17
91:7 92:12,18
93:3 95:4,20,
22 100:2
108:21 110:19,
22 119:1
127:10 129:3
133:23 142:3
146:6,24
179:10 180:7
191:5 198:23
217:13 222:25
223:1 239:20
242:1 250:23
278:6

began  14:1
44:10,14

beginning
35:14

behalf  170:19

behavior
102:25

behind  48:18
172:14

being  49:16
58:15 60:17

61:5,7 70:4
78:17 84:4
93:11 96:7
99:15 100:7
110:17 112:1
113:16 116:14,
15 124:25
125:11 154:19
184:23 211:14
237:11 252:25
255:19 258:16
262:17 263:11
281:23 288:19

belabor  88:25

believe  15:13,
21 17:1,2,3
19:2 22:11
23:6,24 25:1,6
26:13,19 29:20
31:13 34:20
38:12 42:2
49:6 51:25
54:9 55:6,11,
13,19,23,25
56:5,6,8 57:6
61:13 63:6,11
64:3 66:21
68:19 69:2
71:3 72:8 74:4
75:7,15 76:17
77:9 79:8 80:4,
11 81:15,19
88:11 94:2,16
96:24 97:24
101:12,15
102:9 105:9,12
106:21 108:6
113:16 121:7,
12 123:13
125:23 128:22
130:19 135:24
136:19 140:2
144:5 145:2
149:7,9,20

156:12 157:5
166:20 168:19
169:8,9,12
175:7,15
177:20 193:6
197:13,17
198:16,24
200:10 202:18
208:10 219:25
222:20 223:22
224:17 225:5,
24 227:25
229:1,5,15
233:6 234:18,
21 242:21
248:5,7 249:6
250:24 252:21
260:13 268:17
271:21 277:19
280:15 281:9,
12,16 282:14
288:1

believed
234:21

belong  224:9

belonged  158:8

below  29:1
230:18 265:21

benefit  252:15

benefits  152:5
163:4,17 164:3

benevolence
251:17,21
252:17 285:10,
11,13,16,24
286:2,6

best  102:20
235:7 237:15

better  19:24
241:15 257:18

between  46:11
49:24 50:24
56:17 73:7,17
87:10 98:13
117:9 120:10
122:10,16
136:23 145:8
148:17 149:24
150:5 152:17
203:18 223:7
241:21 272:5
284:21

beverage  196:9

Beyond  253:6

Biddin'  256:2
258:12,23

bills  212:15

bin  64:20

birth  9:11
161:24 162:7,
12,13

birthday  32:13

black  231:20

board  11:10,
11,18 12:5,10,
16,24 13:2,9,
19,21 14:3,7,
10,14 15:3,6
18:17,19,23,25
19:9,10,11,20
20:9,18 29:12
32:16 99:1,7
128:23 145:22
169:10,17
189:2 221:7,8,
9 241:7
270:17,25
286:13,14,24

boards  31:12,
15 128:3



**Bob** 219:14 220:12 228:9

**Bob's** 219:16

**boiled** 285:12

**bonus** 270:19 274:10,13,18, 20,22 275:5,9, 12,20,23 276:2,4,7,19, 22

**bonuses** 274:10 276:14

**book** 19:9,11, 20 20:9,18 63:5 277:7,11

**booked** 228:12

**booker** 228:13

**books** 19:6 189:2

**born** 135:1,2 243:8

**both** 10:17 13:12 15:24 49:23 77:7 85:15,19 104:16 143:23 144:15 182:3 193:3,23 202:23 203:13 223:11,13 232:8 237:4, 12,25 238:4,6 254:4 275:8 278:6,21 286:25 287:14

**bottom** 72:18 141:16 143:19 147:5 159:7 163:16 171:10 172:11,16,19

237:25 238:4 262:25 264:7

**bought** 35:17 169:20

**bowling** 252:15

**boxed** 64:16

**Brad** 202:6

**break** 30:18 31:3,7,9 32:2,4 76:7,9 133:3,6 138:20 167:15, 17 193:10 233:9,13 239:11,15 284:4,6

**breakdown** 288:18

**breaks** 32:3

**Brett** 75:15

**Brian** 202:11 269:4,6,15

**Bridgman** 135:15,20

**brief** 76:9 138:20 167:17 179:16 239:15 284:6

**briefed** 48:7

**briefly** 124:17

**Brigitte** 9:6,7, 10,12

**bring** 105:10 158:16,23 185:16 193:10 240:15 267:1,9

**brochures** 88:9,11

**broken** 205:14

**broker** 26:15, 18

**Brooks** 216:14, 19 224:3

**brother** 15:7

**brought** 49:15 53:2 59:19 159:1 174:14 185:6,24 187:24

**Bud** 194:16 200:9,12 201:19,22 202:1 221:15

**budgeting** 182:3 209:10

**Buehlman** 9:12

**Build** 204:25

**building** 31:11 217:1

**bullet** 152:21, 23 153:13,20 154:9 161:24 178:23

**bulletin** 31:12 32:16

**bus** 253:9

**business** 21:7 32:2 166:13 199:24 225:13 266:13

**Butkovsky** 71:16,22 108:22 185:18 197:1

**buy** 8:21,23

**buyer** 61:13 196:12,13 219:15 228:16, 17

---

**C**

**cake** 32:13

**calculate** 286:4

**calculator** 198:17

**calendar** 62:25 63:2,12 64:6,7 106:17 124:14 141:25 142:7 249:13

**call** 12:23 45:12 88:1 134:25 138:3 201:10 205:9 207:10 210:7 212:7 271:1 280:24 281:2 283:19 285:18

**called** 34:24 170:2 177:17 196:9 206:24, 25 221:6,21 233:7 248:14 251:7 254:11, 12 271:3

**calling** 51:11, 12 190:23 271:2

**calls** 123:5,11 159:11

**came** 16:4 33:13 38:14,22 39:4,13,23 50:15 73:14 74:8,9,10

105:13 156:22 174:5 180:8 185:20 192:1 198:22 203:3 217:15 225:7 230:3 238:7 252:16

**campaign** 249:6 256:3,6 258:20 259:20 260:10 262:3 266:1

**campaigns** 249:16

**can't** 30:22 51:19 84:17 158:2 172:8 190:10 202:13, 14 212:25 216:5 220:21 241:16 244:13 254:10 255:9 262:10 270:14 275:25 286:20 287:9

**cannot** 71:18 89:9 131:23 144:17 170:6 172:10

**capabilities** 63:8

**card** 129:5,6 132:4 179:20, 23 287:6

**cards** 247:15, 18,25

**care** 287:25

**career** 79:15

**Carl** 15:8



Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 304 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                          DEPOSITION OF
DAVID PASSMAN on 10/11/2017                                   Index: Carmike..changes

**Carmike** 10:12, 13,15,24 11:3, 19 12:6,9 13:3, 8,14,18,21 14:6 15:10,16 16:5,19,21,23 17:5,9,12 18:1, 11,21 19:6,17 20:16,18 22:5 23:21 24:2,7, 13,16,20 25:15 27:5,11 28:21 29:6 30:1,11, 16,19 36:23,24 38:7,19,25 39:3,8,9,17,18, 19 40:2,22 44:6,11,14 45:5,7 46:2,6, 10 47:1,20 59:14 65:1 66:5,7,16 67:2, 15,25 69:25 87:10 88:8,12, 14,16,18,23 91:1 92:21,24 94:1,3,7,15,16, 18 96:13 97:11 98:13,17,23 99:2,8 101:10 106:5,7 107:24 109:4 110:11 115:11,14,17, 23 122:24 123:3,4 124:9 125:1,8,11,25 130:1 132:24 136:5,9 139:5 142:10 146:9 147:13,15 148:11 150:12 152:17,22,25 153:10 156:14 157:2,7,11,23 158:3 161:1,20 164:7 165:12, 13 169:19 170:7,10,15, 19,21 175:14 176:19 177:12 178:9,12,19, 24,25 188:16, 24 189:24 190:9 199:19 201:11,13,21, 24 202:1,9 203:17 204:23 213:24 216:13 223:17 225:12 231:2 237:25 238:3,16 239:8 243:5 244:11 247:14,18 249:13,18,24, 25 250:9,14 251:1 252:18, 20 253:1,12,19 254:24 255:24 256:16,21,22 257:8,15,20,22 258:8 259:4,6 260:8 261:1,25 262:16,23 263:10,11 265:8 266:5,9 267:24 268:13 269:14 280:8, 14 283:10,11, 14,21 286:20

**Carmike's** 157:22 161:8 249:8 252:15

**carmike.com** 156:25

**carried** 25:25 26:5,11 228:11

**carry** 12:21

**case** 7:3 10:4 27:7 38:4,15 39:16 40:2 47:25 98:20 105:14,15 129:8 146:9 154:24 273:18 275:23 285:14, 17

**cases** 26:23 51:2 127:23,24 285:15

**casualty** 26:2

**catch** 86:18

**catching** 163:2

**categories** 151:11 230:25 275:14 285:21

**category** 212:3 226:18,23 251:16

**Cathryn** 74:17, 18 268:13,22

**cause** 135:5,9, 12

**ceiling** 92:21, 24 93:11,15, 17,25 94:3,6, 11,14,17,18 95:2,25 96:11, 13 97:7,10,16 98:8 117:22 118:11 124:17, 23 125:14,18 167:5 168:9

**ceilings** 111:13

**celebrating** 32:12

**center** 281:2

**century** 242:20

**CEO** 13:19,22 14:2,6,8 15:2, 10,18 17:9 19:5 29:9 33:11,20 34:6, 9 44:23,25 46:16 48:22 49:2 50:1 67:12 74:20 98:23 194:19

**CEO'S** 15:7 35:10

**certain** 46:13 73:14 74:24,25 140:3 167:2 173:12 174:7 200:11 208:12 254:16 287:16

**certainly** 92:16 95:5 128:15 158:18 168:16 176:12 222:23 240:23 250:3, 11 255:6 281:7

**certainty** 28:6 84:23 86:23 90:5 114:11 134:23 272:23 273:11 287:9

**certificate** 22:16

**certificates** 22:9

**certification** 163:5

**cetera** 18:18 23:4 32:3 88:14 90:18 91:2 151:10,25 164:3 168:24

231:10 276:15

**CFO** 29:1 34:10,19 51:3 56:14,17 128:22 194:11 206:8 216:1 221:14 224:14 270:15

**chair** 254:23

**chairman** 13:20 14:6,10,11 34:7 45:2 128:23,25

**chairs** 199:9

**challenges** 96:11

**Chamber** 132:11 249:7, 10,12,14,23 253:20 254:11, 14,15,21 258:19 260:9 262:7 263:1 268:7,10 285:21

**Champion** 27:24

**change** 8:17,19 33:19 34:2,12 73:19 213:24 214:10

**changed** 33:12, 18 73:3,20 85:6 143:5 157:7 172:9 286:19

**changes** 53:12, 21,22 54:20 55:20 65:3,7 73:7,16 143:14



Case 4:16-cv-00380-CDL    Document 63    Filed 06/21/18    Page 305 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                         DEPOSITION OF
DAVID PASSMAN on 10/11/2017                          Index: characteristic..community

172:3,7
276:16,19,22

**characteristic**
151:12,19

**charge** 30:14
48:15 70:7
71:15 88:22
92:4 103:10
198:25 199:1
201:15 207:9
210:22 248:25
251:24 273:23
287:23 288:9

**charged** 27:5
169:4

**charges** 27:10
168:23

**charitable**
251:18,22

**charities** 138:9,
17

**chart** 144:24
145:6 206:21,
25 207:15
213:3 217:19
222:6 223:16
226:18,23
230:8,11
231:19 232:20,
24 233:4

**Chase** 252:9

**Chattahoochee**
244:6

**check** 11:20,23
68:13 129:17,
25 146:18
251:10 284:5

**checks** 251:5,
20

**chief** 51:9,21
55:3,7 63:16,
17,18,19 72:8
184:10,13,21
185:17,21
186:5,6 196:17
197:1,4,5
229:8

**child** 162:12

**children** 9:21
134:11 158:12,
16

**choose** 164:25

**Christine**
264:23

**Christmas**
257:24

**Chuck** 75:14
198:8,10

**circumstances**
44:22

**citizen** 256:18,
20,22 263:11

**City** 28:8

**claim** 24:21
97:4 102:11

**claims** 26:25
99:2,7 101:7
155:5 273:23

**clarification**
75:9 101:2

**clarity** 35:4

**classified**
230:15,16

**classify** 230:4

**clean** 7:15
65:25

**cleaned** 177:9

**clear** 31:1,2
69:22 124:20
193:9 222:2,4
230:25

**clearly** 52:15
140:4 194:3
220:23 224:8
262:5

**clerical** 145:16

**click** 175:5,10

**client** 132:14

**CLO** 51:3,8,12,
16

**clock** 280:9,11,
12

**close** 21:13
24:12 223:25

**closed** 46:11
67:2

**closing** 66:25

**cloud** 19:24
20:1,9,13,16

**club** 64:19
257:14,23,25
267:23,24
268:3,4,5,9

**CMO** 34:13
109:15,16
110:1 120:4
221:16 231:16
232:2,4

**CMOS** 195:6

**CNN** 32:12

**cocktail** 260:24

**Cocktails**
260:22

**code** 91:3
138:17 149:3,
8,19,22 156:8,
10,13 165:19
166:11,16
167:6,12
168:4,22 171:3
172:13

**coffee** 32:10

**Cole** 196:20
209:9 215:8,9
224:21 226:15
231:10 274:24
275:6 282:19

**college** 21:2,24
93:8 95:12,17,
18 244:7

**Collins** 195:6
196:14 221:16
231:12

**Columbia** 22:2
23:18

**Columbus** 7:23,
25 8:2,6 9:1,
13,19,22 10:8
26:20,21 75:12
88:8,12 135:25
252:10,19
257:14,23,25
263:25 267:23
268:10

**column** 140:25
201:19 202:4
203:9 204:18
216:1

**Comdata**
126:11 127:17,
25 128:4,7,13
248:4 251:6
287:6

**come** 29:3
49:25 50:2
54:18 78:5
109:1 126:8
200:1 272:15
276:14

**coming** 99:9

**commensurate**
222:22

**comment**
211:14

**commented**
79:8

**commenting**
233:25

**comments** 97:7
112:16 234:7

**Commerce**
132:11 249:7,
10,14

**Commission**
208:23

**committee**
128:25 166:13
220:24,25
221:3,7,10
270:16

**communal**
31:17

**communicate**
31:6

**communication**
69:23 131:21

**communication
s** 105:17
157:15 178:5
199:17

**community**



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

115:23,24
132:10 170:18,
20 244:6,11
250:1 256:25
259:9,12 266:5

**commuted** 8:4,
12

**compact**
176:17

**companies**
23:13 145:25
188:18

**company** 11:21
13:4 25:25
26:2,5,8,11
28:11 29:11
30:1 32:22,25
35:17 36:10,
14,19,20 40:15
46:6,12 47:2
50:15 51:9,22
53:16 59:20
64:10,12
67:10,12 68:14
72:5 74:6,7
75:7,14 86:11,
13 89:23 90:4,
13 97:21
100:17,21
101:1,6,11
104:13 111:14
114:5,7,10,16
119:6 126:17,
19,20 127:2,10
129:5 133:10,
14 135:13
136:12 153:2,4
161:13 166:17
167:7 184:16,
19,20 185:7,
17,22 186:22
187:5,8,10,20,
21 188:6,10

196:25 201:6,
21 208:8,11
209:8,10
212:23 216:2,5
219:9 225:23
231:3 232:24
242:9,12,16
248:20 252:9
260:22 269:24
270:22,24
271:12 274:21
276:25

**compared**
100:8 111:5,
19,20 145:24
188:17 262:1

**comparing**
225:18

**comparison**
94:24 261:25

**compensation**
12:21,24 13:11
15:20,21 61:7
83:10 111:1,5
151:23 152:5
163:4,16,22
165:2,7 188:6
190:14 274:8

**complained**
96:7 99:23
100:6

**complaint**
47:24 48:4,11,
14 97:25
101:16,20
103:20 104:8,
14,18,21
105:3,6 151:3
153:1,19
154:18,25
155:17 273:23

**complaints**
100:19 101:9,
13,25 102:3,13
103:6,7,16,19
104:5 182:13,
17 189:17
281:1,4,10

**complete** 219:2
221:24 233:24,
25 262:12
279:10

**completed**
22:13 66:20
198:16 233:19
281:21

**completely**
65:25 182:2

**compliance**
131:20 165:25
166:3,12
171:21 172:4,5
208:7 248:24
283:1

**comply** 166:5
172:7

**components**
23:7

**computation**
270:20

**computer**
19:15,17 20:2
64:21,22
107:7,14,19
157:22 158:5
175:19

**computers**
173:12

**concern** 150:17

**concerning**
243:17

**concessions**
196:9

**concluded** 92:6
289:4

**conclusion**
82:13 115:7

**concurred**
49:17

**concurrently**
164:4

**condition** 42:6

**conditions** 43:4

**conduct** 91:4
107:1,6 149:3,
8,19,22 156:8,
10,14 165:19
167:12 168:3,
22 171:3
172:14

**conducted**
123:21 273:24
274:1,4,5

**conference**
31:25 86:6,12,
20 87:24 123:4

**conferences**
45:10 86:24
87:2,5,14

**confidence**
116:21

**confuse** 33:8

**conjunction**
153:12 285:19

**connection**
176:19

**Consensual**
155:17

**consider** 14:4
63:23 79:16
112:8 155:7,12
167:6 168:8
171:2 223:11,
13 227:19
250:13

**consideration**
274:14

**considered**
23:11 75:11
78:21 80:14,
19,24 82:12
113:1 155:24
184:23 231:2

**consist** 144:4

**consistent**
67:22 164:11,
18,22,25
177:25 261:2

**constantly** 65:9

**constitute**
167:24

**constitutes**
40:17

**construction**
205:11

**consult** 271:10

**consultant**
145:23 188:17
189:4

**consulted**
38:14

**consuming**
217:10

**contact** 147:7
156:4

**contacted** 12:8



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 307 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                                    DEPOSITION OF
DAVID PASSMAN on 10/11/2017                                        Index: contain..counsel

110:15,17

**contain** 105:25
152:10

**contained**
106:23

**contains** 150:8

**content** 239:23
246:18

**context** 240:7

**continue**
170:16

**contract** 17:14
36:16 255:9
260:19

**contracts**
225:19

**contribute**
200:24

**contribution**
252:16

**control** 84:14

**controlled**
106:22,24
177:21

**controller** 74:2
128:10 196:25
215:6 224:15,
18,19 226:15
274:21,24
275:6 288:9,11

**controller's**
76:2 223:22
286:11

**conversation**
76:15,18,20
79:4 83:14
92:9,14,20,23
95:20 97:17

109:8 110:17
111:3,13 120:6
234:3 244:2

**conversations**
124:24

**conversions**
199:9

**convert** 199:11

**COO** 34:10,19
49:22 55:4
74:7,11,12,13
194:9 202:4
203:9 204:18
221:14

**COO'S** 224:25

**coordinate**
288:24

**copied** 263:21

**copies** 17:19,
21 73:9,11
107:18 166:23
283:19,21

**Copner** 74:7,14
224:24

**copy** 19:7 48:5
69:24,25 84:11
108:8 141:25
146:12 165:21
172:13 173:3
191:7,12,15
193:1,2,7,14,
19 223:15
234:24 237:2
245:8 247:1,3

**corner** 172:20
237:25 238:4

**corporate** 33:2,
6 45:8,9,17,22,
24 46:15,20

53:17,19 59:16
68:19 70:3
72:21,24 75:11
87:8 88:6
93:10 99:12
100:22 125:19
144:24 147:10,
13,18,19,23,
24,25 148:8,10
150:1 168:19,
23 206:21
207:3,4 227:9
251:20 254:14,
18 256:18,19,
22 260:18
263:11 272:18,
22,24 280:10
286:7

**correct** 9:13
14:24 16:20,22
19:18 21:19
27:15,17,23
33:3 34:8,20
35:15 36:14,21
37:5 47:3,5,7
48:2,24 49:3
54:4 55:11,13,
19 56:4 60:4
67:3 72:21
77:9 78:3,4
79:7 81:3,15,
19,23 82:19
86:8 87:17
95:21,23
104:25 108:23
110:20 116:25
117:22 118:5,
12,14,18,19
120:6 126:19
128:19 129:4,
15,19 130:3,25
131:15 134:5,
20 135:23
138:13 139:17

143:18 147:15,
16,22 154:2,12
155:2 156:4
158:17,21,25
160:18 163:14
164:19 167:12,
13 168:17,21
169:6,16,20,21
171:24 176:5
180:15 184:4,
10,12,16,17
185:8,9,25
186:5,9,14,15,
17,24 187:5
196:6,19
197:3,6,20,21
198:5 200:14
201:7 202:16
204:3,17
205:24 206:7
209:16 211:7
215:11 217:13
221:17 236:11,
16 237:13
238:1,4 244:8,
11,16 246:4
247:15 248:12
255:16,25
256:8 257:16
258:22 263:5,
16 266:1,14
268:15 271:16,
18 273:8
276:18 278:13
279:10 280:15
286:15 287:18,
22 288:1

**corrected** 39:9
143:9,10
144:10

**correction** 38:2
141:8 228:18

**corrective**

153:15

**correctly** 242:7

**Costello** 216:9
224:2

**could** 13:22
20:3,8,9,12
30:23 32:3
51:2,3 63:12
82:15 90:20
101:7 103:18,
19,22,24
104:22 105:2,
4,21 119:1,15
127:20,21
129:9 136:20
141:11,19
160:10,14
175:8,10
230:22,24
245:23 247:21
250:17 259:4,
5,12,13,14
261:16,18
268:6 270:3
275:17

**couldn't** 46:18
129:25 248:16
252:5 253:15
272:14

**counsel** 12:8,9,
11 18:1 19:2
23:15,25 27:14
34:11,19
36:14,19 37:3,
12 41:6,8,10,
12 48:8,13
51:12,16
103:15 114:22
194:13 207:5
216:23 217:7
221:14 238:7
273:24,25



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations

Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 308 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                    DEPOSITION OF
DAVID PASSMAN on 10/11/2017                                  Index: counsel's..decisions

274:4,6

**counsel's**
167:3

**counterparts**
189:12

**country** 64:18
242:14 257:13,
23,25 267:23
268:3,4,5,9

**County** 9:25

**couple** 82:13
102:24 116:6
135:2 146:7
261:21

**course** 24:1,6,
10 143:11
244:14 245:16

**courses** 21:24
22:10,13,24
23:17

**court** 7:9 10:4
48:1 71:25

**cover** 26:23

**coverage** 26:23
27:3

**covered** 23:5
107:12

**create** 177:1

**created** 14:2
70:14 116:20
192:9,10,13
219:8 254:11

**credit** 129:5,6
132:4 179:20,
23 259:19
260:6,8 287:6

**crew** 205:17

**criteria** 276:2,5,
15

**cross-
examination**
6:3

**crossed** 70:23
140:3,20

**Cruz** 35:14,19
69:20 70:19
137:18 138:4,
8,13 158:23
250:22 253:24,
25 254:1,2
257:7 261:6
267:1,10,14

**Cruz's** 56:12

**Crystal** 7:3
44:5,10 45:3
52:24 54:15
55:20 56:10,22
67:24 68:16
78:2,18 79:11
84:1 88:17
105:17,22
116:9 122:19
123:13,14
129:24 133:23
134:1,3,7
137:4,18,23
138:3,8 139:10
140:18 148:5
149:24 154:18
155:1 157:25
158:4,8 165:14
166:21 167:4
169:2,3 170:10
178:12 180:12,
17 181:5,15,
16,18,23,24
184:3,6,9
203:25 226:16
227:13,14

231:25 234:3
235:12 236:13
239:25 240:9,
16 244:2
246:1,5,15,23
247:13 250:22
251:4,10 252:5
253:24 254:2,8
259:18 260:6
263:15,18,24
264:10,15
265:7,12,25
266:4,16
269:18 270:14
276:20 277:17
278:6 279:17,
25 280:12
281:9

**Crystal's** 59:24
74:18 183:23
244:10 280:18

**CTO** 72:7
232:2,6

**current** 141:3

**currently** 7:21
166:15

**curtains** 202:20

**cushions** 205:1

**customary**
70:22

**customer**
182:21 281:1,2

**cut** 193:21
230:25

————————

**D**

**daily** 62:23
84:9

**Dan** 18:2,3

19:2 20:23
27:15,18,20
28:4,14 29:17
51:10 67:18
69:4,10,15,22
71:3,5,6,8
102:6 116:19,
24 117:10
137:8 168:20
194:13 198:3,4
210:21 212:18,
19 217:5,11
254:24 255:4,
15 259:15
261:8 271:21
272:20 273:1
277:13,16,25
278:5,7,11,20,
24

**Dan's** 259:16

**darker** 165:23

**data** 177:13
190:9,10,12
210:8

**database** 70:12

**date** 73:3 93:2
95:5,6,14
110:16,21
114:3 141:14
255:10,12
261:21

**dated** 72:18
139:9 179:19
235:15 263:15,
19

**dates** 225:8
261:18 268:18

**David** 6:2,21
7:18 202:6,17
205:22 228:9
267:10 273:2

**Dawn** 213:8,11,
22 214:1,2,4,6,
7,13,14,16,18,
21,23 215:13
282:19

**day** 49:13
65:23,24 75:2,
4 123:25
158:20 222:25
223:7

**days** 116:6
162:23

**De** 35:14,19
56:12 69:20
70:19 137:18
138:4,8,13
158:23 250:22
253:24,25
254:1,2 257:6
261:6 267:1,
10,14

**deal** 288:16

**dealing** 93:8

**deals** 179:20

**dealt** 91:1

**Debra** 186:9,14

**December** 13:6
28:15 66:11,14
71:15

**decided** 85:8

**deciding** 169:4

**decision** 82:8
277:14,18
279:1,16,23
285:8

**decision-maker**
274:8,9

**decisions**



Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 309 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                          DEPOSITION OF
DAVID PASSMAN on 10/11/2017                              Index: declined..difficult

151:10,22
169:16

declined 27:2

deemed 251:16

Defendant's
138:24

define 285:22

defined 221:18

defining 63:15

definitely
215:17 267:21

definition 32:10
250:3

degree 21:4,6,
10,17,22,23
93:19,23
113:3,8,11,14,
18,20,25 182:1

degrees 21:18
22:10,19,21

Dela 56:10

delete 69:6
177:4

deleted 65:11
107:6,8,9,10,
12,14 177:6,8,
9,24

deliver 245:21

delivery 120:21

demanded 66:5

demotion 61:21

deny 93:21
94:14,18 96:9
111:16 125:14
134:14

department

23:5 24:19
49:5,8 52:25
56:23 57:2
59:11 60:16
61:2 62:2
65:22 73:15
75:2 76:14
82:5,12,16
83:24 84:3
103:15,17
129:19 131:20
133:21,22
145:11 165:18
173:14 177:21
180:18 181:8,
9,13,17 187:4
189:10 196:3,
13 199:16
200:16 202:18
207:7 215:19
220:17 225:3
229:18 236:24
248:24 253:1
271:5 279:5,
10,21 282:2,3
288:10,15,19

departments
49:23,24
60:19,22
181:11 189:11

departure
65:23 74:18

Depending
251:15

depends 12:23
25:19 30:5
71:13 284:12

depiction
258:14

DEPONENT
6:19 22:21
54:23 59:3

83:6 97:24
98:4 99:5,19
112:11 113:5
117:7,24
118:14 119:5
120:8 121:11,
18 122:8,13
123:7,19
125:3,18
137:10 139:19
143:8 147:1
154:4,14
159:20 162:15
164:21 167:9
168:12 169:8
181:20 182:6
183:10 185:2,
14,20 186:2
188:3 195:9
197:17,25
212:25 219:6,
25 220:6
231:12 237:15,
22 240:13,19
242:3 243:21
277:16 285:1
289:1

deposit 283:15,
16

deposition 6:1,
5,12,15 7:5
35:21,25 37:7,
11,15 38:16
40:8,14 41:4,
11,15,19 58:2
91:8 191:5,10
192:25 193:11,
15,17 213:15
218:7 289:4

depositions
6:11 193:6

derive 286:5

describe 41:17
53:1

described
130:6 131:25

describing
231:1

descriptions
277:1,3,5,8,12

descriptor
216:3

designated
10:5

designs 247:25

desired 256:24

desk 19:15,16
20:2 64:21
70:23 173:11
175:15,16,18
176:25 177:7,8
200:23

destroy 70:25
190:1,3,5,16

destroyed
190:7

destruction
177:11

determination
155:20

determine
117:4 168:24

determined
136:5

development
210:22 211:8

devices 158:1
178:20

diagnosed 42:6

diary 62:23

didn't 12:3 18:7
36:12 38:1,3,4,
13 50:2,6,18
54:21 60:25
63:22 68:8
69:6 76:17
86:18 88:8
94:4 96:24
103:25 111:10
122:10 127:25
129:18 130:1
135:18 158:20
164:13 167:11
176:1,22 177:1
180:4,15
181:25 185:16
190:2,16,18
210:11 227:8
230:25 232:13
243:6 244:17
248:1 253:7,14
266:12 276:14
280:8,13
285:13,15

difference
203:16,17

differences
73:24

different 59:6,
24 85:7 104:8
139:6 144:25
156:23 165:21,
23 191:17
193:18 212:23
213:10,19
215:23 262:24
263:4 269:4
275:9,17,18,20

differently
99:15

difficult 74:19



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 310 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                              DEPOSITION OF
DAVID PASSMAN on 10/11/2017                                    Index: difficulties..document

93:11 124:25
125:8,11

difficulties 44:1

Digiplex 185:21
198:14 201:14

dine-in 199:11

dinner 155:9
258:13,21,24

direct 49:12
50:25 51:4
53:5,8,24 54:2,
20 72:13,15
76:25 77:16
79:11,19 80:22
106:15 107:4
206:18 241:8
274:19 275:1
283:14,16

directed 29:11

directing 77:18

directive
116:16

directly 33:22,
25 54:21
55:10,17
56:13,14
81:13,17 82:9
105:3,5 130:17
161:9 285:15

director 11:10,
12 12:25 50:9,
12,14 55:12
83:13,15 94:21
108:21 109:10,
14,25 111:2,7,
11 118:23
119:17,23
126:5,9 128:3
147:8 163:14
166:4,12

170:15 184:4,7
187:4 189:4,7,
8 208:13
211:22,23
212:22 224:13
226:5 230:1,2
232:10,17
257:13

director's 26:8
80:24 109:7
110:11 111:20
118:21 119:2,
11,12 145:7
212:17

directors 12:6
13:2,21 18:17,
20,23 29:12
98:12 114:7,15
145:23 169:11
186:11 202:5,7
206:12,15,16
208:15 212:10,
21 221:8,9
230:7,11,14,15
270:17 286:14

directory 72:23
228:25

disability
133:12 164:3,8

disagree
276:17

disciplinary
166:6 168:5
280:22

discipline
159:8 161:9

disciplined
168:16

disclosure
166:1,3

discovered
213:9

discovery 6:2
233:7 273:16

discreet 60:8
88:2

discriminated
112:1

discrimination
23:4 25:22
26:24 27:6
30:11,15 32:18
97:1,4,8,20,25
98:5,9,11,24
99:3,8,24
100:2,20
101:10,20,21,
25 102:3,11,14
104:14,22
105:6 111:22
112:4,9,12
150:18 152:22
154:1 155:5

discriminatory
154:19

discuss 28:16,
18 38:21,23
56:16 77:5
78:3 80:13,18
91:17,24 93:10
96:3 109:6
110:25 116:12
137:8,12 164:2
240:2 268:21
271:25 278:25

discussed
31:18 38:19
41:9 58:15
59:23 62:16
77:11,13 78:17
80:1,8 82:11
90:15 91:21

92:5,6,21
94:19 95:25
98:19 99:12
109:25 116:13
124:18,23
167:4 188:1
189:11 194:17
234:11 235:6
239:7 241:2
243:18 258:9
269:2 271:20
284:1,10

discussing
12:10 77:7,14,
15 92:23 240:7
245:2,4

discussion
61:8 62:11
69:22 78:18
79:17 80:10
83:12 93:1,5
95:1,10,19
96:4,20 109:9,
11,22 110:14
114:21 115:6
116:2 117:9,
12,25 118:3,7
125:15 134:1,
10,15 234:4
243:17 277:19

discussions
37:14 48:13
79:15 92:1
96:5 117:22
124:16,22
125:3,10,13,22
126:4 180:7
277:17

disk 68:9

disks 176:17

dispute 52:23
95:6,9 97:12

184:2 243:6
255:19

disputed 47:21

disregard
167:23

distribution
172:15

district 10:3
33:21 45:16
46:19 49:1
103:18 130:19
136:14 186:8,
13 203:18,22
206:2,3 227:1,
5 273:3,6
285:3

divided 83:17
217:9

division 11:20,
23 135:4,8,12
136:24 201:6
203:10,11,18,
19,23 206:4,5
226:25 227:7,8
230:6,10,16,
21,22 284:14,
22 288:20

divorce 213:20

divorced
213:12

Dobbs 269:6,
15

Dobson 202:6,
11 203:3 269:4

dock 174:8,13

document
41:18 57:15,23
58:1,11,12,18
72:17,23 91:16



105:24 147:16, 18,22,24 148:3,11 150:8 159:23 165:9, 25 171:10 172:8,18,19,20 174:17 177:14 179:12 180:5, 8,9 222:18 231:23 234:10, 13 235:9 239:10,20,21 245:17,18,19 248:23 259:24 264:5

**documentation** 281:22

**documented** 159:24

**documents** 17:8,10,11,17, 24 18:4 25:7 41:3,6,7,10,12, 13,14 65:11, 15,16 67:8,13, 19 69:25 70:4, 13 71:1 91:7 105:14,20,21, 23 106:6 109:1 131:24 149:5 152:15 173:11 174:20,23 175:1,4,6,10, 21,23,24 176:2 177:1,3 179:3, 19 189:16,22, 24 215:12 234:6 237:24 238:14 242:21 260:2 273:17 279:5,8 280:5 283:10

**does** 9:14,19,

20 38:18 39:9, 19 45:25 50:16 52:19 57:8 58:4,7,10 64:2 102:22 110:6 112:7 120:23 139:16 144:1 147:23,25 148:24 149:1, 3,4 155:16 156:25 162:15 163:9,10,15,23 165:9,12,13 170:6,8 183:5, 7,10 208:21 210:23,24 215:22 218:20 236:4,6 241:3 243:4 244:1,24 255:4 257:2 259:17 266:2

**doesn't** 40:4 146:24 154:11 171:9 235:23 241:10 248:9 267:11

**doing** 14:4 32:15 69:8 95:12 108:12 143:24 181:6 219:2 228:8 234:4 242:19 261:13 269:18

**dollar** 275:18

**dollars** 181:6

**domain** 106:24 107:2

**donating** 255:24 256:2

**donation** 285:22

**donations** 252:3 285:24

**done** 29:1 49:16 65:18,21 70:16 90:14 180:11 181:10 193:20 269:22 282:22 286:11

**Doreen** 200:4

**double-** 284:4

**down** 6:14 7:11 74:20 203:8 226:21 231:9, 10 259:8 264:15 285:12

**downs** 46:10

**draft** 84:24

**drafted** 177:20

**drew** 201:18

**drink** 42:15,20

**drinks** 155:9

**drive** 68:9 177:7

**drives** 107:19 176:18

**due** 143:20

**duly** 6:22

**Dunaway** 186:23

**during** 27:9,16, 18 35:1 49:13 51:5 56:3 67:24 74:8 75:21 98:16 120:22 122:6, 11,17,19,24 123:5 136:25 144:22 157:23

162:5 163:22 164:16 165:2,7 188:24 193:10 233:9 260:10 262:1 266:19 282:6

**duties** 29:8,10 59:5,9,13,15 78:3,6,10 83:17,18,22,25 84:9 85:6 89:6 112:19 189:13 217:3 276:2 279:4,8

**duty** 89:1 97:2, 22 105:7

---

**E**

**each** 7:10 23:6, 24 63:11 80:10 86:6 87:2 89:24 90:4,7,8 102:10,12 103:15 146:4 194:25 195:2, 14 202:6,9,11 203:20 211:15 240:5 245:6 262:8,11 263:6,8,10 276:8 277:1,4, 6 281:9 284:14

**earlier** 28:12 31:18 90:10 100:5 104:20 111:13 124:17, 23 130:6 140:2 157:2,17 180:24 183:5, 19 185:11 188:20 221:13 235:10 242:5

243:6 267:8 280:17

**early** 11:4 55:16,21 81:2, 5 118:8 134:24 183:16,20,22 268:16

**easier** 7:8 193:20

**economically** 242:13,15

**EEO** 150:12,15 154:1

**EEOC** 27:5,10, 13 30:14 48:15 273:23

**effect** 133:18 134:11 286:12

**effective** 148:14 241:25

**effects** 44:2

**efforts** 281:4

**eight** 14:25 156:7 206:12 218:6 259:1

**either** 10:17 51:16 61:16 63:5 64:4 66:22 120:17 138:7 141:12 155:9 167:2 170:23,25 184:25 190:19 192:4 194:1 216:15 217:9 223:25 226:5 246:5,17 268:5 276:16 281:1

**elect** 163:20



**DISCOVERY LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 4:16-cv-00380-CDL    Document 63    Filed 06/21/18    Page 312 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                    DEPOSITION OF
DAVID PASSMAN on 10/11/2017                                  Index: elected..events

**elected** 12:18, 19

**electronic** 70:12 157:15 177:13 178:5 191:8,15 193:7 283:19

**element** 80:17 167:25

**eligible** 162:2,4

**eliminated** 136:25

**Ellis** 18:2,3 19:2 20:23 27:15,20 28:4, 14 29:17 51:10 67:18 69:5,10, 16 71:3,5,8 102:6 116:24 137:8 168:20 194:13 198:3,4 210:21 212:18, 19 217:5 254:24 255:5, 16 259:15 261:8,10 271:21 272:20 273:1 277:13 278:11

**else** 16:25 17:1 36:2 40:8,11, 19 43:2 60:17 69:7,8,9 118:5 129:2,12 137:13 140:13 141:19 145:10 182:9,10 222:8 223:19 251:8 253:19 254:5,9 261:16 269:21 271:15 278:2

**email** 66:3 67:24 68:25 69:2 106:18 107:8,9,12 156:22 157:22 174:16,18,22 175:2,8,11,13, 16 177:6 178:15 179:6, 10,24 243:1,15 244:5,9,20 263:14,18 264:7 265:19, 21 271:8 272:4,8

**emails** 66:2 68:4,5 84:24 105:15,16 107:10 120:10 122:10,14,16 176:23,24,25 177:24 245:6

**employed** 28:11 158:3 188:5 279:20

**employee** 11:5 13:13,18 31:23 44:20,24 45:5 53:15,16,17,19 75:17 79:16 80:6 89:24 90:15 91:3 97:21 100:8 103:20 104:11 111:18 130:11, 16 145:4 146:8,10 147:14,17,18, 23,25 148:3,8, 11,20 149:23 151:3 155:8, 12,13,23 158:2 162:4,21 163:9

164:2 165:5 166:4 167:25 227:20 257:9, 15 258:4 269:14 270:25 271:10 279:17 284:19

**employee's** 128:18

**employees** 30:19,23 31:5 32:3,15 33:12, 18,19 40:21 44:25 45:4,6,7, 11,12,13,18, 20,23 46:3,20, 25 47:10,14,21 59:16 60:15 68:20 70:4 72:15,24 73:19 74:21 80:11 87:10 88:6 101:15 104:6,7 126:22 145:1 147:10,17,20, 24 148:1 156:11 158:3, 15,22 162:2 163:20 251:19 252:8 253:4, 11,15,16 254:18 257:20, 21 259:14 272:21,25 275:8,14,17 282:7 283:17

**employer** 256:25

**employment** 11:1 23:11 67:25 150:9 151:9,22 157:24 239:8

**encrypted** 179:3

**encryption** 178:24 179:1

**end** 24:13 52:19 54:14 56:17 91:17 114:2 151:1 178:24 203:4

**endeavor** 153:21

**ended** 217:11

**ends** 172:15

**enough** 161:21

**entail** 117:8

**enter** 287:14

**entertainment** 132:14,17

**entire** 27:18 48:11 66:23 86:11,13 128:15 285:20

**entities** 138:16

**entity** 157:3

**entry** 141:17

**environment** 59:14

**Equal** 150:9

**erase** 68:5

**error** 143:10

**establish** 276:5

**established** 28:20 276:6

**establishing** 45:1 274:17 276:14

**estate** 75:6 210:22 211:8

**estimate** 102:20

**et** 18:17 23:4 32:3 88:14 90:18 91:2 151:10,24 164:3 168:24 231:10 276:15

**ethics** 166:13

**evaluate** 270:18

**evaluated** 80:23

**evaluation** 89:13,16,20,24 90:4,14 152:5 167:25 270:2, 6,13 271:1,4, 13

**evaluations** 90:6 275:13

**evaluator** 271:9

**even** 30:22 53:2 61:17 75:11,16 79:19 93:9 194:4 212:21 217:15 225:12 231:13 273:12

**evening** 42:19

**event** 96:24 159:4 244:15, 18,19 252:16 258:17,19 259:4 263:4

**events** 43:3 52:16 115:24



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Index: eventually..fall

116:5 132:11
170:19,20
249:13 252:10
257:22 258:6
262:8 263:6,8,
10 268:9

**eventually**
120:4 196:10
221:16

**ever** 7:5 27:5
30:14 32:24
48:21 58:16
80:22 92:8
110:3 112:15,
18,22 113:7,24
115:11,14,17
133:17 142:3
170:18 178:9
179:3 184:6
187:7 188:6,10
189:3 215:12
240:2,21
268:21 276:19,
22 277:3

**every** 52:14,15
53:14,16,17,19
80:10 86:16,21
105:24 158:20
166:4,19,21
174:4,6 241:7
265:12 286:4

**everybody**
45:23 242:11

**everyone**
190:11

**everything**
64:14,15
192:11 201:20
202:19 231:22

**ex-wife** 9:19

**exact** 15:1 18:6

25:8 75:13

**exactly** 193:12

**example** 33:21
76:1 145:6
174:7 189:7
231:8

**exceedingly**
91:18

**Excel** 191:2,7,
12 194:1
218:8,15

**except** 6:6 53:6
176:1

**exception**
258:15

**exceptions**
52:16

**excerpts** 66:22

**excess** 46:17
47:8 127:12

**Exchange**
106:21 208:22

**excuse** 16:3
22:23 109:23
126:7 136:4
139:1 156:6
167:22 170:10,
15 178:3 187:1
261:24

**execution**
29:11

**executive** 48:6,
7 49:11,16,17
50:5 51:20
52:10 53:9
59:19 63:11,
14,15,23 64:1
72:9,12 82:11
92:6,11 103:23

104:23 110:4
115:7 119:16,
22 120:2
145:19 170:15
188:23 220:23,
24 221:3,6,7,
10,14,18,20,
21,25 222:9
240:3,8,16
247:21 252:1
253:6,14
259:7,10
277:24 278:8,
9,14 281:8
285:20 286:18

**executives**
146:1,2

**exempt** 279:17

**exhibit** 57:16,
23 62:7 71:21,
24 73:21
77:21,24
140:17 142:15
148:9 149:14,
18 156:7
165:20 171:5
174:18 179:6
191:13,24
214:6 217:25
218:9,11,13,
16,17,21
219:21 220:18
235:11 236:8,
10 237:4
239:19 240:8
242:22 243:1,
14 244:23
246:14 247:12
254:20 255:8
258:11 259:24
260:1 261:24
263:14 265:18

**Exhibits**

238:11,15

**exist** 39:9,19
66:7 153:22
154:1 156:25

**existence** 157:4
287:2

**exists** 157:3

**expect** 167:2
256:10

**expectation**
178:4

**expenditure**
285:23

**expenditures**
116:9 130:7,
12,16 131:3,5,
13,14,21
132:23 248:16

**expense** 127:8
138:9 287:19,
23

**expenses**
126:17,18
127:1,16
128:18 129:3,
6,9,25 132:10
137:24 138:5
180:13 248:3
287:6,17

**experience**
119:14 155:20

**experienced**
92:11

**expert** 88:2

**explain** 30:20
31:20 141:1
144:15 249:8
275:22

**expressly**
218:8

**extension**
214:20

**external** 107:2
176:17 208:19

**F**

**fabulous** 265:1

**face** 88:7,11
96:12

**faced** 281:1

**fact** 63:13 88:7
94:4,19 98:23
122:23 136:5,
10 163:12
193:21 217:14
237:17 244:5
259:11

**factory** 280:12

**failure** 166:5
168:3 169:5

**fair** 33:13,15,
17 37:4 46:7
85:2,5 86:16
104:13,17
125:16 174:20,
21 241:21
276:17

**fairly** 102:21
117:9 119:6
200:19,20
211:14 217:8

**faith** 151:3
153:19

**fall** 55:17,21
81:2,5 183:16,
20,22 198:19,
22



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Index: falls..founding

falls 232:19

familiar 126:11 142:1 144:21 148:13 225:12

family 44:13 161:18,19 162:1,8,11,21 164:4

far 107:9 214:22

favor 170:10

feature 176:4

February 171:11,15

federal 10:4 151:13

feel 124:3 285:15

feelings 59:24

fees 36:25

feet 205:17

fellow 13:21 14:3,13

felt 80:2 97:5 99:14 100:7 111:25 115:3 116:19 285:16

female 98:7 111:18,24 112:6 114:15 155:8,13,23 186:8,9,11,14 187:4,7,10,20 194:22 210:1 219:16 220:10 257:11

few 63:7 273:3 282:12

fiance 263:21

field 45:11,12, 20,21,23 53:18 91:14 101:14

fight 233:5

figure 217:14 219:11 224:1 229:25

file 121:15 159:23 160:18, 20,23 161:1 177:8,9 238:8, 9 247:9 270:7 280:18 281:19

filed 27:10 29:19 40:23 41:1 48:1,5,15 66:11,17 67:2 99:2,8 168:17

files 64:18 107:7,8,9,14, 19 176:16

Filings 208:22

fill 253:16

film 49:22 59:21 60:6 61:5,8,13 196:12,13 219:15 220:17 228:13,16,17 229:1,3,17

films 228:12

final 82:13 159:12 160:4, 11,15 172:22 256:24

financial 63:16 74:16 209:7

find 60:8 82:15

130:9,10 173:6 179:15 192:7 219:5

finger 264:15

finish 7:9 192:24 193:5,7

finished 192:14,17

fire 51:1

fired 46:21

first 11:2 13:7 18:13 29:21 37:13 38:9 44:16,19 51:7 59:6 114:21 152:23 159:22 161:24 162:1, 3,10 163:1,7 167:23 199:23 200:3 259:7, 10,17 261:21 266:19 278:23

five 12:2,4 167:15 201:22 206:11 275:14 284:4

fives 275:9

fixed 225:21,23

flash 68:8

flat 119:7 200:19

floor 31:10 32:5

Florida 21:11

FMLA 133:15 161:21,23 163:19 164:11, 13

folded 192:1

folder 173:11 174:20,23 175:21

folders 175:18

folks 103:17 179:7 225:24 226:1

follow 161:8

followed 161:13

following 162:6 282:7

follows 6:23

food 196:9

force 96:12

foreseeable 162:24

forever 287:2

forgive 231:18

forgotten 273:7,9

form 6:6 22:20 25:8 54:22 59:2 69:11 83:5 96:14,18 97:23 99:4,18 104:3 109:17 112:10 117:6, 23 118:13 119:4 120:7 121:10,17 122:7,12 123:6,18 124:19 125:2, 17 137:20 139:5,8,13,18 140:18 141:24

142:1,3,16 143:7 144:4 152:2 154:3,13 162:14 164:20 165:14 167:8 169:7 170:13 181:19 182:5 183:9 185:1, 13,19 186:1 188:2 193:25 197:16,24 212:24 213:14 226:19 235:12, 19,21,25 236:4,19,23 237:2,6,14,21 240:12,18 242:2 243:20 262:19 267:25 269:12 270:3, 13 271:7,8,13, 17 277:15

formal 52:3,7 79:22 121:16

format 68:23 73:5

formed 17:3,11 18:10

former 15:7 35:10 40:21

forms 55:24 56:7 144:10 270:6 271:1

formula 286:12,13,17, 19

forth 8:4,12

found 25:7 111:5 134:2

founding 100:24


Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Index: four..given

**four** 54:9
159:11,14,17
160:14 206:11
215:24 250:5
278:10

**fours** 275:8

**fourth** 32:4
160:7 166:9

**Fox** 32:11

**frame** 62:21
75:13 81:10
262:18 263:3

**Fred** 49:15,20,
22,23 59:18
60:2,3 74:13
77:5 78:20,25
79:2 82:14,17,
25 85:8 92:4,5
110:3 114:22
116:19,22
117:9 120:11
122:10,16
123:13,14
136:24 137:2,7
140:8 141:12
142:21,22
143:15 171:21
179:7 182:11,
12 194:9
199:2,3 202:4
204:1,18
205:19,23
206:3,6 208:3
210:6,10,12,
15,16 224:25
225:15,16
229:21 235:20
240:2,8 246:6
248:2 249:3
269:20 270:5
271:21,22
274:23 275:3,4

276:15 277:25
278:4,5,11,20
281:8 282:24
285:5

**Fred's** 140:8
274:19 275:1
277:25

**free** 152:22

**Freedom**
153:18

**frequent**
256:23

**Friedel** 122:17
171:21 208:3
210:15 249:3
271:22 282:24

**front** 148:14

**full** 7:17 9:9
10:25 11:19
14:4 47:4,9
101:14 121:3,
7,8,12 153:11
162:11

**fully** 261:19

**function** 29:13
145:12 174:10
210:4,5 225:14
284:11

**functions**
111:12,21
112:8 181:7
216:21

**fund** 16:17
251:17,22,24
252:17 285:11,
13 286:2,6

**funded** 286:2

**funds** 36:25
115:15 136:5,9

161:5 249:11
285:14

**further** 267:5

**future** 249:12

———

**G**

———

**G-a-b-b-y** 226:9

**G-a-b-i** 226:10

**Gabi** 226:8

**Gaddis** 212:4

**gain** 20:3

**gaining** 119:14

**gaming** 199:25

**Gary** 201:8,9
232:12

**gather** 234:23

**gathering**
30:18,20 31:2,
17,20 32:10

**gender** 97:1,5,9
101:20 103:6
151:24 152:7

**general** 12:8
17:25 19:2
26:2 27:14
34:11,19 43:24
48:8 50:24
51:12,16,23
52:6 53:4 94:8
103:14 114:22
137:1 161:8
167:3 194:13
207:5 216:23
221:14 241:22
250:19 256:15
279:19 286:7

**generally** 29:10

49:14 51:18
56:15 71:9
82:1,2 87:5
102:24 108:1
163:19 240:5
241:2,14 259:9
285:24 286:1

**gentleman**
37:13

**Georgia** 7:23,
25 8:2 9:1,19,
22 10:4,8
136:1,2 236:24

**Gerakitis** 6:9,
10 7:2 22:20
37:2,6,23,25
38:3 40:7,12
42:13 54:22
58:21,24 59:2
69:11 83:5
96:14,18 97:23
99:4,18 100:24
101:2 104:3
109:17 112:10
113:4 117:6,23
118:13 119:4
120:7 121:10,
17 122:7,12
123:6,18
124:19 125:2,
17 133:5
137:9,20
138:25 139:2,
13,18 143:7
146:12,18,20
152:2 154:3,13
159:15,19
162:14 164:20
167:8 168:11
169:7 181:19
182:5 183:9
185:1,13,19
186:1 188:2

190:23 191:1,
6,11,16,20,23
192:15,18,23
193:1,4,10,17,
25 194:4 195:8
197:16,24
204:6 212:24
213:14,19
217:23 218:3
219:4,20
220:1,3,4
226:19 231:11,
23 233:3,8,12,
16 235:21
237:6,14,21
238:6 239:13
240:12,18
242:2 243:20
244:24 245:3,9
259:25 260:3
262:19 267:25
269:11 277:15
284:23 288:24

**getting** 240:17
265:7

**ghost** 144:6

**gift** 247:14,18

**give** 7:22 57:2
93:12 98:20
198:17 207:15
241:8 259:13
285:6

**given** 13:10
15:14,20
57:13,17 58:19
59:10,13 62:4
65:22,24 66:2
76:21,23 78:10
83:18,25 84:2
89:20 115:9
116:5 135:16
188:6,11 237:1



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 316 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                    DEPOSITION OF
DAVID PASSMAN on 10/11/2017                                  Index: giving..head

239:4 275:8

giving 40:14
102:19

glass 92:21,24
93:10,15,17,25
94:3,6,11,14,
17,18 95:2,25
96:10,13 97:7,
10,16 98:7
111:13 117:22
118:10 124:17,
23 125:14,18
167:5 168:9
228:9 273:2

Gloria 74:14

goals 181:2,9

goes 163:24
178:8

going 6:17 7:4,
12 14:19 19:24
28:19 32:9
49:13 56:24
57:6,17 59:20,
21 60:5,11
61:21 62:1
73:23 76:7
79:14 89:2
98:20 109:13
113:2 118:9
133:3 134:11
146:14,23
149:5 180:8,9
191:2,23
193:16 194:8
206:14 207:10
208:25 210:7
212:7 217:2,
17,21 218:17
225:11 233:15
234:2,7,21
245:6,15
247:11 264:15,

16 266:12
269:11 278:1

Goldwater
75:14 198:8
201:23

gone 41:12
76:2 273:1

good 28:5
59:23 60:1
76:6 133:3
143:24 151:3
153:19 205:16
242:8 256:18,
19,22 263:11
265:3,7 266:10

got 22:15 48:5
64:18 69:4
83:4 85:11
140:23 143:4
161:3 165:22
198:17 213:12
219:7 220:24
241:15 250:21
257:19 258:25

Grace 9:10,12

graduate 22:24

graduated
20:25

Great 243:8

Green 201:8,24
232:12

Greer 203:10
231:8 284:10,
12,14,19,24

Greg 74:16
208:17,19
282:19 283:3

Gristina 37:19
38:6,18

grounds 168:4

group 74:2
103:3,4 141:20
201:14 219:14
221:19 245:1,4
257:4 282:17,
25 285:10

grouping 74:13

grow 57:3

growing 46:12
119:21

guess 10:8
87:9 201:23
207:2 269:9,10
278:23

guessing
248:24 285:4

guide 29:10

guidelines
138:15

gun 228:8

Gus 211:21,22
282:22,23,24

guy 199:17
229:25 269:8,9

——————————

H

H-a-r-e 56:20

hadn't 94:19

Halecky 199:12
201:23

half 203:20
284:15

hand-held
173:12 175:19

handbook 91:3

146:8,11
147:17,23
148:4 157:16
172:11

handing 234:9

handle 57:11
212:10,11

handled 26:15
210:6 284:15

hands 200:23

handwriting
255:21

handwritten
251:20

happen 158:20
223:15 261:17

happened
13:17 25:2
47:22 64:6,10,
11 78:23

happening
110:7,9

happens 64:8

happy 218:5

harassment
25:23 26:24
27:6 30:11,15
31:14 32:18,21
99:3 100:20
104:15,22
105:7 150:18
151:2 152:10,
12,13,16,20
154:12,15
155:21,24
156:3

hard 19:7
107:18 177:7
193:19 285:22

harder 118:11

Hardwick
133:20,23
134:8 185:10,
24 186:4 187:5
209:15 282:15

Hardwick's
134:2

Hare 56:19
113:20 115:1
117:1,2 137:7,
10 159:1
194:11 206:9
208:2 209:12,
23,24 210:17
211:25 212:19,
22 215:1,10
271:23,24
277:22 278:2,
11

Harland 11:21,
23 12:4

Harris 257:8,10

Harvard 22:1,
17 23:17

haven't 40:15
66:9 146:20,22
192:6,13,15,18
217:12 218:14

having 6:22
44:2 68:16
76:16 94:17
109:6,9 124:1,
6 125:15 163:2
193:23 276:25

he's 28:10
72:11 196:22
231:15 232:8,
9,10 264:10,12

head 57:21



141:19 186:16,
19,20,23
196:12 273:5

**headed**  201:12

**header**  231:21

**headquarter**
31:10

**hear**  18:13
123:11,12
193:11 235:5

**heard**  18:15
28:10 29:21
192:22 266:19

**Heather**  257:17

**hedge**  16:17

**held**  30:1
243:18 268:2,
7,9

**help**  65:5
103:13 150:20
220:4

**helped**  211:15

**here**  8:5,12,14,
21 26:20,21
37:12,21 38:10
39:2,7,21
40:14 48:17
75:12,15
165:22 173:5
179:9 213:8
217:16 218:24
219:11 220:6,
25 231:13
272:13

**Here's**  38:17

**herself**  45:4

**hesitated**  37:10

**high**  20:25

21:17

**higher**  112:23
187:25 275:24

**highly**  192:7,8

**himself**  39:23
40:1

**hire**  13:22
36:7,9,12
38:13 44:5
51:1 108:25
123:16 198:12

**hired**  10:13
36:10 44:16
75:21 113:16
125:24 184:15,
20 196:12
197:12,14

**hiring**  85:18
109:15 110:1
151:22 197:22

**hirings**  50:22
61:1

**Hirschfield**
14:17

**historical**  19:10

**history**  190:14

**hit**  111:14

**Hodge**  216:14
224:3

**hold**  55:2 67:8,
13,14,15,22
68:11,15 69:4,
24 70:1,3,8,14,
17,20,24 71:2
105:13 106:9,
13 108:9 109:2

**holding**  28:11

**holiday**  257:24

258:4

**home**  8:5,13
20:10 64:16,
23,25 65:4,19
66:3,6,7
124:12

**honestly**
215:14

**hope**  251:2

**hopefully**
256:23

**horizontally**
192:5

**hospitalizations**
43:8,11

**host**  82:3

**hosted**  106:20
156:17

**hotel**  179:21

**hour**  133:4

**hours**  42:11,16
89:4 280:1,6,
13

**house**  8:21,23
122:19 123:25

**how**  7:8,19,24
9:7 11:9,22
12:7 13:2,15
14:22 19:14
20:5 24:12,13,
15 25:19 34:12
41:17 43:6
45:2 46:3,14,
18,19,25 47:9,
14 59:12 62:15
63:4 86:14
87:4 89:18
92:18 93:3,11,
13 98:12,15

99:22 102:7,13
107:9,21,24
108:1,14,17
114:4,7 118:11
120:25 121:24
122:2 128:14
131:12,14
134:15,17
141:16 143:4
144:6 150:23
173:16,18
180:18,21
195:2 196:11
199:12 200:4
206:22 215:20
219:7 220:8
230:4 248:6
249:2,17 253:7
270:22 275:9
285:8 286:2
288:18

**however**  73:25
163:20

**HR**  47:19 73:2
98:5 99:24
104:16,18
105:3,8,10
112:1,12,16
114:13 117:16
141:20 154:22
155:18 165:18
167:3 189:7,19
278:25 283:6

**hug**  239:4

**Hugh**  216:24
217:1,11 224:3

**human**  22:19,
25 23:1,5,8,11,
15,21 24:7,19
73:15 91:1
96:2,21 97:3,
17,22 99:1,16

100:10 101:18,
24 102:1
103:10,17
147:7 150:19
153:12 163:14
166:12 184:24
185:3,7 197:14

**hundred**  10:7,9
46:8,17,23
66:18 69:3
102:17 128:8
140:7 208:12
250:25

**husband**
263:16,19

**husband's**
44:13

---

**I**

**I'd**  207:14

**I'll**  69:12 130:9
186:12 187:2
195:14 233:8,
11,16 284:4

**I'm**  7:1,3,12
10:23 13:15
19:24 20:25
25:14 31:1,19,
25 32:9 33:11
34:14 35:22
36:15,18 37:1
39:7 40:14
41:5 43:15,21
44:4 46:8,12
47:23 48:17
53:17 55:15
56:9 57:15
60:25 62:10
63:21 66:13,18
67:10 68:7
69:3 72:2 73:7,



Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 318 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                                    DEPOSITION OF
DAVID PASSMAN on 10/11/2017                                              Index: I've..inspecting

14 74:2,21,23
75:3,16 80:5,
17 82:1 90:24
107:11 108:20,
22 109:20
114:18 115:13,
16,21 116:23
117:7 119:24
121:19 123:24
127:5 128:14,
25 130:9 132:1
140:7,15
141:12 142:24
143:21 145:9,
15,17,18
146:13,23
147:21 149:5
152:19 154:4
156:1 157:8
160:13 161:16
162:2,7,19
163:2 165:8
166:15 167:2
169:1 170:20,
24 172:12
179:12 183:18,
21 189:6,9
191:2,11,18,
21,23 192:6
194:8 196:23
198:10 200:11
202:3 204:7
206:14 207:10,
11 208:11,25
210:7,11 212:7
213:18 214:9,
23 215:4,6,17
216:17 217:14
218:1,2,13
219:22 220:4
222:4,5,20
223:3 225:1,
11,22 229:18
230:4 232:25
233:1,14,25

239:10 245:15
246:21 247:11,
12 248:10,24
249:1 252:7
253:7,10
263:17 264:2,
12 268:24
269:3,11 271:2
273:14 274:2,5
275:2,11
280:20 281:20
282:4,22
285:3,5

I've 18:9 41:8
48:10,16
165:22 197:4
198:17 219:6
239:22 264:25
277:5,11

icon 175:5

idea 28:5,7
60:10,12 61:22

identical 154:9

identified
157:17 171:6

identify 149:11

III 7:18

illness 42:7

images 107:18

imagine 30:22

immediate
99:13 100:6

immediately
55:6

impede 109:15

implying 74:12

importance
70:24

important
38:17 167:24
234:22 249:14
266:8

improperly
172:17

improving
242:17

in-house 23:14,
20 24:7

inappropriate
111:7 131:3,5
192:8

incentivize
260:11

include 22:19,
24 64:2 105:22
129:5 148:24
149:3 152:13
154:11 190:13
210:23 212:13
257:6

included 30:3
45:16,19 64:16
84:24 91:5
153:5 154:5
174:19,22
199:18,22
251:19 253:16
257:20 277:16

includes 156:3
161:23

including 46:19
47:6 82:3
83:24 151:22
158:22 168:5

income 144:21
219:11 224:1

incomplete
192:4 228:7

incorporates
157:16

incorrect
144:16 237:12

increase 54:6
56:15 80:14
139:12,17,20
140:24 143:17
181:5,6 240:17
241:22,24

increased 83:4
85:3,11
241:14,19

increases
54:15,17 56:2,
12 118:17
241:4 274:9

independent
11:11 117:3,8

indicated
139:20,22
144:25

indicates
174:17,18

indicating
66:15 71:23
127:4 141:6
159:16 173:19
213:5 261:20
283:2 286:10

indication 97:1,
20 98:8,10

Indirectly 61:3

individual
36:16 104:9
195:3 240:6
276:8,11

individually
36:13,18 59:24

individuals
126:18 201:22
257:3

industry 239:7

industry-wide
172:6

inform 166:11

informal 52:2
78:18 79:15,17
80:3,6 90:3

informally 79:9,
10

information
105:1 178:5
192:3 210:8
240:15

informed 44:25

infrequent
102:23

initially 61:17

initials 139:23,
24 140:1,6,11
141:10 142:19
143:13,19
235:25

ink 48:17

input 271:10,
14 273:16
274:17 279:15

insensitivity
167:23 168:10

inside 271:11

insisted 128:4

inspect 178:9,
10,12

inspecting
178:19



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 319 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                           DEPOSITION OF
DAVID PASSMAN on 10/11/2017                                    Index: install..January

install 205:15

instance 252:14

instead 51:11 184:15 220:3

Institute 264:1

instruct 69:9, 14 70:1 107:16 108:7 190:16, 18

instructed 116:11

instruction 259:17

instructions 131:12

insubordination 114:25 115:9 116:3,20

insurance 25:21,25 26:3, 9,15,16,18,23 212:8,13

insure 176:16

insurer 26:1

interest 10:18 12:9 88:4 281:7

interim 14:9

internal 20:3,6 100:19 101:9, 25 102:3,13

internally 106:22

internet 20:4

interrogatories 273:16 279:3

interrogatory 279:11

interrupt 228:5

interview 243:9,11 245:19

interviewed 185:4

interviews 88:17 123:22 243:5

intimidation 151:2

into 10:13,23 13:4 16:23 17:5 19:19,22 39:4,13,23 44:17 49:5,8 50:15,20 52:19,24 55:9 56:22 58:6,13, 16 59:6,10,21 60:14,18,22 61:1,10,25 62:1,5,16,17 64:20 82:1 114:3 119:1 137:4,23 138:9 139:10 171:20 173:23 174:5, 8,12,14 180:17 187:3 201:11, 14 235:4 242:20 251:6 272:15 273:16 274:14 279:15 286:6

introduce 39:25

introduced 39:23 40:1 45:4

investigate 99:25 105:10 112:2,13,18,22 113:15,24 155:19

investigated 101:18 103:16 104:18 136:4 137:16,18,25 138:4 154:23 169:2

investigation 115:18 116:10, 12 117:3,8,18 120:5 130:6, 11,15 131:8 137:4,12,15,23 138:9 153:11 154:18,25 155:5 180:11 235:4,6 268:21,25 271:20,25 272:8 273:22 274:1,3,5 277:17

investor 262:25

investors 262:17

invoices 130:1

involved 82:17, 20 85:18 90:9 104:19 116:19 252:22 253:19 255:5 257:4 266:15,21 267:17,22 268:3 276:13

involvement 132:11 254:15

Ipad 64:23,25

65:3,22 66:6 67:21 175:20, 25 176:3,9,11 178:17

irrepair 82:7

isn't 65:10

issue 67:8,13, 14,15 110:3 114:23 129:17 167:5 169:11 172:6 221:1 283:14

issued 68:12 108:10 131:20 177:19 246:21

issues 23:21 42:24 71:7,8 79:13 91:2 182:22 183:1,3 193:17 212:9

it's 7:8 20:8 25:9 32:9 33:15,17 38:6 47:12 52:21 60:10 72:8,21 73:22 75:1 85:5 94:11,12 104:13,17 108:1,4 112:11 119:18,20 123:7 124:20 127:16 139:6, 10 140:19 146:8 151:17 156:1 159:17 161:25 164:1, 21 165:23 167:16 171:9 174:19,21 183:14 191:18 192:18 193:20 194:3,4 201:23

204:14 207:19 210:1 211:10, 11 214:6 219:20,24 222:2 233:20 235:15,17 241:11,17 245:3 248:14 253:25 256:3 259:23,24 260:21 262:12 263:18,24 265:24 267:14 269:7,8,9 281:17 285:22

item 173:7 256:1

items 64:15 179:25 240:6

its 24:2 29:11

itself 19:21 24:10 37:11 157:4 179:12, 19

———————

J

J-a-w-a-n 219:19,24,25 220:6

J-e-w-a-n 219:18

J-u-w-a-n 220:1

Jamie 216:14, 17,19 224:2

January 14:2 44:21 72:18 73:3,7,17 75:16,17,24 197:13 207:20 224:24 263:15,



Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 320 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                        DEPOSITION OF
DAVID PASSMAN on 10/11/2017                            Index: Jawan..know

19

**Jawan** 219:15,
16 228:10

**Jay** 26:19

**Jeff** 71:16,22,
25 72:2 108:22
185:17,20
196:20 197:1
209:9 215:8,9
224:21 226:14
231:10 274:24
275:5 282:19

**Jersey's** 75:10

**Jim** 125:24
126:4,7,8
203:10 211:6,
7,8 231:8
284:14

**job** 11:18 50:22
56:24 57:4
77:4,12,14
78:3,6,10 82:6
110:15,18
111:11,21
112:19 115:23
123:22 143:24
145:12 225:14
227:18 229:1
250:7 252:14
277:1,3,5,7,11

**jobs** 33:21,24
34:4

**Joe** 200:24

**Joel** 264:8,22
265:19,21
266:3

**John** 11:21
195:6,23
196:11,12
199:12 203:10

204:19,22
219:14 224:3
229:18,19
231:9 252:13
284:10,12,13,
19,23

**join** 11:5,9
12:5,8

**joined** 11:7
12:16 13:9
202:12

**joining** 11:18

**Jon** 231:8

**Jones** 75:3
207:24 222:24
223:2

**July** 9:16

**June** 14:5
183:7

**junior** 93:8
95:12,17,18

**just** 10:11
14:11 15:6
22:12 24:24
31:20 33:7
34:18 44:23
45:14 50:3
55:8 58:16
60:2 64:13
73:25 75:9
76:1 85:1
86:24 87:21,22
89:10,11 91:15
95:17 103:8,9
123:11 127:10
135:7 144:6
146:18,23
148:7 149:10
156:11 157:16
162:2 165:21,
22 167:14

172:14,17
183:15 188:1,
14 191:11
200:22 201:14
202:12 203:8
204:7,17
208:9,11,25
216:2,8,11,12
219:22 220:4
224:13,22
230:24 234:14
235:5 241:18
242:20 243:21
245:23 246:8,
11 258:1,2
259:21,23
260:6 261:17
262:10,17
268:18 269:3
271:14 273:14,
25 275:22
279:18 284:4
285:4 287:3

**Justice** 267:18

_____

**K**

**Kansas** 28:8

**Kathy** 74:4
76:1 224:6,7

**keep** 14:19
18:23 19:5
62:23,25 107:9
114:10 223:15
225:17 234:24
247:1 264:15,
16 280:14

**keeper** 207:6

**Kellin** 204:19
205:25 224:3
252:13

**Kelly** 244:5

**kept** 19:3,8
63:2 64:18
158:1 167:1
223:17 248:23

**kick-off** 254:21

**Kidney** 43:12,
14

**kids** 158:24
159:1

**Kim** 259:18
260:6

**kind** 63:6
64:17,19 66:3
88:7 105:23
142:12 144:24
199:5 205:8,13
212:8 226:6
227:12 229:5

**kinds** 20:10
115:24 141:22
205:7 248:3
262:24

**King** 12:12

**kiss** 155:13,22

**knew** 67:1
134:17

**know** 7:8,14
10:2,3,6,10,11
12:7 16:4,13
17:22 19:4,13
20:5,15,20,22
22:11,15 24:3,
5,17,23 25:11,
14,16,24 26:1,
5,11,22 27:2,8,
12,13 28:2,4,6,
13,22 31:1
32:17,20,23
33:15 34:25
35:19 36:22

37:1,16,18,20
40:6,16 44:9,
10,13,16 46:5,
8,22,24 47:9,
17,18 52:21
53:11 59:5,9,
13,15 61:9,11
62:4 63:7,12
66:22 67:20,23
68:20 70:15,16
71:1 72:3
73:12,16,25
74:1,5,8,22,24,
25 75:13 76:4
78:14 84:16,
22,23,25 85:1,
5,10,13,21,24
86:3,14,23
87:12,21
88:19,24 89:3
90:1,5,16 91:5
92:19 93:2,4,
23 98:12,15
99:19,22
100:11,12
101:17 102:16
104:12,17
106:23 107:21
108:14,19,21,
23 109:5
110:12,21
112:11 113:13,
18,20 114:6,9,
11 117:17
121:5,11,24
122:2 124:13
130:21 131:9,
10,16 133:13,
16,22,25
135:7,17
136:6,20
137:17,19
138:7,12,14
142:5,9,13
144:2,6,13,14,



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Case 4:16-cv-00380-CDL    Document 63    Filed 06/21/18    Page 321 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                           DEPOSITION OF
DAVID PASSMAN on 10/11/2017                                    Index: knowing..left

20 145:5,13
146:15 148:19
150:6,13
151:20 152:19
154:21 156:17,
21,22,24
157:1,5,13
158:6 159:3
160:19 161:2,
11,13,15,20
164:9,21,24
165:15,17
166:22 169:23
170:8,13,17
172:1,2,3,5
173:2,20
174:11,21,24
175:9,22
177:18,23
178:1,11,14,
16,18 179:2
180:1,4,14,17,
21 181:14,20,
25 182:2
183:13,14,18,
20 184:5,6,8,9,
13 185:3
187:6,9 188:7,
9,12,14
189:23,25
190:15 192:13
194:6,24
195:2,20,25
196:2,23
199:5,14,20
200:9 201:1,2,
4 202:8,12
203:6,7,23
204:17 205:11
206:16 207:2,
25 208:13,14
209:17 211:9,
23 212:21
213:23,25
214:1,2,12,13,

15,19,22
215:15,17,21
216:8,9,18,21
217:7,15
218:20,25
219:7,13
220:13 222:15
224:11,13
225:14 227:16
228:2,7 229:12
231:11 232:15,
16,19 233:22,
23,24 236:23,
25 237:1 238:2
240:6 248:10,
18 249:17
250:2,10 253:5
254:2 256:19
258:1 261:12,
14 262:4
267:19 270:8,
12,22,23 271:2
272:13,23,25
273:6,10,12,25
274:16 277:2,
6,9 279:7,13,
24 280:2,3,24,
25 281:6,16,24
282:10,12,13,
16 283:13,23
288:7

**knowing**
149:21,22
230:3

**knowledge**
61:20,23,24
77:22 154:25
190:5,7 237:16
238:14,17
269:23 284:20

**known** 25:17

**knows** 40:13,
14

_____

**L**
_____

**L-e-e** 27:25

**La** 35:14,19
56:12 69:20
70:19 137:18
138:4,8,13
158:23 250:22
253:24,25
254:1,2 257:6
261:6 267:1,
10,14

**lab** 176:23

**labeled** 147:16,
22,24 148:3
169:23 202:18

**labor** 124:1,6
236:24

**lack** 19:23 82:4
111:1,6 116:20
168:8 257:18

**Lanier** 26:19

**laptop** 19:21
20:10 64:22,25
65:3,15,21
66:6 67:21
122:23 123:1
158:4 173:21
174:5,13,14
175:25 176:3,
7,14,24 177:2,
6 178:10,13

**laptops** 173:6,
16,17

**large** 161:20

**largest** 16:11,
15

**last** 11:18 24:1
28:10,14,17

37:18 42:1,11,
16,18 43:18
71:17 75:3
87:8 150:16
156:15 163:25
164:1,5,6
165:13,24
167:21,22
171:11 191:4,9
193:16 207:15,
19 212:3 213:9
214:19 220:8
261:22

**lasted** 13:23

**late** 81:2,5
134:24 198:17

**later** 63:19
196:17 198:12

**lateral** 61:16,21

**law** 6:4 151:13

**lawsuit** 25:10,
13,18 28:16,
18,21 29:5,18,
22 40:12,13,
15,22 41:1
66:11,17,19
67:1,7,9
168:17

**lawsuits** 25:22
29:5 30:3,5,10

**lawyer** 12:13
38:10 39:2,7,
21

**lead** 29:10
209:9

**leading** 116:5,6

**Leah** 223:22
224:17

**lean** 200:20

211:14 217:8

**learn** 57:2 78:5
92:11

**learning** 119:20

**lease** 211:17

**least** 51:25
67:5 87:13
116:14 162:23
190:14 230:14
265:2

**leave** 64:14
75:22 120:12,
15,16 121:8,
15,19 122:3,6,
11,17,20,24
123:5,17,23
124:12 133:12,
15 134:18,22
142:8,11,12
161:18,20,21,
23,25 162:1,5,
8,9,11,21,23
163:19,20,21,
22 164:4,7,8,
11,13,15,17,24
165:1,2,6,7
274:12,14
283:25 284:1

**leaving** 87:20,
25 135:13
194:7

**led** 23:14,23,24

**Lee** 27:24

**left** 17:21 18:4
19:16,17 33:14
64:21 65:6
74:5,7,9 75:7,
14 81:16 82:22
83:2,17 85:2,
12,16,20,23,25
86:22 87:14,17



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 322 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                    DEPOSITION OF
DAVID PASSMAN on 10/11/2017                              Index: legacy..looked

88:21 89:8
92:16 93:3
141:14 142:23
143:4,13
158:1,5 172:20
181:7,15,17,25
182:15,19,23
183:1 190:8,9,
10,13 198:11,
13,20,23
201:18 202:4
225:7 238:8
268:16,17

legacy 211:16

legal 7:17 51:9,
22 63:18 75:2
99:24 103:15,
18 104:16,19
105:11 155:18
177:21 207:11
209:2,3,4
217:7 222:21
223:1,4

legible 140:12

legibly 141:12

Lehman 195:6,
18 196:2,5
231:9

less 47:15

lesser 61:17

let 7:9,14 31:1,
20 39:22 54:1,
12 57:22 70:1
71:20 77:25
105:2 138:23
140:16 142:14
146:6 148:7,8
149:13,17
167:15 172:12
173:6,25 179:5
190:21 192:24

193:5,7 235:10
236:7 239:18
243:13 244:22
246:13 254:19
255:7 257:1
258:10 260:15
261:23 263:13
264:5 265:17
273:25 287:21

let's 20:24
71:19 76:8,12
97:15 150:7,15
152:9 165:19
167:14,20
171:5 203:8
206:20 207:23
282:10

letter 68:25
147:1 233:11,
14

level 27:6 29:1
49:25 51:18
53:5,8,20 54:2,
3,13,20 61:15
72:11,14
101:14,15
102:25 126:22
145:4 188:18
208:13 212:23
213:6 215:16
217:20 222:22,
23 223:12
224:1,4,10
227:12,15,20
228:22 229:4,
6,24 230:2
231:9,10 232:3
248:18 281:8
287:16,20

levels 144:25
212:23 248:19
270:25

liabilities 24:24
25:2,3

liability 24:21
25:9 26:3,9
212:8,13,18

Liberty 264:8

life 79:14 82:1

like 23:17 32:1
48:20 49:18
59:25 70:24
72:22 73:1
91:14 123:3
134:7 139:8
140:7 141:7
142:21 143:8,
9,15 201:18
209:4 218:20
228:9 231:5
241:6,9,10,12
246:7 248:17
252:9,13 261:9
267:11 270:2
280:12 285:16
288:20

likes 267:11

Linda 75:2
222:25 223:7
228:24 229:13

Linda's 75:3

line 103:13
150:20 201:11,
18 255:11
267:6

lines 192:2
206:22 218:5

lion 205:3

Lisa 35:14,19
56:11,12 138:3
253:25 254:1
261:5,6 267:1,

14

list 73:13 74:20
146:3 172:15
212:20 219:1
221:24 223:14
224:2,9 225:24
233:20,24,25
270:17 281:22,
25 284:9

listed 162:8,9
195:7 196:22
197:1,8 202:5
203:10,25
213:8 214:5,6,
8 216:1 217:24
218:21 222:3,
4,14 230:10
231:12,15,16
232:9,10 265:2
269:4 284:18

listened 277:24

listing 75:10,16
262:12

lists 75:2
151:11 232:8

literally 64:13,
21

literate 71:5

litigation 29:14
67:8,13,15,22
68:11 69:4,24
70:1,3,7,14,17,
20,24 71:2
105:13 106:8,
13 108:9 109:2

little 48:20 76:7
105:22 133:4
216:4

live 9:19,21,25
10:3,7

lived 7:24
135:25

lives 9:13

lma.carmike.
com 156:20

local 20:15
44:24

location 135:21

locations
210:23 211:1
284:15

long 7:24 11:22
13:2 44:2
62:15 78:19
92:18 93:3
109:20 120:25
121:24 122:2
128:14 134:17
272:13

longer 44:25
157:2

look 113:2
122:22 146:17
150:7,8,14,15
151:9 152:9
156:2,10
158:11 165:12,
19 167:21
171:5 172:8
175:4 207:14
218:4 219:5
220:22 221:13
222:2,16
234:12,15
241:10 264:14

looked 41:18,
20 105:25
107:8 123:1,2,
3 160:20
165:11



1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

**looking** 57:15 74:20 111:6 160:13 161:16 167:20 169:1 204:14 208:2 220:18 221:11, 12 222:20 223:18 228:4 233:19 234:1, 19 235:10 239:10 247:25

**looks** 72:22 73:1 139:8 140:7 141:7 142:21 143:8, 9,15 148:13 165:23 241:6, 9,12 261:9

**losing** 48:17

**lot** 36:1 41:20 46:11 119:7 211:15 231:5 249:20

**lots** 80:11

**low** 12:22,23 91:18 111:5,19 112:6

**lower** 50:11 54:11 128:17

**Lucas** 125:24 126:4,7,8 203:11 231:8 284:14

**lucky** 266:4

**lunch** 130:10 133:3,6

**Lundin** 195:6, 23 196:11,12 229:18,19 231:9

**Lundin's** 219:14

**luxury** 199:9

---

**M**

**M-u-r-r-a-y** 226:12

**ma'am** 47:13 48:3 50:10 53:16 134:6 137:5 162:25

**machine** 205:15

**machines** 205:6,13

**made** 65:3 66:21 86:14, 16,23 87:16 97:24 99:1,7 104:5,6,9,14, 18,21 105:5 109:14,25 114:24 132:23 133:11,15 137:3,22 151:10,23 152:6 154:18 155:17 164:10 172:1,3 182:13,17,18, 21,25 184:4,6, 9,13 189:20 205:5 242:18 246:11,22 251:1 266:11 278:18 279:23, 24

**mail** 217:2

**main** 201:21 207:8

**maintain** 20:18

**maintained** 19:12 20:17 63:4 73:13 165:16,18 207:2 277:8

**maintenance** 217:2

**Major** 21:8

**majority** 16:7, 10 23:13 273:2 283:16

**make** 30:25 33:7 38:4 45:14 54:1 69:18 82:8 84:3 86:1,10, 19 87:12,19,23 88:5 97:4 103:19,20 104:22 105:2 107:13,18 108:8 109:13 124:20 137:4 138:2 145:20 155:20 165:21 169:16 172:12 176:18 182:16 185:17 205:15 233:3 246:3 256:21 276:16, 19,22 285:8,18

**makes** 96:25 151:3

**making** 50:8 57:1 59:22 60:7 61:14 78:21 94:21 144:22 153:19 224:22 279:16 287:25

**male** 100:8 112:7 130:25 135:4,8 155:7, 12,23 184:15, 20 185:6,16 186:22 187:24 189:12 194:22 219:16

**man** 111:19,20 209:25

**man's** 27:25

**manage** 209:8 210:13

**management** 22:1,18 23:3,7, 16 85:19 113:1,8 119:1 153:12 188:18, 22 190:8 210:8,9 212:7 215:18 221:4 284:16

**manager** 58:20 59:1,8 62:9 74:5 76:4,22 86:24 87:2,14 103:18 130:19 135:4,9,13 136:15 137:1 147:7 203:18 204:5,11,15 214:2,5,8,22 215:15,16 223:12 224:4, 8,10,12,13 225:21 226:2, 5,17,25 227:1, 14,15,19 230:21,22 284:14,22 285:3

**manager's**

86:5,11,20 87:24

**managers** 33:22 45:11,15 49:1 86:7 87:6 88:4 91:14 114:4 135:1 136:24 186:8, 13 203:10,11, 19,22,23 206:2,3,5 222:23 227:5, 7,8 230:6,10, 16 273:3,6

**managing** 227:18 281:3

**manual** 90:25 91:1,11 147:5, 9,14,19,25 148:9,11,21,25 149:2,6,15,21, 23 150:2 277:7

**many** 14:22 28:25 46:3,14, 18,19,25 47:9, 14 59:15 60:13 86:14 87:4 96:5 98:12,15 102:7,13 114:4,7 180:18,21 195:2 215:20 228:11 246:10 249:17,25 250:2 270:22

**March** 95:3 109:12,23 243:19,22 244:3,7 265:24

**mark** 146:6,24 148:7,8



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Index: marked..memory

**marked** 57:15, 22 71:20 138:23 140:16 142:14 146:20, 22 149:14,18 179:5 190:22 235:11 236:7 239:19 242:25 243:13 244:22 246:13 247:11 254:19 255:7 257:1 258:11 260:15 261:23 263:13 265:17

**market** 91:19 145:25 181:5

**marketing** 49:5, 8,22 50:20 52:19,25 55:9, 12 56:23 57:1, 3,9 58:6,14,19 59:1,6,7,10,21, 22,25 60:6,7, 14,16,18,24 61:1,6,8,10,14, 25 62:2,5,9,16, 17 63:19 76:13,21 82:4, 12,16 83:18,23 84:3 85:15,19 86:2,10,20 87:13,24 92:4, 11 109:14,25 114:3 119:15, 22 120:2 139:10 145:11 171:20 180:18 181:2,7,8,9,12, 16,17,22,24 182:3 184:7, 10,13,21 187:4 196:17 199:17, 19 200:17,20 204:5,10,15

226:17 227:15 241:14,22,24 242:1 245:22 250:14 251:16 252:25 279:4, 9,21 281:4

**Marks** 75:15

**married** 9:3,15, 17 213:12

**Marshall** 141:15,18 143:22 184:23 197:15,22 216:24 236:19 279:1

**Marshall's** 142:22,25

**Mary** 7:1 217:23

**match** 192:2

**material** 25:19

**maternity** 120:12,15,16 121:8,15,19 122:2,6,11,17, 20,24 123:5, 16,23 124:12 134:18,21 142:8,11 164:7,15,16,24 165:7 183:23 274:12 283:25

**matter** 88:2 105:18 116:11 120:23

**matters** 24:8

**may** 10:3 52:9 54:10 69:17, 20,21 91:12,13 95:16,17 144:6

148:15,17 162:4 163:20 165:21 166:5 168:4 178:25 192:10 213:14 215:5 219:1 231:18 257:25 259:6 265:10 279:7 284:3

**maybe** 61:16 87:7 192:12 213:11

**Mayo** 194:16 200:10,12 201:19,22 202:2 221:15

**Mayton** 55:10 78:1 81:3,13, 16,22 82:21 83:2,16,22 85:2,7,12,16, 20,23,25 86:22 87:14,17,25 88:21 89:8 92:16 113:13, 15 140:8 180:25 181:7, 15,17 182:15, 18,23 183:1,6, 21 257:7

**Mayton's** 84:9, 20

**Mcmurray** 211:21,22 282:24

**Mcquagg** 229:8

**meals** 179:21, 22

**mean** 30:20 31:19 33:17 35:22 36:9

48:25 49:20 57:8 58:10 60:25 65:7 79:10 84:5,13 90:2 102:22 110:6 139:15 155:16 170:20, 21,24 171:23 189:19 199:20, 21 208:21 209:4 210:11 215:22 219:21 222:2 241:3 244:17 245:3 252:9,12 253:9,11 256:3,7,15 259:3,5,18 261:13 263:4 266:11 271:14 273:7 275:12 278:10 280:12 282:4 286:23

**meaning** 19:20 20:16 137:7 147:13 174:18 249:24 274:3 278:25 288:3

**means** 57:9 159:24 172:21 211:9 215:22

**meant** 65:10 252:13

**mechanical** 205:8,9

**mechanism** 18:6

**media** 88:22 106:11 108:5 176:17 283:11

**medical** 161:18,19

162:1,8,11,21 164:4

**medically** 283:24

**medication** 41:22,25 42:3, 9,11,13

**meet** 31:6,23 32:9 238:18,21

**meeting** 44:24 45:3,6 46:4 49:16 52:17 59:19 77:17, 18,20 78:1 79:23,24 80:7 117:5,14,18 181:2 277:20

**meetings** 48:7 49:12 52:11 86:1,4 87:9

**Megan** 74:7,14 224:24 225:7

**Melissa** 216:9, 20 224:2

**member** 15:3,6 18:19 103:23 104:23 249:14 277:24 278:16 285:20

**members** 14:3, 14 19:10 253:5 270:16 278:14

**membership** 12:10 257:13 263:1

**memberships** 254:17

**memory** 41:23 42:1,7,25 43:3



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Index: men..Mr

44:3 56:25
65:17 272:15

**men** 113:2

**mentioned** 23:8
51:7 53:3
59:18 80:2
188:20

**merged** 13:4
17:5

**merger** 16:24

**merging** 16:23

**met** 37:13 38:8
49:14 276:6
278:6 281:8

**method** 128:11,
12

**Microsoft** 63:3
66:1 106:21
174:25 175:1

**mid** 198:16

**mid-december**
73:17

**middle** 10:3
14:1

**might** 21:15
60:13 65:16
75:23 76:5
102:23 103:4,5
127:12 155:25
179:15 199:24
211:17 232:8
251:17 261:3
262:1 268:2
270:2 271:3,4,
14 278:22
283:19 285:13

**miles** 10:7,9

**mind** 230:6

**mindful** 239:11

**mine** 48:19
72:13 79:11
82:14 111:14
128:21 141:11,
13

**minute** 19:5
54:1 167:15
189:1 284:4

**minutes** 18:23
19:3

**misconduct**
160:11,14

**misreading**
231:18

**missing** 111:20
172:12 217:19
218:25 220:12
223:19 244:16

**misstated**
186:12

**mistake** 38:4

**misunderstood**
58:9 101:19
104:20

**misuse** 115:15
157:21 158:3
161:5

**moment** 198:17

**Monday** 86:1,3

**Mondays**
52:13,15,17

**monetary**
286:22

**money** 94:21,
22,23 189:20
286:5

**monitor** 178:9,
10,12

**monitoring**
178:20,22

**month** 43:19
162:5 202:12

**months** 77:5
80:24 95:3
110:19 162:13

**more** 8:14
10:14 11:25
12:2,3,4 23:1
24:4 26:13
31:23 46:23
47:12,16,21
60:2 61:15
79:4,9 85:22
87:1 94:21,22,
23 98:24 101:8
102:17 119:7
124:11 125:7,
22 172:14
205:12 215:24
241:9,19,25
250:4 261:19
279:25 285:16

**morning** 42:9
77:17,19
233:17

**Morton** 130:23,
24,25 136:3,4
161:3

**most** 24:6
43:18 52:13
64:19 83:22
87:7 252:4,5
272:19

**move** 8:6 61:21
119:1 218:14
226:21

**moved** 8:2
50:20 52:19
55:9 58:5,16,
17 59:6,10
60:6,17 61:5,
10,25 62:5,17
171:19 180:17
187:3 201:14

**movie** 199:23
200:1,2,3
202:19 225:17

**moving** 49:4,8
50:12 52:24
56:22 58:13
61:8 62:16
139:10 191:21

**Mr** 6:9,10,18
7:1,2 20:24
22:20 37:2,6,
23,25 38:3,6,
18 39:6 40:7,
12 41:22 42:13
50:3 54:21,22
55:1,18 58:21,
24 59:2 69:11
76:25 77:16
78:1,2 80:13,
18,22 81:13,
16,17,18,22
82:9,21 83:2,5,
16,22 84:20,21
85:2,6,7,12,16,
20,23,25
87:14,17 88:21
89:8 91:17,22
92:2,16 96:14,
18 97:23
98:16,19 99:4,
14,18 100:24
101:2 104:3
109:11,17,22
110:10 111:8,
10 112:10,18,

22 113:4,11,
13,15,18,20,24
117:6,23
118:13 119:4
120:7 121:10,
17 122:7,12
123:6,18
124:19 125:2,
17 126:7 133:5
136:3,4 137:9,
20 138:25
139:2,13,18
143:7 144:22
146:12,18,20
152:2 154:3,13
158:23 159:1,
15,19 161:3
162:14 164:20,
23 167:8
168:11 169:7
181:7,15,19
182:5,15,18,23
183:1,9 185:1,
13,19 186:1
188:2 190:23
191:1,6,11,16,
20,23 192:15,
18,23 193:1,4,
10,11,15,17,25
194:4,6,21,23
195:8 197:16,
24 204:6
205:25 212:24
213:14,19
217:23 218:3,
6,24 219:4,20
220:1,3,4
226:19 231:11,
23 233:3,8,12,
16 235:21
237:6,14,21
238:6 239:13
240:12,18
242:2 243:20
244:24 245:3,



1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 326 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                                    DEPOSITION OF
DAVID PASSMAN on 10/11/2017                                          Index: Ms..non-harassment

9,14 257:7,8
259:25 260:3
261:10 262:19
265:5 267:25
269:11 277:15
284:23 288:24

**Ms** 6:1,16,20,
25 22:22 24:22
25:20 27:7
29:5 35:3,8
37:24 38:1,5
42:14 44:20
46:20 49:5,7
50:19 52:18
54:13,25 55:9,
17 57:18 58:5,
13,22,25 59:4
61:4 62:11,16
69:12,13,20
70:14,19 73:4,
18 76:6,11,13
77:1,6,8,12,17,
22 78:6 79:5,8
80:14,19
81:12,17 82:8,
21 83:2,8,12,
18 84:19 85:3,
7,11,14,18,22
86:10,19 88:7,
22 89:2,7
90:10 91:18,
22,24 92:3,21
95:2,25 96:3,
15,19 98:1,6
99:6,12,20
100:25 101:4
104:4 109:6,
10,13,18,24
110:14 112:14,
15,20,23
113:1,6,7
114:2,3,16,19
115:11,14,17,
23 116:9

117:4,11,13
118:2,15 119:9
120:9,11,14
121:13,20
122:5,9,15
123:9,15,20,25
124:11,21,24
125:5,10,20
126:5 129:9
130:7 133:2,8,
9 134:10,17
137:11,21
138:22 139:1,
3,14,21 142:8,
16 143:12
144:11 146:13,
16,19,22 147:3
148:21 150:4
152:3 154:6,16
158:23 159:16,
21 160:17,23
162:16 164:10
167:10,14,19
168:9,13
170:19 171:19
179:18 181:21
182:7 183:12
185:5,15,23
186:3 187:3
188:4 190:25
191:4,8,14,18,
21 192:14,17,
20,24 193:2,5,
13 194:3,5
195:11 197:19
198:1 204:7,9
211:3 213:2,
18,21 218:1,23
219:12,22
220:2,7 226:20
231:14,24
232:1 233:5,
11,14,18
235:5,22
237:1,7,8,13,

18,23 238:8,
10,18,24
239:8,10,14,17
240:14,20
242:4 243:5,
11,23 244:5
245:1,5,11,13
248:16 250:7,
20 252:25
257:6,7,10
260:2,4 262:20
265:5 267:9
268:1,25
269:13 271:25
272:5 273:23
274:10,12,18
275:24 277:14,
21 280:22
283:25 284:3,
8,25 285:7
288:23

**much** 24:13
92:12

**Murray** 226:12

**Muscogee** 9:25

**must** 80:10
90:15 112:3
121:15 143:10
150:18 162:22
176:16

**myself** 39:25
49:12 50:25
51:3 116:19
117:10

---

**N**

**name** 7:1,17
9:5,9,11 15:8
16:18 17:6
27:25 37:18
39:3 71:17

75:6 104:11
105:18 106:24
130:9,10,21
179:9 188:8
207:13,14,15
213:10,19,24
214:4,10,16,19
215:13 216:12,
14 220:8 226:7
248:9 258:23
272:14 284:18

**named** 188:22
269:14 284:19

**names** 26:14
104:6,7 195:13
206:14 217:16
222:3,4 254:10
283:5

**nature** 116:3

**necessarily**
6:13 28:23
61:15 98:10
127:19 155:15
230:20 261:15
270:10

**necessary**
78:22 103:18
104:19 105:19
153:16 155:20
169:12,17

**need** 29:2
68:13 146:24
162:23,24
172:14 182:16
186:10 192:12
206:15 253:14
276:1

**needed** 92:10
105:11 118:4
200:23 205:2
225:15

**needs** 60:13
219:5

**neither** 138:12,
14

**network** 19:19,
21 20:3,6,15
106:5,7,20
107:7,14,19,
22,25 175:14
176:15,19

**never** 18:15
83:11 91:21
128:3 237:16
277:10,11
279:11

**nevertheless**
80:1 115:3

**new** 13:22
75:10 141:5
143:11 184:18
185:9 200:21
204:25 205:14
211:1 225:19
246:6

**news** 264:22

**next** 63:9
77:17,19
119:22 163:25
194:21 217:17
271:6

**Nexus** 248:11,
14 251:6
287:11

**nightly** 108:4

**nine** 173:6

**nodded** 37:4

**non-carmike**
257:20

**non-harassment**



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations

Nationwide Coverage

Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 327 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                                    DEPOSITION OF
DAVID PASSMAN on 10/11/2017                                          Index: non-work..occasions

153:22

**non-work** 32:15

**nonclerical**
98:15

**nondiscriminati
on** 151:18

**none** 22:21
23:9 57:20
179:4 268:8

**nonexempt**
279:17

**nonresponsive**
281:15

**nontraditional**
199:23,25

**nor** 125:8
138:13 186:7
189:17 228:11

**norm** 158:15,
18

**normal** 174:4
250:19

**normally** 23:5
140:5 144:4

**North** 21:10

**Northwestern**
22:2 23:18

**notary** 6:13,14

**note** 152:20
165:24 178:2
232:8 243:7

**notebook**
175:19

**notebooks**
173:12,16

**noted** 164:18
235:17

**notes** 137:4
159:7 234:10,
19,22,24

**nothing** 65:18,
21 66:1,2
94:17 281:18

**notice** 162:17,
23 163:5,13
236:11,12,15

**noticed** 259:21

**notices** 280:18

**notified** 67:7

**November** 8:24
46:21 47:1,10
73:8 74:3 75:4,
18,23 76:3
114:17 117:19
131:11,25
132:3 148:18,
22 168:20
171:15 179:19,
24 187:1
194:6,9,23
195:5,12,18,
21,23 196:14,
20 197:9
198:8,10,23
199:13,15
200:7 201:16
202:7,13,24
203:1,13,17
204:1 205:25
207:17 208:3
209:13,19
210:2,20
211:3,19
212:1,4 214:17
215:7 217:18
218:25 222:13
224:7,19 225:4
226:13 228:19
229:2,14,22

231:17 235:15
249:2,3 268:14
269:19 280:23
284:13,21

**now** 16:23
28:2,4 35:19
58:18 72:3
75:20 76:6
96:10 118:22
135:22 152:20
153:22 184:3
197:4 207:25
265:3

**Noy** 54:21
55:1,18 60:3
74:13 76:25
77:5,16 78:1
79:2 80:13,18,
22 81:18 82:9,
18,25 84:21
85:6 91:17,22
92:2,5 98:16,
19 109:11,22
110:3,10
113:18,24
114:22 116:22
120:11 122:11
123:14 126:7
137:2,7
142:21,22
143:15 179:7
182:11,12
194:9,21,23
199:2 202:5
204:1 205:19,
23 206:3,6
210:16 224:25
229:21 235:20
240:2,9,15
248:2 269:20
270:5 271:21
274:23 275:3,4
276:15 278:4,
12 285:5

**Noy's** 140:8
204:18 225:9,
10 277:25

**number** 15:1
52:16 104:1,
10,24 146:10,
19 147:4,16
172:20 194:22
199:25 221:11
225:19 238:3
245:6,7 254:16
259:14 271:11

**numbered** 87:7
146:17 171:9

**numbers** 72:24
73:1 141:2
143:5 144:16
160:14 181:4
192:4 194:21
195:1 222:5
228:12 240:3
241:2,13,14
242:22 244:24
262:11,14

**numeral** 173:8
178:3

_____

**O**
_____

**oath** 6:22

**object** 22:20
54:22 58:21,24
59:2 69:11
83:5 96:14,18
97:23 99:4,18
104:3 109:17
112:10 117:6,
23 118:13
119:4 120:7
121:10,17
122:7,12
123:6,18

124:19 125:2,
17 137:9,20
139:13,18
143:7 152:2
154:3,13
162:14 164:20
167:8 168:11
169:7 181:19
182:5 183:9
185:1,13,19
186:1 188:2
191:24 193:25
197:16,24
212:24 213:14
226:19 235:21
237:6,14,21
240:12,18
242:2 243:20
262:19 267:25
269:11 277:15

**Objection**
113:4

**objections** 6:6

**objectives**
181:9 276:6

**obtain** 19:19
22:9

**obvious** 106:1

**obviously**
19:16 21:21
53:17 189:19
191:25 268:24

**occasion**
122:22 125:22
159:2,22
160:1,4,7

**occasionally**
158:16,18
173:25 197:5

**occasions**
94:20 118:17



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

occur 24:16
150:23 162:12

occurred
18:14,15 29:4
73:17 77:8
111:16 117:19,
21 128:3

occurrences
43:3

October 43:21
62:19 89:13
171:18 187:3
284:21

off 8:1 57:21
128:17 129:2,
12,14 204:25
211:15 233:5,
16 259:23
273:4

offer 237:16

offered 24:1
26:23 161:21
237:10 253:6,
15 254:16,17

office 26:21
29:3 31:24
33:3,6 45:1
46:15 64:14,20
72:21,25 75:11
76:2 105:23,25
147:19,23
148:1 158:16,
24 159:1 167:3
173:23 174:5,
8,12,14,25
217:3 223:22
224:25 225:9,
10 251:1,20
286:11

officer 36:10,
20 51:9,22

55:3,7 63:16,
18,19 72:8
97:21 166:12
184:10,14,21
185:17,22
186:5,6 187:7,
10,21 196:18
197:2,4,5
208:7,8,10

officer's 26:8

officers 188:23
201:24 202:1
212:10,17
219:9 231:3,6

offices 33:3
45:16 46:19

official 32:1
145:11

often 24:15
32:13 52:13
108:14,17

Oh 15:6 48:19
69:2 146:13
163:6 189:21
206:20 254:3
268:8 275:2

okay 7:8,16
8:25 9:3,21
10:2,7,11
11:11,22 12:5,
20 13:10,13,25
14:13,20 15:9,
25 16:13 18:9,
19 19:16,25
20:24 21:14
22:15 23:20
24:12 25:2
27:19 28:19
29:8,18 31:9
32:6 33:11
34:4,12,18
35:6,13 36:2,4,

7,12 37:6
38:17,21,24
39:2 40:7 41:3
43:10,20 44:1,
5 46:1,6 47:9,
14,20,24 48:4
50:11,16 51:7,
11,23 52:18
54:5 55:1,14
56:22 58:13
59:5 62:7,23
64:1 65:10,18,
20 68:8,11
71:7,19,20,24
72:14 74:2
75:25 76:25
77:16,24 78:5,
9,16 81:10,12,
16 84:8,11
89:6,12 91:24
95:7,15 97:15,
19 104:13,20
105:1,5,13
107:1 108:25
115:8 120:14,
25 121:6,14,23
125:21 126:14,
16,24 127:14
128:5,24
129:8,22
131:11 132:22
133:1,5,8
134:25 136:3
137:6,15
138:19 139:2,
9,22 141:21
142:5 143:16
144:6 145:18,
21 147:4
148:3,7,10,14
149:3,8,17,21
150:7,25
152:4,9,13,16
153:10 155:16
156:6,13,19

157:14,21
158:22 159:6,
19 160:17
162:10,17
163:3 167:20
170:18 171:14,
18 172:11,17
173:5,16
174:2,7,15
175:13,18
176:9,14,21
178:2,8,23
179:12 183:25
184:1,9,15
188:24 189:10
194:21 195:16,
21 197:8,12
198:4,8,12,22
200:4,7 201:8
202:3 203:13,
16,21,25
204:16 205:10,
21 206:8,17,20
207:8,16
208:2,17
209:13 211:19
212:16 214:3,
10 215:3,12,
15,25 216:11,
23 217:12
219:13 220:10,
15 221:2,5,10,
22 222:2,16
223:15,21
226:11,24
227:10,22
228:1 229:7,
11,20 230:13,
18 232:5,7,22
234:18,23
235:1,9 236:3,
9 239:14
240:23 241:1,
21 246:13
248:13 249:17,

22 250:7,13
251:13,21
253:18 254:19
255:15,18,23
257:6,22
259:15,21
260:3,15,17
261:10,16
262:5,9,16
263:9,13,24
265:24 267:20,
22 268:12
269:8,17,21,24
272:3,7,13
275:16 277:13
278:18 279:15
280:11,16
282:23 283:6,
21,24 284:17
287:1,13
288:12,22
289:1

old 43:6
201:10,11
204:23 211:17

older 155:23

omissions
222:17

once 55:16
98:24 104:14
124:12 143:8,
21 287:23

one 15:6 16:11
22:11,15 23:6
26:13 28:21
31:23 32:24
33:1 42:22,23
48:1,6 51:3
58:10 59:17
60:2 61:23,24
79:4 99:1,7
101:7 109:7



Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 329 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                    DEPOSITION OF
DAVID PASSMAN on 10/11/2017                              Index: ones..outside

110:7 114:18
116:14,15
120:17 121:21,
22 122:22
125:22 128:7
136:8 139:23
140:4 144:4
146:17,18,19
147:4 152:17
153:20 159:14,
17 162:7,9
165:20 170:3,
23,25 172:25
179:15 180:25
186:9,14 188:8
190:7 195:14
206:11 214:21,
23 219:17
222:7 232:9,25
234:14 246:9,
12,17 247:24
250:25 251:6
256:10,11,17
258:21 261:5
262:8,24
264:10,19
275:14 277:10
278:6,16,22
282:14 284:9
285:1,3,21

ones  48:20
73:25 75:19
91:12 188:1
189:11

ongoing  235:4

online  19:8,9,
11,20,23 20:9,
18 70:13

only  14:20
74:22 75:19
77:15 108:1
115:1 126:22
146:2 147:17

150:12 157:25
159:17 178:24
186:9,13 187:4
203:11 214:21,
23 278:10,16
282:12

onto  20:2
108:5,6 193:21

opened  177:5

opening  200:22

openings  246:7

opera  199:24

operating  50:24
51:23 52:6
53:4 55:3,7
63:18 89:23

operations
186:19,21,24
200:22 210:7,
13

opportunities
119:8

opportunity
57:2 110:15,18
150:9 153:1
237:10

opposed  20:16
22:9 34:7 59:7
103:6 228:14,
16

option  15:23
162:3

options  82:13
188:11

order  20:1
93:18 113:7
121:14 129:12
205:14 260:11
287:17

orders  247:18

ordinarily
141:22 162:22

organization
119:7 200:19
206:21 217:8,
19 219:9,10
251:18

organizational
206:25 213:3
222:6 223:16
230:11 232:20,
24 233:4

organizationally
220:13

organizations
251:22

original  191:25
194:1

originally
144:16

other  6:3,11
7:10 15:6
21:17 23:17
26:25 27:13
29:5 31:6 32:2
37:2,6 39:25
40:7,12 42:12
43:3 45:4
50:22 51:2
52:6 58:11
60:19,21 63:7,
9 64:5 69:10,
15 72:14 88:6
90:9 91:11
103:7,17
105:20,21
109:7 110:8
111:6 114:18
116:14 121:21,
22 124:16,22,

24 127:20
128:11 130:11,
15 137:6
142:11 145:24
148:20,22
149:23 150:1,3
151:12,19
152:16,17
155:3 157:16
158:2,3 166:16
170:14 172:22
175:1,18
180:12 187:23,
25 188:18
195:1 197:23
199:11 200:2
201:22 205:2
211:15 217:3
222:11,13
224:2 225:24
226:1 232:9
241:25 252:10
253:18 258:1,6
261:2 265:1
269:24 271:19,
24 272:25
278:10,14,16
280:21 283:25
285:15 287:6

others  228:5
241:19 270:24

our  20:3 31:10
48:6,7,19 50:6
59:15 128:10
131:19 166:11,
16 168:4 208:7
211:22 217:1
229:8 233:7
242:12,16
251:17 254:13,
14 256:23
257:24 273:2,3
281:4

oust  15:2

ousted  13:19

out  20:16
26:21 40:21
45:21 48:12
53:18 64:13,22
69:1 120:21,25
121:24 122:2
123:16 134:2,
18,21 140:20
155:8 157:4,12
169:20 180:8,
10 203:20
205:1,16
217:14 218:5
233:10,12
250:8,11
251:17 252:16
256:10,11,12,
13 270:17
274:12 280:9,
12 286:7
288:19

Out-patient
43:9

Outlook  63:3
64:6 106:17,
18,20 156:23
175:1,11,12

outpatient
43:13

outright  15:22
16:1

outside  12:8,11
23:15,17,24
103:12 108:25
145:22,23
184:16,20
185:6,16
188:15,17
238:16 251:19
252:8 271:12



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations

Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

**over** 7:10 16:19
17:23 33:13,
18,19 34:2,12
41:12 45:3
46:15,25 54:6
60:14,25 70:2
98:23 122:22
133:4 169:18
181:16 184:16,
18 185:11,24
186:19,20,23
187:25 189:22,
24 192:8
195:9,13
196:4,24
197:15 218:17
222:6 233:9
234:18,21
281:9,23

**over-written**
108:15,18

**overall** 46:25
92:4 264:11,
14,16,19

**overnight** 43:9

**oversaw**
196:13 203:19

**oversee** 13:22
82:14,16

**overseeing**
14:1,11

**oversite** 83:25
284:16

**owed** 229:3

**own** 31:24
41:13 48:20
129:9,25

**owned** 16:5

**owner** 10:15,
17,19

**ownership**
10:18 15:22
16:1 157:8

---

**P**

**p.m.** 289:4

**page** 37:21
39:13 141:10
144:2,4 146:17
148:4 150:8,15
152:9,21
153:25 154:7,
9,11 156:2,7
157:14 158:11
159:7,18
161:16 162:10,
17,20 163:7
164:12,19
165:13,24
167:23 168:22
171:8 172:15
173:6 178:3
207:19 218:5
224:22 259:17
264:14,16

**pages** 147:12
152:9 172:12
192:2 193:18

**paid** 12:20
69:18 120:16,
22 121:8
129:13 164:11,
16,24 189:12,
15 216:4
248:4,6,7
259:5 285:10
287:25 288:19

**pains** 124:1,7

**panel** 93:7
95:22 109:13,
24 118:10

**panels** 246:11

**paper** 106:2
127:21,22
194:3 222:3

**papers** 41:20
272:17

**paperwork**
272:19

**paragraph**
150:16 156:15
162:11 163:25
164:2 166:7,9
167:22 168:25

**paralegal**
207:10 222:21
223:5

**part** 13:10
18:16 20:5
29:13 61:7
63:23 70:14,16
72:9,11 75:11
80:9 82:6
86:18 97:20
106:8,13
115:22 121:8
131:8,19
137:15 185:20
189:1 193:18
198:14 219:6
242:17,18,19
244:15,18,19
250:7 258:13,
16,25 259:22,
23,25 262:6
265:7 268:6
270:3,7,19
277:18,19
282:9

**part-time** 47:4,6

101:14,15

**partial** 141:24
153:11

**participate**
130:5,10
180:15 249:24

**participated**
181:24 249:15,
16,23,25
283:12

**participation**
249:8

**particular** 58:18
72:17 141:24
145:12 154:24
217:10 246:8

**particulars**
40:16

**parties** 271:11

**parts** 48:11,13,
16 67:4 205:13

**party** 120:10
238:15 257:24
258:4 260:25
262:18 263:3

**pass** 84:19
255:24

**passed** 69:1
185:11

**Passman** 6:2,
18,19,21 7:1,
18 9:10 20:24
22:21 39:6
41:22 54:23
59:3 83:6
97:24 98:4
99:5,19 112:11
113:5 117:7,24
118:14 119:5

120:8 121:11,
18 122:8,13
123:7,19
125:3,18
137:10 139:19
143:8 147:1
154:4,14
159:20 162:15
164:21 167:9
168:12 169:8
181:20 182:6
183:10 185:2,
14,20 186:2
188:3 194:6
195:9 197:17,
25 212:25
218:24 219:6,
25 220:6
231:12 237:15,
22 240:13,19
242:3 243:21
245:14 277:16
285:1 289:1

**Passmore** 50:3

**password**
287:13

**past** 99:3

**pasted** 193:21

**Patrick** 15:8
197:8

**patrons** 200:1

**Patti** 212:3

**pause** 179:16

**pay** 36:17,25
53:13,22 54:6,
15,16,19 55:20
56:2,12,15
62:13 76:16
77:2,5,15
78:16,19,21
79:6,9,17,25



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 4:16-cv-00380-CDL    Document 63    Filed 06/21/18    Page 331 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                    DEPOSITION OF
DAVID PASSMAN on 10/11/2017                          Index: payable..Plaintiff's

80:8,14,19,23
83:3,9,10
90:11,18,22
91:2,18 96:1,3,
6 99:13 100:8
111:19 112:6,
23 118:17
121:3,12
139:12,16
140:24 141:16
143:20 145:4
154:18 167:5
168:10 170:4,
5,11 222:21
229:2 240:11,
17 283:17,19,
20,21 285:14

**payable** 248:8,
13 285:10,25
287:24

**paychecks**
283:14

**paying** 36:18,
22 212:15

**payouts** 274:22

**payroll** 139:4
140:17 142:15
214:2,5,8,22,
23 215:19
235:12 236:3
288:3,4,6,10,
13,19,21

**PCI** 171:20
172:3,5

**PDA** 175:19

**peer** 116:15
186:23 271:4

**pending** 29:6,
14

**penny** 286:21

**pens** 48:18

**people** 23:7
33:13,14 45:21
46:14 53:18
54:2,3,20 63:7,
10 71:11 73:5,
6 74:3 75:21
83:23 87:1,4
116:14,19
119:5 123:16
127:25 137:6
180:18,21
194:22 195:2
200:20 205:5,6
212:20 215:18,
20,23 217:4
219:8,10,11
220:14,22
223:14 224:2
226:23 227:24
230:4 235:6
252:10 253:7
256:22 259:3,5
260:11,14
269:2,25
271:19 278:10
280:8 281:3

**per** 286:22
288:19

**percent** 46:8
54:9 66:18
69:3 128:8
140:7 143:16
208:12 250:25

**percentage**
16:5,13 54:6
139:20 140:25
276:7 286:3

**performance**
89:16,20,24
90:4,6,14
134:12,16

181:1 189:14
242:10 263:25
269:25 270:4,
18,20 272:5
274:22 275:13

**performers**
264:11,14,16,
19 265:2

**performing**
111:11,21
112:8,19

**perhaps** 58:9
140:8 193:8

**period** 35:1,12
56:3 71:13
74:9 75:21
107:11 114:8
122:11 127:9
136:25 144:22
162:5 163:22
165:2 180:22
183:17 242:16
249:11 282:6,8
283:7

**periodic** 23:14
181:10

**periodically**
73:2 79:12
107:10

**permanent** 8:15
14:4 282:4,5

**permanently**
8:6 107:10

**permission**
158:1

**permitted** 6:3
66:8 158:19
159:4

**person** 38:13
63:11 76:4

108:20 111:25
150:17 169:2
180:11 201:11
212:3 213:22
214:9 226:6
266:4 269:4
284:9 288:10

**personal** 64:15,
18 241:10
247:3

**personally**
36:7,9 49:18
67:10,14 104:9
158:9 247:17
249:15,24
252:22

**personnel** 23:3,
4 52:8 85:19
91:14 160:20,
23 161:1
200:20 238:8,9
270:7 280:18
281:19

**persons** 8:25
9:24 33:24
279:9

**perusing**
152:15 245:17
264:5

**Pflegal** 202:6,
17 203:1
205:22

**phone** 72:24
73:1 207:15
233:20

**phonetic**
186:16

**physical**
135:20 156:4

**physically**

253:9

**pictures** 88:13,
15

**piece** 222:3

**pieces** 66:22
165:10

**pilot** 229:8,20

**place** 25:22
30:23 93:12
128:15 133:3
145:25 152:22
158:13 190:9,
10,13 207:18,
20 230:7

**placement**
162:13

**places** 106:1

**plainly** 192:3

**plaintiff** 7:3

**Plaintiff's** 57:23
58:18 62:7
71:21 72:17
73:21 77:21,24
78:14 138:25
139:1 140:17
142:15 143:23
148:9,22
149:14,18
150:7 156:7
165:20 167:21
171:5 174:18
179:6 180:13
190:21,24
191:13,24
193:14,21,22
204:14 214:6,7
217:12,24
218:9,10,12,
16,21 219:21
220:18 222:19



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

235:11 236:1,
8,10 237:19
238:7 239:19
240:7 241:1,4
242:22,25
243:14 244:23
245:10,14
246:14 247:12
254:20 255:8
257:2 258:11
260:1,16
261:24 262:23
263:7,14
265:18 269:3

**plan** 18:16

**planned** 93:10

**plans** 274:20

**play** 114:19
115:5 277:13,
22 278:4

**plays** 199:24

**please** 7:14
98:2

**plug** 173:24

**plus** 205:5

**point** 11:12
34:1 35:9
74:10 75:9
76:13 81:12
82:10 83:19
85:25 88:25
95:24 100:23
101:5 106:2
109:7 136:22
152:23 153:13
161:24 164:10
178:24 189:19
203:12 204:10
214:11 218:5
225:1 233:10,
12 285:1,3

**pointed** 48:12

**points** 152:21
153:20 154:9

**policies** 23:4,
12 31:15 52:7
90:3,17,21,25
91:4,10 131:19
132:2,6,9,13,
16,19,22
133:17 147:14,
19,25 148:11,
20,24 149:1,6,
23 150:1,3
155:10,14
167:24 169:6

**policy** 24:15
32:19,22 50:24
51:23 52:2
53:4 89:23
90:1,3,13,16,
25 99:12,21
100:3,12,14
108:17 121:14,
18 133:10,14
138:15,18
142:10 145:3,7
147:6 150:9,
12,16 151:6,8,
21 152:10,12,
17,20 153:23
154:2,20,21
155:3 156:3
159:8 161:8,9,
14 164:12,18
165:4 166:17
167:7 171:6,15
172:22 174:4
177:11,12,13,
15,22,25 178:1
179:25 269:24
276:25

**pollen** 156:1

**poor** 124:4
242:9

**popcorn** 205:6,
13

**popper** 205:14

**portion** 223:9

**position** 11:19
12:20 44:16
50:11 59:22
80:24 98:16
110:11 111:6
123:22 136:23,
24 146:4
186:4,7 187:25
224:8 227:14
277:1,4,6
279:6,7

**positions**
15:16,17 34:14
51:18 189:5

**possible** 12:10
92:12 166:10,
16 167:6
253:17

**post** 21:17,24
22:24 217:3

**post-ms** 194:7

**posted** 31:15
32:19,22,24

**pot** 32:11

**power** 267:4

**PR** 84:11

**Prebula** 6:1,16,
20,25 7:1
22:22 37:24
38:1,5 42:14
54:25 58:22,25
59:4 69:12,13
76:6,11 83:8

96:15,19 98:1,
6 99:6,20
100:25 101:4
104:4 109:18
112:14 113:6
117:11 118:2,
15 119:9 120:9
121:13,20
122:9,15
123:9,20
124:21 125:5,
20 133:2,8,9
137:11,21
138:22 139:1,
3,14,21 143:12
146:13,16,19,
22 147:3 152:3
154:6,16
159:16,21
162:16 164:23
167:10,14,19
168:13 169:15
179:18 181:21
182:7 183:12
185:5,15,23
186:3 188:4
190:25 191:4,
8,14,18,21
192:14,17,20,
24 193:2,5,13
194:3,5 195:11
197:19 198:1
204:7,9 213:2,
18,21 218:1,23
219:12,22
220:2,7 226:20
231:14,24
232:1 233:5,
11,14,18
235:22 237:7,
18,23 238:10
239:10,14,17
240:14,20
242:4 243:23
245:1,5,11,13

260:2,4 262:20
268:1 269:13
277:21 284:3,
8,25 285:7
288:23

**preceding**
282:6

**predecessor**
27:20,22

**prefer** 48:19

**preferred**
256:25

**pregnancy**
121:1 134:2,4
151:24

**pregnant** 134:3

**preparation**
41:4,11,15
58:2 91:8

**prepare** 35:21,
24 40:8 181:18
231:24 246:3,6
272:4,7,10
281:22

**prepared** 58:19
78:14 148:12
181:12,23
182:14 231:25
239:24 241:6
245:21 246:1,
15,23

**presence** 17:25

**present** 118:10
137:1 139:15
141:3,5 143:9
153:1 234:6
250:22 276:15
278:15,17

**presentation**



**DISCOVERY**
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 333 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                    DEPOSITION OF
DAVID PASSMAN on 10/11/2017                    Index: presentations..promotion

87:19,24 88:5
95:12 109:13
117:25 234:10
245:21

**presentations**
86:2,11,14,15,
19,24 87:13,16
246:11

**presented**
227:17

**presenting**
88:13 258:24
263:1

**preserve** 67:8,
13 68:4,6,8
69:5,15 108:8
109:1 190:19

**preserved**
67:19 70:4
108:9

**president**
11:20,22 12:3
14:5,8 15:10,
18 17:8 19:5
25:17 27:9
29:8 30:12
33:11,20 34:6,
9,16 46:16
48:22,23 49:2
50:1 63:19
67:12 74:20
98:23 100:16,
21 101:1,5,10
102:8,15 126:2
127:5,7
130:13,16
157:24 161:12
185:7,12
187:19 194:16,
19 195:19,24,
25 196:22
197:9,14

198:4,7,9
199:13 200:7,
12 201:3
221:15 222:11,
13 227:11
230:1,23
231:13,15
232:3,9,14,16
286:24

**presidents**
48:21 51:20,21
64:2,3,4
200:10 222:12
230:19 231:2,
6,21

**press** 84:11,24
246:6,16
247:1,9 265:8

**presume** 43:23

**presuming** 56:9
145:18

**pretty** 12:22,23
28:5 32:14
69:22 205:16
222:2,4 252:20

**prevent** 110:1

**previously** 41:7
71:21 149:13,
17 171:6 179:6
190:22 239:18
284:1

**primarily**
180:25 199:18
200:24 211:1

**primary** 204:22
210:5 211:13,
16

**Prince** 12:14

**print** 144:7
233:16

**printed** 144:3

**printer** 64:23,
25 65:4,14,16,
19 66:6

**printing** 11:20,
23

**prior** 11:18
24:2 30:10,12
62:8 87:20,25
98:22 99:9
128:13 131:11,
25 132:3
156:19 179:24
197:22 238:11
252:25 280:22

**privacy** 178:4

**privilege** 6:8
213:4

**privileged**
38:20

**probably** 8:11
11:4 28:15
47:8 87:8 89:5
124:15 135:19
230:1,2 248:12
256:6 269:7
273:2

**problem** 193:9
219:6 254:2

**procedure** 91:1
142:10 148:25
149:2 159:11,
15 160:11
250:20 251:13

**procedures**
91:4,11 131:19
132:3,7,10,14,
17,20,23 147:6
150:4

**proceed** 160:10

**process** 209:10
266:20 270:3,
23

**processed**
131:13

**produced** 41:7
146:9 147:13
149:2 161:1
191:1,4,6,12,
17 192:6,13,
15,19,22,25
193:15,19
218:9,12,13,15
237:25 245:10,
12 279:6,8

**producing**
209:7

**production**
247:14 273:17

**Professional**
254:16

**Professional's**
257:4

**professionally**
119:21

**Professionals**
254:12,13
260:21,25
262:6

**program**
254:11

**programming**
34:16 63:20
127:6,7 194:17
199:18,21,22
200:13,21
201:5,12,13,
20,25

**programs** 22:1,
14

**progress** 82:4

**progressive**
159:8 161:9

**prohibited**
155:9

**project** 57:6
58:20 88:3

**projectors**
202:21

**projects** 57:9,
12,17 59:1,7
60:8,11,13,15
62:9 76:21
88:3 199:2,5
204:5,11,15
225:18 226:17
227:15,18
242:19

**promote**
110:10 115:23
126:9 250:8
256:16,21
258:8 261:1
266:12

**promoted**
93:19 186:22
187:24 285:2

**promoting**
91:22,24 126:5
263:11

**promotion** 51:1
90:18,22 91:2
99:14 100:8
151:22 152:4
168:1 184:25
185:11 256:18
263:24



**DISCOVERY LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

**promotions**
50:22 88:9,11

**prompt** 153:11

**properties**
211:16

**property** 212:8,
12

**proposed**
265:13 267:2,9
276:20,23

**protected**
151:13

**proud** 244:14

**provide** 71:24
152:22,25
153:11 162:22
170:6

**provided** 77:21
78:6 105:1
210:12,15
222:7 238:7,15
240:9 276:11
283:17

**provider** 19:23
20:13 106:20
156:23

**provides**
161:19 162:18

**providing**
36:14,19

**provision**
157:15 158:12
162:18 173:5

**provisions**
154:1

**public** 6:13
25:7 145:24

**publicly** 30:1

**published** 30:8
146:3

**pull** 204:12
259:23

**pulse** 225:17

**purchase** 13:11
18:11 248:1

**purchased**
17:4,12 65:1
169:19

**purchasing**
18:20

**purports**
141:25 142:5

**purpose** 260:24
261:1

**purposes** 6:2,3

**Pursuing**
267:17

**put** 13:17
64:20 70:7
71:2 202:19
224:4 228:22
229:4,24
244:15 253:9
261:22 286:5

**putting** 226:1
268:4,6

---

**Q**

**Q-a** 245:21

**Quaderal**
266:16,19,23,
24,25 267:1,15

**qualify** 92:7

**quantity** 248:1

**quarter** 286:4,

21

**quarterly** 102:9
287:5,11
288:12,18

**question** 6:7
7:10,12,14
28:19 31:1
36:12 40:4
50:17 63:9
64:8 80:16
90:20 91:5
98:1,3 99:23
100:5 101:7,19
109:20 147:21
149:22 150:17
191:17,19,22
192:21 193:8
204:6 216:6
217:18 218:19
261:19 263:17
264:6 269:12
271:6 275:11

**questionable**
116:8

**questioned**
122:25 130:12

**questions** 7:4
146:7 147:6
194:8 218:2
233:1 246:11
288:23

**quick** 219:3

**quit** 236:17

**quite** 253:17

**quote** 45:18

---

**R**

**race** 151:24

**racial** 101:21

**Railey** 197:8

**raise** 61:5,9
62:13 76:16
77:2,5 78:16,
19 79:17
80:19,23 83:3,
9,10 96:1,3,6
110:3 168:10
249:11

**raised** 281:7

**ran** 200:19
288:3,5,10

**range** 145:8,12,
16,19

**ranges** 144:25
145:24 146:4

**rare** 32:14
102:21

**rarely** 65:19
119:5 174:14

**rate** 139:16
141:3 143:9,11
275:13

**rates** 141:5

**rather** 74:23
237:11 270:25

**re-retired** 13:20

**reached** 40:21
93:14 96:13

**read** 6:12,17
48:9,10,11
98:1,3 100:14,
16 162:3
176:1,6 177:3
245:15 255:9,
10 264:2,4

**reading** 138:18
159:15

**real** 31:19 75:6
210:22 211:8
249:11

**reality** 94:10

**realize** 219:1
222:11

**really** 221:11
230:21 232:18
285:22

**reask** 90:20
147:21

**reason** 52:23
77:9 81:25
115:8 136:22
143:24 144:18
169:9 184:2
236:3,17
242:21 247:12
263:10

**reasonable**
102:19 273:13

**reasonably**
177:15

**reasons** 82:3
162:6 181:1
256:17 258:2,6

**Rebecca** 75:3
207:14,24
222:24 223:1

**rebuilding**
242:6

**recall** 9:2 11:24
14:13,15,16,
21,22 15:1,8
16:17,18 17:7,
18 18:5,10
21:12,13 22:12
24:6,9,12 26:7,
14 27:2 29:23
30:17 31:16



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 335 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                    DEPOSITION OF
DAVID PASSMAN on 10/11/2017                          Index: recalled..remember

33:1 34:15,25
35:2,4 41:16,
18 43:5 48:10,
25 49:15 51:15
52:9,22 54:10,
16 55:8,15
57:1,21,25
58:1,10,11,12,
15 60:21 61:7,
19 62:14,19,22
68:13 69:8,21
70:6,9,21
72:16 75:7,21
76:17,20,23
77:3,7,14,15,
18 78:16 81:7,
9 83:7,14
86:25 87:18,22
88:10,15
89:10,14,17,
19,22 90:12
91:13,15
92:15,23 93:5
95:2,5,7,8,11,
13,14 96:16
101:23 104:7
109:9 110:2,5,
6,7,9,16,22,24
111:4 118:20,
22,23 120:13,
14,25 121:18,
21,22,24
122:13,18
124:2,3,6
125:15,24
126:10 131:7
134:9,19
135:3,10,11,
12,17,19
138:18 150:1
170:2 179:4,11
183:15 188:3
211:2 212:18
213:7 215:14
216:10,11,12,

14,19,22 224:7
234:9,13,16
239:21 240:19,
22 241:18
245:24 246:12
247:24,25
250:18 264:2
268:8,16,18
271:5 272:19
273:4 276:21,
24 278:22
283:5,8 285:5

**recalled** 76:15

**recap** 116:5

**receipts** 181:6

**receive** 73:2
102:7,14
163:21 165:1,7
235:8 281:18
287:5,11

**received** 54:16
84:23 102:9
103:16 279:11
280:22

**receiving** 164:2
170:5

**recent** 24:6
43:8,10,18

**recently** 13:20

**recognize** 62:7
72:23 139:4
140:9,10
148:10 236:21
243:14 245:14,
20,25 246:8,14
255:18,21
262:5,6,8,13,
15 263:6,8
265:18 266:16

**recollection**

58:4 77:10
178:21 183:8,
11 234:1 235:7
239:3 240:24,
25 243:4 244:1
255:4 257:3
273:14

**recommend**
56:15

**recommendatio
n** 114:24 115:2
278:1,19

**recommended**
116:18 169:3

**reconcile** 229:2

**reconditioning**
205:12

**record** 7:15
142:1,11
191:18 192:18
233:6 238:6
280:14 283:20,
21

**records** 19:6,
10 25:7 69:5
114:10 207:6,9
223:17 283:11

**recover** 107:13

**redeemed**
16:20

**reduced** 121:3
141:3 143:6

**reduction**
140:24

**refer** 45:20
51:17 155:18

**reference**
147:11 154:11,
14

**referenced**
28:12

**referencing**
149:19

**referred** 16:23
51:18 279:5

**referring** 21:25
120:2,4
151:16,17
154:20,21
155:4 162:6
188:19 214:8,9
218:9 234:11
243:11 249:7

**refers** 45:23

**reflect** 144:11

**refresh** 58:4
183:7,10 243:4
244:1 255:4
257:2

**refurbishment**
211:17

**refused** 281:13

**regard** 9:24
76:16 82:12
83:12 86:20
90:17,22 94:18
96:9 115:19
118:10 125:13
126:5 130:7,12
131:2,4,12
132:3,7,10,20,
23 150:17
151:10,12,24
152:7 155:18
180:12 182:14,
22 184:3 189:4
194:25 234:3
270:14,15
272:8,11 279:8

**regarding**
105:15 111:13
131:21 156:13
281:4

**Regardless**
111:24

**Regional** 264:1

**registration**
8:17

**regular** 52:12
146:19 147:4

**regularly** 49:11
52:10 176:16

**related** 8:25
67:9 283:24

**relation** 182:21,
25

**relations** 183:2
258:5

**relationships**
82:5

**release** 246:16,
21

**releases** 84:11,
24 246:6
247:1,9

**relevant** 70:13
146:8

**relied** 209:8

**religious**
101:21

**reluctantly**
115:2

**remained** 14:6
35:16

**remember** 8:7,
20 13:1 20:13



Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 336 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                          DEPOSITION OF
DAVID PASSMAN on 10/11/2017                            Index: remembered..responsibilities

22:3 25:8 29:7
37:14 46:14
50:19 57:4
62:15 78:23
93:9,16 94:22
95:16,18
103:6,8 105:24
134:21,23
181:2 198:11
204:13 225:8
243:6 245:17,
18 246:17,18,
19,20,23 285:2
287:3

**remembered**
15:6

**remote** 45:17
176:14

**renewal** 211:17

**rent** 229:1,3

**repaired** 205:6

**repeat** 80:16
101:7 109:21
264:6

**repeated**
270:21

**repeatedly**
94:22,24

**replaced** 76:3

**replacement**
82:15

**replacing**
202:21

**replied** 266:3

**report** 29:13
33:22 48:21
49:1 51:4
54:21 72:13,15
79:11 82:9

96:1,20 97:2,
17,22 98:5
105:7 109:15
115:11 126:8
150:19 167:11
168:3 169:5
189:4 195:1
197:22 203:22
204:1 206:4,5
207:9 209:11,
21 211:24
214:25 215:9
217:5 229:16,
20 235:8
239:24 240:2,3
277:25

**reportable**
96:24

**reported** 29:18
33:12,21,24
34:5,10,11,13,
16,22 49:23
55:10,17
56:13,14 63:17
81:13,17 98:4,
16 99:16
100:3,9
104:10,15
154:22 157:23
180:19,21
194:23 195:2
197:20 199:3
205:19,21,22,
23 209:12
210:10,11,14,
17,21 211:25
212:19 215:5
217:7 224:14,
15,18 226:14
227:24 229:17,
21 274:22
278:7 288:11

**reporter** 7:9

71:25

**reporting** 74:16
150:23 168:17
206:22 208:20
209:4 210:6
227:6,7

**reports** 30:4,6,
7 49:12 50:25
51:1 53:5,8,24,
25 54:2,20
90:7 101:24
102:2,7,9,10,
12,13 127:8
138:10 181:18,
22,25 182:14,
18 188:15,16,
19,24 189:20
206:18 208:23
210:12,15
239:22 241:8
261:17 275:1
287:5,11

**reports'** 274:20

**represent** 7:2
36:13 38:18

**representative**
153:2

**representatives**
153:4

**represented**
39:17,18 218:7

**representing**
217:23 218:1
222:5

**represents**
37:16 38:7,11,
25

**reprimand**
281:7

**reprimanded**
138:8

**reprimands**
280:21,25
281:18

**reprisal** 153:18

**request** 121:16
133:11,15
137:23 165:5
233:3,7 239:12
240:10 246:1,3
247:13 250:21

**requested** 98:3
118:17,21
235:19 246:5
251:1

**requesting** 83:3
118:23

**requests** 138:2
250:12 261:11
273:17 274:8

**require** 50:6
166:5 280:8

**required** 17:25
30:3 53:2,12
166:4

**requirements**
209:5

**requires** 165:4

**research** 108:7
199:8,10 264:1

**reservation**
233:23

**reserve** 6:6
25:12,15,17
28:20 36:25

**reserved** 259:1

**reserves** 28:25

**reside** 7:21

**residence** 8:16

**resign** 236:17
237:8,9,10,13,
17

**resigned** 14:6
115:12 236:4,
16

**resolve** 192:10

**resolved**
101:18

**resource** 23:16
91:2 103:17
147:8 166:12
201:9 249:6
262:2 266:1

**resources**
22:19,25 23:2,
5,9,11,21 24:7,
19 73:15 96:2,
21 97:3,17,22
99:1,17 100:10
101:18,24
102:1 103:11
150:20 153:12
163:14 184:24
185:3,7 197:15

**respect** 240:5

**Respectfully**
50:16 161:12
216:4

**responded**
30:14

**response** 89:2
168:8 219:2
279:14

**responses**
273:16,20

**responsibilities**



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 337 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                          DEPOSITION OF
DAVID PASSMAN on 10/11/2017                              Index: responsibility..rules

56:24 57:5
58:5 62:8
77:13,15 82:21
83:4,25 84:9
85:4,11 196:3
228:11 279:4,9

responsibility
92:13 163:13
169:10 204:22
211:13,16

responsible
182:3 205:2
208:19 209:6,7
212:12,13
217:1 225:23
261:13 269:17

responsive
250:12

responsiveness
6:7

rest  49:17 50:5
120:19 121:1,
25 203:8
278:8,9 282:16

restate  39:22
186:10

restaurant
186:17,19,21,
24

restaurants
189:8

restricted  16:1

result  15:15
115:18 138:8
160:15

resulted  281:6

results  181:8,
23 235:3,4
241:23,24

242:17

resume  113:17

resuming  76:10
133:7 138:21
167:18 179:17
239:16 284:7

retail  172:6

retain  17:19
18:7 64:24
188:16,24
283:10,21

retained  68:17
161:4 282:8

retainer  36:17

retaliation
25:23 26:25
151:2 153:19

retention
177:13,15
207:9

retire  11:17

retired  11:16
75:5

return  66:5

returned  65:23,
25

returns  288:12

retyped  144:18

revert  259:10

review  30:6
41:3,7 48:4
91:7 143:25
193:24 218:20
234:7 235:3,8
241:6,7 250:23
265:11 269:22
270:1,4 273:20
274:21 275:5

276:1

reviewed  41:8,
10,13,14 47:24
114:23 115:1
128:22 145:23
181:4,8,9

reviewing  58:1
234:17 266:23
275:25

reviews  181:10
269:18

revised  72:18
148:17 171:10

revision
171:11,18

revisions
171:14

rewards  260:12

Reynolds
223:23 224:17

Richard  37:15
39:4,11,12,24
56:19 115:1
116:19 117:1,
2,10 137:10
192:24 194:11
206:9,19 208:2
209:12,22
210:14,17
211:25 212:19,
22 214:25
215:9 271:23,
24 277:22
278:2,11

Richard's
270:18

rid  167:15

rifling  105:24

right  6:16 7:21,

24 9:3,15
10:12 13:17
37:2 49:18,19
52:20,21 53:5,
7 55:10,18
56:21 63:22
67:4 74:15
80:8 81:6 83:1
105:11 106:3,
4,6 115:3,25
120:15,23
129:10,11,17
131:6 133:2
134:19 140:21
142:17,20
143:17,25
149:6,10
150:14 153:6,
16,20,23
159:11,23
160:10,11
161:19,21
162:7,13
163:22,24
172:19 174:17
179:14 183:13,
14,20 189:20
192:16 195:5,
19 201:20
202:3,24 203:8
204:2,10 206:8
209:18 210:17,
19 211:12
214:25 215:25
216:7 220:13,
24 221:21,23,
24 222:19
226:18,23
227:8 228:9,19
231:7 235:17,
20 237:25
238:4 243:9,
10,19 244:7
245:9 248:15
252:19 253:14

257:9 258:3,10
260:22 262:7,
11,13,21
264:1,8,20
266:13 267:12
269:17 275:15,
18 280:1,9,14
287:14,15
288:2

risk  212:7

Rob  195:5,6,18
196:2,5,14
221:16 231:9,
12

Roland  14:20

role  61:15,17
92:7 114:19
115:5 137:1
184:16,18
208:6,18 211:5
212:6 221:7
277:13,22
278:4,5 284:22

roles  119:8

roll-  203:19

Roman  173:8
178:3

room  30:18,21
31:2,3,5,7,9,
12,17,18,20,25
32:1,2,3,4,10,
14,16,19 38:22
39:4,13,23
217:2

rooms  31:20

routinely
252:18 279:25

row  265:3

rules  250:16



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Index: run..seats

run 192:4
199:23 200:3
264:15

running 32:11

runs 164:4

rust 204:25

Ryan 257:10

_____

**S**

S-i-d-n-e-y 7:20

S-t-r-o-u-d
228:24

Sadie 141:15,
18,19 142:22,
25 143:21
184:23 185:2
197:15,20,22
216:24 236:19
278:25

said 27:16
37:24,25 38:10
39:2,6,7 40:6
50:3 52:10
54:19 58:9
59:18 63:20
76:17 78:19
92:3 93:9
94:13 95:11
96:9 97:5
100:25 106:17
116:22 120:1
134:18 140:2
154:22 155:4
157:2 162:20
164:14,15,16
168:19 180:24
183:5,19
186:10 193:3,
6,12,23 195:12
197:4,5 204:4,

8 210:12
212:12 213:15
218:12,13
221:10,13
222:12 241:1
242:5 243:8
244:13,16,20
250:4 266:5
268:12 271:22
274:25 278:21,
23 280:19

Sailors 6:11
50:9,12,14
56:1 78:2
81:13,17 82:9
84:6,7 94:20,
25 96:10 99:14
111:8,10
112:18 113:11
137:16,24
138:7,13
144:22 158:23
180:22 182:14,
18,22 183:1
202:10,15,23
257:7 273:1
276:23 281:11,
14

Sailors' 6:5
112:22 192:25
193:11,15
218:6,16
275:23

Saint 213:11,
22 214:4,10,
13,14,16
215:13 282:20

salaries 188:17

salary 53:20
62:1 121:3,4,9
144:11,25
145:7,8,12,16,

19,24 146:3
190:13

sale 24:2 29:4,
24 66:20 67:2
272:17 281:21
286:22

sales 257:18
259:19 260:6,8
286:4

Sam 229:8

same 6:10 35:6
56:1 89:3
92:20 108:20
109:12,24
111:21 112:7,8
128:12 144:22
147:11 153:25
164:7 165:22
169:2 170:14
171:19 189:12,
13,14,15 195:1
200:25 201:2
211:10,11
212:23 213:6,
22 214:7,9
215:25 216:13
224:22 227:1
228:22 258:2
263:9 264:25
269:8,9 278:5,
21 284:18,22
287:12

sandblast
204:24

Sanders 23:25
36:6,8,11,13,
17

save 148:7
175:24

saved 175:20

saw 45:2
66:19,21,23
67:1,4 113:17
123:2 250:20

Sayegh 200:4,5
201:23

saying 124:3
162:7 193:8
218:13,14
219:7 224:5
231:20 245:9
264:10,12
265:24 273:13

says 59:1
71:22 72:7
77:8 97:12
111:24 143:24
147:5,18
148:14 150:16
151:1,8,9,11
152:21,25
153:10,15
160:10,14
162:2,11,20
163:12,19
166:4,9,15
167:23 173:11
176:15 178:4,
23 204:15
231:21 236:4,
12,15 258:23
259:2 261:5
264:25

Scarborough
219:15 220:12
228:10,23

schedule 52:12
79:12 244:14
280:3

scheduled
49:11 52:10
79:23,24 80:7

93:6 123:5

school 20:25
21:17

Schoonover
74:4 76:2
224:6

scotch 42:21,
22,23

Scott 186:22

Scranthem
37:25

Scrantom
37:21,23

scrapbook
247:5

screen 123:2

screened 251:2

screens 202:20

screenshots
41:21

sea 51:17 53:5,
8 54:2,3,20
72:11,14
126:22

search 14:2
105:16,20
106:8,11
107:12

searches
107:1,6

seasoned
92:11

seat 204:23,25
205:11 252:14

seating 199:10

seats 200:2
202:21 204:24



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 339 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                    DEPOSITION OF
DAVID PASSMAN on 10/11/2017                          Index: SEC..Shedrick

205:3,5

**SEC** 209:5

**second** 21:22
31:10 144:2
151:9 156:11
160:1 163:12
165:20 243:21
256:21 259:22
284:18

**second-hand**
123:7,10

**secondary**
21:25

**secretary** 18:25
35:7 168:19,23
207:3,4,5

**section** 154:12
159:8 161:17
163:17

**Securities**
208:22

**see** 32:14,24
48:15 57:15
58:23 59:3
63:12 71:19
72:19,20
73:22,24
104:11 105:16,
25 122:10,16,
23 139:9,11,
12,19 140:18,
19,20,22,25
141:4,7 148:15
150:9,20,25
151:4,13
152:11,12,21,
23 153:2,13
154:14 156:8,
15 157:19
158:13 159:9,
13,20 160:2,5,

7 161:22
162:24 163:8
164:5,6
165:10,20
166:2,6,13,17
167:15 168:1,
6,25 171:12,
13,21,22
173:6,9,14
176:19 177:11,
14 178:6,7
179:9,21,23
206:12,13
207:23 215:12
219:23 223:18
228:4 231:20
234:15 235:11,
13 236:2
237:24 238:3,5
243:2 245:7
254:21,23
256:5,22
264:12,17
277:3 288:12,
18

**seeing** 33:1
58:11,12 104:7
122:13,18
213:4 234:13
239:21

**seek** 250:8,10

**seeking** 240:10

**seem** 95:17

**seemed** 59:25

**seems** 157:18
221:12

**seen** 48:10,13,
16 57:23 58:8
72:5 133:17
142:3 172:25
179:10 216:20
217:12 238:11,

24 239:1,19,22
264:25 277:5,
10,11 281:25

**segregate**
105:14

**segregation**
105:19

**selected** 12:18

**sell** 260:11

**selling** 249:12

**seminar** 93:8

**send** 179:3
205:1,16
233:11,14
270:16

**sending** 243:7

**senior** 51:20
61:15 64:4
155:7 198:6
219:8,10

**Senn** 264:23

**sent** 68:18,19
70:5 180:8,10
244:5 245:7
267:5 285:9

**sentence**
150:25 160:13
163:1,7,11,12,
25 164:1,5,6
167:22

**separate** 91:10,
15 142:11
251:21 259:24
260:2

**separation**
158:2 169:25
170:1,11,13
225:8 236:10,

12,15,17

**September** 81:8
110:13 112:25
118:8 218:7

**series** 7:4

**serious** 116:11
160:11,14

**serve** 15:9,10
32:13

**server** 173:13,
17

**service** 19:23
103:13 108:25

**services**
186:17

**serving** 13:20

**set** 25:12,15,18
28:21 29:1
31:5 36:25
54:7 66:3
155:19 170:19,
21 217:10
276:4

**set-aside** 28:20

**sets** 85:8

**setting** 90:10

**seven** 14:25
147:12 152:10
156:2 203:24
206:12 218:5

**several** 45:4
48:18 51:5
79:9 94:20
96:8 110:19
118:17 171:1,
10 179:7
205:17 210:6
215:18,21,22

223:14 224:1
226:22 243:18
249:21 250:2,
3,4 254:17
256:17 270:18
282:7

**severance**
135:16 169:22,
23 170:4,5

**sexual** 30:11,
15 152:10,13
156:2

**Shannon** 50:8
56:1 84:2,5,7
87:15 94:20,25
137:16,24
138:7 180:22
182:14,18,22
183:1 192:25
193:11 202:5,
15 218:16
246:5 259:18
260:5 272:25
275:23 276:23
281:11,14

**share** 179:13
181:5 205:3

**shared** 209:10
264:22,23
265:5

**shareholder**
16:7,10,15

**shareholders**
16:11 18:17

**shares** 13:10
15:15,22 16:20
18:21

**she's** 96:10
214:8 226:17

**Shedrick**



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Index: sheet..something

216:25 224:3

**sheet** 191:2,7,
12,25 194:1,4
218:8,15
241:10 259:22

**shop** 204:23,24

**short** 76:7
127:9 129:24
133:11 164:3,8
239:11 249:11

**shortly** 12:15,
16 95:20
110:22 135:1

**should** 70:5
84:16 99:13,16
100:9 108:24
126:9 129:11,
14 147:7
217:16 230:10
248:2 259:22
270:9

**shoulder**
122:23

**show** 57:22
71:20 124:14
138:23 139:16
140:16 142:5,
14 147:11,14
149:13,17
156:13 179:5
189:16,17
190:21 193:16
194:21 206:2,
22 235:10
236:7 239:18
243:13 244:22
246:13 247:11
254:19 255:7
257:1 258:10
260:15 261:23
263:13 265:17
280:6

**showed** 145:6,
7

**showing**
242:25 247:12

**shown** 75:15
180:13 241:4,
13

**shows** 139:15
140:24 143:16
146:11 171:8,
20 172:20
224:24 228:25
262:16,23,24

**SIC** 137:18
138:8 250:22
253:24

**sick** 163:21
165:1,6

**Sidney** 7:18,19

**sign** 6:12,17
17:8,14,17,25
19:19 20:2
36:16 128:17
129:2,12,14
141:22 166:19,
21 169:22,24
170:3 261:10
272:17

**signage** 157:8,
9

**signature**
236:21 255:11,
18,19 259:16
288:25

**signatures**
140:10 141:9

**signed** 17:24
19:22 20:10
55:24 56:6
165:14 170:14,

16 175:4
236:19 255:15
259:15 261:8
272:20

**significant** 82:6
252:20 253:1

**signing** 166:23

**similar** 99:14
111:11 112:19
142:7 189:3
239:22 260:18
270:24 288:2

**similarly** 50:8
190:18

**simply** 222:6
245:23 283:17

**since** 8:1 20:8
40:22 41:1
48:12 56:12
65:5,6 72:5
238:24 239:5
252:21

**single** 41:18

**Sinkel** 186:16

**sir** 11:2 60:20
173:9 188:21

**sit** 200:1
218:24

**sitting** 19:20
32:1 157:12

**situation** 219:3

**situations**
128:2,5

**six** 77:4 80:24
95:3 152:9,10,
21 178:3
201:23 206:11
219:11 223:25

229:25

**size** 139:6
205:16

**skill** 85:8
155:19 217:10

**skills** 57:3

**slash** 176:14

**slightly** 54:10

**slot** 254:25

**slowly** 195:13

**small** 80:9
147:1 199:9
286:3

**smaller** 46:6,9

**Smith** 14:20
26:19 213:9,22
214:1,6 282:20

**Smitherman**
74:17 268:13,
22

**social** 88:22
283:11

**software** 66:1
288:3

**sold** 16:3,19
19:17 46:7,10
64:11 72:5
127:10 187:20
256:6 258:16,
19

**sole** 10:19 51:3

**Solomon**
200:25 201:23

**Solutions**
247:14

**some** 14:15
19:21 23:8

32:2 33:13
35:9 45:14
51:2 64:17
74:10 83:24
84:1 85:3,25
87:13 116:8
127:23 131:20
138:4 157:11
158:1 172:11
186:20 189:19
194:7 199:19
214:10 222:12,
22 231:5
241:16,19
257:3 261:21
263:2 268:6
271:14

**somebody**
129:12 251:7
271:14

**someone** 37:10
51:2 82:15
96:25 98:4
99:23 100:1,5
104:14,21
118:4 119:1
128:17 129:2,
14,16 141:19
182:9,10
229:17 261:16
287:8,19

**someone's**
32:12

**something**
16:25 17:1
39:15 40:2
49:25 68:25
70:23 91:13
99:16 100:9
123:2 146:14
182:8 200:2
213:13,20
251:19 252:8



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Index: sometime..Stroud

**sometime** 8:8 22:7 35:14 75:4,8,15 244:3

**somewhere** 8:13 62:21 224:9 247:5

**son** 135:1,2

**sorry** 15:17 26:7 34:14,23 38:3 43:15,21 48:17 55:15 60:25 62:10 66:13 82:19 109:20 116:23 119:24 121:19 124:3,20 127:5 146:13 147:21 156:1 157:8 162:19 179:12 183:18 196:23 210:11 215:17 239:2 248:10 253:10 262:22 263:17 264:2, 12 273:14 275:2 285:5

**sort** 13:24

**sound** 52:20

**sounded** 49:18 59:23

**sounds** 81:6

**space** 205:17

**Spalding** 12:12

**speak** 77:1 78:20,25 84:18 170:5 190:10 244:13

**speaker** 202:21

**speaking** 33:5

**special** 163:21 165:1,6 199:1, 5 266:4

**specific** 10:14 23:1,8 56:25 57:9 59:15 69:21 76:17 89:1,6 103:4 125:14 158:12 239:21 242:19 246:12 247:24 271:17 276:6

**specifically** 23:19 54:10 62:14 70:21 75:20 77:3 78:8 95:24 96:12 152:6 156:3 161:23 172:2 180:9 245:18,24 246:17,20 275:23 288:21

**specificity** 283:9

**specifics** 241:3

**speculating** 142:24 143:21 229:18

**spell** 7:19 9:7 71:17 219:17

**spelled** 194:13 220:8

**spelling** 219:23 220:5

**split** 203:24

**sponsor** 170:22 252:18,20 253:1 257:22

**258:24 260:18 263:1,2,3 267:2**

**sponsored** 258:1

**sponsoring** 258:6,18,22 260:24 262:18 263:10 268:10

**sponsors** 262:17

**sponsorship** 249:12 250:20, 21 251:5,11 254:13,14 256:6 258:12, 16,23 259:10 261:3 265:12, 15 267:10,18 268:2 285:9

**sponsorships** 115:20 132:7 138:16 249:18, 23,25 250:8, 11,12,13,17,25 252:3 256:12, 13,15 260:12 261:11,25 262:24 266:11, 15 267:5,23

**sporting** 199:24

**spot** 57:1 60:1, 8 61:14

**spouses** 253:16

**spread** 191:2,7, 12,25 194:1,4 218:8,15

**spring** 95:13

**110:4 118:9 134:24**

**square** 205:17

**staff** 220:16

**stand** 39:9

**standard** 145:3

**standing** 52:17

**stapled** 172:17

**staples** 146:14

**star** 243:8

**start** 11:2 70:2 86:1 169:18 282:10

**started** 10:23 34:4 46:12 55:4 147:15 242:6

**starting** 148:4 262:25

**starts** 146:9

**state** 7:17 82:6 115:14,17 151:13 262:10

**stated** 258:3

**statement** 33:17 96:25 97:8 164:22 166:1,3,24 213:16 245:20, 25 246:15,22 263:9 272:4,8, 10

**statements** 64:19 125:15 209:7 246:4,6

**stay** 43:9 136:11 283:6

**stayed** 8:12,14

**Steeple** 252:9

**Steeplechase** 252:18,21 253:2,4,12

**step** 119:23

**steps** 159:12

**still** 6:9 109:15 150:15 156:25 157:11 177:7 183:16 201:16 203:1,9 222:20 228:4 268:13 284:23

**stipulated** 6:11

**stipulation** 6:10

**stock** 15:15,23 16:5 17:4,12 24:2,25 25:1,5, 6 169:19,20 188:6,11

**stockholder** 10:16,17,19 11:7 13:7 208:23 209:5

**stone** 43:12,14

**stored** 70:13 71:2 106:6 247:14 270:11, 12

**strategic** 29:11

**strategy** 85:15

**street** 7:22

**strengths** 59:25

**stricken** 141:2 143:6

**Stroud** 228:24



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 342 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                                    DEPOSITION OF
DAVID PASSMAN on 10/11/2017                                           Index: structure..talked

229:13

structure
274:13,18
275:12,24
276:4,20,23

structures
274:10 275:10,
20

struggling
230:4

stub 283:20

stubs 283:18

studio 82:5
132:17 182:25
183:2 281:3,13

studios 229:2

stuff 64:17
66:4

sub 17:11
18:20 24:20
28:12 272:15,
18,22

subject 88:1
105:18

submit 163:9,
13

submitted 30:7
128:21 236:23

subordinate
116:15

subpoenas
38:15 39:24

subset 201:19,
21

subsidiary
17:4,5,6 18:11

substance 37:8

substantial
223:9

success 82:4
265:25

successful
93:13 242:16

successor 40:3

such 24:1
25:22 26:23
27:3 36:10
59:14 79:4
91:2 102:7
103:20 105:2
114:10 132:11
138:18 163:13
176:17 281:25

sued 98:24

sufficient
285:14

suggested 98:5

suggesting
232:23

suit 66:23

suitable 82:15

summaries
241:8

summarize
103:14

summer 55:16,
21 81:2,5
134:24 135:6,8
183:16,20,22

supervise
84:15 215:20

supervised
84:17,25
215:18

supervising
83:23 204:23

supervisor
79:19 99:13
100:6 103:21
104:15,23
105:6,7 150:19
162:22 166:11
204:21 205:4
216:2 217:20
222:23 229:1,5
252:14 270:5

supervisor's
153:5 163:13

supervisors
102:25 153:5,6
216:1 220:16
226:3,4

support
240:10,16
253:19

suppose
230:24

supposedly
71:2

sure 7:2 13:15
14:15 30:25
31:19,22 32:9
33:7,10 35:22
36:15 41:5
45:14 46:8
54:1 63:21
66:18 67:11
68:7 69:3,12,
18 73:7,16,25
74:3 75:3,16
78:21 84:3
90:21 101:9
107:11 117:7
124:20 128:14,
25 136:21
140:7 141:12

147:22 154:4
165:22 170:20,
24 172:12
177:15 182:16
183:6,21
195:14 198:10,
18 203:6,7
205:15 207:11
215:4,6,24
223:3 224:22,
23 225:1
246:21 249:1
253:7 256:15
264:7 268:12
275:11 287:25

surprise 61:11

surprised 88:20
268:9

survey 270:16

suspect 166:10

swear 6:20

sworn 6:22

symbol 256:3

synchronized
173:13,17
176:24 177:10

synchronizes
174:9

system 126:12
127:18 128:1,
13 174:22,25
210:8 248:4,8,
14 283:15
287:20 288:2,
3,5

systems
157:23 174:7
202:21 210:9
251:6 287:14,
17,24

T

T-a-y-l-o-r
220:9

T-shirt 262:18
263:2

tables 259:1

take 7:11 21:24
35:24 66:8
69:14 73:23
76:6 99:24
112:12,15
121:15 162:4,
21 167:14
184:16 204:23,
24 215:4
217:21 219:4
239:11 245:16
253:7 258:15
259:13 264:4
284:4 286:3
287:24

taken 6:2 7:5
41:25 42:3,9
65:22 131:7
136:5,11

takes 6:14

taking 41:22
98:22 136:9
155:7,8 183:22
184:17 274:14

talk 7:10 35:23
38:16 40:8,22
49:13 60:25
79:20,25 119:5
149:11

talked 28:14,17
36:3 37:3,7,10
38:18 40:11,
15,25 41:8



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 343 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                    DEPOSITION OF
DAVID PASSMAN on 10/11/2017                         Index: talking..thank

115:19 119:7 124:17,22 137:6 183:5 185:10 216:24 222:9 227:4

**talking** 10:25 31:25 33:2,8 38:15 39:12,24 40:17 41:6 53:18 60:3 70:21 71:14,25 72:2 93:16 96:10 97:10,16 98:7 106:2 119:2,10,12, 13,14 128:5 136:18 149:15 161:25 168:9 234:19 268:24 284:13,23

**tape** 108:6

**tapes** 106:11 108:8,14,18

**target** 276:7

**task** 84:19 89:1

**tasks** 83:23

**tax** 138:17 211:22 288:12

**Taylor** 219:15 220:9 228:10, 23

**team** 48:6,7 49:11,16,17 50:5 52:11 59:19 63:12, 14,15,24 64:1 72:9,12 82:11 92:6 103:23 104:23 110:4 115:7 190:8 221:6,14,20,

21,25 222:9 240:4,8,16 247:21 252:1 253:6,14 257:18 259:7, 11 277:24 278:8,9,14 281:8 285:20, 21 286:18

**technical** 23:8 36:15 185:17 186:5 197:2,4 201:9 202:19, 22 207:11

**technically** 282:25

**technology** 72:8 185:21 186:6 197:5,7

**telephone** 45:10 75:10 157:22 228:25

**television** 32:11 88:17 243:5

**tell** 14:16 33:20 42:4 46:18 51:19 52:18 61:18,20 70:3, 23,24 73:22,24 74:22,25 75:1 79:13 80:22 89:6 92:8 93:5, 14,18,25 94:4, 10 111:10 113:1,7 131:22 134:7 136:18 141:9 142:16, 19 172:8 183:6 190:3 192:1,3 208:14 220:21 233:8 240:9

245:15 254:10 267:15 270:15 272:14 273:24 282:13 284:10 286:20

**telling** 61:19 74:23 79:16 111:4 114:22 192:6

**tells** 111:18 112:6

**temporary** 282:5

**Tennessee** 130:20

**tent** 253:16

**tenure** 27:9,16, 18 51:5 98:16 128:16 189:14 286:20,23

**tenured** 228:11

**term** 19:24 44:2 46:2 64:1 133:11 164:3,8 225:11 228:15 257:18

**terminate** 115:4,7 277:14,18 279:1

**terminated** 35:3,8 44:23 55:16 73:18 81:3 82:2 86:17 92:18 95:4 110:20,23 114:25 115:15, 18 116:18 131:2,4,9,10 135:5,9 136:3

138:13,14 161:5 169:4 180:25 183:6 237:10,11,17 238:19,22 268:19

**termination** 25:20 55:22 73:4 81:14,21, 25 84:20 114:4,16,20 115:5,6,9 116:6 135:22, 24 148:5 151:23 152:6 159:13 160:7, 15 161:10 168:5 235:17 238:25 239:6,8 266:20 272:11 277:20,23 278:7,19 279:18 280:23

**terms** 23:3 100:7 175:22 187:25 207:12 225:16 239:22 284:15

**Terra** 133:20, 23 134:2,8 185:10,24 186:4 187:5 209:15 282:14, 15

**Terra's** 134:4

**Terrell** 55:10 57:10 60:7 81:2,13 88:2 140:8 180:25 181:25 183:21

**terribly** 119:24

**testified** 6:22 170:9

**testify** 170:7 220:3

**testimony** 36:4 37:8 60:10,12 83:11 85:10,13 91:21,23 98:20 100:1 104:20 112:3 177:5 267:14

**Thad** 130:22,25

**than** 8:14 11:25 12:2,4 24:4 26:13 27:13 29:5 31:6,23 32:2 37:2,6 39:25 40:7,12 42:12 46:6,9, 23 47:12,15, 16,21 51:2 60:2 64:5 69:10,15 74:23 79:4 87:1 90:9 91:11 98:24 102:17 109:7 112:23 119:8 124:11,16,22 125:22 137:6 148:22 152:17 172:14 180:12 187:25 197:23 200:2 215:24 237:11 241:19 242:1 250:4 253:18 270:25 271:19,24 272:25 275:24 278:10 279:25 283:25

**thank** 38:1 43:16 129:23



Case 4:16-cv-00380-CDL   Document 63   Filed 06/21/18   Page 344 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                    DEPOSITION OF
DAVID PASSMAN on 10/11/2017                              Index: Thanks..those

195:15,17
228:17

**Thanks** 266:3

**that's** 33:3,5
34:20 35:15,18
36:12,21 37:3
38:17 39:6
42:13 49:3
53:7 54:4
55:11,13,19
60:4 67:3
71:25 72:22
77:9 80:6
81:15,19 82:19
83:20 91:23
94:5,9,13
95:21,23
104:25 106:4
118:14,19
119:17 129:4,
14,19 130:3
133:2 143:1,3,
18,21 144:3
149:19 155:2
157:10 158:21,
25 159:23
168:21 169:21
179:14 183:19
184:17 186:15
196:19 197:3
201:7,19
202:16 205:24
206:7 209:16,
18 213:15
214:9 215:4,11
217:21 219:17
220:10 221:17,
18,23 222:4,13
225:2 228:15,
24 233:1,22
235:9 241:9,12
244:8,9,20
248:12 253:17
254:2 255:2

256:18 257:10
259:2 260:23
261:2 263:5
266:14 268:15
271:16 274:23
278:13 280:15
285:22 287:22
288:1,23

**theater** 33:9
44:24 45:11,
12,15,18 86:7
87:6 88:4
91:14 101:15
102:25 135:1
147:7,10,17
199:8 200:1,2,
22 202:22
210:6,13,23
211:1,18
246:7,21 273:3
284:15

**theaters** 45:15
46:11 157:6,11
202:20 203:20
205:1 225:17
228:12 256:23

**their** 26:14
31:24 50:25
100:6 103:20
111:18,19
140:10 153:5
158:16,24
165:6 176:16
189:12 201:14
202:8 208:15
216:21 241:8
254:10 287:20

**theme** 95:16

**themselves**
51:4

**there's** 40:14
48:18 60:2

74:16 139:12,
16 141:24
144:2 149:21,
22 156:8
165:25 178:4
214:23 218:25
221:1 222:3
235:25 265:21
269:4 281:18

**therefore**
249:15 279:12

**these** 71:1
74:3,19 75:19
77:24 78:5
141:22 144:10
146:14 155:10,
14 167:24
169:6 180:13
194:7,25
200:10 201:3
208:15 220:14
222:12,22
223:14 226:22
230:3,14,15
237:24 240:6
248:3,6 256:12
257:3 261:18,
22 262:2,8
263:2,6,8,10
264:25

**They'd** 204:24

**they're** 30:24
140:11 154:5,7
201:5 212:21
260:2

**thin** 217:8

**thing** 49:18,19
63:6 64:19
115:3 124:4
146:18 157:25
165:22 189:15
200:25 201:2

205:13 219:7
265:3 266:10
270:21

**things** 20:10
49:13 52:16
79:14 115:24
141:23 199:11,
23 205:2,7,12
215:23 217:9
225:19 245:6
246:7 252:13
258:1 259:14,
21 262:17
263:4 270:18,
24 285:13

**think** 11:15
13:6 14:25
21:15,16 22:11
30:22 34:15
43:25 44:21
50:14 53:11
54:23 61:16
63:20 65:24
66:17 67:4
73:14 74:17,23
75:1,4,19 80:6
81:11 90:5
91:13 93:7
95:11 101:19
113:17 114:21
127:10 133:2
134:18,23
136:25 139:25
141:15,18
143:1,2,3
146:7,23 147:9
157:25 158:2
164:1 165:21
172:13 175:22
176:10,13
179:8 183:14,
19 186:10,15
191:9,14
198:6,19

199:20 200:12
201:3 202:11
203:3,4,5
204:4,7
205:20,21,22
206:3,25
207:17,20
208:11 210:5,
20 213:1,9
214:5 215:5
231:4,24
232:13 233:19
239:5 241:11,
17 254:12
255:17 257:5,
14 259:19
260:5 265:10
266:12 269:7
278:3 280:16,
18 282:19
283:8 284:3
288:23

**third** 116:15
153:13 160:4
166:6 171:8
178:23 238:15
256:24

**Thomas** 37:18
39:3,23 75:6
135:15,20
210:19 211:5

**thorough** 117:9

**those** 9:24
14:20 15:15
17:8 18:6
20:10 22:3,10,
18,21,24 23:9,
23 25:6 31:15
34:14,18 45:17
49:24 52:11
53:9,14 57:11
60:11,13 64:20
66:2,7 67:19



CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                   DEPOSITION OF
DAVID PASSMAN on 10/11/2017                                 Index: though..top

68:4,5 73:9,11
77:7 78:10,13
81:7,16 83:24
84:1 85:8 86:3,
13 87:1,4,9,13,
16 91:5,7,11,
12 92:1 93:12
101:13,14
102:10,12
103:14,15
108:8 115:24
125:21 128:2
131:22 138:5
139:23 140:9
142:25 149:4,
11 153:4,22,25
154:9 158:8
169:16 179:25
181:10,12,18
188:24 189:3,
22 194:8
201:22 202:6
205:6 206:14,
15 220:22
223:11,13
230:17,25
234:19,22,24
238:14 250:8
251:20 252:6
260:13 268:3
271:1 273:4
281:9,10
283:5,22
285:21 287:14,
17

**though** 21:16
47:12 75:12
172:9 212:21
281:16

**thought** 36:1
37:25 49:19
54:19 92:10
105:21 125:7
183:22 214:4,

14 265:3
266:8,10
284:17

**thousand**
205:17

**three** 22:12
34:14,19 91:7,
11 143:16
150:8,15
153:25 154:7,
10,11 159:14,
17 168:22
172:21 178:3
202:5 206:11
215:24 216:1,
16 250:4
260:13 264:11,
25 265:1

**threshold** 54:7,
8,17

**thresholds**
140:3

**through** 8:11
73:23 83:2
101:18 103:16,
25 104:18
105:24 114:3
127:17 148:22
156:22,23
171:15 177:21
191:9 206:14
218:4,6 248:4,
7 258:17
260:8,9,10
262:2 265:12
275:14 284:3
288:15

**throughout**
248:19 249:13
250:1

**ticket** 286:3,22

**tickets** 132:20
253:6,12,13

**time** 10:25
11:14,19 13:9
14:4 16:2
25:20 28:14,17
29:21 33:13,
18,19 34:1,2,
12 35:12 37:13
38:9 39:15
46:9 47:4,9,22
48:5 51:7 55:4,
7,21 56:3
57:10 58:16,17
60:13 62:21
68:1 71:13
74:18 75:13
76:6 77:13
78:20 80:10,18
81:10 89:4
95:10,24
101:8,14
106:24 107:11
109:12,24
112:25 113:15
114:8 120:22
125:8 127:9
128:15 135:22,
24 136:23
137:1 138:2
148:17 156:1
168:20 171:19
174:4,6,8
176:18 180:22
183:16 187:19
188:25 201:13
213:9 217:9
219:4 223:9
224:18 225:1
237:9 241:5
245:16 246:4
249:12 254:25
260:21 263:22,
23 264:4

266:19 268:17
272:13 278:21
279:18,20
282:8

**times** 79:9 96:8
171:11 231:5
243:18 246:10

**timing** 80:17

**title** 12:3 34:25
35:2,5,7 51:14,
15 55:1,7,15
58:14,15,19
62:4,12 76:16,
21,24 77:1,6,
10 83:3,6,15
90:18,22 93:9
94:20,23
109:7,10
111:1,7,11,19,
20 112:7
118:21,24
119:3,11,12,25
127:6 133:22
154:19 178:7
179:22 185:9
195:20 196:23
197:18 199:14
200:9 201:1
204:12,13
208:9,11
209:17 211:23
216:2 223:3
224:11 225:14,
22 227:9,17
228:15 229:12
240:17 271:5

**titled** 41:16

**titles** 119:6,8
202:8 208:16
216:5

**today** 39:14
40:9 41:23

42:4,25 43:3
78:9 189:11
217:13 218:11,
24 233:15,22
235:1 238:11
249:3 271:2
272:14

**together** 30:24
31:6 274:20

**told** 7:2 30:25
61:23,24
69:17,20 70:19
78:20 80:11
90:2,10 92:9
93:6 94:2,9,16
108:21,22
109:8 110:14
111:25 116:4,
7,8,10 117:4,
13 118:4,9,25
126:8 128:7
154:17 170:9
226:24 232:13
234:14 239:2
267:8 271:20
287:2

**too** 231:21
241:19 286:24

**took** 16:19 18:5
24:6,21 46:15
64:16,22,23
66:2,7 80:7
89:7 120:14
142:8 173:23
181:15 237:16
253:4 283:25

**top** 19:15,16
20:2 57:21
64:21 96:11
139:23 140:1,6
141:10 142:20
151:8 157:14



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations

Nationwide Coverage

1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                    DEPOSITION OF
DAVID PASSMAN on 10/11/2017                                 Index: total..types

173:11 175:15, 16,19 176:23, 25 177:7,8 236:12 256:4,5 257:2 263:14 264:10,14,16, 19 265:2 273:4

**total** 87:9 249:6 262:2 266:1

**totally** 266:25

**tougher** 94:12

**tournament** 252:15

**toward** 103:1,3, 4 252:16

**Tra** 227:13

**track** 287:6

**trade** 255:8

**traded** 211:15

**traditional** 199:9 200:22 207:5

**trail** 127:22

**training** 22:19, 25 23:10,11, 15,20 24:7,10, 16

**transaction** 16:24 18:22 25:8

**transcribes** 6:14

**transfer** 49:24 59:12,21 140:14 286:9

**transferred** 25:3 201:11 286:6

**transfers** 60:19,21

**transition** 20:5 282:9 283:7

**transitioned** 20:6

**transmitted** 85:1

**trash** 64:20

**travel** 52:16 63:6 85:22 179:20,22 280:3

**Trawick** 7:3 24:22 35:3,8 44:5,20 46:20 49:5,7 50:19 52:18,24 54:13 55:9,17 57:18 58:5,13 61:4 62:11,16 67:24 68:17 70:14 73:18 76:13 77:1,6,8,17,22 78:2,6 79:5,8 80:14,19 81:12,17 82:8, 21 83:2,12,18 84:19 85:3,7, 11,14,18,22 86:10,19 88:7, 22 89:2,7 91:22,24 92:3, 21 95:2,25 96:3 99:12 109:6,10,13,24 110:14 112:20 113:1,7 114:3 115:11,14,17 116:9 117:4,13 120:11,14 122:5 123:14,

15 124:11,24 125:10 126:5,9 129:9,24 130:7 133:24 134:1, 7,10,17 137:23 139:10 140:18 142:8,16 148:5,21 149:24 150:4 155:1 158:23 160:17 165:14 166:21 167:4 168:9 169:3 170:11,19 171:19 180:12 181:5,23 187:3 194:7 203:25 226:16 227:14 231:25 234:3 235:5,13 236:13 237:1, 8,13 238:18,24 239:25 240:9, 16 243:5 246:1,15 247:13 248:16 250:20 252:25 254:8 257:6 263:15,18 264:15 265:5 267:9 268:25 269:18 271:25 274:10,12,18 276:20 277:14 279:17,25 280:22 283:25

**Trawick's** 25:20 27:7 29:5 54:15 55:20 73:4 77:12 90:10 91:18 112:15,23 114:16,19 115:23 123:25

144:11 160:23 164:10 178:13 238:8 239:8 243:11 250:7 272:5 273:23 275:24

**TRC** 249:5,17 254:20 255:9, 24 256:3,5,6, 14 257:18 258:13,16,17, 18,19 259:19 260:10,12 261:11 263:25 264:11 265:14

**treat** 164:7 279:16

**treated** 99:15 100:7 164:8

**treatment** 43:24

**tree** 148:8

**tremendous** 265:25

**trend** 241:22

**tried** 53:1 218:10 225:17 249:10 259:7 287:19

**Triplet** 186:9, 14

**trophies** 64:16

**trouble** 163:2

**Troutman** 23:25 36:6,7, 11,13,17

**true** 33:16 35:18 56:1 145:10 185:2 216:13 241:13

247:17

**trust** 116:21

**truth** 42:4

**try** 7:10 39:22 69:12 186:12 187:2 249:10

**trying** 10:23 33:7 39:11 80:5 130:9 162:3 217:14 220:4 225:22 242:20

**turn** 17:23 153:25 158:4 161:16 210:13 280:13

**turned** 189:22, 24 281:23

**two** 14:21 24:4 42:1 49:24 65:24 81:17 116:14 124:16, 22 127:13 147:12 149:4 159:14,17 172:22 173:1 194:22 203:9, 11,19 206:11 251:6 258:25 259:21 261:22 264:14 265:1,2 275:8 284:17 285:12

**type** 92:13 131:21 150:18 225:20 245:18, 19 270:21,24 285:23

**typed** 141:2

**types** 162:1,8,9



**DISCOVERY LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations

Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

**typewritten**
143:5

**typical** 225:20

**typo** 269:7

---

**U**

**Uh-huh** 66:15
71:23 127:4
141:6 159:16
173:19 213:5
261:20 283:2
286:10

**ultimate** 168:23
169:13

**ultimately** 16:3

**unaware**
266:25

**undefined**
221:12

**under** 6:22
53:4 71:21
74:2,7,11,13,
16 92:10
100:3,12
118:4,25
138:17 143:23
150:14,15
151:13 153:22
154:1 155:9
160:13 163:4,5
167:11 176:14
179:22 202:4
203:9,25
204:18 206:2,8
208:2 212:20,
22 213:8 214:8
215:25 216:1,
23 220:14
228:8 233:7

**underneath**

231:22

**underpaid** 80:2,
12 96:7 97:6

**understand**
7:13 30:23
54:1 64:8 84:1
97:2,19 99:21
107:24 108:1
111:21 113:10
122:5 123:15
125:14 150:22
151:6,21 152:4
231:16 239:24
240:1 242:7
274:7 275:11

**understanding**
25:9 38:6,8,24
39:1 56:23
57:16 60:5
68:15 78:9
83:16,20,21
84:8 97:15
99:11 108:3
127:1,16
129:20,21
144:9 150:23
153:8 157:3,6,
10 158:7
190:12 245:11
251:14 281:17

**understood**
7:13 46:3
107:24 158:8
182:16 206:4
227:17 234:2
269:1 273:15

**unfairly** 100:7

**unfortunate**
94:5,12

**Unfortunately**
94:10

**United** 252:15

**University**
21:10

**unless** 192:9
206:15 211:10

**unpaid** 161:25
162:5,9 163:19

**unresponsivene
ss** 281:2

**unsatisfactory**
281:5

**until** 13:4,22
35:17 82:14
176:18 177:9
187:20

**unusual** 87:19,
23 250:24
267:9,12,13

**unwelcome**
155:22

**unwelcomed**
156:3

**up** 49:15 53:2
54:12 59:19
64:13,16,22
66:3 77:25
83:17 105:2
107:21,23,25
108:2,4 116:6
119:1 127:3
162:4 163:2
168:5 170:19,
21 173:17,18,
24 174:1,5,19
175:15 176:17,
22 192:2
193:9,11
201:12 202:19
204:12 217:9,
11,20 226:21

228:25 237:16
239:4 267:6
271:9 276:4,14

**updated** 78:21
171:20

**updates** 172:1

**upholding**
15:15

**upon** 76:10
84:19 111:7
133:7 138:21
167:18 179:17
239:16 255:11
263:25 284:7

**ups** 46:10

**upwards**
225:16

**us** 7:14 37:16
38:11 198:10
202:12 224:7
225:7,8 237:16
242:20 279:5

**usage** 132:4
179:20,23

**use** 19:24 64:1
65:9 100:2
106:18,21
112:4 126:14,
16 128:4 139:8
163:20 165:6
176:1 218:10
225:11,22

**used** 18:6 65:7,
19 106:17
128:13 139:5
174:16 210:13
270:23,24

**users** 176:15,
16

**using** 176:17
222:6

**usually** 172:21
285:19

**Utilities** 264:8

**utilize** 85:9

**utilized** 178:25

---

**V**

**V3** 172:20

**vacation**
141:25 163:21
165:1,6

**vaguely** 126:13

**Valley** 244:6

**value** 244:11
247:14

**Van** 54:21
55:1,18 60:3
74:13 76:25
77:5,16 78:1
79:2 80:13,18,
22 81:18 82:9,
18,25 84:21
85:6 91:17,22
92:2,5 98:16,
19 109:11,22
110:3,10
113:18,24
114:22 116:22
120:11 122:11
123:14 126:7
137:2,7 140:8
142:21,22
143:15 179:7
182:11,12
194:9,21,23
199:2 202:4
204:1,18
205:19,23



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Case 4:16-cv-00380-CDL    Document 63    Filed 06/21/18    Page 348 of 351

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.                    DEPOSITION OF
DAVID PASSMAN on 10/11/2017                          Index: Vanderway..well

206:3,6 210:16 224:25 225:9, 10 229:21 235:20 240:2, 9,15 248:2 269:20 270:5 271:21 274:23 275:3,4 276:15 277:25 278:4, 11 285:5

**Vanderway** 49:21,22

**variety** 79:13

**various** 23:15 158:22 189:11 262:16 270:21 275:14

**vast** 283:16

**vendor** 259:13

**vendors** 225:19

**venues** 199:25

**verbal** 159:12, 22

**version** 19:8 20:19 129:24 172:21,25 173:1 191:9

**versions** 172:22

**vertically** 192:5

**Verville** 209:25 211:3

**very** 23:8 70:22 74:19 80:9 102:23 105:22 109:20 126:13 127:9 141:11 143:24 216:4 223:25 242:8,

9,16 245:23 266:4

**vice** 48:21,23 51:20,21 64:2, 3,4 185:7,11 195:18,23,25 196:22 197:9, 14 198:4,7,9 199:12 200:7, 10 201:3 222:11,12,13 227:11 230:1, 18,23 231:2,6, 13,15,21 232:2,9,14,16 254:23

**view** 230:25

**violated** 116:13

**violation** 116:16 155:13 166:10,11,16 167:6 168:4 169:5 171:2

**virtually** 181:11

**visit** 122:19 124:11

**visiting** 158:12

**vitamins** 42:12

**voicemail** 157:22

**voluntarily** 170:7

**voluntary** 236:17

**vote** 15:2,5,9, 12

**voter** 8:17

**VP** 184:24

185:3 201:5

**VPS** 195:6

_____

**W**
_____

**wait** 14:18 54:1

**walk** 64:13,22

**walked** 239:4

**Wanda** 186:16

**want** 38:3 45:14 73:22,24 88:25 89:3 124:20 130:20 136:19 138:3 147:11 165:21 192:10 198:16 211:9 218:19 225:21 228:5 239:11 248:11

**wanted** 33:7 62:12,13 92:3 218:4 252:14

**wanting** 79:8

**wants** 79:17 162:21

**warned** 131:6

**warning** 159:12,13,22 160:1,4,15,25 280:17

**warnings** 160:17,22 161:4 280:17

**wasn't** 19:20 31:1,24 33:7 47:12 53:11 70:10 88:7,21 120:19 124:1 127:10 128:15

164:12 189:18 196:16 197:11 231:13 249:20 256:16 271:7 281:13

**waste** 89:3

**watch** 146:13 200:2

**Watley** 257:7, 17

**way** 37:24 52:22 53:18 58:10 76:1 94:5 105:22 110:8 113:2 114:18 121:21, 22 127:20 144:3 146:15 175:8,13 192:1 213:1 227:3 230:14 252:15 259:8 268:5 286:19

**we'd** 218:20

**we'll** 149:10,11 156:10

**we're** 32:1 43:21 119:6 133:8 136:18 183:16 224:22 233:13 266:4 284:23

**we've** 76:7 133:3 189:11 204:4,7 220:24 227:4 243:18 245:2,4 272:13

**weaknesses** 59:25

**website**

156:14,17,20, 23,25

**weeds** 60:14

**week** 49:14 52:14,15 66:17 280:1

**weekdays** 8:12

**weekends** 8:13

**weekly** 49:14

**weeks** 135:2 162:4

**well** 8:4 10:25 13:24 23:6 30:25 31:19 32:4 33:15 34:13 37:12 38:10,25 39:10 40:13 41:5,20 45:14,19 50:5 54:19 55:8 60:17 69:18 71:13 74:25 77:24,25 91:14 94:19 95:11 103:12 106:18 120:1,6 127:12 129:16,18 136:8,20 138:5 140:11 141:2, 18 149:2 171:9 175:1 183:19 192:7 199:19 200:19 205:3 207:8 212:10 213:3,10 214:7 218:3 219:14 221:1 225:25 226:22 230:16 231:12,18 232:13 234:14 245:23 254:24 255:14 256:5



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Index: went..Wiggins

258:4,15 259:9
269:10 270:14
280:3 282:6

**went** 8:13
25:10 28:9
114:3 174:12
175:12 191:9
234:18 252:10
265:12 272:21

**weren't** 75:24
183:6 205:12
252:23 258:18
280:19 281:10

**Westfield** 75:10

**what's** 21:6
23:4 71:20
83:21 108:3
113:22 123:10
127:20 138:23
140:16 149:13,
17 151:16,19
235:10 236:7
242:25 243:13
244:22 246:13
247:11 254:19
255:7 257:1
258:10 260:15
261:23 263:13

**whatever** 35:7
200:23 201:10
222:17 223:6
229:3 251:7
268:11

**whatsoever**
223:17

**whenever**
95:19

**where** 7:21
10:4 17:21
19:3,11 20:4
28:2,4,5,7

30:23 31:9,17,
21 32:1,3 33:3
35:19 63:2
67:19 71:1
72:3 74:9
78:19 92:20
104:19 105:17
106:6 110:14
118:3,8,9
124:17,23
127:25 135:20
144:10 162:19
165:16 167:1
170:21 174:8
192:1 199:25
206:2 207:25
217:14 225:2
230:3 232:19
261:21 264:12
270:11,12
280:25

**Where'd** 21:9

**whether** 10:18
26:22 28:19
34:15 46:9
48:11 51:19
59:5 61:4
66:23 84:17
95:8 104:8,10
112:18,22
113:10,13,18,
20,24 118:20
122:25 138:7
154:4 155:21
157:13 158:7
161:3 169:4
192:12 199:10
200:21 202:13
208:15 220:16
223:3 225:1,2
232:16 245:5
248:14 251:15
256:18 262:10,
11 268:16

271:10,11
279:16 285:9,
22 286:21

**which** 11:19
15:17 17:10
20:4 22:15
34:1 42:7 53:5
61:14 71:12
78:12 81:7
82:5,13 85:8
86:15,25 87:7
90:10,18,22,24
92:9 103:3
128:14 129:1
141:25 147:14
151:12 152:13
157:16 161:19
165:19 171:5,
19 172:21
175:20 179:6
187:23 191:24
193:15 197:6
205:17 210:10
217:18 218:10
227:18 248:9
250:16 271:20
273:6 277:7
278:22 279:5
283:11 285:14,
17

**while** 73:23
76:7,14
100:20,25
101:5,10
102:7,14
110:11 120:11,
19 123:16,22
124:9,12
130:12,16
158:3 181:6
187:19 213:24
217:21 222:20
232:8 279:20
286:23

**White** 74:14

**who** 6:14 11:14
12:5,7,11,13
14:13,16 16:9,
15 17:23 18:25
20:20,22 23:23
24:18,21 25:25
27:13,15,21
29:16 34:22
36:4 37:17
38:10,11 39:3,
8,10 40:5 44:8
47:18 51:8
56:17 63:9,10,
14,16 67:17
68:18 70:4
71:1,10,12,15
72:15 73:11,13
76:4 78:14
82:24 84:25
85:1 102:5
103:10 106:23
111:20 128:20
130:18 133:20
135:14 136:17
137:24 140:13
143:3 151:3
156:17 162:21
169:2 177:19
181:12 186:23
187:24 188:5,
6,10 189:20
192:9 198:2
201:11 205:5,
6,21,23 207:1,
2,4,8,9 209:11,
21 211:24
214:1,2 215:7
216:9,24
217:19 219:13
224:16,19
229:16,20
230:4 232:11
247:20,23

248:23,25
251:24 253:22
254:7 257:4
267:10 269:17,
21 270:23
273:13 278:6,
18 279:23,24
282:10,13,18
285:18 286:8,
17

**who'd** 123:12

**whoever**
230:15

**whole** 82:3
201:6 220:24
274:13

**whom** 128:9
251:3 269:25

**whose** 140:1,6
141:9 142:19
143:1,13,19

**why** 28:24
38:17 39:20
40:5,6 49:7,10,
25 50:11 61:12
62:4 72:11
79:22 80:3,6
82:2 96:23
144:2,15,18
146:15 147:11
180:4 217:7
233:1 254:1
274:13 275:22,
23

**wide** 47:2

**wife** 40:13,18
247:7 263:22,
23

**wife's** 9:5

**Wiggins** 74:17



1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Index: Wiggins'..wouldn't

208:19 282:19 283:3

**Wiggins'**
208:17

**Wilkerson** 75:6 210:19

**Wilkinson**
211:10

**will** 6:1,20 7:14 12:18 71:24 84:3 89:5 144:7,19 147:14 150:14 151:1 152:22, 25 153:10,21 157:15 159:6 166:11 167:24 170:11 193:5, 9,10 203:20 208:14 228:7 233:14 251:25 285:23 288:24

**Williams-sowers**
244:6

**wiped** 65:25

**wiping** 67:21

**wish** 261:18

**within** 9:25 10:3,7,8 42:1, 11,15 119:6 126:20 162:12 184:18 202:22 216:5 221:3

**without** 58:14 151:10,12,24 152:6 158:1 230:3 274:14 275:25

**witness** 6:12, 20 152:15

192:9 218:3,18 220:2 245:17 264:5

**woman** 93:11 103:5 110:10 121:15 154:20 187:23 188:5, 10 209:25

**women** 94:11 95:25 96:11 97:8,16 98:8, 12,15 100:20 103:1 118:11 124:18,25 125:8,11 189:10 216:16, 20 217:24 218:21 265:1

**wonderful**
244:9

**wondering**
269:3

**Woods** 257:7

**word** 100:2 112:4 175:5

**words** 39:25 201:22 241:25

**work** 10:23 21:21,25 44:5 85:18 92:10 93:12 96:12 118:4,11,25 122:5,24 123:3,4 124:9 134:12,16 152:22 158:13 162:4 225:20 259:8 272:21, 22 273:1 280:6 281:14

**worked** 21:21 23:14 85:14 200:9 205:15 269:25 279:25 280:13

**workers** 145:16

**working** 11:2, 14,15 30:24 44:10,14 45:2 88:2,3 122:24 124:9 224:25

**works** 7:8

**world** 230:25

**would** 7:17 8:15 14:4 17:24 18:3 20:1,22 23:10 24:16,18,19 25:3,17,19 27:13 28:21 29:2 30:20 31:23 32:13,14 41:16,23,25 42:3,7,24 43:2, 5,21 44:21 45:15,18 46:24 47:8,15,18 49:7,12,25 50:11 51:1,5, 10,17 52:3 54:17,18 55:23,24,25 56:1,2,5,6,8,9, 15,16 57:9,11 60:8,15 61:5, 14,16,25 62:3 63:5,16,17 70:22 71:1,3 73:11,20 75:20 76:3 78:20 79:12,14 80:14,16,19,23

82:9 87:6,9,10, 18,23 88:1,4,5 91:5 92:12 98:1,5 99:11, 24 100:2 103:10,13,14, 16 104:5,8,10, 19 105:10,25 107:11 108:21, 22 109:14,15, 21 110:1 112:1,12 114:11,13 116:10 117:8, 24 118:7 123:13 124:14 128:12,19 129:5,8,19 131:16,17,18, 20 134:16 136:7,13,17 137:2 139:8,22 140:3,4,5,13 141:1,15,18,22 142:7,24 143:3 144:12 145:4, 7,10,18 146:17 147:21 148:2, 4,6,21 149:23 150:4 151:17 152:13,14 153:7 154:17, 22 155:4,7,12, 18,19,23 158:11,23 160:12 161:1, 2,15 165:16,17 167:1,2,21 168:8,12,14 169:5,10,12,13 172:7 175:20 177:3,4,6,8,20 182:8,10 184:2 189:1,14,25 190:13 192:21

195:1,4 200:1, 23 203:22 204:23 205:11, 14 206:4,21 207:2,3,9 215:7,8,9 216:13 217:4 220:22 222:21, 22 223:11,13 224:4,8,12,14, 15,17 225:18, 24 226:3,5,14, 16,21,25 227:2,11,13,19 229:4,5,17,18, 24 230:1,16,18 231:8 232:4,6 235:2 239:13 241:5 244:14 248:1,3,6,7,25 249:3 250:2, 10,21,24 251:2,5 252:2 256:23 258:8 259:3,5,10,11 261:1,6 262:22 267:10,20,21 268:8 269:21 270:4,7,11,12, 13,15,17,19 271:3,8,9,17 272:23 274:19, 21,24,25 275:5,9,24 276:1,15,16 278:23 279:16 280:6,24 282:16 285:4, 5,9,14,17,18, 19,21,24,25 286:3,5,6,8,13, 17,18 287:9,24 288:16

**wouldn't** 49:9



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

CRYSTAL TRAWICK vs. CARMIKE CINEMAS, INC.
DAVID PASSMAN on 10/11/2017

DEPOSITION OF
Index: write..zip

50:18 61:11
88:19 145:20
205:9 220:23
226:22 235:1
242:3 255:19
266:11 287:21

**write** 14:18
63:8 129:25
141:11

**writing** 51:24
52:4,5,7,25
53:10,12,13
68:21,24
163:10 165:5
177:16 248:21
251:10 276:9

**written** 90:1,17,
21 108:17
121:16 131:12,
21 132:2,6,9,
13,16,19,22
133:11,15,17
138:15 150:3
155:3 159:12,
13 160:1,4,15,
17,22,25 161:4
179:25 234:6,
9,13 235:3
250:16 272:4
276:5 277:1,3,
5

**wrong** 192:20
194:14 230:7

**www.carmike.
com.** 156:15

---

**Y**

---

**y'all** 190:8

**yeah** 45:21
51:13 56:14
80:17 88:1

136:22 144:8
165:22 169:13
175:17 207:22,
23 208:25
209:4 213:12
228:17 231:5
258:15 261:18
262:8 280:11
285:12

**year** 13:15
21:12,13 24:4
25:21 50:19
86:6,16,21
87:2,8 89:25
90:4,7,8
102:24 127:11,
12 136:18
166:19,21
203:4 241:7
242:9,13,15,16
249:13 254:24
274:14 284:12
285:2 286:12

**year's** 135:16

**year-end** 241:6,
7,11 275:7

**years** 11:25
22:3 24:4 42:1
86:15,25
127:13 242:5
262:11 265:2

**yesterday**
37:13 38:9,14
39:5 42:19

**yet** 146:21,22
272:15

**you'd** 157:2
228:22

**you'll** 64:12
68:13 71:6
84:21 85:5

150:8 151:8
161:16 165:12,
24 178:2
204:12 259:23

**you're** 9:3 60:3
67:11 71:13,25
74:11 89:7
106:2 113:2
149:15 159:15
161:12 162:6
173:18 190:23
191:16 211:7
213:16 214:7
218:14 219:2
220:18 223:18
224:5 228:7
231:1,20
232:23 239:2
249:7 262:25
274:3 284:13

**you've** 90:2
131:24 137:6
160:20 197:5
222:17 226:24
227:16 277:10

**Young** 254:11,
12,16 257:4
260:21,25
262:6

**younger** 155:8,
13

**yours** 72:15
128:20 172:15

**yourself** 15:9

---

**Z**

---

**Zehr** 211:5,6,7,
8

**zero** 139:16

**zip** 176:18



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com