```
        IN THE UNITED STATES DISTRICT COURT
       FOR THE MIDDLE DISTRICT OF GEORGIA
               COLUMBUS DIVISION


CRYSTAL TRAWICK,

          Plaintiff,              CIVIL ACTION FILE

      vs.                         NO. 4:16-CV-380(CDL)

CARMIKE CINEMAS, INC.,

          Defendant.

                        - - -



                    DEPOSITION OF
                     RICHARD HARE


                  April 10, 2018
                    10:10 a.m.


        600 Peachtree Street, NE, Suite 3000
              Atlanta, Georgia  30308


         Michelle J. Ruiz, CCR, B-1397
```

REGENCY-BRENTANO, INC.

CERTIFIED COURT REPORTERS

13 Corporate Square, Suite 140

Atlanta, Georgia  30329

(404)321-3333

```
 1   APPEARANCES OF COUNSEL:

 2

 3   For the Plaintiff:

 4        MARY A. PREBULA, Esq.
          Prebula & Associates, LLC
 5        3400 Peachtree Road, NE, Suite 1250
          Atlanta, Georgia  30326
 6        email:  Mprebula@prebulallc.com

 7

 8
     For the Defendant:
 9
          RICHARD GERAKITIS, Esq.
10        Troutman, Sanders, LLP
          600 Peachtree Street, NE, Suite 3000
11        Atlanta, Georgia  30308
          email:  Richard.gerakitis@troutman.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        C O N T E N T S

 2     WITNESS              EXAMINATION    FURTHER EXAMINATION

 3     RICHARD HARE

 4     BY MS. PREBULA      PAGE 4

 5

 6                        E X H I B I T S

 7     PLAINTIFF'S
       EXHIBITS             IDENTIFICATION      PAGE
 8
       EXHIBIT 37          EMPLOYEE MANUAL      83
 9
       EXHIBIT 38          FORM DOCUMENT        105
10
       EXHIBIT 39          HANDBOOK             101
11
       EXHIBIT 40          E-MAIL               106
12
       EXHIBIT 89          FORM DOCUMENT        104
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        APRIL 10, 2018

 2                 DEPOSITION OF RICHARD HARE

 3                       PROCEEDINGS

 4                       RICHARD HARE,

 5           being first duly sworn, was examined and

 6           testified as follows:

 7                       EXAMINATION

 8  BY MS. PREBULA:

 9      Q    Mr. Hare, I'm Mary Prebula, as you just

10  heard, and I represent Plaintiff Crystal Trawick in

11  this litigation.  You are here by agreement and

12  notice, and I'm going to ask you a series of

13  questions.

14           We want a clean record.  If you don't

15  understand my question, if you will let me know, we

16  will try to rephrase it.

17      A    Okay.

18      Q    I do see you shaking your head but you did

19  say okay.

20      A    Yes.

21      Q    We need to try to have verbal responses;

22  yeses or nos so that we can be clear of your answer.

23  You may say uh-huh or huh-uh and we may ask is that

24  a yes or no.  We're not trying to be rude.  We're

25  just trying to understand your responses.
```

```
 1              If you can state your full legal name.

 2     A     Richard Brian Hare.

 3     Q     Mr. Hare, how old are you?

 4     A     51.

 5     Q     Where do you currently reside; just give

 6  me a city and state?

 7     A     I reside in two residences; Columbus,

 8  Georgia and Atlanta, Georgia.

 9     Q     What is your legal residence?

10     A     Columbus, Georgia.

11     Q     And where are you currently employed?

12     A     Havertys Furniture Company.

13     Q     What's your position?

14     A     Executive vice-president and chief

15  financial officer.

16     Q     When did you get that position?

17     A     May of 2017.

18     Q     And prior to that, you were CFO at

19  Carmike?

20     A     Yes.

21     Q     When did you first start working at

22  Carmike?

23     A     March of 2006.

24     Q     Had you had any contact with Carmike prior

25  to March of 2006?  I don't mean going to the movie,
```

1   you know, but with the executive or corporate

2   office?

3        A     No.

4        Q     And so I take it that you had no contact

5   with Carmike with regard to any other discrimination

6   claims prior to March 2006?

7        A     I had no contact with Carmike regarding

8   any matter prior to 2006.

9        Q     Including that?

10       A     Can you rephrase the question?

11       Q     Prior to March 2006, you had no contact or

12  involvement where Carmike with regard to any

13  discrimination claim?

14       A     That's correct.

15       Q     After March 2006, other than Ms. Trawick's

16  claim, have you had any contact with any

17  discrimination claims or any involvement with any

18  discrimination claims involving Carmike?

19       A     Not that I can remember.

20       Q     Are you aware of any other person raising

21  a claim of discrimination or harassment, and then

22  being terminated after an investigation by the CFO's

23  department?

24            MR. GERAKITIS:  Object to form.

25            THE WITNESS:  Can you repeat that

1       question, please?

2   BY MS. PREBULA:

3       Q    Are you aware of any claim by any person

4   raising an issue of discrimination or harassment,

5   and then being terminated by an investigation coming

6   from the CFO's department at Carmike?

7            MR. GERAKITIS:  Object to form.

8            THE WITNESS:  I'm not aware of anyone

9        being terminated by the CFO's office at Carmike

10       Cinemas.

11  BY MS. PREBULA:

12      Q    That was not my question.  Perhaps it was

13  inartful.  Let's try again.

14           Are you aware anyone who had raised a

15  claim of discrimination or harassment, and then was

16  terminated as a result of an investigation by the

17  CFO's department?

18      A    I'm not aware.

19           MR. GERAKITIS:  Object to form.  You can

20       answer.

21           THE WITNESS:  I'm not aware.

22  BY MS. PREBULA:

23      Q    So when you were hired in March of 2016,

24  what was the organizational reporting from you up?

25      A    I believe you just referenced me being

1    hired in 2016.

2         Q    Okay.  I was trying to correct it.  We'll

3    just rephrase.

4              When you were fired in March of 2006, what

5    was the lines of reporting from you up?

6         A    I was hired as the senior vice-president

7    and chief financial officer of Carmike Cinemas in

8    2006 and remained in that same role until the sale

9    of Carmike to AMC Theaters in December of 2016.

10        Q    And my question was, what were the lines

11   of reporting; who did you report to?

12        A    I always reported to the chief executive

13   officer of Carmike Cinemas with a dotted line to the

14   audit committee chairman of our board of directors.

15        Q    And in March of 2006, who was the CEO?

16        A    Michael Patrick.

17        Q    Who was the audit committee chair on the

18   board of directors?

19        A    Allen Hirshfield.

20        Q    Can you spell that last name for the court

21   reporter?

22        A    H-I-R-S-H-F-I-E-L-D.

23        Q    When did Mr. Patrick leave?

24        A    Let's see, I believe it was around 2008.

25        Q    Was there an interim replacement before

```
 1   David Passman took over?

 2        A     When Michael Patrick left, the board

 3   instituted an office of the chairman which consisted

 4   of David Passman as an independent director, Fred

 5   Van Noy as chief financial officer, and myself.

 6        Q     How long did that office of the chairman

 7   exist?

 8        A     Approximately six months.

 9        Q     And then what occurred?

10        A     Then David Passman was appointed chief

11   executive officer of Carmike Cinemas.

12        Q     And the office of the chairman was expired

13   or was done away with?

14        A     At the point of Mr. Passman's appointment

15   as CEO, the office of the chair was dissolved.

16        Q     And then you reported directly to Mr.

17   Passman?

18        A     That's correct.

19        Q     And that was approximately the end of

20   2008?

21        A     It was either -- that was either the end

22   of 2008 or in 2009.  I can't quite remember.

23        Q     From that point on, was Mr. Passman

24   responsible for your raises, promotions, bonuses, et

25   cetera?
```

Richard Hare                    Trawick v. Carmike Cinemas, Inc.                    April 10, 2018

```
 1        A     David was partially responsible, but some
 2   of that went through our compensation committee
 3   which was comprised of members of the board of
 4   directors.
 5        Q     Including Mr. Passman?
 6        A     Mr. Passman was not a member of the
 7   compensation committee.
 8        Q     Did he have to approve?
 9        A     I believe the process was Mr. Passman
10   would make recommendations for executive officers
11   and the compensation committee would review and/or
12   approve.
13        Q     And did you get bonuses or raises while
14   you were there after Mr. Passman became CEO?
15        A     Yes.
16        Q     But you stayed in your position of senior
17   VP/CFO until you left?
18        A     That's correct.
19        Q     And Carmike, you mentioned earlier, was
20   sold in December of 2016.  Is that what you said?
21        A     Yes.
22        Q     And were you involved in that transition?
23              MR. GERAKITIS:  Object to form.
24              THE WITNESS:  I'm not sure what you mean
25        by transition.
```

 1   BY MS. PREBULA:

 2        Q    Were you involved at all in the sale of

 3   Carmike to AMC?

 4        A    Yes.

 5        Q    What was your involvement?

 6        A    As chief financial officer, I was involved

 7   in discussions with our board of directors and with

 8   the management team of AMC in advising our CEO on

 9   negotiations.

10        Q    And what was the form of the transaction?

11        A    It was a stock and cash transaction, which

12   is all public record.

13        Q    Meaning everything was filed with the SEC,

14   is that what you mean?

15        A    That's correct.

16        Q    What was the form of the document that

17   transferred Carmike to AMC?

18        A    I'm not sure the legal document, but there

19   was -- in December of 2016, the board had approved

20   the transaction -- our shareholders had approved the

21   transaction and the sale was consummated, and those

22   documents were filed with the security and exchange

23   commission.

24        Q    Was it a stock purchase?

25        A    I don't recall the specifics.

```
 1        Q      Did you negotiate the purchase?

 2        A      No.

 3        Q      You advised Mr. Passman and the board as

 4   to the purchase?

 5        A      I advised the board.  I advised Mr.

 6   Passman as well as our investment bankers advised

 7   the board and Mr. Passman.

 8        Q      And do you know whether or not it was a

 9   purchase that included liabilities being taken over

10   by AMC?

11        A      I'm not a lawyer so I couldn't answer

12   that.

13        Q      But you are a chief financial officer.

14   What happened to the debt?

15        A      I am a chief financial officer.

16        Q      So what happened to the debt?

17        A      I left the company the day of close.

18        Q      Okay.

19        A      I'm not sure how the debt -- Carmike's

20   debt was extinguished or assumed.

21        Q      Was that not a part of the negotiation?

22        A      I don't recall.

23        Q      What happened to any liabilities, such as

24   this lawsuit?

25        A      You would have to -- I would -- you would
```

1    have to refer that to AMC.

2        Q    Was that not a part of your negotiations?

3        A    I don't recall the specifics of the

4    negotiations.

5        Q    Did you keep any notes?

6        A    Not that I can recall.

7        Q    So what did you do between December of

8    2016 and May of 2017?

9        A    I took off a few months and started

10   interviewing for a new job.

11       Q    And the position you have not with

12   Havertys is the first one you have had since you

13   level Carmike?

14       A    That is correct.

15       Q    While you were at Carmike, did you have

16   any day-to-day contact with the Ms. Trawick?

17       A    Yes.

18       Q    What was that day-to-day contact?

19       A    More of a social nature.

20       Q    What do you mean by that?

21       A    Crystal didn't report to me.  But it's a

22   small building, we see each other in the hallways.

23   We would -- I would see her at meetings from time to

24   time.  But I didn't really work directly with her.

25       Q    Did you socialize outside the office with

```
 1   Ms. Trawick?

 2         A     Yes.

 3         Q     In what manner?

 4         A     Mostly social events in Columbus.

 5   Community events where we would see each other.

 6   Charity events, things of that nature.

 7         Q     And what are those events; what are you

 8   thinking of when you say community and charity

 9   events?

10         A     Let's see, Steeple Chase for the Arts is a

11   civic fundraising.  I believe she was involved with

12   Screen on the Green, which was probably done through

13   our local chamber of commerce.  I believe I remember

14   she was involved with that.  I don't recall any

15   other specifics.

16         Q     Were you attending those events on behalf

17   of Carmike?

18         A     Yes.

19         Q     When you say Ms. Trawick was involved,

20   what do you mean?

21         A     Crystal was involved in several

22   community-related organizations oftentimes in

23   leadership roles.  She was very active in the

24   community.

25         Q     And she did that on behalf of Carmike, as
```

```
 1    well, didn't she?
 2         A     I don't know specifically.  In some cases,
 3    she probably did.  In some cases, I don't know.
 4         Q     Did you have to approve those as chief
 5    financial officer?
 6         A     I didn't have to approve what
 7    organizations particular members were involved with.
 8    We did have a policy that we put in place that any
 9    donations to organizations needed to go through
10    CEO's office and be approved in that manner.  And
11    the CEO would bring those to the attention of
12    executive team when we met on a weekly basis and we
13    would vet those requests.
14         Q     When did you put that policy in place?
15         A     I don't recall specifically.  But I do
16    recall it being an initiative that David
17    implemented, so that would have been from
18    whenever -- that's public record whenever David
19    became CEO.  But it would be from that point forward
20    was when that policy was instituted.
21         Q     And was there a written policy?
22         A     I don't recall.
23         Q     Meaning you just don't remember one way or
24    the other?
25         A     I don't remember.  I don't remember one
```

1   way or the other if there was a written policy.

2   That policy was articulated and verbalized to

3   myself, Fred Van Noy and Dan Ellis.  Everybody else

4   reported up through of those people, or David, so.

5       Q    So basically David Passman said this is

6   how I want to do it?

7       A    I would say when David became CEO, we

8   needed to put some controls around our charitable

9   contributions.  David encouraged employees to get

10  involved in the community, which was not a policy

11  his predecessor had embraced.  And so, we needed to

12  institute some sort of process for helping employees

13  get involved in the community.

14      Q    So is that a yes, that Mr. Passman told

15  the three, Mr. Van Noy, Mr. Ellis and you, that now

16  donations to any organization had to go through the

17  CEO office?

18      A    I'm not sure if it was David specifically

19  or if it was something that evolved between the four

20  of us when David became CEO.

21      Q    Initially, you said that donations to any

22  organizations had to go through the CEO.  And then

23  you said, when David became CEO, he had to put

24  controls around charitable contributions.

25              So my question is, did this policy apply

```
 1    to any donations, whether it was charitable or any

 2    other organization?

 3              MR. GERAKITIS:  Object to form.

 4              THE WITNESS:  Can you repeat that?

 5    BY MS. PREBULA:

 6         Q    Sure.  I'm just making sure I understand

 7    your testimony.

 8              You said that the policy was donations to

 9    any organizations would go through the CEO office,

10    right?

11         A    It would go through the CEO's office and

12    be vetted by the executive team.

13         Q    Okay.  And that was a verbal policy as far

14    as you know?

15         A    That is correct.

16         Q    And that policy would apply to any

17    organization where Carmike was going to make a

18    donation of any kind?

19         A    That was to apply to all charitable

20    community-type donations, ad hoc request, et cetera.

21         Q    So are you saying that policy only applied

22    to charities or it also applied to any community

23    events where you were going to make any kind of

24    contribution or donation; you, I mean Carmike?

25         A    Yes, yes.  I recall we liked -- I recall
```

1    it was to be applied to all charitable contribution

2    requests that came in at the corporate office.

3        Q    Does that include contributions to the

4    chamber of commerce?

5        A    I don't know.

6        Q    Does that include contributions to any

7    social organization in Columbus?

8            MR. GERAKITIS:  Object to form.

9            THE WITNESS:  I don't know.

10   BY MS. PREBULA:

11       Q    Was there any other policy, verbal or

12   written, other than the one you have just described,

13   that donations to any organizations had to go

14   through the CEO office and then be vetted by the

15   executive committee?

16           MR. GERAKITIS:  Object to form.

17           THE WITNESS:  Can you repeat that again?

18   BY MS. PREBULA:

19       Q    Other than the policy you just described

20   that any donations to any organizations had to go

21   through the CEO office and be vetted by the

22   executive committee, was there any other policy

23   applicable to any other donation?

24           MR. GERAKITIS:  Object to form.

25           THE WITNESS:  I don't recall.

1   BY MR. GERAKITIS:

2        Q    You don't recall one way or the other?

3        A    I don't -- I don't -- I'm not aware.  I

4   don't recall.

5        Q    I don't understand your response.  I don't

6   know if that's a yes or a no, or you just don't

7   remember one way or the other?

8        A    Can you repeat it?

9        Q    Was there any other policy as to how

10  donations were going to be handled other than the

11  verbal policy that Mr. Passman told the three of

12  you?

13       A    Not that I'm aware of.

14       Q    Was there any other written policy?

15            MR. GERAKITIS:  Object to form.

16            THE WITNESS:  Not that I can recall.

17  BY MS. PREBULA:

18       Q    Was there a policy and procedures manual

19  with regard to donations, or expenses, or credit

20  card use when you came to the company?

21       A    I don't remember.

22       Q    Was there a policies and procedures manual

23  with regard to those issues when you left the

24  company?

25       A    I don't remember.

 1        Q     Would your office not have put that
 2   together if it existed?
 3        A     I don't remember.
 4        Q     Was there any other office or group that
 5   would have been responsible for policies and
 6   procedures manual with regard to financial matters?
 7              MR. GERAKITIS:  Object to form.
 8              THE WITNESS:  The human resources
 9         department often had policies and procedures.
10         I don't recall any specific policies of where
11         they might reside at Carmike.
12   BY MS. PREBULA:
13        Q     So you would rely on the testimony of
14   Sadie Marshal as to whether or not such policies and
15   procedures existed?
16              MR. GERAKITIS:  Object to form.
17              THE WITNESS:  I don't know what Sadie
18         Marshal said, or I can't comment as to what
19         Sadie Marshal may or may not have said.
20   BY MS. PREBULA:
21        Q     She was the director of human resources
22   while you were there, correct?
23        A     Yes.
24        Q     And it is your testimony that human
25   resources would have been responsible for any other

```
 1   policies and procedures?
 2            MR. GERAKITIS:  Object to form.
 3            THE WITNESS:  No.
 4   BY MS. PREBULA:
 5        Q    What is your testimony then?
 6        A    My testimony is I don't recall.
 7        Q    Any department, other than human resources
 8   and the chief financial officer who would have had
 9   responsibility for establishing policies and
10   procedures with regard to financial matters at
11   Carmike while you were there?
12        A    I don't recall.
13        Q    Did Carmike have an organizational chart
14   while you were there?
15        A    I don't recall.
16        Q    Mr. Hare, I have to ask this question so
17   please don't be offended.  Are you taking any
18   medication today that would affect your memory?
19        A    No.
20        Q    Are you taking any medication today that
21   would affect you giving truthful testimony here?
22        A    No.
23        Q    Is there any other condition or
24   circumstance that would affect your memory today?
25        A    No.
```

```
 1        Q     Any other condition or circumstance that
 2   would affect you giving truth testimony today?
 3        A     No.
 4        Q     When did you first learn about this
 5   deposition?
 6        A     I don't recall specifically, but in the
 7   last two weeks.
 8        Q     Prior to the last two weeks, did you know
 9   you had been listed as a witness in this case?
10        A     No.
11        Q     How did you learn about the deposition?
12        A     Mr. Gerakitis reached out to me.
13        Q     Have you hired Mr. Gerakitis as your
14   personal counsel to represent you here today?
15             MR. GERAKITIS:  I am here as counsel for
16        the deponent.
17             MS. PREBULA:  No.  You're here as
18        corporate counsel.
19             MR. GERAKITIS:  And the witness.
20             MS. PREBULA:  I'm going to let the witness
21        answer the question.
22             MR. GERAKITIS:  Okay.
23             MS. PREBULA:  After the coaching.
24             THE WITNESS:  Can you repeat the question?
25   BY MS. PREBULA:
```

Richard Hare                Trawick v. Carmike Cinemas, Inc.                April 10, 2018

```
1        Q    Have you hired Mr. Gerakitis as your
2    personal attorney?
3             MR. GERAKITIS:  Object to form.
4             THE WITNESS:  I don't know how to answer
5        that question.
6    BY MS. PREBULA:
7        Q    Did you sign a retainer and fee agreement
8    and pay him any money?
9             MR. GERAKITIS:  Object to form.
10            THE WITNESS:  I have not paid Mr.
11       Gerakitis.
12   BY MS. PREBULA:
13       Q    Have you signed a fee agreement?
14            MR. GERAKITIS:  Object.
15            THE WITNESS:  No.
16   BY MS. PREBULA:
17       Q    What did you do to prepare for the
18   depositions today, Mr. Hare?
19       A    I met with Mr. Gerakitis yesterday
20   afternoon.
21       Q    And you understand he represents Carmike?
22       A    Yes.
23       Q    Did you review any documents in
24   preparation for the deposition today?
25       A    Yes.
```

**REGENCY-BRENTANO, INC.**

1      Q     What did you review?

2      A     I reviewed a internal audit report.

3      Q     Prepared by who?

4      A     I don't recall her name.  She worked for

5  Carmike and worked for Fred Friedl.

6      Q     Other than Mr. Gerakitis, have you had any

7  communication with anyone about your deposition

8  today?

9      A     No.

10      Q     Did you retain any documents when you left

11  Carmike that related to Carmike?

12      A     No.

13      Q     Did you take any computer equipment with

14  you when you left?

15      A     Yes.

16      Q     What did you take?

17      A     I took my ipad and my personal computer.

18      Q     Was that a computer provided by Carmike?

19      A     It was.

20      Q     When you said personal computer, is it a

21  laptop?

22      A     No.  It was a regular.

23      Q     PC?

24      A     Yes.

25      Q     And was your ipad provided by Carmike, as

```
 1   well?

 2        A     Yes.

 3        Q     Did you take any other electronic

 4   equipment when you left Carmike?

 5        A     Yes.

 6        Q     What?

 7        A     My phone.

 8        Q     Was that also provide by Carmike?

 9        A     It -- no, I had to assume that.  I had to

10   assume the payments on that.

11        Q     So it was initially provided by Carmike?

12        A     It was and then I was offered the phone

13   and I picked up payments on it.

14        Q     What happened to the data that was on the

15   personal computer?

16        A     It was swept.

17        Q     Meaning it was wiped clean?

18        A     Yes, it was wiped clean before I could

19   take it.

20        Q     Who wiped it?

21        A     Somebody in the IT department.

22        Q     You don't know who?

23        A     I don't know who specifically.

24        Q     Did you turn it over to somebody?

25        A     I don't recall who specifically took it.
```

```
 1   I remember Tara Hardwick was in charge of all that
 2   at the time.
 3        Q     Did you make a back-up before the data was
 4   wiped?
 5        A     I didn't, no.
 6        Q     Was there data on your computer about the
 7   financial affairs of Carmike?
 8        A     Yes.
 9        Q     Was there data on your computer about Ms.
10   Trawick?
11        A     No.
12        Q     Was the internal audit report on your
13   computer?
14        A     I don't recall.  If it was, it would have
15   been in my e-mail.
16        Q     What e-mail server were you using at that
17   time?
18        A     The company e-mail server.
19        Q     You don't recall?
20        A     Well, there was -- the company had an
21   e-mail server.  I don't know if the company had
22   multiple e-mail servers.  But I used the company
23   e-mail.
24        Q     You don't know who provided that server?
25        A     No.
```

Richard Hare                    Trawick v. Carmike Cinemas, Inc.                    April 10, 2018

 1          Q      Were there e-mails about the investigation
 2   of Ms. Trawick on your computer?
 3          A      I don't recall.
 4          Q      Were you asked to preserve any data with
 5   regard to Ms. Trawick prior to leaving Carmike?
 6          A      I don't recall.
 7          Q      Did you get a litigation hold letter or
 8   notice to preserve data with regard to this case?
 9          A      I don't recall.
10          Q      Did you preserve any data or documents
11   with regard to this case?
12          A      I don't remember.
13          Q      Were there financial reports on your
14   computer about salaries and bonuses before it was
15   wiped?
16          A      I don't remember having that type of
17   information.  That would have been something that
18   would have been part of the controller's office
19   records.
20          Q      Who was the controller when you left?
21          A      Jeff Kohl.
22          Q      Was there a central database that was used
23   to contain that information?
24          A      Most of the information of that form were
25   in Excel spreadsheets.

1      Q    Would human resources have had access to

2   that information, as well?

3      A    I don't know.

4      Q    So are you saying that, to your knowledge,

5   there was no personnel database that would contain

6   payroll records and financial records?

7           MR. GERAKITIS:  Object to form.

8           THE WITNESS:  I'm not sure what type of

9       database there would have been or not have

10      been -- would or would not have been.

11  BY MS. PREBULA:

12      Q    If you wanted to determine what someone

13  was making, what would you go look at?

14      A    I'd pick up the phone and ask the

15  controller.

16      Q    You wouldn't look at any electronic data?

17      A    No.

18      Q    Was your ipad also wiped clean before you

19  left?

20      A    Yes.

21      Q    Did you make a back-up of that?

22      A    Yes.

23      Q    Did it have any corporate data on it?

24      A    No.

25      Q    None at all?

```
 1        A     I used it for e-mail, so it was tied to
 2   the e-mail.  Whatever the e-mail exchange server was
 3   that Carmike used, that was it.
 4        Q     Did you store e-mail on your ipad?
 5        A     I didn't store e-mail on the ipad, no.  I
 6   had e-mail -- access to e-mail on my ipad.
 7        Q     When you would pull up e-mail on your
 8   ipad, did you automatically delete every e-mail as
 9   it was reviewed or did they sit on your ipad?
10        A     They didn't sit on my ipad.  They sat on
11   the server at the office.
12        Q     And when you pulled up e-mail on your
13   ipad, could you see more than one e-mail?
14        A     Yes.
15        Q     In other words, you could open your in-box
16   and see whatever was there?
17        A     Yes.
18        Q     And whatever you had not deleted, was
19   still there?
20        A     Yes.  And then -- I'm sorry.  Go ahead.
21        Q     Go ahead.  That's fine.  You can finish
22   your response.
23        A     When the company turned me off of the
24   server, everything was gone.
25        Q     And was a back-up made of the data on your
```

```
 1   ipad?
 2        A    No.
 3        Q    What else was on your ipad other than
 4   e-mail?
 5        A    Several apps.
 6        Q    Tell me what you recall.
 7        A    Weather Channel, maybe Facebook.  I don't
 8   recall specifically, but those types of personal
 9   apps.
10        Q    So when you say apps, you're referring
11   mostly to personal apps?
12        A    Yes.
13        Q    Did you have access to Comdata on your
14   ipad?
15        A    No.
16        Q    Did you have access to the Nexus system on
17   your ipad?
18        A    No.
19        Q    Did you have access to those two systems
20   on your personal computer?
21        A    I remember having access to Comdata.  I
22   don't remember Nexus.  I'm not sure I know what that
23   is.
24        Q    Did you have to enter Comdata with a
25   password?
```

```
 1        A     I don't remember.
 2        Q     Who maintained the Comdata system while
 3   you were at Carmike?
 4        A     I don't remember.
 5        Q     Is your testimony the same with regard to
 6   somebody in IT wiped it and you don't know who?
 7        A     Are you referring to Comdata?
 8        Q     No, no.  I'm sorry.  For the ipad.  You
 9   said the ipad was wiped before you took it?
10        A     Yes.
11        Q     And same thing, somebody in IT did it but
12   you don't know who did it?
13        A     Yes.
14        Q     Do you know who you turned the ipad over
15   to?
16        A     I don't recall specifically.
17        Q     Was your phone also wiped before you left
18   Carmike?
19        A     Yes.
20        Q     Is that the same response, someone in IT
21   wiped it, but you don't know who wiped the phone?
22        A     Yes.
23        Q     Did you make a back-up before you deleted
24   it?
25        A     No.
```

```
1      Q    Or before it was wiped?
2      A    No.
3      Q    Did you back-up your phone to your
4  personal computer at the office?
5      A    I don't know.  I don't know if I could do
6  that.
7      Q    Did you have an Apple iphone?
8      A    Yes.
9      Q    Did you back it up to itunes?
10     A    No.
11     Q    How did you get updates to the phone?
12     A    I would just hit update and it would
13 update.
14     Q    Did you sync your phone with your personal
15 computer?
16     A    I don't know how to do that.
17     Q    Okay.
18     A    I don't know.  I don't know.
19     Q    Did you have a feature where you plug it
20 in and it would run a program to sync it to your
21 personal computer when you got to the office?
22     A    No, I don't remember that.
23     Q    I apologize if I asked this.  Did you make
24 a back-up of the iphone before you turned it over to
25 IT?
```

```
 1        A     No.
 2        Q     Did anyone in IT tell you whether or not
 3   they had maintained a back-up of those three items,
 4   your PC, your ipad and your iphone?
 5        A     No.
 6        Q     Did you get any directions, either
 7   verbally or in writing, that back-ups were going to
 8   be made to preserve data?
 9        A     I don't recall.
10        Q     Were there any items with regard to Ms.
11   Trawick on the ipad?
12        A     I don't recall.
13        Q     If there was an e-mail, it might have been
14   on your ipad, but you don't know?
15             MR. GERAKITIS:  Object to the form.
16             THE WITNESS:  Can you repeat the question?
17   BY MS. PREBULA:
18        Q     I said if there was an e-mail regarding
19   Ms. Trawick, it might have been on the ipad but you
20   don't know?
21        A     I don't know.
22        Q     Did you store documents, meaning Word
23   documents, PDFs, Excel spreadsheets to your ipad?
24        A     No.
25        Q     Did you store such documents on your PC?
```

```
 1        A      Yes.

 2        Q      Did you store them on your desktop?

 3        A      I would store them on my PC.

 4        Q      And the division I'm making is, between

 5   saving those to a central location or saving them on

 6   your desktop of your PC, did you store documents on

 7   the desktop?

 8        A      I would store documents on a drive that I

 9   could -- that I knew -- when you store documents on

10   your PC, if memory serves, if you store them in a

11   "my documents" folder, my understanding is those

12   were backed up.

13        Q      Okay.

14        A      So that's where I would store stuff.

15        Q      Did you store documents directly to the

16   desktop so that when you opened the desktop the

17   documents were there on the screen?

18        A      That was not my practice.

19        Q      And it's your understanding that your PC

20   was backed up from the "my documents" file, correct?

21        A      As a normal course of business, my

22   understanding at Carmike Cinemas was our files were

23   backed up if they were in your documents.

24        Q      To where?

25        A      Some IT server.
```

```
 1        Q     And you don't know where?

 2        A     No.

 3        Q     And who backed them up?

 4        A     Someone in IT.  I don't know who

 5   specifically.

 6        Q     Did you also have a laptop that you used

 7   at Carmike?

 8        A     Yes.  If memory serves, my laptop was my

 9   PC.  It went into a docking station.  And so, they

10   are one in the same.  When I describe my PC, it's

11   the same thing as my laptop.

12        Q     Okay.  Actually they are not.

13              Did you have a tower that was a PC or just

14   a docking station that you put your laptop in?

15              MR. GERAKITIS:  Object to the form.

16              THE WITNESS:  I don't recall at what

17        point, but I had both at one point in my

18        tenure.

19   BY MS. PREBULA:

20        Q     Which did you have when you left?

21        A     If memory serves, I think I had both.

22        Q     Meaning you had a central standalone PC

23   and a laptop?

24        A     Yes.

25        Q     And did you take both of those with you
```

1     when you left?

2          A     Yes, I did.

3          Q     And did you have both the laptop and a

4     standalone PC from 2013 to 2015?

5          A     I know I had both when I left.  That's all

6     I can remember.

7          Q     Did you have both when you were dealing

8     with the investigation of Ms. Trawick?

9               MR. GERAKITIS:  Object to form.

10              THE WITNESS:  I don't recall specifically

11         when I had both.  But I do know when I left I

12         had both.

13    BY MS. PREBULA:

14         Q     And you took both?

15         A     Yes.

16         Q     Was the laptop wiped, also?

17         A     Yes.

18         Q     Did you make a back-up of that?

19         A     No.

20         Q     Did you give any e-mail or written

21    instruction from Dan Ellis to preserve documents

22    with regard to Ms. Trawick?

23         A     I don't remember.

24         Q     But you did not preserve anything?

25              MR. GERAKITIS:  Object to the form.

Richard Hare                 Trawick v. Carmike Cinemas, Inc.                 April 10, 2018

```
 1              THE WITNESS:  I don't remember.
 2    BY MS. PREBULA:
 3         Q     Did you make any copies of any electronic
 4    files to preserve with regard to Ms. Trawick?
 5         A     I don't recall.
 6         Q     Did you make any paper copies of any
 7    documents with regard to Ms. Trawick?
 8         A     I don't recall.
 9         Q     Did you turn any documents or data over to
10    anyone before you left Carmike with regard to Ms.
11    Trawick?
12         A     I left all my documents that I had.  All
13    my CFO office documents were left in my office my
14    last day of, whenever that was, in December of 2016.
15         Q     When you say I left all my documents, are
16    you talking about paper files?
17         A     Paper, electronic.  When I left, I left,
18    you know, my office in tact with all the materials
19    that were there when I left.  I don't know what --
20    you know, where they are or what happened to them,
21    but.
22         Q     Were they boxed up?  And obviously I'm
23    talking about paper.
24         A     Yes.  I don't remember if they were boxed
25    up or if they were still in my desk in file -- yes.
```

**REGENCY-BRENTANO, INC.**

1       Q     You had a filing cabinet in your office?

2       A     I had a desk with a -- yes, I didn't have,

3   per se, a filing cabinet.  But I had a desk with

4   drawers that had files.

5       Q     Paper files?

6       A     Yes.

7       Q     So let me make sure I understand.  You

8   left your electronic documents there as well, and

9   then the computers were wiped and the ipad and

10  iphone were wiped and given back to you later?

11      A     Yes.

12      Q     Who returned those to you?

13      A     I think I went and picked them up from the

14  office.  I don't know, a week -- maybe a week or so

15  after the deal was closed.  Except for my phone, I

16  think I kept it the whole time.

17      Q     Who did you pick them up from?

18      A     I don't remember.  It may have been Tara

19  Hardwood, but I don't remember specifically.

20      Q     Were the operating programs also wiped

21  from the computer?

22      A     Yes.

23      Q     Do you recall the names of the files in

24  your drawers?

25      A     Most of the files that I had were all

```
 1   historical earnings release and conference calls
 2   books dating back 10 plus years.  So each quarter,
 3   part of my job was quarterly financial reporting and
 4   doing earnings calls.  So most of my files were in
 5   that regard.
 6        Q    Did you have any source documents or
 7   back-up documents for the internal audit report you
 8   referenced with regard to Ms. Trawick?
 9        A    No.
10        Q    Did you make any effort to preserve those
11   after this lawsuit was filed?
12        A    I don't remember.
13        Q    Now, when you say internal audit report,
14   tell me what you're talking about.
15        A    There was an internal audit report -- the
16   internal audit report that I reviewed yesterday was
17   from Fred Friedl's office and it was regarding, I
18   believe, a review of Crystal Trawick's expenses.
19        Q    What was the form of that report?  Did it
20   say internal audit report across the top?
21        A    I don't remember.  I'd have to look at it.
22        Q    Had you seen it before yesterday?
23        A    I vaguely remember it.  I vaguely remember
24   there was an audit report.
25        Q    How did you get involved in -- if you
```

```
 1   were, in the internal audit?
 2        A    Can you repeat the question?
 3        Q    Well, let's take it two-fold.
 4             Were you involved in the internal audit or
 5   did you just receive a report?
 6        A    I received a report from the internal
 7   audit department.
 8        Q    Were you involved in doing that audit?
 9        A    I, as -- the CFO's office is not involved
10   in the auditing of that report or the actual work of
11   that report.  That was produced by the internal
12   audit department.
13        Q    So that's a no, you were not involved in
14   doing that audit?
15             MR. GERAKITIS:  Object to the form.
16             THE WITNESS:  I don't understand the
17        question.
18   BY MS. PREBULA:
19        Q    Well the question was, were you involved
20   in doing the audit of Ms. Trawick.  And I believe I
21   understood your testimony that the answer is no, you
22   were not.
23        A    The internal audit department did an audit
24   and I got the report.
25        Q    So you didn't actually do any part of the
```

```
 1   audit?

 2        A    I did not audit Ms. Trawick.  The internal

 3   audit department did an audit.

 4        Q    Did you meet with Ms. Trawick about that

 5   audit?

 6        A    I don't recall.

 7        Q    When do you recall first having any

 8   knowledge of this audit at all?

 9        A    I remember the issue coming up.  The issue

10   was raised by our head of internal audit, Fred

11   Friedl, that he had come across some stuff that he

12   was going to take a look at.  And he told me it was

13   expenses related to charitable contributions and he

14   was going to take a look at it and let me know what

15   he found.

16        Q    When was that?

17        A    I don't remember specifically.  He

18   generated that report.

19        Q    Are you saying Mr. Friedl generated a

20   report?

21        A    Well, Mr. Friedl's office.  Melanie

22   reports -- reported -- the person that wrote the

23   report worked for Mr. Friedl.

24        Q    Do you remember Melanie's last name?

25        A    I don't.
```

1      Q      Powell, does that ring a bell?

2      A      It does ring a bell, yes.

3      Q      Do you think that's it?

4      A      I guess, yes.  Yes.

5      Q      Did Mr. Friedl ask you to be involved in

6   that report at all?

7      A      I'm not sure I understand what you mean by

8   involved.

9      Q      Did you do anything other than receive the

10  report from Mr. Friedl's office?

11     A      I remember Mr. Friedl making me aware of

12  the situation and what he was going -- and what his

13  next steps were.  And I told him to let me know --

14  when you get done, let me know what the results are.

15     Q      So did you anything other than receive the

16  report?

17     A      With regard to what?

18     Q      The internal audit.

19     A      No.  The internal audit department is a

20  separate function.  In a public company, that

21  internal audit reports actually to the audit

22  committee with a dotted line to me.

23     Q      Was it Carmike's policy -- you recall this

24  report was done before Ms. Trawick was terminated

25  November 2015, correct?

1       A     I don't recall when she was terminated or

2   when that report was released.

3       Q     You know the report was generated before

4   she was terminated, right?

5       A     I do not know that.

6       Q     Okay.

7       A     I don't remember the specific dates.

8       Q     Were you involved in the termination of

9   Ms. Trawick?

10      A     What do you mean by involved?  I'm not

11  sure I understand the question.

12      Q     Did you have any involvement at all,

13  review, meetings, conferences, telephone calls,

14  conversations, anything that involvement normally

15  means in the termination of Ms. Trawick?

16          MR. GERAKITIS:  Object to the form.

17          THE WITNESS:  I do remember that Crystal

18      reported to Fred Van Noy.  And I do remember we

19      had usually weekly meetings with the executive

20      team, with David Passman, in his office.  We'd

21      have a lunch and we would go over important

22      issues in the company.  And I remember we had a

23      policy that any types of terminations needed to

24      be discussed in those meetings.  And I remember

25      Fred bringing it up and I remember we all

1     discussed it.

2  BY MS. PREBULA:

3     Q     Did you make the decision to terminate Ms.

4  Trawick?

5     A     I did not.

6     Q     Did Mr. Passman make the decision to

7  terminate Ms. Trawick?

8     A     I believe it was a group decision.

9     Q     Did Ms. --

10    A     Fred -- I would -- normal protocol would

11 be, since Crystal reported up to Fred, the normal

12 protocol would be for the -- whoever, the executive

13 that this relates to, which would be Fred, would

14 state the fact pattern, what the situation was, and

15 what his opinion was, and we would go around and

16 discuss it.

17    Q     Did Mr. Van Noy make the recommendation

18 that Ms. Trawick be terminated?

19    A     I don't recall specifically if he made the

20 recommendation.  I do remember it was all discussed

21 in that meeting.

22    Q     And did Mr. Passman ultimately make the

23 decision to terminate her?

24    A     I don't know if he made the ultimate

25 decision.  I do know it was discussed and there was

```
 1   no objection to the recommendation.

 2         Q     Have you read any of the depositions in

 3   this case?

 4         A     I have not read.  I have looked at -- I'm

 5   trying to remember whose I looked at.  I've looked

 6   at Jim Lucas's deposition.

 7         Q     How did you come to review Mr. Lucas's

 8   deposition?

 9         A     I obtained it from Mr. Gerakitis.

10         Q     Have you read any other depositions in

11   this case?

12         A     No.

13         Q     At the time you had this discussion with

14   the group about the termination of Ms. Trawick, was

15   it discussed that Ms. Trawick had made requests for

16   promotions prior to this investigation?

17         A     I don't remember.

18         Q     Was it discussed in this group meeting

19   that Ms. Trawick had made requests for pay raises?

20         A     I don't recall.

21         Q     Was it discussed that Ms. Trawick had

22   discussed the glass ceiling at Carmike for women

23   with Mr. Passman before this investigation?

24         A     I don't recall.

25         Q     Was it discussed that any other women who
```

1   had made allegations of harassment or discrimination

2   had subsequently been terminated as a result of a

3   similar investigation?

4        A    I don't remember that.

5        Q    Was it disclosed by Mr. Passman that he

6   had on more than one occasion, prior to this

7   investigation, discussed with Ms. Trawick that it

8   was harder for women at Carmike?

9        A    I don't remember that.

10       Q    You stated that there was a policy that

11  terminations were discussed in meetings.  Was that a

12  written policy?

13       A    I don't remember it being a written

14  policy.  I remember it being a policy that we had

15  with the executive team.

16       Q    And is it your understanding that the

17  policy was that any termination at Carmike would be

18  discussed by the executive team?

19       A    It was more if you had a direct report or

20  somebody -- either a direct report or maybe one

21  below that, that needed to be -- we needed to kick

22  that around.  We needed to make -- you know, we

23  needed to put all our heads together on it.

24       Q    Was it discussed at the meeting when Ms.

25  Trawick's termination came up that Mr. Van Noy had

 1    said he would never promote her?

 2        A     I don't remember that.

 3        Q     Was it discussed at that group meeting

 4    that Ms. Trawick had been requesting to be made a

 5    director since she was performing those duties?

 6        A     I don't recall.

 7        Q     So, was there anything discussed about Ms.

 8    Trawick's performance, or claims, or treatment at

 9    Carmike, other than the internal audit at that group

10    meeting?

11        A     The only thing I remember from that

12    meeting is that she was instructed not to discuss an

13    investigation of her expenses with others and that

14    she had broken that commitment and the

15    recommendation was to terminate her for violating

16    that.

17        Q     And had you been present when she was

18    allegedly instructed not to discuss an

19    investigation?

20        A     I was not present.

21        Q     So you never heard that?

22        A     That was -- not directly.  That was what I

23    heard from Fred Van Noy.

24        Q     Were you in the meeting with Ms. Trawick

25    when she was informed of an investigation?

1      A      No.

2      Q      Were you in the meeting with Ms. Trawick

3  when she was terminated?

4      A      No.

5      Q      Was it Carmike policy at the time that if

6  an employee was accused of issues with their expense

7  reports or other financial matters that they were to

8  be afforded the opportunity to respond?

9      A      I don't remember.

10      Q      Do you remember any written policies at

11  Carmike when you were there?

12      A      I'm sure we had an accounting manual

13  somewhere with policies in it.

14      Q      And that would be with the accounting

15  department, not for other employees?

16      A      That would be for the accounting

17  department.  I do remember there was an employee

18  handbook.  I remember that.

19      Q      Do you remember an employee handbook for

20  anyone other than theater employees?

21      A      I don't remember.  I just remember there

22  was an employee handbook.

23      Q      Did the employee handbook that you recall

24  include any financial policies that we have

25  discussed today and review policies?

1       A    I don't remember.  I just remember there

2   was an employee handbook.  I'm not sure of the

3   contents of it, but I do remember we had one.

4       Q    And you think there is an employee

5   handbook for the general corporate office as opposed

6   to theaters and theater managers?

7       A    Again, I don't recall who it related to,

8   the field or corporate.  But I do remember there was

9   an employee handbook.

10       Q    Would the accounting manual that you

11   discussed have been provided to anybody who was not

12   in accounting or the controller department?

13       A    I don't remember who had it.  I would

14   assume the controller's office had an accounting

15   manual.

16       Q    But you did not?

17       A    No, I didn't.

18       Q    And Ms. Trawick would not have had that?

19       A    I don't know.  I wouldn't think she would.

20       Q    Was it given out to employees outside of

21   the controller department?

22       A    I don't know, but it probably would just

23   be related to the accounting department.

24       Q    And when we are using the term accounting

25   and controller, are you using them interchangeably?

 1        A     I'm not sure.

 2        Q     Are you making a distinction between the

 3   accounting department and the controller department?

 4        A     All the accountants report up to the

 5   controller.

 6        Q     So no, you're referring to that as the

 7   same department?

 8        A     Yes.

 9        Q     Were you asked to pull any documents or

10   have any of your staff pull any documents with

11   regard to any investigation of Ms. Trawick?

12        A     I was not asked to pull any documents.  I

13   don't know -- you know, the internal audit

14   department can ask anybody anything, but they didn't

15   ask me for any documents.

16        Q     And you don't know if your department was

17   asked for anything?

18        A     I don't know if my department was asked to

19   provide anything.

20        Q     Would you have normally maintained any

21   such documents when they were a meeting about

22   expenses or charitable contributions, or would they

23   have been in the accounting department?

24        A     I would not have kept them.  As a normal

25   matter of course, somewhere in the accounting

```
 1    department those things are coded to a line item, so
 2    there would be some back-up in terms of, you know,
 3    when bills are paid.  Those are somewhere -- stored
 4    somewhere.  And then, David Passman's assistant --
 5    and she was also my assistant, Lisa De La Cruz, kept
 6    up with the disbursements of a fund that we -- I
 7    think we called the benevolence fund or something
 8    like that.
 9         Q     What was the benevolence fund for?
10         A     Basically for charitable contributions and
11    community involvement, that type of stuff.
12         Q     So if someone wanted to make a charitable
13    contribution or a donation to a community group,
14    they would go to Lisa De La Cruz?
15         A     They would go to any executive.
16    Executives being direct reports to David Passman.
17    Those were myself, Fred Van Noy or Dan Ellis and --
18    or go to David and say, hey, I want you -- the
19    company to consider making a donation to this
20    particular group because of, you know, I'm involved,
21    or my spouse is involved, et cetera.
22         Q     Would you go through Lisa De La Cruz to
23    get to David Passman to do that?
24         A     I would not.  I would go directly to
25    David.
```

Richard Hare                  Trawick v. Carmike Cinemas, Inc.                  April 10, 2018

1        Q      Would other people go to Lisa De La Cruz?

2        A      I don't know.

3        Q      Well, you had to go through Lisa to make

4   an appointment to get to David, didn't you?

5        A      We could make one with him directly.  But,

6   it would not be unusual to go through Lisa to get an

7   appointment with David.

8        Q      To make a contribution to either a charity

9   or a community group, wouldn't Lisa De La Cruz get

10  the paperwork or the request, and then pass it on to

11  David?

12       A      I don't know specifically, but that -- I

13  don't know specifically.

14       Q      When you say Lisa De La Cruz kept up with

15  disbursements, what did you mean by that?

16       A      I believe she had a log of disbursements

17  that were made to these charities.  And so, if a

18  request came in for XYZ charity, you could easily

19  reference it and see if we have already donated to

20  that company.

21       Q      Are you limiting that list of

22  disbursements to charities or did that log also

23  include community groups?

24       A      They were -- if memory serves, they were

25  nonprofits, traditional nonprofits, schools, those

```
 1    types of donations.  There were no political

 2    donations.  It was all those types of things.  No

 3    political action committees.  They weren't

 4    organizational duties, per se.  It was things like

 5    the symphony, the chamber, those types of things.

 6         Q     And you think those were in the same log?

 7         A     Yes.

 8         Q     Is it your understanding that that's a

 9    handwritten log or an electronic log?

10         A     I remember it -- I don't remember

11    specifically.  But at one point, it may have been a

12    manual long.  I don't know if it was ever converted

13    over to a spreadsheet.

14         Q     Where do you recall seeing it?

15         A     Lisa De La Cruz had it in her office.

16         Q     And do you mean she had a paper file in

17    her desk that you saw?

18         A     Yes.

19         Q     Do you know where that document went?

20         A     No.

21         Q     Were there any written policies or

22    procedures as to requiring that there be a log of

23    these disbursements?

24              MR. GERAKITIS:  Object to the form.

25              THE WITNESS:  I think we kept -- well, we
```

1        a log or she kept a log so that we could keep

2        up with how much money was going out of the

3        fund and how much money was coming into the

4        fund.

5    BY MS. PREBULA:

6        Q    Right.  But was there any written or

7    verbal policy that she was required to keep that

8    log?

9        A    I don't recall.

10        Q    You did say you were familiar with the

11    Comdata system.  And Comdata was used to track and

12    approve all credit card expenses, right?

13        A    Yes.

14        Q    And there were -- so all expense records

15    made by anyone would go through that system?

16        A    That was the policy.  All travel and

17    expense reimbursements were to go through that

18    system.

19        Q    And someone would have to approve

20    everyone's expenses, correct?

21        A    Within that system, you were required to

22    have an approver set up in the system.

23        Q    And you had to have an approver in that

24    system, right?

25        A    I did, yes.

1    Q    Ms. Trawick had an approver in that
2  system, right?
3    A    She would have had -- any employee,
4  including Ms. Trawick, would have to have somebody
5  approve those expenses in order for them to go
6  through that system.
7    Q    Or they wouldn't be paid?
8    A    Or they would not be paid.  Well they were
9  already paid.  But the way that system was set-up
10  was the payments would go out before -- you could
11  have somebody sit on an expense report for three
12  months, but the invoices would still get paid
13  because they all come through a centralize process
14  so we --
15    Q    If they used the corporate credit card?
16    A    Yes.  So the corporate credit card bill
17  would be paid.  It wouldn't be held up because
18  somebody was late approving expenses.
19    Q    And if the expenses were not approved,
20  then they would not be paid or the company employee
21  would have to pay it back?
22    A    The company employee would technically
23  have to pay it back if there was unapproved expenses
24  or expenses that shouldn't have been paid that were.
25  But, if they were approved, that wouldn't kick it --

1    if they were approved in the Comdata system, that

2    was our policy.  I mean, that was -- the approval

3    was there.  There would be no way to prevent the

4    money from being paid out to the vendor.

5         Q    And who maintained the Comdata system?

6         A    I don't remember.

7         Q    Who set-up the approvals?

8         A    I don't remember.  Each department was

9    different, so when we set-up the system approvers

10   were determined and all that was, you know, approved

11   by the controller's office.  And, I believe our

12   internal audit department also looked at who the

13   approvers were to make sure we didn't have -- we

14   always have to have segregation of duties that --

15   you know, you had -- the proper person was approving

16   those expenses.

17        Q    So they know something about those

18   expenses?

19        A    Yes.

20        Q    Do you recall who Ms. Trawick's approver

21   was?

22        A    I do not.

23        Q    Would it have been her supervisor Mr. Van

24   Noy?

25        A    I don't know who it was.

1      Q      You were there when Terrell Mantent (sic)

2   was there, as well, right?

3      A      Yes.

4      Q      Do you know whether or not he was ever one

5   of her approvers?

6      A      I don't.

7      Q      You said you did not recall the Nexus

8   program.  Do you recall software used to assign

9   invoices and company expenses to the departments?

10          MR. GERAKITIS:  Object to the form.

11          THE WITNESS:  I don't.  I don't remember

12      that.  I'm trying to remember what Nexus is.  I

13      don't recall.  I might if you give me something

14      else that might jog my memory.

15   BY MS. PREBULA:

16      Q      Do you recall a separate software that

17   would assign the external invoices or expenses to

18   various departments?

19      A      I don't.

20      Q      Do you recall a system where invoices and

21   expenses had to good through that software in order

22   for accounts payable to pay those?

23      A      I don't.  But I do -- I believe, now that

24   you said accounts payable, I think Nexus may have

25   been our accounts payable system.  But I'm not sure

1   how -- the mechanics of it worked.

2        Q    Did you understand that someone had to

3   approve any expenses that went through that accounts

4   payable system?

5        A    Yes.  That would be standard practice.  In

6   order for an invoice to be paid, it would have to be

7   approved by the appropriate party.

8        Q    And when donations or sponsorships were

9   made to these community groups, would those go

10  through the accounts payable system or the Comdata

11  system?

12       A    I believe they -- I think there was -- let

13  me pause and think about that.  I don't believe they

14  would go through the Comdata system because that was

15  personal expenses -- expense reports.  I think

16  traditionally it would go through accounts payable.

17       Q    And each of those expenses or invoices,

18  including the donations, or sponsorships, or

19  charitable contributions, had to be approved by

20  someone before they were paid by accounts payable?

21       A    Any expense out of AP had to be approved

22  by somebody.  And I don't remember if the

23  benevolence fund ran through AP or not.  I believe

24  it did, but I'm not sure.

25       Q    If they wrote a check, it would go through

1   AP, wouldn't it?

2          MR. GERAKITIS:  Object to the form.

3          THE WITNESS:  I don't remember

4       specifically.  At some point in time, the

5       benevolence fund may have had an old fashioned

6       checkbook and we may have transitioned it on to

7       the automated accounts payable system at some

8       point over my 10 years there, or 11 years

9       there.

10  BY MS. PREBULA:

11      Q    And that would have been your

12  recommendation to put it on an automated system

13  where approvals were recorded in the system?

14      A    It would have been -- it's always a

15  good -- well, let me rephrase that.  I don't know if

16  it was my specific recommendation.  But it's always

17  better to automate systems and have those types of

18  processes in place versus a manual one.

19      Q    Other than the document that you referred

20  to as the internal audit report and Jim Lucas's

21  deposition, did you review any other documents in

22  preparation for the deposition today?

23      A    No.

24      Q    Did you review the complaint in this case?

25      A    No.

**REGENCY-BRENTANO, INC.**

```
 1        Q     How did you come to select Jim Lucas's
 2   deposition to read?
 3        A     I just needed a fresher on how depositions
 4   work and what to expect.
 5        Q     Have you had your deposition taken before?
 6        A     I've had my deposition taken before, yes.
 7        Q     When?
 8        A     I don't recall the specific date, but it
 9   was four -- three or four years ago.
10        Q     In what matter?
11        A     It was a personal matter between David
12   Passman and his now ex-wife.
13        Q     So you were deposed in the divorce case?
14        A     Yes.
15        Q     Why?
16        A     I do not know.
17        Q     Did you receive any questions in that
18   deposition with regard to Ms. Trawick?
19        A     No.
20        Q     Did you answer any questions in that
21   deposition with regard to Carmike's internal
22   operating procedures?
23        A     I don't remember.
24        Q     Did you answer any questions in that case
25   with regard to Mr. Passman's behavior toward female
```

1    employees?

2        A    I don't remember.

3        Q    Do you think that was about 2014?

4        A    Let's see --

5        Q    It 2018, but I think you said three or so

6    years ago so.

7        A    It was within two or three years of my

8    leaving Carmike, so in that time period.

9        Q    So not two or three years from today?

10       A    No, no.  It would be from 2016.

11       Q    So some time between 2013 and 2016?

12       A    Uh-huh.

13       Q    I'm sorry, was that a yes?

14       A    Yes, yes.

15       Q    Who took your deposition?

16       A    I don't remember.

17       Q    His then wife's lawyer?

18       A    Yes.

19       Q    Other than that, have you given any

20   deposition before?

21       A    No.

22       Q    Did you speak with anyone who had been at

23   Carmike with regard to this case since you left

24   Carmike?

25       A    No.

```
 1        Q     Have you talked with Mr. Lucas about this
 2   case?
 3        A     No.
 4        Q     Have you talked to Mr. Passman about this
 5   case?
 6        A     No.
 7        Q     Is there any reason why you did not go to
 8   AMC when the sale went through?
 9        A     Yes.
10        Q     What is that?
11        A     They already have a CFO.
12              MS. PREBULA:   Let's take a short break.
13              (WHEREUPON, A SHORT BREAK WAS
14        HAD IN THE DEPOSITION.)
15   BY MS. PREBULA:
16        Q     Mr. Hare, when you reviewed parts of Mr.
17   Lucas's deposition, what parts did you review?
18        A     I just scanned it.  I don't remember
19   specific parts.
20        Q     What does that mean?
21        A     I scanned the document to get a gist of
22   how depositions work, what types of -- how to answer
23   questions, how questions are asked, the decorum and
24   process of a deposition.
25        Q     Has that influenced your responses here
```

1    today?

2          A     No.

3          Q     Have you made any effort to make your

4    testimony consistent with that of Mr. Lucas?

5          A     No.

6          Q     Did you review the EEOC charge in this

7    case?

8          A     No.

9          Q     When Ms. Trawick filed her EEOC charge,

10   were you notified that she had filed a charge?

11         A     I don't remember.

12         Q     As you sit here today, you don't remember

13   hearing that Ms. Trawick filed a charge of

14   discrimination with the EEOC?

15         A     I don't.

16         Q     So when she filed the charge of

17   discrimination, did you get any directive or request

18   to preserve any documents?

19         A     I don't recall.

20         Q     Did you reserve any documents back in

21   2015?

22         A     I don't recall.

23         Q     While you were at Carmike, did Carmike

24   have a policy that in order to be a director that

25   one had to have a bachelor's degree?

```
 1        A    I don't remember any policy like that.
 2        Q    Were there, in fact, directors at Carmike
 3   who did not have bachelor's degrees while you were
 4   there?
 5        A    I'm not sure what you mean when you
 6   reference the term director.
 7        Q    The title of director at Carmike:
 8   Director of marketing, director of advertising,
 9   director of accounting, that specific position.
10        A    There were many people that had degrees
11   and many people who didn't have degrees that worked
12   at Carmike that I remember were directors.
13        Q    So that's a --
14        A    Or both, actually.
15        Q    So that's a yes?
16        A    Yes.
17        Q    And tell me who you recall were directors
18   or above who did not have a bachelor's degree?
19        A    Shannon Sailors, John Lundin, Fred Van
20   Noy.
21        Q    Anyone else?
22        A    I'm not sure if Patty Gattis a director,
23   but she didn't have a degree.  I don't believe Tara
24   Hardwick had one either.
25        Q    Did you have any conversation with Mr.
```

1   Passman with regard to him telling Ms. Trawick that

2   in order for her to be promoted to director she had

3   to complete her bachelor's degree?

4        A    I don't recall having a conversation of

5   that nature.

6        Q    And you don't recall that policy either,

7   correct?

8        A    I do not recall that policy.

9        Q    And there was certainly no such written

10  policy?

11       A    I'm not aware of any written policy that

12  indicated that.

13       Q    And you know Tara Hardwick was a director?

14       A    I don't know if she was or wasn't.  She

15  reported to Fred, so I didn't -- I don't know what

16  her specific title was.

17       Q    After Ms. Hardwick left, were there any

18  female directors reporting to Fred Van Noy?

19       A    I don't remember.  I don't remember his

20  specific organization chart or people that worked

21  for him.

22       Q    Was there anyone who maintained an

23  organization chart?

24       A    I don't remember.  I don't recall if --

25  that's traditionally, you know, an HR function,

 1   human resource function.

 2       Q    Because of the background noise, let me

 3   know if you can't hear me.  We'll try to speak up.

 4       A    Okay.

 5       Q    And you do not know whether Patty Gattis

 6   was a director or not?

 7       A    I don't know if she was a director or not,

 8   I don't.  I don't remember.

 9       Q    If I tell you that we have seen no

10   document that shows that she was ever a director,

11   does that refresh your recollection at all?

12       A    No.  I mean --

13       Q    Were you asked to investigate Thad Morton

14   while you were at Carmike?

15       A    No.

16       Q    Were you involved in any investigation or

17   review of Mr. Morton's expenses or funds?

18       A    No.

19       Q    Were you aware of that as part of the

20   executive committee?

21       A    I do remember there was some sort of

22   investigation on it, but I don't recall the

23   specifics.

24       Q    And Mr. Morton was a division manager,

25   correct?

 1      A     I don't remember what he was.  I remember
 2  he was in operations.  That's the extent of my
 3  recollection.  He worked in Fred's organization.  He
 4  may have been one or two people removed from Fred,
 5  but I don't remember specifics.
 6      Q     Okay.  Since there are two Freds, which
 7  Fred?
 8      A     Fred Van Noy.
 9      Q     You are aware that there was an
10  investigation of Mr. Morton, right?
11      A     I do remember there was some sort of
12  investigation or inquiry regarding his expenses.
13      Q     And Mr. Morton was allowed to respond to
14  that investigation, was he not?
15           MR. GERAKITIS:  Object to the form.
16           THE WITNESS:  I do not know if he was or
17      was not.  I was not a part of that.
18  BY MS. PREBULA:
19      Q     Was he terminated?
20      A     I do not -- I don't recall specifically.
21  But I don't -- I believe he was employed with the
22  company when we were sold to AMC.
23      Q     And so, you believe he was not terminated
24  as a result of the investigation of his expenses?
25      A     That's correct.

1      Q     Was this termination or proposed

2  termination discussed in the executive committee

3  meeting?

4           MR. GERAKITIS:  Object to the form.

5           THE WITNESS:  I don't recall the specifics

6      of what was said about him and his

7      investigation at our executive meeting.

8  BY MS. PREBULA:

9      Q     Did you make any recommendation as to

10  whether or not he should be terminated?

11     A     I don't recall the conversations about him

12  and that meeting.

13     Q     Do you recall when this occurred?

14     A     I do not recall when that occurred.

15     Q     But it was certainly before Ms. Trawick

16  was terminated, right?

17     A     I don't know that.  I don't know if it was

18  before or after.

19     Q     Were you asked to participate in any

20  investigation of Shannon Sailors?

21     A     No.

22     Q     At the time that you received the internal

23  audit report with regard to Ms. Trawick's expenses,

24  did you receive a similar report from Mr. Sailors?

25     A     I did not receive a report from the

1    internal audit department on Mr. Sailors.

2        Q    Did you receive an internal audit report

3    on Mr. Van Noy?

4        A    I did not receive a report from the

5    internal audit department on Mr. Van Noy.

6        Q    Is it your understanding that both of

7    those individuals approved various expenses that Ms.

8    Trawick submitted?

9        A    My understanding is that her expenses were

10   approved by either Shannon Sailors or Fred Van Noy.

11       Q    And were either of those individuals

12   terminated as a result of that investigation?

13       A    No.

14       Q    Have you been asked to participate in any

15   investigation of expenses or credit card usage other

16   than the ones we have just mentioned?

17       A    I have not been asked to be a part of any

18   investigation, including the ones you have just

19   mentioned.

20       Q    Have you been asked to review any such

21   investigation for anyone other than Ms. Trawick?

22            MR. GERAKITIS:  Object to the form.

23            THE WITNESS:  Can you repeat the question?

24   BY MS. PREBULA:

25       Q    Have you been asked to review the results

1   of such investigation for anyone other than Ms.

2   Trawick?

3        A    Over the years at Carmike, I have read

4   multiple internal reports and I can't remember

5   specifics on all the ones that I have read over the

6   years.

7        Q    In any of those internal audit reports,

8   has every employee been given the opportunity to

9   respond to the charges other than Ms. Trawick?

10       A    I don't -- I can't -- can you repeat that

11   again?

12       Q    Has every employee, where you have read

13   internal audit reports, other than Ms. Trawick,

14   given an opportunity to respond to the charges?

15            MR. GERAKITIS:  Object to the form.

16            THE WITNESS:  I'm not sure I can answer

17       that.  There are lots of internal audit reports

18       and they cover a wide range of issues,

19       including account balances.  You know, they're

20       not all regarding personal expense reports.

21   BY MS. PREBULA:

22       Q    So with regard to any internal audit

23   reports concerning personal expense reports, has

24   every employee except Ms. Trawick been given the

25   opportunity to respond?

 1          MR. GERAKITIS:  Object to the form.

 2          THE WITNESS:  I don't know.

 3   BY MS. PREBULA:

 4      Q    Other than the executive committee and the

 5   one conversation you talked about earlier when Mr.

 6   Van Noy told you he was going to do an

 7   investigation, have you discussed the investigation

 8   into Ms. Trawick's expense reports with anyone else?

 9          MR. GERAKITIS:  Object to the form.

10          THE WITNESS:  Did you mention Fred Van Noy

11      then?  Repeat your question.

12   BY MS. PREBULA:

13      Q    I did.  You're right.  It was Fred Friedl,

14   wasn't it?

15      A    Yes.  Can you just go back?

16      Q    Absolutely.  Other than the conversation

17   where Fred Friedl and the executive committee, have

18   you discussed the investigation into Ms. Trawick

19   with anyone else?

20      A    No.

21      Q    Did you discuss it with Mr. Friedl on more

22   than one occasion?

23      A    I don't remember specific conversations

24   with Fred Friedl.

25      Q    When this investigation occurred into Ms.

1   Trawick, did you receive an internal audit report on

2   Crystal De La Cruz?

3       A    I don't recall seeing any reports from

4   Fred Friedl's office on Lisa De La Cruz.

5       Q    You know, I apologize.  I know a Crystal

6   De La Cruz and I said that every time.  I meant Lisa

7   De La Cruz.  Do you understand that?

8       A    Yes.

9       Q    Were you asked to review any investigation

10  or any expenses of Ms. De La Cruz?

11      A    No.

12      Q    Were you ever told the specific

13  allegations made to or about Ms. Trawick?

14      A    Yes.

15      Q    What were you told?

16      A    I was told that Fred Van Noy -- well, let

17  me back up.  Can you repeat the question?

18      Q    Were you told the specific allegations

19  made against Ms. Trawick with regard to her expense

20  reports?

21      A    I don't believe there were specific

22  allegations made to Ms. Trawick.  There was an audit

23  report that indicated further review and

24  clarification was required on certain expenses and

25  they needed to be looked at.

1      Q     And did that further review ever occur?

2      A     I don't remember.

3      Q     You didn't do it?

4      A     I did not.  I certainly -- well, let me

5  rephrase.  No, I did not.

6      Q     And you were not involved in providing her

7  any documents or discussing it with her on any

8  occasion?

9      A     The internal audit report was issued.

10 Further investigation was warranted.  Based on my

11 discussions with Fred Van Noy, he instructed her to

12 not discuss it with anyone.  She breached that

13 agreement with him and the decision was made to

14 terminate her.

15     Q     And you are relying on Mr. Van Noy for

16 having said that?

17     A     Yes.

18     Q     You didn't hear that?

19     A     I did not hear the directly.

20     Q     And you don't know what words were used or

21 what she understood?

22     A     That's correct.

23     Q     And as I understood you, you did not make

24 any recommendation one way or the other as to

25 whether she should be terminated?

**REGENCY-BRENTANO, INC.**

```
1        A    I agreed with the executive team.  It was

2   that -- based on the facts and circumstances, she

3   should be terminated.

4        Q    Based upon what Mr. Van Noy said?

5        A    Yes.

6        Q    But you didn't talk to Ms. Trawick?

7        A    I did not.

8        Q    And you didn't give her a chance to

9   explain?

10            MR. GERAKITIS:  Object to the form.

11            THE WITNESS:  Ms. Trawick worked for Mr.

12       Van Noy.

13   BY MS. PREBULA:

14        Q    I understand that.  But you didn't talk to

15   her and you didn't give her a chance to explain, did

16   you?

17            MR. GERAKITIS:  Object to the form.

18            THE WITNESS:  What's the question?

19   BY MS. PREBULA:

20        Q    You did not talk to Ms. Trawick and give

21   her a chance to explain --

22            MR. GERAKITIS:  Objection.  Go ahead.

23   BY MS. PREBULA:

24        Q    -- what she understood or what

25   instructions she understood she had received?
```

```
 1              MR. GERAKITIS:  Object to the form.

 2              THE WITNESS:  I did not speak to Mrs.

 3         Trawick before or after her termination.

 4    BY MS. PREBULA:

 5         Q    And you relied solely on Mr. Van Noy?

 6              MR. GERAKITIS:  Object to the form.

 7              THE WITNESS:  I relied totally on Mr. Van

 8         Noy for what?  I don't understand the question.

 9    BY MS. PREBULA:

10         Q    For saying that he had instructed her not

11    to discuss the investigation and that she had done

12    so?

13         A    Yes.  I relied on Mr. Van Noy.  I worked

14    with him for many years and never doubted his word.

15         Q    And when you were asked in the executive

16    committee to agree with her termination, no one

17    discussed with you any claims of discrimination,

18    right?

19         A    I don't recall any -- I don't recall

20    claims of discrimination.

21         Q    Mr. Passman didn't tell you that?

22         A    Is the question did Mr. Passman --

23         Q    Mr. Passman didn't tell you that she had

24    made claims of discrimination to him, correct?

25              MR. GERAKITIS:  Object to the form.
```

 1            THE WITNESS:  I don't recall Mr. Passman

 2       indicating to me that she had made any

 3       representations of discrimination.  I don't

 4       remember that.

 5  BY MS. PREBULA:

 6       Q    Did you ever see the report that Sadie

 7  Marshall prepared with regard to women promotions

 8  and salaries at Carmike?

 9            MR. GERAKITIS:  Object to the form.

10            THE WITNESS:  I don't recall seeing any

11       report from Sadie regarding that matter.

12  BY MS. PREBULA:

13       Q    Did the executive committee request that

14  Ms. Marshall prepare such a report?

15            MR. GERAKITIS:  Object to the form.

16            THE WITNESS:  I don't recall the executive

17       team requesting that report from -- or a report

18       of that type from Sadie.

19  BY MS. PREBULA:

20       Q    Did Ms. Marshal prepare such a report and

21  asked to discuss it with the executive committee

22  team?

23            MR. GERAKITIS:  Object to the form.

24            THE WITNESS:  I don't recall Sadie making

25       that type of request.

```
 1   BY MS. PREBULA:
 2       Q    I asked you if you had received a report
 3   on Ms. De La Cruz.  She was not terminated, was she?
 4       A    Ms. De La Cruz was not -- was with the
 5   company until it was sold by AMC.
 6            MR. GERAKITIS:  Sold by or sold to?
 7            THE WITNESS:  Yes.  Ms. De La Cruz was
 8       with the company until such time it was sold to
 9       AMC.
10   BY MS. PREBULA:
11       Q    I understood the response.
12       A    Yes.
13       Q    Was there a payroll schedule for each
14   position at Carmike corporate?
15       A    I don't remember there being a payroll
16   schedule for each specific person or position at
17   Carmike.
18       Q    Was there a range of pay for each level of
19   position at Carmike?
20       A    I don't -- I don't recall having -- I
21   don't recall that being the case.
22       Q    Did you have to sign-off on any pay raises
23   or bonuses?
24       A    I had to sign-off on pay raises and
25   bonuses for people within my -- that reported to me
```

```
 1    or indirectly to me.
 2         Q    And for Ms. Trawick, you had no such
 3    responsibility?
 4         A    No.
 5         Q    That would have been Mr. Van Noy?
 6         A    Yes.
 7         Q    And then ultimately Mr. Passman?
 8         A    Mr. Van Noy would make recommendations.
 9    They would be accumulated and our controller would
10    accumulate all the bonus information.  And then, he
11    and I would sit down with Mr. Passman and review it.
12         Q    And would Mr. Passman ultimately make the
13    decision as to what was approved and what wasn't?
14         A    For some level employees, yes.  For
15    others, it went to the compensation committee of the
16    board of directors.
17         Q    For Ms. Trawick, would that be made by Mr.
18    Passman?
19         A    That decision would be made by --
20    ultimately by Mr. Van Noy and Mr. Passman would have
21    to approve it.
22         Q    So Mr. Van Noy would make the
23    recommendation and Mr. Passman would have to approve
24    bonuses or salary increases for Ms. Trawick?
25         A    Yes.
```

1      Q      Would that also be true for Mr. Sailors?

2      A      Yes.

3      Q      That Mr. Van Noy would make the

4  recommendation and Mr. Passman would have to approve

5  it?

6      A      Yes.

7      Q      I think you said Shannon Sellers.  You

8  meant Shannon Sailors, right?

9      A      Yes.

10      Q      Would it also be true that Mr. Passman

11  would have to approve bonuses or pay increases for

12  Mr. Van Noy or would that go to the compensation

13  committee?

14      A      The company engaged a compensation

15  consultant which helped us determine what

16  recommendations to make to the audit committee for

17  the compensation structure for the executive team.

18  And with that consultation, we would present it to

19  the compensation committee for their review and

20  comments.

21      Q      I think in your response you said for the

22  audit committee.  You meant the compensation

23  committee?

24      A      For compensation matters, it would be the

25  compensation committee.

1    Q    And who did the consultant review; what

2  level?  You said executive team.  Is that just the

3  ones you have named earlier?

4    A    Yes.  It would be the individuals included

5  in the company's proxy statement.  So it would be

6  the top five salaried individuals at Carmike.

7    Q    And were they all vice-president or above?

8    A    Yes.

9    Q    Were there any women in that group?

10   A    No.

11   Q    And there were never any women in that

12 group the entire time you were at Carmike; is that

13 correct?

14   A    That is correct.

15   Q    Were you on the executive committee when

16 the decision was made not to promote Ms. Marshall to

17 vice-president?

18        MR. GERAKITIS:  Object to the form.

19        THE WITNESS:  I don't recall those

20     conversations.

21 BY MS. PREBULA:

22   Q    Okay.

23   A    Or that conversation.

24   Q    You do know that Ms. Marshall was passed

25 over and an outside male was hired as vice-president

1   of human resources, right?

2           MR. GERAKITIS:  Object to the form.

3           THE WITNESS:  I do recall another

4       individual coming into the company.  I believe

5       he may have been a vice-president.  I can't

6       recall his name.

7   BY MS. PREBULA:

8       Q    Of human resources?

9       A    Yes.

10      Q    And he was brought in over Ms. Marshall?

11      A    That's correct.

12      Q    When the executive committee was taking

13  the input from Mr. Van Noy with regard to whether or

14  not to terminate Ms. Trawick, was human resources

15  brought in?

16      A    Dan Ellis was over human resources, so

17  effectively HR was represented in that decision.

18      Q    Your general counsel is who you're

19  referring to, Dan Ellis?

20      A    That's correct.

21      Q    Was Ms. Marshall brought in on that

22  decision?

23      A    I don't know.

24      Q    Did you have any conversations with her?

25      A    With Ms. Marshall?

1       Q      Correct.

2       A      I don't recall any.

3       Q      Was there any report received from human

4    resources with the executive committee with regard

5    to whether or not to terminate Ms. Trawick?

6       A      I don't recall any.

7       Q      And you didn't talk with Ms. Marshall

8    personally about this termination of Ms. Trawick,

9    did you?

10      A      I don't recall speaking with her.

11      Q      When you use the term you don't recall,

12   does that mean you don't think you did or you just

13   don't remember one way or the other?

14      A      I don't think I did.

15      Q      When you were referring to the audit

16   department, is that the same department as the

17   compliance department?

18      A      It is.

19      Q      Do you know what the official name of that

20   department is?

21      A      I don't know the official name.  It was

22   referred to as the compliance department and the

23   internal audit department.

24      Q      And that was Mr. Friedl?

25      A      Yes.

1    Q    Who maintained records for that

2  department?

3    A    Mr. Friedl would be the person that would

4  maintain any records regarding internal audit

5  matters.

6    Q    Do you know where those were maintained?

7    A    No.

8    Q    Do you know if they were computerized?

9    A    I don't know.

10    Q    When you saved documents to "my

11  documents", did you have a separate file or folder

12  for your documents?

13    A    I don't know.  I just saved things in "my

14  documents".

15    Q    Did you have a system where you could pull

16  up other people's documents that were saved to that

17  server?

18    A    I don't know if there was a way to do

19  that.

20    Q    You never did that?

21    A    No.

22                    (PLAINTIFF'S EXHIBIT 37 WAS

23                     IDENTIFIED.)

24  BY MS. PREBULA:

25    Q    Let me show you what's previously been

1    marked as Plaintiff's Exhibit 37.  Take a look at

2    that document.

3              Have you seen this document before?

4        A    I have.

5        Q    When you referred to an employee manual,

6    is this the document to which you were referring?

7        A    No.

8        Q    Okay.  You believe there is a separate

9    employee manual for corporate employees of Carmike

10   when you were there?

11       A    I believe there was an employee manual.

12   I'm not sure if it was for corporate employees or

13   for the field.  But I do remember a manual.

14       Q    Did you review this document while you

15   were an employee?

16             MR. GERAKITIS:  Referring to 37?

17             MS. PREBULA:  The only one he has in front

18        of him, yes.

19             THE WITNESS:  Did I review this?

20   BY MS. PREBULA:

21       Q    Yes.

22       A    Yes, I believe I reviewed it as a matter

23   of course.  I think we had to look at it annually

24   and sign it and send it back to HR.  I also believe

25   it may have been on our website, too.  I think it

1  may be a public document, as well.

2      Q    What do you mean a public document,

3  because it's on the website?

4      A    Because it -- yes.  And it may have been

5  filed with the SEC at some point as it is a code of

6  conduct for officers, directors and employees, which

7  is very important for corporate governance matters.

8      Q    And you believe that you reviewed and

9  signed this every year?

10     A    I believe that it was done on an annual

11 basis and that -- I'm not sure if all employees had

12 to sign it or just executive officers.  But I

13 remember signing this annually.

14     Q    Well, the front page says code of conduct

15 for officers, directors and employees, right?

16     A    Indeed it does.

17     Q    And then if you look on page two, Roman

18 numeral two, it says that this applies to all

19 employees and members of the board of directors of

20 Carmike Cinemas.  Do you see that?

21     A    Roman numeral two?

22     Q    Yes.

23     A    Okay.

24     Q    Okay.

25     A    Yes, I see it.

**REGENCY-BRENTANO, INC.**

1    Q    Having reviewed that, is it your

2 understanding this applied to every one?

3    A    Well, you're asking me two things.  A,

4 this document does apply to the people specified in

5 that paragraph under Roman numeral two.  But I don't

6 know if our HR department required just officers, or

7 me to sign this, or if everybody had to sign it

8 every year.  I can't speak to their enforcement of

9 the policy.

10    Q    Okay.  You understood it was a policy and

11 it actually appears in Roman numeral 2-A-2 if you

12 want to review that?

13    A    Yes.

14    Q    So does that refresh your recollection

15 that managers, level employees and above had to sign

16 this every year?

17         MR. GERAKITIS:  Object to the form.

18         THE WITNESS:  I don't know if -- the

19    policy indicates they are to do that every

20    year.  I don't know if that was indeed the

21    case.

22 BY MS. PREBULA:

23    Q    You just know you did it sometimes?

24    A    I know I did it.

25    Q    Okay.  Was this policy ever updated

1    through the website?

2         A    I don't know.

3         Q    Are you aware of any other version of this

4    codes of conduct, other than what you see as

5    Plaintiff's Exhibit 37?

6         A    I am not aware of any, other than what I'm

7    seeing in front of me.

8         Q    If you would look at page three.  I'm

9    looking at item C-1.  It says it applies to

10   managers, directors, vice-presidents and senior

11   vice-presidents.  It says that you should insure

12   that subordinates understand the code, know they

13   must comply with the code and take prompt action to

14   correct any code violation.  Do you see that?

15        A    Yes.

16        Q    Was that your understanding at the time

17   when you were employed at Carmike?

18        A    Yes.

19        Q    Did anyone at Carmike ever have any

20   sessions with any employee to explain this code, to

21   your knowledge?

22        A    I believe, on an annual basis, this was

23   sent out.  I know I got it.  So, it was sent out and

24   each department head or manager would make sure that

25   employees got this, understood it and signed it and

1    sent it back.

2        Q    Are you saying that actually occurred or

3    that's what should have occurred?

4        A    I'm saying that's what I assume occurred.

5        Q    Did you ever do that?

6        A    I did with my staff.  I made sure that

7    they understood it.

8        Q    Did you actually have a session with your

9    staff where you went over the code of conduct?

10       A    I would have sessions -- I would have

11   staff meetings, periodic staff meetings, and if this

12   was coming around the corner I would say, don't

13   forget about the code of conduct.

14       Q    Did you actually go over the contents of

15   the code of conduct with your staff?

16       A    I don't remember.

17       Q    If you would -- I know you looked through

18   it briefly.  Other than this document, which does

19   not appear, and correct me if I'm wrong, to contain

20   a harassment or discrimination policy -- well, let's

21   just answer that question.  Does this document

22   contain a harassment or discrimination policy?

23            MR. GERAKITIS:  Object to the form.

24            THE WITNESS:  I don't know.  I just

25       scanned it.  I mean, I can read it.

 1   BY MS. PREBULA:

 2       Q    I will submit to do you it doesn't it.  I

 3   have not seen it anywhere.

 4            Are you aware whether or not Carmike had a

 5   harassment or discrimination policy?

 6            MR. GERAKITIS:  Object to the form.

 7            THE WITNESS:  I don't recall if we had a

 8        written policy regarding what you just

 9        described.

10   BY MS. PREBULA:

11       Q    Meaning you just don't recall one way or

12   the other, or you don't recall it existing?

13       A    I don't recall it one way or the other if

14   there was a written policy on sexual harassment.  I

15   do recall there was heightened awareness of it and

16   there was training in the field.  I remember we had

17   a hotline number that we advertised a lot in break

18   rooms, even on paystubs, about if you see anything

19   regarding multiple types of issues, theft,

20   harassment, XYZ, here is the hotline, report it.

21       Q    Do you know where that was written?

22       A    The hotline number?

23       Q    No.  You said you had a policy and it was

24   written if you see theft, harassment, XYZ.

25       A    Yes.  I remember it being on paystubs.

```
 1   Sometimes it'd be on your paystub.  Sometimes I
 2   remember it in the break room.  I remember we talked
 3   about it at our audit committee meetings because all
 4   of the -- that hotline number was for anything
 5   that -- you could report anything on the hotline
 6   number.  So, we had a firm that would take the
 7   hotline calls, would put out a report of what the
 8   information was, what's being reported.  It went to
 9   HR, and our general counsel saw it and our audit
10   committee chairman saw it, too.  So, there was full
11   transparency on anything reported.
12        Q    When was -- the hotline reports, were they
13   in writing?
14        A    Yes.
15        Q    And they were sent to the executive
16   committee?
17        A    They were not sent to the executive
18   committee.  They were sent to HR's office, primarily
19   our general counsel, and it was sent -- my
20   understanding, it was also sent to our audit
21   committee chair person who was on our board of
22   directors.  So you had everything reported from, you
23   know, my paycheck is short five bucks to, you know,
24   any type of claim.  That was the reporting mechanism
25   that we had within the company.  I felt like we
```

```
 1   really pushed it.  I know our HR team did.

 2        Q    You said there was training for the

 3   fields.  When you mean in the field, you're talking

 4   about theater managers and theater staff?

 5        A    I do remember -- yes, I remember that, and

 6   I think we had it at the corporate office, too.  And

 7   I can't remember the law firm we hired, but we

 8   brought in a firm and they would show, you know,

 9   sexual harassment, what is it, what does it look

10   like.  It would be a video that would go through

11   role playing and show people what is appropriate,

12   what is not appropriate, those type of things.

13        Q    Do you remember when this occurred?

14        A    I don't remember specifically.

15        Q    Were Mr. Van Noy and Mr. Passman in those

16   video training sessions?

17        A    I don't recall.

18        Q    Now, you said it was in the break room.

19   Where was that?

20        A    The break room was on the second or -- let

21   me think.  I was on the fourth floor.  It was on the

22   third floor in the corporate office.

23        Q    And what was that?  You said it was

24   posted.  What was that?

25        A    Well, there is a bulletin board in the
```

1   break room that would have all your postings like

2   that.  It would have minimal wage postings, your

3   government-type postings.  Minimum wage, you know,

4   all that type of stuff.  It'd have everything from

5   that to anything the employees were promoting, you

6   know, charitable events, et cetera.

7        Q    What did it say?

8        A    You know, I don't remember specifically,

9   but it would say something along the lines of,

10  please report any issues to our hotline.  Then it

11  would have a hotline number.  It's like a 1-800

12  number.  You would see that.  We would go out in the

13  field and we would see -- you know, that was one of

14  the things you would see out in the field, too.  We

15  visited theaters a lot.

16       Q    How often did you get these hotline

17  reports?

18       A    I didn't get them.  Our general counsel

19  got them and our audit committee chairman got them.

20  I would get a report of them on a quarterly basis at

21  our audit committee meetings.  It would be reported

22  to the audit committee.

23       Q    So you got them -- you were on the audit

24  committee?

25       A    I presented to the audit committee as the

Richard Hare                  Trawick v. Carmike Cinemas, Inc.                  April 10, 2018

```
1    CFO, so I was at the meetings.
2         Q    You would see them quarterly?
3         A    Quarterly or I would hear -- get a verbal
4    report on them quarterly.
5         Q    And do you know how often they went to HR
6    or the audit committee?
7         A    Audit committee, I think it was a
8    quarterly basis.  You know, to HR, I believe it was
9    a monthly basis.
10        Q    Who maintained the copies of those
11   reports?
12        A    I believe it was our general counsel's
13   office.
14        Q    Would human resources also have copies?
15        A    I don't know specifically.  I would
16   presume so.
17        Q    Okay.  When you say that you had an
18   employee handbook, can you tell me what its title
19   was?  We have seen one related to theater employees.
20   Can you tell me what you say the employee handbook
21   is?
22        A    I just remember it being an older handbook
23   that had been accumulated over the years.  I'm not
24   sure if it had been updated.  But I just remember
25   there being one and I don't recall if it was
```

```
 1    specifically to employees in the field or to the

 2    office but.

 3         Q    I gather you didn't keep a copy of it?

 4         A    No.

 5              MS. PREBULA:  I think now is a good time

 6         to take a quick lunch break.

 7              (WHEREUPON, A SHORT LUNCH BREAK WAS

 8         TAKEN IN THE DEPOSITION.)

 9    BY MS. PREBULA:

10         Q    Mr. Hare, before we broke you were telling

11    me that you had a training for harassment

12    discrimination.  Were there written materials for

13    that in addition to the video?

14         A    I believe there was.

15         Q    Who arranged that?

16         A    Our HR department arranged it and they

17    had -- I can't remember the law firm.  They had an

18    outside law firm that came in and did all that.

19         Q    When is the last time you remember that

20    training occurring?

21         A    I don't remember the last time.  I can't

22    recall specifics.

23         Q    How much before you left?

24         A    I don't remember.

25              Here is one thing I do remember.  I think
```

```
 1    they updated the videos.  I do remember that so.

 2        Q    Were all corporate office employees in

 3    that meeting?

 4        A    I don't remember.

 5        Q    You also said that there was an 800

 6    number.  Is it your understanding that that's the

 7    only way that an employee could report

 8    discrimination or harassment?

 9        A    No.  That was a way.

10        Q    What were the other ways?

11        A    Report to your supervisor, or anybody for

12    that matter.

13        Q    And once those reports were made to a

14    supervisor, did a supervisor have a duty to

15    investigate it?

16             MR. GERAKITIS:  Object to form.

17             THE WITNESS:  I don't know.  I'm not a

18        lawyer.

19    BY MS. PREBULA:

20        Q    Well, I'm not asking you for a legal

21    opinion.

22             But let me direct your attention to page

23    18 of your code of conduct, which is Plaintiff's

24    Exhibit 37.

25        A    Okay.
```

```
 1        Q    I'm looking at paragraph C.  Obligation to
 2   act?
 3             MR. GERAKITIS:  Page 18?
 4             MS. PREBULA:  Yes.
 5             THE WITNESS:  Okay.
 6   BY MS. PREBULA:
 7        Q    The first section requires you to bring
 8   any potential conflict of interest, business ethic
 9   questions or concerns, to the attention of your
10   supervisor, the business compliance officer.  Do you
11   see that?
12        A    Yes.
13        Q    If you look at the bold in the center of
14   the page it says, if you suspect or discover illegal
15   or unethical behavior at Carmike Cinemas, including
16   violations of laws, rules, regulations or this code,
17   you must notify management immediately.  Do you see
18   that?
19        A    I do.
20        Q    So having seen that, if harassment or
21   discrimination was reported to a supervisor, did
22   they have a duty to notify management?
23        A    They are required under this policy to act
24   and to report it by one of these methods listed on
25   page 18 of this policy.
```

1    Q    And it goes further in the last paragraph

2  on the page, third sentence.  In addition reports

3  can be made to the business ethics committee

4  regarding laws and regulations, fair dealing with

5  people outside the company, conflicts of interest,

6  use of company information and resources, equal

7  employment opportunity, health and safety,

8  accounting, auditing or financial reporting or any

9  other ethics or compliance issue, correct?

10        A    You lost me.

11        Q    Last paragraph.

12        A    Page 18?

13        Q    Third sentence.

14        A    Okay.  Third sentence.

15        Q    Yes.  In addition?

16        A    Okay.  That's -- I was looking at line --

17  addition to -- okay.  I read it.

18        Q    So once any supervisor, or vice-president,

19  or director, or anyone had any knowledge of unequal

20  pay, they had a duty to report it, right?

21             MR. GERAKITIS:  Object to the form.

22             THE WITNESS:  I don't know about unequal

23        pay, but it looks like if there is --

24  BY MS. PREBULA:

25        Q    You're aware there is an equal pay act in

1    this country?

2         A    Let me reread the sentence.

3         Q    Sure.  Take your time.

4         A    Repeat the question.

5         Q    Once a supervisor or above became aware of

6    a violation of unequal pay, they had a duty to

7    report it?

8              MR. GERAKITIS:  Object to form.

9              THE WITNESS:  If a situation presented

10        itself where they felt like laws and

11        regulations were being broken, fair dealings

12        with people outside the company, if there was a

13        conflict of interest or use of company

14        information resources, equal opportunity

15        employment, health and safety, accounting,

16        auditing, financial or other ethics or

17        compliance issues, then they had a duty to

18        report it.

19   BY MS. PREBULA:

20        Q    So if a supervisor became aware of

21   discrimination or harassment, they had a duty to

22   report it?

23             MR. GERAKITIS:  Object to the form.

24             THE WITNESS:   I don't know if the two

25        things you just mentioned fall into this

1      category or not.  I'm not a lawyer.

2    BY MS. PREBULA:

3        Q    Your training didn't show you that

4    harassment and discrimination are covered under the

5    equal employment opportunity?

6              MR. GERAKITIS:  Object to the form.

7    BY MS. PREBULA:

8        Q    He can answer.  It either did or didn't.

9        A    I don't understand the question.

10       Q    When you received the EEO training through

11   the firm and the videos, did they discuss that

12   harassment and discrimination were enforced by the

13   equal employment opportunity commission?

14       A    I don't remember what was -- I don't

15   remember what they went over.

16       Q    Was it your understanding while you were

17   an officer at Carmike that if you became aware of

18   discrimination or harassment you had a duty to

19   report it?

20             MR. GERAKITIS:  Object to the form.

21             THE WITNESS:  Yes.

22   BY MS. PREBULA:

23       Q    Is it further your understanding that the

24   company had a no retaliation policy, right?

25       A    Yes.

1      Q      If you look at D, which is on page 19, it

2   says Carmike Cinemas will take appropriate action

3   against any director or employee whose actions are

4   found to violate the policies set fourth in our code

5   or any other policies of the company.  Do you see

6   that?

7      A      I do.

8      Q      To your knowledge, while you were at

9   Carmike, was any director or above disciplined for

10  violation of any policy?

11     A      I don't remember.

12     Q      When you read that sentence it says, set

13  forth in our code, which is Plaintiff's Exhibit 37,

14  and any other policies of the company.  What did

15  understand that referred to?  That's a bad question.

16     A      I'm sorry.  Can you reference what you're

17  talking about?

18     Q      Look at the first sentence under D.

19     A      Okay.

20     Q      What are the any other policies of the

21  company?

22     A      The way I read this sentence, it would be

23  any other policies beyond the one that we are

24  reading right now.

25     Q      And what would that be?

1      A     Off the top of my head, I don't know.

2      Q     You're not aware of any other written

3   policies of the company, right, other than the

4   employee handbook you referenced?

5      A     I really don't remember where our policies

6   were documented.

7      Q     Was this Plaintiff's Exhibit 37 updated

8   while you were there?

9      A     I don't recall specifically.  It may have

10  been over a course of 10 years that I was there.

11  It's very common to review and update codes of

12  conduct, other public documents that were on our

13  website to be in compliance with SEC, NASDAQ, et

14  cetera.

15     Q     In addition to all of the other places

16  where we have talked that you could report, could

17  persons also report violations of policy, including

18  second sexual harassment discrimination to human

19  resources?

20     A     Yes.

21                    (PLAINTIFF'S EXHIBIT 39 WAS

22                     IDENTIFIED.)

23  BY MS. PREBULA:

24     Q     Let me show you what's previously been

25  marked Plaintiff's Exhibit 39.  Let me know when

 1   you're ready.

 2        A    Okay.

 3        Q    Do you recognize this as Information

 4   Technology & Security User Policy Handbook?

 5        A    I see that is what it says, yes.

 6        Q    Does that mean you have not seen it

 7   before?

 8        A    I don't remember seeing this.

 9        Q    It shows on the front that it was revised

10   February 19, 2013.  Do you see that?

11        A    I do.

12        Q    And then on the third page in, it shows a

13   revision history.

14        A    Okay.

15        Q    Did you ever see such a revision history

16   for Plaintiff's 37, the code of conduct?

17        A    I have not.

18        Q    Did you receive any of the revisions that

19   are noted on page -- third page?

20        A    I don't remember.

21        Q    Did you take your laptop out of the

22   office?

23        A    Yes.

24        Q    Did you take your ipad out of the office?

25        A    Yes.

```
 1        Q     Your apps were personal, right, on the
 2   ipad?
 3        A     Yes.
 4        Q     Would you look at what says page two on
 5   the bottom right, but it's about the fifth page in.
 6   It has Roman numeral five in the center of the page.
 7        A     Okay.
 8        Q     Roman numeral five says, computer
 9   equipment should not be removed from Carmike's
10   premises without written authorization from the IT
11   department.  Was that policy followed?
12        A     I don't know.
13        Q     Did you have written authorization from
14   the IT department to remove your laptop?
15        A     I don't recall.
16        Q     Did you have -- if you will look at the
17   second bullet point it says, users shall not modify
18   Carmike computer equipment in any manner, including
19   but not limited to adding software of any kind,
20   attaching external disk drives or external hard
21   drives, et cetera.  Did you have permission to add
22   personal apps to your ipad?
23              MR. GERAKITIS:  Object to form.
24              THE WITNESS:  I don't recall.
25
```

```
 1  BY MS. PREBULA:
 2       Q    Was that policy followed?
 3       A    I don't recall.
 4       Q    Did you ever have an occasion to be beware
 5  of Carmike accessing someone's personal e-mail
 6  account through any of the computer equipment issued
 7  by Carmike?
 8       A    I'm not aware of Carmike accessing any
 9  individuals' personal e-mail accounts.
10       Q    You understood that they could do that,
11  right, if they were on the corporate equipment?
12       A    I did not.
13       Q    Were your laptop and PC protected by
14  passwords?
15       A    Yes.
16       Q    Who assigned the passwords?
17       A    I don't remember on the computer.  But I
18  think the ipad -- I think ipads, employees could
19  determine their passwords I think on the computer
20  laptops and work stations.  I remember those
21  passwords had to change frequently and I think you
22  could -- I think the user was prompted to change
23  them to whatever that user wanted within certain
24  parameters.
25       Q    Other than Plaintiff's Exhibit 37 and
```

1    Plaintiff's Exhibit 39, and the employee handbook

2    that you told me you think exists, are you aware of

3    any other written policies that Carmike had between

4    2013 and 2015?

5         A    I don't have specific recollection of any

6    others.

7                        (PLAINTIFF'S EXHIBIT 38 WAS

8                        IDENTIFIED.)

9    BY MS. PREBULA:

10        Q    Let me show you what's been marked

11   previously as Plaintiff's Exhibit 38.  Do you

12   recognize the form of that document?

13        A    I do not.

14        Q    I will submit to you Shannon Sailor's

15   identified this as his signature and it says Carmike

16   prohibits sexual harassment.  Do you recall if there

17   was a similar form for discrimination?

18        A    I do not recall.

19        Q    Have you ever seen this before?

20        A    I don't recall seeing this.

21        Q    And I take it then you don't recall ever

22   signing a document like this?

23        A    I don't.  I don't recall.

24        Q    And the way you're saying that, are you

25   saying that you don't recall -- you think you did

```
 1    not or that you don't recall one way or the other?

 2              MR. GERAKITIS:  Object to form.

 3              THE WITNESS:  I don't remember this

 4         document.

 5    BY MS. PREBULA:

 6         Q    Was this what was posted on the bulletin

 7    board?

 8         A    I don't recall this document being posted

 9    on the bulletin board.

10                   (PLAINTIFF'S EXHIBIT 40 WAS

11                    IDENTIFIED.)

12    BY MS. PREBULA:

13         Q    Let me show you what's been marked

14    previously as Plaintiff's Exhibit 40.

15         A    Okay.

16         Q    Have you seen this document before?

17         A    I don't recall seeing this document.

18         Q    You're not shown as a CC on it?

19         A    I am not.  It appears to be from Fred Van

20    Noy to either his direct reports or his direct and

21    indirect reports.  And copied -- it looks like the

22    CC is our head of -- was our head of our internal

23    audit and compliance department.

24         Q    Did you have any input into preparation of

25    this document?
```

1     A     I don't recall being involved with this

2  document.

3     Q     Prior to this -- and it's an e-mail.  When

4  you said from Fred Van Noy, it's an e-mail from Fred

5  Van Noy to those folks, right?

6     A     It is.

7     Q     Prior to November 12, 2015, was there any

8  written policy on credit card usages?

9     A     I don't remember if we had a manual with

10  the policy in it.  I don't recall.  I don't know.

11     Q     Do you recall any written policy on credit

12  card usage prior to the issuance of this e-mail on

13  November 12, 2015?

14     A     I do remember tightening on up on these

15  controls over the years.  When I first came to

16  Carmike, we didn't have a computerized approval

17  process.  It was people would just turn in their

18  corporate credit card bill and supervisors would

19  sign it.  So, I do remember going from that manual

20  process to the computerized, but I don't remember if

21  Fred Friedl and the compliance department issued any

22  type of guidelines or not.  I don't remember.

23     Q     Do you have copies of any such guidelines?

24     A     I do not have any Carmike documents.

25     Q     Have you personally seen any written

1    policies on credit card usage prior to today?

2        A    No, I haven't seen any.

3        Q    Similarly, are you aware of any written

4    policies on expenses?

5        A    I don't recall any written policies on

6    expenses or where they would be housed.  If we had

7    them, they would have come out of -- the compliance

8    department would have released them.

9        Q    But you don't recall any?

10       A    I don't.

11       Q    Okay.

12       A    And no written ones.

13                     (PLAINTIFF'S EXHIBIT 89 WAS

14                     IDENTIFIED.)

15   BY MS. PREBULA:

16       Q    Let me show you what's been marked as

17   Plaintiff's Exhibit 89.  Take a second to look at

18   this.

19            MR. GERAKITIS:  Haven't we used this?

20            MS. PREBULA:  You have.  I haven't.  It's

21       your old Exhibit 34.

22            MR. GERAKITIS:  I'll make a copy.

23            (WHEREUPON, A SHORT BREAK WAS HAD

24       IN THE DEPOSITION.)

25   BY MS. PREBULA:

1        Q      Looking at Plaintiff's Exhibit 89, take a

2    look at it and let me knowledge when you're ready.

3        A      I'm ready.

4        Q      So when you referred to an internal

5    auditing report, is this the document that you're

6    referring to?

7        A      It is, but it looks like there is maybe

8    some other stuff behind here, too.  It looks like

9    some e-mails, so I haven't looked at these e-mails.

10   I have seen this seven page memo.

11       Q      So the last two pages that are attached to

12   Plaintiff's Exhibit 89 are an e-mail that you have

13   not seen before?

14       A      No, I have not.

15       Q      So when you were referring to the internal

16   auditing report, you were referring to the pages

17   that are numbered in the bottom right corner 178

18   through 184?

19       A      Yes.

20       Q      And is this the document that says that

21   you understood said that further investigation was

22   warranted?

23       A      Yes.

24       Q      If you will look at the first page, it

25   says continues on neck page.

 1        A     Uh-huh.

 2        Q     The pages are number consecutively.  Was

 3   there another page to this document?

 4        A     I don't think so.

 5        Q     I think you have answered this question,

 6   but now that you have it in front of you, did you

 7   investigate or have any input into any of the

 8   contents of Plaintiff's Exhibit 89?

 9        A     No.

10        Q     Plaintiff's Exhibit 89 is dated

11   November 6, 2015, right?

12        A     It is.

13        Q     And Ms. Trawick was terminated

14   November 15th, 2015?

15            MR. GERAKITIS:  Object to form.

16            THE WITNESS:  I don't recall when she was

17        terminated.

18   BY MS. PREBULA:

19        Q     You don't recall at all?

20        A     Not the date, no.

21        Q     You know it was shortly after this with

22   was issued?

23        A     I don't know if it was before or after

24   this was issued.

25        Q     And do you know whether it was before or

```
 1   after she had conversations with Mr. Passman about
 2   the glass ceiling at Carmike?
 3              MR. GERAKITIS:  Object to the form.
 4              THE WITNESS:  I'm not aware of those
 5         conversations.  And if they occurred, I would
 6         not know when they occurred.
 7   BY MS. PREBULA:
 8         Q    Is there any other document you received
 9   or reviewed that you are referring to as an internal
10   auditing report?
11         A    Not in reference to --
12         Q    Crystal Trawick?
13         A    -- Crystal Trawick.
14         Q    Is there any document that you have
15   reviewed or received that is a follow-up to
16   Plaintiff's Exhibit 89?
17         A    No, not that I can recall.
18         Q    Was there any written policy at Carmike
19   with regard to airline travel or hotel expenses
20   prior to Ms. Trawick's termination?
21         A    I don't remember specifically.  I do
22   remember there was some stuff coming out of the
23   internal audit department or the compliance group
24   where travel -- what's the word -- travel policy.  I
25   don't know if it was ever issued.  I don't remember
```

```
 1   if it was issued.  I don't remember if it was

 2   replacing an older version.  But I do remember that

 3   was something that Fred Friedl and his group were

 4   working on at some point that has nothing to do with

 5   this.

 6        Q    And do you know whether or not such policy

 7   existed prior to Ms. Trawick's termination?

 8        A    I do not.  I do not recall.

 9        Q    Are you aware of any written policy with

10   regard to airline travel or hotel expenses prior to

11   Ms. Trawick's termination?

12        A    I don't recall specific written guidelines

13   on airfare.

14        Q    Have you reviewed any notes of any

15   individual that had any meeting with Ms. Trawick in

16   the last month she was there?

17        A    No.

18        Q    Were you tasked with, or anyone tasked

19   with, pulling any of the back-up documents with

20   regard to Plaintiff's Exhibit 89?

21             MR. GERAKITIS:  Object to form.

22             THE WITNESS:  I was not asked.  I do not

23        know who Fred and/or Melanie asked to pull

24        information or if they pulled it themselves.

25   BY MS. PREBULA:
```

**REGENCY-BRENTANO, INC.**

1      Q    And you are not aware of any document

2  where Ms. Trawick was given the opportunity to

3  respond to Plaintiff's Exhibit 89, correct?

4           MR. GERAKITIS:  Object to the form.

5           THE WITNESS:  I am not aware of any type

6      of correspondence of that nature.

7  BY MS. PREBULA:

8      Q    When you left Carmike, did you receive a

9  severance package?

10     A    I did.

11     Q    And did your severance package include a

12 provision prohibiting you from cooperating in any

13 lawsuit against Carmike?

14          MR. GERAKITIS:  Object to the form.

15          THE WITNESS:  Can you repeat the question?

16 BY MS. PREBULA:

17     Q    Sure.  Did the severance package that you

18 received from Carmike prohibit you from cooperating

19 in any lawsuit against Carmike?

20     A    Not that I'm aware of, and that document

21 is public record.  My severance agreement is public

22 record and it's been filed with the SEC.

23     Q    Are you aware of any prohibition that

24 Carmike made to you to prohibit you from cooperating

25 in any lawsuit against Carmike?

```
 1            MR. GERAKITIS:  Object to the form.
 2            THE WITNESS:  I am not familiar with
 3        any -- I'm not familiar with any -- well, I
 4        don't know.  That document is publicly
 5        available.
 6   BY MS. PREBULA:
 7        Q    If you breach any provision of the
 8   severance agreement, do you have to pay any
 9   severance funds back to Carmike?
10        A    I don't know.
11            MS. PREBULA:  That's all I have for you
12        today.  I appreciate your time.
13            MR. GERAKITIS:  No questions.
14            MS. PREBULA:  I'd like this transcribed.
15        Format, both; hard copy and electronic.
16            MR. GERAKITIS:  Same.
17            (WHEREUPON, THE DEPOSITION WAS
18        CONCLUDED AT 1:12 P.M.)
19            (PURSUANT TO RULE 30(e) OF THE FEDERAL
20        RULES OF CIVIL PROCEDURE AND/OR O.C.G.A.
21        9-11-30(e), SIGNATURE OF THE WITNESS HAS BEEN
22        RESERVED.)
23
24
25
```

```
1                C E R T I F I C A T E

2    STATE OF GEORGIA )

3    COUNTY OF HALL   )

4            I hereby certify that the foregoing

5        transcript was taken down, as stated in the

6        caption, and the proceedings were reduced to

7        typewriting under my direction and control.

8            I further certify that the transcript is a

9        true and correct record of the evidence given

10       at the said proceedings.

11           I further certify that I am neither a

12       relative or employee or attorney or counsel to

13       any of the parties, nor financially or

14       otherwise interested in this matter.

15           This, the 18th day of April, 2018.

16

17       _____
         MICHELLE J. RUIZ
18       CERTIFIED COURT REPORTER, B-1397

19

20

21

22

23

24

25
```

```
 1                    DISCLOSURE OF NO CONTRACT

 2          I, Michelle J. Ruiz, Certified Court
       Reporter, do hereby disclose pursuant to
 3     Article 10.B of the Rules and Regulations of
       the Board of Court Reporting of the Judicial
 4     Council of Georgia that I am a Georgia
       Certified Court Reporter; I was contacted by
 5     the party taking the deposition to provide
       court reporting services for this deposition; I
 6     will not be taking this deposition under any
       contract that is prohibited by O.C.G.A.
 7     15-14-37(a) and (b) or Article 7.C of the Rules
       and Regulations of the Board; and I am not
 8     disqualified for a relationship of interest
       under O.C.G.A. 9-11-28(c).
 9          There is no contract to provide reporting
       services between myself or any person with whom
10     I have a principal and agency relationship nor
       any attorney at law in this action, party to
11     this action, party having a financial interest
       in this action, or agent for an attorney at law
12     in this action, party to this action, or party
       having a financial interest in this action.
13     Any and all financial arrangements beyond my
       usual and customary rates have been disclosed
14     and offered to all parties.

15          This, the 18th day of April, 2018.

16

17

18          Michelle J. Ruiz
            Certified Court Reporter
19          Certificate Number B-1397

20

21

22

23

24

25
```

1          E R R A T A       S H E E T

2

3          I, the undersigned, RICHARD HARE,

4     do hereby certify that I have read the foregoing

5     deposition and that, to the best of my knowledge,

6     said deposition is true and accurate (with the

7     exception of the corrections listed below).

8

9        PAGE/ LINE CORRECTION

10    -------/--------------------------------------

11    -------/--------------------------------------

12    -------/--------------------------------------

13    -------/--------------------------------------

14    -------/--------------------------------------

15    -------/--------------------------------------

16    -------/--------------------------------------

17    -------/--------------------------------------

18    -------/--------------------------------------

19    -------/--------------------------------------

20    -------/--------------------------------------

21

22    -----------------      ---------------------------

      NOTARY PUBLIC           SIGNATURE

23

      DATE--------------

24

      MY COMMISSION EXPIRES:

25

Richard Hare        Trawick v. Carmike Cinemas, Inc.        April 10, 2018

**A**

**Absolutely** 71:16
**access** 28:1 29:6
  30:13,16,19,21
**accessing** 104:5,8
**account** 70:19
  104:6
**accountants** 50:4
**accounting** 48:12
  48:14,16 49:10,12
  49:14,23,24 50:3
  50:23,25 64:9
  97:8 98:15
**accounts** 57:22,24
  57:25 58:3,10,16
  58:20 59:7 104:9
**accumulate** 78:10
**accumulated** 78:9
  93:23
**accurate** 117:6
**accused** 48:6
**act** 96:2,23 97:25
**action** 1:5 53:3
  87:13 100:2
  116:10,11,11,12
  116:12,12
**actions** 100:3
**active** 14:23
**actual** 40:10
**ad** 17:20
**add** 103:21
**adding** 103:19
**addition** 94:13 97:2
  97:15,17 101:15
**advertised** 89:17
**advertising** 64:8
**advised** 12:3,5,5,6
**advising** 11:8
**affairs** 26:7
**affect** 21:18,21,24
  22:2
**afforded** 48:8
**afternoon** 23:20
**agency** 116:10
**agent** 116:11
**ago** 60:9 61:6
**agree** 75:16
**agreed** 74:1
**agreement** 4:11
  23:7,13 73:13
  113:21 114:8
**ahead** 29:20,21
  74:22
**airfare** 112:13
**airline** 111:19

112:10
**allegations** 46:1
  72:13,18,22
**allegedly** 47:18
**Allen** 8:19
**allowed** 67:13
**AMC** 8:9 11:3,8,17
  12:10 13:1 62:8
  67:22 77:5,9
**and/or** 10:11
  112:23 114:20
**annual** 85:10 87:22
**annually** 84:23
  85:13
**answer** 4:22 7:20
  12:11 22:21 23:4
  40:21 60:20,24
  62:22 70:16 88:21
  99:8
**answered** 110:5
**anybody** 49:11
  50:14 95:11
**AP** 58:21,23 59:1
**apologize** 32:23
  72:5
**appear** 88:19
**APPEARANCES**
  2:1
**appears** 86:11
  106:19
**Apple** 32:7
**applicable** 18:23
**applied** 17:21,22
  18:1 86:2
**applies** 85:18 87:9
**apply** 16:25 17:16
  17:19 86:4
**appointed** 9:10
**appointment** 9:14
  52:4,7
**appreciate** 114:12
**appropriate** 58:7
  91:11,12 100:2
**approval** 56:2
  107:16
**approvals** 56:7
  59:13
**approve** 10:8,12
  15:4,6 54:12,19
  55:5 58:3 78:21
  78:23 79:4,11
**approved** 11:19,20
  15:10 55:19,25
  56:1,10 58:7,19
  58:21 69:7,10
  78:13

**approver** 54:22,23
  55:1 56:20
**approvers** 56:9,13
  57:5
**approving** 55:18
  56:15
**approximately** 9:8
  9:19
**apps** 30:5,9,10,11
  103:1,22
**April** 1:13 4:1
  115:15 116:15
**arranged** 94:15,16
**arrangements**
  116:13
**Article** 116:3,7
**articulated** 16:2
**Arts** 14:10
**asked** 27:4 32:23
  50:9,12,17,18
  62:23 66:13 68:19
  69:14,17,20,25
  72:9 75:15 76:21
  77:2 112:22,23
**asking** 86:3 95:20
**assign** 57:8,17
**assigned** 104:16
**assistant** 51:4,5
**Associates** 2:4
**assume** 25:9,10
  49:14 88:4
**assumed** 12:20
**Atlanta** 1:16,24 2:5
  2:11 5:8
**attached** 109:11
**attaching** 103:20
**attending** 14:16
**attention** 15:11
  95:22 96:9
**attorney** 23:2
  115:12 116:10,11
**audit** 8:14,17 24:2
  26:12 39:7,13,15
  39:16,20,24 40:1
  40:4,7,8,12,14,20
  40:23,23 41:1,2,3
  41:3,5,8,10 42:18
  42:19,21,21 47:9
  50:13 56:12 59:20
  68:23 69:1,2,5
  70:7,13,17,22
  72:1,22 73:9
  79:16,22 82:15,23
  83:4 90:3,9,20
  92:19,21,22,23,25
  93:6,7 106:23

111:23
**auditing** 40:10 97:8
  98:16 109:5,16
  111:10
**authorization**
  103:10,13
**automate** 59:17
**automated** 59:7,12
**automatically** 29:8
**available** 114:5
**aware** 6:20 7:3,8,14
  7:18,21 19:3,13
  42:11 65:11 66:19
  67:9 87:3,6 89:4
  97:25 98:5,20
  99:17 101:2 104:8
  105:2 108:3 111:4
  112:9 113:1,5,20
  113:23
**awareness** 89:15
**a.m** 1:14

**B**

**b** 3:6 116:7
**bachelor's** 63:25
  64:3,18 65:3
**back** 32:9 38:10
  39:2 55:21,23
  63:20 71:15 72:17
  84:24 88:1 114:9
**backed** 34:12,20,23
  35:3
**background** 66:2
**back-up** 26:3 28:21
  29:25 31:23 32:3
  32:24 33:3 36:18
  39:7 51:2 112:19
**back-ups** 33:7
**bad** 100:15
**balances** 70:19
**bankers** 12:6
**based** 73:10 74:2,4
**basically** 16:5 51:10
**basis** 15:12 85:11
  87:22 92:20 93:8
  93:9
**behalf** 14:16,25
**behavior** 60:25
  96:15
**believe** 7:25 8:24
  10:9 14:11,13
  39:18 40:20 44:8
  52:16 56:11 57:23
  58:12,13,23 64:23
  67:21,23 72:21
  81:4 84:8,11,22

84:24 85:8,10
  87:22 93:8,12
  94:14
**bell** 42:1,2
**benevolence** 51:7,9
  58:23 59:5
**best** 117:5
**better** 59:17
**beware** 104:4
**beyond** 100:23
  116:13
**bill** 55:16 107:18
**bills** 51:3
**board** 8:14,18 9:2
  10:3 11:7,19 12:3
  12:5,7 78:16
  85:19 90:21 91:25
  106:7,9 116:3,7
**bold** 96:13
**bonus** 78:10
**bonuses** 9:24 10:13
  27:14 77:23,25
  78:24 79:11
**books** 39:2
**bottom** 103:5
  109:17
**boxed** 37:22,24
**breach** 114:7
**breached** 73:12
**break** 62:12,13
  89:17 90:2 91:18
  91:20 92:1 94:6,7
  108:23
**Brian** 5:2
**briefly** 88:18
**bring** 15:11 96:7
**bringing** 43:25
**broke** 94:10
**broken** 47:14 98:11
**brought** 81:10,15
  81:21 91:8
**bucks** 90:23
**building** 13:22
**bullet** 103:17
**bulletin** 91:25
  106:6,9
**business** 34:21 96:8
  96:10 97:3
**B-1397** 1:17 115:18
  116:19

**C**

**C** 3:1 96:1 115:1,1
**cabinet** 38:1,3
**called** 51:7
**calls** 39:1,4 43:13

90:7
caption 115:6
card 19:20 54:12
  55:15,16 69:15
  107:8,12,18 108:1
Carmike 1:7 5:19
  5:22,24 6:5,7,12
  6:18 7:6,9 8:7,9
  8:13 9:11 10:19
  11:3,17 13:13,15
  14:17,25 17:17,24
  20:11 21:11,13
  23:21 24:5,11,11
  24:18,25 25:4,8
  25:11 26:7 27:5
  29:3 31:3,18
  34:22 35:7 37:10
  45:22 46:8,17
  47:9 48:5,11 61:8
  61:23,24 63:23,23
  64:2,7,12 66:14
  70:3 76:8 77:14
  77:17,19 80:6,12
  84:9 85:20 87:17
  87:19 89:4 96:15
  99:17 100:2,9
  103:18 104:5,7,8
  105:3,15 107:16
  107:24 111:2,18
  113:8,13,18,19,24
  113:25 114:9
Carmike's 12:19
  42:23 60:21 103:9
case 22:9 27:8,11
  45:3,11 59:24
  60:13,24 61:23
  62:2,5 63:7 77:21
  86:21
cases 15:2,3
cash 11:11
category 99:1
CC 106:18,22
CCR 1:17
ceiling 45:22 111:2
center 96:13 103:6
central 27:22 34:5
  35:22
centralize 55:13
CEO 8:15 9:15
  10:14 11:8 15:11
  15:19 16:7,17,20
  16:22,23 17:9
  18:14,21
CEO's 15:10 17:11
certain 72:24
  104:23

certainly 65:9
  68:15 73:4
Certificate 116:19
Certified 1:22
  115:18 116:2,4,18
certify 115:4,8,11
  117:4
cetera 9:25 17:20
  51:21 92:6 101:14
  103:21
CFO 5:18 37:13
  62:11 93:1
CFO's 6:22 7:6,9
  7:17 40:9
chair 8:17 9:15
  90:21
chairman 8:14 9:3
  9:6,12 90:10
  92:19
chamber 14:13
  18:4 53:5
chance 74:8,15,21
change 104:21,22
Channel 30:7
charge 26:1 63:6,9
  63:10,13,16
charges 70:9,14
charitable 16:8,24
  17:1,19 18:1
  41:13 50:22 51:10
  51:12 58:19 92:6
charities 17:22
  52:17,22
charity 14:6,8 52:8
  52:18
chart 21:13 65:20
  65:23
Chase 14:10
check 58:25
checkbook 59:6
chief 5:14 8:7,12
  9:5,10 11:6 12:13
  12:15 15:4 21:8
Cinemas 1:7 7:10
  8:7,13 9:11 34:22
  85:20 96:15 100:2
circumstance 21:24
  22:1
circumstances 74:2
city 5:6
civic 14:11
CIVIL 1:5 114:20
claim 6:13,16,21
  7:3,15 90:24
claims 6:6,17,18
  47:8 75:17,20,24

clarification 72:24
clean 4:14 25:17,18
  28:18
clear 4:22
close 12:17
closed 38:15
coaching 22:23
code 85:5,14 87:12
  87:13,14,20 88:9
  88:13,15 95:23
  96:16 100:4,13
  102:16
coded 51:1
codes 87:4 101:11
Columbus 1:2 5:7
  5:10 14:4 18:7
Comdata 30:13,21
  30:24 31:2,7
  54:11,11 56:1,5
  58:10,14
come 41:11 45:7
  55:13 60:1 108:7
coming 7:5 41:9
  54:3 81:4 88:12
  111:22
comment 20:18
comments 79:20
commerce 14:13
  18:4
commission 11:23
  99:13 117:24
commitment 47:14
committee 8:14,17
  10:2,7,11 18:15
  18:22 42:22 66:20
  68:2 71:4,17
  75:16 76:13,21
  78:15 79:13,16,19
  79:22,23,25 80:15
  81:12 82:4 90:3
  90:10,16,18,21
  92:19,21,22,24,25
  93:6,7 97:3
committees 53:3
common 101:11
communication
  24:7
community 14:5,8
  14:24 16:10,13
  17:22 51:11,13
  52:9,23 58:9
community-related
  14:22
community-type
  17:20
company 5:12

12:17 19:20,24
  26:18,20,21,22
  29:23 42:20 43:22
  51:19 52:20 55:20
  55:22 57:9 67:22
  77:5,8 79:14 81:4
  90:25 97:5,6
  98:12,13 99:24
  100:5,14,21 101:3
company's 80:5
compensation 10:2
  10:7,11 78:15
  79:12,14,17,19,22
  79:24,25
complaint 59:24
complete 65:3
compliance 82:17
  82:22 96:10 97:9
  98:17 101:13
  106:23 107:21
  108:7 111:23
comply 87:13
comprised 10:3
computer 24:13,17
  24:18,20 25:15
  26:6,9,13 27:2,14
  30:20 32:4,15,21
  38:21 103:8,18
  104:6,17,19
computerized 83:8
  107:16,20
computers 38:9
concerning 70:23
concerns 96:9
CONCLUDED
  114:18
condition 21:23
  22:1
conduct 85:6,14
  87:4 88:9,13,15
  95:23 101:12
  102:16
conference 39:1
conferences 43:13
conflict 96:8 98:13
conflicts 97:5
consecutively 110:2
consider 51:19
consisted 9:3
consistent 63:4
consultant 79:15
  80:1
consultation 79:18
consummated
  11:21
contact 5:24 6:4,7

6:11,16 13:16,18
contacted 116:4
contain 27:23 28:5
  88:19,22
contents 49:3 88:14
  110:8
continues 109:25
contract 116:1,6,9
contribution 17:24
  18:1 51:13 52:8
contributions 16:9
  16:24 18:3,6
  41:13 50:22 51:10
  58:19
control 115:7
controller 27:20
  28:15 49:12,21,25
  50:3,5 78:9
controller's 27:18
  49:14 56:11
controls 16:8,24
  107:15
conversation 64:25
  65:4 71:5,16
  80:23
conversations
  43:14 68:11 71:23
  80:20 81:24 111:1
  111:5
converted 53:12
cooperating 113:12
  113:18,24
copied 106:21
copies 37:3,6 93:10
  93:14 107:23
copy 94:3 108:22
  114:15
corner 88:12
  109:17
corporate 1:23 6:1
  18:2 22:18 28:23
  49:5,8 55:15,16
  77:14 84:9,12
  85:7 91:6,22 95:2
  104:11 107:18
correct 6:14 8:2
  9:18 10:18 11:15
  13:14 17:15 20:22
  34:20 42:25 54:20
  65:7 66:25 67:25
  73:22 75:24 80:13
  80:14 81:11,20
  82:1 87:14 88:19
  97:9 113:3 115:9
CORRECTION
  117:9

**corrections** 117:7
**correspondence** 113:6
**Council** 116:4
**counsel** 2:1 22:14 22:15,18 81:18 90:9,19 92:18 115:12
**counsel's** 93:12
**country** 98:1
**COUNTY** 115:3
**course** 34:21 50:25 84:23 101:10
**court** 1:1,22 8:20 115:18 116:2,3,4 116:5,18
**cover** 70:18
**covered** 99:4
**credit** 19:19 54:12 55:15,16 69:15 107:8,11,18 108:1
**Cruz** 51:5,14,22 52:1,9,14 53:15 72:2,4,6,7,10 77:3 77:4,7
**Crystal** 1:4 4:10 13:21 14:21 39:18 43:17 44:11 72:2 72:5 111:12,13
**currently** 5:5,11
**customary** 116:13
**C-1** 87:9

**— D —**

**D** 100:1,18
**Dan** 16:3 36:21 51:17 81:16,19
**data** 25:14 26:3,6,9 27:4,8,10 28:16 28:23 29:25 33:8 37:9
**database** 27:22 28:5,9
**date** 60:8 110:20 117:23
**dated** 110:10
**dates** 43:7
**dating** 39:2
**David** 9:1,4,10 10:1 15:16,18 16:4,5,7 16:9,18,20,23 43:20 51:4,16,18 51:23,25 52:4,7 52:11 60:11
**day** 12:17 37:14 115:15 116:15

**day-to-day** 13:16 13:18
**De** 51:5,14,22 52:1 52:9,14 53:15 72:2,4,6,7,10 77:3 77:4,7
**deal** 38:15
**dealing** 36:7 97:4
**dealings** 98:11
**debt** 12:14,16,19,20
**December** 8:9 10:20 11:19 13:7 37:14
**decision** 44:3,6,8,23 44:25 73:13 78:13 78:19 80:16 81:17 81:22
**decorum** 62:23
**Defendant** 1:8 2:8
**degree** 63:25 64:18 64:23 65:3
**degrees** 64:3,10,11
**delete** 29:8
**deleted** 29:18 31:23
**department** 6:23 7:6,17 20:9 21:7 25:21 40:7,12,23 41:3 42:19 48:15 48:17 49:12,21,23 50:3,3,7,14,16,18 50:23 51:1 56:8 56:12 69:1,5 82:16,16,17,20,22 82:23 83:2 86:6 87:24 94:16 103:11,14 106:23 107:21 108:8 111:23
**departments** 57:9 57:18
**deponent** 22:16
**deposed** 60:13
**deposition** 1:11 4:2 22:5,11 23:24 24:7 45:6,8 59:21 59:22 60:2,5,6,18 60:21 61:15,20 62:14,17,24 94:8 108:24 114:17 116:5,5,6 117:5,6
**depositions** 23:18 45:2,10 60:3 62:22
**describe** 35:10
**described** 18:12,19 89:9

**desk** 37:25 38:2,3 53:17
**desktop** 34:2,6,7,16 34:16
**determine** 28:12 79:15 104:19
**determined** 56:10
**different** 56:9
**direct** 46:19,20 51:16 95:22 106:20,20
**direction** 115:7
**directions** 33:6
**directive** 63:17
**directly** 9:16 13:24 34:15 47:22 51:24 52:5 73:19
**director** 9:4 20:21 47:5 63:24 64:6,7 64:8,8,9,22 65:2 65:13 66:6,7,10 97:19 100:3,9
**directors** 8:14,18 10:4 11:7 64:2,12 64:17 65:18 78:16 85:6,15,19 87:10 90:22
**disbursements** 51:6 52:15,16,22 53:23
**disciplined** 100:9
**disclose** 116:2
**disclosed** 46:5 116:13
**DISCLOSURE** 116:1
**discover** 96:14
**discrimination** 6:5 6:13,17,18,21 7:4 7:15 46:1 63:14 63:17 75:17,20,24 76:3 88:20,22 89:5 94:12 95:8 96:21 98:21 99:4 99:12,18 101:18 105:17
**discuss** 44:16 47:12 47:18 71:21 73:12 75:11 76:21 99:11
**discussed** 43:24 44:1,20,25 45:15 45:18,21,22,25 46:7,11,18,24 47:3,7 48:25 49:11 68:2 71:7 71:18 75:17
**discussing** 73:7

**discussion** 45:13
**discussions** 11:7 73:11
**disk** 103:20
**disqualified** 116:8
**dissolved** 9:15
**distinction** 50:2
**DISTRICT** 1:1,1
**division** 1:2 34:4 66:24
**divorce** 60:13
**docking** 35:9,14
**document** 3:9,12 11:16,18 53:19 59:19 62:21 66:10 84:2,3,6,14 85:1,2 86:4 88:18,21 105:12,22 106:4,8 106:16,17,25 107:2 109:5,20 110:3 111:8,14 113:1,20 114:4
**documented** 101:6
**documents** 11:22 23:23 24:10 27:10 33:22,23,25 34:6 34:8,9,11,15,17 34:20,23 36:21 37:7,9,12,13,15 38:8 39:6,7 50:9 50:10,12,15,21 59:21 63:18,20 73:7 83:10,11,12 83:14,16 101:12 107:24 112:19
**doing** 39:4 40:8,14 40:20
**donated** 52:19
**donation** 17:18,24 18:23 51:13,19
**donations** 15:9 16:16,21 17:1,8 17:20 18:13,20 19:10,19 53:1,2 58:8,18
**dotted** 8:13 42:22
**doubted** 75:14
**drawers** 38:4,24
**drive** 34:8
**drives** 103:20,21
**duly** 4:5
**duties** 47:5 53:4 56:14
**duty** 95:14 96:22 97:20 98:6,17,21 99:18

**— E —**

**E** 3:1,6 115:1,1 117:1,1,1
**earlier** 10:19 71:5 80:3
**earnings** 39:1,4
**easily** 52:18
**EEO** 99:10
**EEOC** 63:6,9,14
**effectively** 81:17
**effort** 39:10 63:3
**either** 9:21,21 33:6 46:20 52:8 64:24 65:6 69:10,11 99:8 106:20
**electronic** 25:3 28:16 37:3,17 38:8 53:9 114:15
**Ellis** 16:3,15 36:21 51:17 81:16,19
**email** 2:6,11
**embraced** 16:11
**employed** 5:11 67:21 87:17
**employee** 3:8 48:6 48:17,19,22,23 49:2,4,9 55:3,20 55:22 70:8,12,24 84:5,9,11,15 87:20 93:18,20 95:7 100:3 101:4 105:1 115:12
**employees** 16:9,12 48:15,20 49:20 61:1 78:14 84:9 84:12 85:6,11,15 85:19 86:15 87:25 92:5 93:19 94:1 95:2 104:18
**employment** 97:7 98:15 99:5,13
**encouraged** 16:9
**enforced** 99:12
**enforcement** 86:8
**engaged** 79:14
**enter** 30:24
**entire** 80:12
**equal** 97:6,25 98:14 99:5,13
**equipment** 24:13 25:4 103:9,18 104:6,11
**Esq** 2:4,9
**establishing** 21:9
**et** 9:24 17:20 51:21

Richard Hare                     Trawick v. Carmike Cinemas, Inc.                     April 10, 2018

92:6 101:13
103:21
**ethic** 96:8
**ethics** 97:3,9 98:16
**events** 14:4,5,6,7,9
14:16 17:23 92:6
**everybody** 16:3
86:7
**everyone's** 54:20
**evidence** 115:9
**evolved** 16:19
**EXAMINATION**
3:2,2 4:7
**examined** 4:5
**Excel** 27:25 33:23
**exception** 117:7
**exchange** 11:22
29:2
**executive** 5:14 6:1
8:12 9:11 10:10
15:12 17:12 18:15
18:22 43:19 44:12
46:15,18 51:15
66:20 68:2,7 71:4
71:17 74:1 75:15
76:13,16,21 79:17
80:2,15 81:12
82:4 85:12 90:15
90:17
**Executives** 51:16
**Exhibit** 3:8,9,10,11
3:12 83:22 84:1
87:5 95:24 100:13
101:7,21,25
104:25 105:1,7,11
106:10,14 108:13
108:17,21 109:1
109:12 110:8,10
111:16 112:20
113:3
**EXHIBITS** 3:7
**exist** 9:7
**existed** 20:2,15
112:7
**existing** 89:12
**exists** 105:2
**expect** 60:4
**expense** 48:6 54:14
54:17 55:11 58:15
58:21 70:20,23
71:8 72:19
**expenses** 19:19
39:18 41:13 47:13
50:22 54:12,20
55:5,18,19,23,24
56:16,18 57:9,17

57:21 58:3,15,17
66:17 67:12,24
68:23 69:7,9,15
72:10,24 108:4,6
111:19 112:10
**expired** 9:12
**EXPIRES** 117:24
**explain** 74:9,15,21
87:20
**extent** 67:2
**external** 57:17
103:20,20
**extinguished** 12:20
**ex-wife** 60:12
**e-mail** 3:11 26:15
26:16,18,21,22,23
29:1,2,2,4,5,6,6,7
29:8,12,13 30:4
33:13,18 36:20
104:5,9 107:3,4
107:12 109:12
**e-mails** 27:1 109:9
109:9

---

**F**

**F** 115:1
**Facebook** 30:7
**fact** 44:14 64:2
**facts** 74:2
**fair** 97:4 98:11
**fall** 98:25
**familiar** 54:10
114:2,3
**far** 17:13
**fashioned** 59:5
**feature** 32:19
**February** 102:10
**FEDERAL** 114:19
**fee** 23:7,13
**felt** 90:25 98:10
**female** 60:25 65:18
**field** 49:8 84:13
89:16 91:3 92:13
92:14 94:1
**fields** 91:3
**fifth** 103:5
**file** 1:5 34:20 37:25
53:16 83:11
**filed** 11:13,22 39:11
63:9,10,13,16
85:5 113:22
**files** 34:22 37:4,16
38:4,5,23,25 39:4
**filing** 38:1,3
**financial** 5:15 8:7
9:5 11:6 12:13,15

15:5 20:6 21:8,10
26:7 27:13 28:6
39:3 48:7,24 97:8
98:16 116:11,12
116:13
**financially** 115:13
**fine** 29:21
**finish** 29:21
**fired** 8:4
**firm** 90:6 91:7,8
94:17,18 99:11
**first** 4:5 5:21 13:12
22:4 41:7 96:7
100:18 107:15
109:24
**five** 80:6 90:23
103:6,8
**floor** 91:21,22
**folder** 34:11 83:11
**folks** 107:5
**followed** 103:11
104:2
**follows** 4:6
**follow-up** 111:15
**foregoing** 115:4
117:4
**forget** 88:13
**form** 3:9,12 6:24
7:7,19 10:23
11:10,16 17:3
18:8,16,24 19:15
20:7,16 21:2 23:3
23:9 27:24 28:7
33:15 35:15 36:9
36:25 39:19 40:15
43:16 53:24 57:10
59:2 67:15 68:4
69:22 70:15 71:1
71:9 74:10,17
75:1,6,25 76:9,15
76:23 80:18 81:2
86:17 88:23 89:6
95:16 97:21 98:8
98:23 99:6,20
103:23 105:12,17
106:2 110:15
111:3 112:21
113:4,14 114:1
**Format** 114:15
**forth** 100:13
**forward** 15:19
**found** 41:15 100:4
**four** 16:19 60:9,9
**fourth** 91:21 100:4
**Fred** 9:4 16:3 24:5
39:17 41:10 43:18

43:25 44:10,11,13
47:23 51:17 64:19
65:15,18 67:4,7,8
69:10 71:10,13,17
71:24 72:4,16
73:11 106:19
107:4,4,21 112:3
112:23
**Freds** 67:6
**Fred's** 67:3
**frequently** 104:21
**fresher** 60:3
**Fried** 24:5 41:11
41:19,23 42:5,11
71:13,17,21,24
82:24 83:3 107:21
112:3
**Friedl's** 39:17
41:21 42:10 72:4
87:7 102:9 110:6
**full** 5:1 90:10
**function** 42:20
65:25 66:1
**fund** 51:6,7,9 54:3,4
58:23 59:5
**fundraising** 14:11
**funds** 66:17 114:9
**Furniture** 5:12
**further** 3:2 72:23
73:1,10 97:1
99:23 109:21
115:8,11

---

**G**

**gather** 94:3
**Gattis** 64:22 66:5
**general** 49:5 81:18
90:9,19 92:18
93:12
**generated** 41:18,19
43:3
**Georgia** 1:1,16,24
2:5,11 5:8,8,10
115:2 116:4,4
**Gerakitis** 2:9 6:24
7:7,19 10:23 17:3
18:8,16,24 19:1
19:15 20:7,16
21:2 22:12,13,15
22:19,22 23:1,3,9
23:11,14,19 24:6
28:7 33:15 35:15
36:9,25 40:15
43:16 45:9 53:24
57:10 59:2 67:15

68:4 69:22 70:15
71:1,9 74:10,17
74:22 75:1,6,25
76:9,15,23 77:6
80:18 81:2 84:16
86:17 88:23 89:6
95:16 96:3 97:21
98:8,23 99:6,20
103:23 106:2
108:19,22 110:15
111:3 112:21
113:4,14 114:1,13
114:16
**gist** 62:21
**give** 5:5 36:20 57:13
74:8,15,20
**given** 38:10 49:20
61:19 70:8,14,24
113:2 115:9
**giving** 21:21 22:2
**glass** 45:22 111:2
**go** 15:9 16:16,22
17:9,11 18:13,20
28:13 29:20,21
43:21 44:15 51:14
51:15,18,22,24
52:1,3,6 54:15,17
55:5,10 58:9,14
58:16,25 62:7
71:15 74:22 79:12
88:14 91:10 92:12
**goes** 97:1
**going** 4:12 5:25
17:17,23 19:10
22:20 33:7 41:12
41:14 42:12 54:2
71:6 107:19
**good** 57:21 59:15
94:5
**governance** 85:7
**government-type**
92:3
**Green** 14:12
**group** 20:4 44:8
45:14,18 47:3,9
51:13,20 52:9
80:9,12 111:23
112:3
**groups** 52:23 58:9
**guess** 42:4
**guidelines** 107:22
107:23 112:12

---

**H**

**H** 3:6 117:1
**HALL** 115:3

---

Richard Hare                    Trawick v. Carmike Cinemas, Inc.                    April 10, 2018

**hallways** 13:22
**handbook** 3:10
     48:18,19,22,23
     49:2,5,9 93:18,20
     93:22 101:4 102:4
     105:1
**handled** 19:10
**handwritten** 53:9
**happened** 12:14,16
     12:23 25:14 37:20
**harassment** 6:21
     7:4,15 46:1 88:20
     88:22 89:5,14,20
     89:24 91:9 94:11
     95:8 96:20 98:21
     99:4,12,18 101:18
     105:16
**hard** 103:20 114:15
**harder** 46:8
**Hardwick** 26:1
     64:24 65:13,17
**Hardwood** 38:19
**Hare** 1:12 3:3 4:2,4
     4:9 5:2,3 21:16
     23:18 62:16 94:10
     117:3
**Havertys** 5:12
     13:12
**head** 4:18 41:10
     87:24 101:1
     106:22,22
**heads** 46:23
**health** 97:7 98:15
**hear** 66:3 73:18,19
     93:3
**heard** 4:10 47:21,23
**hearing** 63:13
**heightened** 89:15
**held** 55:17
**helped** 79:15
**helping** 16:12
**hey** 51:18
**hired** 7:23 8:1,6
     22:13 23:1 80:25
     91:7
**Hirshfield** 8:19
**historical** 39:1
**history** 102:13,15
**hit** 32:12
**hoc** 17:20
**hold** 27:7
**hotel** 111:19 112:10
**hotline** 89:17,20,22
     90:4,5,7,12 92:10
     92:11,16
**housed** 108:6

**HR** 65:25 81:17
     84:24 86:6 90:9
     91:1 93:5,8 94:16
**HR's** 90:18
**huh-uh** 4:23
**human** 20:8,21,24
     21:7 28:1 66:1
     81:1,8,14,16 82:3
     93:14 101:18
**H-I-R-S-H-F-I-E...**
     8:22

_____

**I**

**IDENTIFICATI...**
     3:7
**identified** 83:23
     101:22 105:8,15
     106:11 108:14
**illegal** 96:14
**immediately** 96:17
**implemented** 15:17
**important** 43:21
     85:7
**inartful** 7:13
**include** 18:3,6
     48:24 52:23
     113:11
**included** 12:9 80:4
**including** 6:9 10:5
     55:4 58:18 69:18
     70:19 96:15
     101:17 103:18
**increases** 78:24
     79:11
**independent** 9:4
**indicated** 65:12
     72:23
**indicates** 86:19
**indicating** 76:2
**indirect** 106:21
**indirectly** 78:1
**individual** 81:4
     112:15
**individuals** 69:7,11
     80:4,6 104:9
**influenced** 62:25
**information** 27:17
     27:23,24 28:2
     78:10 90:8 97:6
     98:14 102:3
     112:24
**informed** 47:25
**initially** 16:21
     25:11
**initiative** 15:16
**input** 81:13 106:24

110:7
**inquiry** 67:12
**institute** 16:12
**instituted** 9:3 15:20
**instructed** 47:12,18
     73:11 75:10
**instruction** 36:21
**instructions** 74:25
**insure** 87:11
**interchangeably**
     49:25
**interest** 96:8 97:5
     98:13 116:8,11,12
**interested** 115:14
**interim** 8:25
**internal** 24:2 26:12
     39:7,13,15,16,20
     40:1,4,6,11,23
     41:2,10 42:18,19
     42:21 47:9 50:13
     56:12 59:20 60:21
     68:22 69:1,2,5
     70:4,7,13,17,22
     72:1 73:9 82:23
     83:4 106:22 109:4
     109:15 111:9,23
**interviewing** 13:10
**investigate** 66:13
     95:15 110:7
**investigation** 6:22
     7:5,16 27:1 36:8
     45:16,23 46:3,7
     47:13,19,25 50:11
     66:16,22 67:10,12
     67:14,24 68:7,20
     69:12,15,18,21
     70:1 71:7,7,18,25
     72:9 73:10 75:11
     109:21
**investment** 12:6
**invoice** 58:6
**invoices** 55:12 57:9
     57:17,20 58:17
**involved** 10:22 11:2
     11:6 14:11,14,19
     14:21 15:7 16:10
     16:13 39:25 40:4
     40:8,9,13,19 42:5
     42:8 43:8,10
     51:20,21 66:16
     73:6 107:1
**involvement** 6:12
     6:17 11:5 43:12
     43:14 51:11
**involving** 6:18
**in-box** 29:15

**ipad** 24:17,25 28:18
     29:4,5,6,8,9,10,13
     30:1,3,14,17 31:8
     31:9,14 33:4,11
     33:14,19,23 38:9
     102:24 103:2,22
     104:18
**ipads** 104:18
**iphone** 32:7,24 33:4
     38:10
**issuance** 107:12
**issue** 7:4 41:9,9
     97:9
**issued** 73:9 104:6
     107:21 110:22,24
     111:25 112:1
**issues** 19:23 43:22
     48:6 70:18 89:19
     92:10 98:17
**item** 51:1 87:9
**items** 33:3,10
**itunes** 32:9
**it'd** 90:1 92:4

_____

**J**

**J** 1:17 115:17 116:2
     116:18
**Jeff** 27:21
**Jim** 45:6 59:20 60:1
**job** 13:10 39:3
**jog** 57:14
**John** 64:19
**Judicial** 116:3

_____

**K**

**keep** 13:5 54:1,7
     94:3
**kept** 38:16 50:24
     51:5 52:14 53:25
     54:1
**kick** 46:21 55:25
**kind** 17:18,23
     103:19
**knew** 34:9
**knowledge** 28:4
     41:8 87:21 97:19
     100:8 109:2 117:5
**Kohl** 27:21

_____

**L**

**La** 51:5,14,22 52:1
     52:9,14 53:15
     72:2,4,6,7,10 77:3
     77:4,7
**laptop** 24:21 35:6,8
     35:11,14,23 36:3

36:16 102:21
     103:14 104:13
**laptops** 104:20
**late** 55:18
**law** 91:7 94:17,18
     116:10,11
**laws** 96:16 97:4
     98:10
**lawsuit** 12:24 39:11
     113:13,19,25
**lawyer** 12:11 61:17
     95:18 99:1
**leadership** 14:23
**learn** 22:4,11
**leave** 8:23
**leaving** 27:5 61:8
**left** 9:2 10:17 12:17
     19:23 24:10,14
     25:4 27:20 28:19
     31:17 35:20 36:1
     36:5,11 37:10,12
     37:13,15,17,17,19
     38:8 61:23 65:17
     94:23 113:8
**legal** 5:1,9 11:18
     95:20
**letter** 27:7
**let's** 7:13 8:24 14:10
     40:3 61:4 62:12
     88:20
**level** 13:13 77:18
     78:14 80:2 86:15
**liabilities** 12:9,23
**liked** 17:25
**limited** 103:19
**limiting** 52:21
**line** 8:13 42:22 51:1
     97:16 117:9
**lines** 8:5,10 92:9
**Lisa** 51:5,14,22
     52:1,3,6,9,14
     53:15 72:4,6
**list** 52:21
**listed** 22:9 96:24
     117:7
**litigation** 4:11 27:7
**LLC** 2:4
**LLP** 2:10
**local** 14:13
**location** 34:5
**log** 52:16,22 53:6,9
     53:9,22 54:1,1,8
**long** 9:6 53:12
**look** 28:13,16 39:21
     41:12,14 84:1,23
     85:17 87:8 91:9

96:13 100:1,18
103:4,16 108:17
109:2,24
**looked** 45:4,5,5
56:12 72:25 88:17
109:9
**looking** 87:9 96:1
97:16 109:1
**looks** 97:23 106:21
109:7,8
**lost** 97:10
**lot** 89:17 92:15
**lots** 70:17
**Lucas** 62:1 63:4
**Lucas's** 45:6,7
59:20 60:1 62:17
**lunch** 43:21 94:6,7
**Lundin** 64:19

**M**

**maintain** 83:4
**maintained** 31:2
33:3 50:20 56:5
65:22 83:1,6
93:10
**making** 17:6 28:13
34:4 42:11 50:2
51:19 76:24
**male** 80:25
**management** 11:8
96:17,22
**manager** 66:24
87:24
**managers** 49:6
86:15 87:10 91:4
**manner** 14:3 15:10
103:18
**Mantent** 57:1
**manual** 3:8 19:18
19:22 20:6 48:12
49:10,15 53:12
59:18 84:5,9,11
84:13 107:9,19
**March** 5:23,25 6:6
6:11,15 7:23 8:4
8:15
**marked** 84:1
101:25 105:10
106:13 108:16
**marketing** 64:8
**Marshal** 20:14,18
20:19 76:20
**Marshall** 76:7,14
80:16,24 81:10,21
81:25 82:7
**Mary** 2:4 4:9

materials 37:18
94:12
**matter** 6:8 50:25
60:10,11 76:11
84:22 95:12
115:14
**matters** 20:6 21:10
48:7 79:24 83:5
85:7
**mean** 5:25 10:24
11:14 13:20 14:20
17:24 42:7 43:10
52:15 53:16 56:2
62:20 64:5 66:12
82:12 85:2 88:25
91:3 102:6
**meaning** 11:13
15:23 25:17 33:22
35:22 89:11
**means** 43:15
**meant** 72:6 79:8,22
**mechanics** 58:1
**mechanism** 90:24
**medication** 21:18
21:20
**meet** 41:4
**meeting** 44:21
45:18 46:24 47:3
47:10,12,24 48:2
50:21 68:3,7,12
95:3 112:15
**meetings** 13:23
43:13,19,24 46:11
88:11,11 90:3
92:21 93:1
**Melanie** 41:21
112:23
**Melanie's** 41:24
**member** 10:6
**members** 10:3 15:7
85:19
**memo** 109:10
**memory** 21:18,24
34:10 35:8,21
52:24 57:14
**mention** 71:10
**mentioned** 10:19
69:16,19 98:25
**met** 15:12 23:19
**methods** 96:24
**Michael** 8:16 9:2
**Michelle** 1:17
115:17 116:2,18
**MIDDLE** 1:1
**minimal** 92:2
**Minimum** 92:3

**modify** 103:17
**money** 23:8 54:2,3
56:4
**month** 112:16
**monthly** 93:9
**months** 9:8 13:9
55:12
**Morton** 66:13,24
67:10,13
**Morton's** 66:17
**movie** 5:25
**Mprebula@preb...**
2:6
**multiple** 26:22 70:4
89:19

**N**

**N** 3:1,1
**name** 5:1 8:20 24:4
41:24 81:6 82:19
82:21
**named** 80:3
**names** 38:23
**NASDAQ** 101:13
**nature** 13:19 14:6
65:5 113:6
**NE** 1:15 2:5,10
**neck** 109:25
**need** 4:21
**needed** 15:9 16:8,11
43:23 46:21,21,22
46:23 60:3 72:25
**negotiate** 12:1
**negotiation** 12:21
**negotiations** 11:9
13:2,4
**neither** 115:11
**never** 47:1,21 75:14
80:11 83:20
**new** 13:10
**Nexus** 30:16,22
57:7,12,24
**noise** 66:2
**nonprofits** 52:25,25
**normal** 34:21 44:10
44:11 50:24
**normally** 43:14
50:20
**nos** 4:22
**NOTARY** 117:22
**noted** 102:19
**notes** 13:5 112:14
**notice** 4:12 27:8
**notified** 63:10
**notify** 96:17,22
**November** 42:25

107:7,13 110:11
110:14
**Noy** 9:5 16:3,15
43:18 44:17 46:25
47:23 51:17 56:24
64:20 65:18 67:8
69:3,5,10 71:6,10
72:16 73:11,15
74:4,12 75:5,8,13
78:5,8,20,22 79:3
79:12 81:13 91:15
106:20 107:4,5
**number** 89:17,22
90:4,6 92:11,12
95:6 110:2 116:19
**numbered** 109:17
**numeral** 85:18,21
86:5,11 103:6,8

**O**

**O** 3:1
**Object** 6:24 7:7,19
10:23 17:3 18:8
18:16,24 19:15
20:7,16 21:2 23:3
23:9,14 28:7
33:15 35:15 36:9
36:25 40:15 43:16
53:24 57:10 59:2
67:15 68:4 69:22
70:15 71:1,9
74:10,17 75:1,6
75:25 76:9,15,23
80:18 81:2 86:17
88:23 89:6 95:16
97:21 98:8,23
99:6,20 103:23
106:2 110:15
111:3 112:21
113:4,14 114:1
**objection** 45:1
74:22
**Obligation** 96:1
**obtained** 45:9
**obviously** 37:22
**occasion** 46:6 71:22
73:8 104:4
**occur** 73:1
**occurred** 9:9 68:13
68:14 71:25 88:2
88:3,4 91:13
111:5,6
**occurring** 94:20
**offended** 21:17
**offered** 25:12
116:14

**office** 6:2 7:9 9:3,6
9:12,15 13:25
15:10 16:17 17:9
17:11 18:2,14,21
20:1,4 27:18
29:11 32:4,21
37:13,13,18 38:1
38:14 39:17 40:9
41:21 42:10 43:20
49:5,14 53:15
56:11 72:4 90:18
91:6,22 93:13
94:2 95:2 102:22
102:24
**officer** 5:15 8:7,13
9:5,11 11:6 12:13
12:15 15:5 21:8
96:10 99:17
**officers** 10:10 85:6
85:12,15 86:6
**official** 82:19,21
**oftentimes** 14:22
**okay** 4:17,19 8:2
12:18 17:13 22:22
32:17 34:13 35:12
43:6 66:4 67:6
80:22 84:8 85:23
85:24 86:10,25
93:17 95:25 96:5
97:14,16,17
100:19 102:2,14
103:7 106:15
108:11
**old** 5:3 59:5 108:21
**older** 93:22 112:2
**once** 95:13 97:18
98:5
**ones** 69:16,18 70:5
80:3 108:12
**open** 29:15
**opened** 34:16
**operating** 38:20
60:22
**operations** 67:2
**opinion** 44:15 95:21
**opportunity** 48:8
70:8,14,25 97:7
98:14 99:5,13
113:2
**opposed** 49:5
**order** 55:5 57:21
58:6 63:24 65:2
**organization** 16:16
17:2,17 18:7
65:20,23 67:3
**organizational** 7:24

21:13 53:4
**organizations** 14:22
15:7,9 16:22 17:9
18:13,20
**outside** 13:25 49:20
80:25 94:18 97:5
98:12
**O.C.G.A** 114:20
116:6,8

—————
**P**
**package** 113:9,11
113:17
**page** 3:4,7 85:14,17
87:8 95:22 96:3
96:14,25 97:2,12
100:1 102:12,19
102:19 103:4,5,6
109:10,24,25
110:3 117:9
**pages** 109:11,16
110:2
**paid** 23:10 51:3
55:7,8,9,12,17,20
55:24 56:4 58:6
58:20
**paper** 37:6,16,17,23
38:5 53:16
**paperwork** 52:10
**paragraph** 86:5
96:1 97:1,11
**parameters** 104:24
**part** 12:21 13:2
27:18 39:3 40:25
66:19 67:17 69:17
**partially** 10:1
**participate** 68:19
69:14
**particular** 15:7
51:20
**parties** 115:13
116:14
**parts** 62:16,17,19
**party** 58:7 116:5,10
116:11,12,12
**pass** 52:10
**passed** 80:24
**Passman** 9:1,4,10
9:17,23 10:5,6,9
10:14 12:3,6,7
16:5,14 19:11
43:20 44:6,22
45:23 46:5 51:16
51:23 60:12 62:4
65:1 75:21,22,23
76:1 78:7,11,12

78:18,20,23 79:4
79:10 91:15 111:1
**Passman's** 9:14
51:4 60:25
**password** 30:25
**passwords** 104:14
104:16,19,21
**Patrick** 8:16,23 9:2
**pattern** 44:14
**Patty** 64:22 66:5
**pause** 58:13
**pay** 23:8 45:19
55:21,23 57:22
77:18,22,24 79:11
97:20,23,25 98:6
114:8
**payable** 57:22,24
57:25 58:4,10,16
58:20 59:7
**paycheck** 90:23
**payments** 25:10,13
55:10
**payroll** 28:6 77:13
77:15
**paystub** 90:1
**paystubs** 89:18,25
**PC** 24:23 33:4,25
34:3,6,10,19 35:9
35:10,13,22 36:4
104:13
**PDFs** 33:23
**Peachtree** 1:15 2:5
2:10
**people** 16:4 52:1
64:10,11 65:20
67:4 77:25 86:4
91:11 97:5 98:12
107:17
**people's** 83:16
**performance** 47:8
**performing** 47:5
**period** 61:8
**periodic** 88:11
**permission** 103:21
**person** 6:20 7:3
41:22 56:15 77:16
83:3 90:21 116:9
**personal** 22:14 23:2
24:17,20 25:15
30:8,11,20 32:4
32:14,21 58:15
60:11 70:20,23
103:1,22 104:5,9
**personally** 82:8
107:25
**personnel** 28:5

**persons** 101:17
**phone** 25:7,12
28:14 31:17,21
32:3,11,14 38:15
**pick** 28:14 38:17
**picked** 25:13 38:13
**place** 15:8,14 59:18
**places** 101:15
**Plaintiff** 1:5 2:3
4:10
**Plaintiff's** 3:7 83:22
84:1 87:5 95:23
100:13 101:7,21
101:25 102:16
104:25 105:1,7,11
106:10,14 108:13
108:17 109:1,12
110:8,10 111:16
112:20 113:3
**playing** 91:11
**please** 7:1 21:17
92:10
**plug** 32:19
**plus** 39:2
**point** 9:14,23 15:19
35:17,17 53:11
59:4,8 85:5
103:17 112:4
**policies** 19:22 20:5
20:9,10,14 21:1,9
48:10,13,24,25
53:21 100:4,5,14
100:20,23 101:3,5
105:3 108:1,4,5
**policy** 15:8,14,20
15:21 16:1,2,10
16:25 17:8,13,16
17:21 18:11,19,22
19:9,11,14,18
42:23 43:23 46:10
46:12,14,14,17
48:5 54:7,16 56:2
63:24 64:1 65:6,8
65:10,11 86:9,10
86:19,25 88:20,22
89:5,8,14,23
96:23,25 99:24
100:10 101:17
102:4 103:11
104:2 107:8,10,11
111:18,24 112:6,9
**political** 53:1,3
**position** 5:13,16
10:16 13:11 64:9
77:14,16,19
**posted** 91:24 106:6

106:8
**postings** 92:1,2,3
**potential** 96:8
**Powell** 42:1
**practice** 34:18 58:5
**Prebula** 2:4,4 3:4
4:8,9 7:2,11,22
11:1 17:5 18:10
18:18 19:17 20:12
20:20 21:4 22:17
22:20,23,25 23:6
23:12,16 28:11
33:17 35:19 36:13
37:2 40:18 44:2
54:5 57:15 59:10
62:12,15 67:18
68:8 69:24 70:21
71:3,12 74:13,19
74:23 75:4,9 76:5
76:12,19 77:1,10
80:21 81:7 83:24
84:17,20 86:22
89:1,10 94:5,9
95:19 96:4,6
97:24 98:19 99:2
99:7,22 101:23
104:1 105:9 106:5
106:12 108:15,20
108:25 110:18
111:7 112:25
113:7,16 114:6,11
114:14
**predecessor** 16:11
**premises** 103:10
**preparation** 23:24
59:22 106:24
**prepare** 23:17
76:14,20
**prepared** 24:3 76:7
**present** 47:17,20
79:18
**presented** 92:25
98:9
**preserve** 27:4,8,10
33:8 36:21,24
37:4 39:10 63:18
**presume** 90:18
**prevent** 56:3
**previously** 83:25
101:24 105:11
106:14
**primarily** 90:18
**principal** 116:10
**prior** 5:18,24 6:6,8
6:11 22:8 27:5
45:16 46:6 107:3

107:7,12 108:1
111:20 112:7,10
**probably** 14:12
15:3 49:22
**PROCEDURE**
114:20
**procedures** 19:18
19:22 20:6,9,15
21:1,10 53:22
60:22
**proceedings** 4:3
115:6,10
**process** 10:9 16:12
55:13 62:24
107:17,20
**processes** 59:18
**produced** 40:11
**program** 32:20
57:8
**programs** 38:20
**prohibit** 113:18,24
**prohibited** 116:6
**prohibiting** 113:12
**prohibition** 113:23
**prohibits** 105:16
**promote** 47:1 80:16
**promoted** 65:2
**promoting** 92:5
**promotions** 9:24
45:16 76:7
**prompt** 67:1
**prompted** 104:22
**proper** 56:15
**proposed** 68:1
**protected** 104:13
**protocol** 44:10,12
**provide** 25:8 50:19
116:5,9
**provided** 24:18,25
25:11 26:24 49:11
**providing** 73:6
**provision** 113:12
114:7
**proxy** 80:5
**public** 11:12 15:18
42:20 85:1,2
101:12 113:21,21
117:22
**publicly** 114:4
**pull** 29:7 50:9,10,12
83:15 112:23
**pulled** 29:12 112:24
**pulling** 112:19
**purchase** 11:24
12:1,4,9
**pursuant** 114:19

116:2
**pushed** 91:1
**put** 15:8,14 16:8,23
  20:1 35:14 46:23
  59:12 90:7
**P.M** 114:18

_____

**Q**

**quarter** 39:2
**quarterly** 39:9
  92:20 93:2,3,4,8
**question** 4:15 6:10
  7:1,12 8:10 16:25
  21:16 22:21,24
  23:5 33:16 40:2
  40:17,19 43:11
  69:23 71:11 72:17
  74:18 75:8,22
  88:21 98:4 99:9
  100:15 110:5
  113:15
**questions** 4:13
  60:17,20,24 62:23
  62:23 96:9 114:13
**quick** 94:6
**quite** 9:22

_____

**R**

**R** 115:1 117:1,1
**raised** 7:14 41:10
**raises** 9:24 10:13
  45:19 77:22,24
**raising** 6:20 7:4
**ran** 58:23
**range** 70:18 77:18
**rates** 116:13
**reached** 22:12
**read** 45:2,4,10 60:2
  70:3,5,12 88:25
  97:17 100:12,22
  117:4
**reading** 100:24
**ready** 102:1 109:2,3
**really** 13:24 91:1
  101:5
**reason** 62:7
**receive** 40:5 42:9,15
  60:17 68:24,25
  69:2,4 72:1
  102:18 113:8
**received** 40:6 68:22
  74:25 77:2 82:3
  99:10 111:8,15
  113:18
**recognize** 102:3
  105:12

**recollection** 66:11
  67:3 86:14 105:5
**recommendation**
  44:17,20 45:1
  47:15 59:12,16
  68:9 73:24 78:23
  79:4
**recommendations**
  10:10 78:8 79:16
**record** 4:14 11:12
  15:18 113:21,22
  115:9
**recorded** 59:13
**records** 27:19 28:6
  28:6 54:14 83:1,4
**reduced** 115:6
**refer** 13:1
**reference** 52:19
  64:6 100:16
  111:11
**referenced** 7:25
  39:8 101:4
**referred** 59:19
  82:22 84:5 100:15
  109:4
**referring** 30:10
  31:7 50:6 81:19
  82:15 84:6,16
  109:6,15,16 111:9
**refresh** 66:11 86:14
**regard** 6:5,12 19:19
  19:23 20:6 21:10
  27:5,8,11 31:5
  33:10 36:22 37:4
  37:7,10 39:5,8
  42:17 50:11 60:18
  60:21,25 61:23
  65:1 68:23 70:22
  72:19 76:7 81:13
  82:4 111:19
  112:10,20
**regarding** 6:7 33:18
  39:17 67:12 70:20
  76:11 83:4 89:8
  89:19 97:4
**REGENCY-BRE...**
  1:21
**regular** 24:22
**regulations** 96:16
  97:4 98:11 116:3
  116:7
**reimbursements**
  54:17
**related** 24:11 41:13
  49:7,23 93:19
**relates** 44:13

**relationship** 116:8
  116:10
**relative** 115:12
**release** 39:1
**released** 43:2 108:8
**relied** 75:5,7,13
**rely** 20:13
**relying** 73:15
**remained** 8:8
**remove** 103:14
**removed** 67:4 103:9
**repeat** 6:25 17:4
  18:17 19:8 22:24
  33:16 40:2 69:23
  70:10 71:11 72:17
  98:4 113:15
**rephrase** 4:16 6:10
  8:3 59:15 73:5
**replacement** 8:25
**replacing** 112:2
**report** 8:11 13:21
  24:2 26:12 39:7
  39:13,15,16,19,20
  39:24 40:5,6,10
  40:11,24 41:18,20
  41:23 42:6,10,16
  42:24 43:2,3
  46:19,20 50:4
  55:11 59:20 68:23
  68:24,25 69:2,4
  72:1,23 73:9 76:6
  76:11,14,17,17,20
  77:2 82:3 89:20
  90:5,7 92:10,20
  93:4 95:7,11
  96:24 97:20 98:7
  98:18,22 99:19
  101:16,17 109:5
  109:16 111:10
**reported** 8:12 9:16
  16:4 41:22 43:18
  44:11 65:15 77:25
  90:8,11,22 92:21
  96:21
**reporter** 8:21
  115:18 116:2,4,18
**REPORTERS** 1:22
**reporting** 7:24 8:5
  8:11 39:3 65:18
  90:24 97:8 116:3
  116:5,9
**reports** 27:13 41:22
  42:21 48:7 51:16
  58:15 70:4,7,13
  70:17,20,23,23
  71:8 72:3,20

90:12 92:17 93:11
  95:13 97:2 106:20
  106:21
**represent** 4:10
  22:14
**representations**
  76:3
**represented** 81:17
**represents** 23:21
**request** 17:20 52:10
  52:18 63:17 76:13
  76:25
**requesting** 47:4
  76:17
**requests** 15:13 18:2
  45:15,19
**required** 54:7,21
  72:24 86:6 96:23
**requires** 96:7
**requiring** 53:22
**reread** 98:2
**reserve** 63:20
**RESERVED**
  114:22
**reside** 5:5,7 20:11
**residence** 5:9
**residences** 5:7
**resource** 66:1
**resources** 20:8,21
  20:25 21:7 28:1
  81:1,8,14,16 82:4
  93:14 97:6 98:14
  101:19
**respond** 48:8 67:13
  70:9,14,25 113:3
**response** 19:5 29:22
  31:20 77:11 79:21
**responses** 4:21,25
  62:25
**responsibility** 21:9
  78:3
**responsible** 9:24
  10:1 20:5,25
**result** 7:16 46:2
  67:24 69:12
**results** 42:14 69:25
**retain** 24:10
**retainer** 23:7
**retaliation** 99:24
**returned** 38:12
**review** 10:11 23:23
  24:1 39:18 43:13
  45:7 48:25 59:21
  59:24 62:17 63:6
  66:17 69:20,25
  72:9,23 73:1

78:11 79:19 80:1
  84:14,19 86:12
  101:11
**reviewed** 24:2 29:9
  39:16 62:16 84:22
  85:8 86:1 111:9
  111:15 112:14
**revised** 102:9
**revision** 102:13,15
**revisions** 102:18
**Richard** 1:12 2:9
  3:3 4:2,4 5:2
  117:3
**Richard.gerakitis...**
  2:11
**right** 17:10 43:4
  54:6,12,24 55:2
  57:2 67:10 68:16
  71:13 75:18 79:8
  81:1 85:15 97:20
  99:24 100:24
  101:3 103:1,5
  104:11 107:5
  109:17 110:11
**ring** 42:1,2
**Road** 2:5
**role** 8:8 91:11
**roles** 14:23
**Roman** 85:17,21
  86:5,11 103:6,8
**room** 90:2 91:18,20
  92:1
**rooms** 89:18
**rude** 4:24
**Ruiz** 1:17 115:17
  116:2,18
**RULE** 114:19
**rules** 96:16 114:20
  116:3,7
**run** 32:20

_____

**S**

**S** 3:1,6 117:1
**Sadie** 20:14,17,19
  76:6,11,18,24
**safety** 97:7 98:15
**Sailors** 64:19 68:20
  68:24 69:1,10
  79:1,8
**Sailor's** 105:14
**salaried** 80:6
**salaries** 21:14 76:8
**salary** 78:24
**sale** 8:8 11:2,21
  62:8
**Sanders** 2:10

**sat** 29:10
**saved** 83:10,13,16
**saving** 34:5,5
**saw** 53:17 90:9,10
**saying** 17:21 28:4
  41:19 75:10 88:2
  88:4 105:24,25
**says** 85:14,18 87:9
  87:11 96:14 100:2
  100:12 102:5
  103:4,8,17 105:15
  109:20,25
**scanned** 62:18,21
  88:25
**schedule** 77:13,16
**schools** 52:25
**screen** 14:12 34:17
  se 38:3 53:4
**SEC** 11:13 85:5
  101:13 113:22
**second** 91:20
  101:18 103:17
  108:17
**section** 96:7
**security** 11:22
  102:4
**see** 4:18 8:24 13:22
  13:23 14:5,10
  29:13,16 52:19
  61:4 76:6 85:20
  85:25 87:4,14
  89:18,24 92:12,13
  92:14 93:2 96:11
  96:17 100:5 102:5
  102:10,15
**seeing** 53:14 72:3
  76:10 87:7 102:8
  105:20 106:17
**seen** 39:22 66:9
  84:3 89:3 93:19
  96:20 102:6
  105:19 106:16
  107:25 108:2
  109:10,13
**segregation** 56:14
**select** 60:1
**Sellers** 79:7
**send** 84:24
**senior** 8:6 10:16
  87:10
**sent** 87:23,23 88:1
  90:15,17,18,19,20
**sentence** 97:2,13,14
  98:2 100:12,18,22
**separate** 42:20
  57:16 83:11 84:8

**series** 4:12
**server** 26:16,18,21
  26:24 29:2,11,24
  34:25 83:17
**servers** 26:22
**serves** 34:10 35:8
  35:21 52:24
**services** 116:5,9
**session** 88:8
**sessions** 87:20
  88:10 91:16
**set** 54:22 100:4,12
**set-up** 55:9 56:7,9
**seven** 109:10
**severance** 113:9,11
  113:17,21 114:8,9
**sexual** 89:14 91:9
  101:18 105:16
**shaking** 4:18
**Shannon** 64:19
  68:20 69:10 79:7
  79:8 105:14
**shareholders** 11:20
**short** 62:12,13
  90:23 94:7 108:23
**shortly** 110:21
**show** 83:25 91:8,11
  99:3 101:24
  105:10 106:13
  108:16
**shown** 106:18
**shows** 66:10 102:9
  102:12
**sic** 57:1
**sign** 23:7 84:24
  85:12 86:7,7,15
  107:19
**signature** 105:15
  114:21 117:22
**signed** 23:13 85:9
  87:25
**signing** 85:13
  105:22
**sign-off** 77:22,24
**similar** 46:3 68:24
  105:17
**Similarly** 108:3
**sit** 29:9,10 55:11
  63:12 78:11
**situation** 42:12
  44:14 98:9
**six** 9:8
**small** 13:22
**social** 13:19 14:4
  18:7
**socialize** 13:25

**software** 57:8,16,21
  103:19
**sold** 10:20 67:22
  77:5,6,6,8
**solely** 75:5
**somebody** 25:21,24
  31:6,11 46:20
  55:4,11,18 58:22
**someone's** 104:5
**sorry** 29:20 31:8
  61:13 100:16
**sort** 16:12 66:21
  67:11
**source** 39:6
**speak** 61:22 66:3
  75:2 86:8
**speaking** 82:10
**specific** 20:10 43:7
  59:16 60:8 62:19
  64:9 65:16,20
  71:23 72:12,18,21
  77:16 105:5
  112:12
**specifically** 15:2,15
  16:18 22:6 25:23
  25:25 30:8 31:16
  35:5 36:10 38:19
  41:17 44:19 52:12
  52:13 53:11 59:4
  67:20 91:14 92:8
  93:15 94:1 101:9
  111:21
**specifics** 11:25 13:3
  14:15 66:23 67:5
  68:5 70:5 94:22
**specified** 86:4
**spell** 8:20
**sponsorships** 58:8
  58:18
**spouse** 51:21
**spreadsheet** 53:13
**spreadsheets** 27:25
  33:23
**Square** 1:23
**staff** 50:10 88:6,9
  88:11,11,15 91:4
**standalone** 35:22
  36:4
**standard** 58:5
**start** 5:21
**started** 13:9
**state** 5:1,6 44:14
  115:2
**stated** 46:10 115:5
**statement** 80:5
**STATES** 1:1

**station** 35:9,14
**stations** 104:20
**stayed** 10:16
**Steeple** 14:10
**steps** 42:13
**stock** 11:11,24
**store** 29:4,5 33:22
  33:25 34:2,3,6,8,9
  34:10,14,15
**stored** 51:3
**Street** 1:15 2:10
**structure** 79:17
**stuff** 34:14 41:11
  51:11 92:4 109:8
  111:22
**submit** 89:2 105:14
**submitted** 69:8
**subordinates** 87:12
**subsequently** 46:2
**Suite** 1:15,23 2:5,10
**supervisor** 56:23
  95:11,14,14 96:10
  96:21 97:18 98:5
  98:20
**supervisors** 107:18
**sure** 10:24 11:18
  12:19 16:18 17:6
  17:6 28:8 30:22
  38:7 42:7 43:11
  48:12 49:2 50:1
  56:13 57:25 58:24
  64:5,22 70:16
  84:12 85:11 87:24
  88:6 93:24 98:3
  113:17
**suspect** 96:14
**swept** 25:16
**sworn** 4:5
**symphony** 53:5
**sync** 32:14,20
**system** 30:16 31:2
  54:11,15,18,21,22
  54:24 55:2,6,9
  56:1,5,9 57:20,25
  58:4,10,11,14
  59:7,12,13 83:15
**systems** 30:19
  59:17

——————————
**T**
——————————

**T** 3:1,1,6 115:1,1
  117:1,1
**tact** 37:18
**take** 6:4 24:13,16
  25:3,19 35:25
  40:3 41:12,14

  62:12 84:1 87:13
  90:6 94:6 98:3
  100:2 102:21,24
  105:21 108:17
  109:1
**taken** 12:9 60:5,6
  94:8 115:5
**talk** 74:6,14,20 82:7
**talked** 62:1,4 71:5
  90:2 101:16
**talking** 37:16,23
  39:14 91:3 100:17
**Tara** 26:1 38:18
  64:23 65:13
**tasked** 112:18,18
**team** 11:8 15:12
  17:12 43:20 46:15
  46:18 74:1 76:17
  76:22 79:17 80:2
  91:1
**technically** 55:22
**Technology** 102:4
**telephone** 43:13
**tell** 30:6 33:2 39:14
  64:17 66:9 75:21
  75:23 93:18,20
**telling** 65:1 94:10
**tenure** 35:18
**term** 49:24 64:6
  82:11
**terminate** 44:3,7,23
  47:15 73:14 81:14
  82:5
**terminated** 6:22 7:5
  7:9,16 42:24 43:1
  43:4 44:18 46:2
  48:3 67:19,23
  68:10,16 69:12
  73:25 74:3 77:3
  110:13,17
**termination** 43:8
  43:15 45:14 46:17
  46:25 68:1,2 75:3
  75:16 82:8 111:20
  112:7,11
**terminations** 43:23
  46:11
**terms** 51:2
**Terrell** 57:1
**testified** 4:6
**testimony** 17:7
  20:13,24 21:5,6
  21:21 22:2 31:5
  40:21 63:4
**Thad** 66:13
**theater** 48:20 49:6

91:4,4 93:19
**theaters** 8:9 49:6
  92:15
**theft** 89:19,24
**thing** 31:11 35:11
  47:11 94:25
**things** 14:6 51:1
  53:2,4,5 83:13
  86:3 91:12 92:14
  98:25
**think** 35:21 38:13
  38:16 42:3 49:4
  49:19 51:7 53:6
  53:25 57:24 58:12
  58:13,15 61:3,5
  79:7,21 82:12,14
  84:23,25 91:6,21
  93:7 94:5,25
  104:18,18,19,21
  104:22 105:2,25
  110:4,5
**thinking** 14:8
**third** 91:22 97:2,13
  97:14 102:12,19
**three** 16:15 19:11
  33:3 55:11 60:9
  61:5,7,9 87:8
**tied** 29:1
**tightening** 107:14
**time** 13:23,24 26:2
  26:17 38:16 45:13
  48:5 59:4 61:8,11
  68:22 72:6 77:8
  80:12 87:16 94:5
  94:19,21 98:3
  114:12
**title** 64:7 65:16
  93:18
**today** 21:18,20,24
  22:2,14 23:18,24
  24:8 48:25 59:22
  61:9 63:1,12
  108:1 114:12
**told** 16:14 19:11
  41:12 42:13 71:6
  72:12,15,16,18
  105:2
**top** 39:20 80:6
  101:1
**totally** 75:7
**tower** 35:13
**track** 54:11
**traditional** 52:25
**traditionally** 58:16
  65:25
**training** 89:16 91:2

91:16 94:11,20
  99:3,10
**transaction** 11:10
  11:11,20,21
**transcribed** 114:14
**transcript** 115:5,8
**transferred** 11:17
**transition** 10:22,25
**transitioned** 59:6
**transparency** 99:11
**travel** 54:16 111:19
  111:24,24 112:10
**Trawick** 1:4 4:10
  13:16 14:1,19
  26:10 27:2,5
  33:11,19 36:8,22
  37:4,7,11 39:8
  40:20 41:2,4
  42:24 43:9,15
  44:4,7,18 45:14
  45:15,19,21 46:7
  47:4,24 48:2
  49:18 50:11 55:1
  55:4 60:18 63:9
  63:13 65:1 68:15
  69:8,21 70:2,9,13
  70:24 71:18 72:1
  72:13,19,22 74:6
  74:11,20 75:3
  78:2,17,24 81:14
  82:5,8 110:13
  111:12,13 112:15
  113:2
**Trawick's** 6:15
  39:18 46:25 47:8
  56:20 68:23 71:8
  111:20 112:7,11
**treatment** 47:8
**Troutman** 2:10
**true** 79:1,10 115:9
  117:6
**truth** 22:2
**truthful** 21:21
**try** 4:16,21 7:13
  66:3
**trying** 4:24,25 8:2
  45:5 57:12
**turn** 25:24 37:9
  107:17
**turned** 29:23 31:14
  32:24
**two** 5:7 22:7,8
  30:19 61:7,9 67:4
  67:6 85:17,18,21
  86:3,5 98:24
  103:4 109:11

**two-fold** 40:3
**type** 27:16 28:8
  51:11 76:18,25
  90:24 91:12 92:4
  107:22 113:5
**types** 30:8 43:23
  53:1,2,5 59:17
  62:22 89:19
**typewriting** 115:7

_____
**U**

**uh-huh** 4:23 61:12
  110:1
**ultimate** 44:24
**ultimately** 44:22
  78:7,12,20
**unapproved** 55:23
**undersigned** 117:3
**understand** 4:15,25
  17:6 19:5 23:21
  38:7 40:16 42:7
  43:11 58:2 72:7
  74:14 75:8 87:12
  99:9 100:15
**understanding**
  34:11,19,22 46:16
  53:8 69:6,9 86:2
  87:16 90:20 95:6
  99:16,23
**understood** 40:21
  73:21,23 74:24,25
  77:11 86:10 87:25
  88:7 104:10
  109:21
**unequal** 97:19,22
  98:6
**unethical** 96:15
**UNITED** 1:1
**unusual** 52:6
**update** 32:12,13
  101:11
**updated** 86:25
  93:24 95:1 101:7
**updates** 32:11
**usage** 69:15 107:12
  108:1
**usages** 107:8
**use** 19:20 82:11
  97:6 98:13
**user** 102:4 104:22
  104:23
**users** 103:17
**usual** 116:13
**usually** 43:19

**vaguely** 39:23,23
**Van** 9:5 16:3,15
  43:18 44:17 46:25
  47:23 51:17 56:23
  64:19 65:18 67:8
  69:3,5,10 71:6,10
  72:16 73:11,15
  74:4,12 75:5,7,13
  78:5,8,20,22 79:3
  79:12 81:13 91:15
  106:19 107:4,5
**various** 57:18 69:7
**vendor** 56:4
**verbal** 4:21 17:13
  18:11 19:11 54:7
  93:3
**verbalized** 16:2
**verbally** 33:7
**version** 87:3 112:2
**versus** 59:18
**vet** 15:13
**vetted** 17:12 18:14
  18:21
**vice-president** 5:14
  8:6 80:7,17,25
  81:5 97:18
**vice-presidents**
  87:10,11
**video** 91:10,16
  94:13
**videos** 95:1 99:11
**violate** 100:4
**violating** 47:15
**violation** 87:14 98:6
  100:10
**violations** 96:16
  101:17
**visited** 92:15
**VP/CFO** 10:17
**vs** 1:6

_____
**W**

**wage** 92:2,3
**want** 4:14 16:6
  51:18 86:12
**wanted** 28:12 51:12
  104:23
**warranted** 73:10
  109:22
**wasn't** 65:14 71:14
  78:13
**way** 15:23 16:1 19:2
  19:7 55:9 56:3
  73:24 82:13 83:18
  89:11,13 95:7,9
  100:22 105:24

106:1
**ways** 95:10
**Weather** 30:7
**website** 84:25 85:3
  87:1 101:13
**week** 38:14,14
**weekly** 15:12 43:19
**weeks** 22:7,8
**went** 10:2 35:9
  38:13 53:19 58:3
  62:8 78:15 88:9
  90:8 93:5 99:15
**weren't** 53:3
**We'll** 8:2 66:3
**We're** 4:24,24
**wide** 70:18
**wife's** 61:17
**wiped** 25:17,18,20
  26:4 27:15 28:18
  31:6,9,17,21,21
  32:1 36:16 38:9
  38:10,20
**witness** 3:2 6:25 7:8
  7:21 10:24 17:4
  18:9,17,25 19:16
  20:8,17 21:3 22:9
  22:19,20,24 23:4
  23:10,15 28:8
  33:16 35:16 36:10
  37:1 40:16 43:17
  53:25 57:11 59:3
  67:16 68:5 69:23
  70:16 71:2,10
  74:11,18 75:2,7
  76:1,10,16,24
  77:7 80:19 81:3
  84:19 86:18 88:24
  89:7 95:17 96:5
  97:22 98:9,24
  99:21 103:24
  106:3 110:16
  111:4 112:22
  113:5,15 114:2,21
**women** 45:22,25
  46:8 76:7 80:9,11
**word** 33:22 75:14
  111:24
**words** 29:15 73:20
**work** 13:24 40:10
  60:4 62:22 104:20
**worked** 24:4,5
  41:23 58:1 64:11
  65:20 67:3 74:11
  75:13
**working** 5:21 112:4
**wouldn't** 28:16

**Richard Hare**                    **Trawick v. Carmike Cinemas, Inc.**                    **April 10, 2018**

49:19 52:9 55:7
55:17,25 59:1
**writing** 33:7 90:13
**written** 15:21 16:1
18:12 19:14 36:20
46:12,13 48:10
53:21 54:6 65:9
65:11 89:8,14,21
89:24 94:12 101:2
103:10,13 105:3
107:8,11,25 108:3
108:5,12 111:18
112:9,12
**wrong** 88:19
**wrote** 41:22 58:25

**X**

**X** 3:6
**XYZ** 52:18 89:20
89:24

**Y**

**year** 85:9 86:8,16
86:20
**years** 39:2 59:8,8
60:9 61:6,7,9 70:3
70:6 75:14 93:23
101:10 107:15
**yeses** 4:22
**yesterday** 23:19
39:16,22

**1**

**1-800** 92:11
**1:12** 114:18
**10** 1:13 4:1 39:2
59:8 101:10
**10.B** 116:3
**10:10** 1:14
**101** 3:10
**104** 3:12
**105** 3:9
**106** 3:11
**11** 59:8
**12** 107:7,13
**1250** 2:5
**13** 1:23
**140** 1:23
**15th** 110:14
**15-14-37(a)** 116:7
**178** 109:17
**18** 95:23 96:3,25
97:12
**18th** 115:15 116:15
**184** 109:18
**19** 100:1 102:10

**2**

**2-A-2** 86:11
**2006** 5:23,25 6:6,8
6:11,15 8:4,8,15
**2008** 8:24 9:20,22
**2009** 9:22
**2013** 36:4 61:11
102:10 105:4
**2014** 61:3
**2015** 36:4 42:25
63:21 105:4 107:7
107:13 110:11,14
**2016** 7:23 8:1,9
10:20 11:19 13:8
37:14 61:10,11
**2017** 5:17 13:8
**2018** 1:13 4:1 61:5
115:15 116:15

**3**

**30(e)** 114:19
**3000** 1:15 2:10
**30308** 1:16 2:11
**30326** 2:5
**30329** 1:24
**34** 108:21
**3400** 2:5
**37** 3:8 83:22 84:1
84:16 87:5 95:24
100:13 101:7
102:16 104:25
**38** 3:9 105:7,11
**39** 3:10 101:21,25
105:1

**4**

**4** 3:4
**4:16-CV-380(CDL)**
1:6
**40** 3:11 106:10,14
**404)321-3333** 1:25

**5**

**51** 5:4

**6**

**6** 110:11
**600** 1:15 2:10

**7**

**7.C** 116:7

**8**

**800** 95:5
**83** 3:8

**89** 3:12 108:13,17
109:1,12 110:8,10
111:16 112:20
113:3

**9**

**9-11-28(c)** 116:8
**9-11-30(e)** 114:21

**REGENCY-BRENTANO, INC.**