IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF GEORGIA

COLUMBUS DIVISION

| | |
|---|---|
| CRYSTAL TRAWICK, | ) |
| | ) CIVIL ACTION NO. |
|        Plaintiff, | ) 4:16—CV—00380 |
| | ) |
| vs. | ) AUGUST 21, 2018 |
| | ) |
| CARMIKE CINEMAS, INC., | ) PRETRIAL CONFERENCE/MOTION |
| | ) HEARING |
|        Defendant. | ) |

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE CLAY D. LAND,

UNITED STATES DISTRICT JUDGE

**Proceedings recorded by stenography; transcript produced by computer.**

BETSY J. PETERSON, CRR, RPR, CCR
Federal Official Court Reporter
Post Office Box 2324
Columbus, Georgia  31902
betsy_peterson@bellsouth.net

1                          APPEARANCES

2

3    FOR THE PLAINTIFF:

4         MARY A. PREBULA
          mprebula@prebulallc.com
5         Prebula & Associates LLC
          3400 Peachtree Road
6         Suite 1250
          Atlanta, Georgia  30326
7         (770) 495-9090

8

9    FOR THE DEFENDANT:

10
          RICHARD W. GERAKITIS
11        richard.gerakitis@troutmansanders.com
          EMILY EVANS SCHIFTER
12        emily.schifter@troutmansanders.com
          REBECCA HALLE SILK
13        rebecca.silk@troutmansanders.com
          Troutman Sanders LLP
14        Bank of America Plaza
          600 Peachtree Street, N.E.
15        Suite 5200
          Atlanta, Georgia  30308-2216
16        (404) 885-3000

17

18

19

20

21

22   COURT REPORTER:

23        BETSY J. PETERSON, CRR, RPR, CCR
          Federal Official Court Reporter
24        P. O. Box 2324
          Columbus, Georgia  31902
25        betsy_peterson@bellsouth.net

1          (Proceedings on August 21, 2018, commencing at 2:08 p.m.,

2     as follows:)

3          THE COURT:  Please be seated.  Good afternoon.

4          All right.  This will be in the case of Crystal

5  Trawick versus Carmike Cinemas, Inc., Case 4:16—CR — CV—380.

6  Let's identify who is present for the parties.

7          For the plaintiff?

8          MS. PREBULA:  Good afternoon, Your Honor.  Mary

9  Prebula for plaintiff, Crystal Trawick.

10          THE COURT:  Welcome.

11          MS. PREBULA:  Thank you.

12          MR. GERAKITIS:  For Carmike Cinemas, Your Honor,

13  Richard Gerakitis.  And I've also got Rebecca Silk and Emily

14  Schifter.

15          THE COURT:  All right.  Welcome.

16          MS. SILK:  Thank you.

17          MR. GERAKITIS:  Thank you, Your Honor.

18          MS. SCHIFTER:  Thank you.

19          THE COURT:  Okay.  We had set this down for a final

20  pretrial conference for our upcoming September term.  There is

21  a pending motion for summary judgment that I've not yet

22  decided, and I wanted to ask a few questions about that motion

23  before we go any further.

24          The reason I set it down without having made a ruling

25  yet on the summary judgment motion is because if we don't try

```
 1    the case this term, we won't get to it until next March.  And I
 2    thought if I issued a summary judgment ruling in close
 3    proximity to today's hearing y'all would still have plenty of
 4    time to get the case ready for trial.
 5            We're actually not going to start our September term
 6    until September the 24th.  So the trial weeks would be — and
 7    during the first week we'll be trying criminal cases and maybe
 8    into that second week of October the 1st.  So it looks like, at
 9    the moment at least, that we would not start any civil cases
10    until the week of October the 9th, and we would have the weeks
11    of October the 9th, the 15th, and the 22nd.
12            I guess before I get into these questions I have
13    about summary judgment, Ms. Prebula, what — you had some
14    conflicts, potential conflicts.  Do you have conflicts during
15    the weeks of October 9th, 15th, or 22nd?
16            MS. PREBULA:  I can resolve — I have a leave of
17    absence the week of October 9th, three days of that, but I can
18    resolve that if the Court sets this case for trial then.  But I
19    do have a conflict for the week of October 22nd.  I have a
20    long-long-planned family reunion with a sick elderly relative,
21    and I really want to be there.
22            THE COURT:  And does the — do the defendants have
23    any conflicts that they know about the week of October the 9th
24    or 15th?
25            MR. GERAKITIS:  Your Honor, we have a corporate
```

1  representative, Dan Ellis, who we would like present for trial.

2  He is supposed to be traveling literally all over the world for

3  work from October 2nd until October 16.  So if there's any way

4  to specially set it, it would be ideal.  But obviously that's

5  just a request, hopefully that both sides could be accommodated

6  in that respect so we'd know, because we've got folks certainly

7  coming from out of state to come for trial.

8           THE COURT:  Okay.  How long —

9           MS. PREBULA:  Your Honor — sorry.

10           THE COURT:  How long do y'all anticipate the trial

11  lasting?

12           MS. PREBULA:  We're estimating five to seven days.

13  But may I throw another kink in the works?

14           THE COURT:  Yes.

15           MS. PREBULA:  I have a planned trip to the Holy Land

16  March 3rd through March 20th.  And that is right in the middle

17  of your calendar.  So I obviously would — long-planned,

18  prepaid — would like to go.  But I just want to make the Court

19  aware of that.  I mean, you know, I don't know what the chances

20  are that we'd hit all those dates, but — I apologize, but it's

21  already in the works.

22           THE COURT:  When — when will you be back from your

23  October 22nd trip?

24           MS. PREBULA:  The leave of absence is the 25th

25  through the 29th, so I would be back on the —

```
 1            THE COURT:  We don't give —— we don't give —— you
 2  don't have a leave of absence in this court.
 3            MS. PREBULA:  The leave of absence I've filed in
 4  other courts is the 25th through the 29th.
 5            THE COURT:  Okay.
 6            MS. PREBULA:  So ——
 7            THE COURT:  The 29th, is that a Monday?
 8            MS. PREBULA:  That's a Monday, yeah.  And it's out of
 9  state, so in order to get back.
10            THE COURT:  Okay.  And so your person would be back
11  if we were to start the case on October the 30th,
12  Mr. Gerakitis?
13            MR. GERAKITIS:  Yes, Your Honor, but I thought you
14  said the weeks were the 9th, 15th, and 22nd.
15            THE COURT:  They are.  But I could look at my
16  calendar and see whether or not I could try this case the week
17  of October the 30th.
18            MR. GERAKITIS:  Oh, perfect.
19            THE COURT:  Your person will be available then?
20            MR. GERAKITIS:  Yes, absolutely.  I'm sorry.  I was
21  confused with your March ——
22            THE COURT:  You're correct.  You're correct.  My
23  traditional September term is supposed to end on October the
24  22nd.  And I would need to —— before we finish today, I'll go
25  pull up my calendar and see what the week of October 30th looks
```

1  like, because I don't — I'm fairly certain I'm not going to be

2  able to specially set this case for trial any — much later, in

3  November or December.  We've got a products liability trial I

4  know.  It's going to be about a two-, two-and-a-half-week trial

5  during that period.

6         Anyway, we'll — I'll — I'll check my calendar for

7  that week before we finish.

8         A few questions on the summary judgment motion.

9  Ms. Prebula, let me ask you:  What is your interpretation of

10  the evidence where Ms. Trawick had a conversation with

11  Mr. Passman and they had a discussion about the glass ceiling

12  and her pay in relation to Mr. Sailors?  How do you think that

13  evidence should be considered at the summary judgment stage

14  when any reasonable inferences would be construed in — in your

15  favor?  What is your interpretation of that testimony and

16  evidence?

17         MS. PREBULA:  Well, I think it's — it's — there's

18  several factors that — that that testimony is admissible for.

19  The Court —

20         THE COURT:  Well, just what do you think — what is

21  your take on what was said?  What do you think a reasonable

22  juror could conclude from what he said?

23         MS. PREBULA:  I think based on the history in the

24  case and her previous complaints of failing to be promoted,

25  asking for pay raises, stating her bonus was not equal to

```
 1    Sailors', that she had taken over Mr. Mayton's job, we contend
 2    Mr. Mayton is a comparator as well, and obviously that's the
 3    subject of our motion to compel.
 4            We also contend that Mr. Collins, who replaced her,
 5    is a possible comparator.  They produced none of the data, none
 6    of the discovery, that we've requested with regard to their
 7    salaries, personnel files, et cetera.  But we believe based
 8    upon the previous conversations, including but not limited to
 9    Mr. Lucas's testimony, who was a division manager, that her
10    supervisor, Van Noy, had already said he would not promote her.
11            And then she had this — this opportunity to speak at
12    a local college.  She went in and spoke with Mr. Passman.  She
13    took an outline with her.  And she asked him specifically
14    whether or not her comments were appropriate.  That outline is
15    produced in this case.  She said, "I'm going to say it's harder
16    for women," and, "Have I hit my glass ceiling at Carmike?"
17            And he told her — and I'm not quoting, but the
18    quotes are in my brief — that there was a glass ceiling for
19    women, she had not hit hers, but that in addition to everything
20    else she would have to finish her bachelor's degree.
21            Now, she already had an associate's degree.  Her
22    boss, a vice president, CFO, did not have a college degree at
23    all.  One of her comparators, Sailors, did not have a degree at
24    all.  And based upon those two comments in that meeting,
25    within — I think it's 47 days — she was investigated and
```

1      terminated as of November 17th.

2              So to me it's several.  It shows part of the pattern

3      of discrimination.  As the Court is aware, part of our motion

4      to compel deals with at least four other women who had the same

5      thing happen to them in that — not that they were terminated,

6      but they were passed over for promotion by an outside male.  So

7      we think that shows discrimination.  We think the evidence of

8      the glass —

9              THE COURT:  Well, that really wasn't my question.

10             MS. PREBULA:  I apologize.

11             THE COURT:  And we're going to get into whether or

12     not you're now trying to assert a pattern and practice claim by

13     trying to get in "me too" evidence kind of through the back

14     door, but we'll get to that in a moment.

15             So you would agree that what Passman said — that's

16     not direct evidence.  Your case is entirely circumstantial.  Do

17     you agree with that?

18             MS. PREBULA:  No, sir, I don't think so.  I think —

19             THE COURT:  What is the — what is the direct

20     evidence of — in support of your gender claims?

21             MS. PREBULA:  The direct evidence is that, even if we

22     take out the earlier history, once Mr. Mayton left —

23             THE COURT:  What is this earlier history you're

24     referring to —

25             MS. PREBULA:  That —

1            THE COURT:  —— just so we'll ——

2            MS. PREBULA:  Sure.  That prior to Mr. Mayton leaving

3    in 2000 —— I believe it was 2015; don't hold me to that date ——

4    excuse me, 2013 —— Ms. Trawick had already asked for a title, a

5    pay raise, a promotion.  Once Mr. Mayton —— and asked to be

6    named a director.  Once —— because she was performing some of

7    those duties.  Once Mr. Mayton left, she took on all of his

8    duties except for approval of her credit expenses and credit

9    cards and sponsorships.  As a check, someone else approved

10   them.  That was company policy.

11           THE COURT:  So —— so those duties that were given to

12   Mr. Sailors just related to approval of Ms. Trawick's expenses

13   and —— and sponsorships that she would solicit or related to

14   company-wide approval of expenses and sponsorships?

15           MS. PREBULA:  Mr. —— the only additional duty that

16   Mr. Sailors was given after Mr. Mayton left was to approve

17   Ms. Trawick's expenses that went through a Comdata system and

18   to approve sponsorships.  He already had approval authority for

19   his reports to him, and he had two reports.  Ms. Trawick had

20   four reports.  And those —— some of those people were hired by

21   her while she was on maternity leave and after Mr. Mayton left.

22   Mr. Van Noy, her immediate superior, who was also Sailors'

23   superior after Mayton left, could approve some of those

24   expenses as well.  And then we learned in another deposition

25   that, based upon a certain level of requests for sponsorships,

1    those requests could be made directly to the CEO, Mr. Passman's

2    administrator, and that administrator says she could approve

3    those.  She also — excuse me — says that she would pass them

4    up for approval.  She also said she had a book with all of

5    those approvals in them, who approved them, what the level was,

6    et cetera, which has not been produced in this case.

7            THE COURT:  So what — what is — what do you believe

8    is the direct evidence of gender discrimination with regard to

9    any of these gender-based claims?  What is the direct evidence

10   of discrimination, as the Eleventh Circuit has defined it,

11   meaning that it's evidence of discrimination without any

12   inference at all, just the evidence itself shows gender

13   motivation?

14           MS. PREBULA:  I think that it's twofold.  One is the

15   fact that, as compared to males in similar positions, she was

16   not paid the same.  That is undisputed.

17           THE COURT:  And your comparators are both Mayton and

18   Sailors?

19           MS. PREBULA:  Yes, sir.  And perhaps Collins.  And

20   here's why.  Sailors was —

21           THE COURT:  So what — what is your response — is

22   your argument that she should have been paid the same as Mayton

23   and Sailors or that there's such a difference in that pay that,

24   even if she should've made a little less because she had less

25   years with the company, that does not fully explain the

1  disparity and therefore part of the disparity is only

2  explainable based on gender?  Or what is your contention?

3           MS. PREBULA:  That is part of our argument, Your

4  Honor.

5           THE COURT:  You think — do you contend she should've

6  been making exactly what Mayton made?

7           MS. PREBULA:  We do.  We contend that — and in our

8  damage calculations that we were able to, you know, gather

9  information for, it is her understanding through the corporate

10  world and the discussions — of course, again, the dollars —

11  the data hasn't been produced to us — that Mr. Mayton was

12  making at least $95,000 a year.  We know that Sailors was,

13  particularly in his last year — and they're detailed in our

14  initial disclosure supplements — because he was making a

15  salary over 64, plus he got bonuses of almost $40,000.  So he

16  was making over a hundred.  If we —

17           THE COURT:  What was Ms. Trawick making?

18           MS. PREBULA:  She was making 47,5.  And she got a

19  slight bonus the — each year less than — less than $10,000,

20  in the $10,000 range.  The exact numbers are set out, and I'm

21  happy to pull those out if the Court wants to hear it.

22           So we are looking at the back pay from at least the

23  date that Mayton left, although we contend —

24           THE COURT:  So you're — you're suggesting that

25  you're going to put up evidence that the duties that she

 1  performed were essentially the same duties that Mayton

 2  performed and yet she was paid half as much.

 3          MS. PREBULA:  We think — believe, quite frankly,

 4  Your Honor, if we got the data, we would find she was paid less

 5  than half as much.  We — based upon her anecdotal evidence,

 6  the salary was half as much.  But the bonuses for Mayton are

 7  unknown.  We have the data —

 8          THE COURT:  What about the contention that that

 9  disparity can be explained because they had — well, Sailors

10  had seven or eight — whatever it was — more years in the job?

11          MS. PREBULA:  Well, I think that can be explained by

12  looking at what his job was.  Both Sailors and Trawick had

13  earlier experience at Carmike that were not directly related to

14  marketing and advertising at the time of where we're looking at

15  Mr. Mayton leaving.  But the Court is aware that you can't just

16  look at past history on salary in order to determine whether or

17  not there's disparity.  In this particular case the people at

18  the company even recognized that Ms. Trawick was performing the

19  duties of director of marketing.  Mr. Van Noy, her supervisor,

20  introduced her to theater owners at a meeting as the director

21  of marketing.  Mr. Sailors went to Mr. Van Noy and said, "She

22  should be promoted and given the title of director of

23  marketing.  She's doing that work."  Mr. Lucas, a division

24  manager, did the same thing.

25          THE COURT:  What did Passman say to her about her pay

 1    in relation to Sailors when she had the conversation with him

 2    about the glass ceiling?

 3              MS. PREBULA:  "You're underpaid.  We need to fix it.

 4    I'll look at it."  That's what they told her every time.

 5    "You're right."  Those aren't the exact words, but that's the

 6    gist of the conversation.  Van Noy told her the same thing, "We

 7    need to look at it."

 8              When she had that glass ——

 9              THE COURT:  What —— what is your theory as to why Van

10    Noy said she would never be promoted under his watch?

11              MS. PREBULA:  Because when Mr. Van Noy came in ——

12    there was —— there was an earlier management at Carmike, and

13    that earlier management was basically ousted.  Mr. Passman was

14    brought in as a new team to try to, you know, get things back

15    on track.  And when that happened, there were some females who

16    reported to Mr. Van Noy.  By the time Ms. Trawick reported to

17    Mr. Van Noy, he had removed every female that reported to him.

18    No females other than Ms. Trawick reported to him.

19              And the other inference that we believe the jury can

20    draw is when he —— and Mr. Lucas ——

21              THE COURT:  So you think he just didn't like working

22    with women?

23              MS. PREBULA:  Absolutely.  And when he said to

24    Mr. Lucas, "I will never promote her" —— and pointed to the

25    ceiling —— "unless he tells me to," I think the jury can

1    conclude from that statement and all the other statements that

2    this termination and this discrimination was based solely —

3              THE COURT:  Explain to me what — he pointed to —

4    her office was above his?

5              MS. PREBULA:  No.  Mr. Passman.  Ms. Trawick

6    testify —

7              THE COURT:  Oh, he said that he'll never promote her

8    unless "he" —

9              MS. PREBULA:  Right.

10             THE COURT:  — meaning the big boss, told him to.

11             MS. PREBULA:  Right.  So here — so here's the

12   situation we have —

13             THE COURT:  Your — your suggestion is the only

14   inference from that is it had to be based upon her gender

15   because she was doing the job or —

16             MS. PREBULA:  Based upon everything else, looking at

17   the totality of the circumstances.  If it were simply a fact of

18   I don't like her, I don't like that person, that would've been

19   different.  That's not what he said.

20             THE COURT:  But you say he didn't have a degree

21   either?

22             MS. PREBULA:  He did not.

23             THE COURT:  So you think it's incredible for him to

24   suggest he wasn't going to hire her, even though she was going

25   to be his subordinate, just because she didn't have a degree

 1  when he didn't have one?

 2          MS. PREBULA:  I do.  And it's not just Mr. Van Noy.

 3  Mr. Van Noy specifically told her, "You do not need an

 4  educational degree to advance."  He told her that.

 5          Mr. Passman told her, "In order for you to move up

 6  into management" —— this is at the glass ceiling

 7  conversation —— "In order for you to move up into management,

 8  you're going to have to have a degree.  Men are going to expect

 9  that of you."

10          THE COURT:  That's what she said, or that's what

11  you're interpreting that to be?

12          MS. PREBULA:  That's what she testified.

13          THE COURT:  That's what he said —— that's what she

14  said he said.

15          MS. PREBULA:  That's correct.  And Mr. Passman, of

16  course, equivocated in his deposition.  He did admit that they

17  had a conversation about her statements.  He did admit that

18  they discussed the glass ceiling.  He denied that he said it

19  applied directly to Carmike.  And he waffled on the education

20  issue.

21          But she has a direct quote.  She was —— she wrote

22  down these items as they occurred.  We produced some of her

23  statements that were prepared back when all this happened.  And

24  we think in the totality of circumstances this supports not

25  only the discrimination claim, the disparate treatment claim,

1    but that the termination itself was total pretext.  We have

2    evidence —

3              THE COURT:  Well, let me make sure I understand.

4    Mr. Gerakitis or — who's going to handle the argument at your

5    table?

6              MR. GERAKITIS:  If the Court please, I will.

7              THE COURT:  Okay.  What is — what is the stated

8    reason, first of all, for the failure to promote?

9              MR. GERAKITIS:  Well, can I point out that the

10   failure to promote is a time-barred claim for her, because they

11   filed their EEOC charge in April, April 14 of 2016, which means

12   you can only reach back 180 days under *Cody v. Gold Kist* —

13   even your own cases, *Seldon*, *Hooper*, Gossage — you can only

14   reach back 180 days to capture a promotion claim.  That gets

15   her back to October 17.

16             As the evidence is clear and unrebutted, Mr. Collins,

17   who has a college degree, 24 years worth of experience, that

18   is an undisputed fact under our statement of material facts —

19   No. 100, Your Honor, undisputed.  He has a Bachelor of Science

20   degree in communications from Florida and a certification in

21   management from Rollins College of Business, extensive past

22   experience as vice president of brand activation for Turner

23   Entertainment Networks, and as the founder and vice president

24   of marketing at Focus Point Advertising.

25             That in and of itself demonstrates that she can't

1    reach back all the way to that Mayton time frame to say, "I

2    should have been promoted during that time frame," because she

3    should have acted like the prototypical employee who has a

4    timely charge of discrimination and act on it and file to —

5    point to a discrete act that denied her a promotion.  She

6    didn't do that, Your Honor.  And she knew —

7            THE COURT:  So — so when was the replacement —

8    you're saying the replacement person was — was hired more than

9    180 days before she filed her EEOC claim?

10           MR. GERAKITIS:  He was hired as the CMO.

11           THE COURT:  Yeah.

12           MR. GERAKITIS:  They started a search for him in the

13   second quarter of 2015.  She admits, in fact, in her complaint,

14   Your Honor — she points out in her complaint that she went to

15   Mr. Van Noy and told Mr. Van Noy, "I understand you're

16   considering a CMO.  I could still be director of marketing and

17   work under a CMO."  And that belies this idea that she was

18   trying to achieve the CMO position.

19           So all that she can do is to reach back from that

20   April filing date in 2016 on her EEOC charge and capture any

21   decision that lands in that mid-October — October 16, to be

22   precise — of 2015 time frame.  The only promotion decision —

23   because no one was ever promoted to director of marketing — is

24   Mr. Collins was hired in November of 2015 and started in

25   December of 2015.  And as the Court's aware, the company was

1    sold by April of the next year and ended up closing shop, if

2    you will, by December.

3             THE COURT:  Is the plaintiff's position that

4    Mr. Collins filled the position that she had asked to fill?

5             MS. PREBULA:  Yes, Your Honor.  It's our position

6    that the — once she made this issue, they changed direction,

7    because initially Carmike was looking for a director of

8    marketing to replace Mayton.  Once Ms. Trawick made this an

9    issue in her case and made it — made it — made the

10   supervisors and the CEO aware and directors of divisions,

11   division managers, they changed boats in midstream.  And so

12   then they decided to go to the CMO position.  And it's our

13   position, twofold, that this is a continuing violation and we

14   are not time barred, as — as obviously the Court knows that or

15   we wouldn't have filed a complaint, and we contend it's not

16   time barred — and hiring of Mr. Collins with a different title

17   is further part of the pretext that they used to terminate

18   Ms. Trawick.

19            THE COURT:  So they — they hired Mr. Collins within

20   the 180-day period.

21            MS. PREBULA:  They did.  And they hired —

22            THE COURT:  And your — your contention is that part

23   — that them changing this title to this position, that may

24   have occurred more than 180 days before she filed her EEOC

25   claim, but that continued up until the time that they actually

 1  hired Collins and, therefore, part of that was within the 180

 2  days and the rest of it should be considered a continuing

 3  conduct that would be considered in deciding whether it was

 4  time barred or not.

 5          MS. PREBULA:  Yes, Your Honor.  And we also contend

 6  that —

 7          THE COURT:  So you contend the whole thing is just —

 8  once they knew she wanted the position, they then engaged in

 9  this activity to change the position to one that she was

10  perhaps, they would argue, was not qualified for?

11          MS. PREBULA:  I think it's even more significant than

12  that, Your Honor.  I think once they realized that she was

13  going to file with the EEOC and received notice of the claim,

14  that they started back pedaling to try to find a legitimate

15  reason that they could say that justified them in terminating

16  her.  As you know, part of our motion to strike is that they

17  have — they cannot now put forward any comparator evidence.

18  During the course of discovery we asked for that comparator

19  evidence.  And the — the case law is clear that if you don't

20  meet — if the defendant does not meet its rebuttal duty to

21  show that she was not at least minimally qualified for this

22  position, they can't offer it at trial.  So we moved to exclude

23  that, because they never said, "You are not qualified for this

24  position."  They never offered that excuse.

25          THE COURT:  Well, as I understand what he's saying

1   today and perhaps in his briefing is that she never applied for
2   the job that Mr. Collins filled and that the job that she
3   wanted was eliminated.
4            Is that correct?
5            MR. GERAKITIS:  It wasn't eliminated, Your Honor.  It
6   was never existing from '13 through the time the company
7   closed.  The point is — and you just pointed it out — the
8   question listed here that we asked her was what promotion did
9   they withhold.  And she answered, "The title of director."
10            Her affidavit, which she filed in the case —
11            THE COURT:  She obviously wanted — May — May —
12   what's the name, Mayton?
13            MS. PREBULA:  Terrell Mayton.
14            THE COURT:  She wanted — she wanted Mayton's job.
15            MR. GERAKITIS:  The problem is, Your Honor —
16            THE COURT:  She allegedly — well, she allegedly was
17   performing Mayton's duties —
18            MR. GERAKITIS:  The —
19            THE COURT:  — and they at some point decided that
20   rather than hire somebody in that exact job, they changed —
21   I'm assuming Carmike's saying not only the title of the
22   position but the job.
23            MR. GERAKITIS:  Oh, they admit that they changed —
24   they expanded the duties for the chief marketing officer.
25            THE COURT:  So does Carmike deny that they denied her

```
 1   a promotion?
 2             MR. GERAKITIS:  They did not promote her in 2013,
 3   2014, or 2015 to her expressed director of marketing position.
 4             THE COURT:  And you're saying that their decisions
 5   not to do that are barred by — are time barred.
 6             MR. GERAKITIS:  Absolutely.  They're unquestionably
 7   time barred.  And the problem is, Your Honor, they point out —
 8             I don't know if that's me or somebody else, but —
 9             THE COURT:  The beeping is just our construction —
10             MR. GERAKITIS:  Oh.
11             THE COURT:  — going on outside.
12             MS. PREBULA:  Oh, good.
13             THE COURT:  Yes.  We've got — as you can see,
14   there's construction all over this place.  And you'll hear
15   beeps and everything else.
16             MR. GERAKITIS:  The only position that she says she
17   was seeking, both in her complaint and in her deposition, is
18   promotion to a director position.
19             THE COURT:  So your position is that any conduct that
20   happened beyond the 180 days is discrete conduct, not
21   continuing conduct that is barred.
22             MR. GERAKITIS:  There is no recognized continuing
23   violation on a promotion claim.  That is Supreme Court
24   precedent, National Railroad.  They're as explicit as they can
25   be about it.  And the Eleventh Circuit follows it to the
```

1  letter.  And you have followed it to the letter.

2           And the reason it's important, Your Honor, to point

3  out —

4           THE COURT:  What if there's no difference — what if

5  there's no material difference between the position that —

6  it's not marketing director.  It's marketing —

7           MR. GERAKITIS:  It's chief marketing officer.  The

8  problem is —

9           THE COURT:  What if that's just a difference in

10  name —

11           MR. GERAKITIS:  But it's —

12           THE COURT:  — and what —

13           MR. GERAKITIS:  — it's not.

14           THE COURT:  I'm not saying that I think it is or not.

15  I'm saying what if there's enough evidence for a jury to make

16  that determination.  Then that — that claim would be timely,

17  would it not?

18           MR. GERAKITIS:  She hasn't said that she sought the

19  chief marketing officer position.  It's not in her complaint.

20  It's not in her affidavit.  It's not in her deposition.

21           THE COURT:  Well, she said she was seeking the

22  position —

23           MR. GERAKITIS:  — of director.

24           THE COURT:  — that had the duties — well, but all

25  this is semantics.  She said she was — as I understand it, she

1   is saying that she was seeking the position that had the

2   marketing duties that Mayton was performing and that she was

3   performing.  And whether you come in later on and say, "Okay,

4   that's now called chief marketing officer," and if the duties

5   are essentially the same, surely Carmike knew that's the job

6   she wanted.

7           MR. GERAKITIS:  But she points out ——

8           THE COURT:  Even if she says in her deposition that

9   what I wanted is the —— the director job ——

10          MR. GERAKITIS:  Understood.

11          THE COURT:  —— she's really, in essence, saying, "I

12  want the job that had these" —— I mean, that —— that job, as I

13  understand it, with Mayton there —— he's the head marketing guy

14  in the company, right, other than Passman and ——

15          MR. GERAKITIS:  Back in that 2013.

16          MS. PREBULA:  That's correct.  He was the director of

17  marketing ——

18          THE COURT:  That's —— and as the marketing department

19  is concerned, that's the head of the —— of the pyramid.

20          MS. PREBULA:  Exactly, Your Honor.

21          THE COURT:  That's what she wanted to be was the head

22  of the marketing pyramid.

23          MR. GERAKITIS:  And she ——

24          MS. PREBULA:  She did want to be the head of the

25  marketing, period, and it's —— it's even more significant than

 1    that.  They did point out that she said, "I want to be director

 2    of marketing."  Well, you know what?  They didn't tell her they

 3    were going to change the title before they fired ——

 4              THE COURT:  Well, let me let Mr. Gerakitis respond.

 5              If it's clear that she thought she was qualified, and

 6    if the evidence is such that a jury could conclude that she was

 7    qualified because she was doing the —— the marketing duties as

 8    the person at the top of the pyramid, maybe only in an acting

 9    capacity, then why would it not be reasonable for a jury to

10    conclude that when they changed the name of the position that's

11    the one that she'd been talking about all along that she

12    wanted, regardless of what you call it?

13              MR. GERAKITIS:  There's several pitfalls for that for

14    her.  She argued in her summary judgment filing before you that

15    the reason she was asking to be promoted to the director of

16    marketing position is that you could have a director of

17    marketing and a director of advertising who both run their

18    program, their particular departments.  The CMO is who

19    Mr. Sailors reports to.  She admits in the summary judgment

20    filings that Mr. Mayton is who Mr. Sailors and her both

21    reported to at the same time, before Mr. Mayton left in July of

22    2013.

23              THE COURT:  So —— so the new position —— who took the

24    new position?

25              MR. GERAKITIS:  Rob Collins, Your Honor.  And it's

1  clear also —

2          THE COURT:  And the director of advertising reports

3  to him?

4          MR. GERAKITIS:  The director of advertising reports

5  up to him.

6          THE COURT:  And is there now a director of marketing

7  that reports to him?

8          MR. GERAKITIS:  Well, there's no longer.

9          THE COURT:  Exactly.  That's what looks —

10         MR. GERAKITIS:  No, no.  Your Honor, there's no

11  company any longer.  December 2016 they're closed.

12         THE COURT:  Okay.

13         MR. GERAKITIS:  That's the — which is a fundamental

14  part of the case anyway.

15         THE COURT:  So after the — so when they developed

16  the position of chief marketing officer, he continued with all

17  of the duties of the marketing director, plus the advertising

18  director ended up reporting to him?

19         MR. GERAKITIS:  That's exactly right, Your Honor.

20  And it's clear that she understood because it was told to her

21  that the CMO position they were going to require a college

22  degree, a graduate degree.

23         THE COURT:  She wanted — so it's your position that

24  what she really wanted was the marketing director position and

25  then she could report — she wanted to be on the same level as

1    Sailors.

2              MR. GERAKITIS:  Which is why she's trying to pivot to

3    this minimally qualified basis.  And the problem is, Your

4    Honor, you can't pivot to minimally qualified.

5              THE COURT:  So you're saying that what she's

6    second-guessing, she wanted them to make this — that she's

7    second-guessing the consolidation of this position into the CMO

8    position.

9              MR. GERAKITIS:  It's not really a consolidation,

10   though, Your Honor, because —

11             THE COURT:  Well, it takes all of the duties of

12   the —

13             MR. GERAKITIS:  And the advertising duties also

14   because they're all combined.

15             THE COURT:  Well, it doesn't take all the duties.  It

16   just —

17             MR. GERAKITIS:  It takes all the advertising

18   responsibility.  He's going to have a director reporting to

19   him, but he's still responsible for it.

20             MS. PREBULA:  Your Honor, may I address that?

21             MR. GERAKITIS:  And he's a C-level employee also,

22   which she never thought she was the equivalent, never.  She

23   said for sure, "Mr. Van Noy, who's a C level, who reports to

24   Mr. Passman.  He is not my comparator."  That's why Mr. Collins

25   would not be her comparator either.

1              THE COURT:  What's the — what's Carmike's contention

2   as to why she was not paid — when she started taking over

3   Mayton's duties, what's Carmike's position as to why she was

4   not paid comparable to Mayton?

5              MR. GERAKITIS:  Because —

6              THE COURT:  I mean not exactly what he was paid, but

7   why would she not have been paid comparable if she was doing

8   comparable duties?

9              MR. GERAKITIS:  Because, Your Honor, she would not

10  have Mr. Sailors reporting to her.  She did not have all of the

11  responsibilities that Mr. Mayton had.

12             THE COURT:  Mr. Sailors reported to Mayton?

13             MR. GERAKITIS:  Mr. Sailors reported to Mayton while

14  Mr. Mayton was there, that's correct.

15             THE COURT:  Okay.

16             MR. GERAKITIS:  And her argument has been

17  throughout — it's in her summary judgment — is that —

18             THE COURT:  Well, who — who did Sailors report to

19  when Mayton left?

20             MR. GERAKITIS:  Mr. Sailors reported to Mr. Van

21  Noy —

22             THE COURT:  Okay.

23             MR. GERAKITIS:  — as did probably seven or eight

24  others.

25             THE COURT:  So she did not take over all of Mayton's

1   duties.

2           MR. GERAKITIS:  No, no.  That's clear, and she admits

3   it.

4           THE COURT:  She took over —— well, what she did not

5   take over is the sponsorship duties that Mayton had —— went to

6   Sailors.  And the supervisory management executive

7   responsibilities that Sailors had with regard —— that Mayton

8   had with regard to Sailors reporting to him, those went to Van

9   Noy.  Is that —— is that correct?

10          MR. GERAKITIS:  Van Noy actually offered and managed

11  marketing literally throughout.  He testified to the fact that

12  it was really sort of a team effort.  And ——

13          THE COURT:  Well, I'm trying to find out just —— if

14  you look at what Ms. Trawick was doing day-to-day, the duties

15  that she was doing in marketing, how were they different than

16  what Mayton did?

17          MR. GERAKITIS:  They were different because she

18  didn't have the key decision-maker position that he did.  The

19  reason for that is when this case was first filed and even

20  before that, she maintained that she was a nonexempt worker who

21  was entitled to overtime, who did not have the type of either

22  professional, administrative, or executive exemption to be a

23  salary employee.  And that's what —— and remember, Your Honor,

24  this is a shotgun pleading case.  It's just like the case you

25  had with Bobby Aniekwu and the one that Judge Tjoflat just

 1    came — came down on the plaintiff's counsel in *Jacks* —

 2              THE COURT:  But let me just try to narrow down the

 3    duties, her compared to Mayton.  Mayton had Sailors, who was

 4    the director of advertising, reporting to him.  And, therefore,

 5    he had ultimate responsibility for advertising under his

 6    umbrella.  Is that —

 7              MR. GERAKITIS:  That's correct.

 8              THE COURT:  And she had none of advertising under her

 9    umbrella.

10              MR. GERAKITIS:  She did not.  Exactly.

11              THE COURT:  And —

12              MR. GERAKITIS:  And she even admits that in Paragraph

13    14 of her complaint.

14              THE COURT:  So that alone, you would suggest, is

15    sufficient to conclude that Mayton is certainly not a

16    comparator.

17              MR. GERAKITIS:  Correct.  Because it's any factor.

18    It's not a qualitate — it's not quantitative.  It's a

19    qualitative factor.  Is there some exigency, as the courts have

20    said, for why there's a difference.

21              THE COURT:  And other than they may have different

22    tasks, how were her responsibilities different than Sailors?  I

23    know he was in advertising, so he's got different tasks maybe

24    than she's got over here in marketing.  But how were their

25    responsibilities different?

1          MR. GERAKITIS:  They were completely distinct except
2    for those projects that they might end up working on together.
3    What Mr. Sailors had was he had studio relations as the
4    director of advertising —— and this is undisputed in the
5    statement of material facts —— for in-theater marketing and
6    on-screen trailer placement.  He had to run the mail room, all
7    shipping and receiving for Carmike.  He was the key
8    decision-maker regarding movie trailer programming and
9    placement.  He created in-theater marketing materials and
10   planned theater marketing programs for the studios, and he
11   created graphics.  None of those duties are duties that she
12   had, none of them.  And they admit that those are, in fact, his
13   duties distinct from what she did.  And that demonstrates ——
14   along with the fact that he'd been the director of advertising
15   since 2004.  He'd been there since 1994.  And he stayed in the
16   same department.
17          THE COURT:  So you claim that she can't even make out
18   a *prima facie* case on equal pay?
19          MR. GERAKITIS:  No, she cannot, because —— or she
20   cannot demonstrate that the jobs contain the substantially
21   equal skill, ability, and responsibility.  Especially skill,
22   because Mr. Van Noy pointed out —— and this is unrebutted ——
23   Mr. Sailors' in-theater trailer placement responsibility was
24   vital to Carmike.  It is the reason you get people to be a
25   repeat customer, is what trailers can we put before a feature

1    presentation that generates the kind of interest for folks to

2    return.  That, he thought, was essential, and it was valuable.

3    And that, in fact, is the basis — when they took his

4    deposition back in September of last year, they pointed out,

5    "What are your bonus requirements?"  That was one of his bonus

6    requirements.  The only bonus requirement they had that matched

7    was a — was a percentage that went to EBITDA.  What's our

8    EBITDA, that'll be a factor.  Every other bonus factor for them

9    was different.

10           That's why you can't match them.  That's why, as

11   you've said, this really is an apples-and-oranges analysis.

12   She may be doing other things with him.  She may go to theater

13   grand openings.  David Pflegl, who was somebody they deposed,

14   who claimed — they claimed he was a comparator — when they

15   deposed David Flagle, they said, "Did you work together?

16           "No."

17           "Did you go to theater grand openings?"

18           "Sure.  I had to go check lighting and the bulbs in

19   the theater and the screens and the chairs and the flooring.

20   But that's what I did.  That was my job."

21           He's not her comparator.  So —

22           THE COURT:  So assuming they get over the *prima facie*

23   case, if the Court were to conclude that their duties are

24   sufficiently comparable, then — I'm not saying that I've made

25   that decision.  But if the Court found that the duties were

1  substantially comparable, and yet your reason for the pay

2  disparity is that the duties are not comparable, then doesn't

3  that mean that there would be a jury question on pretext?

4          MR. GERAKITIS:  No, because —

5          THE COURT:  Tell me — tell me how you could prevail

6  if — if I were to determine that they make out a *prima facie*

7  case, but how — but how do you prevail with her inability to

8  show that your reason is pretext?  Isn't your reason that she's

9  paid different because these other people did other jobs —

10          MR. GERAKITIS:  Sure, absolutely —

11          THE COURT:  Right.

12          MR. GERAKITIS:  — because they did do other jobs.

13          THE COURT:  Right.

14          MR. GERAKITIS:  And her comparators, Your Honor, when

15  we took her deposition, she said — she had four comparators.

16          THE COURT:  But I under — I guess what I'm

17  suggesting is, would it not be inconsistent for the Court to

18  say she makes out a *prima facie* case but then say that she's

19  been unable to prove pretext?

20          MR. GERAKITIS:  And pretext, Your Honor —

21          THE COURT:  Wouldn't that be inconsistent?

22          MR. GERAKITIS:  It's — it's not inconsistent because

23  you've even said in various footnotes, "I'm going to presume

24  there's a *prima facie* case."  Here's the pretext problem that

25  they —

1                THE COURT:  All right.  Tell me the pretext issue

2    here.

3                MR. GERAKITIS:  He'd been there for four more years.

4    He'd been in the job literally as a graphic artist for 10 years

5    and then was in the same job as director of advertising from

6    2004 until it ended in 2016.  His experience and the value that

7    the company places in him.  That also still goes to this

8    argument of is there a pretext for it.  Mr. Van Noy made it

9    clear in his declaration.  "He's vital to us from a graphics

10   standpoint and from a theater trailer standpoint."  She doesn't

11   have that.  She can't rebut it, and she hasn't rebutted it.  So

12   that's why — that's her pitfall on that.

13               THE COURT:  And so what is your understanding, based

14   on the discovery, as to when Mayton was terminated — is your

15   position that she did assume some additional responsibilities

16   but it was not to be his replacement, that they were — that

17   them terminating him put them in a position where they had to

18   obviously continue the day-to-day operations of that

19   department?

20               MR. GERAKITIS:  That's correct.

21               THE COURT:  She helped out in that regard, as did

22   Sailors, and Van Noy picked up some additional stuff?

23               MR. GERAKITIS:  That's correct.  And, in fact,

24   Mr. Passman testified the entire senior leadership team thought

25   that everybody had to be involved in some respects with

 1  marketing.

 2          THE COURT:  So they went out and looked -- looked for

 3  somebody for this chief managing position that would be more

 4  qualified not only than Trawick but also than Mayton.

 5          MR. GERAKITIS:  Not at first.  As the, again,

 6  undisputed evidence is --

 7          THE COURT:  At first they were looking for his

 8  replacement?

 9          MR. GERAKITIS:  At first they were looking for a

10  director of marketing.  Both Mr. --

11          THE COURT:  And that's when you -- that's what --

12          MR. GERAKITIS:  She and --

13          THE COURT:  That's what's time barred in your

14  opinion.

15          MR. GERAKITIS:  And both she and Mr. Sailors -- and

16  I'm trying to -- I just want the Court to understand the timing

17  of this because it's critical.  Both Mr. Mayton and -- excuse

18  me -- both Mr. Sailors and Ms. Trawick expressed an interest in

19  becoming the director of marketing.  Neither was promoted.  In

20  fact, no one was promoted for that position.  And they

21  interviewed for folks outside the company for that position.

22          When AMC went away in the -- because they'd been

23  having discussions in 2014 -- when they went away at the start

24  of 2015, they said, "Well, I guess we're back on the same

25  footing.  Let's look for a CMO."  And I hate to say this comes

1    back into this point of –– in looking for a CMO, she told
2    Mr. Passman, "I've spoken to Van Noy."  You could still have a
3    director of marketing who could report up to a chief marketing
4    officer.  You cannot demonstrate that you've been passed over
5    if that's what you've expressed.  You can't say, "Oh, well, I
6    really thought that I should be the chief marketing officer."
7    The company isn't obligated to take what the employees'
8    impression of how they ought to run it.  The company should be
9    left to decide what are the requirements we're going to have
10   for a chief marketing officer.  And she admits they told her
11   that a college degree was an essential part of the chief
12   marketing officer position.  And, in fact, it is undisputed,
13   according to the plaintiff, that that's who Rob Collins ––
14   that's what Rob Collins had, that's who Rob Collins is, that's
15   the position he took.
16              THE COURT:  All right.  Ms. Prebula, if –– if it is
17   undisputed that Sailors, who was the director of advertising,
18   reported ultimately to Mayton, and if it's undisputed that when
19   Ms. Trawick started performing certain duties after Mayton was
20   terminated, but one duty she did not perform was having Sailors
21   report to her so that she was the ultimate executive ––
22   ultimate employee responsible for advertising, how does that
23   difference alone not represent a material difference of duties
24   to where Mayton could not possibly be a comparator for
25   Ms. Trawick?

1          MS. PREBULA:  Well, because that's not exactly what

2    happened, Your Honor.  We had a situation where we had Mayton

3    as director of marketing.  Sailors was — excuse me — Mayton

4    was director of marketing.  Sailors was director of advertising

5    and reported to him.  At the time Ms. Trawick was called

6    projects manager.  Okay.  Mr. Mayton had responsibility for

7    marketing and advertising.  After Mr. Mayton left, Ms. Trawick

8    took on not just Mr. Mayton's duties of marketing, she also

9    took on duties of advertising.  She became responsible for

10   developing strategy for both marketing and advertising.

11         THE COURT:  But — but did Sailors — did Sailors as

12   the director of advertising report to her?  Was she his

13   supervisor, his boss, who ultimately would be accountable to

14   the chief executive or the chief operating officer for

15   advertising?

16         MS. PREBULA:  The answer to that is there is some

17   evidence both ways.  Although they did not produce an

18   organizational chart that we requested, there is some evidence

19   that other executives in the company would come to Ms. Trawick

20   to get Mr. Sailors straight, because he has irritated studios,

21   irritated companies.  And they would bring Ms. Trawick in over

22   Mr. Sailors to fix that particular problem.  And part of that

23   dealt with dealing with vendors and dealing with vendors in —

24   they said he was a graphics artist for four years.  He was.  He

25   was responsible for advertising.  But after Mr. Mayton left,

1    Ms. Trawick became responsible for meeting with vendors to

2    enhance marketing department technology, print, and customer

3    experience.

4              THE COURT:  Who did Mr. Sailors actually report to?

5    Who was his boss after Mayton was terminated?

6              MS. PREBULA:  They —— you know, I think that the

7    short answer is nobody did anything, they just left this hole.

8    But for purposes of approving things that were done, reporting

9    at monthly meetings, they both reported to Mr. Van Noy.  So

10   what we —— I mean, our —— we believe the evidence and a

11   reasonable jury could conclude that they did that deliberately

12   because Ms. Trawick had already made this request.  Mr. —— I

13   believe Mr. Gerakitis said she didn't apply for it.  But the

14   Court is well aware of the law, that if a person expresses the

15   interest in that position, they don't have to make a formal

16   application if the position is open.  And that's what happened

17   here.  The ——

18             THE COURT:  Well, what —— what —— I mean, Ms. Trawick

19   obviously —— they had at one time great confidence in her

20   abilities and gave her a lot of new duties over time.  But what

21   is it in her background or her training that indicates that she

22   was in a position to not only do marketing work but to

23   supervise and be ultimately responsible for the director of

24   advertising?

25             MS. PREBULA:  I would say it was the same thing that

1    the — was true for Mr. Van Noy.  Both Ms. Trawick — excuse

2    me.  All three — Ms. Trawick, Mr. Sailors, and Mr. Van Noy —

3    had started out —

4              THE COURT:  You put all of them on the same level.

5              MS. PREBULA:  I don't, but I do in terms of

6    experience.  All three of them had started out at the bottom of

7    the industry and worked their way up and had been trained and

8    on-the-job training.  None of them had an education — none of

9    them had a degree except Ms. Trawick.  Ms. Trawick had an

10   associate's degree.

11             THE COURT:  Well, how many — how many years had

12   Mr. Van Noy supervised other people?

13             MS. PREBULA:  I don't know the answer to that

14   question because they haven't produced that information.  We do

15   know that he had been at the executive level for several years.

16   We don't know how long.  We know they've said that Mr. Sailors

17   had been there 14 years.  Ms. Trawick was there 18 years.

18             And I believe that one of the other significance

19   is — I believe the Court misunderstood something I said when

20   you said that Mr. Sailors became responsible for sponsorships.

21   He did not.  Ms. Trawick always had responsibility for

22   sponsorships.  But in the Comdata system, somebody else had to

23   sign off on it after Mayton left, and Sailors did that.  He —

24   any sponsorship she requested that went through that system so

25   a check would be issued, he had to check it off.

1            So we admit that that happened —

2            THE COURT:  So what — what — what duties did Mayton

3    have that she did not have when he was terminated?  She — you

4    say it's kind of cloudy as to whether or not she actually

5    supervised Sailors.  You're contending that there's evidence

6    that a jury could conclude that she did that?

7            MS. PREBULA:  I contend — yes, we contend that

8    there's evidence that on — on various matters that she

9    supervised Sailors after Mr. Mayton left.  The — the — for

10   example, in addition to the developing strategy for marketing

11   and advertising, she also met with the other department heads

12   and Carmike's COO for every Monday morning meeting representing

13   on behalf of marketing and advertisement.  Now, Mr. Sailors

14   would occasionally attend those meetings, but she was there for

15   marketing and advertisement in the meeting with the other

16   C-level people after Mayton left as director of marketing.  She

17   created marketing presentations for the yearly managers

18   conferences after Mayton left.  That was — that had been

19   Mayton's job.  She now did that.

20           So the only — I mean, she wrote letters to the CEO

21   and the president.  We've produced those in the case.  They

22   said she had no C-level responsibility.  Well, she was

23   responsible for risk and issue management in marketing and

24   advertising once — once Mayton left.  And she attended

25   marketing conferences —

1           THE COURT:  So you — she has testified that she did
2    all of the essential duties that Mayton did.
3           MS. PREBULA:  Except the only — the only duty that
4    they moved to Sailors was to check off and approve sponsorships
5    and expenses.  So what they did was they — instead of moving
6    her up to that position, they gave her Mayton's duties.  They
7    gave her responsibility over Sailors on certain aspects.  But
8    they wouldn't say, "You are entirely responsible, and Sailors
9    now has to report to you."
10          I also want to correct one statement.  Mr. Gerakitis
11   said that Mr. Sailors expressed interest in the director of
12   marketing.  I don't believe there's any evidence of that in
13   this case, and that would be post-termination evidence.  That
14   is inadmissible.  He also misstated the evidence as to college
15   degree.  He said that she was told that a college degree was
16   key for a CMO position.  That's not what she was told.  Passman
17   specifically told her, "In order to advance into management,
18   you must complete your degree because men are going to expect
19   it of you in this industry."  He specifically stated that.  She
20   testified to that.
21          So I'm not —
22          THE COURT:  What is your evidence of pretext as to
23   their stated reasons for disparate pay?
24          MS. PREBULA:  After — for disparate pay?
25          THE COURT:  Disparate pay and failure to promote.

1                MS. PREBULA:  The —

2                THE COURT:  I mean, they essentially say that they —

3                Mr. Gerakitis, are you saying that — that at least

4    as far as any decisions that were made to put someone in the

5    chief marketing officer position, y'all never — Carmike never

6    even considered Ms. Trawick for that position because she never

7    applied for that position?

8                MR. GERAKITIS:  That is absolutely true, and that

9    is —

10                THE COURT:  Okay.

11                MR. GERAKITIS:  That is —

12                THE COURT:  And your — your contention is that to

13   the extent that she applied for the marketing director position

14   and didn't get that, that that's barred by the statute.

15                MS. SILK:  Correct, Your Honor.  And I'll also point

16   out that —

17                THE COURT:  Okay.

18                MR. GERAKITIS:  — she just — Ms. Prebula just said

19   that Mr. Sailors did not express an interest.  Declaration

20   Document Docket 395, Paragraph 4, Mr. Sailors' declaration:  "I

21   expressed interest in the director of marketing position after

22   Mayton left Carmike.  This position would have been a promotion

23   for me."  So the idea that Mr. Sailors — there's no evidence

24   of it, there is evidence of it.

25                THE COURT:  All right.  Ms. Prebula, I mean, I don't

1  guess — I don't guess you've got to show pretext with regard

2  to — if you can show that she applied and they knew she was

3  interested in the chief marketing officer position, regardless

4  of what you call it, and if they acknowledge that they never

5  considered her for that position, then there's not a legitimate

6  nondiscriminatory reason that you've got to overcome the

7  pretext.

8            MS. PREBULA:  That's correct, Your Honor.  And we

9  have —

10           THE COURT:  So your contention is that there's enough

11 circumstantial evidence — well, that I guess she says, that

12 she said somewhere that "Yes, they knew that I wanted that

13 position regardless of what they called it"?

14           MS. PREBULA:  I don't think that question has been

15 asked of her in that — in that language.  I would say that

16 the — if the Court would look at the declarations attached to

17 Exhibit 39, we've moved to strike every one of those as

18 post-termination after-the-fact statements —

19           THE COURT:  Well, I don't want to get into some

20 spitting contest back and forth about —

21           MS. PREBULA:  No.

22           THE COURT:  — all that kind of stuff.  I want to

23 focus in on is your position that there is evidence in the

24 record from which a reasonable jury could conclude that she did

25 express an interest and that Carmike was aware of her interest

1  in the chief marketing officer position, regardless of what

2  it's called.

3        MS. PREBULA:  I think that's correct.  I think that

4  the evidence is clear that she wanted the — to be the head of

5  marketing, whatever you called it, and that she —

6        THE COURT:  Well, did — did she want to be head of

7  the marketing — head of marketing understanding that there

8  would be this chief marketing officer to whom she would report,

9  or did she want to be head of marketing where she'd not only be

10  head of marketing but she'd also be head of advertising?

11        MS. PREBULA:  She wanted Mayton's position, to be

12  director of marketing, which would include Sailors reporting to

13  her.

14        THE COURT:  Well, they claim they changed that

15  position.

16        MS. PREBULA:  They do claim they changed that

17  position.

18        THE COURT:  What do you — and you claim that they

19  just changed it in name?  You claim they went through all of

20  that just to avoid promoting Ms. Trawick.

21        MS. PREBULA:  I do believe that to be true, Your

22  Honor.

23        THE COURT:  Just because she was a woman.

24        MS. PREBULA:  Correct.  Because — not just because

25  she was a woman but because she was a woman who had repeatedly

 1    said, "I want to move up to a director's position."  Look at

 2    the number of women in these directors' positions.

 3            We also have evidence that Ms. Marshall, who was the

 4    director of human resources, prepared a report of the

 5    differential salaries between males and females in the company.

 6    They won't produce that.  Ms. Marshall is one of the four women

 7    who was passed over by hiring an outside male, and she was

 8    director of human resources.

 9            So she prepared a report — she testified to it in

10    her deposition — showing the salary and compensation

11    differentials between males and females.  They won't produce

12    that.  We've repeatedly asked for it.  We think that that

13    evidence will bolster our claim.  And the Court knows we've

14    asked — we've asked for the ultimate sanction that their

15    answer be stricken, but we've also asked for a negative jury

16    instruction on the many, many things that they have not

17    produced.

18            MR. GERAKITIS:  Your Honor —

19            THE COURT:  Yes.

20            MR. GERAKITIS:  — this directly rebuts what you just

21    heard.  May I approach?

22            THE COURT:  Yes, sir.

23            MR. GERAKITIS:  I'm handing the complaint, Paragraph

24    27.

25            Your Honor, you asked the question — Your Honor, you

1    asked the question, number one, did they tell her it was —— a

2    college degree was required; and, number two, did she express

3    an interest in the CMO position.  If you read her own

4    complaint, they're both undercut directly by what Paragraph 27

5    says.  That's why you cannot prove pretext in this case.  And

6    they admit in Paragraph 46 that the job duties of the CMO were

7    expanded.

8           MS. PREBULA:  But, Your Honor, we contend that that

9    was done basically as a cover-up.  I mean, let's just use that

10   word.  It was basically done to cover their tracks because they

11   knew she had a claim for disparate treatment and

12   discrimination.  And Passman knew not only that he had told her

13   she had hit her glass ceiling, admitted it existed, told her

14   that she had to have an education because men expected it, and

15   there was evidence that he had sexually harassed her by

16   inappropriately trying to kiss her, which was reported by

17   Ms. Trawick to Ms. De La Cruz, and Ms. De La Cruz did not

18   report the claim to human resources.

19          Now, admittedly, Ms. De La Cruz was an administrator

20   and assistant to Mr. Passman, and she —— but she did not —— she

21   testified she had not signed the corporate policy on sexual

22   harassment and reporting and she didn't report it.

23          So now what we have is Mr. Van Noy who wants —— who

24   has no women directors reporting to him —— they —— they've all

25   been shuffled out —— won't promote her, specifically says he

```
1   won't promote her.  And we have Mr. Passman, who's had this
2   conversation with her.  And then within six weeks after that
3   conversation they decide, "Oh, we're going to investigate her
4   for her sponsorship requests and her credit card expenses," all
5   of which have been ——
6              THE COURT:  All right.  Well, that goes ——
7              MS. PREBULA:  —— approved by males.
8              THE COURT:  That goes to her retaliation claim.
9              MS. PREBULA:  It does.  It does.
10              And all of that was approved by males.  And we have
11   evidence that the —— none of the men that —— that approved any
12   of the expenses were investigated.  None of the men were
13   terminated.  And there's evidence that other men were
14   investigated for misuse of corporate funds.  They were not
15   terminated.  So that goes to retaliation and disparate
16   treatment.
17              So we contend that ——
18              THE COURT:  So your —— so your —— your termination
19   claim is that she was terminated in retaliation for complaining
20   of gender discrimination and separately that she was terminated
21   because she was female?
22              MS. PREBULA:  I think ——
23              THE COURT:  Are you asserting two separate —— are you
24   asserting a gender termination claim unrelated to retaliation,
25   I guess is my question.
```

1             MS. PREBULA:  No.

2             THE COURT:  Okay.

3             MS. PREBULA:  They're the same.  It was ——

4             THE COURT:  Your termination claim is the

5    retaliation ——

6             MS. PREBULA:  That's correct.

7             THE COURT:  —— that she was complaining about

8    gender-based discrimination and that's why they got rid of her.

9             MS. PREBULA:  That's correct.

10            THE COURT:  And they invented this ——

11            MS. PREBULA:  Insubordination.

12            THE COURT:  You're claiming they invented the ——

13   you're claiming that they started the investigation after she

14   was making those kinds of complaints.

15            MS. PREBULA:  I think it was like the perfect storm.

16   They have some evidence —— which we've moved to strike because

17   it's a post-termination declaration.  But they have some

18   evidence that a woman came forward and said, "I think that some

19   of these expenses are wrong."  And under the cat's paw theory

20   we believe that they used that excuse after her —— after she

21   had these discussions about discrimination, they —— because the

22   two people involved, who got those reports and who made the

23   decision, were the very two bad actors here, Van Noy and

24   Passman.  They both sat on that group, the quasi group of four,

25   that decided to terminate her for insubordination.

1           Now, the insubordination claim is an interesting
2   claim because --
3           THE COURT:  What exactly did she -- did she say to
4   those people, the bad actors, about gender discrimination?
5   What exactly was her protected conduct?
6           MS. PREBULA:  She did not use the term
7   "discrimination."  She'd been there 18 years.  She used the, "I
8   need to be paid more.  I need to be a director like Sailors.  I
9   need to be promoted."  And based upon that and her discussions
10  of the glass ceiling for women and the sexual harassment
11  complaint she made to De La Cruz, all of those things together
12  show that she had made a claim for gender discrimination.  The
13  Court is aware you don't have to use those magic words.
14          And Mr. Passman admitted in his deposition,
15  reluctantly, that perhaps sexual advances and maybe kissing
16  someone might be barred by their policy.  But these people who
17  were supposed to protect this employee were the bad actors.
18  These people that are on the list of who you report to if you
19  claim you have unequal pay or disparate treatment, they're the
20  bad actors in this case.  She told them.  Van Noy at the -- at
21  one time was her supervisor.  She told him.  She told Mayton
22  before -- before he left as well that she wanted a promotion
23  and a pay raise.  But she specifically told Van Noy and
24  Passman.
25          She also told division manager Jim Lucas.  She talked

1  to him about some of her claims of "I'm not being treated the

2  same as men."  He said he didn't report it.  Nobody reported

3  her claims.  Nobody investigated her claims.  So — and nobody

4  preserved any evidence of her — of those files.

5        THE COURT:  So when in relation to that did the

6  investigation of her expense account come up?

7        MS. PREBULA:  It came up after the glass ceiling

8  conversation and after she at that same conversation told

9  Mr. Passman that she knew she was underpaid.

10        THE COURT:  So that investigation did not start until

11  after the glass ceiling conversation.

12        MS. PREBULA:  That's correct.  That's correct.

13        THE COURT:  And you've got evidence of males who

14  didn't follow company policy with regard to their expense

15  accounts and they were not disciplined at all?

16        MS. PREBULA:  That's correct.  One — we know one man

17  was told not to do it again.  The other guys were — and they

18  were higher than Ms. Trawick — was simply given the right way

19  to do it, but he was not terminated.

20        The — the semantics game they're playing here is

21  that — it depends on who you talk to as to what reason they

22  gave for termination.  The — their official party line is —

23        THE COURT:  She talked to the employees.

24        MS. PREBULA:  Right.  Now, what they told her in the

25  meeting was —

1           THE COURT:  What is — what is the evidence that that
2   was pretext?
3           MS. PREBULA:  Well, what they — well, there's three
4   things.  One, what they told her in the meeting was, "Don't
5   poll your peers."  They didn't say, "This is a confidential
6   investigation.  You may not discuss it with anybody.  And we're
7   going to conduct this investigation now that you've made a
8   claim."  The Court is aware EEOC says you can't restrict an
9   employee from discussing their claims of discrimination.
10          So three things happened after that meeting.  "Don't
11  poll your peers."  She understood — she did not understand.
12  Her testimony is clear.  At the time she didn't understand
13  "Don't poll your peers" meant don't talk about it.  So one of
14  the issues was a subordinate has sent out a mailing that she
15  shouldn't have sent out.  So she talked to the employee and
16  said, "Have you sent it out?"  So they've got this
17  post-termination declaration as to what happened there.
18          Then Mr. Sailors came and asked her how the meeting
19  went, because prior to the meeting they had told her the
20  meeting would be about sponsorships and expenses.  So she had
21  gone to Mr. Sailors and said, "Help me pull some documents
22  because I know they're going to ask me about this."
23          So after the meeting he came to her and said, "How
24  did it go?"
25          And she said, "Not great.  You know, it was — it

1  didn't go well."

2          And the same thing had happened to De La Cruz.  She

3  had — they had told her, "We're going to talk about

4  sponsorships," and De La Cruz was involved in it.  She said,

5  "Help me pull some documents for this."

6          De La Cruz asked her, "How did it go?"  Those are —

7  that's —

8          THE COURT:  But you know that the Eleventh Circuit

9  has made it clear that just a disagreement with the employer's

10 reason is not enough to show pretext.  They say they — they —

11 they fired her because of insubordination because when they

12 were conducting the investigation they told her not to poll

13 employees and that they found out she talked to employees and

14 they thought that violated their directive to her.

15         MS. PREBULA:  That's —

16         THE COURT:  What is the evidence that they did not

17 really think that — that that was — that she had truly

18 violated their directive?

19         MS. PREBULA:  She was told that she was terminated

20 because of the investigation, which was never conclusive.  And,

21 unlike males, she was never given an opportunity to see the

22 alleged improper charges, much less respond.

23         THE COURT:  So she was — she was told then not just

24 that she was terminated because of insubordination but also

25 because she had written the — she had gotten the $2,000 check

1    sent to the Quadrille Group?

2          MS. PREBULA:  Yes, after the fact.  In the meeting
3    they told her insubordination.

4          THE COURT:  So you're saying that they told her
5    inconsistent things.

6          MS. PREBULA:  Right.  They also — there are — were
7    statements in —

8          THE COURT:  She said — she — where is the evidence
9    of that?  Her testimony?

10         MS. PREBULA:  Her testimony.  There —

11         THE COURT:  She says at one point they told her
12   insubordination and at another point they told her she misused
13   the expense accounts?

14         MS. PREBULA:  No.  They just told her the — well,
15   they told her the investigation.  Then there were —

16         THE COURT:  What did they tell her about the
17   investigation —

18         MS. PREBULA:  Just the investigation.

19         THE COURT:  — the fact that she was told not to talk
20   to anybody during the investigation?

21         MS. PREBULA:  They told her that in the meeting —

22         THE COURT:  Well, you know the standard.  It has to
23   be such implausibilities, dah, dah, dah, dah, dah, to where you
24   can't just say they were wrong but that they didn't really
25   believe what — the reason they gave.

```
 1              MS. PREBULA:  Right.
 2              THE COURT:  What's the evidence that they didn't
 3    really believe that she had been insubordinate?
 4              MS. PREBULA:  There is some evidence that there were
 5    employees that had stated to members of the Chamber of Commerce
 6    and one other social group who escapes me right now that she
 7    had been fired for stealing $50,000.  She was — she was told
 8    that it was because of misappropriation of funds.  Mr. Passman
 9    and Mr. Van Noy —
10              THE COURT:  Who — who was she told that by?
11              MS. PREBULA:  The $50,000?
12              THE COURT:  Yeah.
13              MS. PREBULA:  She — that was heard by and — a
14    member of the Chamber of Commerce and reported to her husband.
15              THE COURT:  So that was hearsay —
16              MS. PREBULA:  That was —
17              THE COURT:  — that somebody told somebody at the
18    company — did they even say somebody at the company or that
19    they had just heard —
20              MS. PREBULA:  They said somebody at the company.  We
21    believe that's an admission against interest.  They —
22    Mr. Passman —
23              THE COURT:  Well, an admission against interest is
24    somebody unassociated with the defendant who said, "Somebody
25    told me at the company that you got fired for this."
```

1          MS. PREBULA:  The company's statement itself, yes, if
2     we can prove it.  We understand the Court will have to hear it.
3          THE COURT:  Well, don't I need to — don't I need to
4     see it at summary judgment if it's your basis for pretext?
5          MS. PREBULA:  It's one.  The other reason —
6          THE COURT:  What's the other one?
7          MS. PREBULA:  Resignation.  They issued a —
8     Mr. Passman and Mr. Van Noy both stated that — that they —
9     they said she'd resigned, which is not true.  They —
10    Mr. Passman —
11         THE COURT:  Did they do that because — for her
12    benefit, because they would — perhaps she would want a
13    resignation on her record instead of the termination?
14         MS. PREBULA:  That's what Carmike wants them to say,
15    but the — the evidence is not clear.  They just said
16    resignation.
17         THE COURT:  She — she would not have preferred a
18    resignation over a termination before she got a lawyer?
19         MS. PREBULA:  No.  She did not hire me during that
20    process.
21         THE COURT:  Okay.
22         MS. PREBULA:  Mr. Passman testified that —
23         THE COURT:  So part of the evidence of pretext is
24    that they say they terminated her and they also say she
25    resigned.

1        MS. PREBULA:  Correct.  Then Mr. Passman testified

2   she was terminated for lack of trust, which is not

3   insubordination.  They also have ——

4        THE COURT:  Why would that not be consistent with

5   insubordination if —— if they told an employee during an

6   investigation, "Don't talk to anybody else," and she goes

7   behind their back and —— I thought there was something about

8   went into a broom closet and told somebody not to do something.

9        MS. PREBULA:  Told them not to send out mailings for

10  a particular ——

11       THE COURT:  Why would that not be ——

12       MS. PREBULA:  Those are —— those are two distinctly

13  different things.  A lack of trust means I don't have the

14  ability to trust you anymore.  Insubordination means you went

15  against a directive of —— that we told you to do.  Those are ——

16  those are —— you know, I hate to go back to Black's Law

17  Dictionary, but I think those are two distinctly different

18  things.

19       They also told her ——

20       THE COURT:  I think insubordination could cause an

21  employer to have a lack of trust perhaps, but —— I mean, I'm

22  just trying to —— it's not me.  It's these Eleventh Circuit

23  cases ——

24       MS. PREBULA:  I understand.

25       THE COURT:  —— that have this fairly high burden in

1  proving pretext.

2          MS. PREBULA:  They —

3          THE COURT:  If any lawyer came into an employment

4  case that had not handled employment cases before and had

5  handled general negligence cases, they would not understand the

6  summary judgment standard to be applied in employment cases,

7  because it looks like these cases have factual disputes all

8  throughout and yet the Eleventh Circuit says that maybe not.

9          MS. PREBULA:  They are very factually intense, I

10  would agree.

11          THE COURT:  Well, they're very factually intense, but

12  the Eleventh Circuit decides a lot of factually intense cases

13  as a matter of law.  That's the difference in these cases and

14  other negligence cases.

15          MS. PREBULA:  You are absolutely —

16          THE COURT:  And — okay.

17          MS. PREBULA:  May I add one more thing?

18          THE COURT:  Yes.

19          MS. PREBULA:  They — she was also told — there's an

20  exhibit on it — that they had no belief in her ability to

21  manage the department.  Well, that is totally different from

22  insubordination, the reason they gave, and it's completely

23  different from lack of trust.  I mean, it may be related to

24  lack of trust, but it's completely different from you resigned.

25          THE COURT:  Mr. Gerakitis, why did Carmike state that

1    they fired her?

2              MR. GERAKITIS:  You want it out of the plaintiff's

3    mouth?

4              THE COURT:  No, no — well, I'll take it any way.

5    What is your position as to why they — why they fired her?

6              MR. GERAKITIS:  Insubordination.  She took Jennifer

7    Therrien into a prize closet, a 25-year-old marketing

8    assistant.  And as Mr. Van Noy's declaration points out, after

9    Ms. Smitherman — who was the treasurer of the Quadrille Club

10   and — and an analyst at Carmike — inquired about this $2,000

11   sponsorship — this is Mr. Van Noy:  "Ms. Trawick was

12   terminated in a meeting with me and" —

13             THE COURT REPORTER:  Mr. Gerakitis, please slow down

14   if you're reading that.

15             MR. GERAKITIS:  Thank you.

16             THE COURT REPORTER:  Start over.

17             MR. GERAKITIS:  Thank you.

18             "Ms. Trawick was terminated in a meeting with me and

19   HR director Sadie Marshall for insubordination after learning

20   first from Mr. Friedel" — who was the head of compliance, Your

21   Honor — "and next from Jennifer Therrien herself that

22   Ms. Trawick had told Ms. Therrien of this investigation, saying

23   that, quote, she was in a lot of trouble, closed quote; that,

24   quote, she needed to make things right, closed quote; and that,

25   quote, this conversation never happened, closed quote.

1  Ms. Trawick was not terminated for misappropriation of funds."

2          And we shift to Ms. Trawick's testimony, Your Honor.

3  Ms. Trawick's testimony at page 183, line 18:  "The only reason

4  that you're aware of that's ever been reported by anybody at

5  Carmike in the senior leadership team or in HR has been that

6  you were insubordinate."

7          Answer:  "I'm not sure if you're referring — I don't

8  understand what you're referring to.  I'm sorry."

9          Question:  "There was one reason given by the senior

10 leadership team and Sadie Marshall and HR as to why you were

11 terminated; correct?"

12         Answer:  "And that they couldn't trust me.  But yes."

13         Question:  "Insubordination was the reason that was

14 given; correct?"

15         "Correct."

16         Question:  "And if someone is insubordinate" — this

17 is to your point, Your Honor — "you could lose trust in them.

18 That would be a reasonable conclusion for them, wouldn't it?"

19         Answer:  "Yes."

20         "There's no other reason, other than insubordination

21 and lack of trust, that's ever been given by any Carmike

22 officer as the reason for your termination."

23         Answer:  "Is that a question or a statement?"

24         Question:  "Yes, that's a question."

25         Answer:  "I mean, other than my

1   resignation/termination paperwork, I wouldn't know what they

2   discussed about me."

3           Let me stop right there, Your Honor.  In her

4   deposition, Exhibit 61, her current occurrences that she wrote

5   up after her termination, she said that "Fred Van Noy stated

6   due to my tenure they needed to take this investigation very

7   serious and be thorough.  However, after my direct violation of

8   his instruction, he no longer believed I was capable of manage

9   my — managing my department and would be ending my employment.

10  He went on to say, quote, however, this is a small town" —

11          THE COURT REPORTER:  Mr. Gerakitis.

12          MR. GERAKITIS:  I'm sorry.

13          THE COURT REPORTER:  "Small town" —

14          MR. GERAKITIS:  "However, this is a small town, and

15  due to your extensive community service we are willing to let

16  me resign voluntarily if I so choose."

17          Your Honor — so let's shift back to her testimony.

18          Question:  "The only reason you are aware of for your

19  termination at Carmike that's ever been given by anyone who's

20  an officer or in HR is that you were insubordinate and they

21  lost trust in you or lost confidence."

22          Answer:  "That was the only statement from Fred on

23  the day of my termination."

24          Question:  "That's the only statement you have ever

25  heard from any officer or HR personnel is that you were

1  insubordinate and they lost confidence or trust in you;

2  correct?"

3        Answer:  "Correct."

4        Question:  "They never said that you were terminated

5  for misappropriation at any point in time, did they?"

6        Answer:  "No."

7        THE COURT:  Why did they lose trust in her?  They

8  didn't lose trust in her because of the $2,000 that she got

9  sent to the social club?  Your — their contention is they only

10  lost trust in her because when they told her not to talk to

11  anybody during the investigation she did.

12        MR. GERAKITIS:  Unfortunately, we didn't learn all

13  that went into that $2,000 solicitation, if you will, but the

14  statement of material facts points it out.  We did not know —

15  Carmike did not know that she — we didn't know until we took

16  her deposition — she's the one who drafted the letter.  She

17  did.  She wrote it on Sunday, June 7, 2015.  She's the one who

18  misspelled Jenny McMillen's name, who is the past president.

19  She's the one who submitted it in the name of Jenny McMillen.

20  The company did not know that until they took her deposition.

21  Could they have found it out?  Presumably they could have at

22  some point.  But you don't have to wait to decide —

23        THE COURT:  So your — Carmike's contention is when

24  they're referring to lack of trust, they're talking about when

25  they directed her not to talk to an employee during the

1    investigation and she did.

2              MR. GERAKITIS:  That's correct.

3              THE COURT:  And what started the investigation?

4              MR. GERAKITIS:  What started the investigation —

5              THE COURT:  Another employee associated with that

6    social club reported it to somebody in management?

7              MR. GERAKITIS:  Ms. Trawick, when she was president,

8    she asked — she was losing a treasurer.  She was losing Amy

9    Bryan, who actually I think works for the Chamber of Commerce.

10   She was losing Amy Bryan.  And so she knew that Cathryn

11   Smitherman did financial analysis for Carmike.  She asked her

12   to become the treasurer in October.  Cathryn Smitherman was

13   looking through expenses and saw the Quadrille Club.

14             And, Your Honor, it's replete, undisputed, throughout

15   our statement of material facts that — if I can find it fairly

16   quickly — the report that Ms. Powell, who did the compliance

17   department review — she says, "As the result of the review of

18   an e-mail chain providing information about a questionable

19   donation, compliance was asked to review certain donations."

20   That e-mail is attached as Carmike 185 and 186.  They've had it

21   since the beginning of time in this case.

22             Here's what Ms. Smitherman sent.  She writes to Jenny

23   McMillen on November 2nd — and, Your Honor, this is absolutely

24   undisputed — "Jenny, did Quadrille have sponsors last year?  I

25   am confused as to why Quadrille would have sponsors since we're

1   a social club.  I have a letter that is from you asking for

2   sponsorships, and I wanted to make sure it was legitimate."

3   Signed Cathryn Smitherman.

4           Ms. McMillen flips it to Ms. Trawick.

5           Mind you, also in our statement of facts is the fact

6   that at the exact same point in time Ms. Smitherman is trying

7   to get the bank records from Ms. Trawick for the Quadrille

8   Club, the exact same day.

9           Jenny McMillen flips Cathryn Smitherman's e-mail to

10  Ms. Trawick and says, "Please read below," what I have just

11  read to you.

12          Ms. Trawick's response she sends back to

13  Ms. McMillen, who forwards it then on to Ms. Smitherman, quote,

14  "Tell her we solicited support for our New Year's Eve party,"

15  period, "that only one company signed on.  This was only last

16  year raised funding and will not be duplicated moving forward.

17  Try not to get into who because she works at Carmike and I

18  would prefer she wasn't involved."

19          THE COURT:  But Carmike's position is that none of

20  that caused them to have a lack of trust in — this is what I'm

21  having a hard time understanding.  None of that they — they

22  didn't learn that until afterwards?

23          MR. GERAKITIS:  No, no.  They didn't learn all of the

24  detail about —

25          THE COURT:  They didn't have these e-mails available

 1    to them when they — when they terminated her?

 2              MR. GERAKITIS:  They had this e-mail.  They had this

 3    single e-mail.  What they didn't have was evidence that

 4    Ms. Trawick had actually herself drafted the letter and sent it

 5    herself or presented it herself.  Jenny McMillen didn't present

 6    it.  Jenny McMillen didn't draft the letter.  We didn't know

 7    that until we took her deposition.  In fact, I even act

 8    surprised back last August when I took her deposition:  "You

 9    drafted the letter?"  Because, quite frankly, we didn't think

10    we'd hear her say, "Yeah, I drafted the letter."

11              But the point is, Your Honor, I think they intended

12    to protect Jennifer Therrien.  I think that's what they

13    intended to do.  They intended to protect Jennifer Therrien

14    because they want an employee to come forward and feel like

15    they can come forward when they're told this conversation never

16    happened.  And, sure, I'm sure there was deep suspicion about

17    this e-mail exchange.  But the point is all you need to rely on

18    is one legitimate nondiscriminatory reason, and that is

19    insubordination.  And she could not have testified more

20    directly on that's the only reason she's ever been given.

21              And, Your Honor, you've been given a response to our

22    motion *in limine* that says that we didn't inquire into what you

23    just inquired into, about who said — where were these hearsay

24    statements.  If you look at pages 281 through 288 of

25    Ms. Trawick's deposition, you will see that we literally — to

1    quote Judge Murphy — we tried everything but Preparation H and

2    voodoo to tell — to get her to tell us who said this, what did

3    they say, and who was it said to.  And it was, "I don't know, I

4    don't know, I don't know."  So you're not going to get anything

5    more, and a jury certainly isn't going to get anything more out

6    of it in this case.

7              THE COURT:  Well, tell me, Mr. Gerakitis — you're

8    familiar with this — this case or cases that say that the

9    *McDonnell Douglas* analysis is not always the only way that the

10   court can evaluate a circumstantial case; that if the

11   circumstantial — if the mosaic — explain to me what you

12   understand the mosaic rule to be in the Eleventh Circuit.

13             MR. GERAKITIS:  Here's what I understand the mosaic

14   rule to be, Your Honor.

15             THE COURT:  All right.

16             MR. GERAKITIS:  In a circumstance where you have to

17   have at least something approaching direct evidence, you have

18   to have something in the way of a statistical basis, you have

19   to have events that piece and patch together reliable evidence

20   of virtually intentional discrimination.  If you have that, you

21   can go into the mosaic theory.  Now, mind you, they have not

22   presented you a mosaic case nor argued it.

23             THE COURT:  So explain to me from your perspective

24   why the "glass ceiling" comments in the meeting don't fall into

25   the mosaic theory.

1          MR. GERAKITIS:  They don't fall into the mosaic

2    theory, Your Honor, because in a situation like this, number

3    one, the interruption of taking the — taking Jennifer Therrien

4    into a prize closet and telling her this conversation never

5    happened interrupts any sort of claim of protected activity.

6    Her protected activity claim, Your Honor, from a —

7          THE COURT:  But why doesn't the mosaic theory apply

8    to the other nonretaliation claims, the gender disparity pay

9    claim —

10          MR. GERAKITIS:  Because, Your Honor, what they're

11   trying to build it off of they don't have in this case.

12   They're trying to bring, as you've said, a pattern case, what I

13   call "them too" evidence.  That is, these people aren't

14   complaining.  It's not their claim they're asserting.  It's

15   their claims she's asserting that she thinks they should have

16   asserted.  She doesn't have that.

17          Number two, besides the lack of statistical evidence,

18   that's why she's trying to bring in now this idea that David

19   Passman kissed her.  Well, Your Honor, you can look through the

20   complaint in detail.  You can look through her charge.  You can

21   look through literally everything that she has written.

22   There's nothing about David Passman ever attempting to kiss

23   her, nothing.  We could never have been on notice of that.  She

24   didn't even ask in his deposition, "Did you kiss her?"

25          The point of all that, it helps to demonstrate why,

 1    when someone brings a negligent retention claim, Your Honor,

 2    that relies on an affidavit that doesn't tell you when this

 3    kiss took place, no other circumstance than it happened

 4    according to her, for the first time that she presents in a

 5    summary judgment response, you've got to look and say, "Okay,

 6    what's the —— what's the underlying tort here?  I can't base a

 7    negligent retention claim without an underlying tort.  There

 8    has to be intentional infliction of emotional distress."

 9    You've kicked cases on that basis, where you've said, "It's not

10    IIED, and I'm not going to let you have a negligent retention

11    claim."

12            They're trying to say that a negligent retention

13    claim stands on its own, but it does not.  There is no

14    recognized negligent retention absent a state law tort.  That's

15    why we don't think the Court would even entertain pendent

16    jurisdiction of her claim.  It is so time barred —— I mean,

17    she's been gone from the company for nearly three years.  She

18    couldn't bring a claim under 9333.  That's why you don't have

19    the mosaic claim, Judge.  You might have it if those things

20    actually fit, but they don't fit.  You can't paint it that way.

21            THE COURT:  All right, Ms. Prebula.  Take about five

22    minutes and tell me whatever you haven't had a chance to tell

23    me, and we'll finish this.

24            MS. PREBULA:  Okay.  We —— it's significant that you

25    focused on what Ms. Trawick actually responded to with regard

1   has anyone told you other than —— any reason other than

2   insubordination.  His question was, "Has any senior leadership

3   or HR told you that?"  They're undefined senior leadership.  So

4   we'd ask the Court to keep that in mind as you're looking at

5   the evidence that other reasons were given.

6           We'd submit that —— and I believe there's an

7   admission *in judicio* right here that Carmike did not know until

8   the deposition that Ms. Trawick had authored a letter

9   requesting a sponsorship.  Well, to me that's a big deal.  The

10  point is the letter was submitted requesting a sponsorship,

11  just like every other sponsorship she'd done, for approval.

12  She didn't go write a check.  She couldn't do that.  They're

13  not contending she got the money.  She didn't get the money.

14  She followed the procedure.  This is a group that —— just like

15  the Chamber of Commerce and Mr. Sailors' kids' cheerleaders and

16  the school that Mr. Van Noy's kids went to and the Boy Scouts.

17  Here's a sponsorship.  Let me submit it for approval.  You put

18  it in the system.  It's approved.  And guess who writes the

19  check?  Either Lisa De La Cruz or accounts payable.

20  Ms. Trawick didn't have control over disbursing the money.  The

21  money didn't go into her account.  She didn't ——

22          THE COURT:  Why did she send the letter under

23  somebody else's name who had no idea she was sending it under

24  their name, Ms. McMillen?

25          MS. PREBULA:  That's not our understanding of the

1  testimony.  Our understanding of the testimony is that there

2  was a transition of officers at that time and, in order to get

3  it done, that she and Jenny and two or three other people had

4  discussed getting sponsorships.  This was one that they were

5  going to try to get, and other people were responsible for

6  asking others to get —

7          THE COURT:  Why didn't she — why wouldn't she just

8  have written the letter herself?

9          MS. PREBULA:  Because she wasn't the acting president

10  at that time.  She understood Ms. McMillen was the acting

11  president at that time.  And —

12          THE COURT:  Okay.

13          MS. PREBULA:  But the point is that that had nothing

14  to do with their decision.  I would point out to the Court that

15  this case is very similar to the evidence allowed in *Goldsmith*

16  of Ms. Cheryl Braswell.  Ms. Braswell in that case was rocking

17  along — and that was a race case.  She was rocking along doing

18  her job.  She filed a charge with the EEOC, made a complaint

19  with the EEOC.  After the fact they decided to do an

20  investigation of her.  They — she'd never been questioned

21  about previous employee advances, and now she was questioned.

22  She was reprimanded for removing her paycheck from automatic

23  deductions.  And she denied she'd done it without a supervisor,

24  which is what we have here.  Ms. Trawick requested

25  sponsorships.  Somebody approved them.  Ms. Trawick puts —

1    used the credit card.  Mr. Van Noy approved it.

2           So after the complaint was made, then this woman was

3    investigated.  So guess what Ms. Braswell was ultimately fired

4    for?  Insubordination.  The court in Goldsmith found that

5    evidence of motive and intent on behalf of the employer.  And

6    we submit that those facts are parallel to this case.  Their

7    investigation after her complaints and their trumped-up

8    insubordination — and oh, by the way, Ms. Trawick does not

9    agree that she told Ms. Therrien this conversation never

10   happened.  She denies that.  She didn't take her into the prize

11   closet.  She took her into a supply room, and they were talking

12   about the stuff in the supply room.  Her deposition testimony

13   admits the conversation occurred, denies the characterizations

14   that the defendant puts on it.  But my point is that in

15   *Goldsmith* this very same type of case was seen as appropriate

16   "me too" evidence and appropriate to show motive and intent.

17          So we — we believe that there is statistical

18   evidence that will support our claim.  We know of four women

19   who were passed over.  We believe if they will provide the

20   personnel files and the other 41 categories of documents that

21   are subject to our motion to compel that — and in a usable

22   format — that there would — there is additional statistical

23   evidence.  I believe Mr. Gerakitis said we had no statistical

24   evidence.  We've got at least four.  We've got at least pay

25   discrepancies between Mr. Sailors and Ms. Trawick.  We've got

1   bonus discrepancies between Mr. Sailors and Ms. Trawick.  Based

2   upon anecdotal evidence, we have compensation discrepancies

3   between Ms. Trawick and Mr. Mayton, who were performing very

4   similar — substantially similar job functions.

5           THE COURT:  What positions do you believe these other

6   four employees that you claim is admissible "me too"

7   evidence — what positions do you understand they had?

8           MS. PREBULA:  I would have to go back and look at

9   them.  One of them is Ms. Marshall, who was director of human

10  resources.  She was passed over for vice president of human

11  resources.  One is Ms. Wanda Sinkule, who was passed over for a

12  director position.  And I apologize, Your Honor, but the other

13  two are not coming to mind.  I might be able to find it if the

14  Court would give me a second.

15          May I just supplement with the other two names?  Or I

16  can pull it up while we're sitting here.  They're on our EEOC

17  charge, which is attached to — our EEOC supplement, which is

18  attached to — it was produced in the case.  But I'd have to

19  look at the other two names.  I apologize.  They're not coming

20  to mind.  They are in Ms. Marshall's deposition.  But I can sit

21  here and pull them up for the Court after we're done if you

22  would like.

23          THE COURT:  Well, I'm trying — I mean, there's got

24  to — it seems to me that the lesson of "me too" decisions is

25  that — that there's got to be some connection other than just

1  claims of gender discrimination.  There's got to be something

2  that puts it in the category similarly close to what was

3  happening here.

4         MS. PREBULA:  I —

5         THE COURT:  Is it your contention that you believe

6  that the evidence from these four persons will indicate that

7  they were equally as qualified as the person that got the job

8  that they didn't get and that the only rational explanation for

9  them not getting the job is their gender, or are you just going

10 to put up four people — four women that applied for jobs that

11 men got?

12        MS. PREBULA:  I believe that the evidence from

13 Ms. Marshall is that women were treated — Ms. Marshall is

14 director of human resources — that women were treated

15 differently and were passed over for promotion, including her.

16 And — and —

17        THE COURT:  Ms. Marshall has testified in deposition

18 that women were discriminated against based on their gender?

19        MS. PREBULA:  She has not used those phrases.  She

20 has testified that there were at least four women, including

21 her, who were up for promotion and were passed over —

22        THE COURT:  So what?

23        MS. PREBULA:  — in favor of outside men.

24        THE COURT:  So what?

25        MS. PREBULA:  Because when the Court looks at

1  additional statistical evidence and we —

2        THE COURT:  This is not — that's where I'm having a

3  little trouble with this whole case.  I read the complaint to

4  be Ms. Trawick was discriminated against based upon her gender,

5  not that we're going to present a statistical case about a

6  pattern-and-practice case that Carmike discriminates against

7  all the women employees in the organization and therefore they

8  must have discriminated against her.  And then we get sort of

9  toward the end of the day, the end of the discovery period, and

10  we want to try to turn this into a pattern-and-practice case,

11  where we're going to look at all this other evidence of all

12  these other women that have not gotten promotions.  And if

13  there is evidence that they were passed over because of their

14  gender, then okay, maybe it comes in.  But just because a male

15  got a job and a female did not, I don't think that is the "me

16  too" evidence that the Eleventh Circuit has said comes in.

17        MS. PREBULA:  I don't think that by itself is enough,

18  but I think it is some evidence that shows motive and intent.

19  And I do think —

20        THE COURT:  All right.  Well, Ms. Marshall's depo has

21  been taken.

22        MS. PREBULA:  Correct.

23        THE COURT:  All right.  This is what I'm going to do.

24  This case is not going to be ready in the September term anyway

25  because y'all got too many things going on.  Y'all are not

1  going to be able to try it, and I'm probably not going to be

2  able to try it after the September term in October.

3          So I need to spend some more time digging deeper into

4  this summary judgment record and — and decide this case with a

5  solid summary judgment order one way or the other and have

6  y'all have advance enough notice before trial what will or will

7  not be tried.

8          I'm going to — I'm going to read every word of

9  Ms. Marshall's deposition.  And if she does not say what you

10  suggested she said, I'm going to be very disappointed.  But I

11  will agree with you.  If the former director of human resources

12  says anything that could be suggested of "Yes, Carmike

13  discriminated based on gender," then they've got a problem in

14  my view.  If she didn't say that, then I'm going to conclude

15  that you're reaching for straws here at the end of the day.

16  And that will not be the only basis for my decision in the

17  case, but I'm going to read that deposition word for word.

18          MS. PREBULA:  I would ask you to look at her

19  testimony about the report of the differential salaries —

20          THE COURT:  I'm going to look at — I've just

21  indicated I'm going to read it word for word.  I'm going to

22  read the entire — what she said about everything to see what

23  she said.

24          MS. PREBULA:  And I — I want to make sure the Court

25  understood I did — she did not use the words "discrimination

 1   based on gender."

 2          THE COURT:  No.  But what you suggested was that

 3   their own human resources director, who is female, has given

 4   testimony that indicates that even she thought they

 5   discriminated based upon gender.  That was clearly the

 6   suggestion of the argument.  And if she did, she did.  But if

 7   she did not, then that's — that's troublesome.

 8          MS. PREBULA:  Again, I'd ask you to look at her

 9   statements about her report.  And maybe we get that report

10   under our motion to compel.  That might help the Court as well.

11          THE COURT:  Well, let me ask you:  What do you — do

12   you understand — I mean, you're an experienced litigator in

13   this area.  Explain to me what you understand to be the

14   difference between a disparate treatment case for an individual

15   employee and a pattern-and-practice claim brought on behalf of

16   an employee.  What do you understand the Eleventh Circuit has

17   said is the difference in those cases?

18          MS. PREBULA:  I understand that pattern and practice

19   has to relate to an entire group of affected employees.  And we

20   have not alleged a pattern-and-practice case.  Of course, we

21   didn't expect in discovery to find four other women or a report

22   that women's salaries were different than men.  But — so we

23   are — so we believe pattern and practice applies to a group.

24   We have an individual.  So we are offering that evidence,

25   including these statistics, as evidence of motive and intent in

 1  this case.

 2          THE COURT:  So how does every case not turn into a

 3  pattern-and-practice case for —— if the evidence for a

 4  individual disparate treatment case —— if the case can be

 5  proven using pattern-and-practice evidence, which is basically

 6  "me too" type of evidence, then how is there a difference

 7  between the two?

 8          MS. PREBULA:  The way I understand the difference in

 9  the Eleventh Circuit is pattern and practice would apply to an

10  entire group, that there was a systemic pattern of not hiring

11  women or not hiring a protected class.

12          THE COURT:  Well, that's what you're claiming.

13  That's your whole argument here, as I heard you earlier.  Your

14  whole argument is they had these men who didn't like working

15  with women at Carmike; and we've got at least four examples of

16  women who were passed over for promotions simply because they

17  were women; and, therefore, this Carmike is this company that

18  does not promote and treat women well; and so one of the

19  examples of that is Ms. Trawick; and based on that evidence, in

20  addition to what happened to her, you should find that they

21  discriminated against her.  I don't see how that's not a

22  closing argument in a pattern-and-practice claim, other than ——

23  other than in the pattern-and-practice claim maybe you've got

24  more plaintiffs that you're —— that you're arguing for.

25          But I —— I cannot call it off the top of my head, but

1    I seem to remember at least one or more Eleventh Circuit

2    decisions that cautioned courts not to merge the two; that —

3    that — that they're two distinctly different types of claims;

4    and that you should not treat an individual disparate treatment

5    claim like you treat a pattern-and-practice claim.  But —

6         MS. PREBULA:  And we're going to —

7         THE COURT:  — we'll go back and we'll find those

8    cases.  I don't think the — the Bagby Elevator or what — what

9    was the name of the case?

10        MS. PREBULA:  *Goldsmith*.

11        THE COURT:  I don't think that — I was actually on

12    that panel —

13        MS. PREBULA:  Yes, sir.

14        THE COURT:  — to tell you the truth.  But I'm not

15   going to comment about anything that's not in the opinion,

16   but —

17        MS. PREBULA:  Well, that is —

18        THE COURT:  People have taken that case and

19   essentially used it as a means for turning individual disparate

20   treatment cases into pattern-and-practice cases because lawyers

21   are arguing that this — that's opened the door wide open for

22   any kind of "me too" evidence.

23        MS. PREBULA:  We are making a distinction.  If I were

24   representing all four of these women, I would be bringing a

25   pattern-and-practice case.  I am representing Ms. Trawick.

 1          THE COURT:  So the only difference — the only

 2   difference then in your view is the number of plaintiffs.  The

 3   type of evidence that you can introduce in your individual case

 4   is the same type of evidence that you could introduce in a

 5   pattern—and—practice case.  That's what I am hearing from you,

 6   and that may be the case.  I don't think it's the law.  But

 7   what I'm hearing is in your view the difference between a

 8   pattern—and—practice claim and an individual's case is not the

 9   evidence to prove the case but it's just that you got one

10   plaintiff as opposed to a number.

11          MS. PREBULA:  No, sir.  I believe that there's —

12   there's another distinction, which is that pattern — in a

13   pattern—and—practice case, the evidence will come in to show

14   that the entire group was discriminated against.  In our — and

15   that it didn't matter who the person was.  If they were in the

16   protected class, they were going to be — they were

17   discriminated against.  That's not what we're arguing.  We are

18   arguing that the "me too" evidence shows motive and intent on

19   the company from which this Court and a jury could draw a

20   reasonable conclusion that the actions taken as to Ms. Trawick

21   were discriminatory and disparate treatment.

22          THE COURT:  But it's got to be as to this particular

23   plaintiff.

24          MS. PREBULA:  No, sir.

25          THE COURT:  What — what you are trying to do is the

1   same thing you suggest would be done in a pattern-and-practice

2   case, which is that this company does not treat women well;

3   that this company discriminates against women; here's all this

4   evidence that these women were not promoted and the men were;

5   and, therefore, Jury, you know that if they did it to all of

6   these people they did it to her.  That's exactly what the —

7   your theory of the case is.

8            MS. PREBULA:  It's our interpretation of the Eleventh

9   Circuit law that under *Goldsmith* that evidence can come in to

10  show motive and intent in —

11           THE COURT:  In this case.

12           MS. PREBULA:  — Ms. Trawick's case.  And in

13  *Goldsmith* —

14           THE COURT:  But that's why it's got to be —

15           MS. PREBULA:  In *Goldsmith* —

16           THE COURT:  — closely related to the circumstances

17  in this case and not just generally some — some female didn't

18  get a promotion.

19           MS. PREBULA:  We would agree with that, but it

20  doesn't have to be related to the decision with regard to

21  Ms. Trawick.  It can show the motive and intent of the company

22  because they've discriminated against other women in the same

23  position, which is —

24           THE COURT:  Under the similar circumstances.

25           MS. PREBULA:  — similar circumstances of they sought

1  the promotion, were minimally qualified for the promotion, and

2  men were brought in from outside over them for those

3  promotions.  There may be 50 other women.  I don't know.

4  That — but we know of four.  And based upon *Goldsmith,* we

5  believe that that evidence can come in.  And from that evidence

6  we can argue that the jury can reasonably conclude that the

7  motive and intent of this company was to discriminate against

8  Ms. Trawick on the basis of her gender.  It's additional

9  evidence in addition to the other evidence that we have of the

10  glass ceiling and the other comments.

11            THE COURT:  So what if this "me too" evidence — what

12  if — what if — what if they don't think that they were "me

13  too"?

14            MS. PREBULA:  What if the jury —

15            THE COURT:  I mean what — no, no.  What if you got

16  these plaintiffs that come in and say, "Yeah, I applied for

17  promotion, but I understood — I wanted it, but I didn't get

18  it, but I don't think it had anything to my — to do with

19  gender, that it had to do with something else."  Then do we

20  have a trial with a "me too" plaintiff — I mean with a "me

21  too" employee who doesn't — doesn't think "me too" —

22            MS. PREBULA:  We would have —

23            THE COURT:  — who thinks — Ms. Prebula thinks it's

24  "me too," but I don't think it's "me too."  How does that play

25  out?

1          MS. PREBULA:  We would have a — we'd have a conflict

2    in the evidence for the jury to resolve.

3          THE COURT:  So you would —

4          MS. PREBULA:  The jury could —

5          THE COURT:  So you would be asserting that they were

6    discriminated against based on their gender when they didn't

7    think they were entitled to — that they didn't think that they

8    were discriminated based on their gender.

9          MS. PREBULA:  I think that's speculative, but I think

10   that's a possibility, and it would be an issue that the jury

11   would have to resolve.

12         THE COURT:  And you say that you don't know now what

13   they're going to say because you didn't — you were denied this

14   discovery during the discovery period?

15         MS. PREBULA:  That's part of it.  We need the

16   discovery —

17         THE COURT:  I mean, if this was your theory from the

18   beginning, did you not request it from the very beginning?

19         MS. PREBULA:  We did request it from the —

20         THE COURT:  And they refused to turn it over.

21         MS. PREBULA:  That's correct.  And that's — that's

22   the subject of our motion to compel and our motion for

23   spoliation.

24         THE COURT:  All right.  What about that,

25   Mr. Gerakitis?

```
1              MR. GERAKITIS:  Your Honor, thank you.

2              Your Honor, she took Ms. Marshall's deposition.  She

3    never asked her just what you asked, did you think —

4              THE COURT:  This is the human resources director,

5    former?

6              MR. GERAKITIS:  This is the human resources director.

7    Never asked, "Did you think that Patrick Railey being hired in

8    as the senior VP was racially or discriminatory on the basis of

9    your sex?"  Ms. Marshall is African American.  And I figured

10   she'd try and plow that ground.  I can name all the people,

11   Your Honor.  It's Wanda Sinkule —

12             THE COURT:  Has that been disclosed?

13             MR. GERAKITIS:  Oh, absolutely.  They put it in their

14   EEOC charge to —

15             THE COURT:  All — all these four —

16             MR. GERAKITIS:  All these four —

17             THE COURT:  — they were disclosed.

18             MR. GERAKITIS:  — they put in their EEOC charge.

19             THE COURT:  When were they disclosed?

20             MR. GERAKITIS:  Your Honor, they put them in their

21   EEOC charge.

22             THE COURT:  It was their charge.

23             MR. GERAKITIS:  They named them in their EEOC

24   questionnaire.

25             THE COURT:  Why were they not deposed?
```

```
 1            MR. GERAKITIS:  She —— Your Honor, now ——
 2            THE COURT:  Go ahead.
 3            MR. GERAKITIS:  She deposed Ms. Marshall.  She listed
 4   Ms. Hardwick as someone to depose, who was the director of IT.
 5   She didn't depose Ms. Hardwick.  She also didn't depose the ——
 6   Deborah Triplett, who's out in Oklahoma.  And the fourth is
 7   Patti Gaddis, who is a claims manager at J. Smith Lanier now.
 8            THE COURT:  So these people were available during the
 9   discovery period so that either their depositions or affidavits
10   could be obtained ——
11            MR. GERAKITIS:  Absolutely.
12            THE COURT:  —— if they wanted to be used in response
13   to a summary judgment motion.
14            MR. GERAKITIS:  In fact, Your Honor, Patti Gaddis
15   works with Ms. Trawick's husband, and Ms. Gaddis signed
16   Ms. Trawick's affidavit as the notary public.  So it's not like
17   she's not available.  They could have come forward with that,
18   but they didn't.  And that's why you can't —— Judge, this is
19   a —— this is a "them too" case, not a "me too" case.  It's a ——
20   a plaintiff getting up and being able to say, "I think, I
21   think" —— forget what they think —— "I think they've been
22   discriminated against."
23            THE COURT:  Did any of those persons ever file any
24   EEOC claims?
25            MR. GERAKITIS:  Nothing.
```

1          THE COURT:  Or — okay.  I'm not saying that's a
2     prerequisite —
3          MR. GERAKITIS:  And they could have easily asked
4     Ms. Marshall about herself, which as you'll see, nothing.
5          MS. PREBULA:  Your Honor, may I address why they
6     weren't deposed?
7          THE COURT:  Yes, yes.
8          MS. PREBULA:  They weren't deposed because we
9     believed Ms. Marshall's affidavit — excuse me —
10    Ms. Marshall's deposition was sufficient.  And we'd already
11    taken, I believe, 13 depositions in this case.
12         THE COURT:  All right.  Well, what I'm trying to get
13    at — and I don't mean to act frustrated about it — both sides
14    agree that the current record is sufficiently complete for me
15    to decide the pending summary judgment motion.  Is that — is
16    that true?
17         MR. GERAKITIS:  Yes, Your Honor.
18         THE COURT:  Is that true?
19         MS. PREBULA:  No, it's not true.  We believe that in
20    order for the record to be complete the Court should grant our
21    motion to compel, give us the discovery that we've requested.
22    These witnesses were disclosed back in our initial disclosures
23    in April 18, 2017.
24         THE COURT:  That's what I'm having a — that's what
25    I'm having a hard time understanding, is if you knew about at

1    least these four from the very beginning and you think that

2    they are necessary to adequately respond to a summary judgment

3    motion, why would you not have attempted to get an affidavit or

4    a deposition from them.

5              MS. PREBULA:  We don't think they're necessary to

6    respond to the summary judgment motion based upon —

7              THE COURT:  That's all I'm asking.

8              MS. PREBULA:  — based upon Ms. Marshall's testimony.

9    But we do think that with regard to damages and other evidence

10   that —

11             THE COURT:  Okay.

12             MS. PREBULA:  — has been kept from us, that we are

13   entitled to see that evidence.  And part of that is on the

14   comparator issue in that — what has happened is that by

15   refusing to produce the personnel records of the named

16   individuals — we didn't just say — we said comparators.  We

17   also asked in our second request for specific individuals.

18   They've refused to produce those, quite frankly, because in my

19   — based upon the nine depositions of the company folks that we

20   took, we don't think they exist anymore.  We have nine

21   depositions.  We've cited to them in our motion for spoliation.

22             THE COURT:  I guess what —

23             MS. PREBULA:  The records were destroyed.

24             THE COURT:  I guess what I'm trying to find out is —

25   what I'd like to do is decide the summary judgment motion and

1  then whatever is left to try, maybe everything, maybe some

2  claims.  Then after that — because the heat is off for

3  September.  Because of y'all's schedules, y'all can't try the

4  case during my September term, not because of the Court but

5  because of y'all's schedules.  So the heat is off for that.

6  I'm not going to push it, and I'm — and I'm realistically not

7  going to be able to find a time to specially set it before the

8  end of the year.

9         MS. PREBULA:  And praise the Lord —

10         THE COURT:  I set aside five weeks to try the case

11  and — to try cases.  And if I can't get them done then, we

12  usually push them over to — to March, or we may could find

13  some time possibly in February.

14         But what I'd like to do is decide the motion for

15  summary judgment and then, assuming that claims survive,

16  determine at that point whether you're entitled to any of this

17  other information for trial.  Because I don't believe there's

18  been a motion filed under Rule 56 requesting additional

19  discovery to respond to the summary judgment motion.  So I'm

20  assuming — what I had assumed was that each side agrees that

21  the record is sufficiently complete for me to rule on the

22  summary judgment motions.  But now I'm getting a little —

23         MS. PREBULA:  I may have —

24         THE COURT:  — resistance to that —

25         MS. PREBULA:  I may have been unclear.  I think —

1          THE COURT:  I mean, I —— you may still get the stuff

2    for trial if the summary judgment is denied.  But what I want

3    to make sure of is nobody comes back later on and says, "Well,

4    I needed more information to oppose summary judgment."  You've

5    not made that motion.  But the defendant is satisfied with the

6    motion being decided on the current record without any ——

7    anything being added.

8          Are you satisfied with the motion for summary

9    judgment being decided on the current record without me first

10   ruling on your motion to compel, or not?

11         MS. PREBULA:  I would say no.  If the personnel files

12   actually exist, still exist —— contrary to the nine people that

13   say everything was destroyed or wiped from computers —— then I

14   think we're entitled to see those documents and any documents

15   that relate to ——

16         THE COURT:  All right.  Well, then, let's do this.  I

17   just —— I just hate y'all flooding —— flooding me with paper,

18   but I'm used to it by now.

19         You need —— the case is not going to be tried this

20   term.  Within seven days of today, Ms. Prebula, you need to

21   file a motion under Rule 56 ——

22         MR. GERAKITIS:  D.

23         THE COURT:  —— D that sets out exactly what

24   additional discovery you think you're entitled to before I rule

25   on your summary judgment motion, why you think it's relevant to

1   the summary judgment motion and not just for damages at trial,

2   and why that information was not obtained during the discovery

3   period.  And then lawyers always want to respond, so we'll let

4   the defendant — 21 days to respond to that motion.  And then I

5   guess if I — if she makes a strong case that she ought to get

6   more, then I'll rule on that before I decide the summary

7   judgment motion, and we'll try this case in 2025 or whenever.

8              MS. PREBULA:  Judge, but since we're not —

9              THE COURT:  But if it — if I don't — if I determine

10  that the current record is adequate and sufficient and that

11  you've had adequate time, then I'm going to go ahead and decide

12  it on the current record.

13             MS. PREBULA:  May I — if we're giving him 21 days,

14  may I have 14 days?  As you might imagine, getting all these

15  motions in — and quite frankly, to be honest with the Court,

16  in the past week — excuse me — I've lost four people.  I

17  really need some additional time.

18             THE COURT:  Okay.  You can have — well —

19             MS. PREBULA:  Can I have 14 days?

20             THE COURT:  You can take 21 days.

21             MS. PREBULA:  Okay.

22             THE COURT:  Take 21 days.

23             MS. PREBULA:  All right.  Sorry.

24             THE COURT:  I mean, we're not going to try this case

25  until March anyway if — if — whatever is left of it, maybe

1   the whole thing, maybe part of it.  It's just not realistic to
2   try this case before then.
3           MS. PREBULA:  And, unfortunately, I'd have to ask you
4   about that, Your Honor.  I've got ——
5           THE COURT:  I know you've got a conflict.
6           MS. PREBULA:  —— March 3rd through the 20th that I
7   need to —— you know, it's a financial issue.  I need to know
8   whether to ——
9           THE COURT:  I'm not going to make you miss —— how
10  long are you going to be gone?
11          MS. PREBULA:  The 3rd through the 20th.  That gives
12  me one day to recover when I get back.
13          THE COURT:  Okay.  Well, I'm not going to make you
14  cancel the trip.
15          MS. PREBULA:  Thank you.  My traveling companions ——
16          THE COURT:  We'll find the time to ——
17          MS. PREBULA:  —— thank you, too.
18          THE COURT:  —— try the case.
19          MS. PREBULA:  Thank you.
20          THE COURT:  But it won't be —— it will not be before
21  the end of the year.
22          MS. PREBULA:  Okay.
23          THE COURT:  And, of course, I'm going to have to let
24  defense counsel have a "get out of trial free" card, too, here
25  and there, if they want one, but ——

```
 1              MR. GERAKITIS:  That's all right.
 2              THE COURT:  Usually it's the plaintiff that wants all
 3   the — wants the money.  But I understand.
 4              MS. PREBULA:  I understand.
 5              THE COURT:  Let me ask one last question of
 6   Mr. Gerakitis.
 7              If somebody takes maternity leave and the company
 8   says, "You've got the leave, and we're going to pay you," and
 9   this, that, and the other —
10              MR. GERAKITIS:  And return her to work?
11              THE COURT:  — and return to work and keep her in the
12   position when she comes back — but they put pressure on her
13   while she's on maternity leave, before she's completed the
14   maternity leave, that she needs to come back sooner and, if she
15   can't come back sooner, she needs to perform her duties while
16   she's on maternity leave, if that were the evidence that a
17   reasonable jury could conclude those facts, why would that not
18   be an FMLA interference claim?
19              MR. GERAKITIS:  Because Section 2617 says it isn't.
20   Pressure to return from a paid leave in this circumstance,
21   they're not going to be viewed under the — under the law as,
22   you know, truly interfering.  There's no —
23              THE COURT:  What if they make her work from home
24   during the leave?
25              MR. GERAKITIS:  Judge, she's paid during the leave.
```

1   She's paid the entire thing.

2           THE COURT:  So — so you can — so under the FMLA you

3   can require an employee to work from home?

4           MR. GERAKITIS:  It's not — first of all, it was

5   not — it was not treated as a FMLA leave situation because she

6   said — when we asked her, "Did you ask for unpaid leave?" and

7   she said, "I asked for leave alone."  And —

8           THE COURT:  Okay.  So the FMLA leave would be unpaid.

9           MR. GERAKITIS:  FMLA leave is only unpaid unless —

10          THE COURT:  FMLA —

11          MR. GERAKITIS:  — you stack — unless you stack

12  vacation time or sick leave or something like that.  And in

13  fact, Your Honor —

14          THE COURT:  So FMLA leave is only unpaid leave.

15          MR. GERAKITIS:  Is only unpaid leave.

16          THE COURT:  And the leave she took during maternity

17  was —

18          MR. GERAKITIS:  Fully paid.

19          THE COURT:  — fully paid.

20          MR. GERAKITIS:  All benefits, all salary, everything.

21          THE COURT:  So if you have a benefit plan that says

22  you can take 90 days of leave fully paid, then if they think

23  that that means that they don't have to work during that time,

24  they've got a breach-of-contract claim as opposed to an FMLA

25  claim?

 1          MR. GERAKITIS:  Arguably they might have a
 2  breach-of-contract claim for —
 3          THE COURT:  If they're getting paid, then it's not
 4  FMLA leave.
 5          MR. GERAKITIS:  Correct, because it's — not only
 6  that, but there's no compensatory relief that they're entitled
 7  to.  There might be some sort of equitable relief that courts
 8  have entertained, but it's only in those circumstances where
 9  they didn't get returned to work.  And she got return —
10          THE COURT:  What about that, Ms. Prebula?  What about
11  your FMLA claim?
12          MS. PREBULA:  We think the FMLA claim is valid for
13  two reasons.  One, she was required to work during the leave;
14  two, she did request leave.  She — and her supervisor was the
15  one that was responsible for stating which kind of leave it
16  was.  Their — their policy —
17          THE COURT:  Did she get paid during the leave?
18          MS. PREBULA:  She got paid during the leave under her
19  then current salary.  But our contention is that she's entitled
20  to what she should've been paid but for the disparate pay and
21  that her bonus structure should have been adjusted for the time
22  she was out, which it was not.  So she was expected to do the
23  same work while she was out on maternity leave or leave,
24  whichever you prefer, and did not get paid what was the
25  appropriate amount.

1            THE COURT:  But did she ever seek to take unpaid

2   leave?

3            MS. PREBULA:  She described it as leave.  She did not

4   make a distinction between paid or unpaid leave.

5            THE COURT:  Well, she certainly knew that she was

6   getting paid; right?

7            MS. PREBULA:  She did know she was getting paid, Your

8   Honor.  I mean, that's not disputed.

9            THE COURT:  Okay.  All right.  Well, get — get me

10  those — get me your motion under Rule 56 that you need this

11  discovery, and I'll look at that first and then we'll decide

12  the motion.  But, I mean, I realize y'all may have — well, if

13  I grant summary judgment, then I guess you've prepared for this

14  pretrial conference for naught.  But, nevertheless, if you end

15  up winning, you'll get your fees for that —

16            MS. PREBULA:  Yes, sir.

17            THE COURT:  — and y'all will get paid anyway.  So I

18  guess your client —

19            MS. PREBULA:  There's the rub.

20            THE COURT:  All right.  Thank y'all for coming.

21            MR. GERAKITIS:  Thank you, Your Honor.

22            MS. PREBULA:  Thank you, sir.

23            THE COURT:  But we will not be going to trial

24  September or October or any time in 2018.

25        (Proceedings concluded at 4:19 p.m.)

1                    CERTIFICATE OF REPORTER

2              I, Betsy J. Peterson, Official Court Reporter of
   the United States District Court, in and for the Middle
3  District of the State of Georgia, Columbus Division, a
   Registered Professional Reporter, do hereby CERTIFY that the
4  foregoing proceedings were reported by me in stenographic
   shorthand and were thereafter transcribed under my direction
5  into typewriting; that the foregoing is a full, complete, and
   true record of said proceedings.

6

7                            This 7th day of September, 2018.

8

9
                             s/Betsy J. Peterson
10                           Betsy J. Peterson, CRR, RPR, CCR
                             Federal Official Court Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25