IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

CRYSTAL TRAWICK,                    *

    Plaintiff,                 *

vs.                                 *    CASE NO. 4:16-CV-380 (CDL)

CARMIKE CINEMAS, INC.,              *

    Defendant.                 *

_____

O R D E R

Crystal Trawick, a former employee of Carmike Cinemas, Inc. ("Carmike"), claims that Carmike discriminated against her because of her gender by failing to promote her and paying her less than a comparable male employee. She also alleges that when she complained to her superiors about these disparities, Carmike retaliated against her and terminated her employment. Carmike moved for summary judgment as to all of Trawick's claims (ECF No. 39). Because genuine factual disputes exist as to Trawick's wage discrimination claims, summary judgment is denied as to those claims. Trawick, however, has failed to point to sufficient evidence in support of her failure to promote, retaliation, Family and Medical Leave Act ("FMLA"), and negligent retention claims; and Carmike's motion is granted as to those claims.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248. A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.*

## FACTUAL BACKGROUND

Viewed in the light most favorable to Trawick, the record establishes the following facts:

Carmike hired Trawick in 1998 as a part-time theater employee. In October 2012, Carmike transferred Trawick to the marketing department but did not give her an official job title, job description, or pay raise. After six months, Carmike designated Trawick the "Marketing Projects Manager." She and Shannon Sailors, the director of advertising, reported to Terrell Mayton, the director of marketing. Her duties included administering Carmike's social media accounts, managing website updates,

developing and maintaining loyalty programs, and marketing special events.

Several months after Trawick received her new title, Carmike fired Mayton. With the exception of approving corporate expenses and sponsorships, Carmike assigned Mayton's former responsibilities to Trawick. Trawick Aff. ¶ 5, ECF No. 60-2; Sailors Dep. 334:8-19, ECF No. 48. After Mayton's termination, Trawick and Sailors reported directly to Fred Van Noy, the chief operating officer. Trawick reported to Van Noy until her termination.

## I. Trawick's Educational Background and Maternity Leave

Trawick completed her associate's degree at Chattahoochee Valley Community College ("CVCC") in 2012. In 2013, after Carmike terminated Mayton, Trawick enrolled in calculus and marketing courses at Troy State University to complete her bachelor's degree. Carmike paid for the courses. Trawick Dep. 193:25-194:9, ECF No. 46; Van Noy Decl. ¶¶ 9-10, ECF No. 39-3. Because her responsibilities and hours had increased after Mayton's termination, Trawick could not complete those courses. Trawick Dep. 188:20-189:1. And Trawick did not earn a bachelor's degree while employed at Carmike.

Trawick took paid maternity leave to deliver a child in April 2014. After the birth, however, Van Noy continued to contact her and pressured her to work from home. Consequently, Trawick

participated in conference calls, sent emails, and worked from her laptop while on maternity leave. Trawick Aff. ¶ 13. Van Noy also sent her calendar invites for meetings during her leave. *See* Pl.'s Supplemental Resp. in Opp. to Def.'s Mot. for Summ. J. Ex. E, Calendar Invites, ECF No. 116-6 (showing six calendar invites sent by Van Noy to Trawick while she was on maternity leave). She returned to work six weeks after the birth and did not use her full twelve weeks of FMLA leave. Trawick Aff. ¶ 13. Trawick, however, does not dispute that Carmike paid her during her leave, did not deduct any of her sick time or vacation days from her leave, did not alter her bonus structure because of her leave, and returned her to the same position after her leave. *See* Pl.'s Resp. to Def.'s Statement of Material Facts ¶¶ 35-37, ECF No. 60-5. She also pointed to no evidence that she attended any of the meetings during her leave.

## II. Trawick's Tenure at Carmike

Trawick satisfactorily performed her duties as marketing projects manager both before and after Carmike terminated Mayton. *See* Trawick Aff. ¶¶ 11-12 (noting accolades Trawick received for her work). Carmike CEO David Passman praised Trawick after she appeared on television to announce theater renovations. *See* Passman Dep. Ex. 52, Email from D. Passman to C. Trawick *et al*. (Feb. 6, 2015), ECF No. 49-9. Carmike executives and other employees commonly referred to Trawick as the director of

marketing.  Trawick Aff. ¶ 14.  Van Noy even introduced Trawick as director of marketing at a theater grand opening.  *Id.*

### A.   Promotion Discussions with Van Noy

At some point in early 2015, Trawick spoke with Van Noy about a promotion to director of marketing and a salary increase. Trawick Dep. 253:12-15; Van Noy Dep. 120:10-18, ECF No. 31.  Van Noy asked Trawick to provide him a list of her accomplishments, something Trawick had already produced for him at the end of the previous year.  Trawick Dep. 254:17-255:13.  After Trawick directly asked Van Noy for a promotion and more pay, she felt that his management style towards her was more aggressive and his communications to her became more pointed, direct, and harassing. *Id.* at 215:5-17.

Other employees also discussed Trawick's performance with Van Noy and suggested she be promoted to a director-level position. Several months after Carmike terminated Mayton, Sailors asked Van Noy whether Trawick would be promoted to director.  *See* Sailors Dep. 49:13-50:13.  Later, after "initiation" by Trawick, Sailors again broached the topic with Van Noy.  *See id.* at 51:2-12.  Van Noy told Sailors both times that the promotion decision would be made by the executive team based on a number of factors.  *Id.* at 50:20-23; 51:9-15.  At some point in 2014, Jim Lucas, a division director at Carmike, also asked Van Noy why Carmike would not promote Trawick to director since Carmike was paying for her

education for that position.  Lucas Dep. 95:1-5, ECF No. 53.  Van Noy responded that he would not promote Trawick unless Passman insisted.  *Id.* at 95:9-10; 96:4-16.

### B.  Promotion Discussions with Passman

In March 2015, CVCC invited Trawick to participate on a panel to discuss women in corporate leadership.  Trawick discussed an outline of her presentation with Passman before the event.  Trawick Dep. 244:3-6.  Trawick explained to Passman that she would tell the audience about the "glass ceiling" in corporate America and the challenges women face in the workplace.  Passman Dep. 93:9-13, ECF No. 49.  Passman responded to Trawick that "[i]t's unfortunate for [women], but [the glass ceiling] does exist."  Trawick Dep. 246:5-8.  Although Trawick had previously complained to Passman that she was underpaid, Passman Dep. 96:7-8, Trawick did not discuss her pay or position at Carmike during this conversation in March 2015, Trawick Dep. 246:16-25.

Several months later, after a recruiter contacted Trawick about a higher-paying position at a different company, Trawick again discussed her performance, salary, and title with Passman.  *Id.* at 255:22-24; 259:5-260:9.  Trawick complained directly to Passman that she was being treated unfairly compared to Sailors.  And she told Passman that she had previously mentioned these grievances to Van Noy.  *Id.* at 260:5-19.  Passman told Trawick, "You're right.  You should be compensated."  *Id.* at 260:8-9.

Passman also told her she had not hit her glass ceiling and that he still saw her as a potential candidate for upper management. *Id.* at 260:25-261:2. Passman did tell Trawick, however, that she "needed to finish [her] education" because that is "something that men are going to require of [her] as [she] move[s] up in the industry." *Id.* at 261:2-5.[1]

### III. Sponsorship Investigation and Termination

In June 2015, Trawick served as president of the Quadrille social club. One of her responsibilities was to raise money for parties hosted by the club. To that end, Trawick drafted a letter seeking corporate sponsorships for a Quadrille party. Trawick worked with the prior Quadrille president, Jenny McMillen, to draft the letter, and McMillen's name appeared on the bottom of the letter. *See* Trawick Dep. Ex. 1, Quadrille Fundraising Letter (June 7, 2015), ECF No. 46-1. Trawick approached Carmike and obtained a $2,000 sponsorship, which was approved by Sailors. She did not personally solicit sponsorships from any other businesses. Trawick Dep. 160:8-11.

When Trawick's tenure as Quadrille president ended, she asked Cathryn Smitherman, a Carmike financial analyst, to become Quadrille treasurer. Smitherman Decl. ¶ 5, ECF No. 39-9. During

---

[1] Trawick also asserts generally in her affidavit that she "repeatedly" brought up the issue of her title and low pay to Mayton, Van Noy, and Passman. Van Noy and Passman told her the issues would be addressed, so she never reported the issues to the Carmike Human Resources Department. Trawick Aff. ¶ 18.

a budget review of expenses at Carmike, Smitherman found the recorded expense for $2,000 and the sponsorship request letter from Quadrille. *Id*. ¶ 4. Because McMillen's name appeared on the letter, Smitherman emailed McMillen and asked: "[d]id Quadrille have sponsors last year? I am confused as to why Quadrille would have sponsors since we are a social club. I have a letter that is from you asking for sponsorships and I wanted to make sure it was legitimate." *Id*. ¶ 6; *id*. Ex. 1, Email from C. Smitherman to J. McMillen (Nov. 2, 2015), ECF No. 39-9 at 10. McMillen forwarded Smitherman's email to Trawick. In response, Trawick told McMillen to tell Smitherman that only one company had sponsored Quadrille and that the solicitation "will not be duplicated moving forward." *Id*. Ex. 1, Email from C. Wing to J. McMillen (Nov. 2, 2015), ECF No. 39-9 at 10. Trawick also asked McMillen to try not to discuss with Smitherman which company had sponsored Quadrille "because [Smitherman] works at Carmike and I would prefer she wasn't involved." *Id*.

McMillen forwarded Trawick's response to Smitherman, who then forwarded the email chain to Fred Friedel, Carmike's head of compliance. Smitherman Decl. ¶¶ 9 & 15. This triggered an investigation by Carmike. Van Noy and Friedel scheduled a meeting with Trawick to inform her of the investigation into her expenses and donations. Van Noy Dep. 157:11-14. At the meeting, Van Noy and Friedel instructed Trawick not to "poll [her] peers" during

the investigation.  Trawick understood this to mean that "she was not to go to her director and manager peers and discuss the subject matter" of the investigation.  Trawick Dep. Ex. 59, Letter from M. Prebula to J. Vanairsdale 12 (Aug. 2, 2016), ECF No. 46-59.[2]

Trawick admits that she spoke with several Carmike employees about the investigation.  Trawick discussed the meeting and investigation separately with Sailors and Lisa De La Cruz, the administrative assistant to Passman and Van Noy.  Trawick Dep. 268:18-269:8.  Additionally, one of Trawick's subordinates, Jennifer Therrien, reported to Carmike Human Resources and Dan Ellis, Carmike general counsel, that Trawick told her she was in trouble related to the expenses and "needed [Therrien] to make it right."  Ellis Dep. 41:12-42:14, ECF No. 55.

After Therrien's report, Van Noy and Ellis met with Trawick to discuss her conversations about the investigation.  When Van Noy asked Trawick if she had discussed the investigation with anyone, Trawick admitted she had done so.  On November 17, 2015, Carmike terminated Trawick for "insubordination" based on her discussions with other employees about the investigation.  *See* Trawick Dep. 184:22-185:8 ("Q: [T]he only statement you have ever

---

[2] Trawick alleged that she initially did not understand Van Noy's instruction to prevent her from speaking to *subordinates* about the investigation.  Compl. ¶ 41, ECF No. 1.  The only record evidence about Trawick's understanding of Van Noy's instruction is her response to Carmike's position statement in the EEOC proceedings, where she stated that she understood she was not to discuss the subject matter of the investigation with other managers or directors.

heard from any officer or HR personnel is that you were insubordinate and they had lost confidence or trust in you, correct? A: Correct.").[3]

## IV. Hiring of Chief Marketing Officer

Ellis and Van Noy stated that Carmike decided to hire Rob Collins for the chief marketing officer position in November 2015. Ellis Decl. ¶ 6, ECF No. 39-8 (stating Carmike hired Collins in November 2015); Van Noy Decl. ¶ 15 (same). The declarations do not explain whether Carmike made the decision to hire Collins before or after it decided to terminate Trawick. Trawick stated in her affidavit that she did not become aware that Carmike hired Collins until December 2018, when she saw a news article announcing the hire. Trawick Aff. ¶ 15; *see also* Trawick Aff. Ex. A, *On the move: Carmike Cinemas names Rob Collins its chief marketing officer*, Columbus Ledger-Enquirer, Dec. 18, 2015, ECF No. 60-3 (announcing the hire in December 2015).[4]

Several months after her termination, Trawick brought this action.

---

[3] Trawick pointed to Passman's deposition testimony where he acknowledged that Trawick's final payroll authorization form and Department of Labor separation notice indicated that she resigned. Passman Dep. 235:9-236:18. Passman also testified, however, that the reason Carmike terminated Trawick was insubordination. *Id*. at 116:2-21.

[4] Confusingly, Carmike appears to argue that, notwithstanding Ellis and Van Noy's clear declarations to the contrary, the decision to hire Collins was not made until December, when the press release issued.

DISCUSSION

Trawick asserts claims against Carmike pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA"); the FMLA, 29 U.S.C. § 2601 *et seq.;* and state law. Her Title VII claims include: (1) failure to promote; (2) retaliation; and (3) wage discrimination. Her EPA claim likewise alleges that Carmike paid Trawick less than Sailors for similar work because of her gender. Trawick also contends that Carmike violated the FMLA by pressuring her to work from home and return early from her maternity leave. Finally, Trawick maintains that Carmike is liable under state law for negligently retaining Passman and Van Noy. For the following reasons, Carmike's motion is denied as to Trawick's wage-based claims and granted as to her other claims.

## I.   **Trawick's Title VII Failure to Promote and Retaliation Claims**

Trawick pointed to no direct evidence of discrimination. Her Title VII claims are therefore analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). Under this framework, Trawick must first "create an inference" of discrimination or retaliation by establishing her prima facie case. *Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1191 (11th Cir. 2016). "Once the plaintiff has made a prima facie case, a rebuttable presumption arises that the employer

has acted illegally." *Id.* (quoting *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010)). "The employer can rebut that presumption by articulating one or more legitimate non-discriminatory reasons for its action." *Id.* (quoting *Alvarez*, 610 F.3d at 1264). "If it does so, the burden shifts back to the plaintiff to produce evidence that the employer's proffered reasons are a pretext" for discrimination or retaliation. *Id.* (quoting *Alvarez*, 610 F.3d at 1264).

A. Failure to Promote

Carmike urges the Court to grant summary judgment on Trawick's failure to promote claim because the claim is untimely. Title VII requires a plaintiff to file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") within 180 days of the alleged discriminatory adverse employment action. 42 U.S.C. § 2000e-5(e)(1). Trawick filed her charge on April 14, 2016. *See* Charge of Discrimination (Apr. 14, 2016), ECF No. 25-2. The Supreme Court and Eleventh Circuit have further explained that "[a]n employer's failure to promote is a discrete act or single occurrence." *Stuart v. Jefferson Cty. Dep't of Human Res.*, 152 F. App'x 798, 800-01 (11th Cir. 2005) (per curiam) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002)). Therefore, the "continuing violation doctrine" does not apply to such a claim. *Morgan*, 536 U.S. at 114. Accordingly, Trawick must

point to a discrete promotional decision that occurred after October 17, 2015 to sustain this claim.

Carmike argues summary judgment is proper because Trawick failed to point to such a decision. In Trawick's charge, she states she was "refused promotion," but does not identify any instance where Carmike explicitly told her she would not be promoted and does not reference Carmike's decision to hire Collins. Trawick Charge 1-2. Further, Trawick did not offer any specific argument regarding timeliness in her summary judgment response. Though Trawick vigorously disputes the legitimacy of Carmike's continued decision not to promote her throughout 2015 and its decision to hire Collins, she did not even attempt to explain how a continued, tacit denial of a promotion (absent a discrete decision) or a promotional decision made after a plaintiff's termination can give rise to a failure to promote claim. And Trawick pointed to no evidence that the decision to hire Collins was made after October 17 and before her termination. In fact, she appears to encourage the Court to interpret the facts otherwise. *See* Pl.'s Statement of Disputed Material Facts ¶ 82 ("Robert Collins was hired as Carmike's CMO in November 2015, immediately following Plaintiff's termination.").[5]  Simply put,

_____

[5] To the extent that Trawick suggests that the hiring of Collins represents the "discrete act" of failing to promote her, the Court does not understand how a decision not to promote a *former* employee can support a failure to promote claim. Only in *Alice in Wonderland* can you fail to promote someone who is no longer your employee. The Court

Trawick made no effort to identify a "discrete act or single occurrence" necessary to sustain her claim. Accordingly, Carmike's motion for summary judgment on this ground is granted.[6]

###    B.    Retaliatory Termination

Trawick claims Carmike retaliated against her by terminating her after she complained about disparate treatment related to pay and title. Carmike responds that it terminated her for insubordination. Trawick failed to point to any evidence that Carmike's articulated, non-retaliatory reason for her discharge was pretextual. Trawick admits that she engaged in the conduct for which Carmike states it fired her. She admits she spoke to Sailors, a director-level employee, about the investigation. And Trawick points to no evidence to suggest that Carmike's stated reason for terminating her—insubordination by violating Van Noy's instruction not to discuss the investigation into her expenses—

---

recognizes that had Trawick pointed to evidence that a decision was made not to promote her after October 17 and before her termination, then her charge would have been timely. But she pointed to no such evidence.
[6] Alternatively, the Court concludes Trawick abandoned this claim by failing to offer any response to Carmike's timeliness argument. *See Adkins v. Christie*, 491 F. App'x 996, 998 (11th Cir. 2012) (per curiam) (concluding district court did not err in dismissing one of plaintiff's claims when plaintiff did not respond to defendant's motion for summary judgment on that issue); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (en banc) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it at summary judgment."). This ruling does not impact Trawick's ability to recover for wage discrimination based on the period she contends she should have received a promotion or from pointing to Collins's hire as evidence of those claims.

was so implausible that it cannot be believed. Therefore, Trawick's retaliation claim fails.

Trawick pointed to evidence she claims discredits the legitimacy of Carmike's investigation into the Quadrille sponsorship. She also pointed to evidence to show that her use of company resources was reasonable. This evidence, however, misses the point and does not address Carmike's stated reason for her termination head on. That reason, insubordination, arose during the investigation. Whether the investigation was flawed, or even fabricated, does not diminish the significance of the undisputed fact that Trawick clearly violated a directive from her superiors. Just because the insubordination would never have occurred but for the alleged pretextual investigation does not mean that the ultimate reason for the termination was pretextual. Had Carmike's stated reason for terminating her been the way she handled the Quadrille sponsorship or other company expenses, then her evidence of a fraudulent investigation into those areas may be evidence of pretext sufficient to avoid summary judgment. But she presented no evidence from which a reasonable jury could conclude that Carmike's stated reason of insubordination was pretextual. Her failure to do so dooms her retaliatory discharge claim. *See Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015) ("Put frankly, employers are free to fire their employees for 'a good reason, a bad reason, a reason based on

erroneous facts, or for no reason at all, as long as it is not for a discriminatory reason." (quoting *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984))). Accordingly, Carmike is entitled to summary judgment on Trawick's retaliation claim.[7]

## II. Trawick's Wage-Based Claims

Trawick also asserts wage discrimination claims pursuant to Title VII and the EPA based on Carmike's refusal to pay her comparably to Sailors. These claims have similar elements but differ regarding burdens of proof and available remedies. "A plaintiff suing under the Equal Pay Act must meet the fairly strict standard of proving that she performed substantially similar work for less pay. The burden then falls to the employer to establish one of the four affirmative defenses provided in the statute." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1526 (11th Cir. 1992). "Under the disparate treatment approach of Title VII, however, there is a relaxed standard of similarity between

---

[7] The Court notes that had Trawick asserted a gender-based discriminatory termination claim, the Court's pretext analysis would have been different. Such claims permit a plaintiff to prevail even if an employer has mixed motives. And the Eleventh Circuit has recently made clear that the traditional *McDonnell Douglas* framework does not apply in mixed-motive cases. *See Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1238-40 (11th Cir. 2016). But Trawick's counsel clarified at the summary judgment hearing that she was not asserting a gender-based discriminatory termination claim, *see* Tr. of Proceedings 47:23-48:1 (Aug. 21, 2018), ECF No. 106; and retaliation claims cannot proceed under a mixed-motive theory. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 359-60 (2013). Therefore, the traditional *McDonnell Douglas* framework applies, and *Quigg* has no application here.

male and female-occupied jobs, but a plaintiff has the burden of proving an intent to discriminate on the basis of sex (or race or national origin)." *Id*.[8]

A.  Equal Pay Act

Trawick contends Carmike violated the EPA by paying her less for director-level marketing work than it paid Sailors for director-level advertising work.  The EPA prohibits employers from paying employees "at a rate less than the rate at which [the employer] pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility."  29 U.S.C. § 206(d)(1).  "A plaintiff establishes a *prima facie* case [under the EPA] by comparing the jobs held by the female and male employees, and by showing that those jobs are substantially equal."  *Miranda*, 975 F.2d at 1533. The standard for determining whether jobs are equal is "high." *Waters v. Turner, Wood & Smith Ins. Agency, Inc.*, 874 F.2d 797, 799 (11th Cir. 1989) (per curiam).  "[J]ob titles are entitled to some weight" in an EPA analysis, but the controlling factor is "job content."  *Miranda*, 975 F.2d at 1533 (quoting *Hodgson v. Behrens Drug Co.*, 475 F.2d 1041, 1049 (5th Cir. 1073)).

Here, Trawick pointed to evidence from which a jury could find that she and Sailors performed "substantially equal" job

_____

[8] Trawick pointed to Sailors's W-2's in her supplemental summary judgment response, and it is undisputed that Carmike paid Sailors more than Trawick.

functions with respect to their individual departments. Carmike required both Sailors and Trawick to attend weekly director-level meetings on behalf of their departments, hire and manage each department's personnel, provide strategy for their departments, and present their department's annual budget. Trawick Aff. ¶ 6. Trawick and Sailors also both reported directly to the same supervisor. Nonetheless, Sailors held a director title and earned a higher salary. *Id*. ¶¶ 7-8. Just because Sailors and Trawick did these tasks for different departments does not mean that their jobs were substantially unequal as a matter of law. *See Hankinson v. Thomas Cty. Sch. Sys.*, 257 F. App'x 199, 201 (11th Cir. 2007) (per curiam) (concluding that reasonable jury could infer that high school softball coach position was substantially similar to baseball coach position for purposes of the EPA). The Court finds that Trawick has pointed to evidence from which a jury could find that she and Sailors performed substantially equal job duties for purposes of the EPA.

Carmike contends that the pay differential between Sailors and Trawick is attributable in part to Sailors's additional experience. The EPA permits pay disparities between genders when made pursuant to a "seniority system." 29 U.S.C. § 206(d)(1). Carmike promoted Sailors to director of advertising in 2004. Sailors Decl. ¶ 2, ECF No. 39-5. Trawick did not transfer into the corporate division until 2012. But other than pointing to

Trawick's and Sailors's start dates, Carmike pointed to no other evidence of how its seniority system works, how Sailors's salary increased over his tenure, or whether Sailors earned a comparable salary in 2004 in relation to Trawick's compensation in 2012. Without more information, Carmike's conclusory assertion that Sailors's eight additional years of experience justify the pay disparity does not warrant judgment as a matter of law. Therefore, Carmike's motion for summary judgment on Trawick's EPA claim is denied.

### B. Title VII Wage Discrimination Claim

Trawick's Title VII wage discrimination claim is analyzed using the *McDonnell Douglas* framework. Carmike argues that Trawick cannot establish a prima facie case because Sailors is not a valid comparator. As explained previously, the Court finds otherwise. Therefore, Carmike's motion for summary judgment on Trawick's Title VII wage discrimination claim is denied.

## III. Trawick's FMLA Claim

Trawick contends Carmike violated the FMLA by pressuring her to return to work early from maternity leave. The FMLA provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). Carmike argues that Trawick's FMLA claim should be dismissed because she suffered no damages. Trawick admits that Carmike paid

her during her leave, returned her to her same position after her leave, did not alter her bonus structure, and did not reduce her sick/vacation days because of her leave. And Trawick has pointed to no other injury or damage caused by Carmike's alleged FMLA violation. Accordingly, Carmike is entitled to summary judgment on Trawick's FMLA claim. *See Streeter v. City of Pensacola, Fla.*, 501 F. App'x 882, 885 (11th Cir. 2012) (per curiam) ("A plaintiff cannot recover under the FMLA in the absence of damages." (citing *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1284 (11th Cir. 1999))).[9]

## IV. Trawick's State Law Negligent Retention Claims

Under Georgia law, "a defendant employer has a duty to exercise ordinary care not to hire or retain an employee the employer knew or should have known posed a risk of harm to others where it is reasonably foreseeable from the employee's 'tendencies' or propensities that the employee could cause the type of harm sustained by the plaintiff." *Munroe v. Universal Health Servs., Inc.*, 596 S.E.2d 604, 606 (Ga. 2004). "A claim for negligent retention is necessarily derivative and can only survive summary judgment to the extent that the underlying substantive

---

[9] Trawick's summary judgment response attempts to recast her FMLA interference claim as a retaliation claim. *See* Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. 19, ECF No. 60. Trawick's complaint, however, clearly alleged an FMLA interference claim. Compl. ¶ 85 (alleging that Carmike "willfully and unlawfully interfered" with her exercise of FMLA leave). Trawick cannot constructively amend her Complaint in response to summary judgment.

claims survive the same." *Metro. Atlanta Rapid Transit Auth. v.*
*Mosley*, 634 S.E.2d 466, 469 (Ga. Ct. App. 2006).

Here, Trawick contends that Carmike is liable for negligent
retention because Carmike knew Passman was overly "touchy." But
Trawick brought no underlying tort claim relating to Passman's
alleged "touchiness." Therefore, her negligent retention claim
based on this conduct fails. Trawick also contends that Carmike
is liable for negligent retention because it knew Van Noy had no
female subordinates and gave "extra scrutiny" to her work. This
evidence does not demonstrate that Carmike knew or should have
known Van Noy posed a risk of gender discrimination to others.
Accordingly, Trawick's negligent retention claim against Carmike
for Van Noy's conduct fails.

## V.  Remaining Discovery Issues

Trawick continues to complain about Carmike's discovery
responses or lack thereof. Having reviewed the record, the Court
finds no discovery abuse amounting to spoliation. Accordingly,
Trawick's renewed request for spoliation sanctions is denied.
Additionally, the Court finds no basis for compelling further
discovery. It's time to move from discovery to trial.

CONCLUSION

Based on the foregoing, Carmike's motion for summary judgment
(ECF No. 39) is denied as to Trawick's wage discrimination claims
under Title VII and the EPA and granted as to her other claims.

The Court intends to try this case in June 2019. Within seven days of today's Order, the parties shall notify the Court of any scheduling conflicts during the month of June.

IT IS SO ORDERED, this 14th day of February, 2019.

S/Clay D. Land
CLAY D. LAND
CHIEF U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA